## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARY R. SCOTT, individually and** | ) | |
| **as Personal Representative of the Estate** | ) | |
| **of JONATHAN MAGBIE,** | ) | |
| | ) | |
| **Plaintiff.** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 5-1853 (RWR)** |
| | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANT DISTRICT OF COLUMBIA'S MOTION TO DISMISS

Defendant District of Columbia (District), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 12(b)(6), respectfully request that the Court dismiss this matter as to the District and enter judgment in its favor. As set forth more fully in the accompanying Memorandum of Points and Authorities, Plaintiff's complaint fails to state a claim against the District on which relief can be granted, and the District therefore is entitled to judgment as a matter of law.

Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

_____

HOLLY JOHNSON
Chief, General Litigation Section III

_____

STEVEN J. ANDERSON
Assistant Attorney General
Bar no. 334480
Suite 600S
441 Fourth Street, N.W.
Washington, D.C. 20001
(202) 727-3625 (fax) 727-2538
E-mail:  Steve.anderson@dc.gov

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARY R. SCOTT,** | ) |
| | ) |
| **Plaintiff.** | ) |
| | ) |
| **v.** | ) **Civil Action No. 5-1853 (RWR)** |
| | ) |
| | ) |
| **DISTRICT OF COLUMBIA,** *et al.* | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT DISTRICT OF COLUMBIA'S MOTION TO DISMISS

This Court should dismiss the plaintiff's complaint against the District of Columbia ("the District"), for failure to state a claim on which relief can be granted, because:

1. Plaintiff's constitutional claim (Count I) against the District has not alleged any facts to support her claim for municipal liability under *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978);

2. Plaintiff's claims under of the Americans With Disabilities Act (Count II) and the D.C. Human Rights Act (Count IV) against the District should be dismissed, because the plaintiff has not alleged any facts to suggest that the District failed to have reasonable accommodations available to Mr. Magbie, or acted with ill will toward Mr. Magbie; and

3. The District cannot be held liable for the plaintiff's allegations of medical negligence, because all such allegations refer to conduct of employees employed by independent contractors of the District, or by employees of a private hospital.

## *FACTUAL BACKGROUND*

Plaintiff Mary Scott brings this action under the District of Columbia Survival Act, D.C. Code § 12-101, *et seq.* and District of Columbia Wrongful Death Act, D.C. Code § 16-27021, *et seq.*, individually and as personal representative of the estate of her deceased son Jonathan Magbie.  Compl. ¶ 3.  In addition to the District, the complaint names several other entities as defendants, including: the Center for Correctional Health and Policy Studies, Inc. (CCHPS), the Corrections Corporation of America (CCA), and Greater Southeast Community Hospital Corporation (Greater Southeast or GSCH).  Compl. ¶ 6, 9, 14.  According to the complaint, defendants CCHPS and CCA are contractors of the District.  Compl. ¶ 6, 9.  Greater Southeast Community Hospital Corporation is a private corporation that operates a hospital.  Compl. ¶ 14.

Of the 10 individual defendants named in the complaint, only one—former Department of Corrections Director Odie Washington—was employed by the District of Columbia at the time of the alleged incident.   He has not been properly served.

According to the complaint, decedent Jonathan Magbie, who had been paralyzed from the neck down since childhood, was incarcerated for possession of marijuana on September 20, 2004, at the D.C. Detention Center (D.C. Jail, or Jail).  *Id.* ¶¶ 19-20.  Because of his paralysis, Mr. Magbie required a battery-operated pacemaker, a mechanical ventilator, a trachestomy tube, and an indwelling catheter.  *Id.* ¶ 20.

Plaintiff alleges that during Mr. Magbie's in-take at the D.C. Jail on September 20, 2004, "Mr. Magbie had a chest x-ray, the results of which indicated that he might have pneumonia." *Id.* ¶ 22.  The complaint alleges that Defendant Dr. Davis interpreted the x-ray.[1]  *Id.*  According to the complaint, "Despite the fact that Defendant Davis knew from the x-ray that Mr. Magbie

---

[1] Plaintiff states that "Defendant T. Wilkins Davis, M.D. is a radiologist providing medical services to prisoners at the Jail pursuant to the CCHPS contract with the District of Columbia."  Compl. ¶ 8.

had an in-dwelling trachestomy tube and thus was at substantially heightened risk of pneumonia, he did not request any follow-up on the abnormal x-ray for five (5) to seven (7) days." *Id.*

During the Jail in-take process, Mr. Magbie allegedly experienced difficulty breathing. Later the same day, he was transferred by the District to Greater Southeast for medical care. *Id.* ¶ 24. According plaintiff's complaint, the District only had physical custody of Mr. Magbie for a short period on September 20, 2004, before his transfer to GSCH.

Plaintiff states that, during this first stay at Greater Southeast, Mr. Magbie "was noted to be a trachestomy-dependent patient who used a ventilator at night," and that he experienced "wheezing and rails, with an oxygen saturation of 90%," "elevated white blood cell count and was acidotic." Compl. ¶ 25. Also while at Greater Southeast, Plaintiff alleges that Mr. Magbie's "glucose dropped to 56 and his blood pressure dropped to 68/48. Defendant Vaughn diagnosed hypoglycemia (low blood sugar), hypovolemia (dehydration), and respiratory distress."[2] *Id.*

Plaintiff alleges that Dr. Vaughn decided to admit Mr. Magbie to Greater Southeast "for diagnosis and treatment of these conditions after determining that the Jail infirmary did not have the capacity for ventilator support, mechanical ventilation or oxygen." *Id.* ¶ 26. Plaintiff further alleges that, after speaking with Dr. Bastien,[3] Dr. Vaughn "reversed his course of action and discharged Mr. Magbie to the CTF at the Jail, with instructions to provide him nasal oxygen via canula at night, as needed." *Id.* The discharge, however, apparently was not ordered until the following day, September 21. *Id.*

Plaintiff alleges that on September 21, Dr. Bastien informed Dr. Vaughn that the Jail could provide oxygen, but not a ventilator. Compl. ¶ 28. Dr. Bastien directed Dr. Vaughn to

---

[2] Plaintiff states that "Defendant William S. Vaughn, M.D. is a licensed physician providing emergency medical services within the District of Columbia." Compl. ¶ 15.
[3] Plaintiff alleges that "Defendant Joseph Bastien, M.D. was at all times relevant to this Complaint the medical director of CCHPS." Compl. ¶ 7.

contact Dr. Malekghasemi[4] regarding Mr. Magbie's possible transfer to the CTF infirmary.  *Id.*

Plaintiff alleges that Dr. Malekghasemi "learned no later than September 22, 2004 that Mr.

Magbie required ventilator support at night," but that Dr. Malekghasemi "failed to transfer Mr.

Magbie from the infirmary." *Id.* ¶ 29.  Despite this allegation, Plaintiff also contends that Dr.

Malekghasemi did "ask the sentencing court for an order requiring the Hospital to re-admit Mr.

Magbie." *Id.*

Plaintiff asserts that the physician admitting Mr. Magbie at the CTF infirmary was Dr.

Sunday Nwosu.[5]  Compl. ¶ 30.  Plaintiff alleges that Dr. Nwosu "did not examine Mr. Magbie's

lungs although he knew that the patient had a trachestomy and a pulmonary pacemaker and that

Mr. Magbie stated that he was ventilator-dependent at night." *Id.* ¶ 31.  Plaintiff further alleges

that although Dr. Nwosu knew that Mr. Magbie had been treated for dehydration and low blood

sugar at the Hospital, he "did not order monitoring of Mr. Magbie's fluid and caloric in-take."

*Id.* ¶ 32.  Plaintiff further states that Dr. Nwosu's admission note was not signed until September

24.  *Id.* ¶ 33.

