**Roger A. Johns, M.D., M.H.S.**
*Professor*

Department of Anesthesiology and
Critical Care Medicine
720 Rutland Avenue / Ross 361
Baltimore, MD 21205
443-287-6254 T
410-614-7711 F
rajohns@jhmi.edu



JOHNS HOPKINS
MEDICINE
SCHOOL OF MEDICINE

April 29, 2007

Juan M. Anderson
Ronald Guziac
Bonner, Kiernan, Trebach and Crociata, LLP
1233 20th Street, NW Suite 800
Washington, DC 20036

Re: Mary Scott v. Greater Southeast Community Hospital, et al
    USDC No.: 1:05cv01853
    BKTC File No.: 0597.0009

Dear Mssrs. Anderson and Guziac,

I have reviewed the records of the above case and now report my view of the standard of care as practiced by Dr. R.A. Iluyomade in his care of Jonathan Magbie in the Emergency Room of Greater Southeast Community Hospital on September 24, 2004.

Mr. Magbie was a 27 year old quadriplegic who was transferred to the Emergency Room of Greater Southeast Community Hospital at 10:10 am on September 24, 2004 from the Washington DC Department of Corrections where he was a prisoner. The patient was admitted to the ER with a chief complaint of respiratory distress and unresponiveness. Dr. Iluyomade was the attending physician in charge of the ER at time of Mr. Magie's arrival through the time of his cardiopulmonary arrest and death later that day.

The patient's oxygen saturation had been 90% at the prison with a BP of 78/51. On arrival at the ER, his oxygen saturation was 100% with a BP 105/55 with a RR of 26, HR 107 and temperature of 95.6, axillary. A variety of tests were ordered including a chest Xray, head CT scan, arterial blood gas, complete blood count, serum chemistries and electrolytes, a urinalysis and a urinary drug screen. The patient was found to have an elevated white blood cell count, infiltrates in the left upper and lower lobes of the lung consistent with pneumonia and a urinary tract infection. He was given fluids and narcan. Accucheck of his blood suger was 150, ruling out hypoglycemia despite ketones present in his urine. Mr. Magpie's CT scan of the head was normal. His arterial blood gas revealed a pH of 7.29, pCO2 of 56.1, pO2 of 429 suggesting a mixed metabolic and respiratory acidosis. He also had evidence of a urinary tract infection.

Nursing notes indicate that the patient was alert and responsive with stable vital signs during performance of testing and transport to and from the CT scanner. The patient was stable according to the continuing nursing nores and vital sign records throughout the day and intermittently responsive attempting to communicate with the nurses. (He could not speak due to his tracheostomy). His oxygen saturation was 95% at 14:05, 97% at 15:30 and 92% at 16:00.

Dr. Iluyomade noted a continuing evaluation on the ER record at 13:05 indicating his review of the laboratory data and his re-examination of the patient. His diagnoses were altered mental status, multisubstance abuse (based on the urine drug test results), pneumonia and urinary tract infection. Because of these concerns, Dr. Iluyomade appropriately, and consistent with the standard of care, admitted Mr. Magbie to the hospital. At this time, Mr. Magbie was alert and responsive and had stable vital signs and oxygen saturation. Admission was apparently delayed as Mr. Magbie remained in the ER. There is no indication that Dr. Iluyomade was aware that Mr. Magbie was not moved to an inpatient bed until he was later called to see the patient due to a low oxygen saturation at 17:40.

Dr. Iluyomade and the respiratory therapist were called to Mr. Magbie's bedside at 17:40 when the nurse noted his oxygen saturation to have fallen to 80%. The tracheostomy tube was noted to be protruding 1.5 inches out from the dressing and tracheostomy collar (it was not apparently sutured or tied, likely to allow Mr. Magpie to speak).. Dr. Iluyomade repositioned the tracheostomy tube and asked the respiratory therapist to draw a blood gas and the patient was placed on a 100% tracheostomy mask. Patient was noted by the nurse to be in no acute distress. This suggests that there was no obstruction to air intake and that the tracheostomy tube was not obstructed and was not misplaced and that Dr Iluyomade acted within the standard of care in regard to tracheotomy tube placement and assuring patency of the airway. At 1800, the respiratory therapist still had not been able to draw a blood gas and the oxygen saturation had dropped again to 71%. The nurse noted that the patient was in mild respiratory distress and that spikes from his diaphragmatic pacemaker were observed on the ECG, indicating it was functioning. The records currently available do not indicate what diagnostic and treatment approaches were being taken e between 18:00 and 18:16 when the oxygen saturation dropped to 71%.

At 18:16, the nurse notes that, while at the bedside, the respiratory therapist noted that the rise and fall of the chest was decreasing. The nurse could not find a pulse or respirations and initiated and CPR was started. The respiratory therapist ventilated the patient through his tracheostomy tube. There is no reason to think that this was ineffective because the endotracheal tube was found to be appropriately placed within the trachea at autopsy with no tracheal obstruction. Standard drugs and defibrillation were applied, with a brief return to a sinus rhythm, but fibrillation recurred and the patient was pronounced dead at 18:40 by Dr. Iluyomade.

The specific cause of the cardiac and respiratory arrest is not clear from the autopsy or the record. There is no evidence that the patient died of lung pathology. There was no

obstruction of the airways. The tracheal tube was appropriately positioned in the trachea above the carina. Furthermore, Mr. Magbie's diaphragmatic pacemaker was noted to be functioning normally. This further suggests that there was no breach in standard of care in management of the airway. While the lung parenchyma was mildly edematous, there was no area of focal consolidation on gross examination. It is quite possible that Mr. Magpie was exhausted from the several days during his imprisonment where he was forced to go without a period of ventilation in the evenings to provide sufficient rest and recovery so that he could breathe properly during the day. The further stress of pneumonia and urinary tract sepsis which likely were progressing during the delayed admission and treatment as an inpatient could have added very significantly to the respiratory failure.(At home Mr. Magpie used a ventilator at night as needed to provide rest to his respiratory muscles. Mr. Magpie's ventilator had not been brought to the jail from home prior to his admission on 9/24/04). It is also unclear why the hospital could not arrange earlier transport to the inpatient bed.

This report is based upon the information available at the time of this writing. Please contact me with any questions regarding the above or other aspects of this case.

Sincerely yours,

Roger A. Johns, M.D.
Professor