# Attachment 3-1

OPINION REGARDING DEATH OF JONATHAN MAGBIE

I am a board-certified family practitioner and former chief medical officer of the US Penitentiary in Terre Haute, Indiana. I have served as a medical expert in several cases in federal courts during the past seven years. I founded and administer the Packard Community Clinic, a busy family medical practice with a diverse population. I am on the medical staff at St. Joseph Mercy Hospital and am a clinical faculty member of the University of Michigan in the Department of Family Medicine.

The following opinion is mine alone and to reach it I reviewed the following material: records from the DC Jail; records from Greater Southeast Community Hospital (GSEH); a report by the D.C. Department of Health dated 11/18/04 that included notes of interviews with various medical staff involved with Mr. Magbie's care the week that he died; and medical literature including the literature listed in the notes to this report.

Jonathan Magbie entered the DC jail on 9/20/05. This was his first incarceration. Mr. Magbie was a 27-year-old African American who had sustained a cervical injury at the age of four in an accident and was subsequently paralyzed from the neck down. He was wheel-chair bound and preferred to sleep in his chair. He controlled his wheelchair with a mouth-operated device. He had a battery-controlled pulmonary pacemaker that allowed him to breathe. He had a voice transducer that allowed him to speak and be heard. He used a respirator at night as an assist. He didn't have the respirator in jail. (Case record DC jail.)

When he came to prison there was an intake history on 9/20/04 that was highly significant for pneumonia in 1/04 and osteomyelitis. An intake weight was noted to be 130 lbs. (This is in contrast to his weight of 90 lbs. at postmortem exam five days later). He underwent a physical exam which noted the above findings along with significant contractures of his extremities and muscle wasting. Other positive findings included skin breakdown or decubiti (bedsores). He had a suprapubic catheter listed as SOOPY. An anterior tracheostomy was also noted as SOOPY. His vital signs were within normal limits. His pulmonary status was not described well. There was no documentation of his lung sounds on exam. Rather it was noted as purposeful breathing. (Since his breathing is controlled by battery this is uninterpretable and I want to know about the signs of infection and consolidation. This description was absent).

His new medications were listed as valium 5 mgm. four times a day (later changed to ativan because valium was not available) and cyclobenzaprine or Flexeril 10 mgm. orally three times per day. The plan was transfer to CTF (Correctional Treatment Facility). A physician's assistant, Chantal Perrier-Taylor, and a physician, Fozia Abdulwahabe, MD signed this record. I assume that the PA did the exam and that it was countersigned by the MD. (Ibid. - case record.)

An admission chest x-ray was taken which showed a possible infiltrate in his lung. This 9/20/04 reading was transmitted to the record on 9/21/04. No reference to this striking finding was made in any record thereafter.

He had a Comprehensive Mental Health Assessment on admission that noted his physical injuries and that he had "no current or past mental health history." It also noted "Weekly use of marijuana" and no history of an eating disorder. (DC Jail MMHS) At 9:00 p.m. staff felt that Mr. Magbie was in respiratory distress and he was seen at Urgent Care while awaiting transfer to CCA. Staff noted that he needed a "continuous breathing treatment ventilator at night." After consulting with two doctors, R. Gbajabiamila, RN

acted to transfer Mr. Magbie to Greater Southeast Community Hospital (GSEH) via emergency transport. (DC Jail record)

In the emergency room at GSEH Mr. Magpie was found to have chronic obstructive pulmonary disease with an acute exacerbation, hypovolemia (dehydration) and hypoglycemia (low blood sugar) by Dr. Vaughn. His respiratory distress was noted but was evaluated as not a critical factor. His blood pressure was noted to be 68/48 at 09:50 a.m. on 9/21/04. He was given a fluid bolus of normal saline "wide open" and glucose D50W for low blood sugar, meaning that he was given fluids with dissolved sugar intravenously. His blood pressure responded to the fluids. There is no documented laboratory test regarding his blood sugar response although Dr. Vaughn said that a fingerstick test was done. He was to have been admitted. A portable chest x-ray was done, but the results are undocumented.

