# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

MARY SCOTT, Individually and )
As Personal Representative of the Estate of )
JONATHAN MAGBIE, )
            )   Civil Action No. 1:05-CV-01853-RWR
          Plaintiff, )
            )
      v. )
            )
DISTRICT OF COLUMBIA, et al., )
            )
          Defendants. )

---

## DEFENDANT WILLIAM S. VAUGHN, M.D.'S
## MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant William S. Vaughn, M.D., by his counsel, and moves this Court pursuant to Fed. R. Civ. P. 56 for summary judgment as to all claims alleged against this Defendant.

As grounds therefor, Defendant Vaughn asserts that even if one assumes *arguendo*, that the Plaintiff has offered sufficient evidence to create a jury question whether Dr. Vaughn breached the standard of reasonable care in his treatment of the Plaintiff's decedent, the undisputed evidence in this matter clearly shows that such alleged negligence was not a proximate cause of Mr. Magbie's death.

Furthermore, the undisputed evidence demonstrates that numerous superseding, intervening acts were the proximate cause of Mr. Magbie's death. Therefore, as a matter of law, Defendant William S. Vaughn, M.D. is entitled to Summary Judgment.

As further grounds for this Motion, the Defendant refers this Court to the attached Memorandum of Facts of Law and also to the Statement of Material Facts as to Which there is no Genuine Issue.

Dated this 20th day of February, 2008

Respectfully submitted,

*/s/ Thomas V. Monahan, Jr.*
Thomas V. Monahan, Jr. (04471)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202
(410) 783-4000
tvm@gdldlaw.com
**Attorneys for Defendants William S. Vaughn, M.D.,
Rotimi A. Iluyomade, M.D. and National Emergency
Services District of Columbia**

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of February, 2008, I caused to be served *via*

electronic filing a true and correct copy of the Defendant William S. Vaughn, M.D.'s Motion for

Summary Judgment was served *via* electronic mail upon the following:

Donald M. Temple, Esquire
Temple Law Office
1229 15th Street, NW
Washington, DC 20005
*Counsel for Plaintiff*

Edward J. Connor, Esquire
5210 Auth Road, Suite 304
Camp Springs, Maryland 20746-4341
*Counsel for Plaintiff*

Elizabeth Alexander, Director
National Prison Project of the ACLU
    Foundation
915 15th Street, NW, 7th Floor
Washington, DC 20005-2302
*Counsel for Plaintiff*

 

*/s/ Thomas V. Monahan, Jr.*
Thomas V. Monahan, Jr.

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| MARY SCOTT, Individually and<br>As Personal Representative of the Estate of<br>JONATHAN MAGBIE,<br><br>                Plaintiff,<br><br>      v.<br><br>DISTRICT OF COLUMBIA, et al.,<br><br>             Defendants. | )<br>)<br>)<br>)  Civil Action No. 1:05-CV-01853-RWR<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DEFENDANT WILLIAM S. VAUGHN, M.D.'S MEMORANDUM OF
FACTS AND LAW IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT

## I.    FACTUAL STATEMENT

This is a medical malpractice case brought by the mother and personal representative of the estate of Jonathan Magbie, deceased, against various physicians, medical care providers, and other individuals involved in Mr. Magbie's care and treatment for respiratory and other problems that developed after he received a ten day jail sentence on September 20, 2004.

At the time of his death, decedent Jonathan Magbie, was a 27-year-old quadriplegic, paralyzed from the neck down due to a childhood accident. Because of his resulting respiratory difficulties, he had a tracheostomy tube that allowed him to breath and a battery-operated phrenic nerve stimulator that assisted his breathing as needed.

After sentencing on September 20, 2004, Mr. Magbie was transferred to the Central Detention Facility of the District of Columbia. Thereafter, personnel at the Central Detention Facility ("the Jail") transferred Mr. Magbie to the Correctional Treatment Facility ("CTF").

On September 20th, while awaiting placement at the jail, Mr. Magbie developed respiratory problems and was transferred to the emergency room at Greater Southeast Community Hospital. (Plaintiff's Exhibit 1 ¶ 32, attached hereto as Exhibit 1.)  Upon arrival at the emergency room, Mr. Magbie came under the care of Defendant, William S. Vaughn, M.D., an emergency room physician at Greater Southeast Community Hospital.  Dr. Vaughn only saw Mr. Magbie on this one occasion.  He treated Mr. Magbie at the emergency room only between approximately 10:50 p.m. and 8:00 a.m. the next morning (September 21st), when Dr. Vaughn went off shift.

