Mary R. Scott, et al. v. District of Columbia, et al.
United States District Court for the District of Columbia

05CV01853

Exhibit No. 4          Deposition of William S. Vaughn, M.D.

APPEARANCES:

<u>On Behalf of Mary Scott, Plaintiff:</u>

Of:
ELIZABETH ALEXANDER, ESQ.
National Prison Project
of the ACLU Foundation
915 15th Street, NW, 7th Floor
Washington, DC   0005
(202) 393-4930

Of:
EDWARD J. CONNOR, ESQ.
5210 Auth Road, Suite 304
Camp Springs, MD 20746
(301) 899-7801

Of:
DONALD M. TEMPLE, ESQ.
Temple Law Offices
1229 15th Street, NW
Washington, DC   20005
(202) 628-1101

<u>On Behalf of Drs. William Vaughn and Rotimi Iluyomade, Defendants:</u>

Of:
D'ANA E. JOHNSON, ESQ.
Bonner, Kiernan, Trebach & Crociatta, LLP
1250 Eye Street, NW, Suite 600
Washington, DC   20005
(202) 712-7055

Of:
JUAN ANDERSON, ESQ.
Bonner, Kiernan, Trebach & Crociatta, LLP
1233 20th Street, NW, Suite 800
Washington, DC   20036
(202) 712-7000

3

<u>On Behalf of Corrections Corporation of
America & P. Singley:</u>

Of:
DANIEL P. STRUCK, ESQ.
Jones, Skelton & Hochuli, PLC
2901 N. Central Avenue, Suite 800
Phoenix, AZ  85012
(602) 263-1700

Of:
KELVIN S. NEWSOME, ESQ.
Leclair Ryan, PC
999 Waterside Drive
Suite 2525
Norfolk, VA  23510
(757) 441-8938

<u>On Behalf of the Greater Southeast
Community Hospital, Defendant:</u>

Of:
CATHERINE A. HANRAHAN, ESQ.
Wilson, Elser, Moskowitz, Edelman &
Dicker, LLP
1341 G Street, NW, Suite 500
Washington, DC 20005
(202) 626-7660

4

I-N-D-E-X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| William S. Vaughn | 5 | 74 | -- | -- |

| EXHIBITS: | PAGE | IDENTIFIED |
|---|---|---|
| VAUGHN 1 | 5 | William S. Vaughn's Curriculum Vitae (5 pages) |
| VAUGHN 2 | 41 | Greater Southeast Community Hospital Corporation's Medical Records for Jonathan Magbie dated September 20, 2004 (21 pages) |

```
 1  99 percent with 3 liters of oxygen via nasal cannula."
 2       Q    Okay.  So before you administered the
 3  oxygen, he was at 90?
 4       A    Yes.
 5       Q    And that would be below normal, correct?
 6       A    Yes.
 7       Q    And thereafter it says you discussed the
 8  matter with Dr. Ackerman.  Is that right?
 9       A    Yes.
10       Q    Do you remember your discussion with Dr.
11  Ackerman?
12       A    I did not speak to Dr. Ackerman directly.
13  Dr. Haghigi was the person in the hospital at night.
14  I actually spoke to Dr. Haghigi as opposed to Dr.
15  Ackerman.
16       Q    So this should say, "Haghigi,"
17  technically.
18       A    Yes.  But it's the exact same service.
19       Q    Okay.  Can you tell me what your
20  discussion was with Dr. Haghigi?
21       A    Yes.  The question was on Mr. Magbie.  I
22  asked him specifically what was his ventilator.  He
```

1    said, "Use the ventilator if he needed to, as he
2    needed to." No rhyme, no reason. It was not like he
3    used it every night, so I was trying to figure out how
4    I could take care of Mr. Magbie. He said, "You can
5    use it every night, use it sometimes or not
6    sometimes." So I'm looking to how to best accommodate
7    his "sometime" use of a ventilator, as he put it.
8         Q    As who put it?
9         A    Mr. Magbie. Before I got out there, I
10   said, "Mr. Magbie, how often do you use your
11   ventilator." He said, "I use it sometimes if I need
12   to, as I need to. It's not all the time, it's not
13   every day, it's just whenever." I'm trying --
14        Q    Did you -- I'm sorry. I didn't mean to
15   cut you off.
16             MS. JOHNSON: Continue.
17             THE WITNESS: I'm trying to figure out how
18   could I possibly admit somebody with a "whenever"
19   ventilator use was my problem I had admitting him at
20   the time. He was breathing well, but he says he may
21   crash but whether he was going to crash, he didn't
22   know. So I can't say -- how can I justify a PRN

