Mary R. Scott, et al. v. District of Columbia, et al.
United States District Court for the District of Columbia

05CV01853

Exhibit No. 7         Deposition of Rotimi A. Iluyomade, M.D.

BSA ... 07/19/06: Scott v D.C.: Depo: Rotima Iluyomade, MD                                    XMAX(1)

### Page 1

(1) IN THE UNITED STATES DISTRICT COURT
(2) FOR THE DISTRICT OF COLUMBIA
(3)
(4) In the matter of:
(5) MARY R. SCOTT,
(6)     Plaintiff,           Case No.
                             05-cv-1853 (RWR)
(7) v.
(8) DISTRICT OF COLUMBIA, et al.,
(9)     Defendants.
(10)
            Washington, D.C.
(11)
            Wednesday,
(12)        July 19, 2006
(13)
DEPOSITION OF:
(14)
        ROTIMA A. ILUYOMADE, M.D.
(15)
called for examination by counsel for the Plaintiff,
(16) pursuant to subpoena, at 1:18 p.m. at the offices of
the National Prison Project of the ACLU, 915 15th
(17) Street, NW, 7th Floor, Washington, D.C., when were
present on behalf of the respective parties:
(18)
(19)
(20)
(21)
(22)

### Page 2

(1) APPEARANCES:
(2)     On Behalf of Mary Scott, Plaintiff:
(3)     ELIZABETH ALEXANDER, ESQ.
    Of:     National Prison Project
(4)         of the ACLU Foundation
            915 15th Street, NW, 7th Floor
(5)         Washington, DC 20005
            (202) 393-4930
(6)
        EDWARD J. CONNOR, ESQ.
(7) Of:     5210 Auth Road, Suite 304
            Camp Springs, MD 20746
(8)         (301) 899-7801
(9)     DONALD M. TEMPLE, ESQ.
    Of:     Temple Law Offices
(10)        1229 15th Street, NW
            Washington, DC 20005
(11)        (202) 628-1101
(12)    On Behalf of Drs. William Vaughn and
        Rotimi Iluyomade, Defendants:
(13)
    Of:     D'ANA E. JOHNSON, ESQ.
(14)        Bonner, Kiernan, Trebach & Crociatta, LLP
            1250 Eye Street, NW, Suite 600
(15)        Washington, DC 20005
            (202) 712-7055
(16)
        JUAN ANDERSON, ESQ.
(17) Of:    Bonner, Kiernan, Trebach & Crociatta, LLP
            1233 20th Street, NW, Suite 800
(18)        Washington, DC 20036
            (202) 712-7000
(19)
(20)
(21)
(22)

### Page 3

(1) On Behalf of Corrections Corporation of
    America & P. Singley:
(2)
    DANIEL P. STRUCK, ESQ.
(3) Of:     Jones, Skelton & Hochuli, PLC
            2901 N. Central Avenue, Suite 800
(4)         Phoenix, AZ 85012
            (602) 263-1700
(5)
    KELVIN S. NEWSOME, ESQ.
(6) Of:     Leclair Ryan, PC
            999 Waterside Drive
(7)         Suite 2525
            Norfolk, VA 23510
(8)         (757) 441-8938
(9) On Behalf of the Greater Southeast
    Community Hospital, Defendant:
(10)
    CATHERINE A. HANRAHAN, ESQ.
(11) Of:    Wilson, Elser, Moskowitz, Edelman &
            Dicker, LLP
(12)        1341 G Street, NW, Suite 500
            Washington, DC 20005
(13)        (202) 626-7660
(14) On Behalf of the District of Columbia
    and O. Washington, Defendants:
(15)
    STEVEN J. ANDERSON, ESQ.
(16) Of:    Office of Corporation Counsel
            441 Fourth St. NW, Suite 600S
(17)        Washington, DC 20001
            (202) 724-6607
(18)
    Also Present:
(19)
    JASON APOLLO HART, Intern for Mr. Steven
(20) Anderson
(21)
(22)

### Page 4

(1) I-N-D-E-X
(2) WITNESS:        DIRECT    CROSS  REDIRECT  RECROSS
(3) Rotima Iluyomade    5      65    88, 103     --
(4) EXHIBITS:       PAGE            IDENTIFIED
(5) Deposition 1     6        Rotima Iluyomade's Curriculum
                              Vitae (3 pages)
(6)
    Deposition 2    35        Greater Southeast Community
(7)                           Hospital Records re: Jonathan
                              Magbie, September 24, 2004
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)

BSA —— 07/19/06: Scott v D.C.: Depo: Rotima Iluyomade, MD    XMAX(11)

