# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | |
|---|---|
| MARY SCOTT, Individually and<br>As Personal Representative of the Estate of<br>JONATHAN MAGBIE,<br><br>Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA et al.,<br><br>Defendants. | )<br>)<br>)<br>)  Civil Action No. 1:05-CV-01853-RWR<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MOTION FOR PARTIAL SUMMARY JUDGMENT BY DEFENDANTS WILLIAM S. VAUGHN, M.D. AND ROTIMI A. ILUYOMADE, M.D. AS TO ALL CIVIL RIGHTS CLAIMS

COME NOW the Defendants William S. Vaughn, M.D. and Rotimi A. Iluyomade, M.D., by and through undersigned counsel, and move this Court pursuant to Fed. R. Civ. P. 56 for partial summary judgment as to all civil rights claims alleged against Dr. Vaughn and Dr. Iluyomade.

As grounds for their Motion, the Defendants assert: (a) that neither doctor acted under color of federal or state law for purposes of Plaintiff's claim that her decedent's civil rights under the Eighth Amendment or 42 U.S.C. § 1983 were violated, and (b) that any record evidence regarding alleged professional negligence by them is not sufficient to show either that they acted pursuant to any government-sanctioned custom or practice violative of prisoner's civil rights or with deliberate indifference to such rights.

The Defendants respectfully refer the Court to the enclosed Memorandum of Facts and Law and the enclosed Statement of Undisputed Material Facts.

Dated this 20th day of February, 2008.

Respectfully submitted,

/s/ Thomas V. Monahan, Jr.
Thomas V. Monahan, Jr. (04471)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202
(410) 783-4000
tvm@gdldlaw.com
**Attorneys for Defendants William S. Vaughn, M.D. and Rotimi A. Iluyomade, M.D.**

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of February, 2008, I caused to be served *via* electronic filing a true and correct copy of Motion for Partial Summary Judgment by Defendants William S. Vaughn, M.D. and Rotimi A. Iluyomade, M.D. as to all Civil Rights Claims upon the following:

Donald M. Temple, Esquire
Temple Law Office
1229 15th Street, NW
Washington, DC 20005
*Counsel for Plaintiff*

Edward J. Connor, Esquire
5210 Auth Road, Suite 304
Camp Springs, Maryland 20746-4341
*Counsel for Plaintiff*

Elizabeth Alexander, Director
National Prison Project of the ACLU
    Foundation
915 15th Street, NW, 7th Floor
Washington, DC 20005-2302
*Counsel for Plaintiff*

*/s/ Thomas V. Monahan, Jr.*
Thomas V. Monahan, Jr.

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

MARY SCOTT, Individually and            )
As Personal Representative of the Estate of   )
JONATHAN MAGBIE,                        )
                                        )   Civil Action No. 1:05-CV-01853-RWR
            Plaintiff,                  )
                                        )
      v.                                )
                                        )
DISTRICT OF COLUMBIA et al.,            )
                                        )
            Defendants.                 )

---

**DEFENDANTS WILLIAM S. VAUGHN, M.D.'S AND ROTIMI A. ILUYOMADE, M.D.'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO ALL CIVIL RIGHTS CLAIMS**

Defendants William S. Vaughn, M.D. and Rotimi A. Iluyomade, M.D., by and through undersigned counsel, respectfully submit this Statement of Undisputed Material Facts in support of their Motion for Partial Summary Judgment as to All Civil Rights Claims alleged against Defendants Dr. Vaughn and Dr. Iluyomade.

**UNDISPUTED MATERIAL FACTS**

1.      This is a medical malpractice case brought by the mother and personal representative of the estate of Jonathan Magbie, deceased, against various physicians, medical care providers, and others involved in Mr. Magbie's care and treatment for respiratory and other problems that developed after he received a ten day jail sentence on September 20, 2004. (*See* Amended Complaint, *passim*, attached hereto as Exhibit 1.)

2.      Because of dismissals, Drs. Vaughn and Iluyomade and their employer, National Emergency Services District of Columbia, Inc. (NES) are the only remaining Defendants in the case. (*See* Docket Sheet, attached hereto as Exhibit 2.)

3.      At the time of his death, Mr. Magbie, was a 27-year-old quadriplegic, paralyzed from the neck down due to a childhood accident.  He had a permanent tracheotomy tube in place that allowed him to breath and a battery-operated phrenic nerve stimulator that assisted his breathing as needed. (*See* Exhibit 1, ¶28.)

4.      After sentencing on September 20, 2004, Mr. Magbie was transferred to the Central Detention Facility of the District of Columbia (the "Jail").  (*See id.* at Preliminary Statement ¶ 27.)

5.      Thereafter, the Jail transferred Mr. Magbie to the Correctional Treatment Facility ("CTF"). (*See id.* at Preliminary Statement.)

6.      On September 20, while awaiting placement at the Jail, Mr. Magbie developed respiratory problems and was transferred to the emergency room at Greater Southeast Community Hospital (the "Hospital"). (*See id.*, at ¶ 33.)

7.      The Hospital is a private community hospital which, under contract with the D.C. Corrections Department, provided medical services to certain Jail inmates who were brought to the Hospital by Jail custodians. (Exhibit 1, ¶¶ 17, 24)

8.      As a result, the Hospital and its personnel provide Jail inmates the same medical services and other care that it provides to other members of the public. (Exhibit 3 at 25, 31-34, 53-54.)[1]

---

[1] Relevant portions of the transcript of Dr. Rotimi Iluyomade are attached hereto as Exhibit 3.

9.    On admission to the emergency room, Mr. Magbie presented with shortness of breath, a cough, wheezing and rales. His oxygen saturation was 90 percent on room air. He also presented with hypovolemia and low blood sugar. (Exhibit 6 at 118-120.)[2]

10.    At that time, Mr. Magbie came under the care of Dr. Vaughn, an emergency room physician at Greater Southeast Community Hospital. (*See* Exhibit 1, ¶ 33.)

11.    Dr. Vaughn was an employee of National Emergency Services District of Columbia ("NES"), which provided emergency-room services under contract with the Hospital. (Exhibit 4 at 18-19.)

12.    Dr. Vaughn only saw decedent Mr. Magbie on that one occasion and treated Mr. Magbie at the emergency room between about 10:50 p.m. on September 20 and 8:00 a.m. the next morning (September 21) when Dr. Vaughn went off shift. (*See* Exhibit 4 at 41-42, 45, 83-84.)

13.    Between admission and approximately 1:20 a.m. that night, Dr. Vaughn treated Mr. Magbie with three (3) liters of oxygen via nasal cannula, an intravenous ampule of glucose, known as D-50, for his low blood sugar, and fluids for his dehydration and hypovolemia. (*See* Exhibit 5, GSECH ER records; WMVa-0005; 0008-0011.)[3]

14.    As a result of Dr. Vaughn's treatment, Mr. Magbie's condition stabilized by 3:20 a.m. if not before. By that time, his pulse oxygen readings were at 99 percent on room air and all vitals were at normal and/or at least acceptable levels. (See Exhibit 6; WMVa-0011.)

15.    Because of Mr. Magbie's quadriplegia, respiratory abnormalities and breathing problems, Dr. Vaughn initially questioned whether Mr. Magbie needed to be placed on a ventilator at night for additional breathing support. (Exhibit 4 at 53-56.)

---

[2] Relevant portions of the transcript of Dr. William Vaughn are attached hereto as Exhibit 4 .
[3] Relevant portions of the GSECH ER records are attached hereto as Exhibit 5.

16.     Dr. Vaughn initially concluded that Mr. Magbie should be admitted so that, if it became necessary in the future, he could be placed on a ventilator. (*Id.* at 53-54.) He referred to this as an admission so that a ventilator could be used "whenever" or on a PRN [as needed] basis. *Id.*

17.     Later, however, the Hospital's house officer, Dr. Haghighi, declined to approve Mr. Magbie's admission, because Mr. Magbie had only indicated that he needed a ventilator "sometimes" at night and because Mr. Magbie's condition and respiratory status had been stabilized after Dr. Vaughn's treatment without a ventilator. (*Id.* at 54-55.)

18.     By 3:20 a.m. on September 21, Mr. Magbie was at a normal oxygen saturation level and acceptable vital sign values while breathing room air only. (*Id.* at 54-56.)

