Mary R. Scott, et al. v. District of Columbia, et al.
United States District Court for the District of Columbia

05CV01853

Exhibit No. 3          Deposition of Rotimi A. Iluyomade, M.D.

## Page 1

(1) IN THE UNITED STATES DISTRICT COURT
(2) FOR THE DISTRICT OF COLUMBIA
(3)
(4) In the matter of:
(5) MARY R. SCOTT,
(6)     Plaintiff,                Case No.
                                  05-cv-1853 (RWR)
(7) v.
(8) DISTRICT OF COLUMBIA, et al.,
(9)     Defendants.
(10)
                    Washington, D.C.
(11)
                    Wednesday,
(12)                July 19, 2006
(13)
DEPOSITION OF:
(14)
        ROTIMA A. ILUYOMADE, M.D.
(15)
    called for examination by counsel for the Plaintiff,
(16) pursuant to subpoena, at 1:18 p.m. at the offices of
    the National Prison Project of the ACLU, 915 15th
(17) Street, NW, 7th Floor, Washington, D.C., when were
    present on behalf of the respective parties:
(18)
(19)
(20)
(21)
(22)

## Page 2

(1) APPEARANCES:
(2)         On Behalf of Mary Scott, Plaintiff:
(3)     ELIZABETH ALEXANDER, ESQ.
    Of:     National Prison Project
(4)         of the ACLU Foundation
            915 15th Street, NW, 7th Floor
(5)         Washington, DC 20005
            (202) 393-4930
(6)
            EDWARD J. CONNOR, ESQ.
(7) Of:     5210 Auth Road, Suite 304
            Camp Springs, MD 20746
(8)         (301) 899-7801
(9)         DONALD M. TEMPLE, ESQ.
    Of:     Temple Law Offices
(10)        1229 15th Street, NW
            Washington, DC 20005
(11)        (202) 628-1101
(12)        On Behalf of Drs. William Vaughn and
            Rotimi Iluyomade, Defendants:
(13)
    Of:     D'ANA E. JOHNSON, ESQ.
(14)        Bonner, Kiernan, Trebach & Crociatta, LLP
            1250 Eye Street, NW, Suite 600
(15)        Washington, DC 20005
            (202) 712-7055
(16)
            JUAN ANDERSON, ESQ.
(17) Of:    Bonner, Kiernan, Trebach & Crociatta, LLP
            1233 20th Street, NW, Suite 800
(18)        Washington, DC 20036
            (202) 712-7000
(19)
(20)
(21)
(22)

## Page 3

(1) On Behalf of Corrections Corporation of
    America & P. Singley:
(2)
    DANIEL P. STRUCK, ESQ.
(3) Of: Jones, Skelton & Hochuli, PLC
        2901 N. Central Avenue, Suite 800
(4)     Phoenix, AZ 85012
        (602) 263-1700
(5)
    KELVIN S. NEWSOME, ESQ.
(6) Of: Leclair Ryan, PC
        999 Waterside Drive
(7)     Suite 2525
        Norfolk, VA 23510
(8)     (757) 441-8938
(9) On Behalf of the Greater Southeast
    Community Hospital, Defendant:
(10)
    CATHERINE A. HANRAHAN, ESQ.
(11) Of: Wilson, Elser, Moskowitz, Edelman &
         Dicker, LLP
(12)     1341 G Street, NW, Suite 500
         Washington, DC 20005
(13)     (202) 626-7660
(14) On Behalf of the District of Columbia
     and O. Washington, Defendants:
(15)
    STEVEN J. ANDERSON, ESQ.
(16) Of: Office of Corporation Counsel
        441 Fourth St, NW, Suite 600S
(17)    Washington, DC 20001
        (202) 724-6607
(18)
    Also Present:
(19)
    JASON APOLLO HART, Intern for Mr. Steven
(20) Anderson
(21)
(22)

## Page 4

(1) I-N-D-E-X
(2) WITNESS:        DIRECT   CROSS   REDIRECT   RECROSS
(3) Rotima Iluyomade   5     65      88, 103      --
(4) EXHIBITS:      PAGE          IDENTIFIED
(5) Deposition 1    6    Rotima Iluyomade's Curriculum
                         Vitae (3 pages)
(6)
    Deposition 2   35    Greater Southeast Community
(7)                      Hospital Records re: Jonathan
                         Magbie, September 24, 2004
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)

BSA — 07/19/06: Scott v D.C.: Depo: Rotima Iluyomade, MD — XMAX(8)

