Mary R. Scott, et al. v. District of Columbia, et al.
United States District Court for the District of Columbia

05CV01853

Exhibit No. 4        Deposition of William S. Vaughn, M.D.

2

APPEARANCES:

On Behalf of Mary Scott, Plaintiff:

ELIZABETH ALEXANDER, ESQ.
Of:      National Prison Project
         of the ACLU Foundation
         915 15th Street, NW, 7th Floor
         Washington, DC  0005
         (202) 393-4930

EDWARD J. CONNOR, ESQ.
Of:      5210 Auth Road, Suite 304
         Camp Springs, MD 20746
         (301) 899-7801

DONALD M. TEMPLE, ESQ.
Of:      Temple Law Offices
         1229 15th Street, NW
         Washington, DC  20005
         (202) 628-1101

On Behalf of Drs. William Vaughn and
Rotimi Iluyomade, Defendants:

D'ANA E. JOHNSON, ESQ.
Of:      Bonner, Kiernan, Trebach & Crociatta, LLP
         1250 Eye Street, NW, Suite 600
         Washington, DC  20005
         (202) 712-7055

JUAN ANDERSON, ESQ.
Of:      Bonner, Kiernan, Trebach & Crociatta, LLP
         1233 20th Street, NW, Suite 800
         Washington, DC  20036
         (202) 712-7000

On Behalf of Corrections Corporation of
America & P. Singley:

DANIEL P. STRUCK, ESQ.
Of:     Jones, Skelton & Hochuli, PLC
        2901 N. Central Avenue, Suite 800
        Phoenix, AZ  85012
        (602) 263-1700

KELVIN S. NEWSOME, ESQ.
Of:     Leclair Ryan, PC
        999 Waterside Drive
        Suite 2525
        Norfolk, VA  23510
        (757) 441-8938

On Behalf of the Greater Southeast
Community Hospital, Defendant:

CATHERINE A. HANRAHAN, ESQ.
Of:     Wilson, Elser, Moskowitz, Edelman &
        Dicker, LLP
        1341 G Street, NW, Suite 500
        Washington, DC 20005
        (202) 626-7660

4

I-N-D-E-X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|----------|--------|-------|----------|---------|
| William S. Vaughn | 5 | 74 | -- | -- |

| EXHIBITS: | PAGE | IDENTIFIED |
|-----------|------|------------|
| VAUGHN 1 | 5 | William S. Vaughn's Curriculum Vitae (5 pages) |
| VAUGHN 2 | 41 | Greater Southeast Community Hospital Corporation's Medical Records for Jonathan Magbie dated September 20, 2004 (21 pages) |

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVENUE, N.W.
(202) 234-4433          WASHINGTON, D.C. 20005          (202) 234-4433

18

1    Greater Southeast once the license revocation was made

2    official.

3        A    Correct.

4        Q    Have you ever been a Defendant in any

5    legal proceeding?

6        A    No.

7        Q    Have you ever been made aware of any

8    accusation of medical negligence or inadequate patient

9    care other than a lawsuit?

10       A    No.

11       Q    Dr. Vaughn, I'm going to direct my

12   questions to the period of September 2004 unless I

13   tell you otherwise.  You were working at the emergency

14   room at Greater Southeast at that time, correct?

15       A    Yes.

16       Q    Can you tell me how the emergency room was

17   structured?  In other words, who was your employer?

18       A    At that time I believe the ER would be run

19   by NES, National Emergency Services.

20       Q    And the physicians working in the

21   emergency room would be employees of NES?

22       A    Yes.

1          Q      Without exception?

2          A      Without exception.

3          Q      What about the non-physician personnel?

4     Nurses, therapists and so forth?

5               MS. HANRAHAN:   Is the question you're

6     asking him who are they employed by?

7               MR. CONNOR:   I'm not quite sure.

8               MS. HANRAHAN:   I just want to make sure

9     that was the question.

10              MR. CONNOR:

11         Q    Yes.   The question is:   Were the non-

12    physician workers in the emergency room also employed

13    by NES as of September 2004?

