# Mary R. Scott, et al. v. District of Columbia, et al.
## United States District Court for the District of Columbia

## 05CV01853

**Exhibit No. 8**          **Plaintiff's Answers to Interrogatories**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARY R. SCOTT                          :

        Plaintiff                   :

   vs.                                 : Civil Action: 1:05-CV-01853-RWR

DISTRICT OF COLUMBIA, et al            :

       Defendants                  :

## PLAINTIFF'S ANSWERS TO INTERROGATORIES

COMES NOW Mary R. Scott, Plaintiff, and for Answers to Interrogatories propounded by the Defendants, states as follows:

A.     The information contained in these Answers is not based solely on the knowledge of the executing party but includes knowledge of their attorney, unless privileged.

B.     The word usage and the sentence structure is that of the attorney and does not purport to be the exact language of the executing party.

C.     Plaintiff reserves the right to amend and supplement her responses.

1.     State the full legal name, other names by which you have been known, address(es) for the past fifteen (15) years, telephone number, date of birth and social security number of the decedent, decedent's natural mother and father, and any living brothers, sisters, spouse, former spouse (whether by legal ceremony or common law), children, primary beneficiaries and anyone else with whom the decedent lived.

ANSWER:   Plaintiff objects that the interrogatory is vague and confusing as to whose information is being requested. Mary R. Scott, nee Bush. 2206 Parkside Drive, Mitchellville, Maryland 20721 (1997 to present);  24 Arthur Drive, Fort Washington, Maryland 20744 (1991 to

1996); 2/10/77; 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; Mary R. Scott and John Thomas Magbie - natural parents; John

Jeffrey Magbie, Regina Magbie, Rhodina Magbie and Christopher Scott, siblings; Jonathan

Magbie had no spouse or children.

2.      Please list the names, addresses and telephone numbers, and nature of the

relationship of any women or men with whom the decedent had a relationship within the ten (10)

years prior to the subject incident. For purposes of this response, the nature of the relationship

means social, friendship, intimate or sexual relationships.

ANSWER:    Plaintiff objects to Interrogatory No. 2 in that it is overly broad and unclear

as to what is being asked. Without waiving objection, Jonathan Magbie had many friends and

acquaintances, the most prominent of whom were Jonathan Butler (Maryland), "TJ" (Maryland),

Lynne Fleming (Atlanta, Georgia), and Bernard Beckett (Bladensburg, Maryland). The Plaintiff

does not have any further identifying information beyond what is provided here.

3.      List any and all instances that you were arrested, whether convicted of the

underlying arrest or not, and specify what the arrest was for, the time and date of the arrest, the

name of the arresting agency, the city and state where the arrest took place, the facility where

decedent was held, the length of detention, and the disposition of the arrest charges.

ANSWER:    Mary R. Scott has never been arrested. On April 8, 2003 Jonathan

Magbie was arrested by the Metropolitan Police Department and charged with possession of

marijuana, possession of cocaine and illegal possession of a weapon. On July 20, 2004 in the

Superior Court of the District of Columbia before Judge Judith Retchin, Mr. Magbie pled guilty

to misdemeanor possession of marijuana; all other counts were dismissed by the court. A ten-day

sentence was imposed, five days of which were served before Mr. Magbie died in the custody of

2

the District of Columbia. Mr. Magbie was not arrested on any other occasions.

4.    Please provide a detailed description of any physical, medical or mental conditions or injuries, including the accident which rendered the decedent a quadriplegic, originating prior to September 20, 2004, including drug or alcohol use, and treatment received.

ANSWER:    Plaintiff objects to Interrogatory No. 4 in that it is unclear exactly what is being asked. Without waiving objection, Plaintiff states that Jonathan Magbie, as the result of a pedestrian accident which occurred on June 10, 1982 at 4321 Fourth Street, S.E., Washington, D.C., suffered from the conditions:   C1-C2 quadriplegia; permanent tracheostomy; chronic urinary tract infection; spinal scoliosis; recurring decubuti and neurogenic bladder with permanent foley.

Jonathan Magbie was treated immediately following the 1982 motor vehicle accident at Greater Southeast Community Hospital. He was quickly transferred to Children's Hospital, where he was an in-patient from 1982 through 1986. He was admitted to the University of Virginia Hospital in 1984 for phrenic nerve implant. He received out-patient care from 1995 until 2004 at National Rehabilitation Hospital in Washington, D.C.

Jonathan's primary care physician from 2002 to 2004 was Peter Berkman, M.D., 106 Irving Street, N.W., Washington, D.C. Prior to 2002 his primary care physician was Alan Fields, M.D., 1515 Holcombe Boulevard, Houston, Texas. From 1977 until 1994 Jonathan was also followed by his pediatrician, Robert Hudson, M.D., 9015 Woodyard Road, Clinton, Maryland.

Jonathan received home nursing care from 1990 to 2004 from Jay Bee Medical Services, 300 Hyannis Court, Upper Marlboro, Maryland 20772. Prior to 1990 Jonathan's mother obtained various independent nurses from nursing agencies to provide care.

3

Jonathan drank champagne and used marijuana occasionally. He was never treated for any alcohol or drug use.

5.　　State the name and address, date of treatment for each medical practitioner, medical facility or medical or mental health providers who tested, examined, or treated you for any mental or physical condition, their diagnosis and the type of treatment you received during the past twenty-five (25) years, regardless of whether you believe that test or treatment was related to your alleged injuries in this lawsuit, or was part of a medical study.

ANSWER:    Plaintiff objects to Interrogatory No. 5 to the extent it asks for medical information pertaining to Mary R. Scott. Her medical information is private, non-discoverable, and not reasonably calculated to lead to admissible evidence related to any factual issue involved in this case.

