UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**MARY R. SCOTT,**

    **Plaintiff,**

v.                                No. 05-cv-1853 (RWR)

**DISTRICT OF COLUMBIA,** *et al.***,**

    **Defendants.**

**PLAINTIFF'S STATEMENT OF GENUINE ISSUES AS TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO ALL CIVIL RIGHTS CLAIM AND AS TO DEFENDANT VAUGHN'S MOTION FOR SUMMARY JUDGMENT**

**I. PLAINTIFF'S POSITION ON DEFENDANTS' ASSERTED UNDISPUTED MATERIAL FACTS**

1. Not disputed.

2. Not disputed.

3. Not disputed.

4. Not disputed.

5. Not disputed.

6. Not disputed.

7. Not disputed.

8. Disputed. *See* II.A, *infra.*

9. Not disputed.

10. Not disputed.

11. Not disputed.

12. Not disputed.

13. Not disputed.

14. Disputed. *See* II.B.8, *infra.*

15. Disputed. Rather than questioning whether Mr. Magbie needed ventilator support, Dr. Vaughn initially planned to admit him to Greater Southeast Community Hospital ("Hospital"). Defs.' Exh. 5, Hosp. Med. Rec. (Dkt. 168-6)[1] at 9 ("Patient to be admitted for hypovolemia [blood pressure less than 80 [word illegible], hypoglycemia & respiratory distress.").

16. Disputed. *See* resp. to ¶ 15, *supra.*

17. Disputed. *See* II.C.i., *infra.*

18. Disputed. *See* II.B.8, *infra.*

19. Not disputed.

20. Disputed as to implication. Dr. Vaughn did not provide Dr. Haghighi with critical information regarding the risk to Mr. Magbie if discharged from the Hospital. *See* II. B, II.C.10 & II.C.i, *infra.* Further, Dr. Vaughn was the person with the authority to decide whether or not Mr. Magbie would be discharged. Exh. 1, Cooper Dep. at 49-50.

21. Disputed. Mr. Magbie was not stabilized. *See* II.B.8, *infra.*

22. Not disputed.

23. Disputed. *See* II.B.8, *infra.*

24. Not disputed.

25. Disputed. *See* II.B, *infra.*

26. Disputed. *See* II.B., *infra.*

---

[1] Because the Hospital Medical Records have no internal numbering, the page citations to these records herein refer to the docket numbering in the Defendant's Exhibit 5.

27. Disputed. Defendants cite their Exhibit 7, Cooper Deposition, which states on the cited page, "the best indication of whether he needed to go on the ventilator would be to ask him – is it time for you to go back on the ventilator. He could tell you by the way he felt whether his muscles were tired enough to go back on." Exh. 1, Cooper Dep. at 56. Although Defendants do not supply the other document they cite, a page from the Baker deposition, it also fails to support their argument. *See* Exh. 2, Baker Dep. at 123. If one reads the entire passage, it is clear that Dr. Baker rejected Defendants' assertions. All that Dr. Baker agreed to, in a compound question, was that the vitals looked "pretty normal" at the time of discharge. Dr. Baker goes on to the make the point, however, that at the time of discharge Mr. Magbie was suffering from untreated pneumonia that would not improve on its own. *Id.* at 123-127.

28. Disputed. The allegations of Count I, ¶ 84 of the Amended Complaint state that the acts of Defendants, including Dr. Vaughn and Dr. Iluyomade, clearly violated Mr. Magbie's constitutional rights and proximately caused his death. Count I also asks for compensatory damages against Defendants, jointly and severally.

29. Not disputed.

30. Disputed in the limited sense that it is misleading. While other former Defendants and their agents did fail to provide proper monitoring, care and treatment for Mr. Magbie, his condition deteriorated while he was at the DOC because he did not have a ventilator. Exh. 1, Cooper Dep. at 27-28. None of the errors made by persons other than Dr. Vaughn and Dr. Iluyomade caused Mr. Magbie's death. Exh. 1, Cooper Dep. at 14-15, 27-28.

31. Not disputed.

32. Not disputed.

33. Not disputed.

34. Disputed as misleading. What Dr. Baker said was that the DOC did return Mr. Magbie to the Hospital when he had trouble breathing, but that Dr. Vaughn's actions in sending Mr. Magbie back to the Department of Corrections ("DOC")[2] created a risk of an acute crisis in which a ventilator would not be available. Exh. 2, Baker Dep. at 133.

