## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**MARY R. SCOTT,**

       **Plaintiff,**

**v.**                                                    **No. 05-cv-1853 (RWR)**

**DISTRICT OF COLUMBIA, *et al.*,**

       **Defendants.**

---

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO ALL CIVIL RIGHTS CLAIMS

## I. STATEMENT OF FACTS

This wrongful death and survivorship case is filed pursuant to 42 U.S.C. § 1983 based on Defendants' actions that caused the conscious suffering and death of Jonathan Magbie.  Plaintiff also asserts claims of medical malpractice pursuant to the Court's supplemental jurisdiction.  In September 2004, Mr. Magbie was a 27-year-old who had survived since the age of four while suffering from quadriplegia.  That month, he began serving a ten-day sentence, as a first-time offender, for possession of a marijuana cigarette.  He entered the custody of the District of Columbia Department of Corrections ("DOC") on September 20, 2004.  Four days later he died at Greater Southeast Community Hospital ("Hospital").[1]

---

[1]  The Court's ability to evaluate Defendants' Motion for Partial Summary Judgment will be substantially impaired because Defendants repeatedly cite to documents that are not attached to their motion or are not otherwise in the record.  Thus, for example, Defendants assert that "the Hospital and its personnel provide Jail inmates the same medical services and other care that it provides to other members of the public."  Defs.' Mot. at 2.  For this claim, Defendants cite pages 25, 31-34, and 53-54 of the deposition of Dr. Iluyomade, excerpts of which are reproduced in

1

A. Dr. Vaughn's Status as a Governmental Actor

Dr. Vaughn provided medical care to Mr. Magbie pursuant to a contract between the

Hospital and the DOC. Exh. 3, Mem. of Understanding at 3. Pursuant to that contract, the only

medical treatment facility to which the DOC could transfer Mr. Magbie was the Hospital, as long

as the Hospital could provide the treatment. *Id*. at 3 (DOC to use the Hospital exclusively when

the Hospital can provide the treatment at issue); *see also* Exh. 4, Vaughn Dep. at 34, 55-56 (the

Hospital had the capacity to provide a ventilator).

The contract between the DOC and the Hospital also provided for creation of a separate

unit within the Hospital where prisoners would be treated. Exh. 3, Mem. of Understanding at 3.

Prisoners were to be segregated from other patients while receiving treatment. Exh. 4, Vaughn

Dep. at 35, 86-87. At times, medical staff at the Hospital would confer with DOC personnel

before deciding whether to admit the prisoner to the Hospital. Exh. 5, Iluyomade Dep. at 31-32.

The DOC maintained its own nursing staff at the Hospital. Exh. 6, Malekghasemi Dep. at 9, 47.

Further, Dr. Vaughn knew that part of his duties under his contract was treating prisoners; he

treated prisoners on every shift that he worked at the Hospital. Exh. 4, Vaughn Dep. at 33.

Mr. Magbie thus did not choose to be treated at the Hospital; the DOC pursuant to his

contract sent him there. Dr. Vaughn's decision to discharge Mr. Magbie to the DOC meant that

---

Defendants' Exh. 3. That exhibit, however, does not include page 25, which Plaintiff attaches as
part of her Exhibit 5. Neither page 25 of the Iluyomade deposition nor the other pages cited by
Defendants, however, contain anything justifying their claim. *See also* Pl.'s Statement of
Genuine Issues at 14, ¶ 27 (noting another example of Defendants' citation of deposition
testimony that they fail to attach to their motion, at the same time that Defendants' citations in
fact fail to support Defendants' claims). Plaintiff could point to many similar examples,
underlining the importance of not accepting Defendants' claims about the record without
verification.

the DOC, pursuant to its contract, would not be able to seek hospitalization for Mr. Magbie

elsewhere based on Mr. Magbie's need for a ventilator at night. since the Hospital had the

capacity to provide a ventilator to Mr. Magbie.  *See* Exh. 3, Mem. of Understanding at 3.

B.  The Deliberate Indifference of Dr. Vaughn

       Mr. Magbie had a permanent tracheostomy and a diaphragm pacemaker to allow him to

breathe despite his quadriplegia.  He used a ventilator to breathe every night, as is typical of those

quadriplegics whose spinal injury occurred above the third cervical vertebra, with the result that

the phrenic nerve is unable to command the diaphragm muscles to breathe.  Exh. 8, Scott Dep. at

35, 38;  Exh. 1, Cooper Dep. at 40-43, 67-68.  While awaiting admission to a DOC facility, Mr.

Magbie developed respiratory distress and was transferred by ambulance to the Hospital.  Mr.

Magbie reported his need for a ventilator in order to breathe at night to the medical staff who

examined him at the DOC, as well as the emergency medical technicians who transferred him to

the Hospital on September 20, 2004. Exh. 9, DOC Med. Rec. at 6; Defs.' Exh. 5, Hosp. Med.

Rec. at 3.

       Similarly, Mr. Magbie told the Hospital staff member who first assessed him in the

emergency room that he needed a ventilator at night.  Defs.' Exh. 5, Hosp. Med. Rec. at 5.  Dr.

Vaughn described Mr. Magbie as "trach dependent [patient] who uses ventilator at night."  *Id.* at

7.  The Hospital nursing notes similarly describe Mr. Magbie as being ventilator dependent.  *Id*.

at 11.  There is no documentation in the Hospital medical record that Mr. Magbie ever stated, as

Dr. Vaughn later claimed, that he did not need a ventilator every night.  Nor is likely that Mr.

Magbie would have said such a thing because, as noted above, in fact he did use a ventilator

every night, as was not surprising given his injuries.

Given that Dr. Vaughn's entire post-hoc rationale for discharging Mr. Magbie was the implausible claim that Mr. Magbie told him he did not need a ventilator every night, it is highly likely that Dr. Vaughn would have made a record of that conversation if it had occurred. Further, what Dr. Vaughn actually subsequently recorded in the medical notes is quite different: he stated that Mr. Magbie "may *only* need nasal O2, which the DC Jail can provide." Defs.' Exh. 5, Hosp. Med. Rec. at 9 (emphasis in original). Thus, Dr. Vaughn necessarily did not reach a judgment that Mr. Magbie could avoid another respiratory crisis simply through the use of nasal oxygen; rather he concluded only that oxygen *might* be sufficient to avoid a crisis. At the time that Dr. Vaughn examined Mr. Magbie and admitted him to the Hospital, Mr. Magbie was suffering from hypoglycemia (low blood sugar), hypotension (low blood pressure), hypovolemia (dehyration), and pneumonia. Defs.' Exh. 5, Hosp. Med. Rec. at 9; Exh. 2, Baker Dep. at 7, 121-122, 145. Dr. Vaughn did not treat the pneumonia, and provided only symptomatic treatment of the other medical problems, without a search for the causes of Mr. Magbie's low blood sugar, dehydration and low blood pressure. *Id.* at 120, 125-126. Prior to Mr. Magbie's discharge from the Hospital, after Dr. Vaughn's shift was over, Mr. Magbie went into shock, but after further treatment for his low blood pressure was sent back to the DOC. Exh. 2, Baker at 128, 135.

Mr. Magbie also told Dr. Vaughn that he "might crash" without his ventilator. Exh. 4, Vaughn Dep. at 54. Nonetheless, Dr. Vaughn discharged Mr. Magbie back to the DOC, where Dr. Vaughn knew that a ventilator was not available to him. Defs.' Exh. 5, Hosp. Med. Rec. at 9. Persons like Mr. Magbie who need ventilator support because of muscle weakness can go from a normal appearance to near death in a short period of time. Exh. 1, Cooper Dep. at 55-56. Dr. Vaughn should have known, and as the jury will be entitled to find, did know, that Mr. Magbie

4

was at substantial risk of serious harm if sent back to the DOC, given his known conditions aside from his respiratory problems.[2]

## II. LEGAL STANDARDS FOR DETERMINING WHETHER SUMMARY JUDGMENT SHOULD BE GRANTED

The principles applicable to deciding motions for summary judgment pursuant to Fed. R. Civ. P. 56 are well-known.   Summary judgment should not be granted if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A party is entitled to summary judgment only if the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact.  *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*).

A. <u>Dr. Vaughn's Credibility</u>

Defendant Vaughn intends to present his version of his conversations with Mr. Magbie, even though the medical records contradict Dr. Vaughn.  Because of Mr. Magbie's death, however, Plaintiff cannot present the testimony of Mr. Magbie, or produce other direct evidence contradicting Dr. Vaughn's deposition testimony that, at some point, Mr. Magbie repudiated to some extent his statement reflected in the medical records that he needed a ventilator at night. Nonetheless, Defendants' motion for summary judgment does not provide a legal basis for precluding the jury from rejecting Dr. Vaughn's implausible claim that Mr. Magbie told him that he needed a ventilator only at times

---

[2]  Plaintiff does not contest Defendants' motion insofar as it seeks partial summary judgment regarding Plaintiff's claim that Dr. Iluyomade violated Mr. Magbie's right under the Eighth Amendment.

Circumstantial evidence calling into question the credibility of testimony on a material

fact defeats summary judgment.  As the District of Columbia Circuit Court of Appeals said

recently in reversing the grant of a motion for summary judgment:

> Although a jury might ultimately decide to credit the version of
> events described by defendants over that offered by the plaintiff,
> this is not a basis upon which a court may rest in granting a
> motion for summary judgment.  At the summary judgment stage
> the judge's function is not himself to weigh the evidence and
> determine the truth of the matter but to determine whether there
> is a genuine issue for trial.  Credibility determinations, the
> weighing of the evidence, and the drawing of legitimate inferences
> from the facts are jury functions, not those of a judge ruling on a
> motion for summary judgment.

*Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006) (internal quotation marks and

citations omitted).  *See also Typewrite Keyboard Corp. v. Microsoft Corp.,* 374 F.3d 1151, 1158

(Fed. Cir. 2004) (reversing grant of summary judgment; "[S]ummary judgment is not appropriate

where the opposing party offers specific facts that call into question the credibility of the

movant's witnesses"); *Thomas v. Great Atl. & Pac. Tea Co.,* 233 F.3d 326, 329-30 (5th Cir. 2000)

(in determining whether to grant summary judgment, court is to give credence to evidence

favoring the non-moving party, and to evidence favoring the moving party, as long as that

evidence supporting the moving party is uncontradicted and unimpeached; reversing summary

judgment for defendant because circumstantial evidence called into question direct evidence of

party seeking summary judgment).

B. Treatment of the State of Mind Issue

One of the critical issues in this summary judgment motion is whether Defendant Vaughn

acted with a "deliberately indifferent" state of mind, as defined under the Eighth Amendment,

when he discharged Jonathan Magbie from the Hospital to the DOC, where he knew that no

ventilator would be available to Mr. Magbie in another respiratory crisis.  As to this issue, the

Court should be particularly reluctant to grant summary judgment.  As is common in such cases,

the only direct evidence of state of mind can come from the defendant, who has every interest in

claiming a non-culpable state of mind.

Issues turning on a defendant's state of mind should also not be resolved on summary

judgment when the circumstantial evidence creates inferences that could support a jury finding of

a culpable state of mind, regardless of the fact that the defendant's direct testimony is to the

contrary:

> Since the information relating to state of mind generally is within
> the exclusive knowledge of one of the litigants and can be
> evaluated only on the basis of circumstantial evidence, the other
> parties normally should have an opportunity to engage in
> discovery before a summary judgment is rendered.  But even
> this may not be enough.  Inasmuch as a determination of
> someone's state of mind usually entails the drawing of
> factual inferences as to which reasonable people might differ –
> a function traditionally left to the jury – summary judgment
> often will be an inappropriate means of resolving an issue of
> this character.

10B Charles Alan Wright, *et al.*, *Federal Practice and Procedure: Civil 3d* § 2730 (1999 with

2007 pocket part).  The facts of this case underline why issues of a defendant's state of mind

must be approached with such care, and the jury allowed to consider circumstantial evidence that

undermines Dr. Vaughn's self-serving claims regarding his own state of mind.

This issue arises with great frequency in employment law, when the plaintiff claims that

the employer discriminated, and the employer denies discrimination.  *Oldham v. West*, 47 F.3d

985 (8th Cir. 1995), involves a typical situation.  In that case, the plaintiff claimed that he suffered

retaliation as a result of testifying in a racial discrimination case on behalf of a fellow employee. Prior to the plaintiff's testimony, he had received several promotions. Beginning very shortly thereafter, he suffered a series of adverse employment actions, and co-employees noticed a dramatic change in the attitude of management personnel towards him. The defendants, however, articulated legitimate business reasons for their actions. The legal question was thus whether defendants' proffered legitimate business reasons were pretextual. *Id*. at 987. Not surprisingly, the evidence of pretext presented by the plaintiff was based on circumstantial rather than direct evidence. *Id.* at 989.

The district court granted summary judgment for the employer, on the ground that the plaintiff had failed to satisfy his burden of proving discrimination against him. Although the district court held that the plaintiff had shown that he had engaged in a protected activity, and that he had experienced adverse employment actions against him, it held that he had failed to prove any causal connection between the two. *Id.* at 988. The court of appeals reversed because the plaintiff's evidence raised an inference, albeit based on circumstantial evidence of timing rather than direct evidence, that the actions taken against him were retaliatory. *Id.* at 989; *cf. Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147 (2000) (reversing court of appeals' conclusion that employer was entitled to judgment as a matter of law; there was sufficient evidence for jury to find that employer had intentionally discriminated; evidence that employer's explanation of employment actions was unworthy of credence is a form of circumstantial evidence that is probative of intentional discrimination).

The District of Columbia Circuit Court of Appeals has applied a similar principle regarding the treatment of circumstantial evidence in summary judgment motions when the

defendant predictably controls all the direct evidence.   In *Doe v. U.S. Postal Serv.,* 317 F.3d 339 (D.C. Cir. 2003), the court of appeals reversed summary judgment against a plaintiff who claimed that his HIV-positive status was wrongfully revealed by to his co-workers by officials at the United States Postal Service.   The court of appeals held that the plaintiff produced sufficient evidence to survive summary judgment even though the plaintiff's evidence on a material issue was entirely circumstantial, since generally the court draws no distinction between direct and circumstantial evidence and "because plaintiffs can rarely produce direct evidence that government has disclosed confidential evidence obtained from their private records, requiring such evidence would eviscerate the protections of the Privacy Act." *Id.* at 343.   For the same reasons, accepting only direct evidence of a culpable state of mind in an Eighth Amendment case would eviscerate the protections of the Constitution.

## III.  REASONS FOR HOLDING THAT DR. VAUGHN ACTED UNDER COLOR OF LAW

Mr. Magbie was entitled to appropriate medical care as a prisoner in custody of the District of Columbia.  The Hospital and the District of Columbia had a contract stating that the Hospital "shall be the provider of inpatient hospital services except in those cases where treatment must be provided at another hospital."  Pl.'s Statement of Additional Material Facts at 6, ¶ 1.  The contract also required establishment of a separate unit to provide medical services for prisoners within the Hospital.  *Id.* at 3.  Dr. Vaughn, in turn, had a contract with National Emergency Services District of Columbia ("NES") that required him to provide emergency services at the Hospital.  It was pursuant to that contract that Dr. Vaughn  provided emergency medical services to Mr. Magbie at the Hospital while he remained in the custody of the DOC.

Also as a result of this contractual relationship, Dr. Vaughn routinely treated prisoners from the DOC. In fact, Dr. Vaughn treated DOC prisoners on every shift he worked at the Hospital emergency room. Pl.'s Statement of Add. Material Facts at 6-7, ¶ 2.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981) (overruled in part on other grounds, *Daniels v. Williams*, 474 U.S. 327, 330-331 (1986)).[3] For the reasons given below, in providing medical care to Mr. Magbie, Dr. Vaughn acted under color of law and his actions may fairly be attributed to the District.

A. *West v. Atkins*

The Supreme Court in *West v. Atkins* held that a private physician who treated prisoners in State custody pursuant to a contract with the State acted under the color of state law. 487 U.S. 42, 54-57 (1988). The Court reasoned that the State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to incarcerated persons in its custody. *Id.* at 54, citing *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Where "the private entity has exercised powers that are 'traditionally the exclusive prerogative of the state,'" such person acts under color of state law. *Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982), citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353 (1974).

The Supreme Court in *West* also noted that the only medical care that the prisoner could

---

[3] Dr. Vaughn, of course, acted under color of District of Columbia law. District of Columbia governmental actors are subject to suit under 42 U.S.C. § 1983 in the same manner as persons who act under color of state law, because § 1983 applies to persons who act "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia[.]"

receive was the care the State made available to him because it was "only those physicians to

whom the inmate may turn." *Id.* at 55. Under these circumstances, the State's non-delegable

duty, combined with the prisoner's lack of choice, meant that the physician acted under color of

state law:

> If Dr. Atkins misused his power by demonstrating deliberate
> indifference to West's serious medical needs, the resultant
> deprivation was caused, in the sense relevant for state-action
> inquiry, by the State's exercise of its right to punish West by
> incarceration and to deny him a venue independent of the
> State to obtain needed medical care.

*Id.*

These two factors support the same conclusion in the instant case. The District of

Columbia had a duty to provide medical care to Mr. Magbie while serving his sentence, and the

District denied Mr. Magbie any say in the identity of the medical providers that it made available

to him. When Dr. Vaughn undertook to treat Mr. Magbie at the Hospital, he assumed the

District's obligation to provide medical care to Mr. Magbie and became a governmental actor.

The physician in *West* had a part-time contract with the State, under which he provided

orthopedic services two days a week at a correctional facility. *Id.* at 43-44 & n.1. Significantly,

however, the Supreme Court in *West* rejected the argument that the details of the contractual

relationship mattered in determining whether a physician acted under color of state law:

> The fact that the State employed respondent pursuant to a
> contractual arrangement that did not generate the same
> benefits or obligations applicable to other "state employees"
> does not alter the analysis. It is the physician's function
> within the state system, not the precise details of his
> employment, that determines whether his actions can
> fairly be attributed to the State. . . . The State bore an
> affirmative obligation to provide adequate medical care

> to West, the State delegated that function to respondent
> Atkins; and respondent voluntarily assumed that obligation
> by contract.
>
> Nor does the fact that Doctor Atkins' employment
> contract did not require him to work exclusively for
> the prison make him any less a state actor than if he
> performed those duties as a full-time, permanent
> member of the state prison medical staff.  It is the
> physician's function while working for the state,
> not the amount of time that he spends in performance
> of those duties or that fact that he may be employed
> by others to perform similar duties, that determines
> whether he is acting under color of state law.

