**Mary R. Scott, et al. V. District of Columbia, et al.**
**United States District Court for the District of Columbia**

**05CV01853**

**Exhibit No. 4**

**07/19/06: Scott v D.C.: Depo: William Vaughn, MD**

PAGE 1 TO PAGE 108

**NEAL R. GROSS & CO., INC.**

**(202) 234-4433**

**CONDENSED TRANSCRIPT AND CONCORDANCE**
PREPARED BY:

*NEAL R. GROSS & CO., INC.*
*1323 RHODE ISLAND AVE., NW*
*WASHINGTON, DC   20005*
*Phone:   (202) 234-4433*



## Page 1

(1) IN THE UNITED STATES DISTRICT COURT
(2) FOR THE DISTRICT OF COLUMBIA
(3)
(4)
     In the matter of:
(5)
   MARY R. SCOTT,
(6)
     Plaintiff,          Case No.
(7)                       05-cv-1853 (RWR)
   v.
(8)
   DISTRICT OF COLUMBIA, et al.,
(9)
     Defendants.
(10)
(11)                Washington, D.C.
(12)                Wednesday,
                    July 19, 2006
(13)
(14) DEPOSITION OF:
(15)       WILLIAM S. VAUGHN, M.D.
(16) called for examination by counsel for the Plaintiff,
     pursuant to subpoena, at 10:15 a.m. at the offices of
(17) the National Prison Project of the ACLU, 915 15th
     Street, NW, 7th Floor, Washington, D.C., when were
(18) present on behalf of the respective parties:
(19)
(20)
(21)
(22)

## Page 2

(1) APPEARANCES:
(2)     On Behalf of Mary Scott, Plaintiff:
(3)     ELIZABETH ALEXANDER, ESQ.
   Of:
(4)        National Prison Project
           of the ACLU Foundation
(5)        915 15th Street, NW, 7th Floor
           Washington, DC  0005
(6)        (202) 393-4930

        EDWARD J. CONNOR, ESQ.
(7) Of:    5210 Auth Road, Suite 304
           Camp Springs, MD 20746
(8)        (301) 899-7801
(9)     DONALD M. TEMPLE, ESQ.
   Of:
           Temple Law Offices
(10)       1229 15th Street, NW
           Washington, DC  20005
(11)       (202) 628-1101
(12)    On Behalf of Drs. William Vaughn and
        Rotimi Iluyomade, Defendants:
(13)
   Of:  D'ANA E. JOHNSON, ESQ.
(14)    Bonner, Kiernan, Trebach & Crociatta, LLP
        1250 Eye Street, NW, Suite 600
(15)    Washington, DC  20005
        (202) 712-7055
(16)
        JUAN ANDERSON, ESQ.
(17) Of: Bonner, Kiernan, Trebach & Crociatta, LLP
        1233 20th Street, NW, Suite 800
(18)    Washington, DC  20036
        (202) 712-7000
(19)
(20)
(21)
(22)

## Page 3

(1)     On Behalf of Corrections Corporation of
        America & P. Singley:
(2)
        DANIEL P. STRUCK, ESQ.
(3) Of:   Jones, Skelton & Hochuli, PLC
          2901 N. Central Avenue, Suite 800
(4)       Phoenix, AZ  85012
          (602) 263-1700
(5)
        KELVIN S. NEWSOME, ESQ.
(6) Of:  Leclair Ryan, PC
         999 Waterside Drive
(7)      Suite 2525
         Norfolk, VA  23510
(8)      (757) 441-8938
(9)     On Behalf of the Greater Southeast
        Community Hospital, Defendant:
(10)
(11)    CATHERINE A. HANRAHAN, ESQ.
        Wilson, Elser, Moskowitz, Edelman &
(12)    Dicker, LLP
        1341 G Street, NW, Suite 500
(13)    Washington, DC  20005
        (202) 626-7660
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)

## Page 4

(1) I-N-D-E-X
(2) WITNESS:    DIRECT   CROSS   REDIRECT  RECROSS
(3) William S. Vaughn  5    74      --        --
(4) EXHIBITS:   PAGE          IDENTIFIED
(5) VAUGHN 1    5     William S. Vaughn's Curriculum
                     Vitae (5 pages)
(6)
   VAUGHN 2    41    Greater Southeast Community
(7)                  Hospital Corporation's Medical
                     Records for Jonathan Magbie
(8)                  dated September 20, 2004
                     (21 pages)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)

## Page 5

(1) P-R-O-C-E-E-D-I-N-G-S
(2)    (10:15 a.m.)
(3) WHEREUPON, (4) WILLIAM S. VAUGHN (5) was called for examination by counsel for the (6) Plaintiff and, having been first duly sworn, was (7) examined and testified as follows:  (8) DIRECT EXAMINATION
(9)    BY MR. CONNOR:
(10) Q Dr. Vaughn, before we started this morning (11) I asked you to take a look at Exhibit 1 which was sent (12) to me by your counsel and represented to be your (13) curriculum vitae.  Is that current?
(14) A Yes.
(15) Q Any changes that need to be made to it?
(16) (Whereupon, the document (17) referred to above was marked for (18) identification as VAUGHN Exhibit (19) No. 1.)
(20) A Not at this time.
(21) Q Okay.  All right.  You attended medical (22) school at Howard University.  Is that right?

## Page 6

(1)    A Yes.
(2)    Q August 1977 to May of 1982?
(3)    A Yes.
(4)    Q Is there a reason why it was five years (5) instead of three?
(6)    A I repeated second year.
(7)    Q Why was that?
(8)    A I had some problems with a few courses.
(9)    Q Anything to do with emergency medicine?
(10) A No.
(11) Q And you interned at Howard and your (12) residency was also at Howard.  Is that right?
(13) A Yes.
(14) Q Internal medicine and pediatrics?
(15) A Yes.
(16) Q So you've not done an internship and (17) residency in emergency medicine, correct?
(18) A Correct.
(19) Q Are you board certified in any field?
(20) A No.
(21) Q Have you ever sat for the boards in any (22) field?

## Page 7

(1)    A Yes.
(2)    Q What field was that?
(3)    A Internal medicine.
(4)    Q And I take it you were unsuccessful?
(5)    A Correct.
(6)    Q How many times have you applied for the (7) boards?
(8)    A It was three times, I believe.
(9)    Q All in internal medicine?
(10) A Correct.
(11) Q Have you ever applied for the emergency (12) medicine certification?
(13) A Yes.
(14) Q And did you sit for that exam?
(15) A No, I did not.
(16) Q Is there a reason?
(17) A Yes.
(18) Q What is the reason?
(19) A The board I was sitting for was the AAPS (20) Board.
(21) Q American –
(22) A Association of Physician Specialists.

## Page 8

(1) It's an alternate board as opposed to the American (2) Board of Emergency Medicine.  You can gain board (3) certification of emergency medicine through AAPS. (4) Unfortunately, no area accepts AAPS as the accredited (5) board so I didn't see the need to take a useless (6) board.
(7)    Q Okay.  And you indicated that you were (8) board eligible in emergency medicine?
(9)    A Yes.
(10) Q So are you planning to sit for that board?
(11) A No.
(12) Q What are the standard texts in emergency (13) medicine?
(14) A There's Tintinally, there's various texts. (15) Rosen is a various text for emergency medicine so (16) you're taught that – you have different books. (17) Tintinally is one book, Rosen's another book and few (18) others I can't recall right now.
(19) Q And are those the texts that you commonly (20) consult?
(21) A Among others, yes.
(22) Q Are there any others that you can

BSA

07/19/06: Scott v D.C.: Depo: William Vaughn, MD

XMAX(3)

### Page 9

(1) identify?

(2)  A There's a, I think, a Johnson or McGill (3) Quick Guide to Doing ER textbooks that you would use (4) for common problems in the emergency room and I bought (5) that book, I think, last year.

(6)  Q Okay.  Do you subscribe to any journals in (7) the field of emergency medicine?

(8)  A No.

(9)  Q Do you read any journals in the field of (10) emergency medicine?

(11) A Yes.

(12) Q Which journals are those?

(13) A Well, I have access to the Journal of (14) Emergency Medicine.  I read that monthly when I get my (15) hands on it.

(16) Q I'm sorry.  What was the text?

(17) A The Journal of Emergency Medicine.

(18) Q Journal of Emergency Medicine.  Any other (19) journals?

(20)  A And there's – you get the white journals (21) every month from, I think it's the Annals of Emergency (22) Medicine and the ACEP News.  I read those monthly.

### Page 11

(1)  Q Okay.  And can you tell me why you were (2) giving testimony on those other occasions?

(3)  A For various cases on personal injury-type (4) cases.

(5)  Q Cases where you had treated a Plaintiff?

(6)  A Correct.

(7)  Q Who filed an action?

(8)  A Yes.

(9)  Q Okay.  Were all of the 10 or 20 (10) depositions that situation – treating physician (11) testifying for –

(12) A Yes.

(13) Q – a former patient?  Have you ever (14) testified as an expert witness in a case alleging (15) medical negligence?

(16) A No.

(17) Q Have you ever been an Defendant in a case (18) alleging medical negligence other than today?

(19) A No.

(20) Q Have you ever expressed opinions, either (21) under oath or in the form of a consultation or report (22) concerning standards of care or breaches of standards

### Page 10

(1)   Q Prior to coming here this morning, did you (2) review any records before giving testimony?

(3)  A Yes.

(4)  Q Can you identify what you reviewed?

(5)  A My ER bill from the date in question.

(6)  Q September 20 and 21, 2004?

(7)  A Correct.

(8)  Q And am I correct in understanding that you (9) were not involved in any treatment on the second (10) emergency visit, which was September 24, 2004?

(11) A Correct.

(12) Q And on that same point, was Dr. Iluymade (13) involved at all on the first visit, September 20 and (14) 21?

(15) A No.

(16) Q All right.  Have you ever given a (17) deposition before today?

(18) A Yes.

(19) Q How many times?

(20) A Approximately 10 or 20.

(21) Q Ten or twenty?

(22) A I don't remember the exact number.

### Page 12

(1) of care in emergency medicine?

(2)  A No.

(3)  Q Has your privileged practice in any state (4) ever been suspended, revoked or acted upon negatively?

(5)  A Yes.

(6)  Q On how many occasions?

(7)  A Twice.

(8)  Q Can you tell me those two occasions?

(9)  A They both concerned the District of (10) Columbia.

(11) MR. NEWSOME:  Excuse me.  I'm having (12) problems hearing a little bit.  If you could speak up (13) I'd appreciate it.

(14) THE WITNESS: Okay.

(15) BY MR. CONNOR:

(16) Q Can you tell me the first occasion?

