**Mary R. Scott, et al. V. District of Columbia, et al.**
**United States District Court for the District of Columbia**

**05CV01853**

**Exhibit No. 5**

07/19/06: Scott v D.C.: Depo: Rotima Iluyomade, MD

PAGE 1 TO PAGE 107

NEAL R. GROSS & CO., INC.

(202) 234-4433

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

NEAL R. GROSS & CO., INC.
1323 RHODE ISLAND AVE., NW
WASHINGTON, DC    20005
Phone:   (202) 234-4433

## Page 1

(1) IN THE UNITED STATES DISTRICT COURT
(2) FOR THE DISTRICT OF COLUMBIA
(3)
(4) In the matter of:
(5) MARY R. SCOTT,
(6)     Plaintiff,          Case No.
                            05-cv-1853 (RWR)
(7) v.
(8) DISTRICT OF COLUMBIA, et al.,
(9)     Defendants.
(10)
                    Washington, D.C.
(11)
                    Wednesday,
(12)                July 19, 2006
(14)
DEPOSITION OF:
(14)
        ROTIMA A. ILUYOMADE, M.D.
(15)
    called for examination by counsel for the Plaintiff,
(16) pursuant to subpoena, at 1:18 p.m. at the offices of
    the National Prison Project of the ACLU, 915 15th
(17) Street, NW, 7th Floor, Washington, D.C., when were
    present on behalf of the respective parties:
(18)
(19)
(20)
(21)
(22)

## Page 2

(1) APPEARANCES:
(2)     On Behalf of Mary Scott, Plaintiff:
(3)     ELIZABETH ALEXANDER, ESQ.
    Of      National Prison Project
(4)         of the ACLU Foundation
            915 15th Street, NW, 7th Floor
(5)         Washington, DC 20005
            (202) 393-4930
(6)
        EDWARD J. CONNOR, ESQ.
(7) Of:     5210 Auth Road, Suite 304
            Camp Springs, MD 20746
(8)         (301) 899-7801
(9)     DONALD M. TEMPLE, ESQ.
    Of:     Temple Law Offices
(10)        1229 15th Street, NW
            Washington, DC 20005
(11)        (202) 628-1101
(12)    On Behalf of Drs. William Vaughn and
        Rotimi Iluyomade, Defendants:
(13)
    Of:     D'ANA E. JOHNSON, ESQ.
(14)    Bonner, Kiernan, Trebach & Crociatta, LLP
        1250 Eye Street, NW, Suite 600
(15)    Washington, DC 20005
        (202) 712-7055
(16)
        JUAN ANDERSON, ESQ.
(17) Of:    Bonner, Kiernan, Trebach & Crociatta, LLP
        1233 20th Street, NW, Suite 800
(18)    Washington, DC 20036
        (202) 712-7000
(19)
(20)
(21)
(22)

## Page 3

(1)     On Behalf of Corrections Corporation of
        America & P. Singley:
(2)
        DANIEL P. STRUCK, ESQ.
(3) Of:     Jones, Skelton & Hochuli, PLC
            2901 N Central Avenue, Suite 800
(4)         Phoenix, AZ 85012
            (602) 263-1700
(5)
        KELVIN S. NEWSOME, ESQ.
(6) Of:     Leclair Ryan, PC
            999 Waterside Drive
(7)         Suite 2525
            Norfolk, VA 23510
(8)         (757) 441-8938
(9)     On Behalf of the Greater Southeast
        Community Hospital, Defendant:
(10)
        CATHERINE A. HANRAHAN, ESQ.
(11) Of:    Wilson, Elser, Moskowitz, Edelman &
        Dicker, LLP
(12)        1341 G Street, NW, Suite 500
            Washington, DC 20005
(13)        (202) 626-7660
(14)    On Behalf of the District of Columbia
        and O. Washington, Defendants:
(15)
        STEVEN J. ANDERSON, ESQ.
(16) Of:    Office of Corporation Counsel
            441 Fourth St. NW, Suite 600S
(17)        Washington, DC 20001
            (202) 724-6607
(18)
        Also Present:
(19)
        JASON APOLLO HART, Intern for Mr. Steven
(20)    Anderson
(21)
(22)

## Page 4

(1) I-N-D-E-X
(2) WITNESS:      DIRECT    CROSS  REDIRECT  RECROSS
(3) Rotima Iluyomade   5      65    88, 103    --
(4) EXHIBITS:     PAGE          IDENTIFIED
(5) Deposition 1    6   Rotima Iluyomade's Curriculum
                        Vitae (3 pages)
(6)
    Deposition 2   35   Greater Southeast Community
(7)                     Hospital Records re: Jonathan
                        Magbie, September 24, 2004
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)

Page 5

(1) P-R-O-C-E-E-D-I-N-G-S

(2) (1:18 p.m.)

(3) WHEREUPON, (4) ROTIMA A. ILUYOMADE, M.D. (5) was called for examination by counsel for the (6) Plaintiff and, having been first duly sworn, was (7) examined and testified as follows: (8) DIRECT EXAMINATION

(9) BY MR. CONNOR:

(10) Q Good afternoon.

(11) **A Good afternoon.**

(12) Q Will you please state your name and (13) business address for the record?

(14) **A Rotimi Iluyomade.**

(15) Q And your business address? 1310 Southern (16) Avenue?

(17) **A 1310 Southern Avenue, Washington, D.C.**

(18) MS. JOHNSON: What's your home address?

(19) THE WITNESS: My home address: 6139 (20) Wooded Run Drive, Columbia, Maryland, 21044.

(21) BY MR. CONNOR:

(22) Q All right. Dr. Iluyomade, before we

Page 6

(1) started a moment ago, I handed you Deposition Exhibit (2) 1 which is your curriculum vitae. Did you have a (3) chance to look at that?

(4) (Whereupon, the document (5) referred to above was marked for (6) identification as Deposition (7) Exhibit No. 1.)

(8) THE WITNESS: Yes.

(9) BY MR. CONNOR:

(10) Q Is that current and accurate as far as you (11) know?

(12) **A That's not current.**

(13) Q Okay. Is it accurate?

(14) **A It's accurate.**

(15) Q Are there changes that should be made to (16) it?

(17) **A Yes.**

(18) Q Would you tell us what changes should be (19) added?

(20) **A It does not include my correct place of (21) work which is a new place I started working in August (22) of last year.**

Page 7

(1) Q And what place is that?

(2) **A That is Highlands Regional Medical Center.** (3) **That's in Parsonburg, Kentucky.**

(4) Q And are you working as an emergency room (5) physician at that –

(6) **A That's right.**

(7) Q – facility?

(8) **A Yes.**

(9) Q And you've been there since August of (10) 2005?

(11) **A Right.**

(12) Q So I take it you left Greater Southeast at (13) the same time?

(14) **A Pretty much. I haven't worked for Greater** (15) **Southeast for about five months, or six. I don't know** (16) **exactly when I last worked there.**

(17) Q Well, you stopped working at Greater (18) Southeast before you began working at Highlands. Is (19) that correct?

(20) **A It is possible to work at more than one (21) place at the same time.**

(22) Q I agree, but since Washington, D.C. and

Page 8

(1) Kentucky, I figured you have to relocate.

(2) **A Not really.**

(3) Q Oh. Okay. So you're working in –

(4) **A Yes.**

(5) Q – two at once?

(6) **A Yes. Correct.**

(7) Q And you said that you stopped working at (8) Greater Southeast about five months ago?

(9) **A I haven't worked there, you know, I (10) haven't worked there for about five months, (11) approximately.**

(12) Q So February or thereabouts?

(13) **A February, January – five or six months. (14) I'm not exactly certain.**

(15) Q Are there any other changes or revisions (16) that should appear on the curriculum vitae?

(17) **A Not really, no, not that I can see.**

(18) THE COURT REPORTER: Say again, please?

(19) THE WITNESS: Nothing. No changes.

(20) BY MR. CONNOR:

(21) Q All right. You are a graduate of a (22) medical school of the University of –

BSA                          07/19/06: Scott v D.C.: Depo: Rotima Iluyomade, MD                          XMAX(3)

Page 9

(1)  A Ibadon.
(2)  Q Ibadon?
(3)  A Yes.
(4)  Q In Nigeria?
(5)  A That's right.
(6)  Q And you did an internship in Nigeria in (7) 1981 and 1982?
(8)  A Yes.
(9)  Q And you then did another internship at (10) Howard University –
(11) A Yes.
(12) Q Beginning in 1989?
(13) A Yes.
(14) Q What did you do from 1982 to 1989?
(15) A I was working in Nigeria, practicing (16) medicine.
(17) Q When did you begin attempting to become (18) licensed as a physician in the United States?
(19) A In 1989.
(20) Q All right.  Did you have to apply to a (21) hospital for residency?
(22) A Yes.

Page 10

(1)  Q And apparently Howard University accepted (2) you?
(3)  A Yes.
(4)  Q Did you have to take a foreign medical (5) graduate exam?
(6)  A Yes.
(7)  Q And did you pass that?
(8)  A Yes.
(9)  Q First time?
(10) A It's two parts.  The exam comes in two (11) parts.
(12) Q Yes.
(13) A Yes.
(14) Q Did you pass both parts the first time?
(15) A No.  One part the first time; second part (16) two times.
(17) Q And did you also have to take a FLEX?
(18) A Yes.
(19) Q And did you pass that the first time?
(20) A That's right.
(21) Q Did you apply to any other hospitals (22) besides Howard for your residency?

Page 11

(1)  A Yes, many hospitals.
(2)  Q Were you accepted in any other hospitals?
(3)  A Yes.
(4)  Q Do you remember which ones?
(5)  A I can't remember right now.  I worked (6) briefly at Good Samaritan Hospital in Baltimore but it (7) was maybe about less than a month, or a month, and (8) then I moved to Howard University.
(9)  Q Did you work in any other hospitals during (10) your internship or residency besides Good Samaritan (11) and Howard?
(12) A During my residency?
(13) Q Or your internship in the United States.
(14) A Yes.  I was able to moonlight.
(15) Q Let me clarify my question.
(16) A Yes.
(17) Q I'm speaking now just about your (18) internship and residency, not your employment as an (19) emergency –
(20) A Employment, okay.  No.  Definitely not.
(21) Q Okay.  It says that you were employed as (22) a general practitioner from 1983 to 1985 at the

Page 12

(1)  military hospital in Ibadon, Nigeria.
(2)  A Yes.
(3)  Q Were you a member of the military service (4) of Nigeria?
(5)  A No.  Civilian.
(6)  Q Did that position involve emergency room (7) work?
(8)  A Yes.  The way it's set up you cover the (9) length in the emergency room.
(10) Q And you have three board certifications.  (11) Is that correct?
(12) A Only one.
(13) Q Only one?  Which one is that?
(14) A American Board of Emergency Medicine.
(15) Q You've listed here ACLS and ACEP.
(16) A Those are not board certifications.
(17) Q What do those letters stand for?
(18) A The ACLS is Advanced Cardiac Life Support.  (19) It's the certification for doing ACLS.  And ACEP is (20) membership in the American College of Emergency (21) Physicians.
(22) Q All right.  And you were board certified

BSA

**07/19/06: Scott v-D.C.: Depo: Rotima Iluyomade, MD**

XMAX(4)

### Page 13

(1) by the American Board of Emergency Medicine in April (2) of 2000?

(3)  A Yes.

(4)  Q Did you pass that exam the first time?

(5)  A No.

(6)  Q How many times did you take that exam?

(7)  **A I can't remember exactly.  Two times, (8) maybe – three times.**

(9)  Q And is there a re-certification (10) requirement at some point?

(11) **A That's right.**

(12) Q When is that due?

(13) A 2010.

(14) Q And are you still licensed in Kentucky, (15) Maryland, North Carolina and the District of Columbia?

