**Mary R. Scott, et al. V. District of Columbia, et al.**
**United States District Court for the District of Columbia**

**05CV01853**

**Exhibit No. 6**



## Page 1

(1)
(2)  IN THE UNITED STATES DISTRICT COURT
(3)  FOR THE DISTRICT OF COLUMBIA

(4)  In the matter of:
(5)  MARY R. SCOTT,
(6)      Plaintiff,          Case No.
                            05-cv-1853 (RWR)
(7)  v.
(8)  DISTRICT OF COLUMBIA, et al.,
(9)      Defendants.
(10)

(11)                    Washington, D.C.

(12)                    Thursday,
(13)                    June 15, 2006

(14)  DEPOSITION OF:

(15)                  MALEK MALEKGHASEMI

(16)  called for examination by counsel for the Plaintiff,
      pursuant to subpoena, at 9:30 a.m. at the offices of
(17)  the National Prison Project of the ACLU, 915 15th
      Street, NW, 7th Floor, Washington, D.C. when were
(18)  present on behalf of the respective parties:
(19)
(20)
(21)
(22)

## Page 3

(1)      On Behalf of Drs. William Vaughn and
(2)      Rotimi Iluyomade, Defendants:

(3)      JUAN M. ANDERSON, ESQ.
         (present telephonically)
(4)  Of:   Bonner, Kiernan, Trebach & Crociatta, LLP
           1250 Eye Street, NW, Suite 600
(5)        (202) 712-7000

(6)      On Behalf of Corrections Corporation of
(7)      America & P. Singley:
         SHANNON IWANYI, ESQ.
(8)  Of:   Jones, Skelton & Hochuli, PLC
           2901 N. Central Avenue, Suite 800
(9)        Phoenix, AZ 85012
           (602) 263-7323
(10)     On Behalf of the Greater Southeast
(11)     Community Hospital, Defendant:

(12)     ALAN J. RUMSEY, ESQ.
(13) Of:   Wilson, Elser, Moskowitz, Edelman &
           Dicker, LLP
           1341 G Street, NW, Suite 500
(14)       Washington, DC 20005
           (202) 626-7660
(15)     On Behalf of the District of Columbia
(16)     and O. Washington, Defendants:

(17)     STEVEN J. ANDERSON, ESQ.
         Office of Corporation Counsel
(18)     441 Fourth St. NW, Suite 600S
         Washington, DC 20001
         (202) 724-6607
(19)
(20)
(21)
(22)

## Page 2

(1)  APPEARANCES:
(2)      On Behalf of Mary Scott, Plaintiff:
(3)      ELIZABETH ALEXANDER, ESQ.
         National Prison Project
(4)      of the ACLU Foundation
         915 15th Street, NW, 7th Floor
(5)      Washington, DC 20005
         (202) 393-4930
(6)

(7)      EDWARD J. CONNOR, ESQ.
         5210 Auth Road, Suite 304
         Camp Springs, MD 20746
(8)      (301) 899-7801
(9)      DONALD M. TEMPLE, ESQ.
     Of: Temple Law Offices
(10)     1229 15th Street, NW
         Washington, DC 20005
(11)     (202) 628-1101
(12)

(13)     On Behalf of the Correctional Health &
         Policy Studies, Inc., and Drs. T.
(14)     Wilkins Davis, Malek Malekghasemi,
         Sunday Nwosu, and Joseph Bastien,
(15)     Defendants:

(16)     ANDREW J. SPENCE, ESQ.
     Of: Hamilton Altman Canale & Dillon, LLC
(17)     10306 Eaton Place, Suite 200
         Fairfax, VA 22030
         (703) 591-9700
(18)
(19)
(20)
(21)
(22)

## Page 4

(1)  I-N-D-E-X
(2)  WITNESS:  DIRECT CROSS REDIRECT RECROSS (3) M.
Malekghasemi 5 107 133 ---

Page 5

(1) P-R-O-C-E-E-D-I-N-G-S
(2)    (9:30 a.m.)
(3) WHEREUPON,
(4)    MALEK MALEKGHASEMI (5) was called for examination by counsel for the (6) Plaintiff and, having been first duly sworn, was (7) examined and testified as follows:
(8)    DIRECT EXAMINATION
(9)    BY MS. ALEXANDER:
(10) Q Could you please state your full name?
(11) A Malek Malekghasemi.
(12) Q And your business address?
(13) A My business address was 1901 E Street, SE, (14) Washington, D.C.  That was D.C. Jail.
(15) Q That was what?
(16) A I'm sorry.  1901 E – as in Edward – (17) Street, SE, Washington, D.C., 20003.  That was (18) Correctional Treatment Facility, CTF.
(19) Q What's your current occupation?
(20) A I'm a physician.
(21) Q And where are you currently working?
(22) A Right now I'm working part time at Fairfax

Page 6

(1) County.
(2)    Q Fairfax County Hospital?
(3)    A Fairfax County Detention Center.
(4)    Q What's your current job title?
(5)    A Physician, staff physician.
(6)    Q You understand that you are a Defendant in (7) this case?
(8)    A Yes.
(9)    Q And you understand that this case involves (10) events regarding the death of Jonathan Magbie?
(11) A Yes.
(12) Q What documents have you reviewed in (13) preparation for this deposition?
(14) A I'm not sure but the medical records.  (15) That's it.
(16) Q Mr. Magbie's medical records?
(17) A Yes.
(18) Q Okay.  Have you given anyone other than (19) your lawyer an oral or a written statement about the (20) events surrounding the death of Jonathan Magbie?
(21) A I had talked to D.C. Inspector General and (22) that's the only one I remember besides my attorney.

Page 7

(1)    Q Could you summarize your education (2) background, that is, college, medical school, (3) residency, so forth?
(4)    A I went to college in Washington, D.C. an (5) American university and then I went to medical school (6) in Dominican Republic and I did my residency at D.C. (7) General Hospital in Internal medicine.
(8)    Q Okay.  Did you take the foreign medical (9) graduate exam?
(10) A Yes.
(11) Q And did you pass all parts of it?
(12) A Yes.
(13) Q And are you board eligible?
(14) A Yes.
(15) Q Are you board certified?
(16) A No.
(17) Q Could you summarize your employment (18) history prior to your employment at CTF?
(19) A From the time I finished my residency I (20) have worked in Corrections since 1995.
(21) Q So you started working in Corrections at (22) CTF?

Page 8

(1)    A I started working at Corrections in (2) Lorton, originally, when Lorton was open.
(3)    Q I see.
(4)    A First as a contractor and then I became an (5) employee of the D.C. government for a very brief time, (6) maybe less that two months.
(7)    Q And the what happened?
(8)    A Then I was hired by the receivership for (9) D.C. Jail medical services and after that I became the (10) medical director at CTF.  When the medical management (11) at CTF changed hands, when it became a private (12) company, I left that place, I went back to D.C. Jail (13) as a senior physician.  Then –
(14) Q Can I –
(15) A Sure.
(16) Q – interrupt?  Do you recall when that (17) was?
(18) A I went back to D.C. Jail, I believe in (19) 2000, early 2000.
(20) Q So to make certain that I'm understanding (21) correctly what you're saying, you left CTF when the (22) Corrections Corporation of America took over running

BSA

06/15/06 MARY R. SCOTT v D.C. DEPO: MALEK MALEKGHASEMI

XMAX(3)

Page 9

(1) it?

(2)   A No. I left CTF and Correction Corporation (3) when they subcontracted it to Prison Health Services.

(4)   Q I understand. And then you went to the (5) D.C. Jail. Were you a direct employee of the D.C. (6) government or were you an employee of another medical (7) contractor?

(8)   A I became an employee of the CCHPS, Center (9) for Correctional Health and Policies Studies, CCHPS.

(10) Q And was that the entity that employed you (11) until you left the D.C. system?

(12) A Yes.

(13) Q Okay. In September 2004 what was your (14) position?

(15) A I was the associate medical director at (16) Correction Treatment Facility, CTF.

(17) Q Did you have any other position at the (18) same time with any other title?

(19) A No.

(20) Q I've seen documents in which you were (21) referred to as the chief medical officer of CTF. Was (22) that not correct?

Page 10

(1)   A I guess it's correct just by sheer – you (2) know, I was the medical authority at CTF, so I guess (3) that's how but, no. My official title was associate (4) medical director.

(5)   Q Thanks. To the best of your recollection, (6) how did you first become aware of the situation of (7) Jonathan Magbie?

(8)   A When I got a phone call from Mr. Magbie's (9) attorney. I forget the gentleman's name.

(10) Q Was that Mr. Cobbina, C-O-B-B-I-N-A? (11) A I think so.

(12) Q Okay. Do you know the date that you had (13) that conversation?

(14) A I believe it was a Wednesday, but I'm not (15) sure of the date.

(16) Q At that point, where do you understand (17) that Mr. Magbie was?

(18) A Later I found out that he's been at CTF (19) for maybe somewhere around two days. I'm not sure (20) exactly when. I think he came sometime late Monday.

(21) Q So your best recollection is that you knew (22) nothing about this situation until he had been in CTF

Page 11

(1) for two days?

(2)   A That's correct.

(3)   Q What exactly did Mr. Cobbina tell you?

(4)   A From what I recall, Mr. Cobbina told me (5) about Mr. Magbie, that he's a quadriplegic, that he (6) told me about his chart. He went on something about (7) how harsh this sentence was for somebody who was a (8) first offense position, etc. Then at the end of the (9) conversation he mentions about Mr. Magbie using a (10) ventilator at night. I don't know if she called it a (11) respirator or a ventilator, but something to that (12) effect.

(13) Q Could you explain for us what a ventilator (14) is?

(15) A A ventilator is a device that helps a (16) person to breath.

(17) Q And in connection with a quadriplegic, (18) what would be the need for a ventilator?

(19) A That is not my area of expertise, but some (20) quadriplegics, I guess, need it because of this (21) extreme muscle weakness that they have.

(22) Q Where in CTF was Mr. Magbie held?

Page 12

(1)   A He was held in the floor called the (2) infirmary, level 82.