Plaintiff claims that only licensed nurse practitioners ("LPNs") and not doctors,

monitored Mr. Magbie, and from September 21 to September 24 the LPNs "documented that Mr.

Magbie was eating almost nothing and had falling urine output."  Compl. ¶¶ 34-35.  She claims

that LPNs Pauline Ojeifo and Gbenga Ogundipe "failed to perform tracheal suctioning on Mr.

Magbie during their shifts, even though they knew that they were required to suction him to

protect him from respiratory distress." *Id.* ¶ 37.  During his confinement, Plaintiff claims that

Mr. Magbie was "placed in an infirmary room with a door that staff were able to lock" and that

---

[4] Plaintiff alleges that "Defendant Malek Malekghasemi, M.D. was at all times relevant to this Complaint the Chief Medical Officer of the CTF."  Compl. ¶ 10.

[5] Plaintiff claims that "Defendant Sunday Nwosu, M.D. was at all times relevant to this Complaint in charge of the infirmary operated at the CTF."  Compl. ¶ 11.

"[t]he room had no panic button nor any other means that Mr. Magbie could use to communicate with the staff while locked in his room, so when his cell was locked, he was completely isolated and helpless to communicate his needs." *Id.* ¶ 39. Plaintiff claims that LPN Ogundipe "displayed personal hostility towards Mr. Magbie" and failed to provide Mr. Magbie with fluids to prevent dehydration. *Id.* ¶ 40. Plaintiff asserts that CTF staff locked Mr. Magbie in his room, prevented him from receiving water, and failed to monitor his condition and that "[t]his chain of events contributed to Mr. Magbie's dehydration and subsequent respiratory crisis." *Id.* ¶ 41.

Plaintiff alleges that on the morning of September 24 Mr. Magbie "developed an acute respiratory crisis" and that the "level of oxygen in his blood fell to dangerous levels." Compl. ¶ 42. Plaintiff states that Mr. Magbie "was unable to speak intelligibly and was subsequently transferred back to the [Greater Southeast] Hospital." *Id.* At Greater Southeast, "[a]n order for a 'tracheal toilet' procedure was given and noted, but no further suctioning or other respiratory treatment was given, other than oxygen saturation readings." *Id.* ¶ 43. Hospital staff noted that Mr. Magbie's oxygen saturation levels were falling, but did not notify a physician until almost eight hours after Mr. Magbie was admitted. *Id.* Plaintiff claims that at 5:40 p.m., Dr. Iluyomade reasserted Mr. Magbie's trachestomy tube, "but failed to assess the patient's respiratory status. Suctioning was not performed, Saline was not given. An inner canula, if present, was not removed. The protruding trachestomy tube was neither removed not replaced with a smaller tube." *Id.* ¶ 44. Mr. Magbie died at 6:40 p.m. on September 24. *Id.* ¶ 45.

### STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) should be granted when it appears that, under any reasonable reading of the complaint, the Plaintiff will be unable to prove any set of facts that would justify relief. *Conley v. Gibson*, 355 U.S. 41, 45 (1957). The moving

therefore is entitled to judgment if there are no allegations in the complaint that, even if proven, would provide a basis for recovery. *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (1987).

Although the non-moving party enjoys the benefit of all inferences that plausibly can be drawn from well-pleaded allegations of his complaint, bare conclusions of law, or sweeping and unwarranted averments of fact, will not be deemed admitted for purposes of a motion under Rule 12(b)(6). *Id.* Rather, the court need not accept inferences drawn by plaintiff if such inferences are unsupported by the facts set out in the complaint, "[n]or must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Communications* Corp., 16 F.3d 1271, 276 (D.C. Cir. 1994).

## *ARGUMENT*

**I.     PLAINTIFF'S CONSTITUTIONAL CLAIM AGAINST THE DISTRICT MUST BE DISMISSED, BECAUSE THE PLAINTIFF HAS NOT ALLEGED THAT MR. MAGBIE'S INJURIES WERE CAUSED BY A POLICY OR PRACTICE OF THE DISTRICT OF COLUMBIA.**

The plaintiff's complaint alleges that the "Defendants" violated Mr. Magbie's Eighth Amendment rights, because their conduct deprived Mr. Magbie of appropriate medical care, reasonably safe housing, and basic needs such as food and water. Compl. ¶ 60. Her complaint demands relief for these violations pursuant to 42 U.S.C. § 1983.

As explained in *Monell v. Dep't of Social Servs. of the City of New York*, the District cannot be held liable for the plaintiff's constitutional claims as they are alleged in the complaint. 436 U.S. 658, 694 (1978); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985). According to the Supreme Court decision in *Monell*:

> a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom … inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694.

The Supreme Court further held in *Oklahoma City* that, "at the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *Oklahoma City*, 471 U.S. at 824.  The *Oklahoma City* decision interpreted *Monell* as holding that "municipal liability should not be imposed when the municipality was not itself at fault."  *Id.* at 818.

Since the seminal *Monell* ruling, federal courts have articulated a number of different ways in which a plaintiff can allege that a "policy" was set by a municipality to cause it to be held liable under § 1983.  First, a plaintiff can satisfy the *Monell* requirements by alleging that the municipality adopted an unconstitutional policy.  This can be done by pointing to a formally adopted policy—such as a statute or regulation—that violates the constitutional rights of the individual.  *Monell*, 436 U.S. at 694; *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  An official municipal policy also can be alleged by identifying an unconstitutional decision or action taken by an official policymaker of the municipality.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); *Baker*, 326 F.3d at 1306.

If no such facially unconstitutional municipal action exists, a plaintiff still can assert municipal liability by alleging facts suggesting that the municipality has adopted an unconstitutional policy "through a knowing failure to act by a policymaker of actions by his subordinates that are so consistent that they have become 'custom.'"  *Baker*, 326 F.3d at 1306 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)).  Finally, a plaintiff can satisfy this burden by alleging facts suggesting that the municipality failed to respond to a need in such a manner as to show "deliberate indifference" to the risk that not addressing the risk will result in unconstitutional violations.  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000).  Such claims most often appear in the

form of allegations that the municipality failed to train its employees in the face of known abuses. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *Morgan v. Barry*, 785 F. Supp. 2d 187, 195 (D.D.C. 1992).

Here, even with all reasonable inferences made in favor of the plaintiff, the complaint fails to allege any form of municipal liability that could satisfy the requirements of *Monell*. The complaint does not allege that the District of Columbia formally adopted a policy of mistreating its prisoners, nor does it claim that any District policymakers were personally aware of Mr. Magbie's plight or had any personal involvement in his treatment while he was incarcerated.[6]

Instead, the plaintiff relies on an allegation that the District failed to adopt the appropriate policy. The complaint alleges that the Director of the Department of Corrections, defendant Odie Washington, "despite knowledge that adequate policies were required to assure that no prisoners were kept in custody for whom the Department of Corrections lacked safe housing … failed to promulgate or implement such policies," and therefore "failed to provide reasonable policies for assuring medical care, basic needs and reasonably safe housing for persons suffering from paralysis and related disabilities." Compl. ¶ 47, 51.

Plaintiff's broad and conclusory allegations cannot support a claim for municipal liability. First, these sweeping statements are flatly contradicted by the allegations in the complaint, and the documents incorporated by reference into the complaint. Furthermore, such a failure cannot, in and of itself, lead to an inference of a municipal policy or custom sufficient to satisfy the standards set forth in *Monell* and its progeny.

---

[6] Although the complaint takes pains to allege that the Director of the Department of Corrections, defendant Odie Washington, was a policymaker for the District, it does not allege that Mr. Washington had any direct knowledge of Mr. Magbie's incarceration or had any direct involvement with his treatment or care. Compl. ¶ 5.