Labs showed an elevated white blood count, a finding compatible with pneumonia. He had a low normal sodium and low carbon dioxide level. His albumin was 3.4, just barely normal and consistent with malnutrition. His bilirubin was elevated at 1.9, also consistent with malnutrition. Although there was significant hypoglycemia and hypotension (low blood pressure), presumably due to hypovolemia, there was no attempt to determine the root cause of these findings. I am concerned that the low blood sugar was a sign of malnutrition and possibly a sign of infection as well. The finding of hypoglycemia was a serious red flag that Mr. Magbie could be in trouble and it should have triggered a hospital work-up to determine the cause of these findings.

According to Larsen in Williams Textbook of Endocrinology at page 1592, the two most likely causes of hypoglycemia are drugs and sepsis. Drugs were very unlikely, as insulin and alcohol are the drugs that might cause low blood sugar, and Mr. Magbie had no history of diabetes and would not have had access to alcohol since he entered the jail. Another possible cause was inanition-just not eating for a prolonged period.1

According to Foster:

> Hypoglycemic states can best be understood as derangements of normal fuel metabolism. Normally the only sign of catabolism is during the overnight fast, but under some circumstances, particularly serious illness, it may be prolonged. In such circumstances the liver is activated for glucose production. The liver has only about 70 grams of glycogen available and in the average human can sustain the plasma glucose level for only a short time, ordinarily eight to ten hours. Once the patient has been treated and become alert it is important to take a detailed history and carry out a physical examination. Special emphasis should be placed on food intake in the preceding 24 hrs and the possibility of drug ingestion. Signs of heart failure and hepatic congestion should be sought and the presence and thickness of the adipose tissue mass should be noted. Pigmentation of the skin may suggest Addison's disease. Workup includes liver function studies and CT scanning to look for solid tumors in the body…It is important to quantify the amount of glucose required to prevent recurrent hypoglycemia. Treatment is IV glucose 50% solution followed by a constant infusion of glucose until the patient is able to eat a meal. Frequent measurement of capillary glucose should be carried out until it is determined that the food is sufficient. In most cases all that is required is avoidance of fasting.2

Cecil's chapter on malnutrition states that the hypoglycemia with near normal electrolytes

often occurs:

> A careful clinical examination is needed to identify life-threatening
> complications of protein energy malnutrition that require immediate
> treatment. The presence of fluid, plasma glucose, electrolyte, and acid-
> base abnormalities should be determined. A search for infections (e.g.,
> obtaining a white blood cell count, urine analysis and culture, blood
> cultures, and chest radiograph) should be considered even in the absence
> of physical findings because many patients are not able to mount a normal
> inflammatory response. The evaluation must also include a careful
> analysis of the possible route for nutritional support and whether the
> gastrointestinal tract can be used if parenteral nutrition is needed for
> feeding. 3

Robbins and Cotran observe that in bedridden patients malnutrition is common.4 There
is no indication that either Dr. Vaughn or subsequently Dr. Nwosu gave any thought or
attention to these life-threatening issues that should have been obvious to any physician.

Further, Dr. Vaughn made a call to Dr. Bastien of the DC jail and they agreed to transfer
Mr. Magbie back to the CTF, despite the various records documenting the patient's need
for a nighttime ventilator, and both physicians' knowledge that none was available at the
jail. They chose to send him back despite the fact that only oxygen was available.
(GSEH records and statement of Dr. Vaughn). Dr. Malek Malekghasemi, the CMO for
the CTF, stated in his Department of Health interview that he talked to Mr. Magbie's
lawyer and eventually called the lawyer back and asked that the ventilator be brought into
the jail. He also talked to the judge about the need for Mr. Magbie to be in the jail. The
judge said send him to the hospital. Dr. Malekghasemi did not call the hospital to admit
Mr. Magbie or, apparently, make any attempt to examine the patient after he returned to
the CTF.