On admission to the emergency room, Mr. Magbie presented with shortness of breath, a cough, wheezing and rales.  His blood oxygen saturation ($O_2$ sats) was 90 percent on room air.  He also presented with hypovolemia and low blood sugar (Exhibit 2 at pp. 118-120).[1]

### A.    Facts And Allegations As To Dr. Vaughn

Between admission and approximately 1:20 a.m., Dr. Vaughn treated Mr. Magbie with three (3) liters of oxygen via nasal cannula, an ample of D-50 IV for his low blood sugar, and fluids for his dehydration and hypovolemia.  (*See* Exhibit 3 at WMVa-0005; 0008-0011.)[2]

As a result of Dr. Vaughn's treatment, Mr. Magbie's condition stabilized by 3:20 a.m. if not before.  By that time, his $O_2$ sats were at 99 percent on room air and all vitals were at normal or at least acceptable levels.  (*See* Exhibit 3 at WMVa-0011.)

Because of Mr. Magbie's quadriplegia, respiratory abnormalities and breathing problems, Dr. Vaughn initially questioned whether Mr. Magbie needed to be placed on a ventilator at night for additional breathing support (Exhibit 4 at pp. 53-56).[3]  Mr. Magbie assured Dr. Vaughn that he

---

[1] Relevant portions of the transcript of Dr. Frank Baker are attached hereto as Exhibit 2.
[2] Relevant portions of the GSECH ER records are attached hereto as Exhibit 3.
[3] Relevant portions of the transcript of Dr. William Vaughn are attached hereto as Exhibit 4.

2

only used a ventilator at night when he felt he needed additional breathing support and that this did not occur every night. (Exhibit 4 at pp. 53-54.)

Based on his preliminary assessment, Dr. Vaughn ordered that Mr. Magbie be admitted to the hospital with diagnosis of hypovolemia, hypoglycemia and respiratory distress. This would have permitted Mr. Magbie to be placed on a ventilator if the physician who would assume his care decided that it was needed. Later, however, the Hospital's house officer declined to approve Mr. Magbie's admissions since Mr. Magbie had only indicated that he needed a ventilator "sometimes" at night. After Dr. Vaughn's treatment in the emergency room Mr. Magbie's overall condition and respiratory status had stabilized without a ventilator. By 3:20 a.m. Mr. Magbie was at normal oxygen saturation and acceptable vitals on room air only (Exhibit 4 at pp. 54-56). It is undisputed that Mr. Magbie did not require the use of a ventilator at any time before he was discharged from the hospital on the morning of September 21.

As part of his decision making process, Dr. Vaughn testified, he made "two (2) calls to Dr. Bastien at the CTF concerning Mr. Magbie's condition. Dr. Bastien assured Dr. Vaughn thatalthough the CTF did not have a ventilator, Mr. Magbie could and would be provided supplemental oxygen through a nasal cannula at night as needed. Accordingly, Dr. Haghighi, the hospital's house officer, advised Vaughn to discharge Mr. Magbie. (See Exhibit 1 at ¶¶ 34, 38; *see also* Exhibit 4 at pp. 63-68, 71-73.)

Since Dr. Vaughn had stabilized Mr. Magbie after providing only one hour of oxygen by nasal cannula, and had observed him continue to be comfortable for several hours thereafter while he breathed room air only, he agreed to return Mr. Magbie to the CTF based on Dr. Bastien's

3

representations and the understanding that Mr. Magbie would be returned to the emergency room if his condition again deteriorated at the CTF (Exhibit 4 at pp. 66-68).

Several hours later, at 8:00 a.m. on September 21st, Dr. Vaughn went off shift. At that time, Mr. Magbie's condition remained stable. All his vital signs were normal. His pulse ox had risen to the maximum value -- one hundred percent (100%) on only room air. His blood pressure stood at 107/68. Thereafter, Dr. Nunoi, another emergency room physician at Greater Southeast Community Hospital, took over Mr. Magbie's care. Approximately three and one half hours later, Dr. Nunoi discharged Mr. Magbie back to the CTF.

**B.      Facts And Allegations As To Other Defendants And Medical Care Providers**

At approximately 11:40 a.m. on September 21st, Mr. Magbie was returned to the CTF. Thereafter, for the next three (3) days, Mr. Magbie remained in jail and under the care of various other Defendant physicians, nurses, medical, and other caretakers whose alleged failure to properly monitor, care and treat Mr. Magbie caused his health to deteriorate to the point that he was brought back to Greater Southeast Community Hospital on September 24th in severe respiratory distress. (Exhibit 1 at ¶¶ 38-54)

Specifically, after Dr. Vaughn last saw Mr. Magbie on September 21st, the Plaintiff alleges that the following negligent acts and breaches of the standard of care occurred:

   a. Defendant Dr. Malehghasemi, the Chief Medical Officer at the CTF, after learning of Mr. Magbie's alleged need for a ventilator at night and knowing of the CTF's inability to provide ventilator support to Mr. Magbie, failed to arrange his transfer to another facility or to return him to the emergency room. (Exhibit 1 at ¶¶ 38.)