1   ventilator use for admission.  That was the problem I
2   had with Mr. Magbie.
3          BY MR. CONNOR:
4       Q   Okay.  Are you finished?
5       A   And as Dr. Haghigi who had run the service
6   for Dr. Ackerman and was in charge of the inmates, how
7   could I quarantine or put a ventilator to the side for
8   a PRN use was the problem I had, although at the time
9   he was not in respiratory distress.  He sat the entire
10  time well.  How could I justify a PRN use for a
11  ventilator is the problem I had on my hands.
12      Q   Okay.  Are you finished now?
13      A   Yes.
14      Q   I don't want to cut you off again.
15      A   No.
16      Q   When you say, "How can you justify
17  quarantining a ventilator," do you mean the equipment
18  that you had at the hospital, like taking in a
19  ventilator that was available at the hospital --
20      A   Yes.
21      Q   -- using it for this patient?
22      A   On a -- yes -- on a PRN use.  He's not

56

1   using it, so if somebody would need one you take it
2   away from them because he may need it at sometime.
3   That was the problem I had.
4       Q    Were you short of ventilator equipment
5   that night?
6       A    I don't know the status of vents in the
7   hospital. I do not control the vents.
8       Q    All right. I think some minutes ago we
9   were talking about your experience over five years.
10      A    Yes.
11      Q    And I think you told me that you had
12  treated a number of ventilator-dependent patients over
13  the years.
14      A    Yes.
15      Q    I believe that was your answer. This
16  wasn't the first rodeo.
17      A    No, but --
18           MS. JOHNSON: Hold on.
19           THE WITNESS: Go ahead and ask your
20  question. I'm sorry.
21           BY MR. CONNOR:
22      Q    Okay. My question is: When you treated

63

1    A    1:50.

2    Q    -- 1:50 a.m.

3    A    Yes.

4    Q    Okay.  And you mentioned what you just told us that you had provided him with the treatment that you just mentioned.

7    A    Yes.

8    Q    And then about halfway down here, you've written, "Patient to be admitted for hypovolemia --" I'm sorry.  I can't read your handwriting.

11   A    Hypovolemia, hypoglycemia --

12   Q    Hypogloycemia and --

13   A    -- respiratory distress.

14   Q    -- respiratory distress.

15   A    Yes.

16   Q    So at 1:50 a.m. your plan was to admit the patient.  Is that right?

18   A    On my first assessment.

19   Q    Okay.  Then I see, is it 3:29 a.m.?  Is that --

21   A    3:20 a.m.

22   Q    3:20 a.m.  You say that his oxygen is at

64

```
 1   95 now?
 2        A    Yes.  On room air.
 3        Q    On room air.
 4        A    Yes.
 5        Q    And you had already given him the nasal
 6   cannula?
 7        A    No.  They took him off that to see where
 8   he was.  That's why I said on room air.
 9        Q    Right.  So you've given him a nasal
10   cannula --
11        A    A little bit.
12        Q    -- and you'd taken it away --
13        A    And see how he tolerated.
14        Q    -- and you inject him --
15        A    Yes.
16        Q    -- and you're getting a 95 on room air.
17        A    Yes.
18        Q    Okay.
19        A    Which is -- which is good.
20        Q    Okay.  And then you say, "May only need
21   nasal oxygen which the jail infirmary can provide."
22   Correct?
```

1      A      Correct.

2      Q      When you made that entry had you already

3  spoke to Dr. Bastien?

4      A      Well, yes that I spoke with him. It's on

5  the same note. Yes, sir. I'm sorry.

6      Q      Okay. How many times did you talk to Dr.

7  Bastien --

8      A      Twice.

9      Q      -- that evening?

10     A      Twice.

11     Q      Okay. When was the first call if you

12 remember?

13     A      At 1:50 a.m.

14     Q      And did you call him or did he call you?

15     A      I called the jail.

16     Q      And why did you call the jail?

17     A      To see what facilities they had at the

18 jail infirmary.

19     Q      To see what services they had?

20     A      To see what they could provide there.

21     Q      And what were you specifically trying to

22 learn about?