### Page 41

(1) **A Yes, I did.**
(2) Q And you've indicated, "Complete blood (3) count normal except white blood count 19.1." Is that (4) right?
(5) **A Yes.**
(6) Q Is that abnormally high?
(7) **A Yes.**
(8) Q What does that indicate?
(9) **A An infection primarily.**
(10) Q And you indicate there was an abnormal (11) glucose level?
(12) **A Yes.**
(13) Q 155?
(14) **A Yes.**
(15) Q And what would be a normal range?
(16) **A Sixty to one hundred ten or twenty.**
(17) Q And what does a 155 indicate?
(18) **A Slightly higher than normal blood sugar. (19) Higher than the normal range.**
(20) Q And then you have some – your analysis (21) findings in the fourth column?
(22) **A Yes.**

### Page 42

(1) Q And I can't read those. What do they say?
(2) **A It's talking about, "White blood cells (3) count: 30 to 40; red blood cells: 10 to 15; Bacteria (4) plus." And then, "Urine toxicology. Positive for (5) benzodiazepine THC"**
(6) Q All right. The cell count and the (7) bacteria in the urine wouldn't have any relationship (8) to the drug screens, would it?
(9) **A No. Not to the drug screen. Separate (10) finding.**
(11) Q In fact, you diagnosed him among other (12) things with urosepsis, correct?
(13) **A Yes.**
(14) Q What's urosepsis?
(15) **A A urinary tract infection overwhelming. (16) I mean, not just simply a urinary tract infection but (17) causing more – causing the patient to be sick, you (18) know, with high white count among other things.**
(19) Q And you also ordered a chest x-ray?
(20) **A Yes.**
(21) Q And was that abnormal?
(22) **A Yes.**

### Page 43

(1) Q And what did that indicate?
(2) **A He had a left-lower lobe infiltrate, which (3) is pneumonia.**
(4) Q All right. Looking down near the bottom (5) on that column it says, "Discussed with Dr. Ackerman".
(6) **A Yes.**
(7) Q What did you discuss with Dr. Ackerman, if (8) you recall?
(9) **A The presentation and findings on this (10) patient and the need for admission.**
(11) Q You told Dr. Ackerman that your findings (12) indicated that the patient should be admitted?
(13) **A Yes.**
(14) Q And what did Dr. Ackerman say?
(15) **A He agreed.**
(16) Q And then next you entered a clinical (17) impression?
(18) **A Yes.**
(19) Q "Altered mental status."
(20) **A Yes.**
(21) Q And what does that mean?
(22) **A Patient's mental status is changed from**

### Page 44

(1) his normal baseline.
(2) Q Anything more specific?
(3) **A Unresponsive patient. Unconscious (4) patient.**
(5) Q All right. And you also have a clinical (6) impression of "Multi-substance abuse"?
(7) **A Yes.**
(8) Q And that's based on the drug screen?
(9) **A Yes.**
(10) Q And that screen tested positive for THC –
(11) **A Yes.**
(12) Q – which is the chemical, active chemical (13) ingredient in marijuana?
(14) **A Right.**
(15) Q And also for –
(16) **A Benzodiazepine.**
(17) Q Benzodiazepine which is cocaine?
(18) **A No.**
(19) Q What is that?
(20) **A Valium or that family.**
(21) Q Valium-type medication?
(22) **A Yes. Those kinds of medications.**



BSA  07/19/06: Scott v D.C.: Depo: Rotima Iluyomade, MD    XMAX(18)

### Page 69

(1) – it says, "Agree with nurses' note for PFSH." As I (2) would guess that would be a service, but what does (3) that mean? Do you know what that means?
(4) A Past – whatever – something history – (5) PFS history and a review of system.
(6) Q Okay. I don't believe we talked about – (7) I know you ordered arterial blood gases.
(8) A Yes.
(9) Q Is that correct?
(10) A Yes.
(11) Q What was the purpose of ordering the blood (12) gases?
(13) A To see where this patient – how much (14) oxygen he was getting, if he was getting adequate (15) oxygen, if it was acidotic, and if he needed any (16) adjustment to the oxygen supply that we were giving.
(17) Q Okay. And if you look at the results of (18) his pH, was that abnormal?
(19) A Yes.
(20) Q Okay. And what was the significance of (21) his pH?
(22) A His acidosis, respiratory probably.