19.     As part of his decision-making process, Dr. Vaughn testified that he made two calls to Dr. Bastien at the CTF concerning Mr. Magbie's conditions.  As a result of these conversations, Dr. Vaughn was assured that, although the CTF did not have a ventilator, Mr. Magbie could be provided oxygen and a nasal cannula at night as needed. (*See* Exhibit 1 at ¶¶ 34, 38; *see also* Exhibit 4 at 63-68, 71-73.)

20.     In light of this information, Dr. Haghighi, the hospital's house officer, advised Dr. Vaughn to discharge Mr. Magbie. (*See id.*)

21.     Since Dr. Vaughn had stabilized Mr. Magbie on only one hour of oxygen by nasal cannula that evening, he agreed to return Mr. Magbie to the CTF relying on Dr. Bastien's representations regarding the availability of supplemental oxygen and with the understanding that Mr. Magbie would be returned to the emergency room if his condition deteriorated at the CTF. (Exhibit 4 at 66-68.)

4

22.     Several hours later, at 8:00 a.m. on September 21, Dr. Vaughn went off shift. (Exhibit 4 at 84.)

23.     At that time, Mr. Magbie's condition remained stable, his vital signs were normal, and his pulse oxygen reading was at 100 percent on only room air. His blood pressure was normal at 107/68. (Exhibit 6 at 124 & 141.)[4]

24.     Thereafter, Dr. Nunoi, another emergency room physician at Greater Southeast Community Hospital, took over Mr. Magbie's care. Approximately three and one half hours later, Dr. Nunoi discharged Mr. Magbie back to the CTF. (Exhibit 4 at 44-45; Exhibit 1 at ¶¶ 35-36.

25.     In light of the reports and depositions of the Plaintiff's experts, Frank J. Baker, M.D. and Kevin R. Cooper, M.D., the Plaintiff is not claiming that Dr. Vaughn was negligent or violated the standard of care in the treatment that he provided Mr. Magbie to stabilize him on September 20-21. (*See* Exhibit 6 at 123-124, 130-131 & 136-141; Exhibit 7 at 44-53.)[5]

26.     The Plaintiff's experts assert that Dr. Vaughn violated the standard of care only by not admitting Mr. Magbie to provide him access to a ventilator if he needed it in the future. (*See id.*)

27.     The Plaintiff's experts agree that, when Mr. Magbie was discharged on September 21, his condition had been stabilized by Dr. Vaughn and that he did not need to be on a ventilator at that time. (Exhibit 7 at 56; Exhibit 6 at p.123.)

28.     The Amended Complaint does not allege that Dr. Vaughn was responsible for Mr. Magbie's subsequent mistreatment at the jail or the CTF. (*See* Exhibit 1, *passim.*)

---

[4] Relevant portions of the transcript of Dr. Frank Baker are attached hereto as Exhibit 6.
[5] Relevant portions of the transcript of Dr. Kevin Cooper are attached hereto as Exhibit 7.

29.     At approximately 11:30 a.m. on September 21, Mr. Magbie was released to the custody DOC officers and returned to the CTF. (*See id.* at ¶¶ 35-40.)

30.     Thereafter, for more than three full days, Mr. Magbie remained in jail under the care of various other physicians, nurses, medical personnel, and other caretakers whose alleged failure to properly monitor, care and treat Mr. Magbie resulted in his deteriorating medical health. (*See id.* at 38-54.)

31.     Mr. Magbie was brought back to Greater Southeast Community Hospital on the morning of September 24 in severe respiratory distress. (*See id.* at 55.)

32.     After Dr. Vaughn and his colleagues at Greater Southeast Community Hospital last saw Mr. Magbie on September 21, the Plaintiff alleges the occurrence of the following subsequent negligent conduct and breaches of the standard of care at the Jail and CTF prior to Mr. Magbie's return to the Hospital on September 24:

     a.     That Dr. Malehghasemi, the Chief Medical Officer at the CTF, after learning of Mr. Magbie's alleged need for a ventilator at night, and knowing of the CTF's inability to provide ventilator support to Mr. Magbie, failed to arrange his transfer to another facility or to return him to the emergency room. (*Id.* at ¶¶ 38 & 39.)

     b.     That, despite knowledge of Mr. Magbie's special health condition, alleged need for ventilator support, and consequent need for close monitoring by higher-level medical staff, neither Dr. Nwosu, a CTF physician, nor any other doctor, monitored Mr. Magbie while at the CTF. (*Id.* at ¶¶ 40-46.)

     c.     That, upon Mr. Magbie's return to the CTF on September 21, Dr. Nwosu issued an order that Mr. Magbie's tracheostomy tube should be suctioned every eight

6

hours, to check patient's level at every shift, check patient every thirty minutes, and to transfer patient back to GSECH in case of serious breathing difficulty. (*See* Exhibit 7 at p. 18.)

        d.     That, during the period September 21–24, and contrary to Dr. Nwosu's orders, Ojelfo and Ogundipe, who were LPNs at the CTF, failed to perform tracheal suctioning of Mr. Magbie to protect him from respiratory distress, failed to provide sufficient food and nutrition, and failed to provide sufficient fluids to prevent dehydration. (Exhibit 1 at ¶¶ 45-48; Plaintiff's Answers to Interrog. No. 15.)[6]

        e.     That, contrary to doctor's orders and despite Mr. Magbie's weak and helpless condition, Singley, who was a correctional officer, locked Mr. Magbie in his cell and left him unmonitored. (Exhibit 1 at ¶¶ 51-52; Exhibit 8 at No. 35.)

    33.     Frank Baker, M.D., the Plaintiff's medical expert, argued that, after Mr. Magbie was returned to jail on September 21, he remained without adequate treatment until he was returned to Greater Southeast Community Hospital at approximately 10:00 a.m. on September 24, 2004, at which time he presented as unresponsive and in respiratory distress. (Baker report, p. 2.)[7]

    34.     Dr. Baker also testified at his deposition that, while in jail, Mr. Magbie required acute respiratory care and, if the facility noticed that he was having trouble breathing or that he started to deteriorate, that the CTF should have returned him to the emergency room. (Exhibit 6 at 133 & 138.)

---

[6] Relevant portions of Plaintiff's Answers to Interrogatories are attached hereto as Exhibit 8.
[7] Relevant portions of the report of Dr. Frank Baker are attached hereto as Exhibit 9.

35.    Dr. Baker went on to testify that the CTF improperly delayed transfer back to the emergency room and in waiting three days to return Mr. Magbie to the Hospital had waited too long. (*Id.* at 138.)

36.    Kevin R. Cooper, M.D., Plaintiff's other medical expert, testified at his deposition that after Mr. Magbie's return to the CTF, there is no record of Mr. Magbie having his trachea suctioned as frequently as ordered, being given supplemental oxygen through a nasal cannula, or having his oxygen saturation levels checked regularly as ordered. (Exhibit 7 at 20, 22-25.)

37.    The D.C. Jail records do not show Mr. Magbie ever receiving ventilator treatment after being discharged from the emergency room and while under the care of medical personnel at the CTF from September 20 through September 24. (*Id.* at 22.)

38.    Dr. Cooper went on to testify that, even if Dr. Vaughn's treatment and release of Mr. Magbie had been somehow inadequate, it would have been possible to prevent Mr. Magbie's death if proper treatment had been subsequently provided. However, that did not occur. (*Id.* at 62-63.)

39.    In this regard, Dr. Cooper also testified that Dr. Malehghesemi should have returned Mr. Magbie to the emergency room on September 21. (*Id.* at 63.)

40.    Dr. Cooper also admitted that there were any number of doctors who were more immediately in charge of Mr. Magbie from the morning of September 21 through the evening of September 24, when Mr. Magbie died who had the responsibility for his care to include putting him on a ventilator or transferring him to another facility if they believed that was what Mr. Magbie needed. (*Id.* at 65-66.)

41.    As a result of the lack of or inadequacy of medical care and treatment Mr. Magbie received at the Jail and CTF during the three days and nights after his discharge from Greater Southeast Community Hospital on the morning of September 21, Mr. Magbie was once again rushed to the Greater Southeast Community Hospital's emergency room on the morning of September 24, where he came under the care of Dr. Iluyomade, another employee of NES providing emergency room services under contract with the Hospital. (Exhibit 1 at ¶¶ 54-58.)