### Page 29

(1) couldn't tell just by looking what was.
(2) Q Well, let me clarify. I'm not certain (3) what you're telling me, so let me try to clarify my (4) question: Did you learn of the phrenic nerve (5) stimulator by the appearance of the lines on the strip (6) or by palpating or by –
(7) A On physical examination.
(8) MS. JOHNSON: Let him finish his question (9) so –
(10) THE WITNESS: Okay. Sorry.
(11) MS. JOHNSON: – that way the court (12) reporter can get the question down and you can make (13) sure you understand it. Do you want to do it again, (14) or –
(15) BY MR. CONNOR:
(16) Q Do you remember the question?
(17) A No. Could you repeat it, please?
(18) Q Now I'm trying to determine what was it (19) that first informed you that he had a phrenic nerve (20) stimulator. Was it the appearance of the reading on (21) the strip or was it palpating his body?
(22) A Palpating his body.

### Page 30

(1) Q Well then what was it with the strip that (2) had anything to do with a phrenic nerve stimulator?
(3) A Well, when I palpated his body, you know, (4) it's like this is possibly a phrenic nerve stimulator (5) but there was no information to say he definitely had (6) one until later on that we determined that this is (7) what it was.
(8) Q You mentioned a moment ago that there was (9) nothing in his medical record to –
(10) A No.
(11) Q – indicate the presence of a phrenic (12) nerve stimulator.
(13) A Well, at the time I saw him I did not have (14) any information initially to say he had any kind of (15) stimulator, no.
(16) Q Okay. And my question is: At the time (17) that you saw him, what medical records did you have (18) before you?
(19) A Whatever was sent from the prison with (20) him.
(21) Q Do you know what the prison sent with him?
(22) A I know they sent – they always sent some

### Page 31

(1) papers; I don't know exactly what is sent now – right (2) now. I would have to refer to whatever records you (3) have. I don't know what was sent back.
(4) Q So your recollection is that when he (5) arrived at the emergency room on the 24th of September (6) he had some Department of Corrections' medical records (7) with him, but you don't know what records.
(8) MR. NEWSOME: Excuse me. I object to the (9) form. You can go ahead.
(10) BY MR. CONNOR:
(11) Q Is that right?
(12) A Yes. He had some papers. I don't know (13) exactly what papers.
(14) Q You mentioned, I believe, during your five (15) years at the hospital you would encounter D.C. (16) prisoners approximately once a week. Is that right?
(17) A At least.
(18) Q At least. And I take it over your five (19) years you would sometimes decide to admit some of (20) these prisoners and sometimes not admit them. Is that (21) correct?
(22) A Yes.

### Page 32

(1) Q When you were considering whether or not (2) to admit a prisoner, was it your practice to confer (3) with personnel at the Department of Corrections before (4) deciding?
(5) A Before deciding?
(6) Q Yes.
(7) A Yes. Yes. Sometimes.
(8) Q Did you ever have an occasion where you (9) were inclined to admit a prisoner and the Department (10) of Corrections expressed displeasure about that idea?
(11) A No. Not that I can remember.
(12) Q You never had any argument about that?
(13) A No.
(14) Q Since September 24, 2004 have you had any (15) discussion with anyone about the facts of Mr. Magbie's (16) treatment at the emergency room other than with your (17) attorneys or with any peer review process?
(18) A No.
(19) Q Do you intend to render any expert opinion (20) –
(21) MS. SINGLEY: Could you got back that very (22) last – you said, "...with your attorneys or with any



### Page 33

(1) peer .." I just object to the extent that he has (2) acknowledged one way or the other if there is a peer (3) review.
(4) MS. JOHNSON: I agree.
(5) MS. SINGLEY: And I'll just put on the (6) record before you said, "... if there was one." Just (7) on the record. Object to any information on peer (8) review. Sorry about that.
(9) BY MR. CONNOR:
(10) Q All right. Do you intend to render any (11) expert opinions at the trial of this case concerning (12) the standard of care or any breach of the standard of (13) care?
(14) MS. JOHNSON: Objection. That is a (15) determination that would be made by counsel. I didn't (16) make the representation to you. It is not our (17) intention to have him to such opinions.
(18) MR. CONNOR: Be sure and let me know what (19) they are if you change your mind.
(20) MS. JOHNSON: I doubt that I would change (21) my mind, but that's a determination that I would make. (22) And certainly if he were, I would submit it for your

### Page 34

(1) examination and those opinions.
(2) MR. CONNOR: All right.
(3) BY MR. CONNOR:
(4) Q Are you generally familiar with the (5) treatment provided to Mr. Magbie in the emergency room (6) on September 24 of 2004?
(7) A Yes.
(8) Q Assuming that today, July 19, 2006, you (9) were working in an emergency room and had a patient (10) present with the exact same presentation today as Mr. (11) Magbie did at that time, what if anything would you do (12) differently in treating that patient?
(13) A Nothing.
(14) Q When you treated Mr. Magbie September 24, (15) did you consult with any other physicians at Greater (16) Southeast?
(17) A Yes.
(18) Q Who did you consult with?
(19) A The admitting physician group, physician (20) team.
(21) Q Who was that?
(22) A Dr. Ackerman and his team.