14         A    I don't know.

15         Q    Do you have an understanding of the

16    contractual relation between NES and the owners of

17    Greater Southeast Hospital at that time?

18              MS. JOHNSON:  Objection.  Foundation and

19    form.  Go ahead.

20              THE WITNESS:  No.

21              BY MR. CONNOR:

22         Q    Well, you started working at Greater

39

1   at the trial of this case regarding the standard of

2   care or any breach of the standard of care?

3         MS. JOHNSON:  Let me say he doesn't

4   necessarily make that determination.  I would as

5   counsel probably.  It is not our intention that he

6   will offer those opinions.

7         MR. CONNOR:  Okay.

8         BY MR. CONNOR:

9    Q    Let me ask you a hypothetical question,

10  Dr. Vaughn:  Assuming that you were back at the

11  emergency room at Greater Southeast Hospital now

12  practicing emergency medicine, and assuming a patient

13  presented with the exact same presentation as Jonathan

14  Magbie did in September of 2004, would you treat that

15  patient any differently than you treated Mr. Magbie?

16        MS. JOHNSON:  Objection to form.

17  Speculation.  Go ahead if you can answer.

18        THE WITNESS:  I'd perform the same tests.

19  Once I got the results I'd make a decision from there.

20        BY MR. CONNOR:

21   Q    I'm interpreting that as you would treat

22  the patient the same as you treated Mr. Magbie.

40

1      A    I'll do the exact -- I'll examine the

2  patient and do tests as necessary.  Based on your

3  tests you need to decide what is to be done from

4  there.

5      Q    Well, I'm asking you to assume that the

6  facts are all identical including the tests and the

7  results of the tests.

8          MS. JOHNSON:  You're asking him to assume

9  that the test results came back the same way --

10         MR. CONNOR:  Yes.  The exact same way.

11         MS. JOHNSON:  -- as they did.  Hold on.

12  Let me finish.  On September 20th --

13         MR. CONNOR:  That's right.

14         MS. JOHNSON:  -- as if this were July 19,

15  2006.  All the same test results were the same.

16         MR. CONNOR:  That's correct.

17         THE WITNESS:  I wouldn't change my course

18  of therapy.

19         BY MR. CONNOR:

20     Q    Okay.

21         MS. HANRAHAN:  Would this be marked Vaughn

22  Exhibit 2?

41

1          MR. CONNOR:  That's correct.

2                    (Whereupon,     the     document

3                    referred to above was marked for

4                    identification as VAUGHN Exhibit

5                    No. 2.)

6          MR. CONNOR:  Do you want to take a few

7     minutes and review that?

8                    (Whereupon, a short break was taken.)

9          MS. HANRAHAN:  Can I before -- I have with

10    the exhibit DMS transfer page.  Do you want that

11    inclusive of Number 2 or not?

12         MR. CONNOR:  Yes.  That's what I got from

13    the hospital.

14         MR. CONNOR:

15    Q    Dr. Vaughn, I'm showing you what's been

16    marked as Vaughn Exhibit 2 which I will represent as

17    the Greater Southeast chart sent to me for the visit

18    of September 20 and 21, 2004 for Mr. Magbie.  Have you

19    had a chance to look at that?

20    A    (Witness examining document.)

21         Yes.

22    Q    And does that appear to be the chart for

42

1    that visit?

2         A    It does.

3         Q    All right.  I'm going to ask you some

4    questions about that visit, but before I do that, let

5    me just do one more thing.  Your counsel filed what we

6    call a 26(a)(1) statement, but it lists people who may

7    have some knowledge about facts involving this case

8    and I want to ask you -- you've already told me that

9    you were only involved with Mr. Magbie on the first

10   visit, September 20 and 21.  You weren't treating him

11   on the 24th of September, correct?

12        A    That's correct.

13             MS. JOHNSON:  To be accurate, he was only

14   involved with him up until 8:00 o'clock in the morning

15   on the 21st.