6.　　Have you ever been the subject of any court action, including criminal and civil matters, restraining orders (whether temporary or permanent), divorce action, separation, disability action, paternity action, custody action, or mental health commitment? If so, please identify each and every action, including the jurisdiction, dates, case number, parties, and result of each action.

ANSWER:·    Mary Scott was a party to a divorce action from her former husband, John T. Magbie in the Superior Court of the District of Columbia. The divorce was granted in approximately 1978 or 1979.

Mary Scott brought a civil action in the Superior Court of the District of Columbia against the party responsible for injuring Jonathan Magbie in the motor vehicle accident of June 10, 1982. She does not recall the full name of the Defendant or the case number. The matter was

settled before trial in 1984.

7.    Please identify the name, address, dates of attendance and field of study of each

and every school you have attended, from kindergarten through college or vocational school,

including all certifications, educational programs supplied by correctional institutions, and any

other educational or training opportunities provided to you.

ANSWER:  Mary Scott graduated from Roosevelt High School in Washington, D.C. in

1968.  She attended the University of the District of Columbia for two years in 1980 to 1982.

8.    Please identify all entities or persons by whom you have been employed during

the last ten (10) years, including self-employment.  For each, state the name and address of the

employer, job titles or duties, date of employment and reason for termination of employment.

For any gaps in continuous employment, please explain the reason for such gaps in employment.

ANSWER:    Mary Scott has been employed by the Department of Defense for 34

consecutive years.  She is currently a Human Resource Specialist for the Military Personnel

Command of the Department of the Army at 200 Stovall Street, Alexandria, Virginia.

9.    Please state the date, time, place and circumstances of all car accidents, falls, trips,

mishaps, illnesses or other accidents which the decedent has experienced in the ten (10) years

preceding the date of this incident.

ANSWER:    None, other than the illnesses previously described in Answer No. 4,

supra.

10.    For each of the ten (10) years preceding the year during which the decedent died,

list separately the income which he earned or received from wages and salaries, fees, reimbursed

expenses, commissions, bonuses, interest, dividends, rent, partnerships or joint enterprises, loss

or gain on capital assets sold or otherwise disposed of, annuities, structured settlements,

government benefits and any other sources of income whatsoever and identify the person(s)

providing such income.

ANSWER:    As a result of the settlement of the motor vehicle accident case of 1982,

Jonathan Magbie received monthly annuity payments from John Hancock Life Insurance

Company, 601 Congress Street, Boston, Massachusetts 02210.  The annuity agreement, which

has previously been provided to counsel, provided for a beginning payment on January 13, 1984

in the amount of $10,000.00 per month.  That amount increased by six percent each January

thereafter.  The approximate monthly income for the past ten year preceding the year of death is

as follows:

| | | |
|---|---|---|
| 2003 | $30,256.00 | per month |
| 2002 | $28,543.00 | per month |
| 2001 | $26,928.00 | per month |
| 2000 | $25,404.00 | per month |
| 1999 | $23,966.00 | per month |
| 1998 | $22,609.00 | per month |
| 1997 | $21,329.00 | per month |
| 1996 | $20,122.00 | per month |
| 1995 | $18,983.00 | per month |
| 1994 | $17,908.00 | per month |

Jonathan Magbie had no wages or other income, other than income from an investment

account he held with Sanford and Bernstein, 1150 Connecticut Avenue, N.W., Washington, D.C.

The investment account was open from approximately 1998 to 2004.  The Plaintiff does not have

complete documentation for that account.

11.    For bank accounts which the decedent maintained (jointly or severally) at the time

of his death, state the name and address of each bank, the account number, the amount in each

6

account on the date of decedent's death, and the highest and lowest balance in each account during the one-year period preceding his death.

ANSWER:    Jonathan Magbie maintained a checking account with Bank of America under Account No. 4744770003155562. Plaintiff is attempting to locate any banking records for this account.

Jonathan Magbie also held a joint account with Mary R. Scott with Wachovia Bank. Plaintiff is obtaining bank statements for this account, which will be provided to counsel.

12.    List all property, real, personal or intangible, wherever located, in which the decedent owned or had an interest in or claim against as of the date of his death, stating as to each a description thereof, the nature and extent of the decedent's ownership or interest, how acquired (by gift, purchase or otherwise) and the reasonable market value of decedent's interest.

ANSWER:    Jonathan Magbie was a co-owner of the residence located at 2006 Parkside Drive, Mitchellville, Maryland 20721. Ownership of that property passed to Mary R. Scott upon Jonathan Magbie's death.

In the summer before he died, Jonathan Magbie also expressed an interest in acquiring property in Florida. The Plaintiff is not certain whether Jonathan Magbie actually purchased any such property at this time.

13.    Itemize the costs or approximate costs expended by or on behalf of the decedent for the purposes of living expenses on an annual basis in the five (5) years preceding his death, including, but not limited to housing, clothing, food, transportation, medical, dental and recreational expenses.

ANSWER:    Plaintiff estimates that Jonathan Magbie spent the following

7

approximately on a monthly basis for personal expenses:

A.    Housing:

| | |
|---|---|
| Mortgage | $2,800.00 |
| Taxes | $   900.00 |
| Utilities | $2,000.00 |
| Landscaping | $   300.00 |
| Pool | $   100.00 |
| Homeowners insurance | $   400.00 |
| HOUSING TOTAL: | $6,500.00 |

B.    Clothing:                $10,000.00

C.    Food                     $     500.00

D.    Transportation

Auto Liability/Collision
      Insurance           $2,500.00

E.    Medical

Additional premium
      charge for Mary R.
      Scott's major medical
      police                $   235.00

F.    Dental                    $    30.00

G.    Recreational

Jonathan traveled approximately four times per year.  He would bring his family and his

nurse on these trips.  The expense varied.