35. Not disputed.

36. Not disputed.

37. Not disputed.

38. Not disputed.

39. Not disputed.

40. Disputed. Dr. Cooper testified that, given Dr. Vaughn's discharge of Mr. Magbie, the DOC staff would have had to send Mr. Magbie to a different hospital for admission to get a ventilator. Given that the contract between the District of Columbia and the Hospital obligated the District to send all patients to the Hospital if the Hospital *could* provide the necessary care, a transfer to a different hospital was not an option. Exh. 3, Memorandum of Understanding for Intra-District Funding for Correctional Health Services and Correctional Administrative Services Performed Pursuant to Contract No. DCFRA#-00-C-39, Oct. 1, 2003-Sept. 30, 2004 (2nd Revised Exh. G) at 3 (included in Def. District of Columbia Answers to Pl.'s First Set of Interrogatories, Aug. 4, 2006) (*see* Alexander Decl.); Exh. 1, Cooper Dep. at 60-61, 66.

---

[2] For the purposes of this Statement, the term "DOC" refers to all on-site facilities and staff serving prisoners exclusively, including the Correctional Treatment Facility operated by former Defendant Corrections Corporation of America and employees of the Center for Correctional Health and Policy Studies, Inc.

41. Not disputed.

42. Not disputed.

43. Disputed.  This statement is misleading because it omits the blood gases laboratory report which indicated that at the time Mr. Magbie needed to be put on a ventilator.  Exh. 2, Baker Dep. at 98-103; Exh. 1, Cooper Dep. at 77- 78, 92-95.

44. Not disputed.

45. Not disputed.

46. Disputed.  As shown by his previous unresponsive condition and his blood gases, he had already deteriorated.  *See* Resp. to ¶ 43, *supra.*

47. Disputed.   Dr. Cooper stated that Mr. Magbie "most likely" would have survived if properly ventilated by 17:40 (5:40 p.m).  Exh. 1, Cooper Dep. at 95.  Nor do Defendants' citations to Dr. Baker's Deposition support their claim.

48. Disputed.  What Dr. Cooper actually says is that "by 6:15 he was not salvageable because they did an Ambu bag to try to get more breathing going and it didn't work."  Exh. 1, Cooper Dep. at 88.

49. Disputed.  Dr. Baker is making a hypothetical point here in explaining the meaning of the changes in Mr. Magbie's electrocardiograms.  He points out that at that point, based on the condition of the heart alone, there was about a minute before irreversible changes dooming Mr. Magbie.  It is in this context that Dr. Baker says "[a]s late as 18:35 he might have been resuscitated if you would have managed to improve his oxygenation."  Dr. Baker does not address whether improving Mr. Magbie's oxygenation was in fact still possible at that point.  Exh. 2, Baker Dep. at 83-86.

50. Not disputed.

51. Disputed as to Part C. The documents Defendants cite do not support the claim that if the nurses had notified Dr. Iluyomade earlier, it would have changed the ultimate outcome.

52. Not disputed.

53. Disputed for the reasons given in the responses to 47-49 and 51, *supra.*

54. Not disputed.

55. Not disputed.

56. Not disputed.

57. Not disputed.

## II. PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

A. <u>The Status of Dr. Vaughn and Dr. Iluyomade as Governmental Actors</u>

1. Defendants Vaughn and Iluyomade provided medical care to Jonathan Magbie at the Hospital pursuant to a contract with the District of Columbia. That contract provides that the Hospital "shall be the provider of inpatient hospital services except in those cases where treatment must be provided at another hospital." The contract further provides that the Hospital "shall utilize the hospital unit specifically equipped by or on behalf of the District at Greater Southeast Community Hospital to house persons in the custody of [the District of Columbia Department of Corrections] who require Corrections Health Care Services on an inpatient basis." Exh. 3, Mem. of Understanding at 3.

2. As a result of this contractual relationship, a significant component of Defendants' services involved treating prisoners from the District of Columbia DOC. Defendant Vaughn treated District of Columbia prisoners on every shift he worked at the Hospital emergency room. Exh. 4,

Vaughn Dep., July 19, 2006 at 33.