*Id.* at 55-56 (footnote omitted).[4]

In this case, a series of contracts connects the DOC with Dr. Vaughn.  The DOC had a

contract with the Hospital, *see* Exh. 3,  which had a contract with NES to cover the emergency

room at the Hospital.   NES had a contract with Dr. Vaughn to provide emergency room services

at the Hospital.  *See* Pls.' Amended Complaint, Sept. 21, 2006, at 6 (uncontested by Defendants);

Exh. 4, Vaughn Dep. at 21.

The more complex contractual structure linking the District of Columbia and Dr. Vaughn

does not make Dr. Vaughn any less of a governmental actor. From the point of view of Mr.

Magbie, he was equally helpless to obtain medical care from anyone other than Dr. Vaughn

because he remained in the custody of the DOC.   From the point of view of Dr. Vaughn, the

situation was also no different than that of Dr. Atkins in *West*.  Dr. Vaughn treated prisoners

---

[4] *See also id.* at 58 ("I am also of the view, however, that a physician who acts on behalf
of the State to provide needed medical attention to a person involuntarily in state custody (in
prison or elsewhere) and prevented from otherwise obtaining it, and who causes harm to such
person by deliberate indifference, violates the Fourteenth Amendment's protection against the
deprivation of liberty without due process.") (Scalia, J., concurring) (citations omitted).

12

during every shift that he worked, so it is possible that he spent a greater percentage of his time treating prisoners than Dr. Atkins. As noted above, the Supreme Court rejected the notion that "the precise details of [the physician's] employment" could determine whether a physician treating prisoners could be a state actor. Thus, a functional analysis of the relationship between Dr. Vaughn, the DOC, and Mr. Magbie demonstrates that there is no rationale for refusing to apply *West* just because the chain of contracts between the DOC and Dr. Vaughn had extra links. To hold otherwise would allow defendants to subvert constitutional protections by deliberately adding contractual middlemen.

The Court in *West* also made clear that the fact that the medical services take place in a unit under the control of the State is also relevant to the judgment of whether the defendant acted under color of law, as it noted that the physician defendant had performed the medical services within a prison hospital. *Id.* at 56 n.15. The Court added that the non-medical functions of prison life "inevitably influence the nature, timing and form of medical care provided to inmates such as West." *Id.* Again, this language supports finding action under color of state law. The DOC had established a separate unit for the treatment of prisoners at the Hospital, and prisoners were kept segregated within the hospital. Further, just as in *West*, this fact had functional significance. Most critically, the refusal of Dr. Vaughn to keep Mr. Magbie at the Hospital was a barrier to readmitting Mr. Magbie to another hospital, because of the DOC's exclusive contract with the Hospital for those services that it could provide. That contract also meant that, when Dr. Vaughn called another physician, he called a DOC physician, who knew nothing about Mr. Magbie, rather than Mr. Magbie's own physician, who knew all his vulnerabilities.

B. *Conner v. Donnelly*

In *Conner v. Donnelly,* 42 F.3d 220 (4th Cir. 1994), the court of appeals considered whether a private physician who treated a prisoner on referral from a prison physician acted under color of law. The court of appeals reversed the district court and found that the private physician was a state actor, because, it held, "*West* is not limited to physicians under contract with the state to provide medical care to its prison inmates." *Id.* at 227-28. The court based its reasoning on the two central concepts from *West*: the State's duty and exclusive prerogative to provide medical care to prisoners, and prisoners' inability, by reason of their incarceration, to obtain medical care for themselves. *Id.* at 224. The court concluded that the Supreme Court's functional analysis in *West* meant that no contractual relationship between the State and the physician was necessary when these two features coincided:

> Even where a physician does not have a contractual relationship with the state, the physician can treat a prisoner only with the state's authorization. If a physician treating a prisoner – whether by contract or by referral – misuses his power by demonstrating deliberate indifference to the prisoner's serious medical needs, the prisoner suffers a deprivation under color of state law. The source of the deprivation does not change because the physician has no contractual relationship with the state[.]

*Id.* at 225. [5]

Under the reasoning in *Conner,* Dr. Vaughn necessarily acted under color of law. The DOC had a duty to provide medical care to Mr. Magbie; Dr. Vaughn treated Mr. Magbie on referral from the DOC, and Mr. Magbie had no other choice if he wished to receive emergency medical care. Indeed, the court in *Conner* distinguishes one of the principal cases upon which

---

[5] The court also noted that, under its holding, it did not matter whether the physician had an obligation, through his or her employment, or by reason of a contract, to accept the prisoner patient; the contractual relationship in *West* was "incidental." *Id.*

14

Defendants rely.  The first case that Defendants cite in their argument on this point is *McIlwain v. Prince William Hosp.,* 774 F. Supp. 986 (E.D. Va. 1991), which Defendants cite for the proposition that a hospital's acceptance of a prisoner for the provision of emergency medical care services does not transform the hospital into a state actor.   Defs.' Mem. at 10.  The court of appeals questioned the conclusion that the prison did not delegate its constitutional duty to the hospital, but agreed that the hospital did not accept such a duty.  *Conner,* 42 F.3d at 228.

The distinction drawn by the court in *Conner* regarding *McIlwain* does not help Defendants here.  Even assuming that a hospital emergency room could be said not to voluntarily accept the State's duty to provide medical care when it accepts a prisoner solely because of a policy of accepting all patients who show up at its doors, that is not the case here.   As noted above, the hospital in *McIlwain* did not have a contract that made it the exclusive provider, for those services it could provide, to the DOC, nor did that hospital have within it, pursuant to a contract with the DOC,  a special segregated ward for prisoners.

Indeed, the district court in *McIlwain* noted with apparent approval the decision in *Lopez v. Department of Health Services,* 939 F.3d 881 (9th Cir. 1991).[6]  In that case, the Ninth Circuit reversed the dismissal of a § 1983 complaint and held that allegations that a hospital was under contract with the State to provide services to indigents, but that the plaintiff was denied medical services despite his indigency, provided an arguable basis for a constitutional claim.  *Id.* at 883. The court in *McIlwain* also noted that the hospital there did not routinely treat prisoners. *McIlwain,* 774 F. Supp. at 989.  Thus, it appears that the court in *McIlwain,* as well as the court in *Conner*, would have held that Plaintiff's claims are sufficient to show that the Hospital and Dr.

---

[6]  Plaintiff has corrected the district court's citation of the case.

Vaughn are governmental actors.  *See also*, *Rodriquez v. Furtado*, 771 F.Supp. 1245, 1259 (D.

Mass. 1991) (because the State had delegated its traditional governmental functions directly to the

physician, the physician was a state actor).

C.  The Sufficiency of The Contractual Links Here Show Action Under Color of State Law

      Plaintiff urges the Court to agree with the Fourth Circuit that the dispositive issues are

whether Dr. Vaughn accepted the District's duty to provide medical care and whether the Hospital

was the only medical care available to Mr. Magbie.  Even if the Court declines that invitation,

however, the contractual relations linking Dr. Vaughn and the DOC are sufficient to demonstrate

that Dr. Vaughn acted under color of law.  Courts generally agree that where there is a contractual

agreement between the medical providers and the State, *West* applies and the providers act under

color of law, even if no contract directly links the State to the defendant.  *See, e.g., Burgess v.

County of Rensselaer,* 2006 WL 3729750, at *3 (N.D.N.Y. Dec. 18, 2006) (nurse defendants were

state actors even though they had no contract with the County when the nurses were employed by

a private company that did have a contract to provide medical services to all detainees); *Garraway

v. Artuz,* 2002 WL 221584 at **2-3, 6 ( S.D.N.Y. Feb. 13, 2002) (the policy justifications

underlying *West* support recognizing that medical provider with an indirect contractual

relationship with the State is a state actor; thus physician at private hospital who performed

angioplasty pursuant to contract that required him to treat prisoners could be sued under § 1983,

even though the State was not a party to the contract); *Thomas v. Arevalo*, 1998 WL 427623, *10-

11 (S.D.N.Y. July 28, 1998) (an opthalmologist at a private eye clinic was a state actor when her

employer, and apparently the physician, were aware of an arrangement with a private hospital that

the eye clinic would treat prisoners).

Courts diverge on this issue only where there is no contract for provision of services between the medical provider and the state. A few district courts have decided that, without a contract to provide medical services and an on-going routine relationship with the state, or both, the medical provider does not act under color of state law when treating prisoners. In this connection, Defendants cite three cases, in addition to *McIlwain,* in support of their position. Defs.' Mem. at 10. The first of these other cases is *Sykes v. Phillips*, 412 F. Supp. 2d 197, 203 (N.D.N.Y. 2006). In that case, the hospital provided emergency services to a prison without a contract to do so, although it had provided the prison with a letter that it would be willing to provide services to allow the prison to have its health care program accredited. Prisoners in that case were also transferred to other medical facilities in the area, and unlike other area hospital facilities, the hospital did not have a Department of Corrections secured unit on its premises. *Id.* at 199. The district court concluded that "[w]hile it is probable that state actor status may be conferred through less than express contracting, that is not the circumstance of this particular case." Id. at 202. The district court pointed out that, in the absence of any contract between the hospital and the prison, the hospital's obligation to accept patients came only from the hospital's general obligation to accept all patients who presented themselves for care. *Id.* at 203. Given the substantial differences in facts between *Sykes* and this case, *Sykes* provides minimal support to Defendants' position.