(17) A The occasion was in September 30th of (18) 2005.  It was a summary suspension for improperly (19) prescribing medication.  That lasted seven days and (20) the suspension was removed October 7th.  On April 26th (21) of this year, the board again acted on the same (22) material and they revoked my license which I'm sitting

BSA                    07/19/06: Scott v D.C.: Depo: William Vaughn, MD              XMAX(4)

Page 13

(1) right now.
(2)  Q I'm sorry.  I didn't hear the last part.
(3)  A The D.C. Board of Medicine revoked my (4) license on the same case that held the suspension in (5) September, but nonetheless it has been suspended has (6) been revoked right now pending –
(7)  Q All right.  So –
(8)  A – review for the Board.
(9)  Q I'm sorry.  I didn't mean to cut you off. (10) As we sit here now, you are revoked in the District of (11) Columbia?
(12) A That's correct.
(13) Q And are you pursuing an effort to (14) reinstate your privilege.
(15) A Yes.  It's been pursued for the last two (16) months.
(17) Q Okay.
(18) A Hopefully there will be a positive (19) resolution.
(20) Q Can you tell me a little bit more of what (21) the allegation was regarding prescribing medication?
(22) A It was improperly prescribing medications

Page 14

(1) for a patient who had left the clinic who had no (2) insurance.  I thought I was doing him a pro bono help (3) and it had gotten out of hand, and therefore the board (4) thought it was improper care putting the District at (5) danger as they put it on the charges.  Nobody was (6) hurt, nobody was hurt or anything but I was trying to (7) do a good thing in a wrong context and it got out of (8) hand.
(9)  Q What medications were being prescribed?
(10) A Tylenol #4 and Percocett.
(11) Q Do you remember the name of that patient?
(12) MS. JOHNSON:  Let me impose an objection (13) here.  His counsel, in connection with that case, has (14) asked that those matters, since they do not pertain (15) directly to this case be not inquired into.  And so (16) I'm going to have to assert that he's not going to (17) answer those questions regarding details.
(18) MR. CONNOR:  Is there a privilege that (19) you're claiming?
(20) MS. JOHNSON:  An attorney-client privilege (21) with the other lawyer, yes.
(22) MR. CONNOR:  This is a revocation of a

Page 15

(1) District of Columbia license.
(2)  MS. JOHNSON:  Yes.  To who the patient (3) was.
(4)  MR. CONNOR:  It's public record.
(5)  MS. JOHNSON:  Well, then, fine.
(6)  MS. HANRAHAN:  I don't think the patient (7) is public record.  You can use "Patient A."
(8)  MS. JOHNSON:  Yes.
(9)  BY MR. CONNOR:
(10) Q Okay.  Well then who's your counsel in (11) that case?
(12) A Al Belcuore.
(13) Q I'm sorry?
(14) A Al Belcuore.
(15) Q Can you spell that for me?
(16) A A-I, and Belcuore, B-e-l-c-u-o-r-e.
(17) Q Okay.  Do you currently have hospital (18) privileges at any hospital?
(19) A Right now?  No.  Well, yes I do but that's (20) probably tenuous to the revocation of my license.
(21) Q I'm sorry.  I didn't hear you.
(22) A That's prior to my license being revoked.

Page 16

(1) Most hospital boards have the active license to be on (2) staff, so right now I guess I would still be off – (3) I've not had hospital privileges anywhere right (4) now because of the license revocation.
(5)  Q Are you employed anywhere right now?
(6)  A No.
(7)  Q What are you doing?
(8)  A A lot of prayer and looking around for (9) jobs.  I have several license in Maryland right now (10) that has not been revoked as of yet, so I'm looking in (11) Maryland also and also hope for a resolution of my (12) action in D.C. so I can get back to working again.
(13) Q So you're attempting to be employed as an (14) emergency physician in Maryland right now?
(15) A Not right now.  I'm not presently formally (16) pursuing a job right now until things settle down a (17) little bit.
(18) Q Did Greater Southeast terminate your (19) privileges as a result of the incident with the (20) prescription medications?
(21) A It was because of the license being (22) revoked.  You have to have an active license to be on

## Page 17

(1) staff. If I don't have a license I can't be on staff.
(2) Q Do you know when your D.C. license was (3) revoked?
(4) A Well, the order was signed May – I'm (5) sorry – April 28th. I didn't get it until May 20th.
(6) MS. JOHNSON: He asked you one question.
(7) THE WITNESS: I apologize.
(8) MR. CONNOR:
(9) Q Of what year?
(10) A 2006.
(11) Q Okay. And do you know when you were (12) officially notified by Greater Southeast that you no (13) longer had privileges there?
(14) A I can't remember the exact date.
(15) Q Sometime after –
(16) A Yes.
(17) Q – April?
(18) A Yes.
(19) Q Okay. Other than that occasion, have you (20) ever been denied privileges at a hospital?
(21) A No.
(22) Q I'm assuming you stopped working at

## Page 18

(1) Greater Southeast once the license revocation was made (2) official.
(3) A Correct.
(4) Q Have you ever been a Defendant in any (5) legal proceeding?
(6) A No.
(7) Q Have you ever been made aware of any (8) accusation of medical negligence or inadequate patient (9) care other than a lawsuit?
(10) A No.
(11) Q Dr. Vaughn, I'm going to direct my (12) questions to the period of September 2004 unless I (13) tell you otherwise. You were working at the emergency (14) room at Greater Southeast at that time, correct?
(15) A Yes.
(16) Q Can you tell me how the emergency room was (17) structured? In other words, who was your employer?
(18) A At that time I believe the ER would be run (19) by NES, National Emergency Services.
(20) Q And the physicians working in the (21) emergency room would be employees of NES?
(22) A Yes.

## Page 19

(1) Q Without exception?
(2) A Without exception.
(3) Q What about the non-physician personnel? (4) Nurses, therapists and so forth?
(5) MS. HANRAHAN: Is the question you're (6) asking him who are they employed by?
(7) MR. CONNOR: I'm not quite sure.
(8) MS. HANRAHAN: I just want to make sure (9) that was the question.
(10) MR. CONNOR:
(11) Q Yes. The question is: Were the non- (12) physician workers in the emergency room also employed (13) by NES as of September 2004?
(14) A I don't know.
(15) Q Do you have an understanding of the (16) contractual relation between NES and the owners of (17) Greater Southeast Hospital at that time?
(18) MS. JOHNSON: Objection. Foundation and (19) form. Go ahead.
(20) THE WITNESS: No.
(21) BY MR. CONNOR:
(22) Q Well, you started working at Greater

## Page 20

(1) Southeast in 2001. Is that right?
(2) A Yes.
(3) Q Who individually hired you?
(4) A At that time I forget who the medical (5) director was. The hiring group was hired through (6) PhyAmerica at that time.
(7) Q I'm sorry?
(8) A The ER group was being run by PhyAmerica.
(9) Q Is that P-h –
(10) A P-h-y, then the word "America." I forget (11) who the ER director was at that time.
(12) Q So at some point after 2001, PhyAmerica no (13) longer contracted to run the emergency services and (14) NES took over that function?
(15) A Yes.
(16) Q Do you know when that change occurred?
(17) A I believe it was 2003.
(18) Q And was there an emergency physician who (19) was in charge of the emergency room services as of (20) September 2004?
(21) A Rephrase your question. I'm not sure I (22) understand the question.

## Page 21

(1) Q Was there a physician who was the (2) supervisor or the senior physician or had some (3) authority over the other physicians working in the (4) emergency room as of September 2004?

(5) A Yes.

(6) Q How was that?

(7) A That was Dr. William Rogers, I believe.

(8) Q I'm sorry?

(9) A William Rogers.

(10) Q William Rogers. Was there any type of a (11) hierarchy or a rank of physicians, or was it just Mr. (12) Rogers – Dr. Rogers and staff?

(13) A Correct. Basically Dr. Rogers and the (14) staff.

(15) Q When you were getting a paycheck for (16) providing emergency services, who was the drawer of (17) that check?

(18) A It depended on who we contracted to.

(19) Q Again, I'm talking about September of (20) 2004.

(21) A That would've been NES then, I believe, (22) because they had the contract for the emergency room.

## Page 22

(1) Q When you working in the emergency room – (2) again, I'm referring to September of 2004 – did you (3) have authority to order or control nurses, respiratory (4) therapists and other Allied healthcare providers?

(5) MS. JOHNSON: Objection to the form of the (6) question. It's vague and unclear. Go ahead.

(7) MS. HANRAHAN: Same objection.

(8) MS. JOHNSON: So that you're clear as to (9) the term control. That's my objection. Okay.

(10) BY MR. CONNOR:

(11) Q You can answer.

(12) A If you're saying if – I could ask nurses (13) to do things, yes. If it means asking techs to their (14) job, yes, I had the control.

(15) Q Well, if you needed somebody to attend to (16) a patient, say, "Nurse X, go draw some blood from (17) Patient Y"?

(18) A Yes. That was –

(19) Q They would be expected to do that?

(20) A Correct.

(21) Q They would be expected to listen to your (22) orders and follow them?

## Page 23

(1) A Correct.

(2) Q As of September 2004 were you working at (3) any other emergency rooms besides Greater Southeast?

(4) A No.

(5) Q Did you have a written employment (6) agreement with NES?

(7) A Yes.

(8) Q How was the matter of medical liability (9) insurance handled?

(10) A Written through the contract, they covered (11) the malpractice.

(12) Q Part of your contractual benefits was to (13) have coverage?

(14) A Yes.

(15) Q Do you know how much coverage you were (16) given under that contract?

(17) A I can't remember?

(18) Q Do you know today?

(19) A I still can't remember.

(20) Q As of September 2004 did you have any (21) other coverage for medical liability claims besides (22) the NES contract?

## Page 24

(1) A No.

(2) Q Have you ever been denied or coverage (3) terminated for coverage with there in 2001 other (13) than this case? (4) insurance company?

(5) A No.

(6) Q Are you covered today?

(7) A No.

(8) Q When did you stop being covered?

(9) A When my job was ceased.

(10) Q Are you aware of any other suits, claims (11) or allegations of improper emergency care at Greater (12) Southeast since you started work there in 2001 other (13) than this case?

(14) MS. JOHNSON: Objection. Foundation. Go (15) ahead.

(16) THE WITNESS: Can you rephrase? I'm not (17) sure I understand your question directly.

(18) BY MR. CONNOR:

(19) Q Well, let me break it down and see if that (20) will help you. You began working at the Greater (21) Southeast emergency room in 2001. Is that correct?

(22) A Yes.

### Page 25

(1) Q And you worked there until earlier this (2) year? 2006?
(3) A Yes.
(4) Q During that time did you become aware of (5) any other suits, claims or allegations of improper (6) emergency care at Greater Southeast whether you were (7) involved in the care or not?
(8) A Yes.
(9) Q How many such instances were you made (10) aware of?
(11) A One or two, I believe.
(12) Q Do you remember the names of those (13) patients?
(14) A No, I don't remember their names, no.
(15) Q Do you remember the allegation?
(16) A Yes.
(17) Q Can you tell me what you recall about (18) those one or two instances?
(19) A Is that relevant to this case here?
(20) Q I'm sorry?
(21) A Is that relevant to this case? I mean, (22) I'm not being funny, but those cases had nothing to do

### Page 27

(1) Q How's the other one feeling?
(2) A I wouldn't know.
(3) Q Do you recall the name of the patient in (4) those two cases?
(5) MS. JOHNSON: Objection.
(6) MS. HANRAHAN: Objection.
(7) MS. JOHNSON: He can't divulge the name of (8) patients.
(9) MS. HANRAHAN: And on behalf of Greater (10) Southeast I'm going to object and if you incline to (11) answer, instruct him not to answer because that could (12) potentially result in a major problem for Greater (13) Southeast. Huge problem for Greater Southeast.
(14) MS. JOHNSON: Yes. He can't divulge the (15) names of the patients at the time.
(16) MR. CONNOR: Well, if there was a suit (17) that was filed.
(18) MS. JOHNSON: You didn't there was a suit. (19) You said claimed.
(20) MR. CONNOR: Okay. Well then let me ask (21) him there was a suit.
(22) MS. JOHNSON: You said possible claims, or

### Page 26

(1) with this case in the ER with problems. Is that what (2) you're asking?
(3) MS. JOHNSON: No.
(4) BY MR. CONNOR:
(5) Q No. I'm asking what you can recall abut (6) the one or two instances of allegations of improper (7) care in the emergency room that you just testified to?
(8) A One was a blood mismatched transfusion (9) reaction. I believe one was a fractured – it was not (10) set properly.
(11) Q Do you know whether the patient in those (12) two cases died as a result of the treatment?
(13) A Yes.
(14) Q In both cases?
(15) A No.
(16) MS. JOHNSON: You asked him did he know (17) and he said yes, and now you ask him, "Did they die?"
(18) BY MR. CONNOR:
(19) Q Did either one of them die?
(20) A Yes.
(21) Q How many of them died?
(22) A One died.

### Page 28

(1) lawsuits, or you said anything.
(2) MS. HANRAHAN: Actually, if I recall the (3) question which he answered it was: "Are you aware of (4) any – "
(5) MS. JOHNSON: Allegation.
(6) MS. HANRAHAN: "– errors or negligence of (7) Greater Southeast?" He cannot disclose those names.
(8) MR. CONNOR: Okay. Well, fine. I'm not (9) going to persist with that question.
(10) MS. HANRAHAN: Okay.
(11) MS. JOHNSON: About names.
(12) MR. CONNOR: Let me ask him another (13) question.
(14) MS. HANRAHAN: Okay.
(15) BY MR. CONNOR:
(16) Q Do you know whether a suit was filed in (17) either or both of those two instances that you just (18) testified to?
(19) A I'm not sure.
(20) Q Okay. Do you know who the emergency (21) physician was in either of those two instances?
(22) A No.