(16) **A Yes.**

(17) Q And do you have any current privileges (18) other than Highlands Regional Medical Center?

(19) **A Yes.**

(20) Q Where do you have privileges?

(21) **A Malcolm Grove Medical Center at Andrews (22) Air Force Base.**

### Page 14

(1)  Q Any other hospitals?

(2)  **A DeWitt Community Hospital, Fort Belvoir, (3) Virginia.**

(4)  Q Have you practiced emergency medicine at (5) those military hospitals recently?

(6)  **A Yes.**

(7)  Q And what was your employment relation with (8) DeWitt and with Malcolm Grove?

(9)  **A Emergency physician.**

(10) Q Are you a reserve officer?

(11) **A No.  Contractor.  Civilian.**

(12) Q And is your contract individual or is it (13) through an emergency service?

(14) **A Yes.  Through an emergency service group.**

(15) Q And what is the name of that group.

(16) **A There are two different groups.   One is (17) PhyAmerica and the other one is RLM Physician (18) Services.**

(19) Q And when you practice medicine at the (20) military hospitals, you do so as an employee of those (21) groups.  Is that right?

(22) **A Yes.  As an independent contractor.**

### Page 15

(1)  Q Well, you're paid by the –

(2)  **A I'm paid by them.**

(3)  Q – group?

(4)  **A Yes.**

(5)  Q And when you practiced at Greater (6) Southeast, was that also the same type of –

(7)  **A Same.  Same.**

(8)  Q – organization?

(9)  **A Yes.**

(10) Q What was the contracting company that you (11) worked for at Greater Southeast?

(12) **A Two.  PhyAmerica and National Emergency (13) Services.**

(14) Q When did it change from PhyAmerica to NES?

(15) **A I don't know exactly right now when it (16) changed, but it did change.**

(17) Q Did one company buy the other?  Is that (18) what happened?

(19) **A No.  One company lost the contract or gave (20) up the contract and the other one picked it up.**

(21) Q But some or all of the physicians just –

(22) **A Stayed on.**

### Page 16

(1)  Q – worked for the new company?

(2)  **A That's right.**

(3)  Q What are the standard texts that you (4) consult in the field of emergency medicine?

(5)  **A Tintinally, basically mostly Tintinally. (6) It's almost like the Bible of emergency medicine which (7) we use and consult.**

(8)  Q Is that text authoritative in the field of (9) emergency –

(10) **A It is.**

(11) Q – medicine?

(12) **A There's also Rosen's.  That's the author (13) of another one, but I use Tintinally also.**

(14) Q And is Rosen's also authoritative in (15) emergency medicine?

(16) **A It is.**

(17) Q Do you read or subscribe to any journals (18) in the field of emergency medicine?

(19) **A Yes.  I get a lot of journals.**

(20) Q Which ones do you principally read?

(21) **A Annals of Emergency Medicine, which I go (22) to a library to read and a couple of others I can't**

BSA    --- --- --07/19/06: Scott v D.C.: Depo: Rotima Iluyomade, MD    XMAX(5)

## Page 17

(1) immediately remember for emergency physicians. Also, (2) one for residents and physicians. These are free (3) publications that come.

(4) Q And would you say that Annals of Emergency (5) Medicine is an authoritative text –

(6) A It is.

(7) Q – in the field of emergency medicine?

(8) A That's right.

(9) Q Before coming here today to give (10) testimony, have you reviewed any records or other (11) materials?

(12) A Yes.

(13) Q Can you tell us what you reviewed?

(14) A Patient's medical records.

(15) Q And you're talking about Mr. Magbie's –

(16) A Mr. Magbie's.

(17) Q – visit to Greater Southeast on September (18) 24, 2004?

(19) A Yes.

(20) MR. ANDERSON: I missed the name of the (21) first text. There was Rosen and then –

(22) THE WITNESS: Tintinally.

## Page 18

(1) MR. ANDERSON: How do you spell it?

(2) THE WITNESS: T-i-n-t-i-n-a-l-l-y.

(3) MR. ANDERSON: Is that the author, or –

(4) THE WITNESS: That's the author.

(5) MR. ANDERSON: I'm sorry.

(6) THE WITNESS: Those are both authors.

(7) BY MR. CONNOR:

(8) Q Just so that we are clear, you did not (9) have any encounter with Mr. Magbie at Greater (10) Southeast on September 20th, 2004, correct?

(11) A No.

(12) Q You had one encounter with him which was (13) the 24th?

(14) A That's right.

(15) Q Have you ever given a deposition before (16) today?

(17) A Yes.

(18) Q How often have you done one?

(19) A Once before.

(20) Q When was that?

(21) A 1994.

(22) Q And what was the circumstance.

## Page 19

(1) Q I was working at the hospital in (2) Fayetteville, North Carolina, Cape Fear Valley (3) Hospital, and I took care of an elderly nursing-home (4) patient who presented – complained of hip pain after (5) a suspected fall. He was found to have a fractured (6) trochanter and sent back to the nursing home and he (7) returned the next day in cardiac arrest and died.

(8) Q And were you giving testimony in that case (9) as a Defendant?

(10) A Yes.

(11) Q Do you remember the name of that case? (12) The Plaintiff in the case?

(13) A The patient was Stacy. I can't remember. (14) Stacy something. I can't remember.

(15) MS. JOHNSON: I don't object because he's (16) dead.

(17) THE WITNESS: Stacy Murray. That's the (18) patient's name – Stacy Murray. M-u-r-r-a-y.

(19) BY MR. CONNOR:

(20) Q And was the case Murray versus Iluyomade (21) or was the case Murray versus Cape Fear?

(22) A Cape Fear, Iluyomade, nurses. I was just

## Page 20

(1) one of these defendants.

(2) Q And that was in the –

(3) A – the Defendants.

(4) Q I'm sorry if I cut you off. And do you (5) know whether that was in the state court in North (6) Carolina or the federal court?

(7) A It was federal for economic reasons only.

(8) Q Okay. Do you happen to know whether the (9) case was filed in the federal court or the state court (10) or you don't know?

(11) A I do not know.

(12) Q Okay. Have you ever testified in court (13) before?

(14) A No.

(15) Q So the only time you've ever testified (16) under oath was for the deposition in that case that we (17) just discussed?

(18) A Right.

(19) Q Have you ever give expert opinions, either (20) in court or in a report or a consultation –

(21) A No.

(22) Q – for any legal medical case?

Page 21

(1)  **A** No.

(2)  **Q** Has your privilege to practice in any (3) state ever been suspended, revoked or acted upon (4) negatively?

(5)  **A No.**

(6)  **Q** Have you ever been denied privileges or (7) renewal of privileges at any hospital –

(8)  **A No.**

(9)  **Q** – at any time?

(10) **A No.**

(11) **Q** Other than the nursing-home case that we (12) just mentioned, have you ever been a Defendant in any (13) legal proceeding before?

(14) **A No.**

(15) **Q** Are you aware of any instance where any (16) accusation was made, either in court or by (17) correspondence or other means, accusing you of any (18) form of medical negligence or inadequate patient care?

(19) **A No.**

(20) **Q** You began working in the emergency room at (21) Greater Southeast in August of 2001. Is that correct?

(22) **A I believe so, yes.**

Page 22

(1)  **Q** And did you work there continuously until (2) early 2006?

(3)  **A Yes.**

(4)  **Q** Do you know whether the personnel in the (5) emergency room, whether only physicians in the (6) emergency room were employed by NES or did NES also (7) employ any other personnel nurses, therapists?

(8)  **A As far as I know they only employed the (9) physicians.**

(10) **Q** And was it your understanding that you had (11) authority to order and direct the activities of nurses (12) and other Allied healthcare providers in the emergency (13) room?

(14) **A Yes.**

(15) MS. JOHNSON: Objection to form. Go (16) ahead.

(17) MR. CONNOR: I'm sorry? I heard the (18) objection; I didn't hear the answer.

(19) THE WITNESS: Yes.

(20) MS. JOHNSON: He said yes.

(21) BY MR. CONNOR:

(22) **Q** It's my understanding from the last

Page 23

(1) witness that the employment contract with NES provided (2) coverage for professional medical negligence at (3) Greater Southeast. Is that correct?

(4)  **A Yes.**

(5)  **Q** In September of 2004 were you provided (6) coverage by any other policies for medical negligence (7) occurring in Greater Southeast Hospital?

(8)  **A Occurring in Greater Southeast?  No.**

(9)  **Q** Okay.  And do you know the amount of (10) coverage provided under the policy that you obtained (11) for your employment with NES?

(12) **A It was $3 million I think, but I'm not (13) sure.  I don't know.**

(14) **Q** Have you ever been denied professional (15) medical liability coverage by any insurance company?

(16) **A No.**

(17) **Q** Over your approximately five years working (18) at the Greater Southeast emergency room, did you (19) become aware of any other suits, claims or allegations (20) of improper emergency care at that hospital?

(21) **A Against me?**

(22) **Q** Not against you.

Page 24

(1)  **A I'm not aware of it.**

(2)  **Q** Against anyone including you?

(3)  **A I only care about my own – any problems (4) dealing with me.  I don't think about or listen to any (5) other person, so I'm not aware of any other cases.**

(6)  **Q** You don't have a physician's chit-chat (7) after hours about who's being sued?

(8)  **A Well, none of the colleagues that I did (9) chat with had any problems that I can recall.**

(10) **Q** So you're not aware of any other –

(11) **A Not that I can recall, no.**

(12) **Q** – complaints about the emergency room?

(13) **A Complaints about the emergency room, (14) general, but not about any lawsuits against any (15) physician.**

(16) **Q** Okay.  Do you know whether Greater (17) Southeast was accredited in September of 2004?

(18) **A I can't remember.**

(19) **Q** Do you know whether it was continuously (20) accredited during your five years working in the (21) emergency room?

(22) **A I'm not sure.**

BSA                    - - 07/19/06: Scott v D.C.: Depo: Rotima Iluyomade, MD                    XMAX(7)

Page 25

(1)  Q Do you know whether the Greater Southeast (2) emergency service was in compliance with CMMS Medicare (3) requirements in September 2004?

(4)  A I think – I expect so, but I'm not (5) certain.

(6)  Q Do you know whether the emergency service (7) at Greater Southeast was ever found to be not in (8) compliance with CMMS during your five-odd years (9) working there?

(10)  A I don't know.

(11) Q All right.  These questions are going to (12) be directed at your entire time at Greater Southeast (13) which we figure was about five years – thereabouts.

(14)  A Okay.

(15) Q During that time, how frequently did you (16) provide treatment to inmates brought to the emergency (17) room from the D.C. Department of Corrections?

(18)  A Every week.  I work there maybe three or (19) four days a week and at least every week I would help (20) an inmate sometime during that period.

(21) Q Over your five years at Greater Southeast, (22) how often did you have encounters with quadriplegic

Page 26

(1) patients?

(2)  A Rarely.  I can't remember right now any (3) other case –

(4)  Q Other than Mr. Magbie?

(5)  A – but it's possible that I have, but I (6) can't remember.

(7)  Q All right.  Same question:  How often did (8) you have encounters with ventilator-dependent (9) patients?

(10)  A All – almost every day or every other (11) day.

(12) Q When you encountered a ventilator- (13) dependent patient, was there a normal evaluation (14) procedure that you would perform to determine if they (15) needed to be admitted and/or provided a vent?

(16)  A Yes.

(17) Q Can you explain how that worked?

(18)  A Well, patients would – the common (19) situation is, a patient comes in in respiratory (20) distress and I end up having to incubate the patient (21) and automatically they get a vent and they get (22) admitted to the hospital once they get incubated.

Page 27

(1)  Q During your five years at Greater (2) Southeast did you ever encounter any difficulty (3) obtaining a spare vent because the vents were all tied (4) up with other patients?