(3)   Q Was the CTF infirmary capable of providing (4) a ventilator to someone who needed it?

(5)   A No.

(6)   MR. SPENCE: Did it have one or was it (7) capable? I'm not sure what your question was.

(8)   BY MS. ALEXANDER:

(9)   Q Let me clarify. A fair point. Did it (10) have a ventilator?

(11) A No.

(12) Q Did you have any concerns about housing (13) Mr. Magbie at the infirmary after you had the (14) conversation with Mr. Cobbina?

(15) A Yes.

(16) Q And what were those concerns?

(17) A Concerns were that I was not sure that we (18) could meet his medical needs.

(19) Q What, if anything, did you do with (20) information?

(21) A Well, I took the very unusual step of – (22) first I read his chart, because everything is

Page 13

(1) electronic, so all the medical information that was (2) available or produced for him, on him, was available (3) to me.

(4) And then I called the Judge because we had (5) the D.C. Jail, CDF had sent the gentleman, Mr. Magbie, (6) to the hospital and they voiced their concerns. And (7) Mr. Magbie was returned with instructions for getting (8) oxygen via nasal cannula, two liters PRM, which means (9) basically, as needed. And the hospital had spoken, so (10) I called the Judge's chambers and I spoke to her (11) clerk. It was a lady – again, I don't remember her (12) name – and she said she'll get back to me. And maybe (13) 20, 30, 40 minutes later she called me and said Judge (14) will not issue such an order.

(15) Then I called the Department of (16) Corrections and to Ms. Baldwin-White's office and I (17) asked them to see if they can. I spoke to an (18) assistant that they can somehow do something about (19) this. I never got a phone call. (20) So then I called Dr. Nwosu, which was the (21) attending physician for that floor, and I asked him (22) how's the patient doing. He assured me that the

Page 14

(1) patient is stable. And I asked him if he needs (2) anything, ventilator and he said, "No, he's been fine. (3) He's been here for two days. He had no problems." (4) After that conversation, I still called – (5) what was the attorney's name? I'm sorry.

(6) Q Cobbina.

(7) A Mr. Cobbina, and because he had mentioned (8) something about a ventilator and a respirator and I (9) wasn't really sure what he was talking about. So I (10) said, "Whatever it is, tell Mr. Magbie's mother to (11) bring it over." And he told me that she can't do it (12) tomorrow but she'll be there on Friday – "tomorrow" (13) being Thursday. And that was the last thing that I (14) did at that day on behalf of Mr. Magbie.

(15) Q So all the conversations you've just (16) described took place, according to your memory, on (17) Wednesday?

(18) A Yes, ma'am.

(19) Q You mentioned briefly calling the office (20) of a Ms. Baldwin-White?

(21) A Correct.

(22) Q Who was she?

Page 15

(1) A Ms. Baldwin-White is the counsel for the (2) Department of Corrections.

(3) Q But she was not your counsel because you (4) worked for CCHPS?

(5) A That's correct.

(6) Q What was the nature of that conversation?

(7) A I asked – inquired about if they could (8) possibly help me to convince the Judge that this is (9) what I need to move this gentleman out of D.C. – out (10) of CTF to Greater Southeast Hospital.

(11) Q And what did she – you spoke directly to (12) Ms. Baldwin-White?

(13) A No. I spoke to an assistant.

(14) Q Was this a clerical assistant or another (15) lawyer, if you know?

(16) A No, I don't think it was a lawyer. I'm (17) not sure, but it was an assistant.

(18) Q And you said you never got a call back?

(19) A I did not get a call back.

(20) Q Have you ever spoken to Ms. Baldwin-White (21) before?

(22) A Yes, I have.

Page 16

(1) Q So she knew who you were?

(2) A Yes.

(3) Q Okay. Did you leave a callback number?

(4) A There is no need for that. They know. (5) They have my cell phone number and my office number.

(6) Q About how long was your first conversation (7) with Mr. Cobbina?

(8) A I'm not really sure. Five, six minutes.

(9) Q And your second conversation with him that (10) day?

(11) A Much shorter than that because I told them (12) whatever equipment that they use at home and they (13) should bring it over so I can look at it to see what (14) this equipment is.

(15) Q Other than what you've just described, did (16) you take any actions that day as a result of these (17) conversations?

(18) A No.

(19) Q But it was that day you read Mr. Magbie's (20) medical records?

(21) A Yes.

(22) Q And did you see in his medical records a

## Page 17

(1) notation that he needed a ventilator at night?

(2) A Frankly, I don't remember that.

(3) Q Okay.

(4) A I don't remember that.

(5) Q Did you ever have a conversation with Mary (6) Scott, Mr. Magbie's mother, directly?

(7) A The only conversation me and Ms. Scott had (8) was when she brought in the ventilator. That was on (9) a Friday around 10:00 o'clock.

(10) Q But that was a conversation in person?

(11) A Correct.

(12) Q You did not have a phone conversation?

(13) A No, I did not.

(14) Q Did you have any other conversations on (15) Wednesday with regard to Mr. Magbie?

(16) A Not that I recall.

(17) Q Now, tell me again. When did you first (18) read Mr. Magbie's medical record? What part of the (19) sequence was it that you read his record?

(20) A After I got a call from Mr. Cobbina.

(21) Q Between the first and second call?

(22) A I don't think I may have finished reading

## Page 18

(1) the whole thing, but I was reading it as the events (2) went on.

(3) Q Okay. And then the conversation with Dr. (4) Nwosu, was that in person or was that over the (5) telephone?

(6) A Over the telephone.

(7) Q On Wednesday, did you – where were you?

(8) A At CTF.

(9) Q Did you go over to the infirmary to see?

(10) A No, I did not.

(11) Q How far where you from the infirmary?

(12) A One floor.

(13) Q Okay. Did you see the medical record from (14) Greater Southeast that day?

(15) A At that point, I did not access medical (16) records from Southeast.

(17) Q So was it the case that there were no (18) records from Greater Southeast in the medical records (19) of Mr. Magbie that were available at the jail?

(20) MR. SPENCE: Objection. Go ahead and (21) answer. I believe he's already testified that there (22) was the order concerning the nasal cannula and the

## Page 19

(1) oxygen. That was in the chart.

(2) MS. ALEXANDER: Well, the record will (3) show, but the record –

(4) MR. SPENCE: Okay.

(5) MS. ALEXANDER:

(6) Q Could you answer the question?

(7) A What was the question again? I'm sorry.

(8) Q The question was: At that point, were (9) there any medical records from Greater Southeast that (10) were in the jail medical records, that is the CTF (11) medical record?

(12) MR. SPENCE: On Wednesday.

(13) BY MS. ALEXANDER:

(14) Q On Wednesday.

(15) A I would not know that because the only (16) access I had was to the electronic medical records, (17) what we had put in.

(18) Q So you would've had to have gone to the (19) infirmary to see if there were any hard-copy records. (20) Is that correct?

(21) A Correct.

(22) Q Okay. Did you make any attempt to get –

## Page 20

(1) on Wednesday, did you make any attempt to get the (2) medical records from Greater Southeast?

(3) A I personally did not make an attempt to (4) get the medical records, no.

(5) Q Let's go back to your conversation with (6) Dr. Nwosu. What did he tell you had been his (7) interaction with the patient, if any?

(8) A I did not specifically ask about his (9) interaction with the patient. I asked him if he has (10) a patient with this description on this floor, and he (11) said yes. And I said, "Is he stable?" He said yes. (12) Then we went on to tell me that he's been there for (13) two days with no problems and he doesn't need anything (14) specific or special. He's been stable.

(15) Q On Thursday, the next day, did you have (16) any dealings related to Mr. Magbie?

(17) A No.

(18) Q Through Thursday, did you at any point (19) contact Greater Southeast Hospital to attempt to get (20) Mr. Magbie readmitted to the hospital?

(21) A No, I did not.

(22) Q Did you attempt to do anything else to

### Page 21

(1) check on Mr. Magbie's condition through Thursday?

(2)  A No.

(3)  Q Did you ask anyone to do anything to check (4) on Mr. Magbie's condition?

(5)  A Mr. Magbie had an attending physician, so (6) the system provides a physician that is dedicated to (7) infirmary and once I'd spoken to him and he told me (8) his professional opinion, unless he needs me, I will (9) have no dealings with that patient until they need my (10) help in any which way that they may want.

(11)  Q Do you know whether Dr. Nwosu was on duty (12) on that Thursday?

(13)  A I don't remember.

(14)  Q If Dr. Nwosu was not on duty, was there a (15) policy that someone else should've been in the (16) infirmary?

(17)  A If there is not an infirmary physician for (18) whatever reason is not there, then one of the two -- (19) other two PAs or the other physician we have will (20) cover the infirmary.

(21)  Q Was it the policy of the infirmary that (22) rounds were to be made on a daily basis?

### Page 22

(1)  A Not on all patients, no, unless the (2) patient was acute. We had patients that were just for (3) the lack of better word, they were parked there (4) because they could not be housed anywhere else, so we (5) saw them maybe once every month. There were others (6) we're seeing once a week, there was others that were (7) seen every three days, and if they were very acute (8) they would be seen every day.

(9)  Q Was there a formal policy that reflected (10) the requirements for seeing a patient depending on the (11) degree of acuity?

(12)  A You know what? I don't remember seeing an (13) actual policy to be honest, on the infirmary rounds.

(14)  Q Well then let's go back to your (15) understanding of what the practice was. You said an (16) acute patient would be seen on a daily basis.

(17)  A That's correct.

(18)  Q And were there other categories? Could (19) you go back over the categories of patients?

(20)  A Acute would be somebody who may require or (21) may need medical attention or changes in medication on (22) a daily basis.

### Page 23

(1)  Q I'm sorry. That wasn't my question. My (2) question was: What were the other categories besides (3) acute.

(4)  MR. SPENCE: I'm not sure what -- in other (5) words, I'm going to object to the question because I (6) think he said that there was no formal policy (7) regarding the frequency --

(8)  MS. ALEXANDER: I asked about practice.