**A.    The District Adopted Legally Sufficient Policies to Assure Medical Care and Basic Needs for its Inmates.**

Despite the plaintiff's broad allegation that the District failed to provide reasonable policies to assure proper inmate care, this sweeping and conclusory statement is contradicted by the detailed facts set forth in the complaint. According to the complaint, the District has entered into a contract with CCHPS to provide medical care provided to prisoners housed in the Jail and at CTF. Compl. ¶ 6. The complaint also alleges that the District entered into a contract with CCA to house prisoners at the CTF. Compl. ¶ 9.

Because the complaint identifies these contracts, the contract documents can be deemed a part of the complaint. A document is not considered "outside the pleading" for purposes of Rule 12(b) "if the complaint specifically refers to the document and if its authenticity is not questioned." *Molina v. Los Angeles County*, 58 Fed. Appx. 311, 313 (9th Cir. 2003); *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994).

The District's contracts with CCHPS and CCA clearly indicate that the District included provisions aimed at insuring that inmates would be provided with proper medical care and safe housing.

Specifically, the District's contract with CCA provides that CCA "shall operate, maintain and manage the CTF in compliance with this agreement and all applicable provisions of the Constitution and the laws of the United States and the District, the ACA (American Correctional Association) Standards, Court Orders, the Requirements, the Solicitations, the Operator's Proposal and DOC policies. (collectively, the "Operating Standards")…." Exh. 1, CAA's Contract with DC, Art. 5, §5.1 at 10.[7] Clearly, the District was not deliberately indifferent to the

---

[7] The citation is to the original 1997 CCA contract which has been subject to several amendments, which have not altered this language.

operational standards of CCA because it required that it be operated according to acknowledged industry standards.

As is discussed below, when plaintiff's decedent was incarcerated at CTF, CCA no longer was responsible for providing medical care at CTF. See Exh. 2, Modification # 4 to CCA's 1997 Contract[8]. That responsibility was assumed by CCHPS pursuant to its contract with the District. See Exh. 3, Modification #12, to CCHPS' contract with the District which provides at ¶ 2, that CCHPS "shall provide medical and mental health service to approximately 3200 inmates at the Department of Corrections, Central Detention Facility and Central Treatment Facility at the rate of $13 *per diem* for the period March 12, 2004 through March 11, 2005."

The District's master contract with CCHPS, attached as Exh. 4, includes detailed requirements for the timeliness and quality of medical care inmates at D.C. Jail receive. See Generally, §III of the CCHPS Contract, Ex. 4, which provides that new inmates will be given in-take physical examinations within 24 hours, mental health services and RN sick call twice a week. The contract provides that "all non-lockdown inmates requesting assessment must be seen within one workday of the receipt of the request." *Id.* at 14. The contract requires on-site specialty clinics for D.C. Jail inmates in Cardiology, Dermatology, Gynecology, Neurology, Ophthalmology, Optometry, Oral Surgery, Orthopedics, General Surgery, Podiatry, and Pulmonary medicine. *Id.* at 16. The contract includes detailed requirements for staff qualifications at CCHPS, Attachment B, and requires that CCHPS maintain "copies of current professional licenses, privileges and/or proof of professional certification…." *Id.* at 46.

---

[8] The first page of Modification # 4, deletes §5.4.5 of the Master Agreement and that "The District shall assume all liability for the provision of all medical services for inmates housed at the (CTF) facility."

Hence, the Contracts between the District and its subcontractors reflect that the District was very concerned with the quality of medical care provided inmates and disprove plaintiff's contrary conclusions.

### B. The Complaint Has Not Alleged Facts to Support a Claim that the District Was Deliberately Indifferent to a Risk Its Subcontractors Would Violate Their Contracts and Thereby Violate Inmate's Constitutional Violations.

In the alternative, even if the policies embodied in the aforementioned contracts were not incorporated into the complaint, the plaintiff's complaint still fails include allegations of municipal liability sufficient defeat the District Rule 12(b)(6) motion. The complaint simply does not allege that the District's failure to provide such policies was due to the District's deliberate indifference to a known problem with constitutional violations comparable to those alleged by the plaintiff in this lawsuit. Furthermore, even if the plaintiff had made such a sweeping allegation, the complaint does not allege any facts that could support such an inference. As such, the § 1983 claim against the District is facially invalid, fails to state a claim on which relief can be granted, and must be dismissed.

The D.C. Circuit Court of Appeals has held that, to show an informal custom or practice of unconstitutional conduct, the plaintiff must allege that a policymaker "knew of or disregarded a practice" of unconstitutional behavior by its employees. *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997). Furthermore, such a practice or custom must be "longstanding," and must constitute the "standard operating procedure" of the local government entity. *Id.* at 1454 (quoting *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989)). As a D.C. District Court judge explained, "This deliberate indifference requires a high degree of fault. 'Only where a failure to train reflects a "deliberate" or "conscious" choice by a

municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under § 1983.'"  *Morgan*, 785 F. Supp. 2d at 195 (quoting *Harris*, 489 U.S. at 389).

In *Milligan v. City of Newport News*, the Fourth Circuit affirmed dismissal of a § 1983 complaint against a municipality because the claim failed to allege any facts that could support an inference that the city had adopted a tacit custom of unconstitutional conduct.  743 F.2d 227, 230 (4th Cir. 1984).  The court explained:

> While the complaint alleges in legal, conclusory terms that the City was "grossly negligent" in failing adequately to train its personnel and that this exhibited "callous disregard" for Milligan's constitutional rights, there are no factual allegations of known, widespread conduct by its employees comparable to that alleged as to Milligan, *cf. Wellington v. Daniels*, 717 F.2d 932 (4th Cir. 1983), nor could the facts alleged support the conclusion that the conduct charged as to Milligan was part of a known course of conduct by city employees having manifest potential for causing constitutional deprivations to an identifiable group of persons occupying a special relationship to the state, *cf. Avery v. County of Burke*, 660 F.2d 111, 114 (4th Cir. 1981). There is, accordingly, no properly pleaded allegation of the existence of a "policy, practice or custom" upon which municipal liability for the deprivations allegedly suffered by Milligan could be based.

*Id.* (footnotes omitted).

The *Milligan* court also noted that a mere failure to adopt a policy that might have prevented the constitutional violation cannot be sufficient to satisfy *Monell*, writing, "municipal liability may not be rested simply upon a failure to adopt policies that in retrospect can be seen to be a means by which particular unconstitutional conduct of its employees might have been averted."  *Id.*, citing *Polk County v. Dodson*, 454 U.S. 312, 326 (1981).  Other courts have concurred with this analysis.  *See, e.g., Grandstaff v. Borger*, 767 F.2d 161, 169 (5th Cir. 1985) ("It is not enough that the city could, but does not, reduce the risk of harm to the plaintiff."); *Kirk v. Hesselroth*, 707 F. Supp. 1149, 1153 (D. Cal. 1988) (quoting *Milligan* language set forth above).

14

To state a claim for municipal liability based on a failure to promulgate policies to prevent certain unconstitutional conduct, a plaintiff must allege facts to support a claim rising to the level of deliberate indifference. Therefore, to survive a motion to dismiss on such a claim, a plaintiff must allege facts suggesting that there was a need for such policies, a need serious enough that a failure to adopt such policies was likely to result in violations of prisoners' constitutional rights. The plaintiff also must allege facts suggesting that the municipality was aware of such a need. *See, e.g., Baker*, 326 F.3d at 1306-07 (reversing 12(b)(6) dismissal because plaintiff *had* properly alleged that, "that had the District of Columbia contract monitor done its job competently the District of Columbia would had to have known that the Virginia Department of Corrections has contracted out its medical services to a notoriously 'incompetent' health care provider and had nonetheless 'deliberately' allowed this to continue by not maintaining supervision"); *Scott v. District of Columbia*, No. 98-1645 (HHK), 1999 U.S. Dist. LEXIS 21616, *18-19 (D.D.C. 1999) (denying 12(b)(6) motion because plaintiff had specifically alleged that the District deliberately sent its most violent prisoners to Ohio correctional facility, despite agreement that only minimum security prisoners were to be transferred to the facility).