Thus, Mr. Magbie was transferred back to the DC Jail on 9/21. He was seen on 9/21 by
Dr. Sunday Nwosu and had an examination that noted his wasting, decubitus ulcer and
use of pacemaker and voice transducer. A detailed examination was made of several body
parts but again no lung examination was done. There was no notation of the GSEH ER
findings of hypoglycemia and hypovolemia, and no order to monitor Mr. Magbie's fluid
and nutritional status or record daily weights. He was to be suctioned on each shift and
observed every 30 minutes. Dr. Nwosu also indicated that the patient was to be sent to
GSEH if there were signs of respiratory distress. The order for valium was changed to
ativan 1 mgm. for times daily.

While in the jail Mr. Magbie ate little. His urinary output when measured also fell. I
summarize below the information in the CTF infirmary medical record regarding
nutrition and fluids:

| Intake | Measured urine output |
| --- | --- |
| 9/21 at dinner 75% | |
| 9/22 breakfast refused | 1750 |
| Lunch ate very little | 400 |
| Dinner 25% | 475 |
| 9/23 breakfast "received with extra liquids" | 250 |
| "Refused food am and PM" | - |
| Lunch drank one can of VHC | - |
| Dinner refused | - |
| 9/24 breakfast 25% | |

While his nutritional status was declining his lung secretions were increasing. He also had sedating medications. Valium was ordered and when that was unavailable he was given ativan. Sedation made him less likely to eat and move and act in his own behalf. Despite an abnormal chest x-ray and an abnormal blood sugar nothing was done as follow-up.

As noted, he was to be monitored every 30 minutes. The records that I have do not show this level of observation and the gaps in time on the day of his death make me highly skeptical that this was done. He was given a can of nutritional supplement twice a day. This appears to have been his virtually only documented food source. He was being nutritionally deprived. He was probably relatively fluid-deprived as well. Even his falling urine output caused no concern.

In addition, he was not provided with necessary care to monitor potential infection, despite the fact that he was at obvious increased risk. Three issues regarding potential infection were not addressed:

1. Lung. We know he had an infiltrate on his x-ray. He was supposed to be suctioned every eight hours (every shift) and he began producing more sputum. He had a history of pneumonia, and his tracheostomy intrinsically put him at increased risk of pneumonia. There was no concern until he became hypoxic. Oxygen levels were not consistently documented, despite an order to do so each shift, and no one reacted when these vital data were not documented. No one listened to his chest. Only in the ER did rales get documented and then they were ascribed in error to bronchitis and not treated. He had acute pneumonia at the time of death.
2. Skin. There was a note to be concerned about decubiti by one LPN. There had been decubiti noted on his first exam by the PA or physician, but no notation of treatment or observation by the LPNs. Another extremely important area of infection and possible sepsis was minimally monitored without notations of turning. On 9/23, for instance, I. Ajemba, LPN noted a "potential for decubitus ulcers" despite the fact he already had ulcers. Earlier the same day M. Brown, LPN, labeled his "mood arrogant" when Mr. Magbie was asking for repositioning. Repositioning is the key to avoiding decubitus ulcers, and preventing exacerbation.
3. Urine. He had a catheter, a notorious route for infection. When he was admitted on the day of his death the diagnosis was urosepsis. Catheter care was again minimal, and little concern for the possibility of a urinary infection was shown at the jail or GSEH. On the day he died, a urine sample showed high ketones, probably due to his starvation. It was too late!

LPNs were entrusted with all his care and monitoring. There was no physician's consultation or pulmonary medicine consultation in the jail. No RN or PA or doctor followed him or was even consulted about his course. Then the disaster happened.

On 9/24, Mr. Magbie was apparently okay at 7:45 a.m. G. Ogundipe, an LPN, wrote, "No secretions observed." He was seen by an RN at 8:40 a.m. and was "trying to mouth words could not understand. He was alert." His pulse ox was 26. His temp. was 97.4, pulse 43 BP 78/51. He had a large amount of secretions suctioned. Ambu was started. Mr. Magbie was in marked distress. He was very hypoxic. At 8:55 a.m. staff called 911. A Dr. Desta arrived and started four liters of oxygen and a facemask was applied. Dr. Desta did not write a note. Dr. Nwosu wrote one at 11:28 a.m., after he signed the 9/21 admission note. After some time in the morning plans were made to send him to the ER at GSEH.