4

  b.  Upon returning to the CTF, Mr. Magbie told a CTF physician, Dr. Nwosu, that he was dependent on a ventilator at night. According to the testimony of the Plaintiff's expert, the standard of reasonable care required Dr. Nwosu to send Mr. Magbie back to the hospital where ventilator support could be made available to him. (Exhibit 5 at pp. 57-58.)[4]

  c.  Although Dr. Vaughn agreed to send Mr. Magbie back to the jail only after being assured by Dr. Bastien that Mr. Magbie would receive supplemental oxygen by a nasal cannula, Mr. Magbie never received oxygen via a nasal cannula while at the jail. (Exhibit 5 at p. 25.)

Frank Baker, M.D., the Plaintiff's medical expert, has charged that after Mr. Magbie was returned to jail on September 21, 2004, he remained without adequate treatment until he was returned to Greater Southeast Community Hospital at approximately 10:00 a.m. on September 24, 2004 unresponsive and in respiratory distress (Exhibit 6 at p. 2).[5]

Dr. Baker later testified at his deposition that while Mr. Magbie was in jail, if the facility noticed that he was having trouble breathing or was starting to deteriorate, the CTF should have returned him to the emergency room. (Exhibit 2 at pp. 133, 138.) Baker went on to testify that the CTF delayed transfer back to the emergency room, and, by waiting three (3) days to return Mr. Magbie to the Hospital had waited too long (Exhibit 2 at p. 138).

Kevin R. Cooper, M.D., the Plaintiff's other medical expert, testified at his deposition that after Mr. Magbie returned to the CTF, there is no record of Mr. Magbie having his trach suctioned

---

[4] Relevant portions of the transcript of Dr. Kevin Cooper are attached hereto as Exhibit 5.
[5] Relevant portions of the report of Dr. Frank Baker are attached hereto as Exhibit 6.

with the frequency ordered by the jail doctor, being given oxygen through a nasal cannula, or having his pulse ox checked regularly as ordered (Exhibit 5 at pp. 20, 22-25).

### C.    Facts And Allegations As To Dr. Iluyomade

As a result of the lack of and the substandard medical care and treatment which Mr. Magbie received at the CTF between September 21st – 24th, Mr. Magbie was rushed again to the Greater Southeast Community Hospital's emergency room on the morning of September 24th. Although Mr. Magbie arrived unresponsive and in severe respiratory distress, both Dr. Baker and Dr. Cooper agree that Mr. Magbie was still salvageable. In fact, they also agree that Mr. Magbie, initially received appropriate care and treatment which temporarily reversed and stabilized his presenting respiratory problems. (Exhibit 5 at p. 59; Exhibit 2 at pp. 139-140; and 143; and Exhibit 7 at pp. 72-73.)[6] Both experts have testified that by approximately 1:30 p.m., Mr. Magbie's pulse ox and vitals had returned to normal/acceptable readings and that the emergency room physician had appropriately ordered that Mr. Magbie be admitted for further treatment. (Exhibit 2 at pp. 77-78; 91-98; 108; Exhibit 5 at pp. 73-77; 81-82; and Exhibit 7 at p. 43.)

However, at deposition, both Drs. Baker and Cooper were critical of Dr. Iluyomade, the ER physician, and his subsequent care, particularly his response to the results of Mr. Magbie's arterial blood gas test ("ABG"). Both experts opined that the ABG results were abnormal and indicated that although Mr. Magbie was now being given optimum oxygen, his respiratory system was not moving or ventilating enough air to get rid of his carbon dioxide. As a result, Mr. Magbie was acidotic. (Exhibit 2 at pp. 96; 99-101; and Exhibit 5 at pp. 78-79.) Drs. Baker and Cooper therefore have both charged that Dr. Iluyomade violated the standard of care on September 24th by

---

[6] Relevant portions of the transcript of Dr. Rotimi Iluyomade are attached hereto as Exhibit 7.

not ventilating Mr. Magbie after the ABG results were received at approximately 11:10 a.m. (Exhibit 2 at p. 105; and Exhibit 5 at pp. 89-91, 95.)

The Plaintiff's experts further opine that had Mr. Magbie been placed on a ventilator either prior to 1:30 p.m. or even as late as 5:40 p.m., he would have been salvageable and would have survived. (Exhibit 2 at pp. 14, 81-82; and Exhibit 5 at p. 95.) Similarly, in Dr. Baker's opinion, Mr. Magbie may still have been saved if properly ventilated and his airway cleared by 6:35 p.m. (Exhibit 2 at pp. 83-89).

###    D.    Facts and Allegations Regarding Nursing Care on September 24

In addition to being critical of Dr. Iluyomade for failing to initially place Mr. Magbie on a ventilator, Drs. Baker and Cooper also allege additional violations of the standards of care due to omissions by other medical care providers between approximately 2:00 p.m. and Mr. Magbie's death at 6:40 p.m.