1   A   Learn about if they provide a PRN
2   ventilator which Mr. Magbie I guess was used to.
3   Q   A PRN ventilator.
4   A   Yes.
5   Q   All right.
6   A   And they said they could not do anything
7   mechanical ventilation there at all.
8   Q   Okay. And was it after that phone call
9   that you made the entry the patient to be admitted?
10  A   Yes. After I talked to Dr. Batien, yes.
11  I'm sorry.
12  Q   And then you had a second call with Dr.
13  Bastien?
14  A   Correct.
15  Q   What time was that, if you remember?
16  A   Around 3:20 in the morning.
17  Q   And again, did he call you or did you call
18  him?
19  A   I called him.
20  Q   And why did you call him at 3:20 in the
21  morning?
22  A   To see if they could provide oxygen by

1   nasal cannula.  Just to make sure they could provide
2   some kind of oxygen therapy there.
3       Q    And what did Dr. Bastien tell you?
4       A    He said they do have oxygen support there
5   by way of nasal cannula; they could monitor it.  I
6   said, "If I send Mr. Magbie back, can you make sure he
7   gets O2 that can be monitored on the oxygen?"  He
8   said, "Yes, but I have to make arrangements and can
9   you keep him there until we make arrangements?"  I
10  said, "Fine."  And we'd leave him in the emergency
11  room until everything's set for him back at the jail.
12      Q    So was there a point when you changed your
13  mind about admitting the patient?
14      A    Yes.  His condition had changed.  It
15  improved.
16      Q    Did you note that?
17      A    That's where I failed to make the proper
18  documentation on the chart there.  Although I list it
19  here on the 3:20 note, it's listed on my discharge
20  note, discharge instructions.  I transferred the
21  instructions to the second page of the doctor's note.
22      Q    When you talked to Dr. Bastien the second

time, did you discuss providing a ventilator at night for Mr. Magbie?

A   No.

Q   Did you make any further effort to obtain a ventilator for him?

A   No.

Q   Did you feel that you had addressed his respiratory issues by sending him back with a nasal cannula?

A   From my assessment I figured I addressed all his problems. If he had shown any signs of decompensation, I would've changed my course of action. He didn't decompensate. And vital signs reading at 99 percent, 95, 90 percent of room air, to me is not in respiratory distress. His respiratory is 12 to 15; that's not distress. His vital signs were, like, 95 over 65 between through the entire course of the emergency room when I had him. That's not distress to me. So what I'm looking at, I'm looking although he has a lot of preexisting problems, he's stable.

MS. JOHNSON: Is this a good time to take

71

1  break.

2          (Whereupon, a short break was taken.)

3          BY MR. CONNOR:

4      Q   Dr. Vaughn, I have just a couple more
5  questions for you.

6      A   Okay.

7      Q   I want to clarify in my mind the order of
8  the conversations that you had. I think you said --
9  well, I know that you said you had two phone calls
10 with Dr. Bastien and you also talked with Dr. Haghigi,
11 correct?

12     A   Correct.

13     Q   Was it Bastien, Haghigi, Bastien? Was
14 that the order?

15     A   Correct.

16     Q   And when you talked to Dr. Haghigi I think
17 you mentioned that you were discussing in your mind
18 there was adequate indication for commandeering event.
19 That's my recollection. Is that accurate? Or if I'm
20 wrong, tell me.

21     A   The question with Dr. Haghigi is how could
22 I admit somebody for a PRN use of a ventilator as

72

1  needed. And with Mr. Magbie, he was on all the time,
2  that's an easy question to answer. He's in the
3  hospital. If he's vent-dependent, if he's always on
4  the vent, fine. If he always used it, fine. And
5  somebody who maybe uses it if he needs to as he needs
6  to with no particular rhyme or reason to using the
7  ventilator.
8       Now, the respiratory problems he had are
9  really nothing to admit anybody for. You can correct
10 his sugar, you can correct his volume. How can I
11 possibly admit for a PRN use of ventilator and that
12 was my problem.
13     Q    And because you had that issue in your
14 mind, you consulted Dr. Haghigi?
15     A    Because that's who you would go to, yes,
16 correct, yes.
17     Q    And my question is: When you presented
18 this concern of yours --
19     A    Yes.
20     Q    What did Dr. Haghigi say in response?
21     A    He said we couldn't justify a PRN use for
22 a ventilator. This admission was for a PRN use of a

73

1  ventilator with no other problems. He said if he was
2  septic, you've got something to work with. If he was,
3  you know, low blood pressure, something to work with.
4  He had possible use of ventilator and that's all you
5  can admit for, you really can't justify that type of
6  admission.
7       Q    And tell me if I'm wrong, you were leaning
8  in one direction and Dr. Haghigi confirmed what you
9  were already thinking?
10           MS. JOHNSON:  Object to the form.
11           MS. HANRAHAN:  Same objection.
12           THE WITNESS:  I was trying to get what Mr.
13 Magbie was used to having. A ventilator to use if he
14 needed one. That's what I was trying, I was trying
15 maybe to achieve that goal if I could do that. And
16 what Dr. Haghigi and I discussed things, either we
17 couldn't find a way to justify an admission to hold a
18 bedside ventilator for somebody if he needs one.
19           BY MR. CONNOR:
20      Q    Another question: When Mr. Magbie first
21 presented on September the 20th, when he first
22 presented, did you have access to his Department of