### Page 70

(1) Q Okay. And what about his PCO2? First of (2) all, tell us what that is.
(3) A That's 56.1.
(4) Q And tell us what that is – what PCO2 is.
(5) A It's a carbon dioxide, measurement on the (6) carbon dioxide.
(7) Q And what's this abnormal findings?
(8) A That's abnormal finding.
(9) Q And what's the significance of that (10) finding?
(11) A The significance was that this patient (12) was, prior to being given the oxygen which he was (13) given in the emergency room, he was probably not (14) getting enough oxygen and the CO2 may have been higher (15) and has come down as a result of the oxygen we gave.
(16) Q What about the PO2. Is that an abnormal (17) finding?
(18) A Well, you have to take that with a pinch (19) of salt. That's – I had the normal finding.
(20) Q What is the PO2?
(21) A Measurement of his oxygen intake.
(22) Q The pressure, or –

### Page 71

(1) A Yes.
(2) Q Yes. And you said there – do you believe (3) there's any significance to that abnormal finding?
(4) A Well, he was getting more than adequate (5) oxygenation.
(6) Q And what about the HCO3? First of all, (7) what is that?
(8) A That's a bicarbonate, which is a (9) measurement of acidosis more or less. I would look at (10) it. It would be important if a patient had metabolic (11) acidosis.
(12) Q And his was abnormal. What, if any (13) significance did you place on that finding?
(14) A I beg your pardon? The significance of (15) that?
(16) Q Yes.
(17) A Well, it was metabolic acidosis. You (18) know, you have to look for causes, like infection, (19) drugs, other things like that.
(20) Q Okay. Look at – if you turn to the (21) second page of the emergency physician report starting (22) at where is says, "Physical exam constitutional" at

### Page 72

(1) the top. I just want to ask you a couple of questions (2) about the emergency department course. Do you see (3) that on the right-hand side, a little more than (4) halfway down?
(5) A Yes.
(6) Q Do you see that? I'm looking right here (7) if you want to see my highlights.
(8) A Okay.
(9) Q Do you see the emergency department (10) course?
(11) A That's right.
(12) Q If I look at it, the time was 13:05.
(13) A Yes.
(14) Q And I believe that based upon your (15) observations, Mr. Magbie's condition had improved at (16) that point. Is that correct?
(17) A Right. Right.
(18) Q Now, right above that, does it say, (19) "Awake"?
(20) A Yes.
(21) Q So he was awake at that time. Is that (22) correct?



Page 73
(1) A Yes.
(2) Q And at that point, as of 13:05, Mr. (3) Magbie's condition had improved and that he was awake (4) at that time --
(5) A Right.
(6) Q Did you expect him to survive his hospital (7) course at that time?
(8) MS. JOHNSON: Objection.
(9) MS. HANRAHAN: To the form.
(10) BY MR. NEWSOME:
(11) Q You can answer.
(12) A Yes.
(13) Q You did?
(14) A Yes.
(15) Q As of 13:05, did you believe that Mr. (16) Magbie was stable at that point?
(17) MS. HANRAHAN: Object to the form. Go (18) ahead.
(19) THE WITNESS: Yes.
(20) BY MR. NEWSOME:
(21) Q If you look down where it says under (22) "Discuss with --" and it says, "-- counsel." Do you

Page 74
(1) see that? Look right here. Do you see that? If you (2) look down it says, "Counsel," patient is circled. Can (3) you see that? Does everybody see that?
(4) MS. JOHNSON: Yes.
(5) THE WITNESS: Yes.
(6) BY MR. NEWSOME:
(7) Q If you look at that it says that you (8) actually counseled Mr. Magbie about his lab results (9) and his diagnosis. Is that correct?
(10) A Correct.
(11) Q So at that time you actually would have a (12) conversation with Mr. Magbie and you believed that he (13) understood you. Is that correct?
(14) A I believe so.
(15) Q And that was at looks like around 13:10, (16) I believe.
(17) A Or thereabouts.
(18) Q Thereabouts?
(19) A Yes.
(20) Q Let's look at your orders again, and I've (21) got mine Bates stamped, but if you look at your (22) emergency department physician order form.

Page 75
(1) A Okay.
(2) Q Do you see that? Do you see that, Doctor?
(3) A I'm looking for it. Okay.
(4) Q Are you there, Dr. Iluyomade?
(5) A Yes, I'm there.
(6) Q Okay. If we look at the additional (7) treatment. Do you see that? And it talks about a (8) trachea toilet. Is that correct?
(9) A Yes.
(10) Q Okay. Now, as I look at that, it doesn't (11) have a frequency, does it?
(12) A No, it doesn't.
(13) Q Okay. There is nowhere on this chart that (14) says a trachea toilet that you'd given PRN. It (15) doesn't say it on the chart does it?
(16) A No.
(17) MR. ANDERSON: What page are you on?
(18) MR. NEWSOME: Well, my Bates page is 10.
(19) MR. ANDERSON: Ten. Okay.
(20) MR. NEWSOME: It's right at the top.
(21) MR. ANDERSON: Sorry.
(22) MR. NEWSOME: No. That's all right.