42.    Although Mr. Magbie arrived at the Hospital's Emergency Room unresponsive and in severe respiratory distress, both Dr. Baker and Dr. Cooper testified that Mr. Magbie's life still could have been saved. (Exhibit 7 at 62-63, 73-74, 76-77; Exhibit 6 at p. 143; and Exhibit 4 depo., 72-73).

43.    The Plaintiff's experts further agree that, by approximately 1:30 p.m., Mr. Magbie's pulse oxygen and vital signs had returned to normal/acceptable readings and that Dr. Iluyomade, the emergency room physician, had appropriately ordered that Mr. Magbie then be admitted for further treatment. (Exhibit 6 at 77-78; 91-98; 108; Exhibit 7 at 73-77 & 81-82; and Exhibit 3 at 43.)

44.    At deposition, both Dr. Baker and Dr. Cooper were critical of Dr. Iluyomade, however, regarding his subsequent care and lack of follow up, as the ER physician on September 24, with regards to the results of Mr. Magbie's arterial blood gas test ("ABG"). More particularly, both experts opined that the ABG results were abnormal and, although Mr. Magbie was then being given optimum oxygen, those results indicated that Mr. Magbie's respiratory system was not moving or ventilating enough air to get rid of his carbon dioxide. This caused Mr. Magbie to develop respiratory acidosis. (Exhibit 6 at 96; 99-101; Exhibit 7 at 78-79.)

9

45.    Drs. Baker and Cooper therefore both opined that Dr. Iluyomade violated the standard of care on September 24 by not ventilating Mr. Magbie after the ABG results were received at approximately 11:10 a.m. (Exhibit 6 at 105; and Exhibit 7 at 89-91 & 95.)

46.    According to the emergency room records for September 24, Mr. Magbie's condition began to slowly deteriorate around 2:00 p.m. while he was awaiting transfer to a hospital bed. (*See* Nursing Progress records RI-0029.)[8]

47.    The Plaintiff's experts further opined that, had Mr. Magbie been placed on a ventilator either prior to 1:30 p.m. or even as late as 5:40 p.m., he would have been treatable and would have survived. (Exhibit 6 at 14 & 81-82; and Exhibit 7 at p. 95.)

48.    With regard to Mr. Magbie's treatment on September 24 Dr. Cooper testified that despite not yet having been admitted pursuant to Dr. Iluyomade's order and despite not being placed on a ventilator either (a) upon admission at 9:30 a.m., (b) after alleged abnormal ABG results at approximately 11:10 a.m., or (c) at any time during the afternoon hours as his oxygen saturation levels declined, Mr. Magbie may still have been saved if he had been properly ventilated by 6:15 p.m. (Exhibit 7 at 88-89.)

49.    Similarly, in Dr. Baker's opinion, Mr. Magbie may still have been saved if properly ventilated and his airway cleared by 6:35 p.m. (Exhibit 6 at 83-89.)

50.    Thus, in addition to being critical of Dr. Iluyomade for failing to place Mr. Magbie on a ventilator immediately, Drs. Baker and Cooper also allege additional violations of the standards of care by other medical care providers at the hospital between approximately 2:00 p.m. and Mr. Magbie's death at 6:40 p.m. (*See id.*)

---

[8] Relevant portions of the Nursing Progress Notes are attached hereto as Exhibit 10.

10

51.    Specifically, as to the emergency room nursing care, Drs. Baker and Cooper insisted that, during the four to five hour period that Mr. Magbie was awaiting hospital admission:

a.    The nurses failed to monitor Mr. Magbie's vital readings and pulse oxygen monitors as frequently as required given Mr. Magbie's condition.  (Exhibit 6 at 105-107; 109-110; Exhibit 9 at p. 2; and Cooper report p. 2.)[9]

b.    When Mr. Magbie's pulse oxygen and vital readings started to decline between 2:00 p.m. and 3:30 p.m., the nurses should have notified Dr. Iluyomade of such changes but failed to do so.  (Exhibit 6 at  77-79 & 105-106; and Exhibit 7 at  82-83)

c.    The nurses' failure to notify Dr. Iluyomade of Mr. Magbie's deteriorating vital readings and drop in pulse oxygen to 80 percent of normal until 5:40 p.m. (a 2 to 3½ hour delay) was inappropriate and, if reported earlier, should have changed Dr. Iluyomade's response and the ultimate outcome.  (Exhibit 6 at 106; Exhibit 7 at 94-96; Exhibit 11 at p. 2.)

52.    Thereafter, at 5:40 p.m., the nurses finally alerted Dr. Iluyomade to Mr. Magbie's deteriorating condition.  In addition, and for the first time, the nurses also noted a dislodgement of Mr. Magbie's tracheostomy tube, which could interfere with Mr. Magbie's breathing airway. (Exhibit 6 at 84-86; Exhibit 7 at p. 88; Exhibit 3 at 86-87.)

53.    The Plaintiff's experts are also therefore critical of Dr. Iluyomade's response and treatment of Mr. Magbie at 5:40 p.m. and thereafter, reiterating that Mr. Magbie still could have been saved then.  (*See id.*)

---

[9] Relevant portions of the report of Dr. Kevin Cooper are attached hereto as Exhibit 11.

11

54.    More particularly, Dr. Baker opined that, "[d]uring that admission, his ventilatory status was mismanaged when he became progressively hypoxic sometime between 15:30 and 17:40 hours.  There was inadequate monitoring between 15:30 hours and 17:40 hours at which time he was noted by a respiratory therapist to have an oxygen saturation of 80% on room air." (Exhibit 6 at 70-71.)

55.    Dr. Iluyomade was called to the bedside at 5:40 p.m. regarding the respiratory distress and decreasing pulse oximetry values of the patient. After describing a preferable procedure for dealing with that emergent situation and that failing to follow that approach was a deviation from the standard of care Dr. Baker went on to opine that, "had [Mr. Magbie's] airway been reestablished on 9/24/05, he would not have succumbed from hypoxia which was the immediate cause of his cardiac arrest and which was a direct result of dislodgement of his tracheostomy tube." (Exhibit 9 at  3; Exhibit 6 at 57 & 68 (emphasis added); *see also* Exhibit 8 at No. 32.)

56.    The District of Columbia Medical Examiner's office performed an autopsy, from which Dr. Pierre-Louis, the Medical Examiner, concluded that the cause of death was "acute respiratory failure following dislodgement of tracheostomy tube placed for treatment of respiratory insufficiency due to remote upper cervical spinal cord injury with quadriplegia due to blunt impact trauma." (*See* Autopsy Report / Certificate of Death, at 1 (emphasis added) attached hereto as Exhibit 12.)

57.    Mr. Magbie's tracheal tube dislodgement on September 24 occurred approximately one hour before his death. (Exhibit 1 at ¶¶ 56; 52; *see also* Exhibit 5.) There is no indication of any earlier tracheal tube dislodgement during Mr. Magbie's emergency room admission and

12

treatment by Dr. Vaughn on September 20, nor at any time thereafter until the ER nurses entry at approximately 5:40 p.m. on September 24. (Exhibit 1 at ¶¶ 55-59; Exhibit 6 at 57-61.)

Dated this 20th day of February, 2008.

Respectfully submitted,

_/s/ Thomas V. Monahan, Jr._
Thomas V. Monahan, Jr. (04471)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland  21202
(410) 783-4000
tvm@gdldlaw.com
**Attorneys for Defendants William S. Vaughn, M.D. and
Rotimi A. Iluyomade, M.D.**

13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| MARY SCOTT, Individually and<br>As Personal Representative of the Estate of<br>JONATHAN MAGBIE,<br><br>            Plaintiff,<br><br>     v.<br><br>DISTRICT OF COLUMBIA et al.,<br><br>            Defendants. | )<br>)<br>)<br>)  Civil Action No. 1:05-CV-01853-RWR<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF FACTS AND LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT BY DEFENDANTS WILLIAM S. VAUGHN, M.D. AND ROTIMI A. ILUYOMADE, M.D. AS TO ALL CIVIL RIGHTS CLAIMS**

Defendants William S. Vaughn, M.D. and Rotimi A. Iluyomade, M.D., by and through undersigned counsel, respectfully submit this Memorandum of Facts and Law in support of their motion for partial summary judgment as to all civil rights claims alleged against Dr. Vaughn and/or Dr. Iluyomade.