### Page 35

(1) Q Dr. Ackerman? Any other physicians?
(2) A No.
(3) MS. JOHNSON: Let me clarify. I heard him (4) say, "Dr. Ackerman and his team."
(5) THE WITNESS: And his team, yes.
(6) BY MR. CONNOR:
(7) Q So "his team" would be other physicians?
(8) A Yes. I mean – well, they work as a group (9) so I can't remember exactly who else in the team that (10) I may have talked to.
(11) Q All right. Did you confer with at Dr. (12) Haghigi?
(13) A I may have. I don't remember.
(14) Q How about Dr. Noone?
(15) A Dr. Noone is my colleague in the emergency (16) room so I would have consulted – may have talked (17) about a patient.
(18) Q All right. Dr. Iluyomade, would you take (19) a look at Exhibit 2 in front of you just a minute?
(20) (Whereupon, the document (21) referred to above was marked for (22) identification as Deposition

### Page 36

(1) Exhibit No. 2.)
(2) BY MR. CONNOR:
(3) Q Have you had a chance to look at Exhibit (4) 2?
(5) A Yes.
(6) Q Let me represent that that is what was (7) provided to us by Greater Southeast as the chart for (8) Mr. Magbie's visit on September 24, 2004. Does that (9) appear to be the complete chart?
(10) A Yes.
(11) Q I'm going to ask you some questions about (12) his treatment on that date and if you want to refer to (13) that chart, feel free.
(14) A Sure.
(15) Q You don't have to, but you're free to do (16) so. He arrived at the hospital about 9:50 a.m. Does (17) that sound right?
(18) A Yes.
(19) Q And who assessed him at that time?
(20) A The triage nurse.
(21) Q Unfortunately the hospital didn't put (22) these in the normal order, so the triage report is

Page 53

(1) Q You were treating other patients in the (2) emergency room?
(3) A Yes.
(4) Q And following Mr. Magbie's progress?
(5) A Right.
(6) Q And relying on nurses and respiratory (7) therapists to keep you informed –
(8) A Yes.
(9) Q – as to his progress?
(10) A Yes.
(11) Q And were you following his oxygen levels (12) that afternoon?
(13) A Yes.
(14) Q Now, you examined him around 10:10, (15) correct?
(16) A Yes.
(17) Q And did you examine him again around 1:05 (18) when you ordered the additional –
(19) A Yes.
(20) Q – medications?
(21) A I may have. I'm not sure..
(22) Q And when –

Page 54

(1) A I must have.
(2) Q I'm sorry?
(3) A I must have, between the first time he (4) arrived and the time that he was admitted.
(5) Q Well, you would've reassessed him before (6) ordering additional medication at 1:05, wouldn't you?
(7) A Yes.
(8) Q Okay. And when did you next examine him (9) after 1:05.
(10) A He was sitting not quite – I mean, he was (11) in bed not quite 20 feet from where I was writing and (12) sitting so it's continuous observation: I could see (13) the progress. I could tell, and I went by there, you (14) know, all the time.
(15) Q Well, I don't mean when did you observe (16) him across the room. I mean when did you do a hands- (17) on examination of him after 1:05.
(18) A I can't. Not by these records I don't (19) know exactly when, but I did.
(20) Q Okay. Would that have been at 5:40?
(21) A Oh, I'm sure before then, but it's (22) according to the records I was there at 5:40, yes.

Page 55

(1) Q How was he getting oxygen during these (2) hours in the afternoon of September 24th?
(3) A When he first came, after the trachea (4) toilet, I mean, he was placed on high-flow oxygen with (5) the mask, and his oxygen level – and a blood-gas was (6) done which showed him to be oxygenating quite well. (7) And at some point he was downgraded, according to the (8) records, to five liters and there was a continuous (9) pulse oxygenator being done. And he was conscious and (10) stable for most of his stay in the emergency room.
(11) Q So he was on a trach mask?
(12) A Yes.
(13) Q So he was getting oxygen over his mouth. (14) Is that right?
(15) A Over his trachea.
(16) Q Or his trachea. Okay. And I'm looking (17) now at the emergency department progress notes. This (18) is page, I believe, 10.
(19) MR. NEWSOME: I'm sorry. What did you (20) say?
(21) MR. CONNOR: I believe it's page 10, (22) emergency department progress notes.