16             MR. CONNOR:  Okay.

17             BY MR. CONNOR:

18        Q    So  my  question  is  whether  these

19   individuals were involved in that first visit in any

20   way of treating Mr. Magbie: Dr. Christopher Ackerman?

21        A    No.

22        Q    I think his name is on that chart.

44

1      Q     Haghighi.

2      A     Yes.

3      Q     Was he involved in treating Mr. Magbie on

4 September 20th?

5      A     Yes, as a consultant.

6      Q     Do you know what role he played in the

7 treatment of this patient?

8      A     Yes.

9      Q     What did he do?

10     A     He was Dr. Ackerman's person on call that

11 night at the hospital with the house team and I spoke

12 to him about Mr. Magbie, but as far as actual care in

13 the ER? No.

14     Q     Did he do any examination to your

15 knowledge with Mr. Magbie?

16     A     No.

17     Q     Did you order any treatment or tests?

18     A     No.

19     Q     Okay.  How about Dr. Nuni, N-u-n-i?

20     A     Yes.

21     Q     What was his involvement with Mr. Magbie

22 on September 20th and 21st?

45

1      A      He was the doctor I signed off to on the

2    21st of September at 8:00 a.m. when my shift ended.

3    See, he was my relief man.

4      Q      Okay.  Got it.  And I -- you may not know

5    this but just to speed things up, maybe your counsel

6    can respond to this:  I think these nurses were all

7    attending on the 24th -- Kathi Williams-Young, Twalla

8    (ph) Cooper, Monica James, Sheena Krudent (ph) and

9    Brenda Dockery (ph).  I think they were the code team

10   on the 24th.

11     MS. JOHNSON:  Okay.  On the 24th?  Okay.

12   It's possible.  You might ask him directly, but I

13   think you probably are accurate that they were on the

14   24th, not the -- but you might ask him.

15     BY MR. CONNOR:

16     Q      Do you know who the nurses were when you

17   were treating Mr. Magbie on the 20th and 21st?

18     A      I can't recall, no.

19     Q      Okay.

20     MS. HANRAHAN:  Just for the record, I

21   thought when we did the 26(a)(1)disclosure, we

22   distinguished --

55

1    ventilator use for admission.  That was the problem I

2    had with Mr. Magbie.

3              BY MR. CONNOR:

4         Q    Okay.  Are you finished?

5         A    And as Dr. Haghigi who had run the service

6    for Dr. Ackerman and was in charge of the inmates, how

7    could I quarantine or put a ventilator to the side for

8    a PRN use was the problem I had, although at the time

9    he was not in respiratory distress.  He sat the entire

10   time well.  How could I justify a PRN use for a

11   ventilator is the problem I had on my hands.

12        Q    Okay.  Are you finished now?

13        A    Yes.

14        Q    I don't want to cut you off again.

15        A    No.

16        Q    When you say, "How can you justify

17   quarantining a ventilator," do you mean the equipment

18   that you had at the hospital, like taking in a

19   ventilator that was available at the hospital --

20        A    Yes.

21        Q    -- using it for this patient?

22        A    On a -- yes -- on a PRN use.  He's not

53

1    99 percent with 3 liters of oxygen via nasal cannula."

2        Q    Okay.  So before you administered the

3    oxygen, he was at 90?

4        A    Yes.

5        Q    And that would be below normal, correct?

6        A    Yes.

7        Q    And thereafter it says you discussed the

8    matter with Dr. Ackerman.  Is that right?

9        A    Yes.

10       Q    Do you remember your discussion with Dr.

11   Ackerman?

12       A    I did not speak to Dr. Ackerman directly.

13   Dr. Haghigi was the person in the hospital at night.

14   I actually spoke to Dr. Haghigi as opposed to Dr.

15   Ackerman.

16       Q    So    this    should    say,    "Haghigi,"

17   technically.

18       A    Yes.  But it's the exact same service.

19       Q    Okay.    Can    you    tell    me    what    your

20   discussion was with Dr. Haghigi?