14.    State exactly and in detail Plaintiff's version of how this incident occurred,

including identification of any "jail medical staff," "prison porters" or other individuals with

personal knowledge of the incident.

8

ANSWER:    The prison porters were Darryl Carter and Jason Foster. The jail medical staff are identified in Defendant DOC's discovery response Exhibits A and B, Aug. 4, 2006. Other persons known to Plaintiff with personal knowledge of this event are listed in Plaintiff's Initial Disclosures. Please also see Plaintiff's Amended Complaint, which is incorporated herein by reference and contains Plaintiff's account of how Mr. Magbie died.

15.    Give a detailed account of Plaintiff's knowledge and understanding of the decedent's activities during the 120-hour period immediately preceding his death.

ANSWER:    On the morning of September 20, 2004, Mr. Magbie appeared in D.C. Superior Court for sentencing. Mr. Magbie was sentenced to ten days of imprisonment at the Central Detention Facility (CDF). Judge Retchin prepared a Medical Alert which was to go with Mr. Magbie. Mr. Magbie was transferred by Department of Corrections transport staff to the CDF. The Medical Alert either did not arrive with the transportation officers or was not subsequently placed in Mr. Magbie's medical record.

Mr. Magbie arrived at CDF at approximately 11:52 a.m. He was given a security assessment and assigned a prison number. He was then taken to the prison urgent care center to receive his intake medical and mental health screening at approximately 2:00 p.m. Chantal Perrier-Taylor examined him and Dr. Fozia Abdulwahabe assigned him to the Correctional Treatment Facility (CTF) Infirmary. This was completed by approximately 4:30 p.m. Mr. Magbie had an admission chest x-ray that suggested possible pneumonia. Mr. Magbie stayed in the Urgent Care Center awaiting transfer to the CTF. At some later period but no later than 9:00 p.m. Mr. Magbie experienced difficulty in breathing. The medical staff noted that Mr. Magbie indicated that he needed a ventilator at night.

9

At approximately 9:15 p.m. Greater Southeast Community Hospital (GSE) was notified that Mr. Magbie was en route to the hospital. He arrived at GSE approximately 9:45 p.m, where he was noted to be a tracheostomy-dependent patient who uses a ventilator at night who was experiencing trouble breathing. At approximately 11:00 p.m. he was evaluated by Dr. Vaughn. Other information regarding his care and treatment is recorded in the GSE medical record.

At approximately 1:50 a.m. September 21 Dr. Vaughn noted that no ventilator was available at the CTF and indicated that Mr. Magbie would be admitted with diagnoses of dehydration, low blood sugar, and respiratory distress. At approximately 7:15 a.m., after earlier speaking with Dr. Haghighi, Dr. Vaughn discharged Mr. Magbie from GSE. At approximately 9:25 a.m., Mr. Magbie's blood pressure dropped to 68/42 but his transfer to the CTF was not canceled and he was not reevaluated. At approximately 11:45 a.m. he was transported to CDF.

Mr. Magbie arrived at the CDF at approximately 12:29 p.m. At approximately 1:00 p.m. he was transferred from CDF to CTF. When he arrived at the CTF infirmary there was a substantial delay during which transport staff waited for a response from CTF staff to allow them to enter the unit with Mr. Magbie. Mr. Magbie arrived in the CTF infirmary R& D at approximately 2:10 p.m. He was received by CTF Officer Frank Washington. Apparently around 4:00 p.m. Mr. Magbie was admitted to the CTF. Dr. Nwosu examined Mr. Magbie and left orders for his treatment, including an order that he was not to be locked in his cell at any time.

During the period September 21-September 24 Mr. Magbie was not being regularly suctioned, cleaned, or given food or water by the medical or custody staff. On the night of September 23-24 and possibly on additional occasions, Officer Singley, despite the order from

10

Dr. Nwosu, locked Mr. Magbie in his cell. When Mr. Magbie was locked in his cell, he was helpless to contact others. During this period Mr. Magbie's condition deteriorated.

At some point in the morning of September 24, prior to 8:40 a.m., Officer Yates discovered that Mr. Magbie was saying that he was going home and that his sister would pick him up. Officer Yates recognized that these statements called into question Mr. Magbie's mental status. At approximately 8:40 a.m., Officer Yates went back to Mr. Magbie's cell and discovered that he was unresponsive.

At approximately 9:10 a.m. emergency paramedics entered the CTF Infirmary. At approximately 9:33 a.m., they left the Infirmary with Mr. Magbie, having been delayed by CTF's requirements for paperwork before Mr. Magbie could be transferred and an attempt to obtain a blood sugar reading from Mr. Magbie. Further information regarding Mr. Magbie's activities, treatment and status is recorded in Mr. Magbie's CTF medical record.

Mr. Magbie arrived at GSE at approximately 9:50 a.m. At the time, his condition was evaluated as unresponsive, but his condition subsequently improved temporarily prior to his death at 6:40 p.m. Further information regarding Mr. Magbie's activities, treatment, and status is recorded in Mr. Magbie's GSE medical record.

Plaintiff also incorporates the contents of the Amended Complaint by reference into this response.

16.     Did the decedent consume any alcoholic beverages, drugs (either prescribed, over the counter or illicit) or any medications of any kind within 120 hours of his death? If so, state which alcoholic beverages, drugs or medications were consumed, where each such alcoholic beverage, drug or medication was obtained or taken, when it was obtained or taken, from whom

11

it was obtained or taken, and the nature and amount thereof.