3. Prisoners are segregated from other persons receiving treatment at the Hospital. Exh. 4, Vaughn Dep. at 35, 86-87. When admitted to the Hospital, they are admitted to a separate Secured Unit. Exh. 3, Memorandum of Understanding at 3.

4. Aside from the fact of segregation, the Hospital and its personnel did not provide DOC prisoners with medical care under the same terms that such care is provided to other members of the public. The routine was different when a prisoner was brought to the Hospital. Exh. 4, Vaughn Dep. at 34-35. Rather than staying in the emergency room, a prisoner sent to the Hospital awaiting examination would be sent a couple of corridors away, under the control of correctional staff rather than medical staff. *Id.* at 87-89. At times, medical staff at the Hospital would confer with DOC personnel before deciding whether to admit a prisoner. Exh. 5, Iluyomade Dep., July 19, 2006 at 31-32. The DOC maintained nursing staff on-site at the Hospital. Exh. 6, Malekghasemi Dep. at 9, 47.

5. The existence of this contract between the DOC and the Hospital was directly relevant to Mr. Magbie's death, because it meant that DOC staff, after Dr. Vaughn discharged Mr. Magbie, could not transfer Mr. Magbie to a different hospital for access to a ventilator. Exh. 3, Mem. of Understanding at 3; Exh. 1, Cooper Dep. at 60-61, 66.

B. <u>Dr. Vaughn's Failure to Provide Necessary Treatment and Violations of the Standard of Care</u>

6. Plaintiff's proposed expert Kevin R. Cooper, M.D., is qualified to provide expert testimony on medical issues, including standard of care, risk of harm from violation of the standard of care, and causation, related to pulmonary disorders and other critical care issues. In particular, he is qualified to render the opinions expressed in his expert report and deposition of May 21, 2007.

Exh. 1, Cooper Dep. at 97-98; Exh. 7, Cooper Rpt.

7. Plaintiff's proposed expert Frank J. Baker, M.D., is qualified to provide expert testimony on medical issues, including standard of care, risk of harm from violation of the standard of care, and causation, related to emergency care and related issues. In particular, he is qualified to render the opinions expressed in his declaration, his expert report, and his deposition of May 16, 2007. Exh. 2, Baker Dep.

8. Mr. Magbie's treatment did not stabilize as a result of Dr. Vaughn's treatment. During the morning of September 21, 2004, following all of the treatment provided by Dr. Vaughn, Mr. Magbie experienced a drop of blood pressure to 68/42, a significantly abnormal blood pressure. Magbie Medical Records, Sept. 21, 2004; *see also* National Heart Lung and Blood Institute, "Hypotension," available at http://www.nhlbi.nih.gov/health/dci/Diseases/hyp/hyp_whatis.html (visited Feb. 28, 2008) (hypotension, or abnormally low blood pressure, is a blood pressure defined as less than 90/60).[3] In fact, Mr. Magbie went into shock before he was discharged from the Hospital on September 21. Exh. 2, Baker Dep. at 128, 135. A number of the blood pressures recorded for Mr. Magbie the night of September 20-21, 2004 reflect an abnormally low diastolic pressure of less than 60. Defs.' Exh. 5, Hosp. Med. Rec. (Dkt. 168-6) at 12.

9. Dr. Vaughn's treatment of Mr. Magbie deviated from the applicable standard of care by reason of (1) the failure to admit for diagnosis and treatment of his hypotension, hypoglycemia and respiratory distress; (2) the failure to provide a ventilator in light of Mr. Magbie's medical history and reported need for a ventilator at night; (3) the failure to provide oxygen by

---

[3] The blood pressure levels that meet the definition for hypotension are subject to judicial notice pursuant to Fed. R. Evid. 201.