The next case Defendants cite is *Lavin v. Snyder,* 2006 WL 2583711 (S.D. Ill. 2006). The brief unpublished opinion in that case simply concludes that because there was no contract between the State and the physician, and the physician treated the prisoner in his private office, the physician was not a state actor. *Id.* at *2. Again, this case is readily distinguishable from the

17

instant case.

Defendants' final citation for their position is *Nunez v. Horn*, 72 F.Supp.2d 24 (N.D.N.Y. 1999). *Nunez* principally relied on the fact that there was no contract between the physician and the Bureau of Prisons, but it also noted another factor: the defendant in that case did not treat the prisoner within the confines of a prison hospital "subject to all the pressures and constraints resulting from security concerns." *Id.* at 27. Thus, this case differs from *Nunez* both because there was a prison unit at the Hospital here, and because there is a series of linking contracts between the DOC and Dr. Vaughn.[7]

In short, even if the Court requires a contractual relationship to demonstrate that Dr. Vaughn is a governmental actor, that contractual link exists in this case. That Dr. Vaughn routinely treated prisoners indicates that he had to have been aware of the contractual relationship between the DOC and the Hospital. While there are more links in the contractual chain than in *West*, the chain itself is just as strong. The function of Dr. Vaughn within the District is the same as the physician in *West:* the District selected the Hospital as the exclusive provider of the health care services Mr. Magbie needed, and Dr. Vaughn by contract accepted duties that included working in the prison unit established at the Hospital itself, where Mr. Magbie had no choice but to accept the treatment. Like the physician in *West*, Dr. Vaughn in this case acted under color of

---

[7] Defendants also rely on *Blum v. Yaretsky*, 457 U.S. 991 (1982) and *Estades-Negroni v. CPC Hosp. San Juan Capistrano*, 412 F.3d 1 (1st Cir. 2005). *See* Defs.' Mem. at 10-11. Neither of these cases is applicable here. In *Blum*, the Supreme Court found that the physicians and administrators of a nursing home did not become state actors by providing medical services to Medicaid patients. 457 U.S. at 1004. In *West*, the Court distinguished *Blum* because, in that case, the conduct lacked a sufficient "nexus" to the State, as well as the State's obligation to provide medical care to prisoners. *West*, 487 U.S. at 52 n.10. Similarly, *Estades-Negroni* did not involve a traditional state obligation. 412 F.3d at 8 (neither provision of health care to indigents nor involuntary commitment are traditional functions reserved to the state).

law.

## IV.  REASONS FOR DENYING SUMMARY JUDGMENT TO DR. VAUGHN ON THE ISSUE OF DELIBERATE INDIFFERENCE TO MR. MAGBIE'S SERIOUS MEDICAL NEEDS

A.  The *Farmer* Standard

As set forth in the Statement of Facts, *supra,* as well as in Plaintiff's Statement of Genuine Issues, Plaintiff's evidence, if credited by the jury, establishes that Dr.  Vaughn knew that discharging Mr. Magbie from the Hospital to the DOC, where a ventilator was not available, created a substantial danger of serious harm to Mr. Magbie.  These dangers were particularly great because Mr. Magbie also suffered from untreated pneumonia, and from abnormally low blood pressure, as well as dehydration and low blood sugar during his hospital stay.  Dr. Vaughn did not attempt to determine the underlying causes of these symptoms, or treat those causes, before he discharged Mr. Magbie.  As Mr. Magbie told Dr. Vaughn might happen, Mr. Magbie predictably "crashed" and went into a respiratory crisis that, when not effectively treated, resulted in Mr. Magbie's death.  *See supra* at 1-3; *see also* Pl.'s Statement of Genuine Issues at 13, ¶ 24.

Plaintiff's evidence establishes a textbook case of "deliberate indifference" in violation of the Eighth Amendment to the Constitution.  The leading case on the requirements for demonstrating a violation of the Eighth Amendment in the context of prison conditions of confinement is *Farmer v. Brennan,* 511 U.S. 825 (1994).  *Farmer* sets forth the test for an Eighth Amendment violation as follows:

> Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the prison official acted or failed to act despite his knowledge of a substantial risk of serious harm.

19

*Id.* at 842.

Of equal significance, *Farmer* provides a mini-treatise on how a prisoner may demonstrate the defendant's actual knowledge of a substantial risk of serious harm:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk is obvious. For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was long-standing, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Id.* at 842-43 (internal quotation marks, citations and citation parentheticals omitted).

The Court in *Farmer* applied this new standard[8] in reversing summary judgment against the prisoner, a male-to-female transsexual who had been raped after transfer to a maximum security Bureau of Prisons facility. The plaintiff had alleged that prison officials had placed her in the prison general population despite knowledge of the violent atmosphere in the maximum security facility at Terre Haute, Indiana, and their knowledge of her special vulnerability because of her appearance. In turn, the district court, affirmed by the court of appeals, had reasoned that

---

[8] The Court first applied a "deliberate indifference" standard to prison medical care cases in *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). In *Wilson v. Seiter,* 501 U.S. 291 (1991), the Court applied the "deliberate indifference" standard to all prison conditions of confinement Eighth Amendment claims, and held that a showing of deliberate indifference required a showing of an objective deprivation of sufficient seriousness, as well as a subjective showing that the defendant's state of mind reflected deliberate indifference. *Id.* at 298.

the plaintiff never complained about her lack of safety, and so the defendants lacked actual

knowledge of any potential danger to her. *Id.* at 831-32. The Supreme Court noted that failure by

a plaintiff to give advance notice to officials cannot be dispositive under the standards it had just

adopted, and it pointed to potential evidence of an unreasonable risk of violence at Terre Haute, as

well as the evidence that plaintiff by reason of her appearance might be specifically at risk. *Id.* at

848-49.

The reasons for denying summary judgment in the instant case are far stronger than they

were in *Farmer*. Unlike the situation in *Farmer,* in this case Dr. Vaughn did receive a specific

warning from Mr. Magbie of the dangers he faced if Dr. Vaughn chose to deny him access to a

ventilator. As noted above, Mr. Magbie informed Dr. Vaughn that he "might crash" if denied a

ventilator. Exh. 4, Vaughn Dep. at 54. Further, all of the medical records, including the records

created by Dr. Vaughn himself, are consistent in recording that Mr. Magbie told every medical

staff person he came in contact with that he needed a ventilator at night. Most damning of all is

Dr. Vaughn's own language in choosing to ignore the danger to Mr. Magbie and deciding to

discharge him to a place where he knew a ventilator would not be available because Mr. Magbie

"may" have needed only supplemental oxygen. Defs.' Exh. 5, Hosp. Med. Rec. at 9.

In fact, courts of appeals have repeatedly reversed grants of summary judgment on Eighth

Amendment medical care issues when the record, construed most favorably for the plaintiff,

indicated that the defendant ignored specific information of medical risk provided by the prisoner.

*See Greeno v. Daley,* 414 F.3d 645, 654-55 (7th Cir. 2005) (reversing grant of summary judgment

on Eighth Amendment medical claim because a factfinder could find deliberate indifference from

refusal to alter treatment despite patient's self-reports that treatment not working; "self-reporting

is often the only indicator a doctor has of a patient's condition."); *Natale v. Camden Co. Corr. Facility,* 318 F.3d 575 (3d Cir. 2003) (reversing grant of summary judgment for contract medical provider and holding that a reasonable jury could conclude from plaintiff's statement that he informed staff that he needed insulin, and from evidence that the plaintiff had a note from his physician stating that he needed insulin, that medical provider was deliberately indifferent in not providing insulin for twenty-one hours, even though the physician note did not specify how often insulin would be needed); *Weyant v. Okst,* 101 F.3d 845 (2d Cir. 1996) (reversing summary judgment on medical claim and, holding that, under *Farmer*, police officers could be found by jury to have been deliberately indifferent when the officer were told by the arrestee and his wife that the arrestee was in insulin shock and needed to go to the hospital, and one officer suggested to the other officer that the arrestee be taken to the hospital, but instead the arrestee was taken to a police barracks).

Further, Dr. Vaughn knew that Mr. Magbie had symptoms of pneumonia (obviously of particular concern in a quadriplegic who was unable to breathe on his own but rather relied on a phrenic nerve pacemaker) as well as symptoms of the other potential medical problems that resulted in Mr. Magbie going into shock prior to Mr. Magbie's release but after Dr. Vaughn had completed his treatment.  *See* Statement of Genuine Issues at p. 8-9, ¶ 8-9.  Under these circumstances,  a reasonable jury could conclude that Dr. Vaughn discharged Mr. Magbie knowing that the discharge created a substantial risk of death or other serious injury to Mr. Magbie.

The errors in Defendants' arguments can best be seen by looking at the Seventh Circuit "deliberate indifference" standard that led the district court to grant summary judgment to

defendants in *Farmer*.  In affirming that grant of summary judgment, the Seventh Circuit relied on

its decision in *McGill v. Duckworth,* 944 F.2d 344 (7th Cir. 1991).  *Farmer,* 511 U.S. at 832.

*McGill* applied a "deliberate indifference" standard that required the prisoner to prove that the

defendant "had actual knowledge of impending harm easily preventable, so that a conscious,

culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it."  *Id.*

at 348 (quoting standard); at 349 (adopting quoted standard as the law of the Seventh Circuit).