Page 29

(1)  Q How did you become aware of those two (2) instances?
(3)  A Word gets out. People talking. That's (4) all I know about it. As far as the details I don't (5) know.
(6)  Q Did you ever discuss those two instances (7) with any emergency physicians at Greater Southeast?
(8)  A No.
(9)  Q Have you discussed the Magbie case, the (10) case that we're on today, with any emergency (11) physicians at Greater Southeast?
(12)  A No.
(13)  Q I'm going to ask you to listen to this (14) question carefully, because I'm sure counsel are going (15) to object, but I don't think they should, but I'm (16) going to ask it.
(17)  MS. JOHNSON: Okay. So we'll save you the (18) time. Objection.
(19)  BY MR. CONNOR:
(20)  Q Without telling me any of the details of (21) the content, was there a peer review of this Magbie (22) matter a Greater Southeast?

Page 30

(1)  MS. JOHNSON: Objection.
(2)  MS. HANRAHAN: Objection. I believe the (3) D.C. peer review statute is actually much broader than (4) others in jurisdiction and that statute dictates that (5) there is nothing that may be discovered about peer (6) review.
(7)  MR. CONNOR: I'm asking if it happened.
(8)  MS. HANRAHAN: That's part of what is not (9) discoverable.
(10)  MS. JOHNSON: Discoverable. Exactly.
(11)  MS. HANRAHAN: Under the D.C. statute.
(12)  MS. JOHNSON: He's not going to answer (13) that question. Even the fact of it is not (14) discoverable.
(15)  MR. CONNOR: I think because we have a (16) Constitutional claim in this case –
(17)  MS. JOHNSON: Not against our clients.
(18)  MR. CONNOR: Excuse me. Let me just (19) finish.
(20)  MS. JOHNSON: All right.
(21)  MR. CONNOR: Because we have a (22) Constitutional claim in this case the legislation

Page 31

(1) passed by the D.C. counsel does not trump the Eighth (2) Amendment of the American Constitution.
(3)  MS. JOHNSON: All right. You've now made (4) your record. He's not going to answer the question.
(5)  BY MR. CONNOR:
(6)  Q Dr. Vaughn, are you aware of whether or (7) not Greater Southeast Hospital was accredited in (8) September of 2004?
(9)  A I believe it was.
(10)  Q Are you aware whether it was accredited (11) during your time working there from 2001 to 2006? Was (12) it continuously accredited?
(13)  A I believe it was continuously accredited.
(14)  Q Are you aware whether or not the hospital (15) was in compliance with CMMS Medicare requirements in (16) September 2004.
(17)  MS. JOHNSON: Objection. Foundation. Go (18) ahead.
(19)  THE WITNESS: Sir, that I don't know.
(20)  BY MR. CONNOR:
(21)  Q You don't know. I take it then you would (22) not know whether it was found to be out of compliance

Page 32

(1) with CMMS requirements –
(2)  A Yes.
(3)  Q – during the time that you worked there?
(4)  A That's correct.
(5)  Q Are you aware of whether emergency (6) services at Greater Southeast were found to be out of (7) compliance under Medicare requirements the time that (8) you worked there?
(9)  A No.
(10)  Q You have no awareness of that now?
(11)  A I'm not – as far as – I found out we're (12) still in compliance as far as I was aware of.
(13)  Q And as far as you know, you were in (14) compliance from 2001 through 2006?
(15)  A That's correct.
(16)  Q When you worked at the emergency room at (17) Greater Southeast, did you have occasion to treat (18) prisoners sent to you from the D.C. Department of (19) Corrections?
(20)  MS. JOHNSON: Excuse me, Counselor. Are (21) we now talking September 2004 or just the total period (22) of time.

**Page 33**

(1)  BY MR. CONNOR:
(2)  Q I'm sorry. This would be your entire (3) experience there from 2001 up through this year.
(4)  A Okay.
(5)  Q Did you have occasion to provide emergency (6) treatment to other inmates sent to you by the (7) Department of Corrections?
(8)  A Yes.
(9)  Q Can you give me some sense of how often (10) that would happen?
(11)  A Every shift I worked.
(12)  Q So it would be a pretty much a daily (13) occurrence?
(14)  A Correct.
(15)  Q Can you give me some sense of how often (16) you treated quadriplegic patients? Again, this is all (17) during your five years a Greater Southeast.
(18)  MS. HANRAHAN: Can I get a clarification? (19) Generally are you still on your D.C. prisoner focus?
(20)  MR. CONNOR: No.  I'm talking about (21) quadriplegic patients.
(22)  THE WITNESS: One.

**Page 34**

(1)  BY MR. CONNOR:
(2)  Q Would that be Mr. Magbie?
(3)  A Correct.
(4)  Q Again, the same time period 2001 to 2006, (5) how often did you encounter ventilator-dependent (6) patients at Greater Southeast?
(7)  A Approximately one or two per month.
(8)  Q Same time frame, how often did you work (9) with patients who had a diaphragm pacemaker, or a (10) phrenic nerve stimulator?
(11)  A One.
(12)  Q And that would be Mr. Magbie?
(13)  A Correct.
(14)  Q Had you ever seen a diaphragm pacemaker (15) before meeting Mr. Magbie?
(16)  A No.
(17)  Q Were you familiar with them?
(18)  A They – to be honest, no.  Never.  No.
(19)  Q Was there a customary practice at the (20) emergency room when a patient was brought in from the (21) Department of Corrections did you have some sort of a (22) routine that you followed different from a normal

**Page 35**

(1) patient?
(2)  MS. JOHNSON: Objection to form.  Go (3) ahead.
(4)  THE WITNESS: Yes.
(5)  BY MR. CONNOR:
(6)  Q Can you give me a sense of how that (7) worked?
(8)  A Yes.
(9)  Q Can you give me a sense of how that (10) worked?
(11)  A Well, the inmate/patient will be triaged (12) and then depending on the severity of his condition, (13) he'd be placed in a bed in the emergency room or sent (14) to a holding room to be seen later on. That's will (15) all triage patients. They are kept away from the (16) general public of the ER waiting room.
(17)  Q So there was a holding room that was more (18) secure, I take it, than a regular waiting room?
(19)  A I wouldn't know if you'd call more secure, (20) but it was away from the general population emergency (21) room.
(22)  Q Okay.  And were those inmate/patients

**Page 36**

(1) restrained or shackled customarily?
(2)  A Customarily, yes.
(3)  Q Even if they were paraplegic or (4) quadriplegic?
(5)  A Usually yes.  Most patients came with (6) restraints.
(7)  Q Do you recall whether Mr. Magbie arrived (8) September 20, 2004 with restraints?
(9)  A I can't recall.
(10)  Q Did you have the authority as the (11) emergency physician to make a determination whether or (12) not to admit an inmate?
(13)  MS. JOHNSON: Objection to the form.
(14)  THE WITNESS: Yes.
(15)  BY MR. CONNOR:
(16)  Q Did you ever have any occasion where you (17) were examining an inmate from the Department of (18) Corrections where you determined that he or she ought (19) to be admitted and someone from the Department of (20) Corrections disagreed with your recommendation?
(21)  MS. JOHNSON: Is this during the entire (22) five-year period?

## Page 37

(1) MR. CONNOR: Yes. This is during the (2) five-year pe-
riod.
(3) THE WITNESS: I can't recall any (4) disagreements with
them. Now, I should say is that (5) medical or non-medical
persons in Corrections?
(6) BY MR. CONNOR:
(7) Q Either one.
(8) A No. I can't recall any.
(9) Q Do you recall that in the case of Mr. (10) Magbie's visit
on September 20th and 21st, 2004, do (11) you recall that you
had one or more conversations with (12) a Dr. Bastien at the
Department of Corrections?
(13) A Correct.
(14) Q And those conversations involved whether (15) or not to
admit Mr. Magbie. Is that correct?
(16) A No.
(17) Q Did you ever have any conversations over (18) your five
years at Greater Southeast on the subject of (19) whether or not
to admit an inmate with some (20) representative form the De-
partment of Corrections?
(21) A I can't recall having any conversations.
(22) Q Since September 20, 2004 other than your

## Page 38

(1) counsel and peer review, if there was peer review, (2) have
you discussed the facts of Mr. Magbie's treatment (3) with any-
one?
(4) MS. JOHNSON: Objection to the question. (5) He can't
address issues of peer review. I'd ask you (6) to rephrase the
question because it's –
(7) MR. CONNOR: I said, "other than peer (8) review."
(9) MS. JOHNSON: I thought you said, "if (10) there was peer
review," so let's –
(11) MR. CONNOR: No. I said, "other than peer (12) review," if
there was because he won't tell me if (13) there was, so if there
was don't count that. I don't (14) know if there was or not;
you're not going to tell me.
(15) BY MR. CONNOR:
(16) Q But leaving that aside and leaving any (17) conversa-
tions that you've had with counsel aside, my (18) question is:
Have you discussed the facts of Mr. (19) Magbie's treatment
with anyone else besides those two (20) possible sources?
(21) A No.
(22) Q Do you intend to offer any expert opinions

## Page 39

(1) at the trial of this case regarding the standard of (2) care or
any breach of the standard of care?
(3) MS. JOHNSON: Let me say he doesn't (4) necessarily
make that determination. I would as (5) counsel probably. It is
not our intention that he (6) will offer those opinions.
(7) MR. CONNOR: Okay.
(8) BY MR. CONNOR:
(9) Q Let me ask you a hypothetical question, (10) Dr.
Vaughn: Assuming that you were back at the (11) emergency
room at Greater Southeast Hospital now (12) practicing emer-
gency medicine, and assuming a patient (13) presented with
the exact same presentation as Jonathan (14) Magbie did in
September of 2004, would you treat that (15) patient any differ-
ently than you treated Mr. Magbie?
(16) MS. JOHNSON: Objection to form. (17) Speculation. Go
ahead if you can answer.
(18) THE WITNESS: I'd perform the same tests. (19) Once I
got the results I'd make a decision from there.
(20) BY MR. CONNOR:
(21) Q I'm interpreting that as you would treat (22) the patient
the same as you treated Mr. Magbie.

## Page 40

(1) A I'll do the exact – I'll examine the (2) patient and do
tests as necessary. Based on your (3) tests you need to
decide what is to be done from (4) there.
(5) Q Well, I'm asking you to assume that the (6) facts are all
identical including the tests and the (7) results of the tests.
(8) MS. JOHNSON: You're asking him to assume (9) that the
test results came back the same way –
(10) MR. CONNOR: Yes. The exact same way.
(11) MS. JOHNSON: – as they did. Hold on. (12) Let me finish.
On September 20th –
(13) MR. CONNOR: That's right.
(14) MS. JOHNSON: – as if this were July 19, (15) 2006. All the
same test results were the same.
(16) MR. CONNOR: That's correct.
(17) THE WITNESS: I wouldn't change my course (18) of ther-
apy.
(19) BY MR. CONNOR:
(20) Q Okay.
(21) MS. HANRAHAN: Would this be marked Vaughn (22) Ex-
hibit 2?

## Page 41

(1)  MR. CONNOR: That's correct.

(2)  (Whereupon, the document (3) referred to above was marked for (4) identification as VAUGHN Exhibit (5) No. 2.)

(6)  MR. CONNOR: Do you want to take a few (7) minutes and review that?

(8)  (Whereupon, a short break was taken.)

(9)  MS. HANRAHAN: Can I before – I have with (10) the exhibit DMS transfer page. Do you want that (11) inclusive of Number 2 or not?

(12)  MR. CONNOR: Yes. That's what I got from (13) the hospital.

(14)  MR. CONNOR:

(15)  Q Dr. Vaughn, I'm showing you what's been (16) marked as Vaughn Exhibit 2 which I will represent as (17) the Greater Southeast chart sent to me for the visit (18) of September 20 and 21, 2004 for Mr. Magbie. Have you (19) had a chance to look at that?