(5)  A Personally, no.

(6)  Q Again, during your five years at Greater (7) Southeast how often did you encounter patients with a (8) phrenic nerve stimulator or also known as a diaphragm (9) pacemaker?

(10)  A Not often at all – maybe once or twice (11) before.

(12) Q You were aware that Mr. Magbie had one of (13) those devices?

(14)  A Yes, we found out.

(15) Q When you found out that he had that (16) device, had you seen one before then?

(17)  A As I said, it's not something that – no. (18) Maybe I'd seen – I know of it and I'd seen maybe once (19) before, but it's not a common thing.

(20) Q When you saw on Mr. Magbie – it was (21) permanently attached to him, right?

(22)  A Yes, yes, yes.

Page 28

(1)  Q You recognized what it was when you saw (2) it?

(3)  A Well, only when we saw rhythms that he (4) made, not – we didn't even know he had it. I didn't (5) quite notice it on any assessment but we found out (6) when we saw the rhythms that he made.

(7)  THE COURT REPORTER:  Say that again?

(8)  THE WITNESS: I knew for sure what he had (9) when I saw the rhythms on the strip.

(10) BY MR. CONNOR:

(11) Q Are you talking about a cardiogram?

(12) A Well, not exactly.  Well, yes, (13) electrocardiogram, the strips that came out and they (14) showed the rhythms.

(15) Q So the appearance of the rhythms as (16) registered on the strip is what told you that he had (17) a phrenic nerve stimulator?

(18) A I had no information from his medical (19) records that he had anything like that, so it was (20) something which I palpated under the skin and we had (21) to find out what exactly that was by going through the (22) medical records. But you couldn't tell just – I

BSA

07/19/06: Scott v D.C.: Depo: Rotima Iluyomade, MD

XMAX(8)

### Page 29

(1) **couldn't tell just by looking what was.**

(2)   Q Well, let me clarify. I'm not certain (3) what you're telling me, so let me try to clarify my (4) question: Did you learn of the phrenic nerve (5) stimulator by the appearance of the lines on the strip (6) or by palpating or by –

(7)   **A On physical examination.**

(8)   MS. JOHNSON: Let him finish his question (9) so –

(10) THE WITNESS: Okay. Sorry.

(11) MS. JOHNSON: – that way the court (12) reporter can get the question down and you can make (13) sure you understand it. Do you want to do it again, (14) or –

(15) BY MR. CONNOR:

(16) Q Do you remember the question?

(17) **A No. Could you repeat it, please?**

(18) Q Now I'm trying to determine what was it (19) that first informed you that he had a phrenic nerve (20) stimulator. Was it the appearance of the reading on (21) the strip or was it palpating his body?

(22) **A Palpating his body.**

### Page 30

(1)   Q Well then what was it with the strip that (2) had anything to do with a phrenic nerve stimulator?

(3)   **A Well, when I palpated his body, you know, (4) it's like this is possibly a phrenic nerve stimulator (5) but there was no information to say he definitely had (6) one until later on that we determined that this is (7) what it was.**

(8)   Q You mentioned a moment ago that there was (9) nothing in his medical record to –

(10) **A No.**

(11) Q – indicate the presence of a phrenic (12) nerve stimula-tor.

(13) **A Well, at the time I saw him I did not have (14) any information initially to say he had any kind of (15) stimula-tor, no.**

(16) Q Okay. And my question is: At the time (17) that you saw him, what medical records did you have (18) before you?

(19) **A Whatever was sent from the prison with (20) him.**

(21) Q Do you know what the prison sent with him?

(22) **A I know they sent – they always sent some**

### Page 31

(1) **papers; I don't know exactly what is sent now – right (2) now. I would have to refer to whatever records you (3) have. I don't know what was sent back.**

(4)   Q So your recollection is that when he (5) arrived at the emergency room on the 24th of September (6) he had some Department of Corrections' medical records (7) with him, but you don't know what records.

(8)   MR. NEWSOME: Excuse me. I object to the (9) form. You can go ahead.

(10) BY MR. CONNOR:

(11) Q Is that right?

(12) **A Yes. He had some papers. I don't know (13) exactly what papers.**

(14) Q You mentioned, I believe, during your five (15) years at the hospital you would encounter D.C. (16) prisoners approxi-mately once a week. Is that right?

(17) **A At least.**

(18) Q At least. And I take it over your five (19) years you would sometimes decide to admit some of (20) these prisoners and sometimes not admit them. Is that (21) correct?

(22) **A Yes.**

### Page 32

(1)   Q When you were considering whether or not (2) to admit a prisoner, was it your practice to confer (3) with personnel at the Department of Corrections before (4) deciding?

(5)   **A Before deciding?**

(6)   Q Yes.

(7)   **A Yes. Yes. Sometimes.**

(8)   Q Did you ever have an occasion where you (9) were in-clined to admit a prisoner and the Department (10) of Correc-tions expressed displeasure about that idea?

(11) **A No. Not that I can remember.**

(12) Q You never had any argument about that?

(13) **A No.**

(14) Q Since September 24, 2004 have you had any (15) dis-cussion with anyone about the facts of Mr. Magbie's (16) treat-ment at the emergency room other than with your (17) attor-neys or with any peer review process?

(18) **A No.**

(19) Q Do you intend to render any expert opinion (20) –

(21) MS. SINGLEY: Could you got back that very (22) last – you said, "...with your attorneys or with any

BSA

**07/19/06: Scott v D.C.: Depo: Rotima Iluyomade, MD**

XMAX(9)

---

Page 33

(1) peer .." I just object to the extent that he has (2) acknowl-
edged one way or the other if there is a peer (3) review.

(4)  MS. JOHNSON:  I agree.

(5)  MS. SINGLEY:  And I'll just put on the (6) record before
you said, "... if there was one." Just (7) on the record. Object to
any information on peer (8) review.  Sorry about that.

(9)  BY MR. CONNOR:

(10)  Q All right.  Do you intend to render any (11) expert opin-
ions at the trial of this case concerning (12) the standard of care
or any breach of the standard of (13) care?

(14)  MS. JOHNSON:  Objection.  That is a (15) determination
that would be made by counsel.  I didn't (16) make the repre-
sentation to you.  It is not our (17) intention to have him to such
opinions.

(18)  MR. CONNOR:  Be sure and let me know what (19) they
are if you change your mind.

(20)  MS. JOHNSON:  I doubt that I would change (21) my
mind, but that's a determination that I would make. (22) And
certainly if he were, I would submit it for your

---

Page 34

(1) examination and those opinions.

(2)  MR. CONNOR:  All right.

(3)  BY MR. CONNOR:

(4)  Q Are you generally familiar with the (5) treatment pro-
vided to Mr. Magbie in the emergency room (6) on September
24 of 2004?

(7)  A Yes.

(8)  Q Assuming that today, July 19, 2006, you (9) were work-
ing in an emergency room and had a patient (10) present with
the exact same presentation today as Mr. (11) Magbie did at
that time, what if anything would you do (12) differently in treat-
ing that patient?

(13)  A Nothing.

(14)  Q When you treated Mr. Magbie September 24, (15) did
you consult with any other physicians at Greater (16) South-
east?

(17)  A Yes.

(18)  Q Who did you consult with?

(19)  A The admitting physician group, physician (20) team.

(21)  Q Who was that?

(22)  A Dr. Ackerman and his team.

---

Page 35

(1)  Q Dr. Ackerman?  Any other physicians?

(2)  A No.

(3)  MS. JOHNSON:  Let me clarify.  I heard him (4) say, "Dr.
Ackerman and his team."

(5)  THE WITNESS:  And his team, yes.

(6)  BY MR. CONNOR:

(7)  Q So "his team" would be other physicians?

(8)  A Yes.  I mean – well, they work as a group (9) so I can't
remember exactly who else in the team that (10) I may have
talked to.

(11)  Q All right.  Did you confer with at Dr. (12) Haghigi?

(13)  A I may have.  I don't remember.

(14)  Q How about Dr. Noone?

(15)  A Dr. Noone is my colleague in the emergency (16)
room so I would have consulted – may have talked (17)
about a patient.

(18)  Q All right.  Dr. Iluyomade, would you take (19) a look at
Exhibit 2 in front of you just a minute?

(20)  (Whereupon, the document (21) referred to above was
marked for (22) identification as Deposition

---

Page 36

(1)  Exhibit No. 2.)

(2)  BY MR. CONNOR:

(3)  Q Have you had a chance to look at Exhibit (4) 2?

(5)  A Yes.

(6)  Q Let me represent that that is what was (7) provided to us
by Greater Southeast as the chart for (8) Mr. Magbie's visit on
September 24, 2004.  Does that (9) appear to be the complete
chart?

(10)  A Yes.

(11)  Q I'm going to ask you some questions about (12) his
treatment on that date and if you want to refer to (13) that chart,
feel free.

(14)  A Sure.

(15)  Q You don't have to, but you're free to do (16) so.  He
arrived at the hospital about 9:50 a.m.  Does (17) that sound
right?

(18)  A Yes.

(19)  Q And who assessed him at that time?

(20)  A The triage nurse.

(21)  Q Unfortunately the hospital didn't put (22) these in the
normal order, so the triage report is

---

BSA

Page 37

XMAX(10)

(1) pretty far down. I'd say it's about 15 or so.

(2) A Well, there are different notes referring (3) to his arrival.

(4) Q I'm going to ask you about the triage (5) initial assessment.

(6) A Okay.

(7) MS. JOHNSON: Do you want him to go to (8) that page because he's looking at those other pages (9) that reference his arrival. You just want him to look (10) at this page?

(11) MR. CONNOR: Yes.

(12) BY MR. CONNOR:

(13) Q Arrived at 9:50 a.m.?

(14) A Yes.

(15) Q And chief complaint was – what does that (16) mean, "RESP"?

(17) A Respiratory – that means respiratory (18) complaint.

(19) Q It says, "R-E-S-P. Unresponsive."

(20) A Yes.

(21) Q What does that mean to you?

(22) A It means that he had a respiratory

Page 38

(1) complaint and he was also unresponsive, so they had (2) two complaints.

(3) Q And this triage assessment was done by a (4) nurse?

(5) A Yes.

(6) Q Do you know – is it Brenda?

(7) A Looks like it.

(8) Q What's her last name. Do you know?

(9) A Looks like Dockery.

(10) Q Brenda Dockery?

(11) A Yes. I don't know how to spell it.

(12) Q All right. When did you see Mr. Magbie (13) that morning?

(14) A Around 10:00 o'clock. According to my (15) records, I wrote "10:10." That's the time I put pen (16) to paper so I think it was around 10:00 o'clock.

(17) Q All right. And now I'm looking at the (18) emergency physician record.

(19) A Yes.

(20) Q Page 5.

(21) A Yes.

(22) Q And you noted, "Chief complaint:

Page 39

(1) Unresponsive respiratory distress." Correct?

(2) A Yes. Yes.

(3) Q And you noted also that patient was (4) quadriplegic?

(5) A Yes.

(6) Q And you did a physical exam?

(7) A Yes.

(8) Q Page two?

(9) A Yes.

(10) Q Can you read what you entered on the left (11) column of that page? I can't read your handwriting.

(12) A On the left column?

(13) Q Yes. This handwriting.

(14) A Oh. Right there. Okay. "Tracheostomy. (15) Pupils small. Unresponsive."

(16) Q What did "small pupils" indicate to you at (17) that time?

(18) A It meant that he could be under the (19) influence of some medications or drugs or he could be (20) having a kind of stroke. Those are things that (21) immediately go through my mind as a cause of his small (22) pupils. It could also be having eye drops that would

Page 40

(1) cause his pupils to be small, so –

(2) Q Could he also be suffering acidosis?

(3) A Definitely.

(4) Q And then you indicate, it says, (5) "Quadriplegic"?