(9)  MR. SPENCE: Well, whose practice? His?

(10)  MS. ALEXANDER: No. He had testified that (11) this was first the policy and then the practice.

(12)  BY MS. ALEXANDER:

(13)  Q But if you could go on, what were the (14) other categories as you understood them regarding the (15) practice? Is someone was not acute, what were the (16) other categories that person might fall into?

(17)  MR. SPENCE: I'm going to object to the (18) question. If you can answer the question, go ahead.

(19)  THE WITNESS: The reason I'm saying this (20) because I used to be in charge of infirmary and that's (21) how I did it: Acute, sub-acute, chronic and basically (22) warehoused.

### Page 24

(1)  BY MS. ALEXANDER:

(2)  Q Okay. From the information you had at the (3) time, what category would you have placed Mr. Magbie (4) in?

(5)  MR. TEMPLE: Before you go there, can I (6) understand the last thing that you said after you said (7) "chronic"? Did you say "warehoused"?

(8)  THE WITNESS: Yes. The reason I'm saying (9) that is because these were people who would not be (10) housed anywhere else. There were times when (11) Correctional staff will bring somebody up to house (12) them in a single cell because they were disruptive. (13) A lot of females we brought up, if they were (14) disruptive, because the female cells have dry-wall, and (15) they could easily punch a hole in it.

(16) So when they were disruptive they would be (17) brought to the infirmary because that was the only (18) mixed-gender housing that they had that had concrete (19) or cinder block walls. Those, we call them (20) warehousing. They were there not because of medical (21) reasons; they were there because of security concerns.

(22) BY MS. ALEXANDER:

## Page 25

(1) Q Based on the information that you knew, (2) where would Mr. Magbie fall in those categories?

(3) A He would be a chronic.

(4) Q And would that include a person who needed (5) a ventilator at night?

(6) A At that point there was no mention of a (7) ventilator.

(8) Q You had not seen the entry in which he (9) indicated that he needed the ventilator?

(10) A As I said, I didn't recall that part.

(11) Q Okay. Let's assume that reflected in the (12) medical records, in fact, was a note that the (13) ventilator was required at night. What appropriate (14) category would Mr. Magbie have fallen into?

(15) MR. SPENCE: Objection.

(16) BY MS. ALEXANDER:

(17) Q Go ahead.

(18) A If Mr. Magbie required a ventilator he (19) should not be housed at Corrections.

(20) Q Okay. If he required a ventilator at any (21) time?

(22) A Any time.

## Page 26

(1) Q Okay. Now, what does the — could you (2) describe a little, as you did for the term "acute," (3) what you mean by the term "chronic care"?

(4) A We have chronic-care people who, let's see (5) — terminal patients, dementia, quadriplegics, (6) paraplegics, people who are deaf-mute, people who had (7) their larynxes removed and they could not speak, (8) people with limited vision, people who needed wound (9) care because of their chronic confinement to a bed or (10) a wheelchair, they would get bed sores. They needed (11) dressing changes. These are some examples of chronic.

(12) Q You said that one of the categories you (13) gave was quadriplegic. Can you tell us about the (14) experience of CTF housing quadriplegics that you were (15) aware of?

(16) A Frankly, the only one I can recall is Mr. (17) Magbie.

(18) Q Did you not tell someone who spoke to you (19) that you were aware of quadriplegics previously being (20) housed there, but it had been some time ago?

(21) A I don't recall that.

(22) Q Does that refresh your memory that there

## Page 27

(1) were, in fact, a time that quadriplegics have been (2) housed there that you were aware of?

(3) A No.

(4) Q How about paraplegics?

(5) A Yes, we have a lot of paraplegics.

(6) Q Okay. What's the difference between a (7) quadriplegic and a paraplegic?

(8) A A para would be waist down, quad would be (9) neck down, entire paralysis.

(10) Q In medical terms, what's the significance (11) for care of the difference?

(12) A Of course, quadriplegic requires more (13) personal attention.

(14) Q And why is that?

(15) A Because they're totally incapable of (16) carrying out activities of daily living. In other (17) words, they cannot feed themselves, bathe themselves, (18) dress themselves, move, etc.

(19) Q And they would experience more difficulty (20) in summoning help if they needed help?

(21) A Yes.

(22) Q And is it the case that at least some

## Page 28

(1) quadriplegics would be more prone to respiratory (2) disorders?

(3) A Medically speaking, yes.

(4) Q Now I'd like to ask you some questions (5) about the day that Mr. Magbie died and do you recall (6) what day of the week that was?

(7) A It was a Friday.

(8) Q Did you see Mr. Magbie that day?

(9) A I saw Mr. Magbie when he was — when EMS (10) arrived and I went upstairs and I saw him being (11) wheeled out.

(12) Q Okay. So he was in the process of leaving (13) at the point that you saw him?

(14) A That's correct.

(15) Q Do you recall what time of day that was?

(16) A It was somewhere before 10:00, because (17) right after Mr. Magbie left, Mrs. Scott — I think (18) that's Mr. Magbie's mother's name — I was called to (19) meet her downstairs, so somewhere around there. (20) Somewhere before 10:00 o'clock or around 10:00 (21) o'clock.

(22) Q How were you notified so that you went to

Page 29

(1) the infirmary?
(2) A Because somebody called an emergency, and (3) I always go to see what the emergency's about.
(4) Q What sort of emergency was called?
(5) A They just say medical emergency. They (6) don't specify. It's done over the speaker.
(7) Q Where was Mr. Magbie exactly when you saw (8) him?
(9) A When I saw him, they had wheeled him out (10) of his room and he was partially in the hallway while (11) D.C. EMS was attending to him.
(12) Q Was your medical staff involved in his (13) care at that point?
(14) A Yes.
(15) Q What was your staff doing?
(16) A My staff had found him unresponsive and (17) they had checked his pulse, oxygen saturation and it (18) was low, so they had suctioned him and had given him (19) oxygen, and when I got there his oxygenation, I (20) believe, was 97, 98 percent, so that issue had (21) resolved.
(22) Q Who do you recall from your medical staff

Page 30

(1) was actually there, present, around him?
(2) A I only remember the doctor was Dr. Desta, (3) but there were two or three nurses. I'm not exactly (4) sure who they were.
(5) Q Were these nurses people that you knew?
(6) A Yes.
(7) Q Do you know whether they were RNs or LPNs (8) or some other designation?
(9) A Either RN or LPN, but there were more than (10) one person there. I'm not exactly sure who was there.
(11) Q Do you recall the names?
(12) A No, I don't.
(13) Q What, exactly, were the emergency medical (14) services people, the EMS people doing?
(15) A Practically when I got there, they were (16) fumbling around trying to find out an oxygen tubing (17) that would fit Mr. Magbie's tracheostomy.
(18) Q We'll get back to that. Did you see or (19) smell urine of feces on Mr. Magbie or on his clothes (20) when you saw him?
(21) A No, I did not.
(22) Q Based simply on your observation, what was

Page 31

(1) his clinical status at the point that you saw him?
(2) A Physically he was stable, but he was (3) unresponsive to verbal stimuli.
(4) Q Did you observe any other attempt to see (5) if he was responsive to other stimuli?
(6) A Not that I recall, ma'am.
(7) Q Did he require immediate transport to a (8) hospital at the point that you saw him?
(9) A Because of his being unresponsive, yes.
(10) Q You said that the EMS staff were (11) attempting to attach tubing through his tracheostomy?
(12) A Correct.
(13) Q Okay. Was that – was it an Ambu bag, or (14) what exactly were they attempting to attach?
(15) A No. They were trying to disconnect him (16) from the oxygen that we were giving him to attach him (17) to the portable tank that they had.
(18) Q I see. I see. Did you have any direct (19) involvement with that issue of the oxygen tubing?
(20) A The only involvement I had was because (21) they were fumbling around too much, the EMS people. (22) Because I don't remember exactly, I think their tube

Page 32

(1) was too small or too large, so I finally got a (2) scissors and cut the tubing off of our oxygen supply (3) and gave it to them so they can hook him up and take (4) him.
(5) Q Let me make certain I'm picturing this (6) correctly. Where was the tubing that they were, as (7) you called it, "fumbling" around with? Where was (8) that?
(9) A In other words, you disconnect our tubing (10) and they were going to connect theirs, but their tube (11) would not fit because the tracheostomy was either too (12) small or too big – I'm not sure. The valve on the (13) trach was too small or too big.
(14) Q The tubing they were trying to connect was (15) directly to the tracheostomy.
(16) A Correct.
(17) Q Okay. What was the policy regarding the (18) completion of paperwork prior to transport of a (19) prisoner from the infirmary to the hospital?
(20) MR. SPENCE: On an emergent basis?
(21) MS. ALEXANDER: Well, let's just find out.
(22) MR. SPENCE: Okay.

### Page 33

(1) THE WITNESS: The doctor or the PA who's (2) making this transfer happen, takes a consult form and (3) writes on it that patient's information and the (4) pertinent information, that this patient is suffering (5) from this and that, and then they sign off on it.

(6) Then we fill out what's called the trip (7) ticket, which is for Correction's sake is done. It is (8) the doctor authorizing this transfer and they sign off (9) on it with the inmate's name, and DOC number, and the (10) birth date if it's known, and the location to go.

(11) BY MS. ALEXANDER:

(12) Q Did you have any involvement in filling (13) out this paperwork in the case of Mr. Magbie?

(14) A No.

(15) Q Did you see Dr. Nwosu there?

(16) A Dr. Nwosu was not there at that time.

(17) Q Okay. Do you know who signed the (18) paperwork for Mr. Magbie?

(19) A No, I don't.

(20) Q Were you aware – at the time you were (21) there, were you aware of any problem with getting the (22) paperwork signed?

### Page 34

(1) A No.

(2) Q Did the EMS staff have the paperwork at (3) the time that you arrived?

(4) A I don't know.

(5) Q Did you hear any discussion about the (6) paperwork?

(7) A No.

(8) Q In an emergency, was there any – did (9) policy allow completion of any of the paperwork after (10) the patient left?