The D.C. Circuit has held that, to state a claim for municipal liability under § 1983, "the district court should have determined whether Baker's complaint stated a claim that a policy or custom of the District of Columbia caused the constitutional violation alleged under the first prong." 326 F.3d at 1306. According to the court, to state a claim of a policy or custom by alleging deliberate indifference, the district court should have "analyz[ed] whether the municipality knew or should have known of the risk of constitutional violation." *Id.* at 1307. Here, the plaintiff's complaint contains no allegations to satisfy this standard.

1. <u>The complaint does not allege any wrongdoing on the part of the District of Columbia or its employees with regard to Mr. Magbie's care.</u>

First, it is important to note that the complaint does not allege any facts that suggest that the District or any of its employees or agents themselves violated the plaintiff's Eighth Amendment rights. The Eighth Amendment prohibits the infliction of cruel and unusual punishments on those convicted of crimes. In 1976, the Supreme Court first acknowledged that the provision could be applied to some deprivations that were not specifically part of the prison sentence, but were suffered during imprisonment. *Estelle v. Gamble*, 429 U.S. 97 (1976).

For an inmate to suffer an Eighth Amendment violation, the deprivation alleged must objectively result in the denial of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (*quoting Rhodes v. Chapman*, 452 U.S. at 347). The D.C. Circuit Court of Appeals has held that "the 'deprivations' that trigger Eighth Amendment scrutiny are deprivations of essential human needs." *Women Prisoners of the District of Columbia Department of Corrections v. District of Columbia*, 93 F.3d 910, 928 (D.C. Cir. 1996) (*quoting Occoquan v. Barry*, 844 F.2d 828, 836 (D.C. Cir. 1988)). The plaintiff is trying to convert an case of medical negligence into a constitutional claim. However, the Supreme Court has repeatedly held that negligence alone does not violate the constitution.

The Supreme Court has developed a two-prong test to determine when prison conditions violate the Eighth Amendment. First, the alleged deprivation must be sufficiently serious, meaning that the prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (*quoting Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Second, the prison official must have a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. at 834 (*quoting Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

To state a claim for cruel and unusual punishment in the medical context, it is well-settled that the plaintiff must allege, at a minimum, "deliberate indifference to serious medical needs" or conduct that amounts to "unnecessary and wanton infliction of pain." *Cox v. District of Columbia*, 834 F.Supp. 439, 441 (D.D.C. 1992). Furthermore, "in order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 442.

Here, the plaintiff's complaint does not allege any conduct on the part of the District or its employees that can lead to an inference of such misconduct. The complaint merely states that Mr. Magbie went through an "in-take process" on the day he arrived at the Jail, which included at least some medical screening performed by an employee of CCHPS. That same day, when Mr. Magbie told the medical staff that he was having difficulty breathing and that he needed a ventilator, he was transferred to a hospital for additional medical care. Compl. ¶ 22, 24.

The complaint contains no other allegations that even hint at misconduct on the part of the District or its employees. After spending the night at Greater Southeast, the plaintiff was discharged "to the CTF," where he was placed in the CTF infirmary.[9] Compl. ¶ 26, 28. The plaintiff explicitly alleges that this discharge was "ordered and approved" by Dr. Iluyomade, a physician working at Greater Southeast. Compl. ¶ 26, 44. The plaintiff also admits that CTF is operated by CCA, a private, for-profit corporation. Compl. ¶ 9.

None of these allegations can lead to an inference that the District of Columbia or its employees were deliberately indifferent to Mr. Magbie's medical needs. In fact, the facts show precisely the opposite to be true; the District clearly addressed the plaintiff's unique medical needs in a timely manner. First, as part of his in-take process, the plaintiff was seen by medical

---

[9] According to the complaint, Mr. Magbie remained in the CTF infirmary until he again was transferred to Greater Southeast on September 24, 2005, where he eventually died. Compl. ¶ 28-43.

staff employed by an independent contractor, CCHPS.  Furthermore, according to the plaintiff, as soon as the District was made aware of the plaintiff's need for a respirator, the plaintiff was transferred to a hospital for further medical care.  Based on these facts—which are all that are alleged with regard to the District's conduct—the plaintiff does not allege unconstitutional conduct on the part of the District of Columbia employees amounting to cruel and unreasonable punishment.

The plaintiff also alleges that the District denied Mr. Magbie reasonable accommodations in the form of reasonably safe housing, and basic needs such as food and water.  Again, the facts alleged in the complaint do not support a claim against the District.  According to the complaint, as soon as Mr. Magbie informed the medical staff at the D.C. Jail that he needed a ventilator to breathe at night, he was transferred to Greater Southeast for further care.  Compl. ¶ 24.  Even if it could be inferred that decisions regarding Mr. Magbie's care while he was housed at the Jail were made by Jail officials, as opposed to the CCHPS medical staff, this conduct simply cannot have deprived Mr. Magbie of "reasonably safe housing in light of his disabilities."  After all, a hospital arguably represents safest possible housing that the District could provide to Mr. Magbie.  As there are no facts alleged suggesting that any other decisions regarding Mr. Magbie's placement were made by the District or any of its employees, there cannot be a claim that the District acted in a manner that denied Mr. Magbie safe housing.

Similarly, the claim that Mr. Magbie was deprived of food and water is not supported by any allegations of misconduct on the part of the District.  The entirety of plaintiff's allegations with regard to such depravations concern Mr. Magbie's stay in the CTF infirmary which is run by CCA pursuant to its contract with the District.  Compl. ¶ 40-41.

2.      The complaint does not allege facts suggesting that the District was deliberately indifferent to known risks that the contractors were violating prisoners' constitutional rights in a manner similar to that allegedly suffered by Mr. Magbie.

The complaint also does not make any factual allegation from which is can be inferred that the District was deliberately indifferent to its prisoners' constitutional rights when it contracted with independent contractors for the housing and care of inmates.  Nowhere does the complaint allege that CCHPS or CCA, or even Greater Southeast, had a history of violating prisoners' constitutional rights in a manner comparable to the violations alleged by Mr. Magbie.  Nowhere does the complaint present facts to suggest that, had such a history existed, the District was aware of a risk that constitutional violations similar to those allegedly suffered by Mr. Magbie would result from the District's inaction.

With regard to the District's policies or customs, the plaintiff merely alleges that defendant Odie Washington, "despite knowledge that adequate policies were required to assure that no prisoners were kept in custody for whom the Department of Corrections lacked safe and appropriate medial services, failed to promulgate or implement such policies."  Compl. ¶ 51.  The complaint further alleges that the District's agents and employees "acted pursuant to a policy or custom of accepting prisoners who, because of disabilities and medical needs, could not safely be confined at the Jail or CTF."  *Id.*  This sweeping language, in and of itself, does not assert that the District was deliberately indifferent to a known risk that such a failure was likely to cause constitutional violations similar to those allegedly suffered by Mr. Magbie.  *Milligan*, 743 F.2d at 230; *Grandstaff*, 767 F.2d at 169.

Furthermore, the facts that are alleged in the complaint clearly contradict the plaintiff's sweeping allegation that the District "failed to promulgate" policies regarding "accepting custody" of persons who need medical care not available at the Jail or CTF.  Compl. ¶ 51.

According to the complaint, a prisoner not able to be treated by CCHPS—the medical provider for both the Jail and CTF—could be transferred to stay in a hospital. This is precisely what happened to Mr. Magbie when he first had trouble breathing at the Jail. Compl. ¶ 24. The complaint certainly does not suggest that a hospital does not constitute "reasonably safe housing" for someone with Mr. Magbie's health care needs.