On arrival at the ER he was felt to have had a cardiorespiratory arrest and to have left lower lobe pneumonia and urosepsis. He arrived at 11:45 a.m. He was monitored with "cardiac, BP and pulseox monitors." He was sent to get a CAT scan and came back alert at 3:30 p.m. (Nursing progress notes GSEH.) At 5:40 p.m. his blood oxygen level was decreasing.  The respiratory therapist and Dr. Iluyomade were called and found his "trach protruding 1 and ½ inches from his neck. The trach was pushed back in by the doctor. Blood gas to be obtained."
At 6:00 p.m. his blood oxygen level continued to decrease despite 100% oxygen by facemask.  His oxygen saturation level is only 71%. (Nursing Record GSEH)
At 6:16 p.m., he suffered another respiratory arrest and a Code Blue was called. Despite intensive therapy including defibrillation he died at 6:40 p.m. (Physician note GSEH)

This man had a chest x-ray that showed probable pneumonia on admission to the jail. This was marked for follow-up in five to seven days and then ignored.  Mr. Magbie was at high risk for an infection and sepsis; he had a urinary catheter and skin breakdown as well as a tracheostomy with compromised respiratory status. The findings in the ER initially of hypoglycemia and an elevated white blood count were consistent with infection. He had no follow-up for hypoglycemia. He wasn't eating and no one paid attention to this basic nutritional fact of ill health.

This man almost surely was suffering an infection. He had several possible sources, but his abnormal chest x-ray and sputum production made a pulmonary infection very likely. He also had a misplaced tracheostomy tube. He became very hypoxic. He needed intervention along the way, first with hospitalization or at least antibiotics and close monitoring of his fluid and lung status and finally with intensive care.  His tracheostomy was misaligned and shoved back in. It had not been tied to maintain a correct position. At postmortem he was found to have acute respiratory failure following the dislodgment of tracheostomy placed for treatment of respiratory insufficiency due to remote upper cervical spinal cord injury with quadriplegia due to blunt impact trauma. He also had acute bronchopneumonia and hypertensive cardiovascular disease. (Autopsy Report)

Mr. Magbie died from the denial of necessary treatment. There were many parts to the failure to take his health seriously. Beginning with the abnormal chest x-ray there was no one acting to protect this man.  The radiologist not only didn't call to tell the staff of his concern (not necessary, but usual in my hospital) but he gave a follow-up date too far in the future.  The radiologist's failure then was echoed in the failures of other providers to take action.  Subsequent providers never acknowledged the abnormal x-ray or the plan for follow-up.

Again in the ER at GSEH no one took note of the x-ray finding, nor was there any real concern about why Mr. Magbie had hypoglycemia or hypovolemia. There was no documented blood sugar testing after his treatment. There was no plan for further workup even though, as noted above, the literature makes clear the need for treatment and further investigation of these conditions in a hospital until the patient is eating well. At the time of discharge, the known inability of the infirmary at the jail to provide ventilator support also made no difference despite the patient's repeated warnings of his need.

Then when Mr. Magbie was readmitted to the infirmary, Dr. Nwosu did not order intake and output monitoring despite the hypovolemia.  Nor did he monitor the patient's blood sugar levels.  When Mr. Magbie's urine volume decreased and his secretions increased, no one acted.  No one listened to his chest.  No doctor or nurse documented lung findings.  The LPNs did not document 30-minute checks or all the required blood oxygen checks or suctioning of the tracheostomy every shift.  Mr. Magbie was even blamed for

his need for attention and called arrogant by the LPN for trying to get care at a time that he should have been in the hospital for workup and treatment of pneumonia and malnutrition.