Specifically, as to the emergency room nursing care, Drs. Baker and Cooper have testified that during the four to five hour period that Mr. Magbie was awaiting hospital admission:

> a.    The nurses failed to monitor Mr. Magbie's vital signs and pulse ox monitors as frequently as required given Mr. Magbie's condition. (Exhibit 2 at pp. 105-107; 109-110; Exhibit 6 at p. 2; and Exhibit 8 p. 2.)[7]

> b.    When Mr. Magbie's pulse ox and vital sign readings started to decline between 2:00 p.m. and 3:30 p.m., the nurses should have notified Dr. Iluyomade of such changes. (Exhibit 2 at pp. 77-79, 105-106; and Exhibit 5 at pp. 82-83.)

> c.    The nurses' failure to notify Dr. Iluyomade of Mr. Magbie's deteriorating vitals until Mr. Magbie's pulse ox dropped to 80% at 5:40 p.m. (a 2 - 3½ hour delay) was

---

[7] Relevant portions of the report of Dr. Kevin Cooper are attached hereto as Exhibit 8.

7

inappropriate. Notifying him earlier may have changed the response and the outcome. (Exhibit 2 at p. 106; Exhibit 5 at pp. 94-96; and Exhibit 8 at p. 2.)

At 5:40 p.m. the nurses finally alerted Dr. Iluyomade to Mr. Magbie's deteriorating condition. The Plaintiff's experts are also critical of Dr. Iluyomade's response and treatment of Mr. Magbie at 5:40 p.m. and thereafter, reiterating that Mr. Magbie was still salvageable at that time. (Exhibit 2 at pp. 84-86; Exhibit 5 at p. 88; and Exhibit 7 at pp. 86-87.)

Dr. Baker goes on to insist that "had [Mr. Magbie's] airway been reestablished on 9/24/05, he would not have succumbed from hypoxia which was the immediate cause of his cardiac arrest and which was a direct result of dislodgement of his tracheostomy tube." (Emphasis added.) (Exhibit 6 at p. 3; see also Exhibit 2 at pp. 57, 68.)

After his death an autopsy was performed on Mr. Magbie by the District of Columbia Medical Examiner's office. As a result of this autopsy, Dr. Pierre-Louis, medical examiner, concluded that the cause of death was "acute respiratory failure following dislodgement of tracheostomy tube placed for treatment of respiratory insufficiency due to remote upper cervical spinal cord injury with quadriplegia due to blunt impact trauma." (Emphasis added.)

Mr. Magbie's tracheal tube dislodgement on September 24th occurred less than approximately one hour before he was pronounced dead. There is no indication of any earlier tracheal tube dislodgement during Mr. Magbie's emergency room admission and treatment by Dr. Vaughn on September 20th, nor at any time thereafter prior to the ER nurses entry at approximately 17:40 p.m. on the 24th.

8

## II.    LEGAL ARGUMENT

### A.    Legal Standards For The Granting Of A Motion For Summary Judgment

Pursuant to Fed. R. Civ. P. 56, a motion for summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" and a fact is "material" within the meaning of those terms only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, at 248 (1986). If the court concludes that "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the moving party is entitled to summary judgment. *Smith v. Hope Village, Inc.*, 481 F.2d 172 at 184 *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.ed.2d 265 (1986). Thus, in a negligence action, the defendant is entitled to summary judgment if, after reviewing the evidence in the light most favorable to the plaintiff, "no reasonable jury could find that [the plaintiff] established each of the elements of negligence." *Briggs v. Washington Metro Area Transit Authority*, 481 F.3d 839, (D.C. Cir. March 27, 2007).

### B.    Plaintiff Has Failed To Establish That Decedent Mr. Magbie's Death Was Proximately Caused By The Alleged Negligence Of Dr. Vaughn.

To establish negligence under the District of Columbia law, the Plaintiff must prove a duty of care owed by the Defendant to the Plaintiff, breach of that duty by the Defendant, and damage to interests of the Plaintiff, proximately caused by such breach. *Smith v. Hope Village, Inc., supra*

p. 184; *see also, District of Columbia v. Beretta U.S.A. Corporation*, 872 A.2d 633, 641 n. 3 (D.C. 2005).

Under District of Columbia law, proximate cause is that cause which in a natural and continual sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred. *District of Columbia v. Zukerberg*, 880 A.2d 276, 281 (D.C. 2005).

In analyzing proximate causation, "a determinative factor should be whether 'it is evident that the influence of the actor's negligence is still a substantial factor' leading to the plaintiff's harm, . . ." *Smith v. Hope Village, Inc.*, *supra* p. 202.