Page 76
(1) That's why I did it with the Bates.
(2) BY MR. NEWSOME:
(3) Q Now, when you write orders, nurses or the (4) doctors, other people will look at these orders. Is (5) that correct?
(6) A Right.
(7) Q And when they look at orders, they will (8) determine what should be done. Is that correct?
(9) A Right.
(10) Q And a lot of times the order will say (11) who's supposed to do it. Is that correct?
(12) A No.
(13) Q Who carries out the orders?
(14) A They know who carries out. The nurse (15) looks at the orders and knows whether it's for them or (16) whether they need to call to get it done.
(17) Q Well, let me ask you this, Dr. Iluyomade: (18) You said that, even though it doesn't say this in the (19) record, that the orders for trachea toilet were to be (20) done as needed or PRN?
(21) A Yes.
(22) Q Now, I take it you certainly wouldn't rely

Page 85

(1) Q Talk about when you were at the bedside (2) around, I believe, 5:40, and you said you noticed that (3) his trach was protruding?
(4) A Yes.
(5) Q And you said you pushed it back in.
(6) A Yes.
(7) Q Tell me exactly what you did. Every step (8) you took. What you did when you noticed that the (9) trach was protruding.
(10) A I was at the bedside and pushed it back. (11) It was effortless without any resistance.
(12) Q Okay. Did you know – strike that. Do (13) you know how long Mr. Magbie's trach had been (14) protruding?
(15) A Well, it was still in the airway. It was (16) just a matter of – and this is not a terribly unusual (17) thing to see the trach moving a few inches, you know, (18) depending on – so I don't know how long. I don't (19) know how long it was protruding.
(20) Q Okay. All right. Now, you examined Mr. (21) Magbie and you observed him in the emergency (22) department for several hours.

Page 86

(1) A Yes.
(2) Q When is the first time that you believed (3) Mr. Magbie was in danger of not surviving?
(4) A When's the first time I determined that he (5) was in danger of not surviving?
(6) Q Correct.
(7) A When I knew that his oxygen was dropping (8) to levels that were unacceptable.
(9) Q And please tell me what time that was.
(10) A That would be at 17:40.
(11) Q At 17:40 you believed that Mr. Magbie may (12) not survive?
(13) A He was in – was getting into trouble. I (14) couldn't determine his survivability definitely, but (15) I knew he was getting into trouble if we didn't (16) reverse this oxygen or determine what was causing it.
(17) Q Okay. Did you ever, at any point during (18) the time you were providing care and treatment of Mr. (19) Magbie, did you ever consider putting him on the (20) ventilator?
(21) A Well, I was – I could see he was stable (22) and oxygenated very well as far as I knew until the

Page 87

(1) time that I was called, so it's something which I knew (2) he may be needing at some point in the hospital, but (3) while he was with me in the emergency department, I (4) didn't think that he needed it up until the time (5) things started to get critical.
(6) Q I know you hadn't reviewed Mr. Magbie's (7) earlier records from Greater Southeast, but you had (8) know that Mr. Magbie had utilized the ventilator prior (9) to the time you saw him. Could that have impacted (10) your decision on whether or not to place him on a (11) vent?
(12) A Well, it was while I was taking care of (13) him up until that time, 15:40. It wouldn't probably (14) have changed my treatment but I would know that at (15) some point in his stay in the hospital he would need (16) it.
(17) Q Okay.
(18) A Definitely he would need it.
(19) Q Certainly at the time when you believe he (20) was getting in trouble, if you had had the prior (21) knowledge that Mr. Magbie used a vent in the past, (22) that certainly would've impacted your decision as to

Page 88

(1) whether or not to use it at the time you believe he (2) was getting in trouble. Is that true?
(3) MS. JOHNSON: Objection to form. Go (4) ahead.
(5) THE WITNESS: It's at this point when I (6) was intervening, we were doing it manual so really we (7) wouldn't put him on a vent until we had stabilized the (8) situation and then the vent would be something he (9) would be put on.
(10) BY MR. NEWSOME:
(11) Q Earlier, you were having a conversation (12) earlier in the day, around 1:00, 1:10 or so –
(13) A Yes.
(14) Q You were having a conversation with Mr. (15) Magbie. Is that correct?
(16) A Yes, well, the records indicate so, yes.
(17) Q Sure. Would he have been talking back to (18) you?
(19) A No. He could not verbalize.
(20) Q Okay. But he was responding?
(21) A Yes.
(22) Q He understood you?