**I.   STATEMENT OF FACTS**

This is a medical malpractice case brought by the mother and personal representative of the estate of Jonathan Magbie, deceased, against various physicians, medical care providers, and others involved in Mr. Magbie's care and treatment for respiratory and other problems that developed after he received a ten day prison sentence on September 20, 2004. Because of dismissals, Drs. Vaughn and Iluyomade and their employer, National Emergency Medical Services District of Columbia, are the only remaining defendants in the case.

At the time of his death, decedent Jonathan Magbie, was a 27-year-old quadriplegic, paralyzed from the neck down due to a childhood accident. He breathed through a permanent tracheostomy tube. In addition, he had undergone placement of a battery-operated phrenic nerve stimulator which continuously operated to assist his breathing.

After sentencing on September 20, 2004, Mr. Magbie was transferred to the Central Detention Facility of the District of Columbia (the "Jail"). Thereafter, the Jail transferred Mr. Magbie to the Correctional Treatment Facility ("CTF").

On September 20, while awaiting placement at the jail, Mr. Magbie developed respiratory problems and was transferred to the emergency room at Greater Southeast Community Hospital (the "Hospital"), a private community hospital that, under contract with the D.C. Corrections Department, provided medical services to certain Jail inmates who were brought to the Hospital by Jail custodians. (Exhibit 1 at ¶¶ 17, 20.) The Hospital does not have a prison ward or other custodial area for Jail inmates brought for treatment there, and Hospital personnel (whether employees or independent contractors) are not responsible for the custody of Jail inmates. (Exhibit 4 at 32-33; Exhibit 3 at 25, 31-34, 53-54.) As a result, the Hospital and its personnel provide Jail inmates the same medical services and other care that it provides to other members of the public. (Exhibit 3 at 25, 31-34, 53-54.)

On admission to the emergency room, Mr. Magbie presented with shortness of breath, a cough, wheezing and rales. His oxygen saturation was 90 percent on room air. He also presented with hypovolemia and low blood sugar. (Exhibit 6 at 118-120.) At that time, Mr. Magbie came under the care of Dr. Vaughn, an emergency room physician at Greater Southeast Community Hospital. Dr. Vaughn was an employee of National Emergency Services District of Columbia

2

("NES"), which provided emergency-room services under contract with the Hospital. (Exhibit 4 at 18-19.) Dr. Vaughn only saw decedent Mr. Magbie on that one occasion and treated Mr. Magbie at the emergency room between about 10:50 p.m. on September 20 and 8:00 a.m. the next morning (September 21), when Dr. Vaughn went off shift.

Between admission and approximately 1:20 a.m. that night, Dr. Vaughn treated Mr. Magbie with three liters of oxygen via nasal cannula, an ampule of D50 IV for his low blood sugar, and fluids for his dehydration and hypovolemia. (*See* Exhibit 5 at; WMVa-0005; 0008-0011.) As a result of Dr. Vaughn's treatment, Mr. Magbie's condition stabilized by 3:20 a.m. if not before. By that time, his pulse oxygen readings were at 99 percent on room air and all vitals were at normal and/or at least acceptable levels. (See *Id.;* WMVa-0011.)

Because of Mr. Magbie's quadriplegia, respiratory abnormalities and breathing problems, Dr. Vaughn initially had a question as to whether Mr. Magbie needed to be placed on a ventilator at night for additional breathing support. (Exhibit 4 at 53-56.) Indeed, Dr. Vaughn had initially ordered that Mr. Magbie be admitted to the hospital with diagnosis of hypervolemia, hypoglycemia and respiratory distress. Later, however, the Hospital's house officer, Dr. Haghighi, declined to approve Mr. Magbie's admission, because Mr. Magbie had only indicated that he needed a ventilator "sometimes" at night and because Mr. Magbie's condition and respiratory status had been stabilized after Dr. Vaughn's treatment without a ventilator. By 3:20 a.m. on September 21, Mr. Magbie demonstrated a normal pulse oxygen and acceptable vital sign values on room air only. (Exhibit 4 at 54-56.)

3

### A.    Facts And Allegations As To Dr. Vaughn

As part of his decision-making process, Vaughn testified that he made "two (2) calls to Dr. Bastien at the CTF concerning Mr. Magbie's conditions. As a result of these conversations, Vaughn was assured that, although the CTF did not have a ventilator, Mr. Magbie could be provided oxygen and a nasal cannula at night as needed. In light of this information, Dr. Haghighi, the hospital's house officer, advised Dr. Vaughn to discharge Mr. Magbie. (*See* Exhibit 1 at ¶¶ 34, 38; *see also* Exhibit 4 at 63-68, 71-73.)

Since Dr. Vaughn had stabilized Mr. Magbie after only one hour of oxygen by nasal cannula that evening, he agreed to return Mr. Magbie to the CTF relying on Dr. Bastien's representations, with the understanding that Mr. Magbie would be returned to the emergency room if his condition deteriorated at the CTF. (Exhibit 4 at 66-68.)

Several hours later at 8:00 a.m. on September 21, Dr. Vaughn went off shift. At that time, Mr. Magbie's condition remained stable. His vital signs were normal, his pulse oxygen was at 100 percent on only room air, and his blood pressure was reading normal at 107/68. (Exhibit 6 at 124 & 141.) Thereafter, Dr. Nunoi, another emergency room physician at Greater Southeast Community Hospital, took over Mr. Magbie's care. Approximately three one half hours later, Dr. Nunoi discharged Mr. Magbie back to the CTF.

In light of the reports and depositions of the Plaintiff's experts, Frank J. Baker, M.D. and Kevin R. Cooper, M.D., the Plaintiff is not claiming that Dr. Vaughn was negligent or violated the standard of care in the treatment that he provided Mr. Magbie to stabilize him on September 20-21. The Plaintiff's experts assert that Dr. Vaughn violated the standard of care only by not admitting Mr. Magbie to provide him access to a ventilator. (*See* Exhibit 6 at 123-124, 130-131 &

4

136-141; Exhibit 7 at 44-53.)  However, the Plaintiff's experts agree that, when Mr. Magbie was discharged on September 21, his condition had been stabilized by Dr. Vaughn and he did not need to be on a ventilator at that time.  (Exhibit 7 at 56; Exhibit 6 at 123-125.)

At approximately 11:30 a.m. on September 21, Mr. Magbie was released to the custody DOC officers and of returned to the CTF.  Thereafter, for more than three full days, Mr. Magbie remained in jail and under the care of various other physicians, nurses, medical care providers, and other caretakers whose alleged failure to properly monitor, care and treat Mr. Magbie resulted in his deteriorating medical health and being brought back to Greater Southeast Community Hospital on the morning of September 24 in severe respiratory distress.  (Exhibit 1 at ¶¶ 38-54.)

**B.    Facts And Allegations As To Dr. Iluyomade**

As a result of the lack of or inadequacy of medical care and treatment Mr. Magbie had received at the Jail and CTF during the three days and nights after his discharge from Greater Southeast Community Hospital on the morning of September 21, Mr. Magbie was once again rushed to the Greater Southeast Community Hospital's emergency room on the morning of September 24, where he came under the care of Dr. Iluyomade, another employee of NES providing emergency-room services under contract with the Hospital.  (Exhibit 1 at ¶¶ 55-56 .)

Although Mr. Magbie arrived at the Hospital's Emergency Room unresponsive and in severe respiratory distress, both Dr. Baker and Dr. Cooper testified that Mr. Magbie's life still could have been saved, and that he initially received appropriate care and treatment that temporarily reversed and stabilized his presenting respiratory problems.  (Exhibit 7 at p. 59; Exhibit 6 at 139-140 & 143; and Exhibit 3 at 72-73.)  Both experts further agree that, by approximately 1:30 p.m., Mr. Magbie's pulse oxygen and vital signs had returned to

normal/acceptable readings and that Dr. Iluyomade, the emergency room physician, had appropriately ordered that Mr. Magbie then be admitted for further treatment. (Exhibit 6 at 77-78; 91-98; 108; Exhibit 7 at 73-77 & 81-82; and Exhibit 3 at 43.)