Page 56

(1) MR. NEWSOME: Okay.
(2) MR. CONNOR: It's got a grid of his (3) oxygenation. We're on page 10.
(4) THE WITNESS: It says page 7 here.
(5) MS. JOHNSON: It's the right page. (6) Disregard what that says.
(7) BY MR. CONNOR:
(8) Q All right. I'm looking at the upper-left, (9) "Vital signs –"
(10) A Yes.
(11) Q – grid. And it looks like pulse ox, the (12) second column from the right, "pulse ox," 9;50 a.m. it (13) was 100 percent; 12:15 p.m. it was 100 percent, (14) correct?
(15) A Yes.
(16) Q 2:05 it's down to 95 percent?
(17) A Yes, on five liters.
(18) Q 4:00 p.m. it was down to 92 percent?
(19) A Yes.
(20) Q Would you have wanted to be consulted if (21) it went down to 92 percent at 4:00 o'clock?
(22) A Yes.




### Page 85

(1) Q Talk about when you were at the bedside (2) around, I believe, 5:40, and you said you noticed that (3) his trach was protruding?
(4) A Yes.
(5) Q And you said you pushed it back in.
(6) A Yes.
(7) Q Tell me exactly what you did. Every step (8) you took. What you did when you noticed that the (9) trach was protruding.
(10) A I was at the bedside and pushed it back. (11) It was effortless without any resistance.
(12) Q Okay. Did you know – strike that. Do (13) you know how long Mr. Magbie's trach had been (14) protruding?
(15) A Well, it was still in the airway. It was (16) just a matter of – and this is not a terribly unusual (17) thing to see the trach moving a few inches, you know, (18) depending on – so I don't know how long. I don't (19) know how long it was protruding.
(20) Q Okay. All right. Now, you examined Mr. (21) Magbie and you observed him in the emergency (22) department for several hours.

### Page 86

(1) A Yes.
(2) Q When is the first time that you believed (3) Mr. Magbie was in danger of not surviving?
(4) A When's the first time I determined that he (5) was in danger of not surviving?
(6) Q Correct.
(7) A When I knew that his oxygen was dropping (8) to levels that were unacceptable.
(9) Q And please tell me what time that was.
(10) A That would be at 17:40.
(11) Q At 17:40 you believed that Mr. Magbie may (12) not survive?
(13) A He was in – was getting into trouble. I (14) couldn't determine his survivability definitely, but (15) I knew he was getting into trouble if we didn't (16) reverse this oxygen or determine what was causing it.
(17) Q Okay. Did you ever, at any point during (18) the time you were providing care and treatment of Mr. (19) Magbie, did you ever consider putting him on the (20) ventilator?
(21) A Well, I was – I could see he was stable (22) and oxygenated very well as far as I knew until the

### Page 87

(1) time that I was called, so it's something which I knew (2) he may be needing at some point in the hospital, but (3) while he was with me in the emergency department, I (4) didn't think that he needed it up until the time (5) things started to get critical.
(6) Q I know you hadn't reviewed Mr. Magbie's (7) earlier records from Greater Southeast, but you had (8) know that Mr. Magbie had utilized the ventilator prior (9) to the time you saw him. Could that have impacted (10) your decision on whether or not to place him on a (11) vent?
(12) A Well, it was while I was taking care of (13) him up until that time, 15:40. It wouldn't probably (14) have changed my treatment but I would know that at (15) some point in his stay in the hospital he would need (16) it.
(17) Q Okay.
(18) A Definitely he would need it.
(19) Q Certainly at the time when you believe he (20) was getting in trouble, if you had had the prior (21) knowledge that Mr. Magbie used a vent in the past, (22) that certainly would've impacted your decision as to

### Page 88

(1) whether or not to use it at the time you believe he (2) was getting in trouble. Is that true?
(3) MS. JOHNSON: Objection to form. Go (4) ahead.
(5) THE WITNESS: It's at this point when I (6) was intervening, we were doing it manual so really we (7) wouldn't put him on a vent until we had stabilized the (8) situation and then the vent would be something he (9) would be put on.
(10) BY MR. NEWSOME:
(11) Q Earlier, you were having a conversation (12) earlier in the day, around 1:00, 1:10 or so –
(13) A Yes.
(14) Q You were having a conversation with Mr. (15) Magbie. Is that correct?
(16) A Yes, well, the records indicate so, yes.
(17) Q Sure. Would he have been talking back to (18) you?
(19) A No. He could not verbalize.
(20) Q Okay. But he was responding?
(21) A Yes.
(22) Q He understood you?