21       A    Yes.  The question was on Mr. Magbie.  I

22   asked him specifically what was his ventilator.  He

54

1    said, "Use the ventilator if he needed to, as he

2    needed to." No rhyme, no reason. It was not like he

3    used it every night, so I was trying to figure out how

4    I could take care of Mr. Magbie. He said, "You can

5    use it every night, use it sometimes or not

6    sometimes." So I'm looking to how to best accommodate

7    his "sometime" use of a ventilator, as he put it.

8         Q    As who put it?

9         A    Mr. Magbie. Before I got out there, I

10   said, "Mr. Magbie, how often do you use your

11   ventilator." He said, "I use it sometimes if I need

12   to, as I need to. It's not all the time, it's not

13   every day, it's just whenever." I'm trying --

14        Q    Did you -- I'm sorry. I didn't mean to

15   cut you off.

16             MS. JOHNSON: Continue.

17             THE WITNESS: I'm trying to figure out how

18   could I possibly admit somebody with a "whenever"

19   ventilator use was my problem I had admitting him at

20   the time. He was breathing well, but he says he may

21   crash but whether he was going to crash, he didn't

22   know. So I can't say -- how can I justify a PRN

56

1    using it, so if somebody would need one you take it

2    away from them because he may need it at sometime.

3    That was the problem I had.

4        Q    Were you short of ventilator equipment

5    that night?

6        A    I don't know the status of vents in the

7    hospital.  I do not control the vents.

8        Q    All right.  I think some minutes ago we

9    were talking about your experience over five years.

10       A    Yes.

11       Q    And I think you told me that you had

12   treated a number of ventilator-dependent patients over

13   the years.

14       A    Yes.

15       Q    I believe that was your answer.  This

16   wasn't the first rodeo.

17       A    No, but --

18            MS. JOHNSON:  Hold on.

19            THE WITNESS:  Go ahead and ask your

20   question.  I'm sorry.

21            BY MR. CONNOR:

22       Q    Okay.  My question is:  When you treated

63

1          A     1:50.

2          Q     -- 1:50 a.m.

3          A     Yes.

4          Q     Okay.  And you mentioned what you just

5    told us that you had provided him with the treatment

6    that you just mentioned.

7          A     Yes.

8          Q     And then about halfway down here, you've

9    written, "Patient to be admitted for hypovolemia --"

10   I'm sorry.  I can't read your handwriting.

11         A     Hypovolemia, hypoglycemia --

12         Q     Hypogloycemia and --

13         A     -- respiratory distress.

14         Q     -- respiratory distress.

15         A     Yes.

16         Q     So at 1:50 a.m. your plan was to admit the

17   patient.  Is that right?

18         A     On my first assessment.

19         Q     Okay.  Then I see, is it 3:29 a.m.?  Is

20   that --

21         A     3:20 a.m.

22         Q     3:20 a.m.  You say that his oxygen is at

64

1   95 now?

2        A     Yes.  On room air.

3        Q     On room air.

4        A     Yes.

5        Q     And you had already given him the nasal

6   cannula?

7        A     No.  They took him off that to see where

8   he was.  That's why I said on room air.

9        Q     Right.  So you've given him a nasal

10  cannula --

11       A     A little bit.

12       Q     -- and you'd taken it away --

13       A     And see how he tolerated.

14       Q     -- and you inject him --

15       A     Yes.

16       Q     -- and you're getting a 95 on room air.

17       A     Yes.

18       Q     Okay.

19       A     Which is -- which is good.

20       Q     Okay.  And then you say, "May only need

21  nasal oxygen which the jail infirmary can provide."

22  Correct?

65

1        A        Correct.

2        Q        When you made that entry had you already

3    spoke to Dr. Bastien?

4        A        Well, yes that I spoke with him.  It's on

5    the same note.  Yes, sir.  I'm sorry.

6        Q        Okay.  How many times did you talk to Dr.

7    Bastien --

8        A        Twice.

9        Q        -- that evening?

10        A        Twice.

11        Q        Okay.  When was the first call if you

12    remember?