ANSWER:    Jonathan Magbie did not consume any alcohol during the 120-hour period in question. He took his prescribed medications, as they were provided to him by the various Defendants in this case. The medication record is part of the overall medical record and is incorporated herein by reference.

17.    Did Plaintiff ever contact or attempt to contact any staff person at CCA, CCHPS, CDF, CTF, DOC or Greater Southeast during decedent's incarceration in which she communicated or attempted to communicate concern for his medical needs, well-being or safety? If yes, identify all such communications, including, whether or not the communication was recorded.

ANSWER:    Mary Scott spoke with Janet Holtz, R.N., at the District of Columbia Jail on September 20 and described the various treatment Jonathan would require during this 10-day stay. Nurse Holtz assured Ms. Scott that the D.C. Jail could provide everything Jonathan would need.

On September 21, 2004 Mary Scott was called by Malekghashemi, M.D., who inquired about Jonathan's tracheostomy and ventilator. Dr. Malekghasemi said that he would speak with Judge Rechin's chambers about these matters.

Dr. Malekghasemi called Mary Scott again on September 22, 2004 and asked her to bring Jonathan's ventilator into the jail on Friday. He did not express any urgency in this request, and Ms. Scott was assured that Jonathan's medical needs were being properly attended to.

Mary Scott met Dr. Malekghasemi on the morning of September 24, 2004 when she brought the ventilator to the D.C. Jail. She gave the home ventilator and his suctioning

12

equipment to Dr. Malekghasemi on the understanding that he would see that it was used in Mr.
Magbie's care. She was never informed that Jonathan had been taken from the jail prior to her
arrival and was in the process of dying at Greater Southeast Community Hospital on that day.

18.     Did the decedent ever communicate to Plaintiff, through telephone call, personal
visit, conversation, note, correspondence, letter or any other method, that his life or well-being
was in danger at the CDF, CTF or Greater Southeast? If yes, please identify all such
communications.

ANSWER:     No.

19.     Describe the factual basis for the allegation that Defendants knew or should have
known that decedent's life or well-being was in danger, but failed to take any action.

ANSWER:     Plaintiff objects to Interrogatory No. 19 in that it exceeds the permissible
scope of discovery and calls for Plaintiff's counsel's attorney work product, trial strategy and
theory of the case. Without waiving objection, the factual basis requested is outlined in
exhaustive detail in Plaintiff's Amended Complaint which is incorporated herein by reference.

20.     Are you aware of the existence of any oral, written or recorded statement or
admission made or claimed to have been made by any party or witness? If so, identify the person
making the statement or admission, the type of statement or admission, the person to whom the
statement or admission was made; the circumstances under which the statements or admission
was made and the date of the statement or admission.

ANSWER:     There are numerous oral, written and recorded statements and admissions
made by defendants and witnesses to this case. They are contained in the medical records from
the D.C. Jail, the charts from Greater Southeast Community Hospital, the investigation reports of

13

the D.C. Department of Health, the Department of Corrections and the D.C. Inspector General, as well as the depositions taken from Defendants in this action. Whether additional admissions may have been made by various witnesses cannot be determined until they have been deposed.

21.     Has any person, including, but not limited to, health care providers, criticized Defendants' care or treatment given to the decedent? If so, describe each criticism, identify the person who made the criticism, and state the date, time, circumstances and place where the criticism was made.

ANSWER:     Plaintiff objects to Interrogatory No. 21 in that it is overly broad, unduly burdensome and impossible to answer. Without waiving that objection, Plaintiff identifies the reports by the Department of Health, the D.C. Inspector General, the internal report of the Department of Corrections, the expert reports by Plaintiffs' medical experts, various members of the District of Columbia City Council in October 2005, and Colbert King of the <u>Washington Post</u> in numerous columns.

22.     Identify all communications between Plaintiff and any current or former employees of Defendants since September 19, 2004, not previously identified in your answer to Interrogatory No. 17.

ANSWER:     Mary Scott went to Greater Southeast Community Hospital on September 20, 2004. She was not allowed to see Jonathan Magbie on that visit. A corrections officer told her that Jonathan was "in the back" and was "comfortable." On September 24, 2004, Mary Scott received a telephone call from Warden Fred Figueroa, who called to say that Jonathan had died. He offered no apology and no details about the death.

23.     If you contend that any agent or employee of any Defendant, through silence,

14

inaction, conduct or other behavior acted in a manner suggesting or demonstrating the liability of

any Defendant in this matter, describe the action in detail, identify the agent or employee whose

action is described, and identify all other individuals with personal knowledge of the action.

ANSWER:    Plaintiff objects to Interrogatory No. 23 in that it is overly broad, unduly

burdensome and so vague as to make it impossible for Plaintiff to respond.  Plaintiff contends

that agents and employees of defendants acted in a manner demonstrating the liability of those

defendants, since she has sued the defendants for wrongful death.  The specific facts are

contained in the Plaintiff's Amended Complaint, and Plaintiff's expert reports, which are

incorporated herein by reference.  The investigative reports include all those previously

identified, including the Office of Inspector General Report, the Department of Health Report,

and the Internal DOC Report, all of which are identified in Plaintiff's Initial Disclosures.

24.    Describe any statements, investigations, reports or other documents prepared in

connection with the facts and/or incidents alleged in your Complaint, including those prepared by

any party to this action or any person not a party to this action.  Describe the substance of each

statement, investigation, report or document and identify the person providing the statement,

investigation, report or document and when it was provided, and identify the present custodian of

each statement, investigation, report or document.