tracheotomy mask or other similar device; and (4) the failure to have a diaphragm pacemaker available; and (5) the failure to address Mr. Magbie's early pneumonia.  Exh. 12, Baker Expert Rpt. at 4; *see also* Exh. 2, Baker Dep. at 7-8 (another reason to admit him was evidence of pneumonia); 120 (You cannot correct dehydration in a couple hours and discharge; you have to find out why the patient is dehydrated); 122 (wrong to send the patient back to DOC because Vaughn knew the DOC has no ventilator); 126 (there are no circumstances under which the pneumonia would have improved by morning to allow discharge with the treatment provided), 128 (Magbie went into shock that morning before being released); 129 (if you don't have a ventilator, you send the patient to a place that does have a ventilator);131-33 (the fact that Magbie did not die the first night without a ventilator does not mean that risk was acceptable), 135 (patient had become shocky because the treatment given did not address the underlying issues of causes of dehydration and hypoglycemia); 138 (Vaughn knew if Magbie acutely needed a ventilator the Department of Corrections did not have one); 139 (the drop in blood pressure that morning meant that Magbie's condition was not stable); 142-143 (if Magbie had been treated appropriately, he would not have been in trouble on September 24).  *See also* Exh. 7, Cooper Expert Rpt. at 2 (failure to admit Mr. Magbie to the Hospital on September 20, 2004, was a violation of the standard of care).

C.  Dr. Vaughn's Deliberate Indifference

10.  The actions and failures to act of Dr. Vaughn created a substantial danger of serious harm for Mr. Magbie by leaving him open to life-threatening complications.  Exh. 2, Baker Dep. at 7, 120-121, 145 (Magbie was dehydrated, hypotensive and had pneumonia on September 20; Vaughn did not treat the pneumonia and did not adequately treat the dehydration or hypotension

by looking for root causes; pneumonia and dehydration can kill people so Magbie needed to be admitted); 131-132 (Mr. Magbie needed to be admitted because he might need a ventilator at any time; the fact that he did not die for several nights does not mean that the risk was reasonable; the analogy is to persons who show up in an emergency room with heart attacks; while only 10% of these patients may die, physicians do not send them home because the patient is likely to live even without treatment); Exh. 1, Cooper Dep. at 43, 55 (Dr. Vaughn acted unreasonably in failing to admit Mr. Magbie because he was likely to be ventilator-dependent; persons like Mr. Magbie who may need ventilator assistance at any time can go from apparently being in no distress to near death in a short period of time; they just stop breathing).

11.  This problem is illustrated by what happened on the morning of September 24, 2004 at the DOC, when Mr. Magbie was noted to be fine but an hour later was close to death.  This was why Mr. Magbie needed the immediate availability of a ventilator.  Exh. 1, Cooper Dep. at 55.

I. <u>Dr. Vaughn's Actual Knowledge of Magbie's Need for a Ventilator at Night</u>

12.  Mr. Magbie, a quadriplegic, had injured his spinal cord above the third cervical vertebra, meaning that the normal neurological impulses from the brain would not activate the phrenic nerve, and so that nerve would be unable to command Mr. Magbie's diaphragm muscles to breathe for him.   Exh. 1, Cooper Dep. at 67-68; Exh. 8, Scott Dep. at 35.  For that reason, Mr. Magbie had an implanted diaphragm pacemaker to stimulate the phrenic nerve.

13.  Separate from the problem addressed by Mr. Magbie's diaphragm pacemaker was Mr. Magbie's need for a ventilator.  When a person's diaphragm muscles are too weak to move air in and out of the lungs, the person needs a ventilator or ambu bag to force air out of the lungs. Exh. 2, Baker Dep. at 101; Exh. 1, Cooper Dep. at 90-91.  About half the people with high cervical

spine injuries and diaphragm pacemakers like Mr. Magbie are able to get by just with the pacemaker, and may need a ventilator only when they have an acute respiratory illness, such as bronchitis. The other half of persons with a diaphragm pacemaker need to use a ventilator for a period of time each day. These people typically are off the ventilator in the daytime and back on at night. *Id.* at 40-42. Mr. Magbie's spinal injury was severe enough, and old enough, that it was likely that he was dependent on the ventilator. *Id.* at 43.

14. According to Mr. Magbie's mother, Mary Scott, who lived with Mr. Magbie, the pacemaker allowed Mr. Magbie to be off the ventilator for a certain amount of time, but he used the ventilator every day. Exh. 8, Scott Dep. at 35. When Mr. Magbie was at home, he was on a ventilator approximately 75% of the time. *Id*. at 38. The family always kept a back-up ventilator for their home ventilator, and when he took a trip, he always took a ventilator. *Id.* at 118-119, 121.