　　　　If the Supreme Court had adopted the *McGill* standard as the "deliberate indifference"

standard, Plaintiff here would not be able to resist summary judgment on the Eighth Amendment

claim.  That standard  requires a plaintiff to prove that the defendant knew that harm *would* ensue

if defendant failed to act.  Under the *Farmer* standard, in contrast, Plaintiff need only prove that

Defendants knew of a substantial risk – harm *might*, with some likelihood, occur.  The evidence

cited by Defendants is consistent with Plaintiff's evidence that Dr. Vaughn knew of a substantial

risk of serious harm to Mr. Magbie.

B. The Relevance of the Experts' Depositions

　　　　In *LeMarbe v.Wisneski,* 266 F.3d 429 (6th Cir. 2001), the Sixth Circuit considered whether,

construing the facts most favorably to the plaintiff, a prison surgeon could be found to be

deliberately indifferent.  In that case, a laboratory test showed that the patient may have had a bile

leak.  The defendant surgeon with another physician performed exploratory surgery and but did

not find a source for a leak.  The defendant did, however, remove five liters of fluid, and he then

closed the surgical incision.   He did not subsequently refer the patient for treatment for over two

weeks, at which time the patient was found to have fourteen liters of bile in his abdominal cavity,

with serious damage to the prisoner's health.  *Id.* at 432-33.   The court of appeals concluded that

23

a jury could find deliberate indifference, because the jury could find that the surgeon would have

known that the presence of bile meant that there was a bile leak, and that closing the incision

without finding the source of the bile leak, and without seeking assistance from some other

physician if he could not find the source of the bile leak, would cause the prisoner serious harm.

*Id.* at 436-37.

     *LeMarbe* demonstrates that expert testimony can be highly relevant in determining

whether to allow an Eighth Amendment claim to proceed, because expert testimony can assist in

determining what would have been obvious to a physician, and as such sufficient circumstantial

evidence of the defendant's actual state of mind to allow the case to proceed.  Thus, in *LeMarbe*,

the court of appeals relied on an affidavit from a physician stating that anyone with a medical

education and most lay people who encountered five liters of bile during surgery would have

known that there was a bile leak and the patient was at substantial risk.  *LeMarbe* at 438.

Similarly here, Plaintiff's expert physicians, although their depositions primarily concern the

medical malpractice claims, also shed light on what would have been obvious to a physician,[9] and

their testimony is therefore relevant as circumstantial evidence of what Dr. Vaughn actually did

know, so that Plaintiff is entitled to proceed to trial.

C. Defendants' Arguments

     Defendants first claim that nobody told Dr. Vaughn that Mr. Magbie needed a respirator

every night is simply false.  Defs.' Mem. at 17.  Dr. Vaughn, as well as many other people,

recorded Mr. Magbie's statement that he needed a respirator at night, and being ventilator-

---

    [9]  *See Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew
of a substantial risk from the very fact that the risk is obvious").

dependent is normal for a person with Mr. Magbie's injuries.  *See Hudson v. McHugh,* 148 F.3d 859, 864 (7th Cir. 1998) ("[T]his is the prototypical case of deliberate indifference, an inmate with a potentially serious problem repeatedly requesting medical aid, receiving none, and then suffering a serious injury.") (citation omitted).  Second, Defendants claim that nobody told Dr. Vaughn that Mr. Magbie's condition could not be stabilized with nothing more than supplemental oxygen.  Defs.' Mem. at 17.  This statement is also false, because Dr. Vaughn testified that Mr. Magbie said he "might crash" without his ventilator, and Dr. Vaughn himself noted in the medical record that supplemental oxygen might (and therefore might not) be sufficient.  Exh. 4, Vaughn Dep. at 54; Defs.' Exh. 5 (Hospital Medical Rec. at 9).

Defendants' third claim is that discharging Mr. Magbie to the DOC, where Dr. Vaughn knew a ventilator would not be available, appeared to be "a reasonable alternative treatment." Defs.' Mem. at 17.  Under *Farmer*, a defendant who has actual knowledge of a substantial risk to a prisoner is under a duty to act reasonably in response to that risk.  511 U.S. at 844-45. Plaintiff's medical experts, however, testified that discharging Mr. Magbie to the DOC would not appear to a physician to be a reasonable alternative treatment.  Exh. 2, Baker Dep. at 120-123 (Dr. Vaughn needed to admit Mr. Magbie in light of his known physical condition; "You can't send a man back to the jail ward if he might need a ventilator, because you know they haven't got one."); Exh. 1, Cooper Dep. at 43, 63 (It was not reasonable for Dr. Vaughn to decide on the basis of his contact with Mr. Magbie that a ventilator was not needed; where a patient has an obvious reason to need a ventilator at night, and he says he needs a ventilator at night, the patient needs to have a ventilator available at night).

Defendants also point to the possibility that Mr. Magbie could be returned to the

emergency room if it turned out he did need a ventilator at night.  Defs.' Mem. at 18.  The flaw in

this argument is that a patient like Mr. Magbie who cannot breathe on his own can get into severe

trouble quickly.  Exh. 1, Cooper Dep. at 55-56 (it was not safe to discharge Mr. Magbie to the

DOC because people whose respiratory problems are caused by severe muscle weakness can

"look fine until they just stop breathing.").  Indeed, Dr. Vaughn knew that the lack of a ventilator

could produce a respiratory crisis.  *See* Exh. 4, Vaughn Dep. at 54 ("He was breathing well, but he

says he may crash but whether he was going to crash, he didn't know.");  *see also McElligott v.*

*Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999) ("We have also held that deliberate indifference may

be established by a showing of grossly inadequate care as well as a decision to take an easier but

less efficacious course of treatment.") (citations omitted).  The "easier but less efficacious course

of treatment" of nasal oxygen could not address Mr. Magbie's known needs.

Defendants also rely on a handful of cases saying that medical malpractice by itself does

not establish deliberate indifference.  Defs.' Mem. at 21-22.  Plaintiff has no quarrel with this

assertion.   The general requirements for a claim of medical malpractice are a violation of the

applicable standard of care resulting injury from that violation and a causal relationship between

the two.  *District of Columbia v. Watkins,* 684 A.2d 395, 401 (D.C. 1996).  In contrast, as noted,

deliberate indifference in violation of the Eighth Amendment requires that defendants act or fail to

act to prevent a harm despite knowing of a substantial danger of serious harm.

Thus, many kinds of malpractice will not constitute deliberate indifference.  If, for

example, Dr. Vaughn had intended to call the DOC to check if it could provide a ventilator, but

had forgotten to do so, his actions would constitute malpractice, but  not deliberate indifference.

At the same time, obviously malpractice and deliberate indifference can overlap, as it did when

Dr. Vaughn discharged Mr. Magbie knowing that a ventilator would not be available to him at the DOC. Thus, for example, the District of Columbia Circuit Court of Appeals recently reversed a district court's dismissal of a prisoner's Eighth Amendment claim challenging the delay in treatment of his painful gallstones. The district court had reasoned that the delay reflected mere negligence, and negligence does not violate the Eighth Amendment. *See Brown v. District of Columbia,* __F.3d.__ , 2008 WL 268899 at * 2 (D.C. Cir. Feb. 1, 2008). Although the court of appeals agreed that mere negligence by itself would not violate the Eighth Amendment, it noted that the complaint claimed that District of Columbia officials had been notified of the plaintiff's medical need for an immediate transfer, those officials failed to transfer him for two months, subjecting the prisoner to unnecessary pain. Although the District of Columbia argued, like Defendants here, that the dispute reflected no more than a dispute over the quality or course of treatment, the court appeals did "not hesitate to conclude that Brown alleges an Eighth Amendment violation." *Id.* at *4.

In short, there is more than enough evidence to preclude summary judgment for Defendants. If one were construing the record most favorably for Defendants, one might conclude that Defendant Vaughn has done enough to get to the jury on the question of whether he actually recognized the serious risk to the life of Mr. Magbie that his failures to provide necessary medical treatment, and his decision to release Mr. Magbie, caused. When the Court construes the record most favorably for Plaintiff, however, it is apparent that there is more than enough evidence for a reasonable jury to conclude that Dr. Vaughn did have the necessary culpable knowledge, and is thus liable for his deliberate indifference towards Mr. Magbie.

**V. REASONS FOR DENYING QUALIFIED IMMUNITY TO DR. VAUGHN**

A. No Qualified Immunity Defense for Non-Governmental Employees

1. *The Richardson test*

In *Richardson v. McKnight,* 521 U.S. 399 (1997), in a case in which the defendants were correctional officers employed by a privately-operated prison, the Supreme Court established a two-part test for determining whether a defendant in a § 1983 action who is not employed by the government is nonetheless entitled to assert a qualified immunity defense. The first prong of the test involves whether history demonstrates a 'firmly rooted' tradition of immunity applicable to private actors who are sued under § 1983 when they act under color of law. *Id.* at 403-05. The Court concluded that "[h]istory does not reveal a "firmly rooted" tradition of immunity applicable to privately employed prison guards." *Id.* at 404. In reaching this determination, the Court pointed to evidence of privately-operated local jails going back to the Eighteenth Century, and the "hea[v]y involvement" of private contractors in prison management during the Nineteenth Century. *Id.* at 405. Despite this history, the Supreme Court determined that there was "no evidence that the law gave purely private companies or their employees any special immunities" when sued for mistreating prisoners. *Id.* at 406.

The second prong of the *Richardson* test for whether a private person who acts under color of law should be able to assert qualified immunity examines whether the policy considerations that led to the development of the qualified immunity defense for public employees also apply to the particular category of private employees at issue. The qualified immunity defense for public employees serves to assure that qualified persons will not be unduly deterred from public service by the threat of litigation; that public officials will not be inappropriately timid because of that threat; and that public officials might otherwise be detracted from their duties. *Id.* at 408.