(20)  A (Witness examining document.)

(21)  Yes.

(22)  Q And does that appear to be the chart for

## Page 42

(1)  that visit?

(2)  A It does.

(3)  Q All right. I'm going to ask you some (4) questions about that visit, but before I do that, let (5) me just do one more thing. Your counsel filed what we (6) call a 26(a)(1) statement, but it lists people who may (7) have some knowledge about facts involving this case (8) and I want to ask you – you've already told me that (9) you were only involved with Mr. Magbie on the first (10) visit, September 20 and 21. You weren't treating him (11) on the 24th of September, correct?

(12)  A That's correct.

(13)  MS. JOHNSON: To be accurate, he was only (14) involved with him up until 8:00 o'clock in the morning (15) on the 21st.

(16)  MR. CONNOR: Okay.

(17)  BY MR. CONNOR:

(18)  Q So my question is whether these (19) individuals were involved in that first visit in any (20) way of treating Mr. Magbie: Dr. Christopher Ackerman?

(21)  A No.

(22)  Q I think his name is on that chart.

## Page 43

(1)  MS. JOHNSON: Hold on. Let him as his (2) question.

(3)  BY MR. CONNOR:

(4)  Q Would they just put the name on there (5) because he was staffing the emergency room but didn't (6) treat the patient? Is that what happened here?

(7)  A No.

(8)  Q He didn't provide treatment to your (9) knowledge on that day?

(10)  A To the patient? No.

(11)  Q Do you know why his name is on the chart?

(12)  A Yes.

(13)  Q Why is that.

(14)  A Dr. Ackerman at the time, he was the house (15) team coordinator. Anybody who was admitted to the (16) house team inclusive of the prisoners would go under (17) his service. So he's the attending for the house team (18) service. You may not speak with him directly, but (19) he's coordinator of the house team.

(20)  Q Okay. All right. How about Dr. Haghighi, (21) H-a-g-h-i-g-h-i?

(22)  A Haghighi, yes.

## Page 44

(1)  Q Haghighi.

(2)  A Yes.

(3)  Q Was he involved in treating Mr. Magbie on (4) September 20th?

(5)  A Yes, as a consultant.

(6)  Q Do you know what role he played in the (7) treatment of this patient?

(8)  A Yes.

(9)  Q What did he do?

(10)  A He was Dr. Ackerman's person on call that (11) night at the hospital with the house team and I spoke (12) to him about Mr. Magbie, but as far as actual care in (13) the ER? No.

(14)  Q Did he do any examination to your (15) knowledge with Mr. Magbie?

(16)  A No.

(17)  Q Did you order any treatment or tests?

(18)  A No.

(19)  Q Okay. How about Dr. Nuni, N-u-n-i?

(20)  A Yes.

(21)  Q What was his involvement with Mr. Magbie (22) on September 20th and 21st?

BSA

07/19/06: Scott v D.C.: Depo: William Vaughn, MD

XMAX(12)

---
Page 45

(1)  A He was the doctor I signed off to on the (2) 21st of September at 8:00 a.m. when my shift ended. (3) See, he was my relief man.

(4)  Q Okay. Got it. And I – you may not know (5) this but just to speed things up, maybe your counsel (6) can respond to this: I think these nurses were all (7) attending on the 24th – Kathi Williams-Young, Twalla (8) (ph) Cooper, Monica James, Sheena Krudent (ph) and (9) Brenda Dockery (ph). I think they were the code team (10) on the 24th.

(11) MS. JOHNSON: Okay. On the 24th? Okay. (12) It's possible. You might ask him directly, but I (13) think you probably are accurate that they were on the (14) 24th, not the – but you might ask him.

(15) BY MR. CONNOR:

(16)  Q Do you know who the nurses were when you (17) were treating Mr. Magbie on the 20th and 21st?

(18)  A I can't recall, no.

(19)  Q Okay.

(20) MS. HANRAHAN: Just for the record, I (21) thought when we did the 26(a)(1)disclosure, we (22) distinguished –

---
Page 46

(1)  MR. GORDON: You may have. I didn't –

(2)  MS. HANRAHAN: – the dates. I mean, I (3) didn't bring it with me, but I thought we did.

(4)  MR. CONNOR: Well, that's fine. We'll (5) figure it out.

(6)  BY MR. CONNOR:

(7)  Q All right. Doctor, I'm going to ask you (8) some questions about Mr. Magbie's visit on the 20th of (9) September. If you would like to refer to the chart, (10) feel free. You don't have to, but nobody will (11) complain if you do.

(12)  A Okay.

(13)  Q Do you remember what time he arrived?

(14)  A I believe the chart says 9:45 p.m. or (15) 21:45.

(16)  Q And what was his chief complaint when he (17) arrived?

(18) MS. JOHNSON: Is this based on reviewing (19) the chart or do you want him to give you his memory (20) and then tell you if he's relying on the chart? (21) That's why I want to be clear what you want.

(22)  MR. CONNOR: It's entirely up to you.

---
Page 47

(1)  MS. JOHNSON: It doesn't matter to you?

(2)  MR. CONNOR: It's entirely up to you. (3) It's entirely up to you.

(4)  MS. JOHNSON: Okay.

(5)  MR. CONNOR: I don't expect any witness to (6) remember the content of the chart.

(7)  THE WITNESS: The complaint was, according (8) to them, trouble breathing and sent for breathing (9) treatment.

(10) BY MR. CONNOR:

(11)  Q And he was transferred to the emergency (12) room at Greater Southeast from the Department of (13) Corrections medical facility, correct?

(14)  A As far as I know, yes.

(15)  Q Okay. And then he was triaged. Is that (16) right?

(17)  A Yes.

(18)  Q And who did triage?

(19)  A I can't – I don't know if there's a (20) signature here. It may have been a nurse and/or a (21) tech that admitted him. I don't know who's signature (22) it is. I can't tell you.

---
Page 48

(1)  Q Okay. At some point did you review the (2) triage note that night?

(3)  A Yes.

(4)  Q And what was the indication in the triage (5) note, if you recall?

(6)  A Indication for why he was – I'm not sure (7) I understand your question.

(8)  THE COURT REPORTER: Say that again, (9) please?

(10) THE WITNESS: Could you repeat the (11) question to make sure I understand the question?

(12) BY MR. CONNOR:

(13)  Q Well, I think you just told me that you (14) had an opportunity to look at the triage note at some (15) point when you began treating Mr. Magbie, correct?

(16)  A Yes.

(17)  Q And did you note the triage assessment?

(18)  A Yes, I did.

(19)  Q And what was the triage assessment?

(20)  A It said, "Trouble breathing. Set up for (21) breathing treatment." and "Sleeps on the vent at (22) home." And that was it.

---

## Page 49

(1) Q Okay. And I think you just told us you're (2) not sure who signed off on that triage?

(3) A That's correct.

(4) Q It wasn't you though?

(5) A That's correct.

(6) Q And did you note further down on the (7) triage note under "Past medical history, quadriplegic, (8) tracheostomy, diaphragm pacemaker"?

(9) MS. JOHNSON: When you say "note" did he (10) just observe that it was present on the form as (11) opposed to noting that he actually wrote anything?

(12) MR. CONNOR: Yes.

(13) MS. JOHNSON: I just thought I'd make that (14) distinction.

(15) BY MR. CONNOR:

(16) Q Did you become aware of that –

(17) A Yes.

(18) Q – mentioned in the triage notes?

(19) A Yes.

(20) Q Okay. And you also became aware that he (21) had a Foley catheter?

(22) A Yes.

## Page 50

(1) Q And that he had sacral decubitus?

(2) A Yes.

(3) Q And that he had, on examination, wheezing (4) and rails?

(5) A Yes.

(6) MS. JOHNSON: This is not on the triage (7) that you are talking about now. That's what I'm (8) trying to make a distinction. You referred to the (9) triage note –

(10) MR. CONNOR: Okay.

(11) MS. JOHNSON: – and now you're going to (12) the physical exam.

(13) MR. CONNOR: Well, let me just go to the (14) physical exam.

(15) MS. JOHNSON: Okay. Because the last (16) question I'm not sure referred to the triage versus (17) the exam.

(18) BY MR. CONNOR:

(19) Q When did you first examine Mr. Magbie on (20) the 20th of September?

(21) A 11:00 p.m.

(22) Q And you recorded your findings on the

## Page 51

(1) emergency physician record. Is that correct?

(2) A Correct.

(3) Q And what was the patient's chief complaint (4) when you examined him?

(5) A He said shortness of breath and a cough.

(6) Q And again you noted under (7) "Duration/started, trach-dependent patient who uses a (8) ventilator at night." Correct?

(9) A Correct.

(10) Q And I'm looking at page 2 of your (11) emergency physician record. You actually found that (12) he had wheezing and rails on examination. Is that (13) right?

(14) A That's right.

(15) Q And you ordered some tests. Is that (16) right?

(17) A Yes.

(18) Q And you ordered a chest x-ray?

(19) A Yes.

(20) Q And what, if anything, did you find that (21) was abnormal on your testing?

(22) A A low glucose and a slightly elevated

## Page 52

(1) white count.

(2) Q I'm looking halfway down the right column (3) of page 2 of your emergency physician record and I'm (4) looking at chemistries, and circled here "Normal (5) except –" and you mentioned the glucose. You (6) mentioned the white blood count to the left of that.

(7) A Yes.

(8) Q You've also got some other entries here – (9) sodium?

(10) A Yes.

(11) Q Is that abnormal?

(12) A No.

(13) Q Carbon dioxide?

(14) A Borderline low.

(15) Q Creatinine?

(16) A Normal.

(17) Q BUN?

(18) A Normal.

(19) Q I'm looking further down under "Emergency (20) Department course," and tell me what you've written (21) there – "O2 –"?

(22) A "02, room air at 90 percent. Increase to

BSA                07/19/06: Scott v. D.C.: Depo: William Vaughn, MD                XMAX(14)

Page 53

(1) 99 percent with 3 liters of oxygen via nasal cannula."
(2) Q Okay. So before you administered the (3) oxygen, he was at 90?
(4) A Yes.
(5) Q And that would be below normal, correct?
(6) A Yes.
(7) Q And thereafter it says you discussed the (8) matter with Dr. Ackerman. Is that right?
(9) A Yes.
(10) Q Do you remember your discussion with Dr. (11) Ackerman?
(12) A I did not speak to Dr. Ackerman directly. (13) Dr. Haghigi was the person in the hospital at night. (14) I actually spoke to Dr. Haghigi as opposed to Dr. (15) Ackerman.
(16) Q So this should say, "Haghigi," (17) technically.
(18) A Yes. But it's the exact same service.
(19) Q Okay. Can you tell me what your (20) discussion was with Dr. Haghigi?
(21) A Yes. The question was on Mr. Magbie. I (22) asked him specifically what was his ventilator. He

Page 54

(1) said, "Use the ventilator if he needed to, as he (2) needed to." No rhyme, no reason. It was not like he (3) used it every night, so I was trying to figure out how (4) I could take care of Mr. Magbie. He said, "You can (5) use it every night, use it sometimes or not (6) sometimes." So I'm looking to how to best accommodate (7) his "sometime" use of a ventilator, as he put it.
(8) Q As who put it?
(9) A Mr. Magbie. Before I got out there, I (10) said, "Mr. Magbie, how often do you use your (11) ventilator." He said, "I use it sometimes if I need (12) to, as I need to. It's not all the time, it's not (13) every day, it's just whenever." I'm trying –
(14) Q Did you – I'm sorry. I didn't mean to (15) cut you off.
(16) MS. JOHNSON: Continue.
(17) THE WITNESS: I'm trying to figure out how (18) could I possibly admit somebody with a "whenever" (19) ventilator use was my problem I had admitting him at (20) the time. He was breathing well, but he says he may (21) crash but whether he was going to crash, he didn't (22) know. So I can't say – how can I justify a PRN

Page 55

(1) ventilator use for admission. That was the problem I (2) had with Mr. Magbie.
(3) BY MR. CONNOR:
(4) Q Okay. Are you finished?
(5) A And as Dr. Haghigi who had run the service (6) for Dr. Ackerman and was in charge of the inmates, how (7) could I quarantine or put a ventilator to the side for (8) a PRN use was the problem I had, although at the time (9) he was not in respiratory distress. He sat the entire (10) time well. How could I justify a PRN use for a (11) ventilator is the problem I had on my hands.
(12) Q Okay. Are you finished now?
(13) A Yes.
(14) Q I don't want to cut you off again.
(15) A No.
(16) Q When you say, "How can you justify (17) quarantining a ventilator," do you mean the equipment (18) that you had at the hospital, like taking in a (19) ventilator that was available at the hospital –
(20) A Yes.
(21) Q – using it for this patient?
(22) A On a – yes – on a PRN use. He's not

Page 56

(1) using it, so if somebody would need one you take it (2) away from them because he may need it at sometime. (3) That was the problem I had.
(4) Q Were you short of ventilator equipment (5) that night?
(6) A I don't know the status of vents in the (7) hospital. I do not control the vents.
(8) Q All right. I think some minutes ago we (9) were talking about your experience over five years.
(10) A Yes.
(11) Q And I think you told me that you had (12) treated a number of ventilator-dependent patients over (13) the years.
(14) A Yes.
(15) Q I believe that was your answer. This (16) wasn't the first rodeo.
(17) A No, but –
(18) MS. JOHNSON: Hold on.
(19) THE WITNESS: Go ahead and ask your (20) question. I'm sorry.
(21) BY MR. CONNOR:
(22) Q Okay. My question is: When you treated

BSA   ···  ··   ···    ···  ·· ···  07/19/06: Scott v D.C.: Depo: William Vaughn, MD    XMAX(15)

## Page 57

(1) ventilator-dependent patients over your five years, (2) did you ever have a problem obtaining an available (3) vent if the patient needed it?