(6) A Yes.

(7) Q And then what is it below? The next line?

(8) A "Contractures."

(9) Q Okay. And at the bottom of that column is (10) that "contractures" again?

(11) A At the bottom, yes.

(12) Q The last two lines?

(13) A "Contracture. Decubitus ulcers."

(14) Q Decubitus ulcers?

(15) A Yes.

(16) Q Where were the decubitus ulcers if you (17) recall?

(18) A I believe on his heel or something. I'm (19) not sure, but on the heel. This is an extremity exam (20) on his lower extremity.

(21) Q Okay. And now going to the next column, (22) you ordered some lab work?

BSA

– –~ 07/19/06: Scott v-D.C.: Depo: Rotima Iluyomade, MD

XMAX(11)

**Page 41**

(1)  **A Yes, I did.**
(2)  Q And you've indicated, "Complete blood (3) count normal except white blood count 19.1." Is that (4) right?
(5)  **A Yes.**
(6)  Q Is that abnormally high?
(7)  **A Yes.**
(8)  Q What does that indicate?
(9)  **A An infection primarily.**
(10)  Q And you indicate there was an abnormal (11) glucose level?
(12)  **A Yes.**
(13)  Q 155?
(14)  **A Yes.**
(15)  Q And what would be a normal range?
(16)  **A Sixty to one hundred ten or twenty.**
(17)  Q And what does a 155 indicate?
(18)  **A Slightly higher than normal blood sugar. (19) Higher than the normal range.**
(20)  Q And then you have some – your analysis (21) findings in the fourth column?
(22)  **A Yes.**

**Page 42**

(1)  Q And I can't read those.  What do they say?
(2)  **A It's talking about, "White blood cells (3) count: 30 to 40; red blood cells:  10 to 15; Bacteria (4) plus." And then, "Urine toxicology.  Positive for (5) benzodiazepine THC"**
(6)  Q All right.  The cell count and the (7) bacteria in the urine wouldn't have any relationship (8) to the drug screens, would it?
(9)  **A No.  Not to the drug screen.  Separate (10) finding.**
(11)  Q In fact, you diagnosed him among other (12) things with urosepsis, correct?
(13)  **A Yes.**
(14)  Q What's urosepsis?
(15)  **A A urinary tract infection overwhelming. (16) I mean, not just simply a urinary tract infection but (17) causing more – causing the patient to be sick, you (18) know, with high white count among other things.**
(19)  Q And you also ordered a chest x-ray?
(20)  **A Yes.**
(21)  Q And was that abnormal?
(22)  **A Yes.**

**Page 43**

(1)  Q And what did that indicate?
(2)  **A He had a left-lower lobe infiltrate, which (3) is pneumonia.**
(4)  Q All right.  Looking down near the bottom (5) on that column it says, "Discussed with Dr. Ackerman."
(6)  **A Yes.**
(7)  Q What did you discuss with Dr. Ackerman, if (8) you recall?
(9)  **A The presentation and findings on this (10) patient and the need for admission.**
(11)  Q You told Dr. Ackerman that your findings (12) indicated that the patient should be admitted?
(13)  **A Yes.**
(14)  Q And what did Dr. Ackerman say?
(15)  **A He agreed.**
(16)  Q And then next you entered a clinical (17) impression?
(18)  **A Yes.**
(19)  Q "Altered mental status."
(20)  **A Yes.**
(21)  Q And what does that mean?
(22)  **A Patient's mental status is changed from**

**Page 44**

(1)  **his normal baseline.**
(2)  Q Anything more specific?
(3)  **A Unresponsive patient.  Unconscious (4) patient.**
(5)  Q All right.  And you also have a clinical (6) impression of "Multi-substance abuse"?
(7)  **A Yes.**
(8)  Q And that's based on the drug screen?
(9)  **A Yes.**
(10)  Q And that screen tested positive for THC –
(11)  **A Yes.**
(12)  Q – which is the chemical, active chemical (13) ingredient in marijuana?
(14)  **A Right.**
(15)  Q And also for –
(16)  **A Benzodiazepine.**
(17)  Q Benzodiazepine which is cocaine?
(18)  **A No.**
(19)  Q What is that?
(20)  **A Valium or that family.**
(21)  Q Valium-type medication?
(22)  **A Yes.  Those kinds of medications.**

## Page 45

(1) Q All right. How do you know he was abusing (2) Valium?

(3) A I didn't know. It was a suspicion.

(4) Q And the THC, is that also known as (5) marijuana metabolite?

(6) A Yes.

(7) Q How long does that stay in someone's (8) system?

(9) A Not too long. A few days to a week.

(10) Q Or a couple months, right?

(11) A Couple months, yes, possible. It depends (12) on how often, how much he's abusing but it definitely (13) can stay around for a while.

(14) Q Okay. And then you've got "Pneumonia."

(15) A "Pneumonia."

(16) Q And I can't read the next one.

(17) A "UTI/urospesis."

(18) Q Urinary tract infection and urospesis.

(19) A Yes.

(20) Q All right. And you admitted Mr. Magbie?

(21) A Yes.

(22) Q And did you form a plan of treatment?

## Page 46

(1) A Yes.

(2) Q And what was that?

(3) A Well, prior to his being admitted – my (4) treatment started prior to his being admitted. Are (5) you asking for that?

(6) Q Yes.

(7) A My whole treatment?

(8) Q Yes. The entire treatment.

(9) A Yes, I did.

(10) Q And what was your plan of treatment?

(11) A I had to determine what was the cause of (12) his unresponsiveness and also determine what would (13) cause him to have respiratory distress, and I ordered (14) some intervention by the nurse as well as the (15) respiratory therapist. At that point where we (16) admitted him we also added some more medications.

(17) Q Okay. And you ordered an IV of normal (18) saline?

(19) A Yes. I ordered an IV – well, initially, (20) because this patient was unresponsive, I had to go by (21) other standard of prodigals which involved asking them (22) to do a quick sugar test, AccuCheck, as well as the

## Page 47

(1) medication after they started an IV, of course, to (2) give him medication through the IV.

(3) Q And is that when you got the 155 glucose (4) reading?

(5) A That's right.

(6) Q How did you treat that?

(7) A I didn't need to treat that.

(8) Q How did you treat the altered mental (9) status?

(10) A Of course, we placed the patient on (11) oxygen. We have to go by airway breathing and (12) circulation and we give him some narcan IV. We gave (13) him some thiamine and also asked them to make sure his (14) airway was suctioned to make sure there was no kind of (15) obstruction or anything, airway toilet.

(16) Q A tracheal toilet?

(17) A A tracheal toilet.

(18) Q And that was ordered at –

(19) A 10:15.

(20) Q – 10:15?

(21) A Yes.

(22) Q And when was that order carried out?

## Page 48

(1) A Well, I know when it was signed off, which (2) is 11:40 according to this note. I don't know when it (3) was carried out. It was sometime between 10:15 and (4) when they –

(5) Q I'm sorry. Do you know if it was carried (6) out?

(7) A I know the narcan was carried out. I (8) believe the trachea toilet, at least the initial (9) trachea toilet, was carried out and all the other (10) medications that I ordered were given.

(11) Q How many trachea toilets did you order?

(12) A It's supposed to be periodic, repeated, (13) trachea toilet as needed.

(14) Q And as you sit here today do you know if (15) even one trachea toilet was performed?

(16) A I believe so, but – I believe so.

(17) Q Based on what?

(18) A I think I did see it being done, you know.

(19) Q Who did it?

(20) A Respiratory therapist.

(21) Q Do you remember her name?

(22) A No.

Page 49

(1) Q Was there one respiratory therapist (2) attending to Mr. Magbie during this entire time?
(3) A Yes.
(4) Q Same person?
(5) A No. They may have switched over.
(6) Q But you think you saw one of the (7) respiratory therapists?
(8) A Oh, there definitely was a respiratory (9) therapist.
(10) Q Performing?
(11) A Yes. At the bedside. They had to also do (12) a blood gas as well.
(13) Q My question was: You today believe that (14) you recall seeing one respiratory therapist performing (15) a trachea toilet?
(16) A Yes.
(17) Q One time. Is that your recollection?
(18) A Yes.
(19) Q What was the purpose of giving narcan?
(20) A That was to reverse any effect of opiates (21) and medications like that – heroine, things like that (22) in his system which would cause his mental status to

Page 50

(1) be altered and cause it to be unconscious.
(2) Q Did his screen come positive for opiates?
(3) A No, it didn't.
(4) Q Narcan doesn't effect marijuana (5) metabolite, does it?
(6) A No.
(7) Q Would it effect Valium-class drugs?
(8) A No.
(9) Q And what was the next medication after the (10) narcan?
(11) A Thiamine.
(12) Q What was the purpose of thiamine?
(13) A Thiamine is another standard medication (14) you give to patient off the street or patients unknown (15) to you who are unconscious or have altered mental (16) status before you decide to give them anything (17) containing sugar or glucose. It's supposed to protect (18) their brain and their brain stem, so you never give, (19) you know, blood sugar to any patient unconscious (20) without protecting that.
(21) Q Well, did you give Mr. Magbie any type of (22) blood sugar?

Page 51

(1) A No, but these are things that, as I said, (2) are standard before you even determine whether it is - (3) what is the course of his unconsciousness, you know, (4) give these medications and see which one he responds (5) to.
(6) Q I think you just said "unconsciousness." (7) Do you mean altered medical state?
(8) A Unresponsive. Unresponsive condition.
(9) Q Okay. He was conscious, correct?
(10) A He was unresponsive. He was not (11) responding to anything when I saw him, according to my (12) notes.
(13) Q All right. And you'd ordered some (14) additional medications at 1:05, it looks like?
(15) A Yes.
(16) Q What was that?
(17) A Levaquin 500 milligrams IV.
(18) Q And what was the purpose of levaquin?
(19) A Levaquin's an antibiotic. It's supposed (20) to treat his UTI as well as his pneumonia.
(21) Q Okay. Did you order any further trachea (22) toilet?

Page 52

(1) A Yes. This was supposed to PRN as needed, (2) after the first one.
(3) Q Did you follow up with any of the (4) respiratory therapists or nurses to see if trachea (5) toilets were being done PRN?
(6) A No. I didn't follow up. I was not (7) advised that there was any – I didn't know if there (8) was any more done after the first one. Patient (9) improved after the initial treatment that we gave him.
(10) Q And did you order that pulse oxygen be (11) measured –
(12) A Yes.
(13) Q – on a regular basis?
(14) A Well, this is almost standard. This was (15) placed even before I – I didn't have to order a pulse (16) ox. The nurses who are trained and they knew to do (17) pulse oxygen continuously. Patient was on continuous (18) monitor throughout his period in the emergency room. (19) Which included pulse oxygen.
(20) Q And you were – this wasn't your only (21) patient that day, correct?
(22) A No.

Page 53

(1) Q You were treating other patients in the (2) emergency room?

(3) A Yes.

(4) Q And following Mr. Magbie's progress?

(5) A Right.

(6) Q And relying on nurses and respiratory (7) therapists to keep you informed –

(8) A Yes.

(9) Q – as to his progress?

(10) A Yes.

(11) Q And were you following his oxygen levels (12) that afternoon?

(13) A Yes.

(14) Q Now, you examined him around 10:10, (15) correct?

(16) A Yes.

(17) Q And did you examine him again around 1:05 (18) when you ordered the additional –

(19) A Yes.

(20) Q – medications?

(21) A I may have. I'm not sure..

(22) Q And when –

Page 54

(1) A I must have.

(2) Q I'm sorry?

(3) A I must have, between the first time he (4) arrived and the time that he was admitted.

(5) Q Well, you would've reassessed him before (6) ordering additional medication at 1:05, wouldn't you?

(7) A Yes.