(11) A The trip ticket had to be done, otherwise (12) patient would not be moved.

(13) Q And that was a requirement of whom? Was (14) that a CCHPS requirement, or was that a DOC (15) requirement, or something else?

(16) A DOC requirement.

(17) Q Let's go back to the trach tubing. You (18) connected the tubing to Mr. Magbie?

(19) A No.

(20) Q Who did that?

(21) A EMS did that.

(22) Q Okay. But you observed this?

### Page 35

(1) A Yes. I gave them the tube.

(2) Q Do you recall whether Mr. Magbie had a (3) blood sugar test prior to leaving?

(4) A I don't recall.

(5) Q Did you hear any discussion of the need to (6) get a blood sugar test before he left?

(7) A I don't remember that.

(8) Q Based on your review of the medical (9) records and what you know about Mr. Magbie's (10) situation, was it necessary to complete that test (11) prior to his leaving to go to the hospital?

(12) MR. SPENCE: Objection.

(13) THE WITNESS: Since I didn't basically (14) handle this case, I don't know what the physician who (15) handled it asked for and got regarding whatever (16) diagnostic measures she wanted to have.

(17) BY MS. ALEXANDER:

(18) Q That reminds me of something. You said (19) that the document that you reviewed in connection with (20) this deposition was Mr. Magbie's medical record. You (21) mean the medical record from the infirmary? What do (22) you mean? Let's just put it that way.

### Page 36

(1) A Whatever documents were available in the (2) electronic chart.

(3) Q So you reviewed only the electronic chart?

(4) A Correct.

(5) Q Did that have his entrance physical report (6) in it?

(7) A I think it did, yes.

(8) Q Okay. In the chart that you reviewed just (9) prior to the deposition, were there any medical (10) records from Greater Southeast?

(11) A I subsequently saw them, but at the time (12) I don't think I saw them.

(13) Q That's not my question. Do you need to – (14) Okay. Off the record.

(15) (Whereupon, the foregoing matter (16) went off the record, briefly.)

(17) BY MS. ALEXANDER:

(18) Q When was the first – the first call was (19) with Mr. Cobbina?

(20) A Somewhere around noon, maybe.

(21) Q But this was the first call? This was (22) your first information about Mr. Magbie's situation?

Page 37

(1) A Yes.

(2) Q And in that call, you learned that he (3) might need a ventilator or a respirator, according to (4) your memory.

(5) A Correct.

(6) Q Okay. And what happened next in (7) connection with your involvement with Mr. Magbie?

(8) MR. SPENCE: Objection. Asked and (9) answered. Go ahead.

(10) THE WITNESS: I called the Judge's (11) chambers.

(12) BY MS. ALEXANDER:

(13) Q And what did you — and did you talk to (14) the Judge or you talked to a clerk?

(15) A Clerk.

(16) Q Okay. And what did you say to the clerk?

(17) A I told the clerk that this is the kind of (18) patient I have and he's already been to Greater (19) Southeast, and they turned him back. So for me to (20) send him, I needed a Judge's order to do that.

(21) Q Did you ask for such an order?

(22) A Yes.

Page 38

(1) Q Because you thought that there was a (2) possibility that he needed to go back to Greater (3) Southeast?

(4) A Yes.

(5) Q At that point, and what happened next in (6) terms of your involvement with Mr. Magbie?

(7) A Then I guess I waited for the return phone (8) call. That came about, maybe, 30, 40 minutes later. (9) I'm not really sure. And the Judge's clerk informed (10) me that the Judge would not issue such an order.

(11) Q Did you make any other attempts to get him (12) back to a hospital setting?

(13) MR. SPENCE: Objection. Asked and (14) answered.

(15) BY MS. ALEXANDER:

(16) Q Go ahead.

(17) A No. After I talked to Dr. Nwosu I was (18) assured that he's fine. No, I did not make any (19) attempt.

(20) Q At what point did you talk to Dr. Nwosu?

(21) A After I had finished talking to Mr. (22) Cobbina, Judge, and Brenda Baldwin-White's office.

Page 39

(1) Q And by the way, what were you hoping that (2) Ms. Baldwin-White would do?

(3) A Because they have a rapport with the (4) court, so maybe they could convince the court to do (5) it, because sometimes the courts don't take the (6) doctors too seriously. They think –

(7) Q So you wanted – at that point –

(8) MR. SPENCE: Wait. He's not done (9) answering the question.

(10) MS. ALEXANDER: Excuse me. Excuse me.

(11) THE WITNESS: They don't take the doctor (12) too seriously. They think that we are – I don't know (13) how to up it – maybe too much on the inmate's side. (14) Something to that effect. In other words, it's (15) another doctor babbling. But when it comes from their (16) colleague or, you know, somebody in their own field, (17) it carries much more weight than when a doctor calls, (18) because they don't know me, but they know Baldwin- (19) White.

(20) BY MS. ALEXANDER:

(21) Q So at that point you wanted him back at (22) the hospital?

Page 40

(1) A Yes, I did.

(2) Q Okay. And you also told me that you (3) didn't recall other quadriplegics that had been cared (4) for at the infirmary. Is that correct?

(5) A That's correct.

(6) Q Okay. So it was a pretty rare event.

(7) A It is very rare.

(8) Q How often did you typically go to the (9) infirmary?

(10) A Maybe three, four – two, three times a (11) week.

(12) Q How many times were you there that week?

(13) A Maybe once.

(14) Q And why did you go there that time?

(15) A Because they called an emergency.

(16) Q So the only time you were there that week, (17) the week that they had a quadriplegic patient for the (18) first time, was when the emergency was called?

(19) A Yes.

(20) Q Why did you – when you made these trips (21) to the infirmary, ordinarily why did you go?

(22) A I would just go to see what was going on,

### Page 41

(1) depending on how my schedule allowed.
(2)   Q And that was part of your supervisory (3) functions? To make certain things were going all (4) right in the infirmary?
(5)   **A Part of it, but most of the time they (6) would call me for a specific reason.**
(7)   Q So you had a patient that originally you (8) thought needed to be in the hospital, and he was a (9) quadriplegic who you don't recall the infirmary ever (10) handling. Did it occur to you that it would be useful (11) to actually see how the infirmary was able to care for (12) this patient?
(13) MR. SPENCE: Objection.
(14) THE WITNESS: If I had any concerns and (15) that there was a problem, I would've gone, but since (16) I was reassured that everything is fine, no. Because (17) usually when I went to the infirmary it was not (18) patient-related. Occasionally I would go start an IV (19) because once you work in a jail for a long time, you (20) become an expert in starting IVs in people that have (21) used their veins for a long time. Or to fix the (22) computer because I was also the tech boy, and things

### Page 42

(1) like that. Or when the infirmary was full and I was (2) getting calls to see if I can discharge somebody so we (3) can admit another patient. But that's basically the (4) reasons that took me to the infirmary.
(5)   BY MS. ALEXANDER:
(6)   Q Were there any written policies that (7) covered the level of acuity that could be dealt with (8) in the infirmary?
(9)   MR. SPENCE: Objection. I don't (10) understand your questions. Doctor, if you do, go (11) ahead and answer it.
(12) THE WITNESS: I think I answered that (13) before, that I don't remember anything really directly (14) written. There was some leftover policies from when (15) Prison Health Services were running that system, but (16) nothing specific from our part that I remember.
(17) BY MS. ALEXANDER:
(18) Q Did you consider it part of your duties as (19) a supervisor to look out for problems that could occur (20) in the infirmary and try to take care of them?
(21) **A Absolutely. That's my job.**
(22) Q And so did you consider it part of your

### Page 43

(1) responsibilities if there was a patient whose (2) retention at the level of care the infirmary was able (3) to offer was questionable, to assess that?
(4)   **A If I have such a concern, yes.**
(5)   Q And so if you had a concern that a patient (6) was actually – needed hospital-level care, but was (7) housed in the infirmary, it would've been a concern of (8) yours as a supervisor to assure that the person (9) received the level of care he or she needed?
(10) **A My concern would be to contact a physician (11) who is taking care of this patient and ask him, "Since (12) you see him every day, what do you think?" And based (13) on his assessment, than I would take an action.**
(14) Q Was it one of the things that you could do (15) as a supervisor to read the record, go see the patient (16) personally to assure yourself about the level of care (17) that the patient needed?
(18) MR. SPENCE: Objection. Go ahead.
(19) THE WITNESS: If there were any concerns, (20) yes.
(21) BY MS. ALEXANDER:
(22) Q So is it your testimony that after you

### Page 44

(1) talked to Dr. Nwosu you had absolutely no concerns (2) about Mr. Magbie?
(3)   MR. SPENCE: Objection.
(4)   THE WITNESS: Absolutely no concerns. I'm (5) concerned about everybody that was in the infirmary in (6) CTF, but any particular concerns, no.
(7)   BY MS. ALEXANDER:
(8)   Q Are there – were there other occasions in (9) which you assessed an individual patient in person (10) based on concerns that that person might need a (11) different level of care?
(12) MR. SPENCE: In his capacity as a (13) supervisor as opposed to being a staff physician who - (14) -
(15) MS. ALEXANDER: Yes. In his capacity as (16) a supervisor.
(17) THE WITNESS: Ninety-nine percent of time (18) that when I assess a patient in infirmary was to see (19) if they can be discharged. It was not an issue of (20) admission because the physician was there that was (21) responsible for their care, and if he thought the (22) patient needs care that is beyond the scope of our

### Page 45

(1) capabilities, he will transfer him. He didn't need me (2) whatsoever. He would – he acted as an independent (3) licensed physician.

(4) When they call me they wanted me, because (5) the infirmary was full and they wanted to know if – (6) because he would get too busy, and I over come and see (7) that if John Doe and Jane Doe could be discharged to (8) open populations so we can admit more patients into (9) infirmary. In other words, to keep this going.

(10) BY MS. ALEXANDER:

(11) Q So your role in those occasions was to see (12) if the person needed a higher level of care than could (13) be provided in general population?