Furthermore, plaintiff does not allege that the District's policies regarding hospital housing for its prisoners had anything to do with the relevant physicians' decisions to return Mr. Magbie to the CTF infirmary after the District transferred him to Greater Southeast. The plaintiff does not allege that the District's policies regarding prisoner hospitalization put any limitations on the length of a prisoner's hospital stay, or on the treatment available to a prisoner while at a hospital.

Instead, the plaintiff affirmatively asserts that the decision to return Mr. Magbie to CTF was made by physicians at Greater Southeast, perhaps influenced by assurances by a physician working for CCHPS. There is no room for inference in the complaint that these decisions were based on District of Columbia policy regarding prisoner hospitalization. Even making all reasonable inferences in favor of the plaintiff, the plaintiff has merely alleged that the Greater Southeast and CCHPS physicians' decision that Mr. Magbie could be treated at the CTF infirmary was flawed. According to the strict language of *Monell* and the cases interpreting that standard, the District cannot be held liable for the medical negligence of its medical providers. It also cannot be held vicariously liable for the unconstitutional acts of its agents or independent contractors.

Simply put, the complaint fails to make any allegations that can support a finding of municipal liability under *Monell* and its progeny. The complaint merely alleges that the District

20

failed to have policies in place that might have ensured better care for Mr. Magbie.  Compl. ¶ 47.

This allegation cannot support a § 1983 claim against the District, and all constitutional claims

against the District (Count I) must be dismissed pursuant to Rule 12(b)(6).

II.    **THE PLAINTIFF'S ADA AND DCHRA CLAIMS MUST BE DISMISSED, BECAUSE THE DISTRICT HAD REASONABLE ACCOMMODATIONS IN PLACE FOR MR. MAGBIE, AND IT DELEGATED THE PROVISION OF THOSE ACCOMMODATIONS TO AN INDEPENDENT CONTRACTOR.**

Count II of the plaintiff's complaint alleges that the District of Columbia violated Title II

of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131.  Count IV of the complaint

alleges that the District violated the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-

1402.67, 2-1402.73, and 2-1402.16.[10]  Both of these claims rest on the plaintiff's allegations that

Mr. Magbie suffered a disability, and that he "was excluded from services provided by

Defendants for which he was otherwise eligible including basic provisions such as food and

water and reasonably safe housing, by reason of his disability."  Compl. ¶ 46.  The complaint

seeks monetary relief for these alleged violations.

The plaintiff's disability claims against the District must be dismissed for failure to state

an actionable claim.  First, the plaintiff does not state an actionable claim for money damages,

because the complaint does not allege that the District of Columbia or its employees had any

animus or ill will toward Mr. Magbie which influenced their treatment of him.  Second, the

---

[10] Numerous provisions of the DCHRA are similar, if not identical, to federal statutes.  In situations where the DCHRA provision coincides with federal statute, cases interpreting the federal statute are deemed applicable to the DCHRA.  *See Redman v. Kelty*, 795 A.2d 684, 688 (D.C. 2002); *Teru Chang v. Inst. for Public-Private P'ships, Inc.*, 846 A.2d 318, 324 (D.C. 2004) ("Because the DCHRA definition of "disability" closely resembles the definition of disability found in the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102 (2) (2000), 'we have considered decisions construing the ADA as persuasive in our decisions construing comparable sections of [the] DCHRA.'"  Similarly, the D.C. Court of Appeals has held that, "In deciding cases brought under the [DCHRA] Act, we follow the allocations of burdens and order of proof for cases brought under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* (1982)."  *American University v. District of Columbia Commission on Human Rights*, 598 A.2d 416, 422 (D.C. 1991); *see also Hung Van Dang v. Inn at Foggy Bottom*, 85 F. Supp. 2d 39, 41 (D.D.C. 2000).  The D.C. Circuit Court of Appeals has acknowledged this standard.  *Mungin*, 116 F.3d 1549, 1553 (D.C. Cir. 1997).

plaintiff's allegations clearly indicate that the District did have reasonable accommodations in place to provide for full and complete care of Mr. Magbie.[11]

**A.    The Plaintiff Has Not Alleged that the District's Treatment of Mr. Magbie Was Motivated by Ill Will or Discriminatory Animus.**

It is well-settled that, in order to obtain money damages as a remedy for an alleged violation of Title II of the ADA, "plaintiff would need to show not only that there was a violation, but that such violation was motivated by either discriminatory animus or ill will stemming from plaintiff's disability." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 89 (2d Cir. 2004); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 288 (2d Cir., 2003); *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 112 (2d Cir. 2001); *Midgett v. Tri-County Metro. Transp. Dist.*, 254 F.3d 846, 851 (9th Cir. 2001).

Plaintiff's complaint fails to allege facts to satisfy this standard.  The complaint does not allege that the District acted with discriminatory animus or ill will toward Mr. Magbie based on his disability.  Instead, it merely states that the District "failed to make reasonable accommodations" to properly care for Mr. Magbie.  Compl. ¶ 48.  This allegation fails on its face.

Furthermore, no facts in the complaint could support an allegation that the District acted with ill will or discriminatory animus toward Mr. Magbie.  The complaint merely states that Mr. Magbie went through an "in-take process" on the day he arrived at the Jail, which included at least some medical screening performed by an employee of CCHPS.  The same day that Mr.

---

[11] In the alternative, plaintiff's claims under D.C. Code § 2.1403.16 (2001 ed.) must be dismissed because the D.C. Jail is not a "place of public accommodation" within the meaning of that statute. § 2.1403 specifically excludes from its coverage "any institution .... which is in its nature distinctly private ...." See for example, *Adams v. Hitt Contr., Inc.*, -- F. Supp. 2d --, 2005 U.S. Dist. LEXIS 16872 (D.D.C. 2005), holding that construction site was not a "place of public accommodation."  The D.C. Jail is not open to the public.  Rather, "Congress created the D.C. Jail, the workhouse at Occoquan, and the reformatory at Lorton for the express purpose of housing those persons convicted of crimes in the District and those persons detained prior to trial in the courts of D.C." *United States v. District of Columbia*, 703 F. Supp. 982, 989 (D.D.C. 1988).

Magbie told the medical staff that he was having difficulty breathing and that he needed a ventilator, he was transferred by the District to a hospital for medical care. Compl. ¶¶ 22, 24. The complaint contains no other allegations that hint at misconduct on the part of the District or its employees. After spending the night at Greater Southeast, the plaintiff was discharged "to the CTF," by GSCH medical staff. At CTF he was placed in the infirmary and returned to the physical custody of the District. Compl. ¶ 26, 28.

None of these allegations lead to an inference that the District of Columbia or its employees had any discriminatory animus toward Mr. Magbie. In fact, the facts show precisely the opposite; the District was concerned about the plaintiff's unique medical needs. As part of his in-take process, the plaintiff was seen by medical staff employed by an independent contractor, CCHPS. Then, as soon as the District was made aware of the plaintiff's possible need for a respirator, the plaintiff was transferred to a hospital for further medical care. Therefore, the plaintiff's claim that the District deprived Mr. Magbie of "reasonably safe housing" is belied by the plaintiff's own allegations. Compl. ¶ 46. The hospital arguably represents *safest* possible housing the District could provide to a disabled inmate such as Mr. Magbie. As there are no facts alleged suggesting that any other decisions regarding Mr. Magbie's placement were made by the District or any of its employees, there clearly cannot be a claim that the District failed to provide Mr. Magbie with safe housing.

Similarly, the claim that Mr. Magbie was deprived of food and water does not arise out of any allegations of misconduct on the part of the District. The entirety of plaintiff's allegations with regard to such depravation arises out of Mr. Magbie's stay in the CTF infirmary. Compl. ¶ 40-41. The plaintiff's ADA and DCHRA claims with regard to depravation of food and water therefore do not state an actionable claim against the District of Columbia.