After arrival at GSEH Mr. Magbie was once again stabilized briefly. The nurse told the CMO that he was "groggy but fine." (Malekghasemi) He should have gone directly to a pulmonary intensive care bed, but instead he was left "awaiting bed assignment." Certainly the tracheostomy accident could have been prevented. It happened even while he should have been being monitored and receiving tracheal toilet. According to respiratory therapist Monica James, the nurse said that "she'd provide his care." James went back to the room to get another blood gas where she found his tracheostomy tube protruding and pushed the tube back in place. There appears to be no written protocol to support this failure to provide ordered care. He went into arrest as a result of the failure to secure his tracheostomy tube. Staff reported resistance when trying to ventilate him with an Ambu bag, a sign that the tracheostomy tube was displaced and not working optimally.

Mr. Magbie's pneumonia was essentially undiagnosed and untreated. He probably wasn't eating because of his infection but at that point he was severely under his normal weight, which he said was 125-130 pounds. Most physicians can tell when a patient's weight is ten-twenty pounds different from the patient's stated weight, but Mr. Magbie's self-reported weight was 35 to 40 pounds greater than his weight at autopsy, without anyone, even in the hospital, insisting on getting an accurate weight.

The actions described above created grave risks for the patient. For example, had staff paid any attention to Mr. Magbie's weight, or had they heeded any of the other warning flags, including the findings from the first hospitalization regarding his nutritional status, the serious risks created by these actions might not have led to harm. The outcome might also have been different if anyone had followed up on the early x-ray or his increasing sputum production to diagnose and treat his pneumonia. Finally, the outcome might have been avoided if the supervisory staff in the infirmary had not abandoned Mr. Magbie's care to LPNs who then failed to provide even the care they were qualified to give.

1. P. Reed Larson, WilliamsTextbook of Endocrinology (10th Ed.).
2. Eugene Braunwald, Harrison's Principles of Internal Medicine, pp.1759-65 (12th Ed. 1991).
3. Lee Goldman, Cecil Textbook of Medicine (22nd ed. 2004)
4. Vinay Kumar, Robbins & Cotran Pathological Basis of Disease, p. 449 (7th Ed. 2005).

Jerry S. Walden, M.D.

## CURRICULUM VITAE

**NAME**                            Jerry S. Walden, M.D.

**ADDRESS**                         Packard Community Clinic
                                    3174 Packard Road
                                    Ann Arbor, Michigan 48108

**EDUCATION**                       B.S., Alma College, 1963
                                    M.D., University of Michigan, 1966

**MILITARY SERVICE**                United States Public Health Service. 1967 – 1969

**CERTIFICATION**                   Diplomate, American Board of Family Physicians.
                                    1976 with recertification in 1982, 1988, 1994, and 2000.

**LICENSE**                         State of Michigan 1967

**INTERNSHIP**                      Philadelphia General Hospital, 1966 – 1967

**SUB-INTERNSHIP**                  Takum Christian Hospital, Takum, Nigeria. Assisted with
                                    hospital and outpatient primary care including minor surgery.
                                    Due to the physician administrator's urgent leave, I was the
                                    acting medical director for six weeks, 1966.

**TEACHING and**                    St. Joseph Mercy Hospital, Dept. of Family Practice, 1969 -
**ADMINISTRATIVE**                  present. Head of Family Practice 1985, 1986.
**APPOINTMENTS**
                                    University of Michigan; Clinical Associate Dept. of
                                    Obstetrics, 1973 - 1984; Clinical Associate Dept. of Family
                                    Practice 1984 – present; Community Office Rounds-UM, a
                                    behavioral pediatrics study group, 1993 – present; preceptor
                                    for Family Practice and Pediatric residents, medical students
                                    and physician assistant students.

                                    Huron Valley Physicians Association (HVPA); Board of
                                    Directors 1987-1990, and 1997-present. Planning Committee
                                    1990- 1992. Primary Care Caucus 1992 – 1996. I initiated
                                    the formation of the Primary Care Caucus which became an
                                    important forum for primary care initiatives in this health
                                    care region. HVPA Primary Care Council 1994-1999; HVPA
                                    board member 1999-present; co-founder and Executive Vice
                                    President of Allied Primary Care-a 50-member, non-profit
                                    physician group with a mission to preserve independent
                                    medical practice, 1998-present.