In further analyzing proximate causation, it is also axiomatic that under a negligence regime one has a duty to guard against only foreseeable risks. *See Doe v. Dominion Bank of Washington, N.A.*, 963 F.2d 1552, 1560 (D.C. Cir. 1992). An intervening negligent or criminal act breaks the chain of causation if "it is not reasonably foreseeable . . . [and] there is no proximate causation when the sequence of events leading to an injury is highly extraordinary in retrospect." *Smith v. Hope Village, Inc.*, at 200; *citing McKethean v. Wash. Metro. Area Transit Authority*, 588 A.2d 708 at 716; *see also Smith v. D.C.*, 413 F.3d 86, 103 (D.C. Cir. 2005). Where "two tortfeasors are involved, the unforeseeable action of the subsequent tortfeasor may be a 'superseding cause' which breaks the chain of causation." *Grant v. District of Columbia*, 597 A.2d 366, 369 (D.C. 1991) (internal citations omitted). *See also* Restatement (Second) of Torts § 448 (1965). For illustrative purposes, it is important to note that the United States Court of Appeals for the Eighth Circuit has addressed the issue of a superseding/intervening act as an action

10

that breaks the chain of causation in *Gibraltar Sav. V. Commonwealth Land Title Ins. Co.,* 907 F.2d 844 (8th Cir. 1990).

In *Gibraltar*, the Eighth Circuit noted that "[i]n order for an intervening act to constitute a superseding cause (1) its harmful effects must have occurred after the original negligence; (2) it has not been brought about by the original negligence; (3) it actively worked to bring about a result which would not otherwise have followed from the original negligence; and (4) it was not reasonably foreseeable by the original wrongdoer." *Id.* at 848.

Although in most cases the existence of proximate causation is a question of fact for the jury, (*see McNeal v. Hi-Lo Powered Scaffolding, Inc.,* 836 F.2d 637, 644 (D.C. Cir. 1988)), "the question becomes one of law . . . when the evidence [that would be] adduced at trial will not support a rational finding of proximate causation". *Sanders v. Wright*, 642 A.2d 847, 849 (D.C. 1994).

Dr. Vaughn now moves for summary judgment on the grounds that the record fails to raise any genuine issue that Dr. Vaughn's alleged negligence in treating Mr. Magbie on September 20th was a proximate cause of Mr. Magbie's subsequent death four (4) days later on September 24th. As in any medical malpractice case, the Plaintiff's claims that Dr. Vaughn violated the standard of care must be based upon expert medical testimony. *Burke v. Scaggs*, 867 A.2d 213 (D.C. 2005). Specifically here, the Plaintiff's claims against Dr. Vaughn are based upon the testimony of Frank J. Baker, II, M.D., and Kevin R. Cooper, M.D.

### C.    Plaintiffs' Experts' Theories of Causation

In order to understand the Plaintiff's failure of proof on the element of causation, it is necessary to lay out the conflicting and, in fact, contradictory theories of causation offered by the Plaintiff's two medical experts.

#### 1.    Dr. Frank Baker

Dr. Frank Baker has made it clear that in his opinion the cause of Mr. Magbie's death was the dislodgment of his tracheostomy tube and the inappropriate response to that event by Dr. Iluyomade. In other words, Dr. Baker is focusing on the last several minutes before Mr. Magbie coded and has excluded the preceding several days in his explanation for the terminal event. In order to understand how Dr. Baker arrives at this point, it is helpful to explore his opinions chronologically.

Admittedly, Dr. Baker criticized Dr. Vaughn for deciding to discharge Mr. Magbie on September 21 and permitting him to return to the jail where he would not have access to a ventilator. However, Dr. Baker testified that Dr. Vaughn had successfully reversed Mr. Magbie's hypovolemia (Exhibit 2 at p. 135.) He also testified that the hypoglycemia diagnosed by Dr. Vaughn was not a factor in Mr. Magbie's death. In fact, Mr. Magbie's blood sugar level was checked at the jail three days after Dr. Vaughn's treatment and did not factor into the subsequent events. *Id.*

The record in this case is clear that Dr. Vaughn sent Mr. Magbie to the jail only after being assured that he would have supplemental oxygen available to him should he need it. Nevertheless, the record in this case reflects that Mr. Magbie was not given oxygen by nasal cannula any night while he was at the jail. Furthermore, Dr. Vaughn was assured that Mr. Magbie would be

12

monitored carefully and returned to the emergency room if his respiratory condition deteriorated. That did happen on the morning of September 24, 2004. Dr. Baker has acknowledged that even though Mr. Magbie was in respiratory distress at that time, his condition was treatable and salvageable if he had been properly monitored upon his return to Greater Southeast Community Hospital. (Exhibit 2 at p. 143.)

Dr. Baker proceeded to outline a series of missteps and medical mistakes which he considered to fall below the standard of reasonable care in the management of Mr. Magbie on September 24. He noted that the arterial blood gases results demonstrated as early as 10:55 a.m. that Mr. Magbie should be placed on a ventilator. (Exhibit 2 at pp. 8-9.) Nevertheless, Mr. Magbie was not ventilated at that time.