At deposition, both Dr. Baker and Dr. Cooper were critical of Dr. Iluyomade, however, regarding his subsequent care and lack of follow up, as the ER physician on September 24, with regards to the results of Mr. Magbie's arterial blood gas test ("ABG"). Both experts opined that the ABG results were abnormal and, although Mr. Magbie was then being given optimum oxygen, those results indicated that Mr. Magbie's respiratory system was not moving or ventilating enough air to get rid of his carbon dioxide. (Exhibit 6 at 96; 99-101; Exhibit 7 at 78-79.) Drs. Baker and Cooper therefore both claimed that Dr. Iluyomade violated the standard of care on September 24 by not ventilating Mr. Magbie after the ABG results were received at approximately 11:10 a.m. (Exhibit 6 at 105; and Exhibit 7 at 89-91 & 95.)

The Plaintiff's experts further argued that, had Mr. Magbie been placed on a ventilator either prior to 1:30 p.m. or even as late as 5:40 p.m., he would have been treatable and would have survived. (Exhibit 6 at 14 & 81-82; and Exhibit 7 at 95.) Moreover, with regard to Mr. Magbie's treatment on September 24 Dr. Cooper believes Mr. Magbie may still have been saved if he had been ventilated by 6:15 p.m. (Exhibit 7 at 88-89.) Similarly, in Dr. Baker's opinion, Mr. Magbie may still have been saved if properly ventilated and his airway cleared by 6:35 p.m. (Exhibit 6 at 83-89.)

According to the emergency room records for September 24, Mr. Magbie's condition began to slowly deteriorate around 2:00 p.m. while he was awaiting transfer to a hospital bed. (*See* Exhibit 10 at RI-0029.) In addition to being critical of Dr. Iluyomade for failing to place Mr.

Magbie on a ventilator immediately, Drs. Baker and Cooper also allege additional violations of the standards of care by other medical care providers at the hospital between approximately 2:00 p.m. and Mr. Magbie's death at 6:40 p.m.

Specifically, as to the emergency room nursing care, Drs. Baker and Cooper argued that, during the four to five hour period that Mr. Magbie was awaiting hospital admission:

a. The nurses failed to monitor Mr. Magbie's vital readings and pulse oxygen monitors as frequently as required given Mr. Magbie's condition. (Exhibit 6 at 105-107; 109-110; Exhibit 9 at p. 2; and Exhibit 11 at p. 2.)

b. When Mr. Magbie's pulse oxygen and vital readings started to decline between 2:00 p.m. and 3:30 p.m., the nurses should have notified Dr. Iluyomade of such changes. (Exhibit 6 at   77-79 & 105-106; and Exhibit 7 at   82-83)

c. The nurses' failure to notify Dr. Iluyomade of Mr. Magbie's deteriorating vital readings and drop in pulse oxygen to 80 percent of normal until 5:40 p.m. (a 2 - 3½ hour delay) was inappropriate and, if reported earlier, that information should have changed Dr. Iluyomade's response and the ultimate outcome. (Exhibit 6 at 106; Exhibit 7 at 94-96; and Exhibit 11 at 2.)

Thereafter, at 5:40 p.m., the nurses finally alerted Dr. Iluyomade to Mr. Magbie's deteriorating condition.  In addition, and for the first time, the nurses also noted a dislodgement of Mr. Magbie's tracheostomy tube, which could interfere with Mr. Magbie's breathing airway. Dr. Iluyomade was called to the bedside at 17:40 hours regarding the respiratory distress and decreasing pulse oximetry values of the patient.  After describing a preferable procedure for dealing with that emergent situation and that failing to follow that approach was a deviation from

7

the standard of care," (*see id.*, 70-72), Dr. Baker stated further that, "had [Mr. Magbie's] airway been reestablished on 9/24/05, he would not have succumbed from hypoxia which was the immediate cause of his cardiac arrest and which was a direct result of dislodgement of his tracheostomy tube." (Exhibit 9 at p. 3; Exhibit 6 at 57 & 68 (emphasis added); *see also* Exhibit 8 at No. 32.)

The District of Columbia Medical Examiner's office performed an autopsy, from which Dr. Pierre-Louis, the Medical Examiner, concluded that the cause of death was "acute respiratory failure following dislodgement of tracheostomy tube placed for treatment of respiratory insufficiency due to remote upper cervical spinal cord injury with quadriplegia due to blunt impact trauma." (*See* Exhibit 12, at 1 (emphasis added).) Mr. Magbie's tracheal tube dislodgement on September 24 occurred approximately one hour before his death. There is no indication of any earlier tracheal tube dislodgement during Mr. Magbie's emergency room admission and treatment by Dr. Vaughn on September 20, or at any time thereafter until the ER nurses entry at approximately 5:40 p.m. on September 24.

## II.   LEGAL ARGUMENT

### A.   Legal Standards For The Granting Of A Motion For Summary Judgment

Pursuant to Fed. R. Civ. P. 56, a motion for summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" and a fact is "material" within the meaning of those terms only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248 (1986). If the court concludes that "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, in a negligence action, the defendant is entitled to summary judgment if, after reviewing the evidence in the light most favorable to the plaintiff, "no reasonable jury could find that [the plaintiff] established each of the elements of negligence." *Briggs v. WMATA*, 481 F.3d 839, 843 (D.C. Cir. March 27, 2007).

**B.** **The Plaintiff Has Failed To Establish That Defendants Vaughn And/Or Iluyomade Are Liable For Violating Mr. Magbie's Constitutional Or Other Civil Rights.**

1. **The Plaintiff Has Failed To Show That Defendants Vaughn And Iluyomade Were State Actors For Purposes Of Mr. Magbie's Civil Rights Claims.**

a. *The Eighth Amendment And Other Civil Rights Claims Here Lie Only Against Those Acting Under Color Of Federal Or State Law.*

The threshold requirements necessary to maintain a § 1983 claim in an action such as the present case are well known. In *Sallie v. Tax Sale Investors, Inc.*, 998 F.Su 612, 621 (D.Md.1998) the court noted that "[t]o prevail in an action brought under 42 U.S.C. § 1983, plaintiffs must show that they were deprived of a right secured by the Constitution or laws of the United States, and that the defendant acted under color of state law. . . . [A] private entity . . . can only be held liable under 42 U.S.C. § 1983 for activity that constitutes state action. . . ." In *Rossignol v. Voorhaar*, 316 F.3d 516, 523 n.1 (4th Cir. 2003), *cert. denied*, 540 U.S. 822, 124 S.Ct. 135, 157 L.Ed.2d 41 (2003), the Fourth Circuit instructed:    [I]f a defendant's conduct satisfies the state-action

9

requirement of the Fourteenth Amendment, it also constitutes action "under color of state law" for the purposes of § 1983...."

Medical professionals serving as members of a prison's medical staff may be held liable for violating a prisoner's Eighth Amendment rights. *West v. Atkins*, 487 U.S. 42, 48-49 & n.8 (1988). Outside medical professionals having contact with prisoners outside prison to provide some medical service, however, often are not regarded as state actors. *See, e.g., McIlwain v. Prince William Hospital*, 774 F. Su 986, 989-90 (E.D. Va. 1991) (noting that "a hospital's mere acceptance of a prison inmate for emergency care does not transform the hospital into a state actor." By seeking medical care for the inmate, the prison did not delegate its duty to provide prisoner care nor did Hospital, by accepting patient, accept duty to treat); *Sykes v. McPhillips*, 412 F. Su 2d 197, 200-04 (N.D.N.Y. 2006) (despite tendering treatment pursuant to EMTALA, neither private hospital nor treating physicians were state actors); *Lavin v. Snyder*, 2006 WL 2583711, at *2 (S.D. Ill. Sept. 1, 2006) (physician who treated inmate at physician's private office or at private hospital was not state actor); *Nunez v. Horn*, 72 F. Su 2d 24, 27 (N.D.N.Y. 1999) (private physician neither employed as prison doctor nor under contract to provide prison medical services was not state actor for purposes of § 1983 claim against physician's treatment of his elbow constituted a violation of Eight Amendment.)