13        A        At 1:50 a.m.

14        Q        And did you call him or did he call you?

15        A        I called the jail.

16        Q        And why did you call the jail?

17        A        To see what facilities they had at the

18    jail infirmary.

19        Q        To see what services they had?

20        A        To see what they could provide there.

21        Q        And what were you specifically trying to

22    learn about?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVENUE, N.W.
(202) 234-4433            WASHINGTON, D.C. 20005            (202) 234-4433

66

1          A      Learn about if they provide a PRN

2     ventilator which Mr. Magbie I guess was used to.

3          Q      A PRN ventilator.

4          A      Yes.

5          Q      All right.

6          A      And they said they could not do anything

7     mechanical ventilation there at all.

8          Q      Okay.  And was it after that phone call

9     that you made the entry the patient to be admitted?

10         A      Yes.  After I talked to Dr. Batien, yes.

11    I'm sorry.

12         Q      And then you had a second call with Dr.

13    Bastien?

14         A      Correct.

15         Q      What time was that, if you remember?

16         A      Around 3:20 in the morning.

17         Q      And again, did he call you or did you call

18    him?

19         A      I called him.

20         Q      And why did you call him at 3:20 in the

21    morning?

22         A      To see if they could provide oxygen by

1   nasal cannula.  Just to make sure they could provide

2   some kind of oxygen therapy there.

3        Q    And what did Dr. Bastien tell you?

4        A    He said they do have oxygen support there

5   by way of nasal cannula; they could monitor it.  I

6   said, "If I send Mr. Magbie back, can you make sure he

7   gets O2 that can be monitored on the oxygen?"  He

8   said, "Yes, but I have to make arrangements and can

9   you keep him there until we make arrangements?"  I

10  said, "Fine."  And we'd leave him in the emergency

11  room until everything's set for him back at the jail.

12       Q    So was there a point when you changed your

13  mind about admitting the patient?

14       A    Yes.  His condition had changed.  It

15  improved.

16       Q    Did you note that?

17       A    That's where I failed to make the proper

18  documentation on the chart there.  Although I list it

19  here on the 3:20 note, it's listed on my discharge

20  note, discharge instructions.  I transferred the

21  instructions to the second page of the doctor's note.

22       Q    When you talked to Dr. Bastien the second

68

1    time, did you discuss providing a ventilator at night

2    for Mr. Magbie?

3         A    No.

4         Q    Did you make any further effort to obtain

5    a ventilator for him?

6         A    No.

7         Q    Did you feel that you had addressed his

8    respiratory issues by sending him back with a nasal

9    cannula?

10        A    From my assessment I figured I addressed

11   all his problems.  If he had shown any signs of

12   decompensation, I would've changed my course of

13   action.  He didn't decompensate.  And vital signs

14   reading at 99 percent, 95, 90 percent of room air, to

15   me is not in respiratory distress.  His respiratory is

16   12 to 15; that's not distress.  His vital signs were,

17   like, 95 over 65 between through the entire course of

18   the emergency room when I had him.  That's not

19   distress to me.  So what I'm looking at, I'm looking

20   although he has a lot of preexisting problems, he's

21   stable.

22              MS. JOHNSON:  Is this a good time to take

71

1    break.

2                    (Whereupon, a short break was taken.)

3                    BY MR. CONNOR:

4         Q    Dr. Vaughn, I have just a couple more

5    questions for you.

6         A    Okay.

7         Q    I want to clarify in my mind the order of

8    the conversations that you had.  I think you said --

9    well, I know that you said you had two phone calls

10   with Dr. Bastien and you also talked with Dr. Haghigi,

11   correct?

12        A    Correct.

13        Q    Was it Bastien, Haghigi, Bastien?  Was

14   that the order?

15        A    Correct.

16        Q    And when you talked to Dr. Haghigi I think

17   you mentioned that you were discussing in your mind

18   there was adequate indication for commandeering event.