ANSWER:    Plaintiff objects to Interrogatory No. 24 in that it exceeds the permissible

scope of discovery and invades attorney work product.  Without waiving objection, there have

been numerous investigations of the facts in question by various District of Columbia

governmental authorities.  Plaintiff has also had this matter reviewed by her expert witnesses.

The reports from all these sources were previously submitted to counsel with Plaintiff's initial

15

disclosure statement, with the exception of the Department of Corrections' internal report, which the Department provided in response to Plaintiff's discovery request.

25.    Identify all communications you have had with any person, including, but not limited to, attorneys, media, family members, friends, other inmates, or any other person regarding the allegations in your complaint, since September 20, 2004, not including those previously identified in response to Interrogatory No. 17 or 22.

ANSWER:    Plaintiff objects to Plaintiff No. 25 in that it invades the attorney/client privilege, among other reasons.

Without waiving objection, Plaintiff states that she has spoken with Colvert King of The Washington Post on four or five occasions, during the period when he was writing columns about the subject incident. She also spoke to various members of the news media during a news conference on September 20, 2005. She does not recall the specific names of those to whom she spoke.

Plaintiff also received a call in the fall of 2004 from Darryl Carter, a prisoner porter, who described the degrading and inhumane treatment or lack of treatment given to Jonathan Magbie on his last night alive.

26.    Describe each negligent act or omission which you contend was committed or omitted by any Defendant, including identity of each principal, agent, servant or employee of this part who you contend committed such act or omission and the dates and times on which such act or omission was committed. Include in your answer all facts that support any response to this interrogatory.

ANSWER:    Please see Plaintiff's Amended Complaint and the reports of Plaintiff's

16

expert witnesses, which are incorporated herein by reference.

27.    If you contend that any Defendant violated any statute, ordinance, regulation, codified standard, rule, policy or procedure, identify the statute, ordinance, regulation, codified standard, rule, policy or procedure which you contend was violated; identify the person violating the statute, ordinance, regulation, codified standard, rule, policy or procedure; describe how such violation proximately caused or contributed to the injury to the decedent; and state all facts upon which you rely to support this contention.

ANSWER:    Plaintiff objects to Interrogatory No. 27 in that it invades attorney work product and calls for legal opinions from counsel.  Without waiving objection, please see Plaintiff's Amended Complaint, the District of Columbia investigative reports from various agencies investigating this matter, the reports of Plaintiff's expert witnesses, and the complete records for the treatment of Jonathan Magbie, all of which are incorporated herein by reference.

28.    As to those acts Plaintiff contends falls below the standard of care, state each specific act or failure to act by a Defendant which fell below the standard of care; identify the Defendant who you believe committed such act or failure to act; describe specifically what conduct you claim would have complied with the standard of care; and, as to those action Plaintiff contends falls below the standard of care, describe how this act or failure to act equated to negligent performance of the Defendant's duties to the decedent and how those acts or failures proximately caused or contributed to the injury to the decedent.

ANSWER:    Please see the narrative reports of Plaintiff's expert medical witnesses, which are incorporated herein by reference.

29.    Describe why Plaintiff claims that Defendants discriminated against the decedent,

17

stating each and every fact, person and document which supports your allegation that defendants discriminated against the decedent as alleged in the complaint.

ANSWER:    As described in the Amended Complaint, Jonathan Magbie was totally helpless without assistance. Absent accommodations for his profound disabilities, he could not carry on virtually any activities of daily living, including eating, drinking, breathing, notifying others of his needs, and removing his bodily wastes in a safe and sanitary manner. Defendants failed to make reasonable accommodations for these needs as set forth in the Amended Complaint, despite knowing of his needs for accommodations, with the result that he was unable to participate in activities of daily living that would have otherwise been available to him, including eating, drinking, keeping his body clean and sanitary, and breathing.

30.    Describe each and every duty each Defendant owed the decedent under federal and state law, including the statute identifying the duty, and how each Defendant breached each identified duty.

ANSWER:    Plaintiff objects to Interrogatory No. 30 in that it invades attorney work product and calls for legal conclusions. Without waiving objection, Plaintiff states:

A. Federal Law-Eighth Amendment: Defendants owed Mr. Magbie an affirmative duty under the Eighth Amendment to provide for all his basic necessities of life, including adequate medical care, food, water, and reasonable safety.

B. Federal Law-Americans with Disabilities Act (42 U.S.C. § 12141 *et seq.*): The District of Columbia and its agents and employees owed a duty to Mr. Magbie not to exclude him from services, programs and activities or deny him the benefits of such services, programs or activities that he would otherwise have received as a prisoner if he had not been disabled.    The District of

18

Columbia and its agents and employees further owed a duty to make reasonable accommodations in policies, practices and procedures as necessary to avoid discrimination against Mr. Magbie on the basis of Mr. Magbie's disabilities. In Mr. Magbie's case, these services, programs and activities included being provided with medical care, being provided with services for personal hygiene, and being provided with food and water.

C. Federal Law-Americans with Disabilities Act (42 U.S.C. § 12181 *et seq.*): Defendant GSE owed a duty to Mr. Magbie not to discriminate against him on the basis of his disabilities in the full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations in the hospital. GSE further owed a duty to make reasonable modifications in policies, practices, and procedures that were necessary to afford services, facilities, privileges, advantages, and accommodations to Mr. Magbie on an equal basis.

D. District of Columbia-common law negligence: The Defendants owed Mr. Magbie a duty of reasonable care under the circumstances. The Defendant medical services providers owed Mr. Magbie the degree of care reasonably expected of a professional with similar skills acting under the same or similar circumstances and to treat Mr. Magbie within the prevailing standard of care that existed at the time of the subject events and today.