15. Dr. Vaughn knew that Jonathan Magbie had asserted that he needed the ventilator to breathe at night because he recorded Mr. Magbie's statement to this effect in Mr. Magbie's medical records. Defs.' Exh. 5, Hosp. Med. Rec. (Dkt. 168-6) at 3-4, Entry for Sept. 20, 2004, 21:45 ("Patient presents from DC Jail [with complaints of] vent dependency requiring vent and O2 [in] noc [night]. SOB [shortness of breath].").

16. The emergency room initial assessment at the Hospital describes as Mr. Magbie's chief complaint as "trouble breathing. Sent for breathing treatment and vent. Sleeps on vent at home." Defs.' Exh. 5, Hosp. Med. Rec. (Dkt. 168-6) at 5. Dr. Vaughn reviewed the initial assessment the night of Mr. Magbie's initial admission to the Hospital. Exh. 4, Vaughn Dep. at 48.

17. Mr. Magbie, both before and after his first admission to the Hospital, told other medical

11

personnel that he needed a ventilator at night.  Exh. 9, DOC Med. Rec., at 6 (note by Gbajaiamila); at 7 (note by Nwosu).

18.  In short, the medical records of Jonathan Magbie are completely consistent that he told every medical provider with whom he discussed his respiratory needs that he needed a ventilator to breathe at night.  *See* Exh. 9 & Defs.' Exh. 5, Hosp. Med. Rec. (Dkt. 168-6).  There is no medical record documentation supporting Dr. Vaughn's subsequent claim that Mr. Magbie did not need a ventilator every night.

19.  Indeed, Dr. Vaughn's comments about Mr. Magbie to another physician support the inference that Dr. Vaughn's claim that Mr. Magbie sometimes did not use a ventilator at night at home is a self-serving fabrication after the death of Mr. Magbie.  On the morning of September 21, 2004, a physician from the Hospital twice called Joseph Bastien, M.D., a supervising physician for the contract medical provider at the Central Detention Facility.  This physician told Dr. Bastien that he had "heard" that Mr. Magbie "was in need of respiratory support at night."  Dr. Bastien stated that the DOC infirmary did not have any equipment to deal with Mr. Magbie's respiratory needs.  Dr. Bastien did not report any claim by Dr. Vaughn that Mr. Magbie did not always need a ventilator at night.  Exh. 10, Health Care Reg. & Lic. Admin. Rpt., Nov. 18, 2004 at 14-15.[4]  Dr. Vaughn admitted that he twice spoke to Dr. Bastien after midnight on September 21, 2004.  Exh. 4, Vaughn Dep. at 65-66.

20.  Dr. Vaughn's entire post-hoc rationale for discharging Mr. Magbie was that Mr. Magbie told him he did not need a ventilator every night.  In light of the claimed significance to Dr. Vaughn's decision of this alleged statement by Mr. Magbie, it is high likely that Dr. Vaughn would have

---

[4] This document is admissible pursuant to Fed. R. Evid. 803(8)©.

noted this conversation in the record if it had occurred. Exh. 4, Vaughn Dep. at 53-57.

21. It is highly unlikely that Mr. Magbie would have told Dr. Vaughn that he did not need a ventilator at night in light of what Mr. Magbie is consistently recorded in the medical records as stating, *see* ¶¶ 15-18 *supra* and also because it was not true. Mr. Magbie in fact did use a ventilator every night. Exh. 8, Scott Dep. at 35, 38.

22. Mr. Magbie did not tell Dr. Vaughn that he needed a ventilator only some nights. (Factual Conclusion for the Jury).

ii. <u>Dr. Vaughn's Knowledge that, at a Minimum, Magbie Might Need a Ventilator at Night</u>

23. At the time of discharge from the Hospital on September 21, 2004, Dr. Vaughn knew, at a minimum, that Mr. Magbie might need a ventilator at night, as shown by his written rationale at the time for discharging Mr. Magbie to the Department of Corrections: "May *only* need nasal O2, which the DC Jail Infirmary can provide." Defs.' Exh. 5, Hosp. Med. Rec. (Dkt. 168-6) at 9 (emphasis in original). If Mr. Magbie might need only nasal oxygen, he might also need more than nasal oxygen, meaning that he might need nightly ventilator support. (Factual conclusion for the Jury).