The Supreme Court concluded that none of the these purposes justified extending the qualified immunity defense to correctional officers employed in private prisons in light of the incentives and deterrents that apply to private companies doing business in the marketplace. Private prison operators are unlikely to be unduly timid because competitive pressures will cut both ways: a prison staff that is unduly aggressive will result in liability for damages that raise costs, while an unduly timid staff will face threats of replacement by other firms that can do a safer and more effective job. *Id.* at 409. The private firm can, and typically does, buy insurance to protect against the risks of liability. These strong marketplace pressures and incentives assure that creation of a qualified immunity defense for private prison correctional officers is unnecessary to protect from unwarranted timidity on the part of staff in executing their duties. *Id.* at 409-10. Similarly, the different incentive structure of the marketplace assures that talented candidates will not be deterred from accepting positions in these enterprises. Again, part of this different incentive structure is the availability of insurance to guard against litigation risk. *Id.* at 411.

While there is still a danger that litigation may prove a distraction from the private employee's duties, that risk is not severe enough to justify extension of a qualified immunity defense to private prison correctional officers. *Id.* The Court therefore concluded that on balance the policy considerations for extending qualified immunity were not persuasive:

> Given a continual and conceded need for deterring constitutional violations and our sense that the firm's tasks are not enormously different in respect to their importance from various other publicly important tasks carried out by public firms, we are not persuaded that the threat of distracting workers from their duties is enough virtually by itself to justify providing an immunity.

29

*Id*. at 412.

*2. Application of the Richardson test here*

For parallel reasons, the Court should refuse to extend a qualified immunity defense to

Defendant Vaughn.  While the Court in *dictum* in *Richardson* indicated that there may have been

some form of immunity for doctors and lawyers at common law, the case that the Court cited for

that proposition indicates that there was no common-law immunity for intentional acts.  *Id.* at 407,

citing *Tower v. Glover,* 467 U.S. 914, 921-22 (1984) (holding that public defenders do not enjoy

immunity when sued under § 1983 for alleged conspiracy to violate rights).

In *Hinson v. Edmond,* 192 F.3d 1342 (11th Cir. 1999), the court of appeals evaluated the

question of common law immunity for physicians, in the course of holding that the medical

director of a jail, who was employed by a private medical contractor,  was not entitled under

*Richardson* to assert a qualified immunity defense.  The court noted that the defendant had failed

to demonstrate the "firmly rooted" tradition required under the *Richardson* test:

> The parties have not been able to point to, and independent
> research – including a look at the sources cited by the Supreme
> Court in *Richardson* – does not reveal cases which show a
> common law tradition of immunity from liability for privately
> employed prison physicians for acts amounting to recklessness
> or intentional wrongdoing.  Instead, case law shows even state
> physicians may be subject to liability for intentional torts.
>
> And, although the Supreme Court, in passing, mentioned that
> apparently in England, the law did provide a kind of immunity
> for certain private defendants, such as doctors or lawyers who
> performed services at the request of the sovereign, the
> circumstances here do not seem to be the kind of situation
> encompassed by that statement.  The sources cited by the
> Court suggest that, under certain circumstances, English
> doctors and lawyers were immune from liability for acts
> amounting to negligence.  For acts amounting to recklessness

> or intentional wrongdoing, as alleged here, immunity did
> not exist, however.

*Id.* at 1345-46 (internal quotation marks, brackets, and citations omitted).[10]

Accordingly, Defendants cannot show, and have not attempted to show, a "firmly rooted" common law tradition providing a qualified immunity defense for private physicians who act with deliberate indifference to a prisoner's medical needs.  The policy analysis is also parallel. Marketplace incentives, including the availability of liability insurance, sufficiently address concerns about deterring potential practitioners.  Similarly, the marketplace, with its well-known development of utilization review techniques applicable to medical care, adequately balances the pressures to provide too much or too little medical care.  Finally, the existence of potential civil

---

[10] Deliberate indifference, as required to show a violation of the Eighth Amendment when a prisoner challenges conditions of confinement, including medical care, is a species of intentional conduct, going beyond negligence:

> The source of the intent requirement is not the predilections
> of this Court, but the Eighth Amendment, which bans only
> cruel and unusual *punishment.* . . . The infliction of
> punishment is a deliberate act intended to chastise or deter.
> . . . The thread common to all Eighth Amendment prison
> cases is that punishment has been deliberately administered
> for a penal or disciplinary purpose. . . . The long duration
> of cruel prison condition may make it easier to establish
> knowledge and hence some form of intent, but there is
> no logical reason why it should cause the *requirement* of
> intent to evaporate. . . . Whether one characterizes the
> treatment received by the prisoner as inhumane conditions
> of confinement, failure to attend to his medical needs, or a
> combination of both, it is appropriate to apply the "deliberate
> indifference" standard articulated in *Estelle [v. Gamble,* 429
> U.S. 97 (1976)].

*Wilson v. Seiter,* 501 U.S. 294, 300-01, 303 (1991) (quotation marks, citations and internal brackets omitted).

rights liability is an appropriate deterrent to deliberate indifference by medical staff, so that any possible tendencies to provide them with second-class health care by reason of their status is minimized; prisoners like Mr. Magbie should not find that their ten-day sentence has been transformed into a death sentence as a result of the denial of necessary medical care.

The great weight of relevant authority interpreting *Richardson* is consistent with Plaintiff's position.  In *Jensen v. Lane Co.,* 222 F.3d 570 (9th Cir. 2000), the court of appeals reversed the district court's dismissal of a complaint against a contract psychiatrist affiliated with a private psychiatric group who, at the request of a county employee, signed an order that allowed detention of the plaintiff to allow a mental examination, pursuant to an Oregon statute.  As a result of that order, the plaintiff was detained in a county mental health facility for several days.  *Id.* at 573. The district court  held, alternatively, that the psychiatrist was not a state actor, and that the psychiatrist was entitled to qualified immunity.  *Id*. at 572. The court of appeals determined that the psychiatrist was a state actor, and was not entitled to assert qualified immunity.  In denying the availability of qualified immunity, the court of appeals reviewed the general history of the availability of qualified immunity to physicians, in Oregon and otherwise, and concluded that there was no "firmly rooted" tradition of immunity for physicians, and that policy considerations also did not support extension of the qualified immunity defense.  *Id.* at 576-79.

Similarly, in *Hinson v. Edmond,* discussed above,  the court of appeals applied *Richardson* to deny qualified immunity to a jail's medical director, who was employed by a private medical contractor. 192 F.3d at 1347;  *see also Rosewood Servs. v. Sunflower Diversified,* 413 F.3d 1163 (10th Cir. 2005) (holding, under *Richardson* analysis, that a private non-profit developmental disability service provider was not entitled to assert a qualified immunity defense); *Derfiny v.*

*Pontiac Osteopathic Hosp.,* 106 Fed. Appx. 929, 937 (6th Cir. 2004) ("Defendants do not even facially qualify for qualified immunity since they are private physicians employed by the County to provide medical services at the County jail.") (citing *Richardson*).

There are no court of appeals cases discovered by Plaintiff that, after applying *Richardson,* find that a privately-employed physician treating a prisoner patient is entitled to a qualified immunity defense. Instead, there are two First Circuit Court of Appeals cases that recognize a qualified immunity defense in these circumstances post-*Richardson*, but these cases are of limited value because they do not cite *Richardson. See Burke v. Town of Walpole,* 405 F.3d 66 (1st Cir. 2005); *Camilo-Robles v. Hoyos,* 151 F.3d 1 (1st Cir. 1998). In *Sain v. Wood,* 512 F.3d 886 (7th Cir. 2008), the plaintiff waived the *Richardson* argument by not asserting it in the district court, and the court of appeals held only that, in view of the unsettled law in the circuit and the difficulty of applying *Richardson* to the facts of that case, it was not plain error for the district court to allow a qualified immunity defense to the clinical director of a sex offender facility who was employed by a private contractor. Because of the waiver, the court of appeals assumed, for the purpose of that case only, that the defendant could avail himself of a qualified immunity defense. *Id.* at 891-93.

Thus, the court of appeals decisions denying a privately-employed physician the right to assert a qualified immunity defense under *Richardson* are far more persuasive authority. Accordingly, consistent with *Richardson,* the Court should refuse to extend the qualified immunity defense to Dr. Vaughn.

B. <u>Lack of Qualified Immunity Defense Because of Clearly Established Law</u>

When a qualified immunity defense is available to a defendant, that defendant is entitled to

defeat the plaintiff's suit for damages, even if the defendant violated the plaintiff's constitutional rights, if the defendant's actions did not violate "clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). If, however, the jury concludes that Dr. Vaughn acted with deliberate indifference in violation of the Eighth Amendment, that finding by itself will be sufficient to defeat qualified immunity because the legal standard upon which Plaintiff bases her case has been "clearly established" since no later than 1994, when *Farmer* was decided.