(4)   A At times, yes.

(5)   Q So on those occasions would you talk to (6) somebody to make the case why you ought to get the (7) vent for you patient instead of some other physician?

(8)   A Well, you may have to call around to see (9) where you can get a vent available – where it may be.

(10) Q Okay.

(11) A Or transfer a patient somewhere else.

(12) Q All right.  And when you talked to Dr. (13) Haghigi were you exploring the possibility of (14) obtaining a vent within the hospital for this patient?

(15) A Yes.

(16) Q Was there a vent available, to your (17) recollection?

(18) A I can't recall.  I can't recall.  I don't (19) think there was a shortage that night, no, but there's (20) a caveat with that.  Mr. Magbie was not vent- (21) dependent.  Usually people on the ventilator, they (22) come on, they're being bagged and he said most of the

## Page 58

(1) time off the vent stimulator, so he's not really vent- (2) dependent in the true sense of being vent-dependent.

(3)   Q Okay.  And it's you testimony that Mr. (4) Magbie told you on September 20th that he didn't (5) always use a ventilator at night?

(6)   MS. JOHNSON:  Objection.  That misstates (7) what he said.

(8)   MR. CONNOR:  I'm asking him what he said.

(9)   MS. JOHNSON:  Oh. Well, his testimony was (10) what it was. I mean –

(11) MR. CONNOR:  Well, that's why I'm asking.

(12) THE WITNESS:  Yes.

(13) BY MR. CONNOR:

(14) Q Clarify.  If I'm wrong, clarify for me.

(15) A He said he does not use the ventilator (16) every night.  That's what he told me, personally.

(17) Q And did you enter that in his chart?

(18) A No, I did not.

(19) Q All right.  I'm still looking at the (20) second page of your physician record.  You formed a (21) clinical impression after examining the patient and (22) running the tests.  Is that right?

## Page 59

(1)   A Yes.

(2)   Q What was your clinical impression?

(3)   A My first assessment was COPD, acute (4) exasperation, hypovolemia and hypoglycemia.

(5)   Q And we're talking about chronic (6) obstructive pulmonary disease?

(7)   A Yes.

(8)   Q What is chronic obstructive pulmonary (9) disease?

(10) A That he would have prior colds, almost (11) like bronchitis in a sense.

(12) Q And is that a common side effect of being (13) quadriplegic?

(14) A I can't say for sure.

(15) Q Is it a common side effect of not having (16) a functioning diaphragm muscle?

(17) A It could be.  That could attribute to it.

(18) Q Okay. And hypoglycemia means he had low (19) blood sugar?

(20) A Yes.

(21) Q And hypovolemia means he had low blood (22) pressure, correct?

## Page 60

(1)   A No.  Blood volume.

(2)   Q Blood volume.

(3)   A He said he hadn't eaten all day.

(4)   Q Okay.  And did you form a plan of (5) treatment for these diagnosis?

(6)   A Yes.

(7)   Q And what was that?

(8)   A Once I learned of his low blood sugar, he (9) received an ampullar D-50 IV.

(10) THE COURT REPORTER:  Repeat that, (11) please.  MS. JOHNSON:  Ampullar.

(12) THE WITNESS:  Once I received his low (13) glucose, he received an ampullar D-50 intravenously. (14) He also received a liter of saline to his veins, and (15) also at that point, I put what oxygency I would (16) oxygenate with the nasal prongs.

(17) THE COURT REPORTER:  I'm sorry.  I didn't (18) hear the last part.

(19) THE WITNESS:  I gave him oxygen through (20) nasal cannulas, nasal prongs, to see if I could (21) address his problems.

(22) BY MR. CONNOR:

## Page 61

(1)  Q And did you give him glucogen?
(2)  A D-50.  Actually glucose.
(3)  Q Glucose.  Did that improve his blood (4) sugar?
(5)  A Yes.
(6)  Q How do you know that?
(7)  A Well, unfortunately I did not do an (8) Accucheck to repeat the level, so that's one thing (9) that was not done.
(10) Q Okay.  So my question again is:  How do (11) you know that it improved his blood sugar?
(12) A Well, I looked at his vital signs at how (13) he was doing and took that to being his sugar was (14) doing fine, but did I actually repeat his sugar, no I (15) did not.
(16) Q Did you order anyone else to repeat his (17) glucose level?
(18) A No, I did not.
(19) Q And the saline improved his hypovolemia?
(20) A Yes.
(21) Q And his blood pressure stabilized?
(22) A Yes, it did.

## Page 62

(1)  Q Okay.  Was there a time later on during (2) this visit when the blood pressure dropped (3) precipitously?
(4)  A It was not on my shift.
(5)  Q What time did you leave?
(6)  A 8:00 a.m.
(7)  Q Okay.  Did you determine why he had an (8) elevated white blood count?
(9)  A My thoughts were just stress from being in (10) the facility.
(11) Q Being in the Department of Corrections?
(12) A Yes.
(13) Q Now, I'm looking at the next page which (14) says, "Emergency physician record continuation (15) progress note." And this is your handwriting, I (16) assume?
(17) A Yes, it is.
(18) Q I'm looking at this "Emergency physician (19) record continuation progress note" which you just (20) mentioned that you had made these entries?
(21) A Correct.
(22) Q And 15:00 is at the top –

## Page 63

(1)  A 1:50.
(2)  Q – 1:50 a.m.
(3)  A Yes.
(4)  Q Okay.  And you mentioned what you just (5) told us that you had provided him with the treatment (6) that you just mentioned.
(7)  A Yes.
(8)  Q And then about halfway down here, you've (9) written, "Patient to be admitted for hypovolemia –" (10) I'm sorry. I can't read your handwriting.
(11) A Hypovolemia, hypoglycemia –
(12) Q Hypoglycemia and –
(13) A – respiratory distress.
(14) Q – respiratory distress.
(15) A Yes.
(16) Q So at 1:50 a.m. your plan was to admit the (17) patient. Is that right?
(18) A On my first assessment.
(19) Q Okay.  Then I see, is it 3:29 a.m.?  Is (20) that –
(21) A 3:20 a.m.
(22) Q 3:20 a.m.  You say that his oxygen is at

## Page 64

(1) 95 now?
(2)  A Yes.  On room air.
(3)  Q On room air.
(4)  A Yes.
(5)  Q And you had already given him the nasal (6) cannula?
(7)  A No.  They took him off that to see where (8) he was. That's why I said on room air.
(9)  Q Right.  So you've given him a nasal (10) cannula –
(11) A A little bit.
(12) Q – and you'd taken it away –
(13) A And see how he tolerated.
(14) Q – and you inject him –
(15) A Yes.
(16) Q – and you're getting a 95 on room air.
(17) A Yes.
(18) Q Okay.
(19) A Which is – which is good.
(20) Q Okay.  And then you say, "May only need (21) nasal oxygen which the jail infirmary can provide." (22) Correct?

Page 65

(1)  A Correct.
(2)  Q When you made that entry had you already (3) spoke to Dr. Bastien?
(4)  A Well, yes that I spoke with him. It's on (5) the same note. Yes, sir. I'm sorry.
(6)  Q Okay. How many times did you talk to Dr. (7) Bastien –
(8)  A Twice.
(9)  Q – that evening?
(10)  A Twice.
(11)  Q Okay. When was the first call if you (12) remember?
(13)  A At 1:50 a.m.
(14)  Q And did you call him or did he call you?
(15)  A I called the jail.
(16)  Q And why did you call the jail?
(17)  A To see what facilities they had at the (18) jail infirmary.
(19)  Q To see what services they had?
(20)  A To see what they could provide there.
(21)  Q And what were you specifically trying to (22) learn about?

Page 66

(1)  A Learn about if they provide a PRN (2) ventilator which Mr. Magbie I guess was used to.
(3)  Q A PRN ventilator.
(4)  A Yes.
(5)  Q All right.
(6)  A And they said they could not do anything (7) mechanical ventilation there at all.
(8)  Q Okay. And was it after that phone call (9) that you made the entry the patient to be admitted?
(10)  A Yes. After I talked to Dr. Batien, yes. (11) I'm sorry.
(12)  Q And then you had a second call with Dr. (13) Bastien?
(14)  A Correct.
(15)  Q What time was that, if you remember?
(16)  A Around 3:20 in the morning.
(17)  Q And again, did he call you or did you call (18) him?
(19)  A I called him.
(20)  Q And why did you call him at 3:20 in the (21) morning?
(22)  A To see if they could provide oxygen by

Page 67

(1) nasal cannula. Just to make sure they could provide (2) some kind of oxygen therapy there.
(3)  Q And what did Dr. Bastien tell you?
(4)  A He said they do have oxygen support there (5) by way of nasal cannula; they could monitor it. I (6) said, "If I send Mr. Magbie back, can you make sure he (7) gets O2 that can be monitored on the oxygen?" He (8) said, "Yes, but I have to make arrangements and can (9) you keep him there until we make arrangements?" I (10) said, "Fine." And we'd leave him in the emergency (11) room until everything's set for him back at the jail.
(12)  Q So was there a point when you changed your (13) mind about admitting the patient?
(14)  A Yes. His condition had changed. It (15) improved.
(16)  Q Did you note that?
(17)  A That's where I failed to make the proper (18) documentation on the chart there. Although I list it (19) here on the 3:20 note, it's listed on my discharge (20) note, discharge instructions. I transferred the (21) instructions to the second page of the doctor's note.
(22)  Q When you talked to Dr. Bastien the second

Page 68

(1) time, did you discuss providing a ventilator at night (2) for Mr. Magbie?
(3)  A No.
(4)  Q Did you make any further effort to obtain (5) a ventilator for him?
(6)  A No.
(7)  Q Did you feel that you had addressed his (8) respiratory issues by sending him back with a nasal (9) cannula?
(10)  A From my assessment I figured I addressed (11) all his problems. If he had shown any signs of (12) decompensation, I would've changed my course of (13) action. He didn't decompensate. And vital signs (14) reading at 99 percent, 95, 90 percent of room air, to (15) me is not in respiratory distress. His respiratory is (16) 12 to 15; that's not distress. His vital signs were, (17) like, 95 over 65 between through the entire course of (18) the emergency room when I had him. That's not (19) distress to me. So what I'm looking at, I'm looking (20) although he has a lot of preexisting problems, he's (21) stable.
(22)  MS. JOHNSON: Is this a good time to take

BSA · - · - ·— - · —·07/19/06: Scott v D.C. ,Depo: William Vaughn, MD · —

XMAX(18)

Page 69

(1) a short break?