(8) Q Okay. And when did you next examine him (9) after 1:05.

(10) A He was sitting not quite – I mean, he was (11) in bed not quite 20 feet from where I was writing and (12) sitting, so it's continuous observation; I could see (13) the progress. I could tell, and I went by there, you (14) know, all the time.

(15) Q Well, I don't mean when did you observe (16) him across the room. I mean when did you do a hands- (17) on examination of him after 1:05.

(18) A I can't. Not by these records I don't (19) know exactly when, but I did.

(20) Q Okay. Would that have been at 5:40?

(21) A Oh, I'm sure before then, but it's (22) according to the records I was there at 5:40, yes.

Page 55

(1) Q How was he getting oxygen during these (2) hours in the afternoon of September 24th?

(3) A When he first came, after the trachea (4) toilet, I mean, he was placed on high-flow oxygen with (5) the mask, and his oxygen level – and a blood-gas was (6) done which showed him to be oxygenating quite well. (7) And at some point he was downgraded, according to the (8) records, to five liters and there was a continuous (9) pulse oxygenator being done. And he was conscious and (10) stable for most of his stay in the emergency room.

(11) Q So he was on a trach mask?

(12) A Yes.

(13) Q So he was getting oxygen over his mouth. (14) Is that right?

(15) A Over his trachea.

(16) Q Or his trachea. Okay. And I'm looking (17) now at the emergency department progress notes. This (18) is page, I believe, 10.

(19) MR. NEWSOME: I'm sorry. What did you (20) say?

(21) MR. CONNOR: I believe it's page 10, (22) emergency department progress notes.

Page 56

(1) MR. NEWSOME: Okay.

(2) MR. CONNOR: It's got a grid of his (3) oxygenation. We're on page 10.

(4) THE WITNESS: It says page 7 here.

(5) MS. JOHNSON: It's the right page. (6) Disregard what that says.

(7) BY MR. CONNOR:

(8) Q All right. I'm looking at the upper-left, (9) "Vital signs –"

(10) A Yes.

(11) Q – grid. And it looks like pulse ox, the (12) second column from the right, "pulse ox," 9;50 a.m. it (13) was 100 percent; 12:15 p.m. it was 100 percent, (14) correct?

(15) A Yes.

(16) Q 2:05 it's down to 95 percent?

(17) A Yes, on five liters.

(18) Q 4:00 p.m. it was down to 92 percent?

(19) A Yes.

(20) Q Would you have wanted to be consulted if (21) it went down to 92 percent at 4:00 o'clock?

(22) A Yes.

## Page 57

(1) Q Were you consulted?

(2) A I don't remember.

(3) Q Does it appear on your chart that you were (4) consulted at 4:00 o'clock?

(5) A No.

(6) Q The next oxygen reading is 5:40 p.m.?

(7) A Yes.

(8) Q An hour and forty minutes later he's down (9) to 80 percent?

(10) A Yes.

(11) Q Were you consulted then?

(12) A Yes.

(13) Q Did you examine Mr. Magbie at 5:40 p.m.?

(14) A Yes.

(15) Q And how did he appear at that time?

(16) A Well, his pulse ox was dropping, (17) obviously, but he did not appear to be in respiratory (18) distress as far as, you know, his breathing activity. (19) So I examined him and ask for more – I'm sure at that (20) time repeated a trachea toilet, oxygen and a repeat (21) blood-gas, and I also saw, according to the records (22) here, that the trachea was protruding one and half

## Page 58

(1) inches from the neck and that I pushed it back.

(2) Q You ordered an additional trachea toilet (3) at 5:40 p.m.?

(4) A Right. Because his pulse ox was dropping, (5) so that would be something I would order them to do (6) and also to cleanse secretions to see whether that was (7) the cause of his oxygen dropping.

(8) Q Would you show me where, in this chart, (9) you ordered a trachea toilet at 5:40 p.m.?

(10) A As I said, the trachea toilet that I (11) ordered was something that was supposed to be done as (12) needed periodically throughout his stay in the (13) emergency department. This is a patient who would (14) develop secretions, you know, and to me that meant as (15) needed; he needed to be suctioned periodically, even (16) by the nurses if necessary.

(17) Q All right. Did you suction him at 5:40 (18) p.m.?

(19) A Yes.

(20) Q You did?

(21) A Personally?

(22) Q Yes.

## Page 59

(1) A No, but it was done.

(2) Q Who did it?

(3) A I don't know. The nurse or the (4) respiratory therapist.

(5) Q Well, who was at his bedside with you at (6) 5:40 p.m.?

(7) A The nurse and the respiratory therapist.

(8) Q You don't recall the names?

(9) A No, I don't.

(10) Q Okay. But it's your recollection that one (11) of them performed a trachea toilet?

(12) A Yes.

(13) Q At 5:40 p.m.?

(14) A Yes.

(15) Q And you observed the trach tube protruding (16) an inch and half out of his neck.

(17) A According to these records, yes, and it (18) was protruding.

(19) Q Okay. And then what did you do when you (20) observed that?

(21) A I just gently pushed it back in and (22) secured it.

## Page 60

(1) Q Was that before or after the suctioning?

(2) A I don't remember.

(3) Q All right. Did you inject sterile saline (4) into the trachea at that tube?

(5) A That's what the nurse or respiratory (6) therapist would do when suctioning a trachea toilet.

(7) Q Do you recall seeing someone do that?

(8) A I don't recall.

(9) Q Was there an inner cannula in the trach (10) tube?

(11) A Yes.

(12) Q Was that removed during the treatment at (13) 5:40?

(14) A I don't know. I don't remember.

(15) Q Was he getting more oxygen after you moved (16) his trach tube at 5:40?

(17) A As far as how much oxygen we were giving (18) him?

(19) Q Let me rephrase my question: Was his (20) oxygenation improving after you adjusted his trach (21) tube at 5:40.

(22) A Well, according to the records, he was

Page 61

(1) **not.**

(2)   Q I'm sorry?

(3)   **A According to the records, it was not** (4) **improving — records that I'm looking at.**

(5)   Q Okay. Did you consider removing the trach (6) tube and replacing it with a smaller tube?

(7)   **A No. This is the tube he had for I don't** (8) **know how long. He came to the emergency room with it.**

(9)   Q Did you consider inserting a smaller (10) catheter into the trachea –

(11) **A No.**

(12) Q – to help him get more oxygen?

(13) **A No.**

(14) Q Was there any further order for a trachea (15) toilet after 5:40?

(16) **A This is almost a continuous, or as I said,** (17) **it's no new written order I can see, but that was an** (18) **order I gave at that time – to do all necessary** (19) **trachea toilet.**

(20) Q After you adjusted the trach tube around (21) 5:40, did you perform an assessment to respiratory (22) status?

Page 62

(1)   **A Yes.**

(2)   Q Where does that appear on the chart?

(3)   **A Where does that appear on the chart?**

(4)   Q Yes.

(5)   **A I don't believe I left the patient's** (6) **bedside. I don't believe I was able to leave his** (7) **bedside from that moment on.**

(8)   Q And did you note in the chart the (9) patient's response to the trachea toilet and the (10) adjustment of his trach tube at 5:40?

(11) **A No. I never had a chance to even leave** (12) **his bedside. I'm sure I was there until the end.**

(13) Q You told us a few moments ago that you (14) looked at this chart before coming here and you've (15) also had a chance to look at it right here today.

(16) **A Yes.**

(17) Q Is there any place in this chart that (18) shows that any respiratory treatment whatsoever, or (19) any oxygenation efforts whatsoever were done other (20) than the O2 saturation readings and your adjustment of (21) the trach tube?

(22) MS. JOHNSON: Object to the form.

Page 63

(1)   THE WITNESS: As I said, I was at his (2) bedside from that moment on, so a lot of things were (3) being done, you know, to improve his airway and – I (4) mean, to improve his oxygen including an attempt to (5) get a blood-gas and trying to figure out why his pulse (6) ox was dropping.

(7)   BY MR. CONNOR:

(8)   Q Is that a no?

(9)   MS. JOHNSON: That was an answer that he (10) gave.

(11) BY MR. CONNOR:

(12) Q Well, the question was: Is there anything (13) in this chart to document any efforts to improve his (14) oxygenation other than pulse ox and one adjustment of (15) his trach tube? Am I missing something in this chart?

(16) **A Well, as I recall, as I said, I was at his** (17) **bedside, you know, and the respiratory therapist was** (18) **attempting to get a blood-gas. I believe he was on** (19) **oxygen, it was being suctioned and everything was** (20) **being done to figure out why his oxygen was dropping** (21) **and to improve it.**

(22) Q Are you saying –

Page 64

(1)   **A Things happen very fast in the emergency** (2) **room and we're right there doing everything that** (3) **needed to be done at that time.**

(4)   Q I'm sure you were. Did you have an (5) opportunity after this death to add further (6) description to this chart about efforts that were made (7) to keep his oxygen level adequate?

(8)   **A Opportunity? I guess, yes, opportunity.**

(9)   Q Were there any late notes that were put (10) into the chart –

(11) **A No.**

(12) Q – reflect these efforts?

(13) **A No notes apart from the code.**

(14) Q The code report?

(15) **A The code report that I wrote and the** (16) **reference to the code sheet.**

(17) Q Just a moment, Doctor. I want to go back (18) for just a moment to the oxygen chart that we looked (19) at a few minutes ago.

(20) **A Yes.**

(21) Q Do you have that? We've been talking (22) about the treatment given at 5:40 p.m. when he had an

Page 65

(1) 80 percent pulse ox?

(2)  **A Yes.**

(3)  Q What's the next time, below "17:40" on (4) that chart?

(5)  **A It looks like "18 –" I don't know.**

(6)  Q "18:60"?

(7)  **A "18:16."**

(8)  Q 6:16 p.m., right?  Is that right?  6:16?

(9)  **A I guess, yes.  Yes.**

(10) Q And he had a pulse ox of 50?

(11) **A Yes.  That's what is written.**

(12) Q When did he die?

(13) **A You mean when did I pronounce him dead?**

(14) Q Yes.

(15) **A I think it was 18:40.  Let me look.  (16) 18:40.**

(17) Q All right.  Thank you, Doctor.  I have no (18) further questions. (19) CROSS EXAMINATION

(20) BY MR. NEWSOME:

(21) Q Hi Doctor.  My name is Kelvin Newsome and (22) I represent Patricia Singley in this matter.  I'm

Page 66

(1) going to ask you some questions.  If you don't hear me (2) or don't understand me, let me know.  Okay?

(3)  **A Okay.**

(4)  Q And I'm going to be bouncing around; I'll (5) try to do it efficiently.

(6)  **A Sure.**

(7)  Q Why did you leave Greater Southeast?

(8)  **A No reason, no specific reason.  I got this (9) other contract which was more lucrative.  I'm still (10) privileged there, to work there.  I just haven't (11) picked up any shifts there.**

(12) Q Okay.  When you responded to Mr. Connor's (13) questions, you talked about the records that you had (14) at the time that you treated Mr. Magbie and you said (15) you had whatever records that was sent by the jail.  (16) Do you recall that?

(17) **A I recall saying that, yes.**

(18) Q You know, if you had records, would you (19) have documented that in the chart?

(20) **A If I had records?**

(21) Q Correct.

(22) **A If I was able to review his records, yes,**

Page 67

(1) **I would have.**

(2)  Q You would've documented that?

(3)  **A I would've taken a look at them, yes, but (4) I probably would have but I'm not 100 percent.**

(5)  Q But as we sit here today, you can't say, (6) "I looked at this record or that record from the (7) jail." Is that fair to say?

(8)  **A Any patient who's sent from another (9) facility, I always make the effort to look at whatever (10) records are sent with the patient because that (11) information might be pertinent to the treatment we're (12) trying to give.**

(13) Q I understand, Dr. Iluyomade, but what I (14) want to know is:  Can you tell us as we're sitting (15) here today what you reviewed?