(14) A No. In that case my job was to determine (15) that the level of care that the patient needed can be (16) provided in open population.

(17) Q Exactly. Okay. But did you ever have (18) occasion to determine whether the infirmary could not (19) provide the higher – at the level of care while you (20) were a supervisor?

(21) A Yes, based on the information that I would (22) get from the doctor in the infirmary, yes.

### Page 46

(1) Q And what would you do with that (2) information?

(3) A Well, I would get a call and the infirmary (4) physician would tell me that, "Look, we cannot handle (5) this guy and he needs to go." Done. That's it. I (6) would not second guess the physician.

(7) Q And at the time that – did you have – (8) was there a time in which you were the person directly (9) in charge of the infirmary?

(10) A In my previous employment at CCA, there (11) was a time that I was the infirmary physician.

(12) Q And if you had a patient at that point (13) with a record that indicated that the patient needed (14) ventilation at times, what would you have done.

(15) MR. SPENCE: Objection.

(16) THE WITNESS: I'm not going to second (17) guess, because that didn't happen to me. I don't (18) know. It all depends on the information and what was (19) available to me.

(20) BY MS. ALEXANDER:

(21) Q After Mr. Magbie was transported to the (22) Greater Southeast on September 24th, did you have any

### Page 47

(1) conversations with anyone at Greater Southeast?

(2) A Yes, I did.

(3) Q Could you describe the first conversation (4) that you had with someone from Greater Southeast?

(5) A This chronologically may be kind of not (6) totally straight forward, but I called a liaison (7) nurse. We have a nurse station at Greater Southeast. (8) I believe at that time it was Ms. Hilliard, RN.

(9) Q That's Beverly Hilliard?

(10) A Beverly Hilliard. Correct. And I asked (11) her about Mr. Magbie. From what I recall, she told me (12) that she didn't know anything personally about it, but (13) she's going to go find out and get back to me. And (14) maybe an hour or so – I don't remember. I know it (15) was in my car – she called me on my cell phone and (16) tell me that Magbie's fine, he is alert, he's talking (17) and he's just waiting to be admitted. And I asked (18) them what the diagnosis was. She said rule out (19) pneumonia.

(20) And three, four hours later – maybe (21) around 8:00 o'clock, maybe a little earlier than that (22) – I got another call from Ms. Hilliard that told me

### Page 48

(1) that Mr. Magbie had died. To put it mildly, I was (2) dumbfounded because I didn't understand how he can go (3) from stable, talking, alert and oriented in an (4) emergency room to dead in three hours.

(5) So I called the hospital again and I (6) talked to a nurse, I believe, who transferred me to a (7) doctor. I don't remember – it was a female doctor. (8) I don't remember her name – and I asked her, "Do you (9) know anything about Magbie?" She said, "Yeah." I (10) said, "Why does he die?" I was frankly very angry.

(11) And she gave me a very flip answer, which (12) I will never forget. She told me, "Because he stopped (13) breathing." And for five seconds I could not process (14) that answer, because that situation did not need an (15) answer like that.

(16) So I asked her is she trying to be funny. (17) She kind of hemmed and hawed, then she started (18) backtracking and finally said, "Oh, I just came here," (19) or "I just took over. I don't know. I wasn't (20) treating him. It was somebody else, but he has died." (21) And that was the conversation.

(22) Q Now, my understanding of – he was not

## Page 49

(1) verbally responsive at the time you saw him? Mr. (2) Mag-
bie, on September 24th?

(3)  A Correct. That's correct.

(4)  Q Did Ms. Hilliard indicate that she had (5) seen Mr. Mag-
bie and heard Mr. Magbie talking, or that (6) it had been re-
ported to her that Mr. Magbie was (7) talking at some point
while he was a Greater (8) Southeast?

(9)  A That's not clear to me, but she told me (10) that he's
alert, oriented, stable, just waiting to be (11) admitted, to
rule out pneumonia. I don't know if it (12) was a direct
observation or based on talking to people (13) who where
treating him.

(14)  Q Did you have any other phone calls with (15) anyone
associated with Greater Southeast, or with the (16) liaison to
Greater Southeast on September 24th?

(17)  A No.

(18)  Q In September 2004 what were your major job (19) du-
ties?

(20)  A I was the associate medical director at (21) CCHPS.
I was the major troubleshooter. That's to put (22) it mildly.
I was Fire Marshall Malek. If there was

## Page 50

(1) something – because I was the ultimate medical (2) arbi-
trator, arbiter. In other words, if there was a (3) question
between the medical versus security needs, (4) that was
one. I was the chief tech officer, I was the (5) supply per-
son, I was the meeting person.

(6)  Q The what person?

(7)  A Meeting. Every time there was a meeting (8) I would
be dragged out as part of that. And that's (9) basically it. I
supervised what was not going right (10) if I knew about it.

(11)  Q Was part of your job to make certain that (12) medical
issues didn't fall through the cracks and (13) that, sort of, dis-
asters were avoided by making (14) certain that people got the
care they needed?

(15)  A Yes.

(16)  Q And tell us how you went about carrying (17) out that
responsibility.

(18)  A It included making sure that the staffing (19) was
adequate because in Corrections you always have (20)
staffing shortages. People call in sick, or people (21) don't
show up, and it was always a juggling act.

(22)  Talking to –

## Page 51

(1)  Q And how –

(2)  MR. SPENCE: Wait. He's not done.

(3)  THE WITNESS: Talking to various – trying (4) to – one of
my biggest job was trying to arrange (5) consults. It was very
important to arrange consults (6) because we had a lot of trou-
ble with arranging outside (7) consults. We would frequently
get appointments for (8) six, seven, eight weeks, sometimes
three months down (9) the road. And this being a jail with an
open-door (10) policy, it was not a good thing to happen to an
(11) inmate, because in other words, he would not get what (12)
he needed before he is gone in the street.

(13) Another one was that inmates were (14) frequently were
taken to see a doctor, and they would (15) sit there for four or
five hours, and they would be (16) bumped. Because doctors
would get busy with what we (17) call the paying patient and
would bump the inmate.

(18) Or sometimes the security will not take (19) the patient for
whatever reason, or the day that the (20) inmate was scheduled
to go to a visit, he had a court (21) date or a family visit, or an
attorney visit. That (22) took really the bulk of my time every
day trying to

## Page 52

(1) arrange that. Send people to dialysis, taking care of (2) the
staffing, making sure that everything worked, (3) getting sup-
plies and whenever somebody came to me with (4) a problem,
do my best to solve it.

(5)  BY MS. ALEXANDER:

(6)  Q Was one of the things that you got (7) involved in at-
tempting to get patients to a high (8) enough level of care as a
supervisor?

(9)  MR. SPENCE: Objection. Asked and (10) answered.

(11)  THE WITNESS: Again, if a doctor was (12) treating the
patient needed an outside consult and (13) they couldn't get it
through the routine channels, (14) yes, I would get involved if
they asked me.

(15)  BY MS. ALEXANDER:

(16)  Q Well, how about a person in need of (17) evaluation in
the hospital? Was that something that (18) you got involved in?

(19)  A If the treating physician could not, for (20) whatever
reason, send the patient to the hospital and (21) he be-
lieved that this patient needs to go, yes.

(22)  Q Okay. And how often did you get involved

## Page 53

(1) in that?

(2) A For hospital? Almost never, because (3) hospital was an automatic.

(4) Q Okay. Were there other situations in (5) which you attempted to contact the Judge to get help (6) to get somebody to a hospital?

(7) A I think I've done it once or twice, but I (8) was told that that's something that I shouldn't do by (9) the Department of Corrections.

(10) Q Were you told before you made the call to (11) Judge Retchin's chambers?

(12) A Yes. I was told that I'm not supposed to (13) do that.

(14) Q You were told before Mr. Magbie's case (15) that you were not supposed to –

(16) A I would call – yes.

(17) MR. SPENCE: Let her finish her question.

(18) THE WITNESS: Okay. I'm sorry. Go ahead.

(19) BY MS. ALEXANDER:

(20) Q You were told before Mr. Magbie's (21) circumstances that you were not supposed to call the (22) Judge?

## Page 54

(1) A Well, in not so many words, but it was (2) implied, inferred that if you need something, you need (3) to talk to a Judge or something, you should go through (4) us, meaning DOC's health administrator or their (5) counsel because before we had a direct line to (6) superior court.

(7) There is a lady there by the name of (8) Rainey Ransom. Most people who know superior court (9) know her. She's a special assistant to Judge King and (10) every time there was a medical questions raised in a (11) courtroom, either by the Defendant or his attorney, (12) the Judge or his clerk or her clerk would call Rainey (13) Ransom, and Rainey Ransom will call – if it was a CTF (14) inmate – would call me directly and say, "Dr. Malek, (15) this is what the man says. We want to know that this (16) can be done there or this has any validity," etc.

(17) But DOC put a stop to that. They felt (18) that it's, you know, this is speculation on my part, (19) I think maybe I shouldn't do that. But whatever it (20) is, they said that it shouldn't be done, so Rainey (21) Ransom stopped calling. So every time she had a (22) medical question she would call, I guess, the health

## Page 55

(1) administrator of the Department of Correction, a Ms. (2) Willis, and she would tell him what we can and cannot (3) do, which I found kind of to be ironic because she had (4) no clue – not as a person, but medically she did not (5) know anything about medicine.

(6) Q What was her medical background?

(7) A I really don't know.

(8) Q Did you ever have any direct dealings with (9) Ms. Willis?

(10) A Yes.

(11) Q And did you have occasion in those (12) dealings to get any idea of what her medical (13) background was?

(14) A I think she is an MPH, master of public (15) health, and that's it.

(16) Q And do you recall her first name? (17) Lorella?

(18) A Lorella.

(19) Q Did you ever clash with Ms. Willis with (20) regard to medical issues?

(21) A We had our disagreements.

(22) Q What sorts of –

## Page 56

(1) A I wouldn't call it a clash.

(2) Q What sorts of disagreements did you have?