**B.    The Facts Clearly Show that the District Had Policies In Place to Provide Accommodations to Disabled Inmates.**

The complaint rests its ADA and DCHRA claims against the District on the allegation that the District "failed to make reasonable accommodations in policies, practices, and procedures to enable Jonathan Magbie to participate fully and equally in the Jail and CTF's public services, programs and activities," such as "food and water and reasonably safe housing." Compl. ¶¶ 46, 48.

However, according to the factual allegations in the complaint, the District did have a policy establishing accommodations for Mr. Magbie's disabilities. The facts in the complaint clearly show that any prisoner not able to be treated by CCHPS—the medical provider for both the Jail and CTF—could be transferred to a hospital. This procedure was applied to Mr. Magbie when he first complained of troubled breathing. Compl. ¶ 24. The complaint certainly does not suggest that transferring a prisoner to the hospital fails to accommodate a handicapped inmate's need for the public service of "reasonably safe housing."

It is important to note that the plaintiff does not allege that the District's purported failure to provide accommodations for disabled inmates was related to the relevant physicians' decisions to return Mr. Magbie to the CTF infirmary after he had been discharged from Greater Southeast. Instead, the plaintiff asserts that the decision to return Mr. Magbie to CTF was made by a physician at Greater Southeast, perhaps influenced by assurances by a physician working for CCHPS. Compl. ¶ 26. Even making all reasonable inferences in favor of the plaintiff, the plaintiff merely has alleged that the Greater Southeast and CCHPS physicians' decision that the CTF could handle Mr. Magbie's needs was incorrect. This cannot be the basis for a monetary damage claim under Title II of the ADA or the DCHRA against the District of Columbia.

III. **THE PLAINTIFF'S NEGLIGENCE CLAIM AGAINST THE DISTRICT MUST BE DISMISSED, BECAUSE ALL ALLEGATIONS OF NEGLIGENCE ARISE OUT OF THE CONDUCT OF ONE OR MORE OF ITS INDEPENDENT CONTRACTORS.**

### A. Introduction

Above, the District has shown why plaintiff's federal and constitutional claims fail to state a basis for relief. Below, the District demonstrates that Plaintiff's common law claims against the District must be dismissed because the tortuous conduct alleged was committed by the District's independent contractors, for whose conduct the District is not vicariously liable. Rather, the District delegated its responsibility for providing medical care to D.C. Jail inmates such as plaintiff's decedent to two of its independent contractors, Greater Southeast Community Hospital (GSCH) and to Center for Correctional Health Policy and Studies, Inc. (CCHPS).

If the medical negligence alleged occurred, GSCH and CCHPS are responsible, not the District. Plaintiff's complaint also includes claims based on the conduct of the CTF correctional staff. However, these claims concern the conduct of CCA employees. CCA is another independent contractor of the District. Therefore, the District is not liable for their employees' conduct either.

### B. The Allegations in Plaintiff's Complaint

According to plaintiffs' complaint, plaintiff's decedent arrived at D.C. Detention Center ("D.C. Jail") on September 20, 2004, where an in-take medical history was given and a chest x-ray taken. Complaint ¶¶ 21-2. The D.C. Jail is operated by the District. Complaint ¶ 4. Later on September 20, 2004, after he "experienced difficulty breathing," and "told jail officials he needed a ventilator to breathe at night," plaintiff's decedent was transferred from the Jail to GSCH. Complaint ¶ 4.

After September 20, 2004, Mr. Magbie never returned to the District's custody before September 24, 2004, when died at GSCH. According to plaintiff's complaint, the medical care Mr. Magbie received at GSCH and the Correctional Treatment Facility (CTF) after he left the D.C. Jail, was inadequate and caused his death. Plaintiff's complaint appears to allege that the District is liable for the treatment decedent received by providers employed by CCHPS, GSCH and CTF.

Plaintiff's common law medical negligence claim, Count, III, alleges that "Jonathan Magbie enjoyed the status of a medical patient/provider relationship, and relied upon the care, skill and judgment" of the defendants, including the District, "who provided or failed to provide treatment to him." Complaint ¶ 67. The Complaint also alleges that the District "had a duty to treat Mr. Magbie with the same degree of skill care or knowledge which a reasonable and prudent person of the medical profession would have exercised under the same or similar circumstances." Complaint ¶ 68.

If the negligence alleged occurred it was by employees of independent contractors of the District, specifically, CCA, CCHPS, or GSCH. The District is not the employer of the employees that provided medical care to plaintiff's decedent at GSCH or CTF and is therefore not liable for these employees' torts.

Plaintiff's Complaint also alleges that medical providers at D.C. Jail failed to provide proper care for decedent on September 20, 2004. *See* Complaint § A. However, the District has contracted with CCHPS to provide medical care to inmates at the D.C. Jail. The only breach in the standard of care alleged to have occurred at the D.C. Jail concerns x-rays taken of Mr. Magbie during in-take processing. Plaintiff's complaint suggests that the failure to follow-up on plaintiff's allegedly abnormal x-rays lead to his death. Complaint ¶ 22. According to plaintiff's

complaint, Dr. T. Wilkins Davis, MD, a radiologist, was medically negligent in failing to provide proper follow-up for the in-take x-rays.   Complaint ¶ 22 and Count III.

However, Dr. Davis was not an employee of the District.  Rather, as alleged in plaintiff's complaint, he was an employee of the CCHPS, the District's independent contractor that provided medical care for inmates at the D.C. Jail and CTF.  Complaint ¶ 8. Therefore, the District is not vicariously liable for Dr. Davis' alleged malpractice which occurred at the D.C. Jail.

Likewise, plaintiff alleges that the Dr. Bastien, MD, was the Medical Director for CCHPS.  Complaint ¶ 28.  As an employee of an independent contractor, not the District, the District is not vicariously liable for Dr. Bastien's alleged torts either.

### C. CCHPS Is An Independent Contractor of the District

The general rule in the District of Columbia is that the employer of an independent contractor is not liable for the torts of the contractor.  *See, e.g.*, *District of Columbia v. Howell*, 607 A.2d 501, 504 (D.C. 1992) ("An employer generally is not liable for injuries caused by an independent contractor over whom (or over whose work) the employer has reserved no control.") citing *Levy v. Currier*, 587 A.2d 205, 209 (D.C. 1991)("[W]hen [someone] hires another to do certain work, reserving no control over either the work or the workmen, a relationship of contractee and contractor exists [as opposed to master and servant] and the contractee is not liable for injuries to a third party resulting from the work of the independent contractor.") *See also WMATA v. L'Enfant Plaza Prop. Inc.*, 448 A.2d 864 (D.C. 1982)("general rule is that an individual or corporation is not liable for injuries resulting from work of an independent contractor.")

This rule is based, in part, on the principle that the employer should not be held liable "for activities they do not control and, in many instances, lack the knowledge and resources to direct." *Wilson v. Good Humor Corp.*, 757 F.2d 1923, 1301 (D.C. Cir. 1965). "Under the doctrine of respondeat superior, an employer may be held liable for the acts of its employees committed within the scope of their employment." *Boykin v. District of Columbia*, 484 A.2d 560, 561 (D.C. 1984). To establish liability under this theory, a plaintiff need only prove that the wrongdoer was acting within the scope of his employment and that the wrongful action or omission of the wrongdoer proximately caused the plaintiff's injury. *Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C. 1951).

CCHPS was medical provider originally retained to provide medical care at the D.C. Jail. Later, medical care for inmates at CTF was included in the contract between the District and CCHPS. Hence, on January 28, 2000, Dr. Ronald Shansky, MD, "in his capacity as Receiver for Medical and Mental Health Services at the D.C. Central Detention Facility ("Receiver") and the Center for Correctional Health and Policy Studies ("CCHPS") a District of Columbia not for profit," entered into a year long contract pursuant to which, CCHPS agreed to provide "comprehensive medical services to be provided primarily at the D.C. Central Detention Facility." Exh. 4, at bate stamped page 308.