**PLAINTIFF'S
EXHIBIT
3**

1

**Page Two**

Eastern Michigan University; Preceptor for geriatric graduate student physicians from Mexico City in a joint program with EMU, 1992.

**CLINICAL PRACTICE**

Chief Medical Officer, U.S. Penitentiary, Terra Haute, Indiana. Chief medical officer of a 10-person staff for 2500 male inmates, 1968 – 1969.

Family Practice Physician, Summit Medical Center, Ann Arbor, MI. In addition to a full-time practice, I headed a methadone treatment program, the first in Washtenaw County with the assistance of the pharmacy department of St. Joseph Mercy Hospital, 1969 – 1973.

Staff Physician, Huron Oaks, Catherine McAuley Health Center, Ann Arbor, Mi. Cared for chemically dependent adults and adolescents who were hospitalized in the treatment unit. 1986 – 1990.

Founder, Executive Director, Physician, Packard Community Clinic, a non-profit family practice devoted to meeting the health needs of all segments of the community, Ann Arbor, MI. 1973 – present.

**MEDICAL EXPERT TESTIMONY.**

Cain v. Michigan Department of Corrections; (Ingham County Circuit Court), 1999.
Hadix v. Johnson (W.D. Michigan) 1999- present
Caldwell v. Hammonds (D.D.C.) 2001.
Rodriguez v. McGinnis et al (W.D. New York) 2001. I was an expert party.
Caldwell v. Washington (D.D.C.) 2002.
Caldwell v. Center for Correctional Health and Policy Studies, et al. (D.D.C.) 2004-present.
Powe v. Frank, et al (Dane Co. Circuit Ct.) 2004-present.

**HONORS and AWARDS**

Who's Who in The Midwest, 1981
Who's Who in Executives and Businesses 1999-2000
Who's Who in Leadership 2004
Washtenaw Community College Service Award, 1990

Elizabeth Gall Award, Michigan Association of Infant Mental Health, Washtenaw Chapter 1993.

Golden Rule Award, Ann Arbor Exchange Club, 1994.

Community Service Award; Michigan State Medical Society, 1998

2

**Page Three**

Family Physician of the Year-2000. Selected by the Michigan Academy of Family Physicians. Nominated for US Family Physician of the Year, 2001.

**MEMBERSHIPS**

American Academy of Family Physicians
Michigan Academy of Family Physicians
Physicians for a National Health Program
Christian Community Health Fellowship
Physicians For Social Responsibility
Washtenaw County Medical Society
Michigan State Medical Society
Michigan Association of Infant Mental Health. I have a long-time involvement in assisting parents of infants to maximize their success in parenting. Our practice developed parenting programs over twenty years beginning 1982.

**COMMUNITY SERVICE**

Washtenaw Housing Alliance, Board of Directors-2004-present.

Washtenaw County Health Organization, Board of Directors-2005-present.

Ann Arbor Community Center, Board of Directors, 1980 – 1982.

Guild House Advisory Board 1996 – 1999

Family Book Club, Board of Directors 1999 – 2003.

Packard Community Clinic, annual Children's Health Fair 1979-present. I also have assisted in local church health fairs for migrant workers and volunteered in Mexico as a physician, 1983-1994.

Organized and provided relief and medical services to indigenous Mayar peoples in Chiapas, Mexico 1994-2001

Medical Director of the Washtenaw County Shelter Association; Volunteering this time, provided Medical supervision for the health care of the homeless in Washtenaw County, 1999-2003.

**PUBLICATIONS**

"National Health Insurance—An Idea Whose Time Has Come?" Health and Development. 1992. Vol. 12, pp 18-19.

3

JERRY S. WALDEN, MD


Dr. Walden's rate of compensation for forensic cases is $200 per hour.

He has not been paid any compensation in the *Magbie* case yet.