Thereafter, Mr. Magbie received oxygen by mask over his trach during the afternoon hours. Dr. Baker argued that this represented inappropriate treatment and, instead, Mr. Magbie should have been on a ventilator. (Exhibit 2 at p. 95.) As of 2:05 p.m., hospital personnel were aware that Mr. Magbie's oxygen saturation level had fallen to 95% and his respiratory rate was elevated at 24 breaths per minute. Considering that he was receiving 5 liters of oxygen per minute, Dr. Baker argued that this was evidence that Mr. Magbie was experiencing respiratory failure and needed to be on a vent. Still, the health care providers at Greater Southeast Community Hospital did not take that step. By this time, Mr. Magbie had already been in the hospital for more than four hours and the fact that he was experiencing respiratory acidosis had already been evident based upon his arterial blood gas values for more than three hours.

Throughout the afternoon, Mr. Magbie's oxygen saturation began to fall. Dr. Baker testified that there was inadequate monitoring of Mr. Magbie by the nurses between 3:30 p.m. and

5:40 p.m. (Exhibit 2 at p. 109.) Ultimately, at 5:40 p.m., the nurses noted that Mr. Magbie's tracheostomy tube had dislodged. At that point, Dr. Iluyomade was notified. He pushed the tube back into the tracheal collar. Dr. Baker made it clear that this was the start of the events that led to Mr. Magbie's death. He noted that Mr. Magbie quickly decompensated after this event. Dr. Baker noted that a respiratory therapist suctioned the tube and also bagged Mr. Magbie with an ambu bag. The suction would have removed any mucus plug in the trachea, and none was found at the time of the autopsy, Dr. Baker noted. (Exhibit 2 at p. 71-72.) The ambu bag did not deliver oxygen to Mr. Magbie's lungs, Dr. Baker noted. Therefore, by the process of elimination, the only explanation for his inability to breathe and his subsequent death was that the tube had been put back in the wrong place. (Exhibit 2 at p. 72.) More than once at his deposition Dr. Baker testified that the cause of death was the dislodgment of the tracheostomy tube. (*See also* Exhibit 2 at p. 57.)

Dr. Baker made it clear that the dislodgment of Mr. Magbie's tracheostomy tube and the fact that it was reinserted in his lung tissues rather than in the lumen of the trachea was not due to the events which had preceded over the course of the last several days. (Exhibit 2 at p. 88.) He noted that the only reason that Mr. Magbie did not respond to the bagging and to the suctioning of the tracheostomy tube was that the tube had been reinserted in the wrong place (Exhibit 2 at p. 87). Even if Mr. Magbie was exhausted from trying to breathe after going for several days without a ventilator, Dr. Baker made it clear that that problem should have been easily reversed when the respiratory therapist started to ventilate Mr. Magbie with the ambu bag. (Exhibit 2 at pp. 87-88.) When asked if it was possible that Mr. Magbie failed to respond to the respiratory therapists resuscitation efforts because he was exhausted from going three days at the jail without a

14

ventilator, Dr. Baker responded with a definitive, "No." (Exhibit 2 at p. 88.)  Hence, by the process of elimination, he concluded that Mr. Magbie died simply because the tracheostomy tube was reinserted in such a way that air could not get into his lungs despite the efforts by the health care providers in the emergency room on the evening of September 24.  (Exhibit 2 at p. 68.)  "[T]here is no other cause," he testified.  (*Id.*)

Applying Dr. Baker's medical explanation of this case to the law of proximate cause, it is evident that Mr. Magbie's death was not caused by any of the allegations of negligence against Dr. Vaughn.  Mr. Magbie had a tracheostomy tube in place because of an injury that had occurred 23 years earlier.  He was going to continue to have a tracheostomy tube in place for the rest of his life. It was properly in place during the entire time that Mr. Magbie was under the care of Dr. Vaughn and remained so for the next four days.  For reasons which no one can explain, the tube dislodged at or shortly before 5:40 p.m. on September 24.  When asked why the tube dislodged, Dr. Baker stated candidly, "I don't think that we really know.  I mean, there is no evidence that any individual, either intentionally or accidentally, dislodged it." (Exhibit 2 at p. 58.)

The Plaintiff's evidence, as presented through Dr. Baker's expert testimony, demonstrates that the efforts to reinsert the tracheostomy tube failed.  The tube was placed into tissue in such a way that air did not get to Mr. Magbie's lungs.  Dr. Baker made it clear that this had nothing to do with whether or not Mr. Magbie had gone without a ventilator for the preceding three or four days. Therefore, the causal connection between Mr. Magbie's death and the criticism of Dr. Vaughn has clearly been broken by a new, intervening, superseding event.