Similarly, participation in a program of state funding for medical care does not constitute state action for purposes of alleging a violation of constitutional rights. *See Blum v. Yaretsky*, 457 U.S. 991, 1003-12 (1982). Nursing homes, and by analogy private hospitals and their personnel, do not perform a function that has been "traditionally the exclusive prerogative of the state and the State's extensive regulation of the entity does not transform it into a state actor. *See*

10

*Blum*, 457 U.S. at 1011 (citations omitted); *Estades-Negroni v. CPC Hosp. San Juan Capistrano*, 412 F.3d 1, 2-8 (1st Cir. 2005) (private health care providers that participated in patient's involuntary mental health commitment and were subject to extensive state licensing and regulation, were not state actors, and thus were not subject to liability under § 1983, even though patient was indigent covered by State's health insurance system.)

The Courts have traditionally employed three tests to determine whether a private party can be characterized as a state actor: the state-compulsion test, the nexus/joint action test, and the public function test. *Estades-Negroni*, 412 F.3d at 5 *citing Rockwell*, 26 F.3d at 257. In *Estades*, the court considered each of the tests, noting that if any of them were met, the state action requirement would be satisfied.[10] (Holding that under the three tests, private health care providers were not state actors for purposes of § 1983 claim). After application of the three tests to the case *sub judice*, this Court must conclude that Drs. Vaughn and Iluyomade were not state actors.

---

[10] In *Estades-Negroni v. CPC Hosp. San Juan Capistrano*, 412 F.3d 1, 5 (1st Cir. 2005), the Court described the three tests as follows:

> Under the state compulsion test, a private party is fairly characterized as a state actor when the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). The nexus/joint action test provides that a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir.1999) (internal quotation marks omitted) (first alteration in original); *see Perkins*, 196 F.3d at 21. And, in accordance with the public function test, a private party is viewed as a state actor if the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been "traditionally the exclusive prerogative of the State." *Blum*, 457 U.S. at 1005, 102 S.Ct. 2777 (internal quotation marks omitted)

11

Here, there can be no finding of state action under the state compulsion that, the Plaintiff has failed to allege facts that would support a finding the state coerced Drs. Vaughn and Iluyomade in their medical treatment of Mr. Magbie. Similarly, the Plaintiffs have failed to plead sufficient facts to justify a finding of state action under the nexus/joint action that, specifically, the complaint does not indicate that the state "so far insinuated itself into a position of interdependence with [Dr. Iluyomade and Vaughn] that it [should be considered] a joint participant in" their actions pertaining to the medical treatment rendered to Mr. Magbie at Greater Southeast Community Hospital. *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999). Lastly, there is no state action under the public function test because it is beyond cavil that medical treatment is not a function that was traditionally the exclusive prerogative of the state.

**b.**    ***There Is No Record Evidence That Defendants Vaughn Or Iluyomade Acted Under Color Of Federal Or State Law In Providing Medical Care To Mr. Magbie.***

In this case, the Jail and CTF had its own staff of physicians and other medical personnel, and it is such personnel who are normally presumed to be state actors for purposes of Eighth Amendment and other civil rights claims. In contrast, the Hospital as an occasional provider of emergency room services to Jail inmates, as well as the private physicians providing Emergency Room services at the Hospital, are generally not regarded as state actors against whom Eighth Amendment and other civil rights claims could properly be made as the result of allegedly inadequate medical care for an inmate.

In this case, Drs. Vaughn and Iluyomade were independent contractors of defendant NES, which in turn provided certain Emergency Room staffing services under contract with the Hospital. (Exhibit 4 at 18, 21.) As a result, Defendants Vaughn and Iluyomade had no direct

12

contractual relationship with the Jail or the CTF and no contractual expectation of business from those entities. Instead, Drs. Vaughn and Iluyomade were present at the Hospital on September 20-21 and September 24, respectively, to treat whomever came into the Hospital's Emergency Room, without regard to the patient's relationship to custodians, guardians, parents or other relatives directly responsible for the patient's care.

Furthermore, given the fact that the Defendants Vaughn and Iluyomade provided emergency-room care to Mr. Magbie on only one occasion each and had no previous contact with Mr. Magbie or his custodians that could serve to create an agreement by defendants Vaughn or Iluyomade to "provide appropriate custodial care" consistent with the constitutional obligations imposed by law on the Jail and the CTF, as well as their respective staffs, it would be unreasonable to conclude that Dr. Vaughn or Dr. Iluyomade assumed any custody-related duties to Mr. Magbie.

Finally, the record is devoid of evidence that either Dr. Vaughn or Dr. Iluyomade were part of or privy to any deliberately indifferent course of conduct by the governmental defendants (such as the District of Columbia, its Director of Corrections, the Jail's custodial personnel and the CTF's medical personnel) with respect to Mr. Magbie's general right to adequate medical care as a Jail inmate. That is, if any such situation existed within the D.C. Corrections Department, neither Dr. Vaughn nor Dr. Iluyomade were even aware of it, let alone involved in it.

13

**2.    In The Alternative, the Plaintiff Has Failed To Show That Defendants Vaughn and Iluyomade Lacked Qualified Immunity For Good-Faith Efforts To Provide Required Medical Care.**

**a.    Private Parties May Raise the Defense of Qualified Immunity, If Their Allegedly Wrongful Conduct Constitutes State Action.**

Private parties may raise the defense of qualified immunity in certain circumstances where their allegedly wrongful conduct has been held to constitute state action. *See Williams v. O'Leary*, 55 F.3d 320, 323-24 (7th Cir. 1995); *Sherman v. Four County Counseling Center*, 987 F.2d 397, 406 (7th Cir.1993). In *Sherman*, a private mental institution treated a patient under a court order directing the provision of discretionary medical treatment. *Id.* at 406. The court noted that in a variety of contexts, courts have found that a qualified-immunity defense was available to private citizens. Those cases involved private parties acting under a government contract fulfilling a governmental function, parties discharging statutorily mandated duties under a contract, or a physician acting pursuant to a court order. *Id.* at 405 (citation omitted). As a result, since the defendant mental institution in *Sherman* had provided the plaintiff discretionary medical care pursuant to a court order, the court allowed the defendant to raise the defense of qualified immunity. *Id.* at 406. Similarly, in *Williams*, since the physician defendant worked for a private entity providing prison medical services under contract with the state, the court allowed the defendant to raise the defense of qualified immunity. *Id.* at 324.

Under the qualified-immunity defense, public officials and others performing discretionary governmental functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Burns v. Loranger*, 907 F.2d 233, 235 (1st Cir.1990).

14

*Harlow* requires that the court conduct two inquiries: (1) whether at the time of the alleged conduct there was a clearly established constitutional right that was violated; and (2) whether a reasonable person would have known that his conduct violated that right. *See Burns*, 907 F.2d at 235-36.

The Supreme Court has held that, to find a "clearly established" constitutional right, the contours of the right must be sufficiently clear that a reasonable official or other state actor would understand that what he is doing violates that right. *Anderson,* 483 U.S. at 640. The constitutional right must be established at the time of the alleged violation, so a court may not find that the right was established through the use of hindsight. *Harlow,* 457 U.S. at 818; *Brennan v. Hendrigan,* 888 F.2d 189, 192 (1st Cir.1989). Further, a plaintiff must allege more than that the allegedly injurious conduct violated an "abstract" constitutional principle; the plaintiff must plead with particularity the violation of a specific constitutional right. *Anderson,* 483 U.S. at 640. That is, unless the alleged constitutional principle on which the claim is based establishes an absolute and unqualified right regardless of the circumstances, the plaintiff must plead the existence of a particular right in the circumstances and prove that the defendant showed deliberate indifference to that particular right. *See Frazier v. Bailey*, 957 F.2d 920, 929-30 (1st Cir. 1992) (discussing the requirement for alleging and proving deliberate indifference to a particular right based on the abstract principle of familial integrity, for which the dimensions have yet to be clearly established). This same principle applies to the abstract right of prisoners to adequate medical care.

As a result, even if the alleged actions of Drs. Vaughn and Iluyomade had been improper to the point of being unconstitutional, which here they were not, the Defendants still would be

15

entitled to immunity from suit unless the unconstitutionality of their allegedly wrongful actions was so clearly established at the time of the conduct that a reasonable defendant would have understood that he was violating that constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Accordingly, the reasonableness of the Defendant physicians' actions here should be judged from their perspective at the time they engaged in the allegedly injurious conduct, not in hindsight. *Id.* Moreover, even more than in the case of police officers, who often have to make quick arrest or search-and-seizure decisions with a substantial focus on whether their conduct will violate someone's constitutional rights, physicians in an emergency-room setting have to make quick decisions in deciding how to proceed with regard to the patient's medical needs with at most an incidental concern about whether their conduct will violate the patient's constitutional rights. *See id.* Therefore, the burden on the Plaintiff here to bring forward evidence regarding some knowing or deliberately indifferent violation of Mr. Magbie's constitutional rights is especially high.