19   That's my recollection.  Is that accurate?  Or if I'm

20   wrong, tell me.

21        A    The question with Dr. Haghigi is how could

22   I admit somebody for a PRN use of a ventilator as

72

1    needed.  And with Mr. Magbie, he was on all the time,

2    that's an easy question to answer.  He's in the

3    hospital.  If he's vent-dependent, if he's always on

4    the vent, fine.  If he always used it, fine.  And

5    somebody who maybe uses it if he needs to as he needs

6    to with no particular rhyme or reason to using the

7    ventilator.

8           Now, the respiratory problems he had are

9    really nothing to admit anybody for.  You can correct

10    his sugar, you can correct his volume.  How can I

11    possibly admit for a PRN use of ventilator and that

12    was my problem.

13        Q    And because you had that issue in your

14    mind, you consulted Dr. Haghigi?

15        A    Because that's who you would go to, yes,

16    correct, yes.

17        Q    And my question is:  When you presented

18    this concern of yours --

19        A    Yes.

20        Q    What did Dr. Haghigi say in response?

21        A    He said we couldn't justify a PRN use for

22    a ventilator.  This admission was for a PRN use of a

73

1   ventilator with no other problems.  He said if he was

2   septic, you've got something to work with.  If he was,

3   you know, low blood pressure, something to work with.

4   He had possible use of ventilator and that's all you

5   can admit for, you really can't justify that type of

6   admission.

7       Q    And tell me if I'm wrong, you were leaning

8   in one direction and Dr. Haghigi confirmed what you

9   were already thinking?

10          MS. JOHNSON:  Object to the form.

11          MS. HANRAHAN:  Same objection.

12          THE WITNESS:  I was trying to get what Mr.

13  Magbie was used to having.  A ventilator to use if he

14  needed one.  That's what I was trying, I was trying

15  maybe to achieve that goal if I could do that.  And

16  what Dr. Haghigi and I discussed things, either we

17  couldn't find a way to justify an admission to hold a

18  bedside ventilator for somebody if he needs one.

19          BY MR. CONNOR:

20      Q    Another question:  When Mr. Magbie first

21  presented on September the 20th, when he first

22  presented, did you have access to his Department of

83

1    emergency room groups at those other facilities?

2         A    No.    Howard at the time, while I was

3    working at Howard, Howard was hired through Howard

4    University itself.  There's no group that Howard had

5    at that time.  They may have changed since then.

6         Q    So you would've been an employee of

7    Howard?

8         A    I was an employee at the hospital and

9    basically mostly at the ERs the employee of the

10   hospital itself.

11        Q    At Sibley for example?

12        A    Sibley also ran through NES at the time.

13        Q    Okay.    Did NES send you to different

14   hospitals from time to time?

15        A    No.    What it was, you would ask about

16   being on the availability of the hospital.  And say

17   hospital A, NES contracted through, and if you had

18   something available, you had a good match, you'd be

19   able to do shifts at that hospital.  That's how most

20   of the groups work.

21        Q    Back in September of 2004 were you working

22   12-hour shifts then?    10-hour shifts at Greater

84

1    Southeast?

2          A      Twelve-hour shifts.

3          Q      Twelve-hour shifts.

4          A      Yes.

5          Q      Would that have been the length of your

6    shift on September 20 and into the 21st?

7          A      Yes.

8          Q      What hours were you working then?

9          A      Usually 8:00 p.m. to 8:00 a.m.

10         Q      Okay.    What about the Medicine place.

11    First of all, what was that?

12         A      That was basically a personal injury

13    clinic.    People we were seeing from secondary to

14    automobile accidents.    We would evaluate patients,

15    give them therapy and treatment and then they were

16    discharged once they completed therapy.

17         Q      Okay.    You were an employee of Medicine?

18         A      Of the group, yes.  Of the practice, yes.

19         Q      And did they provide coverage for you

20    there?

21         A      Yes.

22         Q      Okay.    The NES, you said you had a