E. District of Columbia- Human Rights Law: Defendants had a duty not to discriminate against Mr. Magbie on the basis of his disabilities.

F. District of Columbia-Common Law Intentional Infliction of Emotional Distress: Defendants had a duty to refrain from the intentional or reckless infliction of severe emotional distress.

See the Amended Complaint, which is incorporated by reference, for a description of how each Defendant breached each duty.

19

31.    Describe, with particularity, your claims for violation of 42 U.S.C. § 1983, stating each and every fact and identifying each person and document which supports your allegation of violation of 42 U.S.C. § 1983 as alleged in your Complaint.

ANSWER:    *See* Amended Complaint, Office of Inspector General Report, Department of Health Report, internal Department of Corrections Report, expert medical reports.

32.    Describe the complete factual basis for your contention that CCA, CCHPS, DOC, and Greater Southeast, including their agents and employees, acted with deliberate indifference in denying the decedent timely medical treatment or willfully ignored his need for certain treatment in violation of the Eighth Amendment to the United States Constitution as alleged in your Complaint.  For each action or willful failure to act, state the action or willful inaction denying timely medical treatment; identify the Defendant whom you believe acted or willfully refrained from acting, which effectively denied timely medical treatment; and describe how this action or willful inaction equated to a violation of decedents Eighth Amendment rights.

ANSWER: For all Defendants who are charged with violating the Eighth Amendment, see the Amended Complaint and Plaintiff's expert medical reports, which are incorporated by reference.

As to Defendants District of Columbia and Washington, Defendant Washington and other agents of the District knew that persons whose medical needs could not be safely met within DOC facilities needed to be transferred to medical facilities where those needs could be met; knew that there were no specific policies that addressed the requirement not to confine such prisoners in DOC facilities; knew that there was a custom of failing to transfer such persons; knew that the care provided by  CCHPS had deficiencies and that the DOC was not monitoring

20

that care appropriately; specifically knew that there had been long-term problems with the

follow-up of abnormal x-rays and off-site services availability at GSE; but never took any action

to enforce the contract provisions of the contract with CCHPS.   Notwithstanding this

knowledge, no District of Columbia agent took any steps to address these practices and customs

that put Mr. Magbie at excessive risk.   *See* Deposition of Odie Washington, June 13, 2006; OIG

Audit of CTF Contract (OIG No. 03-1-06FL and cover letter to Washington, April 2, 2004);

GAO Report, District of Columbia Jail (June 2004).  Further, Defendant DOC's discovery

response fails to identify any policy that requires that persons whose medical needs could not

safely be met within DOC facilities were to be transferred to facilities where such needs could be

met.  *See* Response to Request for Production 7-8, Attach. G, Aug. 4, 2006; *see also*

Malekghasemi Deposition, June 15, 2006 (does not recall any policies limiting decree of acuity

to be handled at infirmary).  Further, see Defendant Malekghasemi's deposition testimony that he

expressed concerns to Ms. Baldwin-White's office about confining Mr. Magbie in the

Department of Corrections but never received a return call and that the "DOC put a stop to" his

direct contact with the Superior Court when Superior Court personnel were attempting to

determine if DOC facilities could manage the medical needs of persons that would potentially be

in DOC custody following sentencing.  Malekghasemi Deposition, June 15, 2006.

As to Defendants CCA and Singley, see the Internal DOC investigation of the Magbie

death, concluding that Mr. Magbie's cell door was locked the night of September 23.  (DOC Exh.

D to Discovery Responses).  See also CTF infirmary custody logs, which indicate that on other

occasions CCA custody officers disregarded physician orders that a particular prisoner not be

locked in his cell, so this practice was documented and known to supervisors. (DOC Exh. F to

21

Discovery Responses; CCA Initial Disclosures).

As to Defendants GSE, Vaughn and Illuyomade, Defendant Vaughn knew because he had been told by Mr. Magbie that he required a ventilator to breathe at night and other times. Defendant Vaughn also knew that he was discharging Mr. Magbie to a facility without ventilator availability, and that Mr. Magbie was very likely to die if he did not have access to a ventilator that he needed to breathe. Defendant Vaughn then ordered Mr. Magbie discharged from GSE on September 21, 2004 based on a mere unexplored possibility that nasal oxygen might be sufficient to sustain his life. GSE did not cause Mr. Magbie to be reevaluated and admitted on September 21 after his blood pressure dropped to 68/48 even though it would be obvious to any medical practitioner that a patient in this condition required reevaluation and treatment prior to discharge and that the failure to do so posed an excessive risk of serious harm to Mr. Magbie. On September 24, 2004, GSE staff failed to notify a physician of Mr. Magbie's deteriorating condition even though it would have been obvious to any RN or licensed respiratory therapist that a physician needed to be notified of Mr. Magbie's deteriorating condition and that there was an excessive risk of death or other serious harm in the absence of attention from a physician. It was obvious to Defendant Iluyomade, as it would be to any physician, that dislodgement of a permanent tracheostomy tube is likely to result in death if not addressed immediately. Notwithstanding that knowledge, Defendant Iluyomade failed to assess Mr. Magbie's respiratory status after he pushed his tracheostomy tube back in, with the result that Mr. Magbie stopped breathing, experienced a cardiac arrest, and died of tracheostomy tube dislodgement.

33.    If you contend that the decedent's constitutional rights were violated as the result of a policy, custom or practice of any corporate defendant or the District of Columbia, whether

written or established by past practice, please identify; each decision, act or omission that you allege affixes liability on the part of each corporate defendant and/or the District of Columbia; each decision maker involved in the creation of such a policy, custom, practice or procedure; the specific law, regulation, directive, practice or procedure that was employed in derogation of the decedent's rights; other instances in which you contend other persons' rights were violated pursuant to the same policy, custom, practice or procedure; and produce all documentation supporting that contention.