24. Mr. Magbie informed Dr. Vaughn of the potential consequences of discharging him to the Department of Corrections, which could not provide a ventilator. Exh. 4, Vaughn Dep. at 54 ("He was breathing well, but he says he may crash but whether he was going to crash, he didn't know.").

25. In light of Mr. Magbie's injuries and condition, if Mr. Magbie said that he might need a ventilator at night, it was obvious that he might need a ventilator at night. Exh. 1, Cooper Dep. at 40-43, 63.

26. Dr. Vaughn had actual knowledge of the substantial danger of serious harm to Mr. Magbie if he were discharged to the DOC, but nonetheless Dr. Vaughn discharged Mr. Magbie. (Factual Conclusion for Jury).

iii. Other Sources of Knowledge of the Substantial Risk of Serious Harm to Magbie.

27. Given the number of violations of the standard of care by Dr. Vaughn, (*see* ¶ 9 *supra*) and the seriousness of those violations, it would have been obvious to any emergency room physician that discharge without necessary diagnosis and treatment would create a substantial risk of serious harm. (Factual Conclusion for the Jury).

D. Dr. Vaughn's Causal Role in Mr. Magbie's Injuries

28. Dr. Vaughn's decision to discharge Mr. Magbie from the Hospital created new barriers to retransferring him to a facility where a respirator would be available to him. The DOC staff, under the terms of the Memorandum of Understanding with the Hospital, could not seek Mr. Magbie's admission to any other hospital, because the Hospital under the contract was to be used exclusively by the DOC for the services it could provide. Exh. 4, Mem. of Understanding at 3; Exh. 1, Cooper Dep. at 60-61, 66.

29. It is typical of a patient with a high cervical injury such as that of Mr. Magbie that the patient requires a ventilator to assist in breathing when the patient's own muscles tire. Exh. 8, Scott Dep. at 35; Exh. 1, Cooper Dep. at 40-42; 67-68, 90-91; Exh. 2, Baker Dep. at 101.

30. Dr. Vaughn's decision to discharge Mr. Magbie to the DOC, where he knew that no ventilator would be available to Mr. Magbie when his diaphragm muscles tired, made it likely and foreseeable that Mr. Magbie would deteriorate and suffer a respiratory crisis while at a DOC facility that would require emergency treatment. Exh. 13, Baker Decl. at 1-2; Exh. 2, Baker Dep.

at 131-132; Exh. 1, Cooper Dep. at 43, 54-55.

31. It was also foreseeable that such a respiratory crisis could in a short period of time place Mr. Magbie at risk of dying. *Id.*; Exh. 13, Baker Decl. at 1; Exh. 1, Cooper Dep. at 54-55.

32. It was foreseeable that, as a result of lack of access to a ventilator, Mr. Magbie's muscles would be so tired that he they would be unable to support his breathing sufficiently, and he would experience a respiratory crisis and die. Exh. 1, Cooper Dep. at 62.

33. It was also foreseeable that, as a result of lack of access to a ventilator, Mr. Magbie's muscles would be so tired that they would be unable to support his breathing sufficiently, and he would experience a respiratory crisis that would result in attempted treatment that would dislodge Mr. Magbie's tracheostomy tube, blocking his airway, and killing him. Exh. 13, Baker Decl. at 1-2.

34. Dr. Vaughn's violation of the standard of care was a substantial cause and foreseeable result of his decision to discharge Mr. Magbie from the Hospital to the DOC where no ventilator was available. (Factual Conclusion for the Jury).

                      Respectfully submitted,

/S/ELIZABETH ALEXANDER
Elizabeth Alexander, D.C. Bar No. 412904
National Prison Project of the ACLU Foundation
915 15th Street, NW, 7th Floor
Washington, DC 20005
202-393-4930

Donald M. Temple, D.C. Bar No. 408749
Temple Law Office
1229 15th Street, NW
Washington, DC 20005
202-628-1101

        Edward J. Connor, D.C. Bar No. 321505
        5210 Auth Road, Suite 304
        Camp Springs, MD 20746
        301-899-7801

        Arthur B. Spitzer, D.C. Bar No. 235960
        American Civil Liberties Union
          of the National Capital Area
        1400 20th Street, NW, Suite 119
        Washington, DC 20036
        202-457-0800

Counsel for Plaintiffs

Dated: March 25, 2008