Estelle v. Gamble, 429 U.S. 97 (1976), established that a physician or prison official who acts with deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. *Id.* at 104. As set forth in Section IV, *supra, Farmer* further explicated the "deliberate indifference" standard from *Estelle,*[11] and specifically noted the applicability of that fully described standard to failures to provide necessary medical care to a prisoner. *See, e.g. Farmer,* 511 U.S. at 834 (referring to "deliberate indifference to inmate health or safety"); at 843 n.8 (giving, as an example of an obvious risk that would allow the trier of fact to infer the defendant's culpable knowledge, a defendant who knew that needles to give flu shots to prisoners were being re-used, and who also knew that certain diseases are communicable); at 844 (referring to "an obvious risk to inmate health or safety" and to "a substantial risk to inmate health or safety"). Thus, under *Farmer,* as noted above, the prisoner must prove that the defendant had actual knowledge of a substantial risk of serious harm, but despite that knowledge, failed to act reasonably to reduce that risk to an acceptable level; if the jury finds these elements, the plaintiff

---

[11]  *See Farmer,* 511 U.S. 835 (noting that the term "deliberate indifference" was first applied to Eighth Amendment conditions of confinement cases in *Estelle,* 429 U.S. at 104).

has also established a violation of clearly established law.

A number of federal courts have recognized that, in light of *Farmer* and *Estelle,* prison staff who act with deliberate indifference to prisoners' serious medical needs are not entitled to qualified immunity.  *See, e.g., Williams v. Mehra,* 186 F.3d 685, 691 n.2 (6th Cir. 1999) (*en banc*) (noting, in the context of evaluating an asserted qualified immunity defense regarding prison health care, that "[t]he Supreme Court's cases on medical care of prisoners make it clear that the right is properly understood as the right not to have one's serious medical needs treated with deliberate indifference."); *LaBounty v. Coughlin,* 137 F.3d 68, 74 (2d Cir. 1998) (reversing district court's grant of qualified immunity to prison Commissioner and Superintendent on prisoner's claim that he was harmed by exposure to friable asbestos particles; reasoning that the right to be free of deliberate indifference to serious medical needs was clearly established in *Estelle*); *Miller v. Schoenen,* 75 F.3d 1305, 1309-11 (8th Cir. 1996) (in interlocutory appeal of denial of qualified immunity on summary judgment to claim that prisoner was denied necessary specialized medical treatment in light of his needs as a heart transplant survivor, court examined whether there was evidence that prisoner had an objectively serious medical need as required by *Estelle* and evidence that defendants knew of and disregarded that need, as required by *Farmer;* finding such evidence in the record, the court of appeals affirmed the denial of qualified immunity).

Some courts have applied a rule that, in addition to establishing a violation of the *Farmer* standard, defeating a qualified immunity defense requires a showing that previous case law provided the defendant with notice that the risk of harm from the defendant's conduct was "substantial."  *See Estate of Ford v. Ramirez-Palmer,* 301 F.3d 1043, 1049-50 (9th Cir. 2002)

35

(warden and correctional officers were entitled to summary judgment even though complaint contained allegations that, if proven, would have shown deliberate indifference because prior case law did not give defendants notice of whether risk of double-celling psychiatric prisoners together was substantial where the two prisoners had previously been double-celled together without incident); *Marsh v. Butler Co.,* 268 F.3d 1014, 1033 (11th Cir. 2001) (holding that defendants were not entitled to qualified immunity defense under facts alleged by plaintiffs because cases at the time of the challenged conduct demonstrated that the jail conditions the plaintiffs alleged did pose a substantial risk of serious harm);  *cf. Easter v. Powell,* 467 F.3d 459, 465 (5th Cir. 2006) (denying qualified immunity defense in prison medical care case because law was clearly established that a refusal to treat prisoner, ignoring a prisoner's complaints, intentionally treating him incorrectly, "or engaging in similar conduct that would clearly evince a wanton disregard for any serious medical needs" violated the Eighth Amendment; nurse's response that heart patient could get nitroglycerin from pharmacy when pharmacy was closed adequately put into issue, for summary judgment purposes, facts that if proven would preclude defense of qualified immunity).

The District of Columbia Circuit Court of Appeals has not addressed, subsequent to *Farmer,* whether a plaintiff who shows that a defendant knowingly allowed a prisoner to be exposed to a substantial risk of serious harm need do anything else to defeat a qualified immunity claim.  Nonetheless, the available evidence indicates that the court of appeals would join the Second,  Sixth, and Eighth Circuits in holding that proof that a defendant knowingly exposed a prisoner to a substantial risk of serious harm is by itself sufficient to defeat a qualified immunity defense.

As the Supreme Court emphasized in *Hope v. Pelzer,* 536 U.S. 730 (2002), the standard

for determining whether a defendant is entitled to assert a qualified immunity defense is one of

fair notice. *Id.* at 740 (citing *United States v. Lanier,* 520 U.S. 259, 269 (1997)).  For previous

cases to provide fair notice, it is not necessary that the cases be "fundamentally similar":[12]

> In some circumstances, as when an earlier case expressly leaves
> open whether a general rule applies to the particular conduct at
> issue, a very high degree of prior factual particularity may be
> necessary.  But general statements of the law are not inherently
> incapable of giving fair and clear warning, and in other instances
> a general constitutional rule already identified in the decisional
> law may apply with obvious clarity to the specific conduct in
> question even though the very action in question has not
> previously been held unlawful.

*Hope,* 536 U.S. at 740-41 (quoting *Lanier*, 520 U.S. at 270-71; citations and internal brackets and

quotation marks omitted).[13]

        In fact, *Farmer* is very explicit that it embodies a general statement of the law applicable

to prison conditions of confinement challenged under the Eighth Amendment, whether the alleged

violation involves threats to prisoner health or safety because of staff failures to protect from

prisoner-on-prisoner violence, unsafe physical plant conditions, or failures to provide necessary

medical care.  *Farmer,* 511 U.S. at 838.   Because *Farmer* states a general rule, and the

framework of analysis *Farmer* establishes explicitly applies to medical issues, as well as applying

---

        [12]  *See Lanier,* 520 U.S. at 269 ("Nor have our decisions demanded precedents that
applied the right at issue to a factual situation that is 'fundamentally similar' at the level of
specificity meant by the Sixth Circuit in using that phrase.  To the contrary, we have upheld
convictions under [18 U.S.C.] § 241 and § 242 despite notable factual distinctions between the
precedents relied on and the cases then before the Court, so long as the prior decisions gave fair
warning that the conduct then at issue violated constitutional rights.") (citations omitted).

        [13]  *Lanier* involved the applicable standard when a defendant is charged with a criminal
violation of civil rights under 18 U.S.C. § 242.  The Court in *Hope* emphasized, however, that
the requirement of fair notice is the same in the qualified immunity context as it is in the § 242
context.  536 U.S. at 740-41.

broadly to all conditions of confinement issues, *Farmer* by itself gave Dr. Vaughn fair notice that

discharging a prisoner who needed a ventilator to breathe at night to a prison that did not have a

ventilator violated the Eighth Amendment.

The case that provides the most guidance as to how this court of appeals would decide this

issue is *Kimberlin v. Quinlan,* 199 F.3d 496 (D.C. Cir. 1999). *Kimberlin* involved a prisoner who

claimed that he had been placed in administrative segregation with the intention of preventing him

from talking to the media about his allegations about a political figure. The court of appeals

framed the issue in the case as follows:

> Finally, it is noteworthy that appellants incorrectly frame the
> relevant "law" for which the court must determine what was
> clearly established when. Appellants ask whether Mr. Kimberlin
> had either an "unfettered clearly established right of access to the
> press," or "a clearly established right not to be placed in
> administrative detention." These are the wrong questions. The
> proper question is whether Mr. Kimberlin had a clearly
> established right "to be free from governmental interference with
> [his] contacts with the press if that interference is based on the
> content of [his] speech or proposed speech." This right without
> doubt was clearly established in 1988. *See Turner v. Safley,* 482
> U.S. 78, 90, 107 S. Ct.2254, 96 L. Ed. 2d 64 (1987) ("We have
> found it important to inquire whether prison regulations
> restricting inmates' First Amendment rights operated in a
> neutral fashion, without regard to the content of the
> expression.")[.]

*Id.* at 501-502 (some citations omitted).

Significantly, *Turner* is a general case about the constitutional standards applicable to

prison claims other than Eighth Amendment claims; the issues decided by the Supreme Court in

*Turner* were whether a Missouri policy restricting prisoner marriages violated the Equal

Protection clause of the Constitution and whether restrictions on prisoner-to-prisoner

correspondence violated the First Amendment. *Id.* at 91. In the course of its decision, the Court

set forth a general standard applicable to most prisoner constitutional claims:[14] "[W]hen a prison

regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably

related to legitimate penological interests." *Id.* at 89. The Court provided four factors to consider

in determining whether a particular regulation was reasonably related to legitimate penological

interests: whether there was a valid, rational connection between the regulation and a legitimate

and neutral governmental interest asserted to justify the regulation; whether there are alternative

ways of exercising the constitutional right in question that remain open to prisoners; the extent to

which recognition of the right would have an impact of prison staff and other prisoners; and

whether there are ready alternatives to the regulation that are more protective of the constitutional

right. *Id.* at 89-91. By citing *Turner* as the case that finally left the law "clearly established,"[15]

the court of appeals was approving the use of a generalized standard, comparable to *Farmer* in the

Eighth Amendment area.

    *Brogsdale v. Barry,* 926 F.2d 1184 (D.C. Cir. 1991), is not to the contrary in light of the

developments in the law since *Brogsdale* was decided. *Brogsdale* held that, as of 1983, the law

was not clearly established regarding the standard applicable to finding that prison overcrowding

violated the Eighth Amendment. *Id.* at 1191. That date, of course, is prior to the Supreme

---

[14]    Subsequent to the decision in *Turner,* the Court has applied the *Turner* standard to most other rights possessed by prisoners, but explicitly noted that the *Turner* standard is not applicable to Eighth Amendment claims, or to claims of racial discrimination. *Johnson v. California,* 543 U.S. 499, 509, 511 (2005).