(2)  MR. CONNOR: I might be just about done.

(3)  MS. JOHNSON: Okay.

(4)  MR. CONNOR: Can you hang on for a minute?

(5)  MS. JOHNSON: Sure.

(6)  BY MR. CONNOR:

(7)  Q I'm looking now at your discharge (8) instructions, page 4 I think of the – okay?

(9)  A Yes.

(10) Q And I'm looking at your diagnosis, and (11) you've indicated, "hypoglycemia resolved, hypovolemia (12) resolve, bronchitis stable." Is that your final (13) diagnosis?

(14) A Yes.

(15) Q Is there any final diagnosis about his (16) original sheet complained on admission which was (17) shortness of breath?

(18) A That's the – this is my final diagnosis (19) here. I'm sorry. This is what I completed after my (20) exam when I last saw him and I had written these (21) around 8:00 o'clock to prepare for discharge. Now, (22) sometimes I've known the ER that you write things that

Page 70

(1) they may change. You say, "Discharge him by 8:00 (2) o'clock," when you designate a shift. At 9:10 stuff (3) hits the fan and everything gets changed over. So I (4) wrote these based on what I had seen in him up to my (5) time of treatment with him.

(6)  Q Okay.

(7)  A So I had not encountered any treatment (8) condition with him. So far as I know, when I saw him, (9) this is what I was going to discharge him with, with (10) these instructions.

(11) Q And you've indicated in the lower left, (12) "Nasal oxygen at multiple times as needed"?

(13) A At nighttime as needed.

(14) Q Oh. Nighttime. I'm sorry.

(15) A Yes.

(16) Q "Nasal oxygen at nighttime as needed."

(17) A Yes.

(18) Q And you felt that resolved his shortness- (19) of-breath complaint?

(20) A At the time, it seemed to address his (21) complaint.

(22) MR. CONNOR: We can take a five-minute

Page 71

(1) break.

(2)  (Whereupon, a short break was taken.)

(3)  BY MR. CONNOR:

(4)  Q Dr. Vaughn, I have just a couple more (5) questions for you.

(6)  A Okay.

(7)  Q I want to clarify in my mind the order of (8) the conversations that you had. I think you said – (9) well, I know that you said you had two phone calls (10) with Dr. Bastien and you also talked with Dr. Haghigi, (11) correct?

(12) A Correct.

(13) Q Was it Bastien, Haghigi, Bastien? Was (14) that the order?

(15) A Correct.

(16) Q And when you talked to Dr. Haghigi I think (17) you mentioned that you were discussing in your mind (18) there was adequate indication for commandeering event. (19) That's my recollection. Is that accurate? Or if I'm (20) wrong, tell me.

(21) A The question with Dr. Haghigi is how could (22) I admit somebody for a PRN use of a ventilator as

Page 72

(1) needed. And with Mr. Magbie, he was on all the time, (2) that's an easy question to answer. He's in the (3) hospital. If he's vent-dependent, if he's always on (4) the vent, fine. If he always used it, fine. And (5) somebody who maybe uses it if he needs to as he needs (6) to with no particular rhyme or reason to using the (7) ventilator.

(8)  Now, the respiratory problems he had are (9) really nothing to admit anybody for. You can correct (10) his sugar, you can correct his volume. How can I (11) possibly admit for a PRN use of ventilator and that (12) was my problem.

(13) Q And because you had that issue in your (14) mind, you consulted Dr. Haghigi?

(15) A Because that's who you would go to, yes, (16) correct, yes.

(17) Q And my question is: When you presented (18) this concern of yours –

(19) A Yes.

(20) Q What did Dr. Haghigi say in response?

(21) A He said we couldn't justify a PRN use for (22) a ventilator. This admission was for a PRN use of a

Page 73

(1) **ventilator with no other problems. He said if he was** (2) **septic, you've got something to work with. If he was,** (3) **you know, low blood pressure, something to work with.** (4) **He had possible use of ventilator and that's all you** (5) **can admit for, you really can't justify that type of** (6) **admission.**

(7) Q And tell me if I'm wrong, you were leaning (8) in one direction and Dr. Haghigi confirmed what you (9) were already thinking?

(10) MS. JOHNSON: Object to the form.

(11) MS. HANRAHAN: Same objection.

(12) THE WITNESS: I was trying to get what Mr. (13) Magbie was used to having. A ventilator to use if he (14) needed one. That's what I was trying, I was trying (15) maybe to achieve that goal if I could do that. And (16) what Dr. Haghigi and I discussed things, either we (17) couldn't find a way to justify an admission to hold a (18) bedside ventilator for somebody if he needs one.

(19) BY MR. CONNOR:

(20) Q Another question: When Mr. Magbie first (21) presented on September the 20th, when he first (22) presented, did you have access to his Department of

Page 74

(1) Corrections' medical records?

(2) A No.

(3) Q Could you have obtained those if you (4) wanted to?

(5) MS. JOHNSON: Objection. Foundation.

(6) THE WITNESS: If I thought I needed them, (7) hopefully I could obtain them.

(8) BY MR. CONNOR:

(9) Q Okay. Did you know as of September the (10) 20th that he had already had a chest x-ray done at the (11) Department of Corrections' intake?

(12) A No.

(13) Q And then I take it you don't know the (14) results of that chest x-ray, or you didn't know it at (15) that time?

(16) A That's correct, yes.

(17) MR. CONNOR: That's all I have. Thank (18) you, Dr. Vaughn. (19) CROSS EXAMINATION

(20) BY MR. NEWSOME:

(21) Q Dr. Vaughn, my name's Kelvin Newsome and (22) I represent Patricia Singley and the CCA in this

Page 75

(1) matter and I, too, am going to ask you a few questions (2) and if you don't hear me or don't understand me, just (3) let me know, okay?

(4) A No problem.

(5) Q Okay. So if you answer my questions I'll (6) assume that you understood them. Is that fair?

(7) A Okay.

(8) Q I get the task of jumping around trying to (9) follow what this gentleman did, so I may bounce around (10) a little bit and I apologize for that. I'll try not (11) to repeat everything that was said or even most things (12) that were said.

(13) Dr. Vaughn, just so I can be clear, I (14) believe what you said what you were trying to do was, (15) as I put down, get Mr. Magbie what he was used to (16) getting with respect to ventilator support. Is that (17) a fair statement?

(18) A Yes.

(19) Q I just want to go back over your – you (20) may want to refer to Exhibit 1, your curriculum vitae. (21) I have a couple questions, but I just want to go (22) through a few things that you said. You had talked

Page 76

(1) earlier about the fact that it took you five years to (2) complete medical school because you had to repeat the (3) second year. Is that right?

(4) A Yes.

(5) Q Okay. And were you placed on probation (6) prior to that when you were in med school?

(7) A No.

(8) Q You just had to repeat?

(9) A When you repeat, you're on probation.

(10) Q Well, that's what I was asking.

(11) A Well, I'm saying – let me make sure I'm (12) **saying it correctly. The year you repeat, you're on** (13) **probation for that year.**

(14) Q Correct.

(15) A Then once you're past the year, you're (16) **off.**

(17) Q Okay. You talked about your experience (18) sitting with the boards and the results that you had (19) gotten. Do you have any plans as we sit here today to (20) retake any boards?

(21) A Yes. **My goal is to take the internal** (22) **medicine board in 2007.**

Page 77

(1) Q Okay. And have you applied already? (2) Filled out the application?

(3) A I'm getting that together right now.

(4) Q Okay. And that's for your internal (5) medicine board?

(6) A Yes.

(7) Q Now, when you say that you were board (8) eligible in emergency medicine, do you mean by the (9) AAPS?

(10) A Yes. Well, with the ABEM boards –

(11) Q Excuse me?

(12) A With the ABEM, the American Board of –

(13) Q Medical Specialists?

(14) A No. American Board of Emergency Medicine, (15) ABEM.

(16) Q Right.

(17) A I just missed the grandfather clause about (18) 400 working hours back about 1990 so therefore, I (19) can't sit for those boards. So I can sit for the AAPS (20) boards, but I told you earlier, nobody recognizes (21) those boards in this area here. So although you have (22) them they're useless as the piece of paper over there.

Page 78

(1) Nobody accepts them.

(2) Q I understand. And the AAPS is recognized (3) in, I believe, maybe one state if not two, and that's (4) in Florida, I believe.

(5) A And in Georgia, but no one right here (6) accepts the AAPS as recognized emergency medicine (7) boards.

(8) Q Okay. I believe your response to the (9) gentleman's question earlier –

(10) (Whereupon, the foregoing matter (11) went off the record, briefly.)

(12) BY MR. NEWSOME:

(13) Q Okay. I am back. In response to Mr. (14) Connor's questions regarding text that you read, you (15) had mentioned – was it Tintinally and Rosen?

(16) A Yes.

(17) Q Okay. Now, you said you read those. Do (18) you believe those texts are authoritative on issues (19) related to emergency medicine?

(20) A They give you a good knowledge. I would (21) say yes.

(22) Q Okay. And you also refer to the Journal

Page 79

(1) of Emergency Medicine. Would you also agree that (2) that's authoritative on emergency medicine issues?

(3) A Yes.

(4) Q You had talked a little bit about the (5) suspension you had related to the Tylenol and (6) percocett. When did that treatment occur? I know (7) when the orders came down, but when did the treatment (8) occur? I believe the summary suspension came down on (9) September 30 of 2005.

(10) A Yes.

(11) Q When was the actual treatment?

(12) A It was from, I believe, December 2002 (13) through June of 2005.

(14) Q June 2005. And this individual was coming (15) into the ER getting –

(16) A No.

(17) Q Okay. How did it occur?

(18) A I had a second job at the time. I was (19) working in another office besides the emergency room.

(20) Q Okay. Where did this occur?

(21) A At the office I had prior to being let go (22) from the job, so it was an office I worked on in

Page 80

(1) Northeast and Southeast D.C.

(2) Q Okay. Who was your employer there?

(3) A It was called – it's on my CV there. (4) It's Medicine Provider Network.

(5) Q Okay. Let's look at your CV. I'll tell (6) you what. But as I look at Exhibit 1, your curriculum (7) vitae, I see you have here Howard University Hospital (8) in the Emergency Department from October 2003 to the (9) present on a part-time basis.

(10) A Yes.

(11) Q So in September 2004, you were working at (12) least on a part-time basis in the Emergency Department (13) at Howard?

(14) A I had been there, like, one or two shifts (15) a year but nothing – I was primarily working at (16) Greater South-east.

(17) Q Okay. And as I look at it, is it Medicine (18) Provider Network?

(19) A Yes.

(20) Q And it says from October 1999 to August (21) 2005?

(22) A Correct, yes.

### Page 81

(1)  Q Is that where you were when the issue that (2) gave rise to the board action occurred?

(3)  A Correct.

(4)  Q Okay. And were you terminated from your (5) employment at Medicine as a result of that?

(6)  A Yes.

(7)  Q Okay. And again, without getting all the (8) details, who made the complaint to the board?

(9)  A I believe it was my employer.

(10) Q Your employer? Okay. And I also see here (11) on your curriculum vitae that you have Sibley Memorial (12) Hospital that you were working in the Emergency (13) Department from July of 1994 and it says to the (14) present on a part-time basis.

(15) A Yes.

(16) Q So I take it even back in September of (17) 2004 you were still working, at least on a part-time (18) basis?

(19) A I basically hadn't for a few years, (20) but I can still work there but I haven't been able – (21) been there for some time.

(22) Q Were you working there in September 2004?

### Page 82

(1)  A No, I was not.

(2)  Q Okay. And I take it you still have, to (3) your knowledge, privileges at Sibley?

(4)  A Yes.

(5)  Q And you still have privileges at Howard. (6) Is that correct?

(7)  A No.

(8)  Q And did you just voluntarily relinquish (9) your privileges at Howard?

(10) A No. It happened when the license was (11) suspended, everything fell like dominoes.

(12) Q Okay. You talked to us about your job at (13) NES, and you said that they covered you under your (14) contract for insurance.