(16) **A I looked at some records; I don't remember (17) exactly what they pertained to, though.**

(18) Q And you didn't document in this chart any (19) records that you reviewed from the jail.  Is that (20) correct?

(21) **A According to the chart, no.**

(22) Q Is the correct?

Page 68

(1)  **A That's correct.**

(2)  Q Okay.  At the time that you treated Mr. (3) Magbie, were you aware that he had been admitted to (4) Greater Southeast on September 20th?

(5)  **A I was not aware.**

(6)  Q You were not aware at the time?

(7)  **A No.**

(8)  Q So I take it you did not review Mr. (9) Magbie's chart from the September 20, 2004 visit.  Is (10) that correct?

(11) **A Not at the time he was presenting (12) unresponsive to the ER, no, I didn't.  I hadn't had a (13) chance to look at those.**

(14) Q Okay.  If you had known that Mr. Magbie (15) had been at Greater Southeast, you certainly would've (16) had access to those records, wouldn't you?

(17) **A Yes.**

(18) Q Dr. Iluyomade, as I look at the emergency (19) physician record, the first page of that –

(20) **A Yes.**

(21) Q – where it says, "Time seen," if you look (22) right to the right at the top, it says – you checked

Page 69

(1) – it says, "Agree with nurses' note for PFSH." As I (2) would guess that would be a service, but what does (3) that mean? Do you know what that means?

(4)   A Past – whatever – something history – (5) PFS history and a review of system.

(6)   Q Okay. I don't believe we talked about – (7) I know you ordered arterial blood gases.

(8)   A Yes.

(9)   Q Is that correct?

(10)   A Yes.

(11)   Q What was the purpose of ordering the blood (12) gases?

(13)   A To see where this patient – how much (14) oxygen he was getting, if he was getting adequate (15) oxygen, if it was acidotic, and if he needed any (16) adjustment to the oxygen supply that we were giving.

(17)   Q Okay. And if you look at the results of (18) his pH, was that abnormal?

(19)   A Yes.

(20)   Q Okay. And what was the significance of (21) his pH?

(22)   A His acidosis, respiratory probably.

Page 70

(1)   Q Okay. And what about his PCO2? First of (2) all, tell us what that is.

(3)   A That's 56.1.

(4)   Q And tell us what that is – what PCO2 is.

(5)   A It's a carbon dioxide, measurement on the (6) carbon dioxide.

(7)   Q And what's this abnormal findings?

(8)   A That's abnormal finding.

(9)   Q And what's the significance of that (10) finding?

(11)   A The significance was that this patient (12) was, prior to being given the oxygen which he was (13) given in the emergency room, he was probably not (14) getting enough oxygen and the CO2 may have been higher (15) and has come down as a result of the oxygen we gave.

(16)   Q What about the PO2. Is that an abnormal (17) finding?

(18)   A Well, you have to take that with a pinch (19) of salt. That's – I had the normal finding.

(20)   Q What is the PO2?

(21)   A Measurement of his oxygen intake.

(22)   Q The pressure, or –

Page 71

(1)   A Yes.

(2)   Q Yes. And you said there – do you believe (3) there's any significance to that abnormal finding?

(4)   A Well, he was getting more than adequate (5) oxygenation.

(6)   Q And what about the HCO3? First of all, (7) what is that?

(8)   A That's a bicarbonate, which is a (9) measurement of acidosis more or less. I would look at (10) it. It would be important if a patient had metabolic (11) acidosis.

(12)   Q And his was abnormal. What, if any (13) significance did you place on that finding?

(14)   A I beg your pardon? The significance of (15) that?

(16)   Q Yes.

(17)   A Well, it was metabolic acidosis. You (18) know, you have to look for causes, like infection, (19) drugs, other things like that.

(20)   Q Okay. Look at – if you turn to the (21) second page of the emergency physician report starting (22) at where is says, "Physical exam constitutional" at

Page 72

(1) the top. I just want to ask you a couple of questions (2) about the emergency department course. Do you see (3) that on the right-hand side, a little more than (4) halfway down?

(5)   A Yes.

(6)   Q Do you see that? I'm looking right here (7) if you want to see my highlights.

(8)   A Okay.

(9)   Q Do you see the emergency department (10) course?

(11)   A That's right.

(12)   Q If I look at it, the time was 13:05.

(13)   A Yes.

(14)   Q And I believe that based upon your (15) observations, Mr. Magbie's condition had improved at (16) that point. Is that correct?

(17)   A Right. Right.

(18)   Q Now, right above that, does it say, (19) "Awake"?

(20)   A Yes.

(21)   Q So he was awake at that time. Is that (22) correct?

Page 73

(1)  A Yes.

(2)  Q And at that point, as of 13:05, Mr. (3) Magbie's condition had improved and that he was awake (4) at that time –

(5)  A Right.

(6)  Q Did you expect him to survive his hospital (7) course at that time?

(8)  MS. JOHNSON:  Objection.

(9)  MS. HANRAHAN:  To the form.

(10)  BY MR. NEWSOME:

(11)  Q You can answer.

(12)  A Yes.

(13)  Q You did?

(14)  A Yes.

(15)  Q As of 13:05, did you believe that Mr. (16) Magbie was stable at that point?

(17)  MS. HANRAHAN:  Object to the form.  Go (18) ahead.

(19)  THE WITNESS:  Yes.

(20)  BY MR. NEWSOME:

(21)  Q If you look down where it says under (22) "Discuss with –" and it says, "– counsel." Do you

Page 75

(1)  A Okay.

(2)  Q Do you see that?  Do you see that, Doctor?

(3)  A I'm looking for it.  Okay.

(4)  Q Are you there, Dr. Iluyomade?

(5)  A Yes, I'm there.

(6)  Q Okay.  If we look at the additional (7) treatment.  Do you see that?  And it talks about a (8) trachea toilet.  Is that correct?

(9)  A Yes.

(10)  Q Okay.  Now, as I look at that, it doesn't (11) have a frequency, does it?

(12)  A No, it doesn't.

(13)  Q Okay.  There is nowhere on this chart that (14) says a trachea toilet that you'd given PRN.  It (15) doesn't say it on the chart does it?

(16)  A No.

(17)  MR. ANDERSON:  What page are you on?

(18)  MR. NEWSOME:  Well, my Bates page is 10.

(19)  MR. ANDERSON:  Ten.  Okay.

(20)  MR. NEWSOME:  It's right at the top.

(21)  MR. ANDERSON:  Sorry.

(22)  MR. NEWSOME:  No.  That's all right.

Page 74

(1)  see that?  Look right here.  Do you see that?  If you (2) look down it says, "Counsel," patient is circled.  Can (3) you see that?  Does everybody see that?

(4)  MS. JOHNSON:  Yes.

(5)  THE WITNESS:  Yes.

(6)  BY MR. NEWSOME:

(7)  Q If you look at that it says that you (8) actually counseled Mr. Magbie about his lab results (9) and his diagnosis.  Is that correct?

(10)  A Correct.

(11)  Q So at that time you actually would have a (12) conversation with Mr. Magbie and you believed that he (13) understood you.  Is that correct?

(14)  A I believe so.

(15)  Q And that was at looks like around 13:10, (16) I believe.

(17)  A Or thereabouts.

(18)  Q Thereabouts?

(19)  A Yes.

(20)  Q Let's look at your orders again, and I've (21) got mine Bates stamped, but if you look at your (22) emergency department physician order form.

Page 76

(1)  That's why I did it with the Bates.

(2)  BY MR. NEWSOME:

(3)  Q Now, when you write orders, nurses or the (4) doctors, other people will look at these orders.  Is (5) that correct?

(6)  A Right.

(7)  Q And when they look at orders, they will (8) determine what should be done.  Is that correct?

(9)  A Right.

(10)  Q And a lot of times the order will say (11) who's supposed to do it.  Is that correct?

(12)  A No.

(13)  Q Who carries out the orders?

(14)  A They know who carries out.  The nurse (15) looks at the orders and knows whether it's for them or (16) whether they need to call to get it done.

(17)  Q Well, let me ask you this, Dr. Iluyomade: (18) You said that, even though it doesn't say this in the (19) record, that the orders for trachea toilet were to be (20) done as needed or PRN?

(21)  A Yes.

(22)  Q Now, I take it you certainly wouldn't rely

### Page 77

(1) on the nursing staff to determine when a trachea (2) toilet would be needed, would you?

(3) **A Oh definitely. They are well-trained (4) nurses who can assess whether these patients are (5) gurgling, you know, and whether he needs, you (6) whether he needs toilets, definitely I think so. (7) Respiratory therapists even can determine, you know, (8) the need, you know, and sometimes even advise whether (9) his patient is making a lot of noises or secretions (10) are coming out of the trachea tube and they will take (11) the initiative to suction the patient.**

(12) Q So I take it that you would totally take (13) you or a physician out of the process as to (14) determining when a trachea toilet was necessary?

(15) MS. JOHNSON: Objection to form.

(16) MR. NEWSOME: That's a question.

(17) MS. JOHNSON: Objection to form. Improper (18) opinion sought, too.

(19) MR. NEWSOME: Okay. Let me just make this (20) clear: If you have an objection to form, please just (21) make the objection to form –

(22) MS. JOHNSON: I did, sir.

### Page 78

(1) MR. NEWSOME: – and we don't need to make (2) any other comments.

(3) MS. JOHNSON: I'm entitled to tell you why (4) the form is incorrect –

(5) MR. NEWSOME: Ma'am, you are protected –

(6) MS. JOHNSON: – and I just did.

(7) MR. NEWSOME: – for any form objection. (8) I don't need clarification. Objection to form is (9) perfectly appropriate, I understand it, it's (10) preserved, and that's all you have to do for the rest (11) of the deposition.

(12) BY MR. NEWSOME:

(13) Q Would you like me to repeat the question?

(14) **A Yes, please.**

(15) Q My question to you is: Is it your opinion (16) that when you were practicing back in Greater (17) Southeast back in September 2004, that you would not (18) have to be involved in determining whether or not a (19) trachea toilet was needed for a patient like Mr. (20) Magbie. You would rely upon either the nursing staff (21) or the respiratory therapist. Is that a true (22) statements?

### Page 79

(1) **A No.**

(2) MS. JOHNSON: Objection.

(3) THE WITNESS: Not at all.

(4) BY MR. NEWSOME:

(5) Q Okay. Well, if it's not written down and (6) you don't tell them –

(7) **A Oh, yes, I do tell them. I have that (8) written down.**

(9) Q You told me that nurses could do it on (10) their own, I thought.

(11) MS. JOHNSON: Hold on, hold on. Counsel, (12) you are now arguing with the witness. If you have (13) another question, ask it.

(14) MR. NEWSOME: Do you have an objection?

(15) MS. JOHNSON: Yes, I do and you are (16) arguing with the witness and don't argue with the (17) witness. Ask the next question.

(18) MR. NEWSOME: Well, I am asking the (19) question that I asked.

(20) MS. JOHNSON: No, you argued with him.

(21) MR. NEWSOME: Well, that's fine. You call (22) it what you want. I want an answer to my

### Page 80

(1) argumentative question.

(2) MS. JOHNSON: Well –

(3) MR. NEWSOME: Unless you're going to (4) instruct the witness not to answer.

(5) MS. JOHNSON: I may do that.

(6) MR. NEWSOME: Well, do it at your own (7) peril.

(8) MS. JOHNSON: It's not my peril. It's not (9) at my peril.

(10) MR. NEWSOME: I want to go on but –

(11) MS. JOHNSON: Just ask the question.

(12) MR. NEWSOME: – your objections are just (13) not really necessary.

(14) MS. JOHNSON: Ask the question.