(3) A Sometimes when we made a medical decision (4) and the court didn't like it, they would call her and (5) ask her to ask us why the inmate John Doe is not in (6) court today.

(7) Example: And inmate John Doe was not in (8) court today because – let's say he's being treated (9) for TB, tuberculosis. But if they seemed infectious, (10) they would go back and forth, you know. Well, the (11) Judge needs him. Well, I cannot release him, you (12) know. But are you sure? I mean, these kind of (13) conversations, yes.

(14) Q When was it – well, first let me clarify (15) something: You inferred that you were not supposed to (16) call the Judge because, am I correct, of this change (17) in policy – that it was supposed to go through Ms. (18) Willis rather than you? Or was it – or am I wrong on (19) that?

(20) A No. These are two separate issues.

(21) Q All right. Could you clarify, please?

(22) A The issue was that they didn't want me to

Page 57

(1) call the Judge's.
(2)    Q And how did you know that?
(3)    A Because I was told that in the meetings (4) when we had, they would say, you know, in a general (5) terms, "We don't want anybody to call the Judge. If (6) you need something from the Judge you should tell (7) either Ms. Willis or Ms. Brenda Baldwin-White and they (8) will handle it and they will get back to you."
(9)    Q Okay. And can you identify, to the best (10) of your memory, when you were first told that you were (11) not supposed to call the Judge?
(12)    A I mean, I don't know exact date, but it (13) was understood that DC, Corrections frowned on that (14) practice. They didn't like it.
(15)    Q Can you give us an approximate date that (16) you first learned –
(17)    A No.
(18)    Q – that they frowned on that practice?
(19)    A I really can't.
(20)    Q But it was before Mr. Magbie's (21) circumstances?
(22)    A Yes.

Page 58

(1)    Q Okay. Now, was Mr. Magbie's the only case (2) after you learned that they did not want you to call (3) a Judge, that you actually did call a Judge?
(4)    A From my recollection, yes.
(5)    Q Okay. When did you start working for (6) CCHPS?
(7)    A In its present form, in 2000, May 2000, I (8) believe.
(9)    Q When you say in "its present form," what (10) do you mean by that?
(11)    A Because CCHPS, the medical – the health (12) services employees of D.C. Jail were the same people (13) who created CCHPS after the receivership ended, so I (14) was working for the receivership. Then I left for (15) about a year and a half and I was working at CTF for (16) CCA, and then I came back. When I came back, the (17) entity had changed to CCHPS from the receivership.
(18)    Q Okay. And when did CCHPS take over the (19) medical contract at CTF?
(20)    A Was it October 2000? Something like that. (21) I'm not really sure. Either October or September of (22) 2000 or 2001. I'm not really sure.

Page 59

(1)    Q You don't recall that CCHPS took over in (2) 2003?
(3)    A I don't remember, to be honest.
(4)    Q Okay. Regardless of exactly when it (5) happened, did your job functions change when CCHPS (6) took over?
(7)    A Yes. I became the medical director. I (8) was transferred from D.C. Jail to CTF as the medical (9) director.
(10)    Q Okay. And did – at CTF, when CCHPS got (11) the contract from medical services did CCHPS mainly (12) hire staff who had previously worked for CTF or did it (13) mainly bring in its own staff?
(14)    A Mainly kept the staff that were already (15) there.
(16)    Q Were there any notable exceptions that you (17) recall?
(18)    A One time after that we brought in a new (19) PA, physician assistant, and we let go one PA, (20) basically replaced one PA.
(21)    Q Other than that, basically the same staff?
(22)    A Correct.

Page 60

(1)    Q Okay.
(2)    A Can I clarify something?
(3)    Q Please go ahead.
(4)    A When CCHPS originally took over the (5) medical contract at CCA, we had a contract with CCA. (6) We had one contract with Department of Corrections for (7) D.C. Jail, a separate contract with Correction (8) Corporation of America for CTF.
(9)    Maybe a year or so down the road, CCA and (10) Department of Corrections renegotiated their contract (11) and CCA relinquished medical care at CCA. And then we (12) had one all-encompassing contract that took care of (13) medical services on both sides, but it was with the (14) Department of Corrections.
(15)    Q And does the 2003 date sound right for (16) that last event?
(17)    A Yes, I think so.
(18)    Q Thank you. That's helpful. Were you (19) aware of any reports relating to the performance of (20) CCHPS that CCHPS provided to the DOC?
(21)    A Any specific reports, no.
(22)    Q Did you have any role in preparing any

## Page 61

(1) sort of quality assurance reports or reports to the (2) DOC or do anyone else with regard to who medical care (3) was being handled at CTF?

(4)   A DOC had an independent contract monitor (5) that will come quarterly, a Dr. Grienfinger, who would (6) evaluate the performance of CCHPS both at D.C. Jail (7) and CTF and write a report and give it to the (8) Department of Corrections.

(9)   Q Understood. But did you have any role in (10) preparing internal quality assurance reports for (11) anyone?

(12)  A We had our own quality assurance meetings, (13) and depending on what was needed, sometimes I was (14) involved on preparing a report, yes, but it depended (15) on what kind of issue had come up previously that (16) needed a followup.

(17)  Q When you were involved, can you tell me (18) what sorts of things you did in preparing such (19) reports?

(20)  A We did some studies, basically involved (21) medication transfer between the two facilities. We (22) also did morbidity and mortality reports. If an

## Page 62

(1) inmate had died at CTF, then I would write a mortality (2) report on that and if the inmate had died at D.C. (3) Jail, than another person would do that, Dr. Akal (4) would do that.

(5)   Q So did you write the mortality report on (6) Mr. Magbie?

(7)   A I think so, yes. I don't really remember, (8) though. This is very strange, but I don't remember (9) but I'm 99 — because I should have, so I'm sure (10) there's such a report somewhere.

(11)  Q Did anyone else who was a CCHPS employee (12) at CTF prepare reports for internal quality assurance (13) purposes?

(14)  A We had a person — I don't remember exact (15) title – she acted as an administrator at CTF. She (16) would do the statistical reports. In other words, how (17) many inmates were seen on sick call, how many were (18) sent out, and they would also get a report from (19) Greater Southeast Hospital to our liaison nurse of how (20) many patients were admitted, how many patients were (21) seen, how many days did they stay. Such reports were (22) created by those two people.

## Page 63

(1)   Q What was her name?

(2)   A The one at Greater Southeast was, at that (3) time, Ms. Hilliard and the one at CTF was Tanya and (4) her last name – I don't remember her name. But there (5) was only one Tanya there.

(6)   Q And so she would prepare –

(7)   A She would compile.

(8)   Q – a statistical report?

(9)   A Correct.

(10)  Q Where those statistical reports – well, (11) let me start again. Did you have quality assurance (12) meetings within CTF?

(13)  A No. We had our quality assurance meetings (14) at D.C. Jail as a combined quality meeting.

(15)  Q How often were those meetings?

(16)  A They were ones – our medical director, (17) Dr. Ronald Shansky would come generally once a month (18) for two days. Sometimes we'd come at the beginning of (19) this month and at the end of the other month, but (20) generally is was about every 30, 40 days.

(21)  Q And you would attend those meetings?

(22)  A Yes, I would.

## Page 64

(1)   Q And what would go on in those meetings?

(2)   MR. SPENCE: We're getting close to where (3) I'm going to start objecting if you're going to ask (4) about what happened in the meetings. I think it's (5) covered by the statutory privilege in general terms. (6) If you want to know the topics, fine, but we're (7) getting awfully close.

(8)   BY MS. ALEXANDER:

(9)   Q Okay. Go ahead.

(10)  A In general terms we would discuss if, at (11) the previous meeting, there was an issue that needed (12) investigating, those reports would be presented and if (13) there were any new concerns, they would be presented. (14) And then everybody would get a chance, all the (15) departments, to talk about their specific areas of (16) need or concern, and if there was any morbidity and (17) mortality report, they would also be presented and (18) discussed.

(19)  Q Were records made of those meetings?

(20)  A Yes.

(21)  Q And to your knowledge – well, did you (22) have access to those records? Did you get a copy?

Page 65

(1)  **A No.  Oh, yes.  The following meeting you** (2) **will get minutes of the previous meeting.**
(3)  Q Okay.  Was there anything other than (4) minutes that was kept regarding these meetings?
(5)  **A No.**
(6)  Q Did you also see Dr. Grienfinger's (7) reports?
(8)  **A Yes.  Not all the time, but yes.**
(9)  Q When you say, "not all the time," was (10) there any pattern to when you did or did not see them?
(11)  **A Not really.  They would be given to Dr.** (12) **Shansky, the medical director, and sometimes somehow** (13) **they were filtered down to me, but there wasn't a** (14) **system in place that Dr. Malek have to get a copy of** (15) **that.**
(16)  Q Did you get the report if there was (17) something relevant to CTF on it, or was there no (18) pattern that you could discern about when you got it?
(19)  **A There was no pattern that I could discern,** (20) **but if Dr. Grienfinger had any CTF concerns, he would** (21) **talk to me personally.**
(22)  Q Okay.  Do you know where the file of those

Page 66

(1) reports would be maintained?
(2)  **A With the QI nurse at our end and also the** (3) **Department of Corrections.  I don't know who keeps it** (4) **there.**
(5)  Q Who was the QI nurse?
(6)  **A At time, it was Ms. Robertson.**
(7)  (Whereupon, the foregoing matter (8) went off the record, briefly.)
(9)  BY MS. ALEXANDER:
(10)  Q You said at that time it was a Ms. (11) Robertson?
(12)  **A Correct.  Gloria Robertson.**
(13)  Q Gloria?
(14)  **A Yes.  Robertson.**
(15)  Q And did it change at some point to your (16) knowledge?
(17)  **A Before that it was somebody else, so I** (18) **don't know who it was before Ms. Robertson. I don't** (19) **remember.  I'm trying really hard to remember.**
(20)  Q At the time you left, was it Ms. (21) Robertson?
(22)  **A Yes.**