Although, this agreement was for a year, it provided that it could be renewed for up to five years, at the option of the contractor. When the U.S. District Court ended its receivership of the medical care at the D.C. Jail, the District assumed the CCHPS contract and it was in-place on September 20, 2004, while plaintiffs' decedent was incarcerated there. See Exh. 2, Modification #12 to contract DCFRA#00-C-039.

CCHPS' contract with the District is alleged in plaintiff's complaint and therefore may properly be considered by the Court to be incorporated into the Complaint. *See* Fed. R. Civ. P. 10(c). In the instant case, plaintiff has alleged that CCHPS provided medical care to "prisoners in the Jail" … "pursuant to a contract for services with the District of Columbia." Complaint ¶ 6. Plaintiff's complaint also alleges that "Defendant T. Wilkins Davis, M.D. is a radiologist providing medical services to prisoners at the Jail pursuant to the CCHPS contract with the District of Columbia." Complaint ¶ 8. Rule 10(c) allows the District to move under FED. R. CIV. P. 12(b)(6) to dismiss plaintiff's complaint based on the terms of its contract with CCHPS without converting its motion into one for summary judgment under FED. R. CIV. P. 56. The same is true of the contracts the District had with CCA and GSCH. They form the basis of plaintiff's complaint and are therefore incorporated therein.[12]

The contract between the District and CCHPS provided that CCHPS would provide "comprehensive medical and mental health services" to "all populations assigned to the CDF." Exh. 1 at 10. The contract further provides at §A(1)(i) that CCHPS will provide,

> A. In-take Health Assessment…( including) 1(i) Medical personnel review of chest x-ray, laboratory and tuberculosis skin test results within 72 hours of in-take. Appropriate referrals for follow-up or further evaluation are required.

Exh. 1, at 7R (RFP issued June 17, 1999/as Amended December 3, 1999). Hence, it is clear that the responsibility for providing following upon on Mr. Magbie's  on September 20, 2004, x-ray had been delegated by the District to CCHPS and its employees. The alleged failure to follow-up on the x-rays taken at the D.C. Jail is plaintiff's only allegation of negligence which occurred at the Jail.

The contract between the District and CCHPS also demonstrates that CCHPS was an independent contractor. The leading case in this jurisdiction setting out the test for determining

the existence of a master-servant relationship, as opposed to independent contractor status, lists the following factors to be considered:

> (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer.  Standing alone, none of the indicia, excepting (4), seem controlling in the determination as to whether such relationship exists.  The decisive test ... is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done.

*LeGrand v. Insurance Co. of N. America*, 241 A.2d 734, 735 (D.C. 1968)(citation omitted).

The CCHPS contract with the District is a "Firm fixed-price contract."  § VI Exh. 2 at 43R.  It provides that the "price established at award will constitute the total amount to the Contractor to perform the Scope of Work set forth in the Contract."  *Id.*  This type of payment arrangement is indicative on a contractor/contractee relationship as opposed to an employer/employee relationship where hourly wages are likely to be the payment arrangement.

The Contract between CCHPS and the District also provides that "The Contractor is an independent contractor.  The Contractor's employees, agents and servants are not employees, agents or servants of the DOC (Department of Corrections) or the District."  Exh. 4, Request for Proposals (RFP) §B,¶18 at 52R.[13]  It further provides that "The Medical Director (of CCHPS) will have final local authority for the hiring or retention of all (CCHPS) personnel."  Exh. 1, §§I.(1)&(4), (Exh. 4 at 39R), and that "The contractor shall, at all times, maintain the staff required by the RFP."  Exh. 4, § X(B)(13) at 51R.  The Contract indicates that CCHPS "is responsible for credentialing and certification of the staff at the CDF" (*Id.*§ I(6)), and that CCHPS is responsible to assure that clinical personnel selected by CCHPS "attend 40 hours of Continuing Education Training annually," *Id.*.   Under its contract CCHPS is required to maintain personnel records

---

[13] The District's contract incorporates the terms of its RFP into the agreement.

and payroll records for its employees at the D.C. Jail. *Id.* at § I(8) at 40R. The CCHPS contract

with the District provides that CCHPS will be,

> Liable for any loss, cost, claim, personal injury, death and any other damage, including
> incidental and consequential, that may be done or suffered by reason the Contractor's
> negligence.

Exh. 1, § X(B)(3) at 50R.

Hence, it is clear that the District does not have the right to "control or direct" CCHPS

employees under the contract. The District does not select/hire CCHPS employees, does not pay

their wages, maintain their personnel files nor is it contractually responsible for their torts. Even

viewing the facts most favorably to the plaintiff, it is clear that CCHPS is an independent

contractor of the District. Therefore, the District is not liable for the alleged medical malpractice

of CCHPS employees, including Dr. Bastien, Dr. Wilkins, Dr. Nwosu, Dr. Malekghasmi, or

nurses Ojelfo and Ogundipe. See Complaint ¶¶ 6-12.

This circumstances that surround plaintiff's claim against the District based CCHPS'

employees' alleged negligence are similar to those presented in *Schlosser Co., Inc. v. Maryland*

*Drywall*, 673 A.2d 647. *Schlosser* held that the District could not be held liable for injuries

caused by the negligence of an independent contractor, even though the injury occurred on

District of Columbia property. The court held that the District had delegated any obligation it

had to make the construction site safe to an independent contractor.

Similarly, in *Herbert v. District of Columbia*, 716 A.2d 196 (D.C. 1998)(*en banc*), the

Court held, that the District may delegate its statutory obligation to provide medical care to

inmates to an independent contractor. There, the court held that District can satisfy its

responsibilities pursuant to D.C. Code §24-442 to provide medical care to inmates by retaining

independent contractors. *Herbert*, 176 A.2d at 201.

In *Herbert*, the court noted that employees of the contractor were not agents of the District because they were not subject to the District's supervision.[14] *Id.* at 199.  Additionally, the *Herbert* court held that contract employees cannot be deemed agents of the DCDC "simply because they are performing tasks that otherwise would be performed by salaried employees of the government." *Id.*

Based on the foregoing, the District's motion to dismiss, as plaintiff's claims regarding inadequate medical care are the D.C. Jail and CTF must be dismissed.  Rather, plaintiff's remedy, if any, is against CCHPS.

**D. The District is Not Vicarious Liable for The Alleged Medical Negligence at the GSCH.**

According to plaintiff's Complaint, on September 20, 1004, plaintiff's decedent "was transferred to the Greater Southeast Community Hospital."  Complaint ¶ 24.  The Complaint proceeds to allege that the medical care decedent received at GSCH was negligent and caused his death.  Specifically, plaintiff claims that Dr. Vaughn, MD, an emergency room physician mismanaged decedent's medical care treatment at GSCH when he decided not to admit him to that hospital but instead to discharge him to CTF.    Complaint ¶¶16, 26.  Plaintiff claims that Dr. Iluyomade was negligent because he approved decedent's discharge from the hospital.

Neither doctor is specifically alleged to have been employed by the District or to have been an agent of the District.  Rather, in board and conclusory terms plaintiff's complaint alleges "all defendants acted under color of law of the District of Columbia and pursuant to their authority as officials, agents, contractors or employees of the District." Complaint ¶ 18.

---

[14] The contract employees in *Herbert* worked in the infirmary of the District of Columbia Jail, similar to those employed by CCHPS in this lawsuit.

Plaintiff's Complaint is ambiguous.  It is not clear if plaintiff is alleging that  Dr. Iluyomade and Dr. Vaughn were employed by the District, were acting under color of law, were "agents" of the District, or were "contractors." As discussed *infra,* if they are alleged to be employees or agents, the result is different then if they are alleged to be contractors. Regardless, in deciding a motion to dismiss, this Court is not bound to accept plaintiff's conclusory accretions.