### 2.    Dr. Kevin Cooper

By contrast, the Plaintiffs have offered a second expert who has expressed his opinion regarding the cause of Mr. Magbie's death. Dr. Michael Cooper, a pulmonologist, has a distinctly different opinion than Dr. Baker's. According to Dr. Cooper's testimony under oath, dislodgment of the tracheostomy tube did not cause Mr. Magbie's death. (Exhibit 5 at p. 71.) To the contrary, Dr. Cooper argues that the tracheostomy tube came out and went back in uneventfully. Thereafter, Dr. Cooper argues that Mr. Magbie could be bagged and the air went into the tracheostomy tube and, by implication, into Mr. Magbie's lungs. There is no indication that the tube was in the wrong place, Dr. Cooper insisted. (Exhibit 5 at p. 72.)

It is instructive again to look at Dr. Cooper's analysis of this case chronologically. Dr. Cooper joins in the criticism of Dr. Vaughn for sending Mr. Magbie back to jail where there was no ventilator. However, Dr. Cooper stated categorically that he did not fault any of the care which Dr. Vaughn rendered to Mr. Magbie in the Emergency Department. (Exhibit 5 at p. 51.) Furthermore, Dr. Cooper acknowledges that when Mr. Magbie returned to the CTF on September 21, 2004 he was not in respiratory distress and had normal vital signs. (Exhibit 5 at p. 53.)

Dr. Cooper contends that when Mr. Vaughn returned to the CTF, the CTF physician, Dr. Malekghasemi breached the standard of care by failing to return Mr. Magbie to the emergency room based on his knowledge that the CTF could not provide him with ventilator support. (Exhibit 5 at p. 63.) Instead, Mr. Magbie remained at the CTF for three nights without receiving oxygen by nasal cannula as agreed to by Dr. Bastien. When Mr. Magbie developed respiratory distress, he was sent back to the emergency room at Greater Southeast Community Hospital.

16

Dr. Cooper acknowledges that when Mr. Magbie returned to the emergency room, he would have lived if he had received care which complied with the standard of reasonable care. (Exhibit 5 at p. 58-59.) Like Dr. Baker, Dr. Cooper noted that the arterial blood gas values which became available at 10:55 a.m. showed that Mr. Magbie had developed respiratory acidosis and needed to be on a ventilator. (Exhibit 5 at p. 78.)

Dr. Cooper also faulted the nurses who cared for Mr. Magbie throughout the afternoon of September 24. When Mr. Magbie's oxygen saturation level fell to 92% at 3:30 p.m., the nurses were required to notify the physician, Dr. Iluyomade, he said. (Exhibit 5 at p. 83.) Later still, the standard of care required that the nurses notify Dr. Iluyomade when the oxygen saturation level fell to 80%. (Exhibit 5 at p. 83.) These falling saturation values demonstrated that Mr. Magbie was worn out and needed to be on a ventilator, Dr. Cooper insisted. (Exhibit 5 at p. 87.) Despite faulting the physician and the nurses who were caring for Mr. Magbie throughout the day on September 24, Dr. Cooper still found that as late as 5:40 p.m. simply placing Mr. Magbie on a ventilator would have prevented his death. (Exhibit 5 at p. 95.) At that point, Mr. Magbie had been in the emergency room for eight hours, including a period of more than six and one-half hours after his blood values demonstrated that he should be on a ventilator. If one accepts the testimony of Dr. Cooper for purposes of this Motion for Summary Judgment, it is irrefutable that his testimony demonstrates that Mr. Magbie's respiratory distress could and should have been managed so as to avoid his death. He argues that the standard of care required that Mr. Magbie be ventilated "promptly" after the arterial blood gases became available at 10:55 a.m. Instead, Dr. Cooper documents a series of negligent acts by the emergency room physician and the nurses over

17

the course of the next seven hours which led to a steady weakening in his ability to breathe. It is this which Dr. Cooper finds caused Mr. Magbie's death.

The evidence in this case offered by the Plaintiff is that the Defendant Dr. Vaughn discharged Mr. Magbie with an express understanding that he would be returned to the emergency room if he developed respiratory distress. The evidence is also clear that Mr. Magbie did return to the emergency room at a point in time when reasonable care would have avoided any injury to him. Dr. Cooper's testimony demonstrates that Mr. Magbie returned at a time when there were hours and hours available to his health care providers to render all necessary care to him. Instead, Dr. Cooper argues that there were a series of negligent acts which caused Mr. Magbie's death. From Dr. Vaughn's standpoint, it was foreseeable that if Mr. Magbie returned in respiratory distress and demonstrated respiratory acidosis, that appropriate steps would be taken to provide him with ventilatory support. It was not foreseeable that his physicians would identify the need for him to be on a ventilator and then fail to provide one for more than six hours. Similarly, it was foreseeable from Dr. Vaughn's standpoint that nurses who were required to monitor Mr. Magbie's respiratory status would do so in a reasonable fashion and would communicate their findings timely to Mr. Magbie's attending physician. It was not foreseeable that over the course of five and one-half hours the nurses would document his declining respiratory status but fail to bring it to the attention of a physician.