> **b.  *The Plaintiff Has Failed To Show That Defendants Vaughn Or Iluyomade Violated Any Accepted Constitutional Right.***

As explained in detail below, the Plaintiff has failed to allege any concrete constitutional right that was clearly established at the time of Mr. Magbie's emergency treatment by Defendants Vaughn and Iluyomade, or that such a right was sufficiently clear to be recognized as such. The Plaintiff has likewise failed to prove that Defendants Vaughn and Iluyomade violated any such right. Accordingly, Defendants Vaughn and Iluyomade are entitled to qualified immunity afforded to persons required as state actors to provide medical treatment to Mr. Magbie.

More particularly, as to Defendant Vaughn, the Plaintiff has failed to prove that Dr. Vaughn's discretionary decision—especially under instructions from the Hospital's house

16

officer Dr. Haghighi—to release Mr. Magbie for return to the Jail or the CTF, despite understanding that the CTF did not have a respirator for Mr. Magbie's use at night, involved any violation of a clearly recognized constitutional right. Instead, for each of the following reasons, Dr. Vaughn is entitled to qualified immunity from suit here.

First, neither Mr. Magbie nor anyone else told Dr. Vaughn that Mr. Magbie required the use of a respirator every night. (*See* Exhibit 4 at 54-55.) Instead, As Dr. Vaughn testified and the medical records confirm, Mr. Magbie told Dr. Vaughn that he needed a respirator at night <u>on some occasions</u>. (*See id.*) As a result, Dr. Vaughn's decision to release Mr. Magbie back to the Jail and its CTF did not effectively deprive Mr. Magbie of something Dr. Vaughn knew that Mr. Magbie had a constitutional right to have.

Second, neither Mr. Magbie nor anyone else told Dr. Vaughn that Mr. Magbie's condition could not be treated at night using supplemental oxygen delivery via canula. (*See id.*) Instead, as Dr. Vaughn testified and the medical records confirm, Dr. Vaughn had treated and monitored Mr. Magbie for an entire night and had been able to correct and stabilize Mr. Magbie's condition using supplemental oxygen, without use of a respirator. Moreover, Dr. Vaughn made his decision to release Mr. Magbie to the Jail and the CTF only after learning from Dr. Bastien at the CTF that Mr. Magbie could be provided with supplemental oxygen delivery via canula. (*See* Exhibit 1 at ¶34, 38; *see also* Exhibit 4 at 63-68, 71-73.) As a result, Dr. Vaughn's decision to release Mr. Magbie back to the Jail and its CTF provided Mr. Magbie what appeared to be a reasonable alternative treatment that the Jail or its CTF would provide him as needed under a doctor's supervision.

17

Third, as Dr. Vaughn discussed with Dr. Bastien of the CTF, Mr. Magbie would be returned to the Emergency Room if such treatment did not take care of any medical need as it arose. (*See* Exhibit 4 at 66-68.) As a result, as Dr. Vaughn then understood the situation, by releasing Mr. Magbie from the Emergency Room he was not knowingly exposing Mr. Magbie to custodial circumstances where his continuing medical needs would not be monitored, treated and otherwise met.

Similarly, as to Defendant Iluyomade, the Plaintiff has failed to allege or prove that Dr. Iluyomade knew or should have known that his conduct in treating Mr. Magbie represented the violation of an established constitutional right. Instead, for each of the following reasons, Dr. Iluyomade is entitled to qualified immunity from suit here.

First, the Plaintiff has failed to offer any evidence that, after he successfully reversed and stabilized Mr. Magbie's condition upon his return to the Hospital's Emergency Room on the morning of September 24, Dr. Iluyomade's decisions to order his admission to the Hospital and to order that Mr. Magbie's condition continue to be monitored by other Emergency Room personnel pending completion of the admission process, involved the violation of a clearly recognized constitutional right. Instead, Dr. Iluyomade and the Hospital were faulted by Plaintiff's medical experts solely for not placing Mr. Magbie on a respirator promptly, for not monitoring his condition more frequently while awaiting his admission to the Hospital, and ultimately for not performing the preferred procedure for dealing with Mr. Magbie's tracheostomy airway when it became dislodged late that afternoon. (*See* Statement of Facts, *supra*, 6-7.) Indeed, in her Response to Defendants' Joint Interrogatories, Plaintiff does not even mention such alleged

18

omissions by Dr. Iluyomade as a basis for claiming deliberate indifference. (*See id.*, Exhibit 8 at No. 32.)

<u>Second</u>, as a basis for knowing disregard of an established constitutional right, the Plaintiff asserts in her Response to the Defendants' Joint Interrogatories that, after recognizing that Mr. Magbie's permanent tracheotomy tube had become dislodged and then pushing it back in, Dr. Iluyomade acted with deliberate indifference by failing to assess Mr. Magbie's respiratory status before returning to other duties. (*See id.*) In fact, however, there is no record evidence even suggesting that Dr. Iluyomade was deliberately indifferent to an excessive risk of serious harm in that regard. Instead, this record simply reflects a dispute between the Plaintiff's experts and Dr. Iluyomade about whether he should have taken further steps to ensure that Mr. Magbie's oxygen saturation was improving before returning to other duties. (*See id.*, p. 11.)

Accordingly, even if the Court were to determine that Defendants Vaughn and Iluyomade were state actors in providing Emergency Room treatment to Mr.Mr. Magbie, <u>which they were not</u>, the Court should nevertheless grant these Defendants summary judgment on the ground that their government-required treatment of Mr. Magbie on September 21-22 and September 24, respectively, was qualifiedly immune from suit because of their good faith in attempting to provide adequate treatment just as if Mr. Magbie were not a Jail inmate.

19

3. **Plaintiff Has Also Failed To Show That Defendants Vaughn And Iluyomade Are Liable For Anything Beyond Ordinary Negligence, and Therefore Are Not Liable for Violating Any Eighth Amendment Right.**

        a.    *The Eighth Amendment and Other Civil Rights Claims Here Lie Only Against Those Following A Policy Or Custom of Violating Such Rights Or Acting With Deliberate Indifferent To Such Rights.*

To the extent that this Court finds that the Plaintiff's claim survives the state actor requirement and that Drs. Vaughn and Iluyomade are not entitled to raise the defense of qualified immunity, the Plaintiff has still failed to state a claim under the Eighth Amendment. Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment. *See Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The Amendment also provides protection with respect to "the treatment a prisoner receives in prison and the conditions under which he is confined." *Helling v. McKinney*, 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Those conditions include the adequacy of the medical care that the prison provides. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

In order to establish that Magie was subjected to cruel and unusual punishment, the Plaintiff must prove (1) that "the deprivation of [a] basic human need was objectively 'sufficiently serious,'" and (2) that "subjectively 'the officials act[ed] with a sufficiently culpable state of mind.'" *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir.1993)(citation omitted). To satisfy the objective component of an Eighth Amendment claim, a Plaintiff must allege "a serious or significant physical or emotional injury resulting from the challenged conditions," *Strickler*, 989 F.2d at 1381, or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions, see *Helling*, 509 U.S. at 33-35. To satisfy the subjective

20

component of an Eighth Amendment claim the Plaintiff must demonstrate deliberate indifference

by prison officials. See *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811

(1994). "[D]eliberate indifference entails <u>something more than mere negligence</u> ... [but] is satisfied

by something less than acts or omissions for the very purpose of causing harm or with knowledge

that harm will result." *Id.* at 835. It requires actual knowledge of and disregard of an objectively

serious condition, medical need, or risk of harm. *See id.* at 837, 114 S.Ct. 1970.