  ANSWER: District of Columbia: The District had a custom of accepting custody of prisoners whose chronic medical needs could not be met in DOC facilities, and a custom of failing to transfer prisoners whose chronic medical needs could not be met in DOC to facilities where such needs could be met.   Other than Odie Washington the responsible decision-makers are unknown.  Mr. Magbie was subjected to this custom twice, once on September 21 when the DOC accepted custody of him from GSE on September 21 despite knowing that he was at times ventilator-dependent but no ventilator was available to him at the DOC; the second was after he arrived at the CTF Infirmary but despite steady deterioration and Mr. Magbie's notification of additional staff that he was at times ventilator-dependent, he was not returned to a facility with a ventilator until after he experienced a severe respiratory crisis.  Other persons affected by this custom are not known at this time and Plaintiff will seek discovery regarding their identity.

  CTF had a custom of allowing correctional officers to disregard physician orders that doors in the infirmary not be locked.  The responsible decision-makers other than Warden Figueroa are unknown at this time. Information about the identity of some other persons affected by this policy appears in DOC Discovery Responses Exhibit F and CCA Initial Disclosures (CTF

Infirmary Logs).

*See also* Amended Complaint, Plaintiff's Medical Expert Reports and Plaintiff's Initial
Disclosures.

34.    If you contend that a corporate defendant of the District of Columbia in liable to
the Plaintiff or the decedent because of the alleged negligence of its subcontractor(s), please
identify how each subcontractor was allegedly negligent, the written material or evidence upon
which you will rely at trial and produce any written documentation (including contracts) or other
evidence that support that contention.

ANSWER:    Plaintiff objects to Interrogatory No. 34 in that it invades attorney work
product, calls for legal conclusions and improperly asks how Plaintiff will present her case at
trial. Without waiving objection, defendants are referred to the Plaintiff's Amended Complaint,
which is incorporated herein by reference.

35.    If you contend that the decedent sustained conscious pain and suffering, state the
precise period of time of said conscious pain and suffering and the specific facts upon which you
rely to support your contentions.

ANSWER:    On the night before he died, Jonathan Magbie was conscious, alert and
oriented. He was locked in his cell by Patricia Singley with no way of reaching his call button.
He was deprived of food and water by her; he expressed to Officer Karen Yates and to Darryl
Carter and that he was "going home," indicating that he had a premonition of imminent death.

He was delayed in departing the D.C. Jail on the morning of September 24, because of
paperwork delays. After he arrived at Greater Southeast Community Hospital on September 24,
he was noted to be alert and oriented. According to Dr. Iluyomade, who pronounced his death at

24

approximately 6:40 P.M., he was conscious, alert and oriented until the end. According to that medical witness, he died of gradual suffocation from unsuctioned secretions in his throat. Plaintiff intends to offer proof at trial that the suffocation of a conscious individual normally produces fear, dread, anxiety and mental anguish. The process of suffocation is also physically painful.

36.    If Plaintiff claims her earning capacity has been or will be impaired as a result of the incident, please describe the particulars, including the nature of the condition that causes the impairment, the manner in which the condition will impair your ability to work, the economic loss caused by your inability to find gainful employment and your method of computation for computing such loss.

ANSWER:    No.

37.    Itemize all damages you are claiming under the Survival Action, whether economic, non-economic, emotional or other, and for each type of damage, state the factual bases, if any, that support your claim for such damages, identify all people with knowledge of such damages, and identify all documents that relate to or support such damages.

ANSWER:    Please see Paragraph III - "Computation of Damages" which appears in Plaintiff's Initial Disclosure Statement and which is incorporated herein by reference.

The lost annuity earnings will be established by expert testimony from Richard Edelman, Ph.D. The conscious pain and suffering will be established by Plaintiff's medical experts. The indignity, embarrassment, et al will be established by the factual witnesses identified elsewhere in Plaintiff's responses.

38.    Itemize all damages you are claiming under the Wrongful Death Action, whether

economic, non-economic, emotional or other, and for each type of damage, state the factual

bases, if any, that support your claim for such damages, identify all people with knowledge of

such damages, and identify all documents that relate to or support such damages.

ANSWER:    Please see Paragraph III - "Computation of Damages" contained in

Plaintiff's initial disclosures, which is incorporated herein by reference.  The lost support which

would have been provided to Mary Scott will be established by her testimony, by Dr. Edelman,

and by family members and others with knowledge.

39.    Itemize and detail each and every expense, debt or obligation incurred or

expended by Plaintiff as a result of the September 24, 2004 incident resulting in the death of

Jonathan Magbie.  This includes, but is not limited to, ambulance expenses, transportation

expenses, laboratory charges, x-ray costs, hospital expenses, physician's, surgeon's or other

practitioner's fees for services, and funeral, burial, or cremation expenses.

ANSWER:    Plaintiff sustained approximately $10,000.00 in funeral and burial

expenses for Jonathan Magbie.  The documentation for these expenses will be provided shortly

to counsel.

40.    During the last ten (10) years of the decedent's life, did he contribute money or

other tangible benefits or support to a child, spouse, parent or any other living individual?  If so,

identify the beneficiary, relationship to the decedent, the date of each contribution and reason

therefore, the amount or value of each contributions and a description of anything of value which

the decedent received in exchange for such contribution.

ANSWER:    Jonathan Magbie contributed approximately $10,000.00 per month to

Mary Scott, and was expected to continue such contributions in the future, but for his untimely

death.