[15]    *Kimberlin* also cites an earlier Supreme Court case, *Pell v. Procunier,* 417 U.S. 817, 828 (1974). Nonetheless, the court of appeals had to consider *Turner* critical to its analysis or it would have cited *Pell* first, or not cited *Turner* at all.

Court's holding in *Wilson v. Seiter* in 1991 that the deliberate indifference standard applies to all conditions of confinement claims,[16] and *Farmer*'s 1994 full explication of the applicable deliberate indifference standard.   At most, because *Brogsdale,* by focusing on the law applicable to the specific issue of overcrowding,  looked at the specific type of conditions of confinement claim at issue,  it supports analyzing whether or not the law applicable to claims of deliberate indifference to serious medical needs was clearly established as of September 2004.  For the reasons given above, that law arguably was clearly established by *Estelle* in 1976 but in any event was clearly established after *Farmer* in 1994.

Finally, even if the Court were to conclude that the law was not clearly established that, in all factual circumstances,[17] creating a substantial danger of serious harm by failing to provide necessary medical care to a prisoner violated the Eighth Amendment, it is clear in this case. Plaintiff's evidence could lead the jury to conclude that Mr. Magbie told Dr. Vaughn that he needed a ventilator at night to breathe; Dr. Vaughn knew that a person with Mr. Magbie's injuries was likely to need a ventilator at night; Dr. Vaughn also knew that Mr. Magbie had a variety of medical conditions that placed him at high risk; Dr. Vaughn knew that if Mr. Magbie did develop a need for a ventilator,  he could die in a short period of time if no ventilator was available,  and yet Dr. Vaughn decided to take a chance that Mr. Magbie could get by on nasal oxygen by

---

[16]   *See Wilson,* 501 U.S. at 302.

[17]   For example, there might be circumstances in which a reasonable jury could decide that the threatened harm was serious enough to violate the Eighth Amendment, but clearly established law did not give fair notice to defendants that such harm could violate the Eighth Amendment.  *Cf. Saucier v. Katz,* 533 U.S. 194, 208-09 (2001) (holding that a reasonable officer would not have fair notice that "a gratuitously violent shove" that did not result in injuries violated Fourth Amendment prohibition of excessive force).   There can be no similar dispute, however, about the seriousness of the threatened harm to which this Plaintiff was exposed.

discharging Mr. Magbie to the DOC, where Dr. Vaughn knew that a ventilator would not be available.  Under these egregious circumstances, any reasonable physician would have known that the "general constitutional rule already identified in the decisional law" in *Farmer* applies "with obvious clarity to the specific conduct in question even though the very action in question has not previously been held unlawful."  *See Lanier,* 520 U.S. at 271.  Accordingly, Defendant Vaughn is not entitled to a qualified immunity defense.

## VI.  LACK OF RELEVANCE OF EVIDENCE OF "POLICY OR CUSTOM"

Defendants appear to argue that there is no evidence that Defendants were following a- "policy or custom" of violating prisoners' rights.  Defs.' Mem. at 23.  Evidence of a "policy or custom" of rights violations is relevant only to municipal liability, not the liability of individual defendants.  *See Collins v. City of Harker Heights,* 503 U.S. 115, 123-24 (1992).  Accordingly, this argument has no merit.

## CONCLUSION

For the above reasons, Plaintiff asks that the Court deny Defendants' motion, with the exception that Plaintiff does not oppose partial summary judgment for Defendant Iluyomade on the Eighth Amendment claim against him.

Respectfully submitted,

/S/ELIZABETH ALEXANDER
Elizabeth Alexander, D.C. Bar No. 412904
National Prison Project of the ACLU Foundation
915 15th Street, NW, 7th Floor
Washington, DC 20005
202-393-4930

Donald M. Temple, D.C. Bar No. 408749
Temple Law Office
1229 15th Street, NW
Washington, DC 20005
202-628-1101

Edward J. Connor, D.C. Bar No. 321505
5210 Auth Road, Suite 304
Camp Springs, MD 20746
301-899-7801

Arthur B. Spitzer, D.C. Bar No. 235960
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, NW, Suite 119
Washington, DC 20036
202-457-0800

Counsel for Plaintiffs

Dated: March 25, 2008

## TABLE OF CASES

*10B Charles Alan Wright, et al., Federal Practice and Procedure: Civil 3d § 2730 (1999 with 2007 pocket part)*

*Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*).

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)

*Arrington v. United States*, 473 F.3d 329 (D.C. Cir. 2006)

*Blum v. Yaretsky*, 457 U.S. 991 (1982)

*Brogsdale v. Barry,* 926 F.2d 1184 (D.C. Cir. 1991)

*Brown v. District of Columbia,* __F.3d.__ , 2008 WL 268899 (D.C. Cir. Feb. 1, 2008)

*Burgess v. County of Rensselaer,* 2006 WL 3729750 (N.D.N.Y. Dec. 18, 2006)

*Burke v. Town of Walpole,* 405 F.3d 66 (1st Cir. 2005)

*Camilo-Robles v. Hoyos,* 151 F.3d 1 (1st Cir. 1998)

*Collins v. City of Harker Heights,* 503 U.S. 115 (1992)

*Conner v. Donnelly,* 42 F.3d 220 (4th Cir. 1994)

*Daniels v. Williams*, 474 U.S. 327 (1986)

*Derfiny v. Pontiac Osteopathic Hosp.,* 106 Fed. Appx. 929 (6th Cir. 2004)

*District of Columbia v. Watkins,* 684 A.2d 395 (D.C. 1996)

*Doe v. U.S. Postal Serv.,* 317 F.3d 339 (D.C. Cir. 2003)

*Easter v. Powell,* 467 F.3d 459 (5th Cir. 2006)

*Estades-Negroni v. CPC Hosp. San Juan Capistrano*, 412 F.3d 1 (1st Cir. 2005)

*Estate of Ford v. Ramirez-Palmer,* 301 F.3d 1043 (9th Cir. 2002)

*Estelle v. Gamble,* 429 U.S. 97 (1976)

*Farmer v. Brennan,* 511 U.S. 825 (1994)

*Garraway v. Artuz,* 2002 WL 221584 ( S.D.N.Y. Feb. 13, 2002)

*Greeno v. Daley,* 414 F.3d 645 (7th Cir. 2005)

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982)

*Hinson v. Edmond,* 192 F.3d 1342 (11th Cir. 1999)

*Hope v. Pelzer,* 536 U.S. 730 (2002)

*Hudson v. McHugh,* 148 F.3d 859 (7th Cir. 1998)

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974)

*Jensen v. Lane Co.,* 222 F.3d 570 (9th Cir. 2000)

*Johnson v. California,* 543 U.S. 499 (2005)

*Kimberlin v. Quinlan,* 199 F.3d 496 (D.C. Cir. 1999)

*LaBounty v. Coughlin,* 137 F.3d 68 (2d Cir. 1998)

*Lavin v. Snyder,* 2006 WL 2583711 (S.D. Ill. 2006)

*LeMarbe v.Wisneski,* 266 F.3d 429 (6th Cir. 2001)

*Lopez v. Department of Health Services,* 939 F.3d 881 (9th Cir. 1991)

*Marsh v. Butler Co.,* 268 F.3d 1014 (11th Cir. 2001)

*McElligott v. Foley,* 182 F.3d 1248 (11th Cir. 1999)

*McGill v. Duckworth,* 944 F.2d 344 (7th Cir. 1991)

*McIlwain v. Prince William Hosp.,* 774 F. Supp. 986 (E.D. Va. 1991)

*Miller v. Schoenen,* 75 F.3d 1305 (8th Cir. 1996)

*Natale v. Camden Co. Corr. Facility,* 318 F.3d 575 (3d Cir. 2003)

*Nunez v. Horn*, 72 F.Supp.2d 24 (N.D.N.Y. 1999)

*Oldham v. West*, 47 F.3d 985 (8th Cir. 1995)

*Parratt v. Taylor*, 451 U.S. 527 (1981)

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000)

*Richardson v. McKnight,* 521 U.S. 399 (1997)

*Rodriquez v. Furtado*, 771 F.Supp. 1245 (D. Mass. 1991)

*Rosewood Servs. v. Sunflower Diversified,* 413 F.3d 1163 (10th Cir. 2005)

*Sain v. Wood,* 512 F.3d 886 (7th Cir. 2008)

*Saucier v. Katz,* 533 U.S. 194 (2001)

*Sykes v. Phillips*, 412 F. Supp. 2d 197 (N.D.N.Y. 2006)

*Thomas v. Great Atl. & Pac. Tea Co.,* 233 F.3d 326 (5th Cir. 2000)

*Thomas v. Arevalo*, 1998 WL 427623 (S.D.N.Y. July 28, 1998)

*Tower v. Glover,* 467 U.S. 914 (1984)

*Typewrite Keyboard Corp. v. Microsoft Corp.,* 374 F.3d 1151 (Fed. Cir. 2004)

*Weyant v. Okst,* 101 F.3d 845 (2d Cir. 1996)

*Williams v. Mehra,* 186 F.3d 685 (6th Cir. 1999)

*Wilson v. Seiter,* 501 U.S. 294 (1991)