(15) A Yes.

(16) Q Did you have any other coverage at any of (17) the other facilities that you worked at?

(18) A Basically it was in the hospital itself as (19) an employee when I worked at Howard, I was under (20) Howard's malpractice. In the agency I would be under (21) the group I'm working with through the hospital there.

(22) Q Okay. Were you working through other

### Page 83

(1) emergency room groups at those other facilities?

(2)  A No. Howard at the time, while I was (3) working at Howard, Howard was hired through Howard (4) University itself. There's no group that Howard had (5) at that time. They may have changed since then.

(6)  Q So you would've been an employee of (7) Howard?

(8)  A I was an employee at the hospital and (9) basically mostly at the ERs the employee of the (10) hospital itself.

(11) Q At Sibley for example?

(12) A Sibley also ran through NES at the time.

(13) Q Okay. Did NES send you to different (14) hospitals from time to time?

(15) A No. What it was, you would ask about (16) being on the availability of the hospital. And say (17) hospital A, NES contracted through, and if you had (18) something available, you had a good match, you'd be (19) able to do shifts at that hospital. That's how most (20) of the groups work.

(21) Q Back in September of 2004 were you working (22) 12-hour shifts then? 10-hour shifts at Greater

### Page 84

(1) Southeast?

(2)  A Twelve-hour shifts.

(3)  Q Twelve-hour shifts.

(4)  A Yes.

(5)  Q Would that have been the length of your (6) shift on September 20 and into the 21st?

(7)  A Yes.

(8)  Q What hours were you working then?

(9)  A Usually 8:00 p.m. to 8:00 a.m.

(10) Q Okay. What about the Medicine place. (11) First of all, what was that?

(12) A That was basically a personal injury (13) clinic. People we were seeing from secondary to (14) automobile accidents. We would evaluate patients, (15) give them therapy and treatment and then they were (16) discharged once they completed therapy.

(17) Q Okay. You were an employee of Medicine?

(18) A Of the group, yes. Of the practice, yes.

(19) Q And did they provide coverage for you (20) there?

(21) A Yes.

(22) Q Okay. The NES, you said you had a

BSA                          07/19/06: Scott v D.C. Depo: William Vaughn, MD                          XMAX(22)

## Page 85

(1) contract with NES. Do you still have a copy of that (2) contract?

(3)  A I believe it's at home.

(4)  Q Okay. Did you have a contract with (5) Medicine?

(6)  A Yes.

(7)  Q And you still have that contract, I (8) believe?

(9)  A Well, that should be at home, too. I'm (10) almost sure.

(11) Q And did you have a contract at Howard or (12) Sibley?

(13) A No. That was just as needed.

(14) Q Okay. You told us that, I mean, you (15) aren't working now. When is the last time you (16) performed medical services?

(17) A The ER has been since May 17th, I think it (18) was.

(19) Q Of 2006?

(20) A 2006, yes.

(21) Q And would that have been in the Greater (22) Southeast ER?

## Page 86

(1)  A I believe so. I think that was my last (2) shift there.

(3)  Q Early in response to Mr. Connor's (4) questions, he had asked you about quadriplegic (5) patients and he also asked you about patients with (6) phrenic nerve simulators. Do you recall that?

(7)  A Yes.

(8)  Q And did you say that the only patient you (9) had been involved with with a phrenic nerve stimulator (10) was Mr. Magbie?

(11) A Correct.

(12) Q Okay. I just wanted to make sure I had (13) that. And you also talked about, with respect to the (14) emergency department, you talked about there was a (15) holding room and then were also beds in the emergency (16) department. Do you recall that?

(17) A Yes.

(18) Q Okay. The holding rooms, while you were (19) working, could you see the patients who were in these (20) holding rooms?

(21) A No. There's a separate area from the (22) emergency room

## Page 87

(1)  Q Okay. Emergency room here (indicating.) (2) Would you have to go into a hall into another area to (3) see those patients?

(4)  A Well, no. What happens is that the (5) patients were in a room aside from their triage deemed (6) not to be emergency care.

(7)  Q Okay.

(8)  A They would be sent over to the holding (9) room.

(10) Q Where is the holding room?

(11) A Holding room, it's separate from the (12) emergency room. You have to walk probably down a (13) couple corridors but the room – it's like, they can (14) give the patients, prisoners, secured in a secure (15) location away from the main emergency room populace. (16) Once they're ready to be seen, they're called over to (17) be seen in the emergency room.

(18) Q Okay. And then do some of the patients, (19) after they're seen in the emergency room, are they (20) sent back to the holding room?

(21) A No. Usually once they're treated they're (22) either sent back to jail or be admitted.

## Page 88

(1)  Q Okay.

(2)  A They don't go holding room, to the area, (3) and holding room.

(4)  Q Okay. I'm just trying to get a – I'm (5) trying to see what the holding room is. Are there (6) beds in the holding room, or what is the holding room?

(7)  A I believe it's just chairs.

(8)  Q Just chairs?

(9)  A Because they're sitting there, you know, (10) if somebody was deemed not emergent, like somebody who (11) has a cold or cough or something that's very simple, (12) that can be seen in a routine sick call. As soon as (13) they complain about it, they're sent over to ER to be (14) seen. At that point, the triage calls them to the (15) holding area. He's put in there, wait his turn to be (16) seen – he's worked in with the rest of the group, or (17) the rest of the ER populace. Once he's seen and (18) treated by a physician he's usually going back to jail (19) or admitted. If he has something serious, he'll be (20) admitted.

(21) Q When a, say a prisoner is in a holding (22) room, are there nurses or other medical personnel in

BSA                    07/19/06: Scott v D.C.: Depo: William Vaughn, MD                    XMAX(23)

Page 89

(1) the holding room?

(2) **A Usually not. The guards are with them** (3) **normally.**

(4) Q Okay. And then you also talked about beds (5) in the emergency room. Could you see the patients who (6) were in the beds in the emergency room?

(7) **A Yes. The way it's set up you can see the** (8) **patients. The way the ER is set up now, you can –**

(9) Q Excuse me one second. I'm talking about (10) in September of 2004.

(11) **A Okay. All right. In September of 2004 –**

(12) Q September 20 through 24 of 2004.

(13) **A You can see people being treated. From** (14) **where you were you could see the beds where people** (15) **were.**

(16) Q Okay.

(17) **A There's no direct sight of any staff** (18) **member.**

(19) Q And I'm just trying to understand the (20) references to Dr. Ackerman, and you said he was a (21) house team coordinator and he had a coordinating (22) function with the prisons.

Page 90

(1) **A I don't understand.**

(2) MS. JOHNSON: He didn't ask you a question (3) yet.

(4) THE WITNESS: Sorry.

(5) MS. JOHNSON: Go ahead.

(6) MR. HANRAHAN: He didn't really have a (7) question yet.

(8) MR. NEWSOME: That's fine. I am a little (9) slow on the uptakes sometimes.

(10) MS. JOHNSON: That's okay, and you may not (11) have heard what I said.

(12) MR. NEWSOME: Okay. No, I heard what you (13) said. I heard what you said. I was going to let him (14) continue to talk if he wanted to, though.

(15) THE WITNESS: I won't say anything yet.

(16) BY MR. NEWSOME:

(17) Q He was the house team coordinator and he (18) had some role, coordinating role with respect to the (19) prisoners. What I'm trying to figure out is, did Dr. (20) Ackerman provide care, or did he coordinate, or did he (21) coordinate and provide care? I'm just trying to (22) understand what his role was generally, and then with

Page 91

(1) respect to Mr. Magbie. I believe you've already –

(2) MS. JOHNSON: Objection. Foundation.

(3) MR. NEWSOME: Excuse me?

(4) MS. JOHNSON: Objection. Foundation.

(5) MR. NEWSOME: That's fine.

(6) BY MR. NEWSOME:

(7) Q Go ahead.

(8) **A From I understand, Dr. Ackerman was in** (9) **charge of the house team.**

(10) Q Okay.

(11) **A He was the house team. Patients who** (12) **either had no insurance because it's the jail** (13) **patients. I'm not sure of the patients they had with** (14) **the jails. That's not my power. I do the treatment** (15) **of patients. Once the patient is decided to go under** (16) **Dr. Ackerman's team, than his appointed doctor would** (17) **take other cases under his team. So the patients from** (18) **jail would be admitted to Dr. Ackerman's service.**

(19) MS. JOHNSON: Can you hear him? Because (20) I'm having trouble. Go ahead.

(21) MR. NEWSOME: Are you having problems (22) hearing me?

Page 92

(1) MS. JOHNSON: Yes. He's turned that way, (2) so go ahead. Once – something –?

(3) THE WITNESS: Once the patient is admitted (4) to the hospital under Dr. Ackerman's service, he (5) assumed care, his service would assume care of the (6) patient and his team take care of the patients.

(7) BY MR. NEWSOME:

(8) Q Okay. So if there's a patient that (9) doesn't have an attending physician at Greater (10) Southeast than they would go to the hospital team. Is (11) that fair?

(12) MS. JOHNSON: Objection. Form.

(13) MS. HANRAHAN: Objection.

(14) THE WITNESS: Could you repeat that, (15) please?

(16) BY MR. NEWSOME:

(17) Q A patient comes in, does not have a (18) primary care physician who has privileges at Greater (19) Southeast than that person, that patient would go to (20) Dr. Ackerman's service?

(21) **A No.**

(22) MS. HANRAHAN: Objection. Foundation.

Page 93

(1)  BY MR. NEWSOME:
(2)  Q Is it only with respect to prisoners?
(3)  **A No.**
(4)  Q What am I missing here.
(5)  MS. JOHNSON: Objection to form.
(6)  MR. NEWSOME:
(7)  Q If a patient does not have a primary care (8) physician –
(9)  **A Okay.**
(10) Q – and they're going to be admitted, would (11) they go to Dr. Ackerman's service? Would they be (12) admitted to Dr. Ackerman's service?
(13) **A Yes.**
(14) Q Okay.  That's what I thought I was asking. (15) You talked about Dr. Haghigi.
(16) **A Yes.**
(17) Q When you had your discussions with Dr. (18) Haghigi, did Dr. Haghigi state that he believed that (19) it was appropriate to send Mr. Magbie back to a jail (20) facility that did not have a ventilator?  Did he (21) actually state that?
(22) **A Yes.  That was the core of finding the**

Page 94

(1) **problem with Mr. Magbie and what he told me,** (2) **ventilator as needed.  Now that meant to us to keep** (3) **the ventilator at the man's bedside the entire time it** (4) **was vent to use only if he needed it.  At the time** (5) **that we saw him he was not on a vent.  His respiratory** (6) **function was quite stable.**
(7)  Q Let me just step back a little bit here. (8) If you could refer to the triage note, "Emergency (9) Department, Triage initial assessment."
(10) **A Okay.**
(11) Q Now, because earlier you testified that (12) you had read this document prior to treating Mr. (13) Magbie, at least around the time you were providing (14) care for Mr. Magbie.  Is that right?
(15) **A Correct.**
(16) Q Okay.  You also are aware that Mr. Magbie (17) had a tracheostomy.  Is that correct?
(18) **A Correct.**
(19) Q And I believe here there's also a mention (20) of Mr. Magbie's primary care physician.  Is that (21) correct?
(22) **A Yes.**

Page 95

(1)  Q And there's a Dr. Berkman.  Do you see (2) that?
(3)  **A I do.**
(4)  Q Do you know Dr. Berkman?
(5)  **A No.**
(6)  Q Did you ever contact Dr. Berkman to see (7) what, if anything, he had to say about Mr. Magbie's (8) care needs?
(9)  **A No.**
(10) Q Okay.  Looking at the emergency physician (11) record, is this your handwriting on this document?
(12) (Whereupon, the foregoing matter (13) went off the record, briefly.)
(14) BY MR. NEWSOME:
(15) Q If you look on the emergency record first (16) where it says, "Time seen: 11:00 o'clock." We on that (17) page?
(18) **A (Witness examining document.)**
(19) **Yes.**
(20) Q And I was asking you if you look at that (21) first page, the second page that starts with "Physical (22) exam," and then you skip over a page and you look at

Page 96

(1) the continuation progress note.  I'm just trying to (2) figure out, did you draft this yourself?
(3)  MS. JOHNSON: Draft what?
(4)  BY MR. NEWSOME:
(5)  Q Did you draft the handwritten – (6) everything that's in handwriting?  Is that your (7) writing?
(8)  MS. JOHNSON: On which pages?
(9)  MR. NEWSOME: I identified three pages.
(10) MS. JOHNSON: One, two and the (11) continuation page.
(12) MR. NEWSOME: That's three pages.
(13) BY MR. NEWSOME:
(14) Q And my question is:  Did you draft the (15) handwriting on these pages?
(16) MS. JOHNSON: Objection to the form of the (17) question draft.  Did he complete the form?
(18) MR. NEWSOME: Well, what is drafting.  Did (19) he write this?
(20) MS. JOHNSON: Okay.  Fine.  That's the (21) question –
(22) BY MR. NEWSOME:

## Page 97

(1) Q Did you write, "Time seen"?