(15) BY MR. NEWSOME:

(16) Q So do you need to be involved or can the (17) nurses make the determination on their own regarding (18) trachea toilets?

(19) **A Well, since this patient's on continuous (20) assessment nurses wouldn't have to tell me about what (21) they are about to do or about the situation, so even (22) if I was not there, they could come over and tell me**

Page 81

(1) this and I'll say, "Okay. Go ahead and do that." I (2) would approve everything that needed to be done.

(3)    Q Well, certainly if a trachea toilet had (4) been performed, you would expect for that to be (5) documented in the chart. Is that correct?

(6)    A By the person who did it?

(7)    Q Correct.

(8)    A I don't know. I don't know what their (9) guidelines are as far as – I mean, it would be nice (10) if it is, but I don't –

(11)  Q I want to know – sorry. I didn't mean to (12) cut you off.

(13)  A It would be nice if it is documented but (14) as far as respiratory therapists or where they have to (15) write or how much they have to write, I have no idea.

(16)  Q What I want to know, as an attending (17) physician in the emergency department at Greater (18) Southeast in September of 2004, did you expect that if (19) a trachea toilet had been performed that it would've (20) been documented in the record so that you and anyone (21) else would know?

(22)  A What I'm most interested in is to make

Page 82

(1) sure that when I ask for it that it is done, and it's (2) – I mean, they should document whatever they do, but (3) what is most important is that they do what I ask them (4) to do.

(5)    Q And the major way you would know it was (6) done is it would be documented in the chart. Is that (7) correct?

(8)    A That's one of the ways I would know.

(9)    Q And I believe you testified that at least (10) from 5:40, you were at Mr. Magbie's bedside the entire (11) time. Is that correct?

(12)  A Almost continuously, yes.

(13)  Q And even when you weren't at Mr. Magbie's (14) bedside, he was very close and you could see him the (15) entire time he was in the emergency department. Is (16) that correct?

(17)  A That's correct.

(18)  Q While you were monitoring Mr. Magbie and (19) you saw that his oxygen saturations were decreasing, (20) what did you determine was the cause of the declining (21) oxygen saturation levels at the time? What did you (22) determine was the cause of that?

Page 83

(1)    A The cause – secretions in his airway are (2) one of the primary things that you worry about. If he (3) was under the influence of any kind of drugs which we (4) reversed with nitrain and we may not have completely (5) reversed it and it could be reverting back to the (6) influence of the drug. Those are two main things that (7) I worry about that – of course, if his pulse (8) oxygenator machine was not monitoring appropriately, (9) that's another thing. You have to adjust it, change (10) the site, things like that.

(11)  Q Any reason to believe that the pulse ox (12) machine was not working properly on September 24, (13) 2004?

(14)  A No reason to believe that.

(15)  Q Okay. Now, can we agree that a ventilator (16) would've been helpful to assist Mr. Magbie in his (17) breathing at the time that his oxygen saturations were (18) decreasing?

(19)  A Yes, it's possible. Yes.

(20)  Q Okay. Was there a ventilator available on (21) September 24, 2004 while Mr. Magbie was in the (22) emergency department?

Page 84

(1)    A I can't say yes or no. I'm sure that it's (2) possible to get a ventilator, you know, at any time.

(3)    Q If you needed one, you could've gotten it?

(4)    A Yes.

(5)    Q You had noted that even though Mr. Magbie (6) stayed in the emergency department, at least there was (7) decision made to admit him, I believe, at around 1:20. (8) Is that correct?

(9)    A Yes. Well, that's the last – yes, that's (10) the note.

(11)  Q Around that time at least?

(12)  A Yes.

(13)  Q Well, why is that Mr. Magbie was not (14) admitted. I believe he was there for several other (15) hours.

(16)  A That's administrative that I can't (17) determine.

(18)  Q Do you know why?

(19)  A No, I don't know why.

(20)  Q Did you expect Mr. Magbie to be admitted (21) sooner?

(22)  A Yes.

Page 85

(1) Q Talk about when you were at the bedside (2) around, I believe, 5:40, and you said you noticed that (3) his trach was protruding?

(4) A Yes.

(5) Q And you said you pushed it back in.

(6) A Yes.

(7) Q Tell me exactly what you did. Every step (8) you took. What you did when you noticed that the (9) trach was protruding.

(10) A I was at the bedside and pushed it back. (11) It was effortless without any resistance.

(12) Q Okay. Did you know – strike that. Do (13) you know how long Mr. Magbie's trach had been (14) protruding?

(15) A Well, it was still in the airway. It was (16) just a matter of – and this is not a terribly unusual (17) thing to see the trach moving a few inches, you know, (18) depending on – so I don't know how long. I don't (19) know how long it was protruding.

(20) Q Okay. All right. Now, you examined Mr. (21) Magbie and you observed him in the emergency (22) department for several hours.

Page 86

(1) A Yes.

(2) Q When is the first time that you believed (3) Mr. Magbie was in danger of not surviving?

(4) A When's the first time I determined that he (5) was in danger of not surviving?

(6) Q Correct.

(7) A When I knew that his oxygen was dropping (8) to levels that were unacceptable.

(9) Q And please tell me what time that was.

(10) A That would be at 17:40.

(11) Q At 17:40 you believed that Mr. Magbie may (12) not survive?

(13) A He was in – was getting into trouble. I (14) couldn't determine his survivability definitely, but (15) I knew he was getting into trouble if we didn't (16) reverse this oxygen or determine what was causing it.

(17) Q Okay. Did you ever, at any point during (18) the time you were providing care and treatment of Mr. (19) Magbie, did you ever consider putting him on the (20) ventilator?

(21) A Well, I was – I could see he was stable (22) and oxygenated very well as far as I knew until the

Page 87

(1) time that I was called, so it's something which I knew (2) he may be needing at some point in the hospital, but (3) while he was with me in the emergency department, I (4) didn't think that he needed it up until the time (5) things started to get critical.

(6) Q I know you hadn't reviewed Mr. Magbie's (7) earlier records from Greater Southeast, but you had (8) know that Mr. Magbie had utilized the ventilator prior (9) to the time you saw him. Could that have impacted (10) your decision on whether or not to place him on a (11) vent?

(12) A Well, it was while I was taking care of (13) him up until that time, 15:40. It wouldn't probably (14) have changed my treatment but I would know that at (15) some point in his stay in the hospital he would need (16) it.

(17) Q Okay.

(18) A Definitely he would need it.

(19) Q Certainly at the time when you believe he (20) was getting in trouble, if you had had the prior (21) knowledge that Mr. Magbie used a vent in the past, (22) that certainly would've impacted your decision as to

Page 88

(1) whether or not to use it at the time you believe he (2) was getting in trouble. Is that true?

(3) MS. JOHNSON: Objection to form. Go (4) ahead.

(5) THE WITNESS: It's at this point when I (6) was intervening, we were doing it manual so really we (7) wouldn't put him on a vent until we had stabilized the (8) situation and then the vent would be something he (9) would be put on.

(10) BY MR. NEWSOME:

(11) Q Earlier, you were having a conversation (12) earlier in the day, around 1:00, 1:10 or so –

(13) A Yes.

(14) Q You were having a conversation with Mr. (15) Magbie. Is that correct?

(16) A Yes, well, the records indicate so, yes.

(17) Q Sure. Would he have been talking back to (18) you?

(19) A No. He could not verbalize.

(20) Q Okay. But he was responding?

(21) A Yes.

(22) Q He understood you?

Page 89

(1)  A Yes.

(2)  Q He was alert enough to understand what you (3) were saying?

(4)  A Right.

(5)  MR. NEWSOME:  I don't think I have anymore (6) questions.  Thank you, Dr. Iluyomade.

(7)  MR. ANDERSON:  I have questions unless (8) somebody else has questions.  All right. (9) REDIRECT EXAMINTION

(10) BY MR. ANDERSON:

(11) Q There are a couple of things I wanted to (12) ask you about.  This one her that says, "Nursing (13) progress note."  The 1740 entry, it says, "Trach (14) protruding out one and a half inches from neck. (15) Dressing under trach collar." And so I wanted to ask (16) you, like, when you were answering his questions, you (17) had said that it was still in his airway; it just (18) wasn't as far in as it should've been.  Is that right?

(19) A Yes.

(20) Q And so when it says, "One and a half (21) inches from neck," what's the nurse talking about (22) there?

Page 90

(1)  A Well, that's the nurse writing.  What I (2) know I saw was that it was protruding from the (3) orifice, the hole, where the neck – what the nurse is (4) writing, I guess it's the same thing that I (5) determined.

(6)  Q Protruding from the hole, but –

(7)  A Yes.  This is an established airway, where (8) the trachea is.

(9)  Q So it's not as deep as it should be?  Is (10) that what you're saying?

(11) A Ideally, it should be sitting flush (12) against the neck with the dressing holding it down. (13) So if it's, you know, not sitting flush than, you (14) know, you want it to be there, especially with the (15) pulse ox changing, we didn't know how much or what (16) effect that could be having on the pulse ox, so –

(17) Q So just so I understand exactly what it (18) is, it's like – like there's some appendage that (19) sticks into your body and it should be at least an (20) inch and a half into your body because it was an inch (21) and a half out when you noticed it.

(22) A No, no.  It's actually much longer than

Page 91

(1) that and the whole thing, probably about four inches (2) long.

(3)  Q Into your body?

(4)  A Correct.  Only a part of it was (5) protruding.

(6)  Q And so that did not effect his supply of (7) oxygen –

(8)  A No.

(9)  Q – the fact that it was an inch and a half (10) out?

(11) A Not really.  I didn't think it would, but (12) it was something that had to be taken care of under (13) the circumstances.

(14) Q And then it says that the dressings are (15) under trach collar.  What's that mean?  What's a trach (16) collar?

(17) A It's a collar.  It's what you use to (18) secure the trach to the neck.  It goes around the neck (19) and it goes through some loops and it holds the main (20) chamber down to the neck.

(21) Q So that's not a significant entry?

(22) A No, no.

Page 92

(1)  Q They're just saying some gauze bandages (2) under that particular –

(3)  A Well, there may be some gauze bandages (4) under it, all around it, but the main thing is the (5) collar that goes around to secure, to hold it in place (6) and that could be loose sometimes.

(7)  Q And so there was a couple other things I (8) wanted to ask you, would a ventilator have addressed (9) the situation where somebody is not getting adequate (10) oxygen because of secretions or drugs?

(11) A No.

(12) Q You had said he had asked you if you (13) considered a ventilator and then there was some more (14) talk, and then I wanted to ask you, if he had been put (15) on a ventilator does that address the problem that you (16) would have for secretions or the drugs?  Those are the (17) two things you thought he might have, right?

(18) A Not at all.  It would not address the (19) problem of secretions or drugs.  The treatments we (20) gave would address those particular – the trachea (21) toilet and the medication narcan and stuff that we (22) gave him.  That's what would address those two

BSA                    07/19/06: Scott v D.C.: Depo: Rotima Iluyomade, MD

Page 93                                                                                    XMAX(24)

(1) problems.

(2)  Q And so the ventilator doesn't help if you (3) have secretions?

(4)  A No. We'd have to suction out the (5) secretions. The ventilator would not help without (6) clearing the airway first.

(7)  Q And so the ventilator, it pushes the air (8) into the lungs at a certain pressure?

(9)  A Yes.

(10) Q And if the problem with your oxygenation (11) is secretions, than pushing it in harder does not (12) help?

(13) A Well, it would have to go through the (14) obstruction maybe to be efficient and it may not be (15) able to go through a lot of mucous and whatever junky (16) stuff that's in the airway, so you have to get them (17) out of the way so that the oxygen can have free (18) exchange in and out.

(19) Q And so, like, between I guess 7:40, when (20) you first became concerned about him and –

(21) A 5:40.