Page 67

(1)  Q Okay.  Do you know if CTF was required to (2) submit any quality assurance reports on a regular (3) basis?
(4)  **A What kind of quality assurance?**
(5)  Q Any kind of quality assurance.
(6)  **A I don't know, because all the** (7) **responsibilities were custody-related, so I don't know** (8) **what they did.**
(9)  Q So to the best of your memory, there were (10) no quality assurance reports that the medical (11) operations were required to prepare and submit?
(12)  **A We gave CCA monthly statistics.**
(13)  Q Was that it?
(14)  **A That was it.**
(15)  Q Okay.
(16)  **A They had a form that we had to fill out.**
(17)  Q Okay.
(18)  **A And that was required by ACA, American** (19) **Correctional Association, and they would provide that** (20) **to CCA.  They would use to provide reports for their** (21) **accreditation.**
(22)  Q And those were the only quality assurance

Page 68

(1) regular reports that you recall involving the CTF (2) medical operation?
(3)  **A I'm also pretty sure they got a copy of** (4) **Dr. Grienfinger's report.**
(5)  Q But that's it.
(6)  **A That's it.**
(7)  Q You were not aware of any Department of (8) Correction's quality assurance activity, other than (9) Dr. Grienfinger, related to CTF's medical operations?
(10)  **A No.**
(11)  Q To your knowledge, did the Department of (12) Corrections ever initiate any actions for contract (13) penalties against CCHPS?
(14)  MR. SPENCE: Objection.
(15)  THE WITNESS: No.
(16)  BY MS. ALEXANDER:
(17)  Q You don't know?
(18)  **A I don't know.  I don't remember if they** (19) **were doing that.**
(20)  Q Okay.  To your knowledge, did the (21) Department of Corrections ever impose any penalties on (22) CCHPS with regard to their contract performance?

### Page 69

(1)  A Didn't I just answer that?

(2)  Q The first question was a little different, (3) but go ahead.

(4)  A No.

(5)  Q Okay.  After Mr. Magbie's death, did there (6) come a time when you learned that CCHPS would stop (7) serving as a medical contractor for the Department of (8) Corrections?

(9)  A I left CCHPS in November of 2005, and at (10) that time I was not aware of it, no.  There were some (11) rumors, but nothing concrete, no.

(12) Q Okay.  At the time that you were employed (13) by CCHPS, did CCHPS have any contracts for medical (14) services that did not involved the District of (15) Columbia Department of Corrections?

(16) A No.

(17) Q Following Mr. Magbie's death, did you (18) undertake any investigation or review of the (19) circumstances of this death?

(20) A Since then I'm pretty sure that I did the (21) morbidity mortality report, yes.

(22) Q And you did that because it was part of

### Page 70

(1) your routine functions?

(2)  A Correct.

(3)  Q What documents did you review in (4) connection with preparing the mortality report?

(5)  A The electronic chart, any paper chart.  I (6) also looked at the documents for Greater Southeast (7) Hospital.

(8)  Q And by "documents" you meant the medical (9) record from Greater Southeast?

(10) A Correct.

(11) Q And you had the electronic record from all (12) parts of the DOC system and you had all the paper (13) records.

(14) A The ones that are available, yes.

(15) Q Did you interview anyone?

(16) A No.

(17) Q Is it ordinarily a part of what you did in (18) the mortality review to interview medical staff?

(19) A No.

(20) Q Let's not call it interview.  Did you talk (21) to anyone informally about anything related to the (22) review of Mr. Magbie's death?

### Page 71

(1)  A The only person that I recall talking to (2) was, again, Ms. Hilliard, at Greater Southeast (3) Hospital.

(4)  Q You talked to her after the death?

(5)  A Yes.

(6)  Q And was that a phone conversation?

(7)  A I don't recall the – it was phone or in (8) person.  I don't remember that part.

(9)  Q About how long after the death did this (10) occur?

(11) A Maybe the next week.

(12) Q Can you tell me that nature of that (13) conversation?

(14) MR. SPENCE:  Objection.  I'm instructing (15) you not to answer that question.  That's part of the (16) peer review process and it's covered as a privileged (17) communication under D.C. statute.

(18) BY MS. ALEXANDER:

(19) Q Did you specifically call her as part of (20) the morality review?

(21) A Yes.

(22) Q Okay.  Could you tell us about that

### Page 72

(1) conversation?

(2)  A Basically I wanted to try to find out what (3) exactly happened at Greater Southeast Hospital because (4) to me, it was a puzzle.

(5)  Q And so what did – tell us what you recall (6) from that conversation.

(7)  A She basically told me that for whatever (8) reason, Mr. Magbie's trach comes out and they ask a (9) doctor – I don't know who the doctor was – take a (10) look at it.  He goes back and he pushes the trach in (11) so it wasn't protruding as much.  That's my (12) understanding.

(13) And after that Mr. Magbie's oxygenation (14) level drops and keeps dropping, and then by the time (15) somebody does anything, and they call the code, he (16) wouldn't respond.  That's it.

(17) Q While you were – when did you most (18) recently review Mr. Magbie's medical record?

(19) A I believe November or December 2004.

(20) Q You didn't review it in connection with (21) this deposition?

(22) A No.

## Page 73

(1)   Q Do you recall seeing a report of Mr. (2) Magbie's entry x-ray?

(3)   A Yes, I've seen that.

(4)   Q Okay. Did you find anything of interest (5) in that report?

(6)   MR. SPENCE: Objection. If you can answer (7) the question, please do.

(8)   THE WITNESS: The only thing I found (9) interesting is how the x-ray was described as (10) distorted because of Mr. Magbie's posture and there (11) was some question of fluid somewhere -- I don't (12) recall exactly where -- in the lower lobes and the (13) recommendation for a followup chest x-ray in five to (14) seven days.

(15)   BY MS. ALEXANDER:

(16)   Q Did it say "followup chest x-ray" or did (17) it say "followup"?

(18)   MR. SPENCE: Can he look a the record, or (19) do you want him to go by memory?

(20)   THE WITNESS: I'll look at the record.

(21)   MS. ALEXANDER: If you have the record, (22) give it to him.

## Page 74

(1)   THE WITNESS: I'm not really sure what (2) statement you're trying to make. They recommended a (3) followup chest x-ray in five to seven days.

(4)   BY MS. ALEXANDER:

(5)   Q Okay. Did you see the autopsy of Mr. (6) Magbie?

(7)   A Yes, I have.

(8)   Q So that was another medical record that (9) you saw?

(10)   A Yes.

(11)   Q At what point did you see the autopsy, if (12) you recall?

(13)   A The summer in 2004, late 2004. Maybe a (14) couple of months after his death.

(15)   Q Okay. With regard to the mortality report (16) that you prepared, did you reach any conclusions from (17) that report?

(18)   MR. SPENCE: Objection as to what the (19) conclusion was. If you want to ask him if he did, yes (20) or no --

(21)   MS. ALEXANDER: Which was he question.

(22)   BY MS. ALEXANDER:

## Page 75

(1)   Q Go ahead.

(2)   A I'm not really sure you can call them (3) conclusion, but there was some areas that we agreed on (4) that were important to remember for future reference.

(5)   Q Aside from the review that you did, was (6) there anything coming out of the death of Mr. Magbie (7) that you personally resolved to do differently in the (8) future.

(9)   MR. SPENCE: Objection. Go ahead and (10) answer.

(11)   THE WITNESS: Frankly, I hope this had (12) never happened, because Mr. Magbie did not deserve (13) that and that's besides my professional duty, that's (14) just from a human-to-human perspective. But I think (15) that D.C. Jail and medical services --

(16)   MR. SPENCE: She's asking you what you (17) would do personally.

(18)   MR. TEMPLE: You can't interrupt a (19) witness, counsel and then qualify the question. He's (20) speaking, and unless you're imposing an objection, (21) that's improper.

(22)   MR. SPENCE: I am objecting and I'm simply

## Page 76

(1) asking him to respond the question that's been asked.

(2)   MR. TEMPLE: He's responding to the (3) question, and that's improper, and I think you (4) understand that.

(5)   THE WITNESS: Could you repeat that (6) question, please?

(7)   BY MS. ALEXANDER:

(8)   Q In looking back on Mr. Magbie's situation (9) today, tell us what you now think should have been (10) done differently.

(11)   MR. SPENCE: No. Your question was -- (12) that wasn't your question.

(13)   MS. ALEXANDER: Okay. Let's just go --

(14)   MR. SPENCE: Your question was: What (15) would you resolve to do? Did you resolve personally? (16) Did you personally resolve to do something (17) differently? That was the question.

(18)   THE WITNESS: There wasn't any specific (19) thing that I did to resolve to do differently.

(20)   BY MS. ALEXANDER:

(21)   Q Okay. In looking back on it, what things (22) should, with regard to Mr. Magbie, should have been

06/15/06 MARY R. SCOTT v D.C. DEPO: MALEK MALEKGHASEMI   XMAX(20)

BSA

Page 77

(1) handled differently in your opinion?

(2)   MR. SPENCE: Objection.

(3)   MR. RUMSEY: I join that objection.

(4)   MR. SPENCE: He is not an expert witness. (5) He is a Defendant in this lawsuit. He is not going to (6) comment on that.

(7)   MR. TEMPLE: Same objection.

(8)   MR. SPENCE: Do not answer that question. (9) That's a — completely improper.

(10) MS. ALEXANDER: What is your basis for (11) objection to that question? It's not privileged. You (12) don't have a basis, and it's relevant information. (13) There is no basis that's set forth clearly in the (14) local rules as well as the federal rules. What is the (15) basis for your objection?

(16) MR. TEMPLE: Apparently he doesn't have to (17) be an expert to give that particular opinion.

(18) MR. SPENCE: Yes, he does. And I think (19) it's completely unfair.

(20) MR. TEMPLE: Is that your objection? That (21) it's unfair?

(22) MR. SPENCE: Well, that's the overriding

Page 78

(1) concern — that it's not a fair question and he's not (2) an expert witness. You've not established that (3) there's any foundation for the question. You haven't (4) asked if he's reviewed medical records of other (5) Defendants. Whether he's even come to such (6) conclusions. I think you're inviting him to point the (7) finger at other Defendants, and I just think it's (8) unfair.