Given plaintiff's allegation that the torts of Dr. Iluyomade and Dr. Vaughn occurred at GSCH, "a duly licensed and accredit District of Columbia hospital, providing health care services,"  it is fair to assume these doctors were employees or subcontractors or GSCH.

Indeed, the District is party to a contract which provides it will GSCH to provide medical care to uninsured citizens of the District and inmates at the Department of Corrections, among others. There is no basis alleged in plaintiff's complaint for holding the District liable for medical malpractice that occurred at GSCH.  The District's alleged involvement in the care rendered at GSCH is limited to deciding to send its inmate needing medical care to that hospital. As such, plaintiff's allegation that the District is liable for care provided at GSCH cannot withstand a Rule 12(b)(6) challenge and this claims must be dismissed.

**E. The District is Not Vicariously Liable For the Alleged Torts of CCA Employees**

The Correctional Treatment Facility (CTF) is a District correctional institution that is privately operated by the Corrections Corporation of America (CCA) pursuant to a contract. Complaint ¶ 9.  Plaintiff's complaint apparently contains allegations of common law torts committed by CCA correctional staff, Officer Singley, and medical staff at the CCA. Complaint ¶¶ 13, 39.  Below, the District demonstrates that it is not liable for the torts of CCA correctional staff because the District is not their employer.  Rather, CTF Officer Singley is an employee of

CCA an independent contractor of the District.  The District retained CCHPS to provide medical care for inmates at CTF.

Contract Modification #4, Exh. 2, between the District and CCA provides that the District assumed from CCA its "medical services obligations under (a prior) Agreement."  Exh. 2, at 1. In turn, the District delegated its duty to provide medical care to CCHPS. Exh. 3, Modification #12 to CCHPS contract.   Hence, when plaintiff's decedent was treated at CTF, the District had extended its contract with CCHPS to provide that CCHPS would provide medical care for inmates at CTF in addition to inmates at those at the D.C. Jail. Exh. 2.

When the incident alleged occurred, CCHPS was under contract to provide medical services at both institutions – CTF and D.C. Jail.  For the same reasons as are discussed above, the District is not vicariously liable the alleged medical torts of CCHPS employees occurring CTF or D.C. Jail.

Plaintiff's complaint alleges that Dr. Malekghasemi, MD, Dr. Nwosu, MD, and LPNs Ojelfo and Ogundipe were medical providers at CTF who were negligent in their treatment of plaintiff's decedent. Complaint ¶¶ 9, 10 and 11.  As medical providers at CTF, they were employees, or subcontractors of CCHPS, and not the District.

### F. The District is Not Liable for the Torts of CTF's Correctional Staff Because They Are Employees of CCA

Plaintiff's Complaint alleges that Defendant Singley was a "correctional officer in charge of custody of the CTF infirmary."  Complaint ¶ 13.  She further alleges that Singley,

> caused Mr. Magbie to be placed in an infirmary room (at CTF) with a door that staff were able to lock.  The room had no panic button nor any other means that Mr. Magbie could use to communicate with staff while locked in his room, so when his cell was locked, he was completely isolated and helpless to communicate his needs.

Complaint ¶ 39.  It is also alleged that on the night of his death, Defendant Singley denied

decedent water, pursuant to the orders of CCHPS nurses.  Complaint ¶ 41.  It is not clear if

plaintiff's complaint intends to include the conduct of Singley as part of the basis for recovery

for medical negligence, Count III.  Assuming this is the case, below the District demonstrates

that it is not vicariously liable for Singley's alleged torts.

CCA has entered into a contract with the District to operate and staff the CTF.  CCA

provides correctional staff at CTF, not the District. Hence, it is clear that, Singley, as a

correctional officer at CTF, Defendant Singley was an employee of CCA.  See Exh. 1, Jan. 30,

1997, CCA Contract.  This Contract provides that CCA will staff and operate the CTF for 20

years in exchange for periodic payments from the District.  *Id*. at 2.  That agreement further

provides at Art. 8, page 29, that,

> The Operator is associated with the District only for the purposes of and to the extent set
> forth in this Agreement.  In respect to the delivery of services provided for in this
> Agreement, the Operator is and shall remain an independent contractor and, subject to the
> terms of this Agreement, shall have the sole right to supervise, manage, operate, control,
> and direct the performance of its duties under this Agreement.

*Id.* Art. 5, page 10, of the Agreement provides that CCA "shall operate maintain and manage

CTF…."  The agreement specifically acknowledges that CCA shall engage in collective

bargaining with its employees, should they choose to organize.  *Id.* Art.5.2.4, page 12. [15] And

that CCA shall provide "adequate staffing for the CTF."  Art. 5.4.1, page 13.

Clearly, the agreement between the District and CCA creates a contractor/contractee

relationship because it provides that CCA and not the District shall direct and control the

employees that perform contract services.

---

[15] CCHPS subsequently entered into a collective bargaining agreement with its employees.

*CONCLUSION*

Plaintiff's Constitutional Claims and federal claims must be dismissed as plaintiff has failed to state claims upon which relief may be granted.  Similarly, plaintiff's common law claims all concern conduct by District contractors for whose conduct the District is not vicariously liable.  Accordingly, plaintiff's common law claims fail to state a basis upon which relief may be granted.

Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division


_____

HOLLY JOHNSON
Chief, General Litigation Section III


_____

STEVEN J. ANDERSON
Assistant Attorney General
Bar no. 334480
Suite 600S
441 Fourth Street, N.W.
Washington, D.C. 20001
(202) 724-6607
(202) 727-3625 (fax)
E-mail:  Steve.anderson@dc.gov

/

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **MARY R. SCOTT, individually and** | ) | |
| **as Personal Representative of the Estate** | ) | |
| **of JONATHAN MAGBIE,** | ) | |
| | ) | |
| **Plaintiff.** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 5-1853 (RWR)** |
| | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

ORDER

Upon consideration of the District's Motion to Dismiss Plaintiff's Complaint, any

opposition filed thereto, and for the reasons in the District's Motion, it is this _____ day of _____

2006,

ORDERED, the District's Motion is GRANTED and plaintiff's complaint is dismissed.

_____

Judge,
United States District Court for
The District of Columbia

Copies to:

Steven J. Anderson, AAG
441-4th Street, NW, 6th Floor South
Washington, D.C. 20001

**Donald M. Temple**
TEMPLE LAW OFFICE
1229 15th Street, NW
Washington, DC 20005

**Elizabeth Alexander**
NATIONAL PRISON PROJECT OF THE ACLU FOUNDATION
733 15th Street, NW
Washington, DC 20005-2112

**Edward J. Connor**
5210 Auth Road
Suite 304
Camp Springs, MD 20746-4341

**Arthur B. Spitzer**
AMERICAN CIVIL LIBERTIES UNION
1400 20th Street, NW
Suite 119
Washington, DC 20036

**Andrew J. Spence**
HAMILTON ALTMAN CANALE & DILLON, LLC
10306 Eaton Place
Suite 100
Fairfax, VA 22030

**Daniel P. Struck**
JONES, SKELTON & HOCHULI
2901 North Central Avenue
Suite 800
Phoeniz, AZ 85012

**Rebecca Everett Kuehn**
LECLAIR RYAN
225 Reinekers Lane
Suite 700
Alexandria, VA 22314

**Catherine A. Hanrahan**
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER
1341 G Street, NW
Washington, DC 20005

**Alan Janoske Rumsey**
JORDAN COYNE & SAVITS, LLP
1100 Connecticut Avenue, NW
Suite 600
Washington, DC 20036

**D'Ana E. Johnson**
BONNER KIERNAN TREBACH & CROCIATA
1250 Eye Street, NW
Suite 600
Washington, DC 20005