In summary, the testimony of the Plaintiff's expert, Dr. Cooper, leads unmistakably to the conclusion that the conduct of Dr. Vaughn which the Plaintiff's criticize was not the proximate cause of Mr. Magbie's death. Rather, a series of unexpected, unanticipated and unforeseeable acts by physicians and nurses led to this death.

18

For all the foregoing reasons, the Plaintiff's have failed to demonstrate that any alleged act of negligence on the part of Dr. Vaughn was the proximate cause of Mr. Magbie's death. Although the Plaintiff's experts have offered two contradictory theories of causation, one merely demonstrates that there was a superseding/intervening cause which led to Mr. Magbie's death and the other demonstrates that a series of unforeseen, unanticipated negligent acts by subsequent health care providers led to the death. Regardless of which theory the Plaintiff ultimately adopts, she has failed, as a matter of law, to meet her burden of proof on the element of proximate cause.

WHEREFORE, William S. Vaughn, M.D., Defendant, respectfully requests that his Motion for Summary Judgment be granted.

Respectfully submitted,

*/s/ Thomas V. Monahan, Jr.*
Thomas V. Monahan, Jr. (04471)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202
(410) 783-4000
tvm@gdldlaw.com
**Attorneys for Defendants William S. Vaughn, M.D.,
Rotimi A. Iluyomade, M.D. and National Emergency
Services District of Columbia**

19

## TABLE OF CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at 248 (1986)

*Briggs v. Washington Metro Area Transit Authority*, 481 F.3d 839 (D.C. Cir. March 27, 2007)

*Burke v. Scaggs*, 867 A.2d 213 (D.C. 2005)

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.ed.2d 265 (1986)

*District of Columbia v. Beretta U.S.A. Corporation*, 872 A.2d 633, 641 n.3 (D.C. 2005)

*District of Columbia v. Zukerberg*, 880 A.2d 276, 281 (D.C. 2005)

*Doe v. Dominion Bank of Washington, N.A.*, 963 F.2d 1552, 1560 (D.C. Cir. 1992)

*Gibraltar Sav. v. Commonwealth Land Title Ins. Co.*, 907 F.2d 844 (8th Cir. 1990)

*Grant v. District of Columbia*, 597 A.2d 366, 369 (D.C. 1991)

*McKethean v. Wash. Metro. Area Transit Authority*, 588 A.2d 708 at 716

*McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 644 (D.C. Cir. 1988)

*Restatement (Second) Torts* § 448 (1965)

*Sanders v. Wright*, 642 A.2d 847, 849 (D.C. 1994)

*Smith v. D.C.*, 413 F.3d 86, 103 (D.C. Cir. 2005)

*Smith v. Hope Village, Inc.*, 481 F.2d 172 at 184

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

MARY SCOTT, Individually and          )
As Personal Representative of the Estate of    )
JONATHAN MAGBIE,                      )
                                      )    Civil Action No. 1:05-CV-01853-RWR
                 Plaintiff,           )
                                      )
        v.                            )
                                      )
DISTRICT OF COLUMBIA, et al.,         )
                                      )
                 Defendants.          )

---

## ORDER

Upon consideration of the Defendant William S. Vaughn, M.D.'s Motion for Summary Judgment and his Memorandum of Law in Support thereof and Plaintiff's Opposition, and good cause having been shown, it is this _____ day of _____, 2008 hereby,

**ORDERED**, that the Defendant Vaughn's Motion for Summary Judgment is hereby **GRANTED**.

_____
Honorable Richard W. Roberts
U.S. District Court Judge for the District of Columbia

Copies to:

D'Ana E. Johnson, Esquire
Ronald G. Guziak, Esquire
BONNER KIERNAN TREBACH & CROCIATA, LLP
1233 20th Street, N.W., Suite 800
Washington, D.C.  20036
(202) 712-7000
*Attorneys for Defendants Rotimi A. Iluyomade, M.D.,*
   *William Vaughn, M.D. and National Emergency*
   *Services District of Columbia, Inc.*

Donald M. Temple, Esquire
Temple Law Office
1229 15th Street, NW
Washington, DC  20005
*Counsel for Plaintiff*

Edward J. Connor, Esquire
5210 Auth Road, Suite 304
Camp Springs, Maryland  20746-4341
*Counsel for Plaintiff*

Elizabeth Alexander, Director
National Prison Project of the ACLU
   Foundation
915 15th Street, NW, 7th Floor
Washington, DC  20005-2302
*Counsel for Plaintiff*