An established corollary of the "deliberate indifference" standard required to show a

violation of a prisoner's Eighth Amendment rights is the proposition that evidence of mere

professional negligence by a physician does not constitute or even tend to show deliberate

indifference and therefore cannot by itself constitute an Eighth Amendment violation.[11]  *See, e.g.,*

*Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) (while inadequate medical care may rise to

the level of a constitutional violation, mere professional malpractice or negligent care does not);

*Brooks v. Celeste*, 39 F.3d 125, 128-29 (6th Cir. 1994) (while repetition of injurious conduct may

be circumstantial evidence that conduct was done with deliberate indifference, repeated acts of

mere negligence injuring a prisoner do not constitute deliberate indifference); *Williams v.*

*O'Leary*, 55 F.3d 320, 324 & n.7 (7th Cir. 1995) (same).  Furthermore, courts may grant physician

defendants summary judgment if there is no record evidence of deliberate indifference rather than

mere professional malpractice.  *Stewart*, 174 F.3d at 534-37 (arguable medical malpractice by

physicians and nurses during a series of prison hospital admissions did not rise to the level of

deliberate indifference); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997) (disagreement

---

[11] *Accord, Pink v. Lester*, 52 F.3d 73, 76 (4th Cir. 1995) (mere negligence does not give rise to claim for impairment of right to court access); *Kincaid v. Vail*, 969 F.2d 594, 602 n.10 (7th Cir. 1992) (same); *Lewis v. Mitchell*, 416 F. Su 2d 935, (S.D. Cal. 2005) (mere negligence does not give rise to claim for impairment of prisoner's right to free exercise of religion); *Shaheed v. Winston*, 855 F. Su 861, 868 (E.D. Va. 1995), *aff'd mem.*, 161 F.3d 3 (4th Cir. 1998) (same).

21

with medical treatment provided does constitute indifference to medical needs); *Steele v. Choi*, 82 F.3d 175, 177-79 (7th Cir. 1996) (physician's treatment decisions in the face of uncertain information suggesting a brain hemorrhage did not reflect deliberate indifference).[12]

In *Stewart*, for example, the court held that repeated instances of alleged negligence by prison-hospital physicians in treatment of swollen legs indicative of congestive heart failure and the related decubitus ulcers that led to an inmate's death did not establish any constitutional violation under the deliberate-indifference standard. *See id.*, 174 F.3d at 534-37. Similarly, in *Steele*, the court held that a prison infirmary physician's failure over several days of treatment to diagnose and treat a possible brain hemorrhage did not reflect deliberate disregard for the inmate's constitutional rights, especially since the inmate's actual medical condition was not clear and, as a result, it could not be said that the physician's alternative treatment decisions reflected deliberate disregard for a known, dangerous condition. *See id.*, 82 F.3d at 177-79.

Under the principles and analysis of cases like *Stewart* and *Steele*, the Court here should hold that the Plaintiff has failed to establish any constitutional violation by Defendants Vaughn and Iluyomade. *Accord, Nunez*, 72 F. Su 2d at 27-29 (possible negligence by physician in managing inmate's pain and assessing his need for surgery did not constitute deliberate indifference).

---

[12] Furthermore, a physician may not be held vicariously liable for unconstitutionally deliberate indifference of nurses in repeatedly failing to follow the physician's orders. *See Stewart*, 174 F.3d at 536 (*citing Monell v. Department of Social Services*, 436 U.S. 658, 692 (1978)). Accordingly, even if Drs. Vaughn or Iluyomade could be held liable in professional negligence for inadequate nursing care provided under their supervision, they may not be held liable for such errors under the civil rights laws.

**b.** **_There Is No Record Evidence That Defendants Vaughn or Iluyomade Followed Any Policy Or Custom of Violating Prisoner's Civil Rights Or Acted With Deliberate Indifferent To Such Rights._**

For all the factual reasons set forth above with respect to Plaintiff's failure to show that Defendants Vaughn and Iluyomade violated any accepted constitutional right, Plaintiff has also failed to show that Defendants Vaughn and Iluyomade, in attempting to provide medical care to Mr. Magbie, acted with indifference to adequate medical treatment even though he was a jail inmate. Accordingly, Defendants Vaughn and Iluyomade are entitled to summary judgment on the ground that the Plaintiff has failed to establish the basis for an Eighth Amendment civil rights claim.

Accordingly, the Defendants Vaughn and Iluyomade are entitled to summary judgment in this matter because the record demonstrates that the allegations and evidence give rise to nothing more than a claim of negligence and do not support a finding of deliberate indifference to Mr. Magbie's right to adequate medical care.

23

## CONCLUSION

For all the reasons set forth above, the Court should grant Defendants Vaughn and Iluyomade Motion for Partial Summary Judgment as to all of the Plaintiff's civil rights claims.

Dated this 19th day of February 2008.

Respectfully submitted,

*/s/ Thomas V. Monahan, Jr.*
Thomas V. Monahan, Jr. (04471)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland  21202
(410) 783-4000
tvm@gdldlaw.com
**Attorneys for Defendants William S. Vaughn, M.D. and Rotimi A. Iluyomade, M.D.**

24

## TABLE OF CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at 248 (1986)

*Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999)

*Blum v. Yaretsky*, 457 U.S. 991, 1003-12 (1982)

*Briggs v. Washington Metro Area Transit Authority*, 481 F.3d 839 (D.C. Cir. March 27, 2007)

*Brennan v. Hendrigan*, 888 F.2d 189, 192 (1st Cir. 1989)

*Burns v. Loranger*, 907 F.2d 233, 235 (1st Cir. 1990)

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.ed.2d 265 (1986)

*Estades-Negroni v. CPC Hosp. San Juan Capistrano*, 412 F.3d 1, 2-8 (1st Cir. 2005)

*Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)

*Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (19094)

*Frazier v. Bailey*, 957 F.2d 920, 929-30 (1st Cir. 1992)

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)

*Helling v. McKinney*, 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)

*Lavin v. Snyder*, 2006 WL 2583711 at *2 (S.D. Ill. Sept. 1, 2006)

*McIlwain v. Prince William Hospital*, 774 F. Su 986, 989-90 (E.D. Va. 1991)

*Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)

*Nunez v. Horn*, 72 F. Su 2d 24, 27 (N.D.N.Y. 1999)

*Restatement (Second) Torts* § 448 (1965)

*Rossignol v. Voorhaar*, 316 F.3d 516, 523 n.1 (4th Cir. 2003), *cert denied*, 540 U.S. 822, 124 S.Ct. 135, 157 L.ed.2d 41 (2003)

*Sallie v. Tax Sale Investors, Inc.*, 998 F.Su 612, 621 (D.Md. 1998)

*Saucier v. Katz*, 533 U.S. 194, 201 (2001)

*Sherman v. Four County Counseling Center*, 987 F.2d 397, 406 (7th Cir. 1993)

*Steele v. Choi*, 82 F.3d 175, 177-79 (7th Cir. 1996)

*Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999)

*Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993)

*Sykes v. McPhillips, 412 F. Su 2d 197, 200-04 (N.D.N.Y. 2006)*

*West v. Atkins*, 487 U.S. 42, 48-49 & n.8 (1988)

*Williams v. O'Leary*, 55 F.3d 320, 323-24 (7th Cir. 1995)

*Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

MARY SCOTT, Individually and )
As Personal Representative of the Estate of )
JONATHAN MAGBIE, )
         ) Civil Action No. 1:05-CV-01853-RWR
        Plaintiff, )
         )
    v. )
         )
DISTRICT OF COLUMBIA, et al., )
         )
        Defendants. )

## ORDER

    Upon consideration of the Motion for Partial Summary Judgment by Defendants William S. Vaughn, M.D. and Rotimi A. Iluyomade, M.D. as to all Civil Rights Claims and their Memorandum of Law in Support thereof, and Plaintiff's Opposition, and any Reply by Defendants, and good cause having been shown, it is this _____ day of _____, 2008, hereby,

    **ORDERED**, that the Motion for Partial Summary Judgment by Defendants William S. Vaughn, M.D. and Rotimi A. Iluyomade, M.D. as to all Civil Rights Claims is hereby **GRANTED**.

_____
Honorable Richard W. Roberts
U.S. District Court Judge for the District of Columbia

Copies to:

Thomas V. Monahan, Jr
Jason B. Penn
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland   21202

Donald M. Temple, Esquire
Temple Law Office
1229 15th Street, NW
Washington, DC  20005

Edward J. Connor, Esquire
5210 Auth Road, Suite 304
Camp Springs, Maryland  20746-4341

Elizabeth Alexander, Director
National Prison Project of the ACLU
    Foundation
915 15th Street, NW, 7th Floor
Washington, DC  20005-2302

2