41.    Describe the life annuity in paragraph 57 of the Complaint, including, but not limited to, the name of the annuity, amount of the annuity, actuarial considerations made a the time of the annuity was established, terms and conditions of the annuity, frequency of payments and schedule of payments.

ANSWER:    A copy of the annuity documentation was provided to counsel with Plaintiff's initial disclosures, and is incorporated herein by reference.

42.    Describe the facts that support the allegation that Plaintiff had a past experience and reasonable future expectation of substantial economic support from the decedent as alleged in paragraph 58 of the Complaint.

ANSWER:    Please see Answer No. 40, supra.

43.    If Plaintiff claims damages in this action based on the loss of the decedent's care, guidance, advise, counsel, training, protection, society, comfort or companionship, describe the basis thereof; the amount of damages claimed; the method whereby such amount was computed or determined; and the state during the last ten (10) years of his life, how many times Plaintiff communicated, whether via personal visits, telephone, or written correspondence, with the decedent.  For each communication, state and how many hours each visit lasted; the average number of hours/minutes per oral communication; the total number of communications; the frequence or oral communications; the number of written communications, be if through letter, e-mail correspondence and/or greeting card; and, the frequency of written communication?  If you cannot answer precisely, please estimate the average time, number, and frequency of the communications, and indicate that you are providing an estimate.

27

ANSWER:    Plaintiff Mary Scott was the mother and next of kin of the late Jonathan Magbie. They lived together for the duration of Jonathan's lifetime. They saw each other on a daily basis. When Jonathan Magbie was not out and about with friends and relatives, he would spend time at home with his mother talking, socializing and sharing their lives. They also traveled together extensively.

When Jonathan was at home they would spend approximately six to eight hours together on a daily basis, and the entire weekend. Jonathan did not send correspondence to his mother, because he could not use his arm.

44.    Identify any persons, including, but not limited to cell mates and other individuals with whom the decedent resided while incarcerated at CDF or CTF, who may have or claims to have knowledge of the incident, any of the events leading up to it, or related events occurring thereafter and state the substance of the information which he or she is believed to possess.

ANSWER:    The persons in question are identified specifically in Plaintiff's Initial Disclosures. Most of such persons are Defendants' employees or agents. Plaintiff objects on the ground of unreasonable burden to summarizing the testimony of such persons.

45.    For any reason, has Plaintiff, any agent of the Plaintiff, or any other individual identified in response to Interrogatory No. 1 made any payments, gifts or promises to any individual identified in response to Interrogatory No. 46 at any time since September 15, 2004. If so, describe the payment, gift or promise; including the date of payment, gift or promise; the amount or fair market value of the payment, gift or promise; the form of payment, gift or promise, the person providing such payment gift or promise; the person receiving such payment, gift or promise; and the rationale and full consideration for providing the payment, gift or

28

promise.

ANSWER:    The compensation rates for Plaintiff's expert witnesses were provided with Plaintiff's expert witness designations, which is incorporated by reference herein.  To date, Dr. Edelman has been paid $900.00.  Dr. Baker has been paid $2,500.00.  Dr. Walden has been paid $2,375 for 19.25 hours work.

46.    Does Plaintiff know of any person who is skilled in any particular field or science, including the fields of medicine and economics, whom she may consult with or call as a witness upon the trial of this action and who has expressed an opinion upon any issue in this action?  If so:

a.    identify each such person;

b.    state the field or science in which each such person is sufficiently skilled to enable her to express opinion evidence in this action;

c.    state exactly on what each potential witness will base his opinion either:

d.    for any potential witness who made a personal investigation or examination, state the nature and dates of such investigation or examination;

e.    identify each and every fact, document, item, photograph or other tangible object supplied or made available to such person;

f.    state the general subject upon which each such person may express an opinion;

g.    identify any reports, including drafts, that such persons have written; and

h.    list all cases, including the name of the case, year filed, jurisdiction of the court, cause number, and retaining party) in which such person has been retained, whether the person testified at a deposition and/or during the trial; and

i.    identify any published materials authored by such person.

ANSWER:    The complete expert witness information requested in this Interrogatory was provided in Plaintiff's expert witness designations, served upon all counsel on July 5, 2006 and incorporated herein by reference.

47.    If you have made any form of settlement or compromise pertaining to the injuries which Plaintiff alleges are the subject matter of the claims in the Complaint, please state the date and place it was made, the nature and extent of the settlement or compromise, the names and address of the party or parties with whom you settled, and attach hereto a copy of any and all releases, settlement agreements, orders of satisfaction or other documents reflecting such settlement or compromise.

ANSWER:    Plaintiff reached an agreement to settle with CCHPS and its employees, defendants in this action, at the Mediation Conference held on June 20, 2006. The consideration for the settlement was the purported one million dollar policy limit for the liability policy covering these defendants. At this time Plaintiff and counsel for the CHPPS defendants are confirming that no other coverage would apply to those defendants. Once that is confirmed, the agreed settlement will be executed and those defendants will be dismissed by the Plaintiff.


DONALD M. TEMPLE, ESQUIRE
#408749
1229 15th Street, N.W.
Washington, D.C. 20005
202-628-1101
Attorney for Plaintiff


30

*Mary R. Scott*

Mary R. Scott

STATE OF MARYLAND
COUNTY OF CALVERT

Subscribed and sworn to before me
this _18_ day of _Aug_ , 2006.

*Barbara Proden*

Notary Public

My Commission Expires: 6-1-2010

Edward J. Connor, #321505
5210 Auth Road
Suite 304
Camp Springs, MD 20746
(301) 899-7801
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed, postage prepaid, this _18th_ day of _August_ , 2006 to all counsel of record.

Edward J. Connor, #321505