(2) MS. JOHNSON: That's what I'm getting at.

(3) THE WITNESS: The form is pre-made. (4) Anything happened there is my handwriting.

(5) BY MR. NEWSOME:

(6) Q Thank you. And that's for all three pages (7) that I've identified. Is that correct?

(8) A That is correct.

(9) Q Thank you very much. Let's look at what (10) you said here. When you look under the – it talks (11) about the chief complaint and it talks about shortness (12) of breath, and if we look down under: "Duration/Start" (13) and if you look down it says – I'm reading this it, (14) says, "Trach-dependent patient." Is that correct?

(15) A Yes.

(16) Q And it says, "...who uses ventilator at (17) night."

(18) A Correct.

(19) Q That's what you wrote down –

(20) A Yes.

(21) Q – back on September 20th. Is that (22) correct?

## Page 98

(1) A That's correct.

(2) Q Now when you wrote down on September 20th, (3) 2004 you didn't say "PRN." You said, "...uses it at (4) night."

(5) A Yes. That's correct.

(6) Q Okay. I just want to understand what you (7) wrote down. Did you know how long Mr. Magbie had been (8) using a ventilator at night?

(9) A No, I didn't. I can't recall the exact – (10) how many years he'd been on a vent, no.

(11) Q So you didn't know?

(12) A No.

(13) Q And I take it you didn't know why he was (14) using a ventilator at night, or did you know?

(15) A He told me that he tires sometimes.

(16) Q Now, you were aware, I mean, you refer to (17) the D.C. Jail. You are aware that there's a D.C. Jail (18) and there's a CTF. You're familiar with that. Is (19) that correct?

(20) A Yes.

(21) Q Okay. And so I take it at the time you (22) were making treatment decisions for Mr. Magbie that

## Page 99

(1) there was no ventilator at CTF either. Is that your (2) understanding?

(3) A Yes.

(4) Q Your understanding is that there was no (5) ventilator at CTF?

(6) A Yes.

(7) Q Okay. So you knew that if Mr. Magbie went (8) back to the jail he wouldn't have ventilator support (9) at night. Is that correct?

(10) A Yes.

(11) Q If you look on the continuation progress (12) note which is the note after the discharge patient (13) instructions, if you look at that document, I believe (14) – is that 3:20 a.m.? Your note at 3:20 a.m.? Do you (15) see that?

(16) A Yes.

(17) Q And it says there, "May only need nasal O2 (18) which the D.C. Jail Infirmary can provide." What was (19) the basis for your conclusion that he may only need (20) nasal O2.

(21) A I'm looking at a gentleman who, after (22) about a half hour, hour's use of nasal cannula oxygen,

## Page 100

(1) he had now gone from 90 percent to 95 percent of room (2) air. The pressure is quite stable; the vital signs (3) are quite stable. The entire time he has stabilized (4) right now and seeing how only a little bit of oxygen (5) is pushed into a near-normal range, oxygen support by (6) his cannula may be all he needs at the time period.

(7) At that point I reassessed, because if you (8) notice the time period between the first and second (9) note, there's an hour-and-a-half time period there – (10) 1:50 to 3:20. He had been reassessed, and my (11) assessment the first time is changed to my second (12) assessment. He's stable now. Now maybe all he needs (13) is nasal O2 and the jail said they can handle nasal (14) O2.

(15) Q Can we agree that if Mr. Magbie had a (16) respiratory emergency at the jail, there wouldn't be (17) a ventilator there? Can we agree to that?

(18) MS. HANRAHAN: Objection.

(19) MS. JOHNSON: Objection.

(20) MS. HANRAHAN: Form and speculation.

(21) MS. JOHNSON: Yes.

(22) MR. NEWSOME: That's fine.

## Page 101

(1) BY MR. NEWSOME:

(2) Q Can you answer my question?

(3) **A Well, they said they didn't have a vent so** (4) **there is no vents at the jail. That's correct from** (5) **what they told me.**

(6) Q And initially Mr. Magbie was sent to (7) Greater Southeast because of breathing problems, true?

(8) **A I will say that's what they said.**

(9) Q Do you know of another reason he was (10) there?

(11) MS. JOHNSON: That's argumentative. You (12) don't have to respond to that.

(13) MR. NEWSOME: I mean, well he said that's (14) what they said.

(15) MS. JOHNSON: You don't have to respond to (16) that, Mr. Vaughn. That's an argumentative question.

(17) MR. NEWSOME:

(18) Q Do you know of another reason Mr. Magbie (19) was at Greater Southeast on September 20th?  Do you (20) know of another reason?

(21) **A No, I do not.**

(22) Q Okay.  Pulse ox readings helped with the

## Page 102

(1) saturation of oxygen in the blood.  Is that correct?

(2) **A Yes.**

(3) Q If Mr. Magbie's pulse oximeter readings (4) had been the declining while he was in the hospital, (5) would you have put him on a ventilator?

(6) **A I'd try to see what's going on and to see** (7) **what he needs.**

(8) Q Assume that Mr. Magbie's pulse ox readings (9) are declining and he's already receiving oxygen via (10) nasal cannula but it's still declining, would you put (11) him on a vent then?

(12) MS. JOHNSON: Objection.  Calls for (13) speculation.  Go ahead.

(14) THE WITNESS: That may not be the next (15) course.  You don't go from nasal to a vent in most (16) cases.

(17) BY MR. NEWSOME:

(18) Q I'm talking about Mr. Magbie.

(19) MS. JOHNSON: Don't argue.

(20) MR. NEWSOME: I'm not arguing.  I'm just (21) trying to clarify.  I'm just clarifying.  The question (22) was relative to Mr. Magbie.

## Page 103

(1) MS. JOHNSON: And I think he answered it.

(2) MS. HANRAHAN: Objection based on form.

(3) MR. NEWSOME: Are you saying no?

(4) MS. JOHNSON: He answered the question.

(5) BY MR. NEWSOME:

(6) Q You would not have put him on one?

(7) MS. JOHNSON: He didn't answer – that's (8) not what his answer was, counselor.  Do you need this (9) court reporter to read it back?

(10) MR. NEWSOME: I just want to know what his (11) answer is.

(12) MS. JOHNSON: Well, don't put words in his (13) mouth.  He answered the question.

(14) MR. NEWSOME: Well, let me ask him again. (15) I just want an answer.

(16) MS. JOHNSON: No.  We can have the court (17) reporter read it back.

(18) MR. NEWSOME: I'm going to ask the (19) question and see if we get an answer.

(20) MS. JOHNSON: I think he gave you one.

(21) MR. NEWSOME: I don't remember, all right. (22) I obviously don't understand.

## Page 104

(1) MS. JOHNSON: Well, that may be so.

(2) MR. NEWSOME: Let me ask again so that (3) we'll be clear, okay?

(4) BY MR. NEWSOME:

(5) Q You have Mr. Magbie at the hospital (6) receiving oxygen via nasal cannula and his pulse ox (7) readings continue to decline.  Under those (8) circumstances would you have placed Mr. Magbie on a (9) ventilator?

(10) MS. HANRAHAN: Objection to the form. (11) That's incomplete and hypothetical but go ahead and (12) answer.

(13) MS. JOHNSON: Also asked and answered.  Go (14) ahead.

(15) THE WITNESS: I would say depending on (16) what his needs needed – replacing the oxygen support, (17) he may not need a vent.  He may need a venting mask, (18) he might – different things you do.  There's not just (19) a cut-and-dried answer.

(20) BY MR. NEWSOME:

(21) Q Tell me what the oxygen would be given (22) that scenario.

## Page 105

(1)  A Well, you have a venting mask, you've got (2) a by-pass, you've got a vent. There's a lot of things (3) you can use. He may need a neb.

(4)  Q A what?

(5)  A A neb treatment.

(6)  Q Nebulizer?

(7)  A He maybe was having an asthma attack. You (8) give him a neb, he clears up. It's not just one set (9) answer. It depends on what his needs are and try to (10) assess his needs as best as possible.

(11) Q But a ventilator would be an option if you (12) determined it was necessary?

(13) A It could be an option, yes.

(14) Q All right.  In reaching your decision to (15) send Mr. Magbie back to a jail facility, did you rely (16) on any discussions with any of the non-medical (17) personnel at CTF?

(18) A No.

(19) Q You talked earlier, I believe you (20) testified that you do not do a repeat AccuCheck.  Is (21) that correct?

(22) A That's correct.

## Page 106

(1)  Q So as far as you know, you sent Mr. Magbie (2) back to the jail facility with low blood sugar.  Is (3) that fair?

(4)  MS. JOHNSON: Objection to the form of the (5) question. I don't know whether it's fair or not.  (6) Would you like to ask a question?

(7)  BY MR. NEWSOME:

(8)  Q Is that your statement?

(9)  A I would say yes and no.  Now, did I (10) actually measure his glucose by AccuCheck?  No, I did (11) not.  Looking at his vital signs, he had maintained (12) himself so his sugar level had been corrected.

(13) Q Is it your testimony that you can look at (14) a patient and determine whether or not their blood (15) glucose level is high or low?

(16) A You can look at his vital signs.  I'm not (17) definite that I could say someones sugar level is (18) okay by looking at the face, I can't do that.  (19) However, if you're looking at vital signs from when (20) he's first started and talk to the patient to get an (21) idea where their glucose level could be.  The exact (22) number, no.  You're not going to know that actual

## Page 107

(1) measurement.  That, I did not do.  Looking at him, the (2) patient himself, he's doing fine.

(3)  Q And looking back at your curriculum vitae, (4) Dr. Vaughn –

(5)  A Yes.

(6)  Q – I believe you spent some time in – is (7) it Mesa, Arizona?

(8)  A The Mesa area.  That's correct, yes.

(9)  Q At Valley Lutheran Hospital?

(10) A Yes.

(11) Q Why did you leave there?

(12) A I left there, I was doing shifts there, (13) and I went to another hospital at the time.

(14) Q Were you ever the subject of any (15) terminations at any hospital that you performed (16) services at?

(17) A Not that I'm aware of, no.

(18) Q Okay.  You're not aware of any?

(19) A Well, make sure I understand your question (20) directly.  Could you repeat that, please?

(21) Q Have you ever been the subject of any (22) disciplinary actions or terminations at any hospital

## Page 108

(1) where you held privileges?

(2)  A I had disciplinary problems; I had to (3) leave the hospital, yes.

(4)  Q Excuse me?

(5)  A I had to leave – on page three, (6) Washington Adventist Hospital.  They had a board (7) policy there.

(8)  THE COURT REPORTER: Repeat that, please?

(9)  THE WITNESS:  What Washington Adventist – (10) they had a board certification policy.  If you're not (11) boarded you have to leave staff, so with that in mind (12) I had to leave the staff from the hospital there.  It (13) was not the cause of anything I – malpractice.  It (14) was just I didn't pass the boards so I had to change (15) hospitals.

(16) MR. NEWSOME: Okay.  Thank you very much.

(17) MS. HANRAHAN:  No questions.

(18) MS. JOHNSON:  He will read and sign.

(19) (Whereupon, at 12:23 p.m. the foregoing (20) matter was adjourned, signature not having (21) been waived.)