(22) Q What?

---

Page 95

(1) notation?

(2)  Q It's at the very end of the 17:40 line.

(3)  A Okay. Thank you.

(4)  Q It says, "NAD," and then I guess that's (5) the person's signature.

(6)  A Okay. Yes. I guess that's

(7)  MR. TEMPLE: What Bates are you referring (8) to?

(9)  MR. ANDERSON: You know, I'm looking at (10) the one that doesn't have the Bates. It's the one (11) with the nursing assessment.

(12) MR. NEWSOME: It's Bates 14.

(13) THE WITNESS: Yes. Okay.

(14) BY MR. ANDERSON:

(15) Q And the trachea toilet, those are the same (16) thing, right?

(17) A Not all – not exactly the same thing, but (18) it all goes together, same thing.

(19) Q What does the trachea toilet mean? What (20) do you do when you –

(21) A You could just suction a patient. You put (22) a suction tubing and you suck stuff out and toilet you

---

Page 94

(1)  MS. JOHNSON: 5:40.

(2)  BY MR. ANDERSON:

(3)  Q 17:40. 17:40 and the time that he died, (4) what was the therapy that you were doing to kind of (5) reverse the pattern that was developing there?

(6)  A Trachea toilet, high-flow oxygen, attempt (7) to determine another blood gas, and also at some (8) point, you know, just making sure that once we cleared (9) the airway we give as much oxygen as necessary to him. (10) He was still breathing.

(11) Q You know, the entries there, they have (12) "NAD." Does that mean not acute distress or something (13) like that?

(14) A Yes.

(15) Q So even –

(16) A No apparent distress.

(17) Q No apparent distress. So even at 17:40 (18) when he begins to turn, he's not in distress then?

(19) A Well, I don't know what – what I (20) understand that to mean is that he was not gasping for (21) breath or showing signs of having difficulty, gasping (22) for breath is what I would – and where is that

---

Page 96

(1) would do a little more – put some saline down, (2) actually suction him out vigorously and do a few other (3) things.

(4)  Q The saline tube dissolved the secretions (5) and then suck it out?

(6)  A Well, it makes it easier to suck it out. (7) It makes it easier.

(8)  Q And how far down does that go down your (9) throat into your body?

(10) A The suction? Pretty far.

(11) Q And then the mucous is what? Do they (12) measure that when you take it out, or they just throw (13) it away, or –

(14) A No they don't. They just suction it out (15) and it goes into a suction container. And if it (16) needed to be tested, we can send specimens to the lab (17) to be tested for bacteria and things like that.

(18) Q The tube that he was breathing through, (19) did it just pass through flesh or was there some, (20) like, aperture on his body that –

(21) A Yes. I mean –

(22) Q Like, the tube went into his – the

---

Page 97

(1) tracheotomy, it went into his body, right?
(2)  A Yes.
(3)  Q And then did it just go into flesh or was (4) there like a ring there that was holding it, or how (5) did that work?
(6)  A Well, it's two things, you know, you have (7) one and then you have another one. It's like –
(8)  Q You have, like, a plastic circle there –
(9)  A Right. Plastic. Yes.
(10) Q – on his body?
(11) A Um-hmm.
(12) Q And that's –
(13) THE COURT REPORTER: Is that a yes?
(14) THE WITNESS: On his body. What?
(15) THE COURT REPORTER: I need you to answer (16) yes or no.
(17) THE WITNESS: Okay. Say that question (18) again.
(19) MS. JOHNSON: Objection to form.
(20) BY MR. ANDERSON:
(21) Q You have a plastic device that is attached (22) to his body –

Page 98

(1)  A Yes.
(2)  Q – or is it just there?
(3)  A It's – well, the old tracheostomy set-up (4) is plastic – everything from outside to inside. It's (5) a whole plastic device, about that long (indicating) (6) with an outside appendage that stays out here to hold (7) it in and the rest of it is the tube that goes right (8) inside the trachea.
(9)  Q And then you pull that off and then stick (10) the tube in to suction and then put it back on.
(11) A Yes.
(12) Q Do you think that his infection or his (13) pneumonia, either of those two things could be (14) contributing to his secretions?
(15) A The pneumonia, I don't know for sure. (16) It's very common that patients with tracheostomy have (17) secretions. That's one of the problems that they (18) generally present with to the emergency department or (19) even ventilatored patients, they have difficulty. And (20) his, he was paralyzed, so he probably would have (21) difficulty clearing his airway anyway, so he would (22) need almost all the time, you know, assistance in

Page 99

(1)  clearing his airway almost as part of his continual (2) care. That's what I do.
(3)  Q So it's not like the pneumonia was, like, (4) making, like, pus or anything like an infection?
(5)  A Not what I saw in the x-ray. I don't (6) think it was pus. I don't think it was a pus (7) containing, kind of, infection. It was more lateral (8) and I don't think it was contributing. I didn't think (9) that it was contributing to this, but it could've (10) been, but I didn't think it was.
(11) Q Do you know how long in this process, I (12) guess between 17:40 and the time he died, was he (13) conscious? When did he lose consciousness.
(14) A I can't really determine exactly when he (15) lost consciousness, but of course when he stopped (16) breathing, according to the note, then when I examined (17) him is what I can say, you know, by notes. I examined (18) him and there was no pulse, no respiration.
(19) Q That's when you did the code thing.
(20) A Yes. That's why I can say that he was (21) unconscious by my exam at that time.
(22) Q By the code. And so to die from this

Page 100

(1)  particular problem, is he just going to, like, lose (2) oxygen and go to sleep, or is this going to be (3) uncomfortable, or can you say?
(4)  A What problem?
(5)  MS. JOHNSON: Object to the form.
(6)  BY MR. ANDERSON:
(7)  Q Well, I guess he has a decreasing (8) oxygenation. Is he just going to get drowsy and go to (9) sleep or is he going to be –
(10) A I don't know whether that's what he died (11) of, you know.
(12) Q Oh. You don't know if the oxygenation was (13) what killed him?
(14) A I don't know. I just know that he had, (15) you know, his oxygenation was not adequate and we had (16) to address it, but I don't what he died of or why he (17) died.
(18) Q When the oxygenation goes down, like, then (19) do you lose consciousness? Is that what happens? You (20) kind of like don't have –
(21) A He may lose consciousness, yes.
(22) Q He goes to sleep?

## Page 101

(1) **A If the gets to a certain point, he may** (2) **lose consciousness.**

(3) Q He'd go to sleep, kind of?

(4) **A Asleep?**

(5) Q Yes. Just kind of like black out.

(6) **A I guess if he gets to a certain level you** (7) **would, yes.**

(8) Q And so is that going to be distressing, or (9) is that painful, or do you have an opinion on it?

(10) **A I think the process before you get to that** (11) **point, you know. But once you're unconscious, you** (12) **don't know. I don't know if you're feeling anything** (13) **at that point, or if you are you could be still** (14) **feeling some – if he was showing signs of distress** (15) **which, according to the notes, there was no gasping or** (16) **anything, so he didn't appear to be suffering prior to** (17) **this what happened. But his oxygen was dropping for** (18) **some reason, but he was not showing signs of** (19) **suffering, if you want to use the word suffering.**

(20) Q I guess you were watching him until the (21) end, so you –

(22) **A Absolutely.**

## Page 102

(1) Q You know, I totally missed this where the (2) suction was ordered and it was or was not PRN. Can (3) you show me on here where it says, "Do the (4) suctioning"?

(5) **A Suctioning. Trachea toilet.**

(6) MS. JOHNSON: Trachea toilet.

(7) BY MR. ANDERSON:

(8) Q Oh. Okay. I was thinking that was some (9) drug. That says "trachea toilet." And then when the (10) nurses that do stuff, do they write it down somewhere (11) or no?

(12) **A They have notes that they write, yes.**

(13) Q Oh. But it's not here.

(14) MS. HANRAHAN: Another objection. It's (15) signed off there.

(16) MR. ANDERSON: For the trachea toilet?

(17) MS. HANRAHAN: Yes.

(18) MR. ANDERSON: On this note here?

(19) MS. HANRAHAN: Yes.

(20) MR. ANDERSON: Or a different one? Oh, I (21) see. This little thing here in the right-hand column, (22) that is showing that the nurse did it.

## Page 103

(1) THE WITNESS: Yes.

(2) BY MR. ANDERSON:

(3) Q And that's the time, 11:40, that that (4) person would've done it?

(5) **A That's the time they signed it. It's** (6) **something they would do and then, you know, sign or** (7) **write a note or whatever, after that.**

(8) Q Okay.

(9) MR. ANDERSON: That's all my questions.

(10) MS. HANRAHAN: I have questions.

(11) MR. CONNOR: I have a couple.

(12) MS. HANRAHAN: Not if they can't come down (13) on paper. He was outlawed.

(14) BY MR. CONNOR:

(15) Q Would you agree, Dr. Iluyomade, that it (16) would be more difficult to observe reactions to pain (17) in a quadriplegic patient versus an able-bodied (18) patient?

(19) **A A quadriplegic patient who is conscious?**

(20) Q Yes.

(21) **A I don't think so.**

(22) Q Well, are they going to crash?

## Page 104

(1) **A They don't have to crash.**

(2) Q What?

(3) **A They don't have to crash. Crashing would** (4) –

(5) Q They can't crash, right?

(6) **A They can't crash but they can definitely** (7) **indicate that they're uncomfortable and in pain and** (8) **this patient was capable of communicating.**

(9) Q So it's your testimony that he wasn't in (10) pain –

(11) **A Not that we could determine.**

(12) Q – at the end of life?

(13) **A We could not determine that he was having** (14) **any distress.**

(15) Q Is he smiling?

(16) **A No. But he was not gasping for breath.**

(17) Q If I understand your testimony correctly (18) that the one and a half protrusion of the trach tube (19) was not significant?

(20) **A Yes.**

(21) Q That's your opinion?

(22) **A That's my opinion.**

Page 105

(1) Q Have you seen the autopsy report in this (2) case?

(3) A Yes.

(4) Q You're aware that the medical examiner (5) found the cause of death to be the dislodgement of the (6) trach tube?

(7) A That's what's written on the autopsy.

(8) Q You don't agree?

(9) A I don't agree.

(10) Q You think it was either decompensation due (11) to secretions building up in the trachea or a drug (12) reaction?

(13) A I really don't want to make, if I don't (14) have to, make any determination at all, conjecture as (15) to what happened.

(16) Q Well you conjectured that he had no (17) suffering.

(18) A Well, it's – the notes show that he was (19) not in apparent distress, so I'm going by that and of (20) course what I remember.

(21) Q And he was conscious, I think you said.

(22) A Most of the time.

Page 106

(1) Q Would he have been conscious that he was (2) about to run out of breath?

(3) A Would he have been conscious? Yes. It's (4) possible.

(5) Q A conscious human being with a functioning (6) brain would realize that they're about to stop (7) breathing?

(8) MS. JOHNSON: Objection.

(9) THE WITNESS: Would he be conscious until (10) the end? Yes. It's possible. At the point where he (11) becomes unconscious, I really, you know, don't know. (12) He could be conscious one moment and unconscious the (13) next.

(14) BY MR. CONNOR:

(15) Q Would there be any potential side effects (16) from the administration of narcan in a patient like (17) this?

(18) A No.

(19) Q I couldn't hurt?

(20) A No.

(21) MR. TEMPLE: Can we take a two-minute (22) break?

Page 107

(1) (Whereupon, a short break was taken.)

(2) MR. CONNOR: I have no further questions.

(3) MS. JOHNSON: We'll read and sign.

(4) (Whereupon, the taking of the (5) above entitled deposition was (6) concluded, signature not having (7) been waived.)

(8) (Whereupon, at 3:18 p.m. the foregoing (9) matter was adjourned.)