(9) MS. ALEXANDER: Okay. Go ahead. You can (10) go ahead and answer.

(11) MR. S. ANDERSON: Well, let me state my (12) objection. Steve Anderson. I think it's speculation (13) and I don't know that he has a basis and I think it's (14) improper.

(15) MS. ALEXANDER: Okay. What I'm pointing (16) out is that nothing that you have said is a basis to (17) the witness from answering in a deposition. That's a (18) standard rule, and that the question needs to be (19) answered. All of you have preserved your objection to (20) any use of the deposition testimony, but we are (21) entitled to take the answer now.

(22) MR. S. ANDERSON: Let me say this about

Page 79

(1) that: If he's going to say things that he did in (2) connection with the mortality report, which is (3) confidential, than I think this is just the backdoor (4) way of getting the same information. And he is (5) privileged to that information and I don't know that (6) you should be allowed to get around a privilege that (7) protects and encourages medical providers to improve (8) their care by just rephrasing it as his personal (9) opinion rather than what he put into a confidential (10) report.

(11) MS. ALEXANDER: First of all, I'm not (12) asking him about the mortality report. Secondly, as (13) a matter of law, you're wrong about the D.C. privilege (14) covering it, but that is obviously an issue for (15) another day.

(16) MR. S. ANDERSON: The issue is that you (17) are wrong.

(18) MS. ALEXANDER: Well, we're probably not (19) going to get anywhere on that, about what privilege (20) covers in federal court in this conversation. Let's (21) go on, and let me be very clear. For the purpose of (22) this question, I am not asking about the conclusions

Page 80

(1) in the mortality report.

(2)   BY MS. ALEXANDER:

(3)   Q I'm asking you, as you sit here today, (4) what do you think should have been done differently (5) with regard to the care of Mr. Magbie?

(6)   MR. S. ANDERSON: I'll object because I (7) don't think there's any way that he can separate what (8) his personal opinions are from what he's learned in (9) the mortality report. On top of it, I think his (10) attorney has instructed him not to answer the (11) question.

(12) MR. SPENCE: I'm going to instruct the (13) witness not to answer that question.

(14) MS. ALEXANDER: Okay. That's fine.

(15) MR. SPENCE: I'll motion to compel, and (16) we'll deal with it.

(17) MS. ALEXANDER: Okay.

(18) BY MS. ALEXANDER:

(19) Q In September of 2004, did CCHPS have a (20) policy that all transfers to the CTF infirmary had to (21) be approved by the doctor in charge of the unit to (22) assure that CTF could accommodate the patient's needs?

XMAX(21)

06/15/06 MARY R. SCOTT v D.C. DEPO: MALEK MALEKGHASEMI

BSA

### Page 81

(1)  A Yes, during daytime.

(2)  Q And if the transfer was not taking place (3) during day-time, what was supposed to happen?

(4)  A Then the doctor who was arranging the (5) transfer would call CTF infirmary nursing station, ask (6) them if they have a bed, and if the answer was yes, he (7) would tell them that he's transferring this patient (8) with these problems, and they will write orders for (9) that patient.

(10) Q Was there a specific written policy that (11) reflected this?

(12) A Not that I remember, no.

(13) Q To your knowledge, was that policy (14) followed with regard to Mr. Magbie?

(15) A Yes.

(16) Q And how was it followed?

(17) A This is going to be an assumption on my (18) part. Maybe I shouldn't assume, but nobody gets (19) transferred out of the blue.  You cannot be sitting in (20) the infirmary and all of a sudden the elevator door (21) opens and there's your new patient which you have no (22) background on.  So, that rarely happens, but it's not

### Page 82

(1) the rule.  So the assumption is that the doctor in (2) D.C. Jail called the nursing station at CTF and told (3) them to expect this patient, and wrote the orders, and (4) wrote a transfer sheet, and then the patient and the (5) paperwork together went to the infirmary at CTF.

(6)  Q Would that paperwork be reflected in Mr. (7) Magbie's medical records?

(8)  A The orders would be handwritten, so they (9) would be on an order sheet. But so the rest of it, (10) there should be a note.

(11) Q There should be a note of this event in (12) Mr. Magbie's medical record at the CTF infirmary?

(13) A Of his arrival, yes.

(14) Q No.  Of the – what note did you mean? (15) Let me clarify that.

(16) A There's a note from the doctor about the (17) transfer to CTF.

(18) Q A note by which doctor?

(19) A The doctor at D.C. Jail.

(20) Q So your understanding of what the policy (21) required was that it would've been – is that Mr. (22) Magbie's medical records should have a note from the

### Page 83

(1) doctor from the jail who was transferring Mr. Magbie (2) to the infirmary?

(3)  A Yes.

(4)  Q And did you see such a note when you (5) reviewed Mr. Magbie's medical record?

(6)  A I think there's such a note in the intake (7) physical of Mr. Magbie's medical record.

(8)  Q How about the transfer back from Greater (9) Southeast?  Is there any note from a D.C. Jail doctor (10) about the transfer to CTF?

(11) A Not that I recall.

(12) Q Do you know if CCHPS had a policy that (13) required the urgent care center at the D.C. Jail to (14) examine all patients returning from offsite (15) hospitalization?

(16) A Yes.

(17) Q Okay.  Was that policy followed with (18) regard to Mr. Magbie?

(19) A I'm not sure.  The reason I'm saying I'm (20) not sure is because Mr. Magbie may have been a direct (21) transfer from hospital to CTF.  Because to take a (22) patient such as Mr. Magbie through the R&D, which is

### Page 84

(1) receiving & discharge, which is always a very, very (2) busy and unpleasant place because all the new inmates (3) coming in which has already been subjected to it once, (4) on rare occasions people are transferred directly from (5) the hospital to CTF, bypassing that area.

(6)  Q Was one of the purposes of requiring the (7) urgent care center physician to see patients returning (8) from the hospital to make certain that the medical (9) record from the outside hospital was available to the (10) CCHPS staff?

(11) A Yes.

(12) Q Are you familiar with a memorandum of (13) understanding between the Department of Health of the (14) District of Columbia, the Department of Corrections of (15) the District of Columbia, and Greater Southeast (16) Hospital that provided that DOC physicians – that is, (17) CCHPS' physicians, were eligible for clinical (18) privileges to admit patients to Greater Southeast and (19) follow and treat hospitalized patients at Greater (20) Southeast?

(21) A No.

(22) Q Did you have privileges at Greater

06/15/06 MARY R. SCOTT v D.C. DEPO: MALEK MALEKGHASEMI

BSA

Page 85

(1) Southeast?
(2)  A No.
(3)  Q Did anyone on your staff have privileges (4) at Greater Southeast?
(5)  A No.
(6)  Q Did you ever seek such privileges?
(7)  A No.
(8)  Q Did you inquire of other staff if they had (9) such privileges?
(10) A No.
(11) Q Do you know if any other CCHPS staff (12) sought such privileges?
(13) A No.
(14) Q Did you have any communications, either (15) written or oral, with CCHPS or CTF employees or agents (16) or any DOC employees regarding the death of Mr. Magbie (17) other than what you've already discussed?
(18) A You mean with anybody in particular?
(19) Q Yes. In particular about Mr. Magbie, yes, (20) and I'm talking about, you know, we've discussed a (21) number of conversations. I'm asking about any others (22) with DOC staff, with CCHPS staff, with Greater

Page 86

(1) Southeast staff.
(2)  A I mean, what happened to Mr. Magbie was (3) such a tragedy that everybody talked about it to (4) everybody, so it was, you know, just a topic of (5) conversation for days. So I'm sure I did talk to many (6) people, and many people talked to me about it.
(7)  Q Did you have any conversations with any of (8) the Greater Southeast Hospital physicians who worked (9) on Mr. Magbie?
(10) A The only person I talked to was the ER (11) doctor, the female doctor. I don't remember her name. (12) And a nurse that picked up the phone initially.
(13) Q Okay. Did you have any conversations with (14) Dr. Nwosu?
(15) MR. SPENCE: Other than what he's already (16) told you about?
(17) MS. ALEXANDER: Exactly.
(18) THE WITNESS: Nothing formal, but I'm sure (19) we talked about a lot of things regarding Mr. Magbie, (20) yes.
(21) BY MS. ALEXANDER:
(22) Q Do you recall having, after Mr. Magbie's

Page 87

(1) death, a conversation with Dr. Nwosu?
(2)  A Specific conversation? No.
(3)  Q Did you have any conversations with any of (4) the other staff on the infirmary unit about Mr. (5) Magbie's death?
(6)  A Specifically? No.
(7)  Q Did you have any written communications (8) after his death?
(9)  A No.
(10) Q With anyone?
(11) A No. Not that I remember, no.
(12) Q Other than the mortality review which (13) you've described, are you aware of any reviews or (14) investigations into the death of Mr. Magbie?
(15) A I know the Inspector General did one.
(16) Q Did you read that?
(17) A No. It was not given to me.
(18) Q Did you read the Department of Health (19) investigation?
(20) A I saw parts of it, but not the whole (21) report. I saw the conclusion.
(22) Q And how did you happen to see the

Page 88

(1) conclusion?
(2)  A He was showing to me in a meeting that we (3) had with the Department of Health.
(4)  Q Was that meeting specifically about Mr. (5) Magbie's death?
(6)  A No.
(7)  Q Was this part of the agenda of the (8) meeting, or was this something that sort of happened (9) off the agenda?
(10) A Nothing happened off the agenda.
(11) Q Who was it that showed that to you?
(12) A I don't remember the name but there is a (13) lady who works for Department of Health that (14) represented DOC's interest in contract talks and (15) performance with Greater Southeast Hospital. I don't (16) recall her name, and I've known the lady for three (17) years, but I'm really bad with names – you'll have to (18) forgive me on that – but she's the one who showed it (19) to me.
(20) Q Were you aware of any attempt from the (21) District of Columbia to take any contract action (22) against Greater Southeast because of this event?