**Mary R. Scott, et al. V. District of Columbia, et al.**
**United States District Court for the District of Columbia**

**05CV01853**

**Exhibit No. 6 Part II**

### Page 89

(1) A I was not privy to that.
(2) Q Okay. Are you aware of any discipline (3) imposed on anyone in connection with Mr. Magbie's (4) death?
(5) MR. SPENCE: Objection.
(6) MS. ALEXANDER: Go ahead.
(7) MR. S. ANDERSON: Objection. Steve (8) Anderson.
(9) MS. IVANYI: Objection.
(10) THE WITNESS: Until the time I left in (11) November, no.
(12) BY MS. ALEXANDER:
(13) Q And you said you left in November 2005?
(14) A Correct.
(15) Q Okay. Were you aware of any (16) investigations of any staff in connection with Mr. (17) Magbie's death that did not result in discipline?
(18) A Specific investigations regarding specific (19) people, no, but I know there were investigations, but (20) I didn't know which direction or how they were being (21) contacted.
(22) Q You weren't aware of any disciplinary

### Page 90

(1) investigation?
(2) A No.
(3) Q Did you investigate anyone for possible (4) discipline?
(5) A No.
(6) Q Were you ever investigated for possible (7) discipline in connection with events surrounding the (8) death of Mr. Magbie?
(9) A Not that I know of, no.
(10) Q How did you come to leave CCHPS?
(11) MR. SPENCE: Objection. You may answer.
(12) THE WITNESS: We had some issues about the (13) direction of the company, with the medical director (14) and the board members. At the time I left CCHPS I was (15) president of CCHPS. This has happened after Mr. (16) Magbie's death and we disagreed on the direction that (17) CCHPS needs to take.
(18) BY MS. ALEXANDER:
(19) Q What direction did you think that CCHPS (20) needed to take?
(21) A Much more proactive than reactive.
(22) Q Well, could you explain a little what you

### Page 91

(1) mean by that?
(2) A Let's see. We carried a lot of dead (3) weight.
(4) Q You mean staff who weren't performing up (5) to the standards that you felt were appropriate?
(6) A Yes.
(7) Q Were any of those people people at CTF?
(8) A No, because if you recall -- well, you (9) don't recall. Let me explain it to you: The majority (10) of CCHPS management staff was located at D.C. Jail. (11) CCA was like a branch that had some autonomy but (12) everything that happened it happened in a way that (13) affected the whole company was at D.C. Jail. So, no. (14) 99.9 percent of it was related to personnel at D.C. (15) Jail.
(16) Q And your concern was that the staff were (17) not required to meet a high enough standard?
(18) MR. SPENCE: Objection.
(19) THE WITNESS: My main concern was that the (20) staff had found a loophole in the system that they (21) could explore it so they didn't have to do what they (22) were hired to do.

### Page 92

(1) BY MS. ALEXANDER:
(2) Q Could you explain a little what you mean (3) by that?
(4) A I'm being put in a position to badmouth my (5) previous employer, but I don't want to do that, but (6) I'll be -- our medical director, Dr. Ronald Shansky, (7) basically what I used to call him an absentee landlord (8) -- he would come maybe once a month.
(9) But we were the people on the scene (10) because I had moved from CTF to CDF and I had become (11) everything -- I was the president of the company, the (12) go-to guy, order-this guy, but what would happen is (13) that when people didn't want to do something, they (14) would pick up the phone and call Dr. Shansky and get (15) a different version of what they should do, so that (16) would create a very unstable environment for you to (17) function as a company, and that was the main problem.
(18) Q And did that ever affect your work?
(19) A Yes.
(20) Q Can you give us an example?
(21) A Examples, or you know, that I would be (22) asked for a certain report that required a certain

Page 93

(1) person to do it, but that person would not do it, but (2) technically, since they did work for me – they worked (3) for Dr. Shansky – they could get away with it, but (4) the pressure was on the person that was sitting there, (5) needing to get the job done, and that would be me. (6) There were examples like that. There were a lot of (7) them.
(8) Q Were any of these problems with infirmary (9) staff?
(10) A No. This was general company issues.
(11) Q Did anything related to the death of Mr. (12) Magbie have anything to do with your decision to leave (13) CCHPS?
(14) A No.
(15) Q Did you participate in any formal meetings (16) on the subject of the future of CCHPS?
(17) A No.
(18) Q Were there any writings written – were (19) there any written communications exchanged between you (20) and someone else on the subject of the future of (21) CCHPS?
(22) A No.

Page 94

(1) Q You said you were – were you a member of (2) the board?
(3) A I was the president of the board.
(4) Q And this was discussed at board meetings?
(5) MR. SPENCE: Was what discussed?
(6) MS. ALEXANDER: The issue of what he's (7) characterized as the need to be more proactive via (8) staff.
(9) MR. SPENCE: I'm going to object because (10) I think it's irrelevant to begin with. There are (11) other objections, too.
(12) BY MS. ALEXANDER:
(13) Q Go ahead and answer.
(14) A Not any specific chairs, but among board (15) members, yes. It was not on the agenda, but I talked (16) about it frequently, always, all the time, to be (17) honest.
(18) Q Do you stay in touch with anybody from (19) CCHPS?
(20) A Maybe I get one phone call every couple of (21) months.
(22) Q What's your understanding right now about

Page 95

(1) whether CCHPS is going to continue to exist?
(2) A My understanding is that the Department of (3) Corrections has decided to give this contract to Unity (4) Public Health, or something like that – Unity System.
(5) Q And will that essentially mean the end of (6) CCHPS?
(7) A That will be the end of CCHPS.
(8) Q Okay. Have you ever been told that you (9) might be the subject of any medical discipline, that (10) is, discipline by the – you're licensed in D.C.?
(11) A No.
(12) Q Where are you licensed?
(13) A I'm licensed in D.C. and Virginia.
(14) Q Okay. Have you ever been told that it was (15) possible that you would be the subject of any sort of (16) medical discipline at any time?
(17) A No. I got a letter from D.C. Board of (18) Medicine after Mr. Magbie's death. All the doctors at (19) CTF did, after the report came out, and they needed a (20) return response and I responded to, and they dismissed (21) the case.
(22) Q Do you have a copy of that response?

Page 96

(1) A I never got the response.
(2) Q No. Perhaps I misunderstood. I thought (3) that you were required to respond in writing.
(4) A I did respond.
(5) Q Do you have a copy of it with –
(6) A No, I don't.
(7) Q The response that you –
(8) A No, I don't.
(9) Q And you said all which doctors (10) specifically received such letters?
(11) A Correct.
(12) Q But which –
(13) A Oh. Who – Dr. Desta and Dr. Nwosu. I (14) know for sure Dr. Desta received one and I'm (15) speculating that Dr. Nwosu received one, too.
(16) Q Okay. To your knowledge, have you ever (17) been a Defendant in a lawsuit that claimed either that (18) you had committed malpractice or that you had violated (19) someone's constitutional or statutory rights?
(20) A No.
(21) Q Other than this case?
(22) A I have testified, but as a representative

### Page 97

(1) of CCHPS, not as a personal Defendant.
(2) Q But to your knowledge, you've never (3) otherwise been a Defendant in such a lawsuit?
(4) A No.
(5) Q Are you aware of any cases in which CCHPS (6) settled a lawsuit involving medical care at CTF that (7) involved allegations of either malpractice or (8) constitutional or statutory violations?
(9) A I don't remember specific CTF cases, but (10) I know two or three D.C. Jail cases.
(11) Q But you're not aware of any CTF cases?
(12) A No, I'm not.
(13) MS. ALEXANDER: We're going to have a two- (14) or three-minute break now.
(15) MR. SPENCE: Okay.
(16) (Whereupon, a short break was (17) taken.)
(18) BY MS. ALEXANDER:
(19) Q What was Mr. Magbie's health status on the (20) Thursday of the week that he died?
(21) MR. SPENCE: Objection.
(22) THE WITNESS: It was unchanged. From what

### Page 98

(1) I recall, nothing had changed. He just was stable.
(2) BY MS. ALEXANDER:
(3) Q And how do you know that?
(4) A After looking at the records I know that, (5) because I read the records. I didn't see anything (6) specific that has changed.
(7) Q Did any physician examine him on Thursday?
(8) A I don't think so from what I recall, no.
(9) Q Do you recall what was going on with his (10) hydration and nutrition status as of Thursday?
(11) MR. SPENCE: Objection. Are you asking (12) him based upon his interaction on Thursday or are you (13) asking him to tell you based upon his review of the (14) records after the fact? It's unclear from your (15) question.
(16) MS. ALEXANDER: Okay. First, based on –
(17) MR. SPENCE: Because I think he's already (18) testified that on Thursday he had no involvement with (19) this patient.
(20) MS. ALEXANDER: I understand he had no (21) involvement.
(22) BY MS. ALEXANDER:

### Page 99

(1) Q Based on your review of the record was his (2) nutritional and hydration status unchanged on (3) Thursday?
(4) A I don't remember the exact details.
(5) Q Did you look at them?
(6) A Did I look at it? Yes, I read them. I (7) read them, but nothing really comes to mind that comes (8) out as being different or something of concern, no.
(9) Q Did you note whether they were tracking (10) his intake and outflow?
(11) A I know they were tracking his intake, but (12) from what I recall, Mr. Magbie – I don't remember (13) about his output, urinary output.
(14) Q Did you take a look at the records they (15) had to determine how much intake was actually (16) occurring?
(17) A Not, like, concentrate on it, no. But I (18) mean, I read it and I saw parts that it said he ate (19) half of his food, or he drank this – that I remember, (20) but how much or what the amounts are, I don't (21) remember.
(22) Q Were they actually formally tracking his

### Page 100

(1) intake?
(2) A I saw notes to that effect, so the answer (3) would be yes.
(4) Q Was it your assumption that the notes that (5) you saw were complete as to all of his intake?
(6) A I'm not assuming anything. I just saw the (7) notes and it said what it said. It said Mr. Magbie (8) ate half of his food or drank half of his water or (9) juice.
(10) Q Did anything in particular strike you when (11) you looked at those entries with regard to what was (12) tracked about his intake?
(13) A No.
(14) Q After your conversation with Dr. Nwosu (15) that you've described, did you have any more (16) communications with Dr. Nwosu before Mr. Magbie died?
(17) A No.
(18) Q Did you call any of the nurses to see how (19) Mr. Magbie was doing?
(20) A No.
(21) Q Did you make any other attempt to (22) determine how Mr. Magbie was doing?

### Page 101

(1) A I think I already answered that, but the (2) answer is no.
(3) Q By the way, you said you were a witness in (4) a CCHPS' case, you thought. What was that case about?
(5) MR. SPENCE: Go ahead and tell her.
(6) THE WITNESS: This was a case involving a (7) Mr. Caldwell, and I became involved because they (8) wanted a medical director, per se, and the previous (9) medical director was no longer employed by CCHPS so I (10) just did a substitution.
(11) BY MS. ALEXANDER:
(12) Q What was the issue in that case?
(13) A I don't really know, because I did only (14) two hours of it, but I think it had to do with a (15) dental.
(16) MR. SPENCE: Just go ahead and tell her (17) what remember since –
(18) THE WITNESS: I think it had to do with (19) something dental that he didn't get. Finally, I'm (20) guessing, it was root canal. I was there to testify (21) as to the procedures that CCHPS follows when it comes (22) to an outpatient consult. That was my involvement in

### Page 102

(1) that case.
(2) BY MS. ALEXANDER:
(3) Q And you believe you testified in that (4) case?
(5) A I was deposed. Maybe I'm getting my (6) verbiage wrong, but no, I never went to the –
(7) Q No. I understand what you're saying.
(8) A I never went to the court and raised my (9) hand to tell the truth, nothing but the truth. No, I (10) didn't do that.
(11) Q Okay. Any other depositions you gave in (12) connection with your role in CCHPS?
(13) A Not that I remember, no.
(14) Q How often did the board meet, the CCHPS (15) board?
(16) A Every three months.
(17) Q What was Dr. Shansky's relationship to the (18) board? I mean, formal relationship?
(19) A Dr. Shansky was a medical director and (20) board member.
(21) Q Did the issue of Mr. Magbie's death ever (22) come up formally or informally at a board meeting?

### Page 103

(1) A Formally? No. But informally, I'm sure (2) we talked about it, yes.
(3) Q Well, what do you recall?
(4) A In general terms that, you know, just a (5) tragedy. That's it. We were all just – amazing that (6) it happened, that's all.
(7) Q Did you have a particular conversation (8) with Dr. Shansky about Mr. Magbie's death?
(9) A No, nothing particular, no.
(10) Q Did you have – well, did you have any (11) conversation with Dr. Shansky about Mr. Magbie's (12) death?
(13) A Yes, we had some conversation about what (14) happened and, you know, told him my version of it and (15) then we got the – then Dr. Shansky, I'm guessing, (16) seeing the hospital records. And then after that, (17) since he was a medical director, he would get all the (18) reports and all that before I – some of them I never (19) saw and whatever I saw, he had seen it before I did, (20) so nothing special after that. Maybe a couple of (21) things in passing.
(22) Q When you say you gave him your version of

### Page 104

(1) the death, can you tell us what you mean by that?
(2) A In other words, the event. He just asked (3) me what happened and then I told him exactly what I (4) told you, that this is what happened, he came in, we (5) found him unresponsive, we revived him, his (6) oxygenation was good, he went to the hospital, I (7) called the hospital, everything was fine, and six, (8) seven, eight hours later, Mr. Magbie is dead.
(9) Q And it was your understanding that Dr. (10) Nwosu had no concerns about being able to maintain Mr. (11) Magbie in the CTF infirmary?
(12) A Yes.
(13) Q Did you know that Mr. Magbie had a phrenic (14) nerve stimulator?
(15) A Yes.
(16) Q When did you find that out?
(17) A I found that out, I think when I read the (18) note, intake note.
(19) Q Did Dr. Nwosu tell you anything about (20) that?
(21) A Not that I recall, no.
(22) Q What's the purpose of a phrenic nerve

### Page 105

(1) stimulator?
(2) A From my understanding, since this was my (3) first time I've seen one of those – or I've heard one (4) of those, to be honest – was that it would stimulate (5) his di-aphragm so he can take a breath deeper than he (6) can usually do because of his atrophy and his (7) position.
(8) Q Would a patient need that because the (9) patient otherwise would be at particular risk of (10) respiratory distress?
(11) A That would explain the reason, yes.
(12) Q And a patient who had such a medical (13) device implanted would be someone who had respiratory (14) compromise?
(15) A Yes. Otherwise they wouldn't implant such (16) a device.
(17) Q Was the presence of a phrenic nerve (18) stimulator consistent with the need for a ventilator (19) at times?
(20) A I'm not an expert in this field, but I (21) don't know.
(22) Q Is that something that if a physician is

### Page 106

(1) not an expert in he or she should find out what the (2) implications of such a device are?
(3) MR. SPENCE: Objection.
(4) BY MS. ALEXANDER:
(5) Q Go ahead.
(6) A It's like having a pacemaker. I mean, (7) it's there and it's doing its job. You don't (8) necessarily have to follow it up as long as it's (9) working and the patient is stable, he's stable.
(10) Q But you said you weren't familiar with the (11) device.
(12) A No, I wasn't.
(13) Q So was it important for the person who (14) examined Mr. Magbie and presumably knew about this (15) device to determine how that would affect the level of (16) care he needed?
(17) MR. SPENCE: Objection.
(18) BY MS. ALEXANDER:
(19) Q Go ahead.
(20) A I'm not going to second guess what the (21) examining physician did. I don't know what they (22) thought.

### Page 107

(1) Q When you spoke to the law clerk for Judge (2) Retchin did you mention that you had information that (3) the patient might be ventilator-dependent?
(4) A No.
(5) Q But you knew that information at that (6) point?
(7) A My information had come from Mr. Cobbina, (8) yes.
(9) Q So yes, you did have that advisement.
(10) A I did have that information.
(11) MS. ALEXANDER: Nothing further.
(12) MR. SPENCE: Anybody on the phone have a (13) question?
(14) MR. S. ANDERSON: Steve Anderson. I have (15) a couple of questions. Dr. Malek, I'm the lawyer for (16) D.C.
(17) THE WITNESS: Yes, sir.
(18) MR. S. ANDERSON: Hear me?
(19) THE WITNESS: Yes, sir, I can hear you. (20) Go ahead.
(21) CROSS EXAMINATION (22) BY MR. S. ANDERSON:

### Page 108

(1) Q Okay. At times you talked about a (2) ventilator and a respirator. Are they the same thing (3) or are they different?
(4) A They are basically the same thing. Let's (5) be honest. One is an old term and one is a newer (6) term. Respirator is an old term; ventilator is a (7) newer term, but they're pretty much interchangeable.
(8) Q You describe a machine, right?
(9) A Describe the machine, correct.
(10) Q Same machine?
(11) A Yes.
(12) Q You had said that when you looked at the (13) electronic record, it said that the people at Greater (14) Southeast thought he was okay with a nasal cannula?
(15) A Nasal cannual. It's a small plastic (16) tubing that goes into the two nostrils that provides (17) oxygen in a limited amount because of the nature of (18) the, you know, the diameter of the two. You could go (19) up to maybe six liters, if you're lucky, eight liters (20) per minute.
(21) Q And how do you spell that?
(22) A C-A-N-N-U-L-A.

### Page 109

(1) Q And so did the medical records say that's (2) something he was getting at CTF?
(3) A I think medical record somewhere, because (4) I haven't seen it, that says he was getting oxygen, (5) yes. And the preferred method of giving oxygen is (6) through a nasal cannula.
(7) Q Okay. And one question I wanted to ask (8) you because you kind of were fading away and I (9) couldn't exactly hear it, and also somebody walked in (10) my office. You were talking about the trach tube, I (11) think at Greater Southeast, becoming dislodged and I (12) couldn't hear what you said or how you came by that (13) information. Can you repeat that?
(14) A I read that in the autopsy report and also (15) I – let me see. Yes, I read that in the autopsy (16) report that it said that, something to the effect of (17) acute dislodgement or accidental dislodgement of the (18) tracheostomy – I mean, oxygen tube. But the part (19) about tracheostomy coming out, I read that in the (20) records that we got from Greater Southeast Hospital – (21) that the tracheostomy was protruding, or was out and (22) a doctor – which I don't recall the name again – was

### Page 110

(1) called and he came, and he saw it, and he pushed it (2) in.
(3) Q Okay. And so there's a connection between (4) the ventilator and the tube. Is that right?
(5) A That's correct. If somebody with a (6) tracheostomy is on a ventilator they should be (7) connected. The ventilator connects to tracheostomy.
(8) Q And you say, "pushed out," so what (9) happens? Like, the tube goes into the body there, on (10) the top of the chest?
(11) A This is a tube that is sitting in a cavity (12) made in your larynx in your throat basically (13) connecting directly to your windpipe, so that's how (14) the oxygen gets past the lungs. So if it comes out, (15) that means you would not get oxygen into the lungs (16) because the air or the oxygen would escape.
(17) And there's also some issues with pushing (18) it back in because you don't know how far or where (19) it's going. You know, things can come out and then (20) you push it back in, you don't know which direction (21) it's taking. These are from my residencies – normal (22) practice that you do on x-ray to make sure that the

### Page 111

(1) thing is sitting where it's supposed to sit.
(2) Q How is it held in place? Is it taped (3) down?
(4) A If it's a permanent trach, they usually (5) suture it to the neck.
(6) Q Is the tube is liked sewed into the body?
(7) A It's like an orifice and tube goes through (8) that, so that orifice is sutured to the neck and the (9) tube goes through the hole inside that whatever you (10) want to call it – the holder. It has a two part: (11) One part is the tube that is sitting inside and (12) there's a little tube on the outside that connects to (13) the oxygen tube.
(14) Q I see.
(15) A It's like two hoses connecting together.
(16) Q And when you do the cannula, the cannula (17) doesn't connect to that tube. Instead, it connects to (18) your nose.
(19) A You know what? That's an excellent (20) question. No, Mr. Magbie getting all his oxygen (21) through his trach – no cannual. You're absolutely (22) right. That was a mistake on my part.

### Page 112

(1) Q Oh. Okay.
(2) A Because if somebody has a trach, you know, (3) but he was getting it through the trach. So you hook (4) him up to the trach and give him the amount of oxygen (5) you need.
(6) Q And then I wanted to ask you – let me (7) look through my notes again – at one point you were (8) talking about when he returned from Greater Southeast, (9) when Greater Southeast discharged him whether or not (10) it would be typical for him to go through the (11) receiving and classification? I think that's how you (12) called it.
(13) A Receiving and discharge.
(14) Q Again?
(15) A Receiving and discharge, R&D.
(16) Q And that's a place at the D.C. Jail?
(17) A That's correct.
(18) Q And you don't think that, based on your (19) review of the records, that he went there?
(20) A No. That's something that I'm guessing (21) because that would happens sometimes for a patient (22) that we did not feel like they need to go through that

Page 113

(1) lengthy process again.
(2) Q How long does it take to go through (3) receiving and discharge?
(4) A If you're a brand new intake, it can take (5) up to five, six, eight, ten hours. And if you're (6) somebody who's gone through the system because it's (7) based on the officer's need for movement and first- (8) come first-served, it can take two, three hours.
(9) Q Okay. The Plaintiff's attorney, she was (10) asking you questions about, like, whether or not that (11) would also make sure that medical records went with (12) the patient, or something like that. Do you remember (13) that?
(14) A Yes.
(15) Q Is that part of what receiving does?
(16) A Receiving is supposed to get the patient (17) and the paperwork, if there is any, and give it to the (18) transport officer who would bring the patient or the (19) inmate to the medical at D.C. Jail, with the (20) paperwork.
(21) Q And so I guess he had an electronic record (22) that you had access to at CTF. What are we just

Page 114

(1) talking about? The paper record from Greater (2) Southeast?
(3) A Yes, but that paper record would not be in (4) the electronic record. These are two separate things.
(5) Q Would his paper record from Greater (6) Southeast come back with him, or is that something (7) they keep at Greater Southeast, or do you know?
(8) A No. It is supposed to come back.
(9) Q Okay. And do you know if it arrived in (10) CTF when he came?
(11) A I have seen the records. I'm assuming (12) that, yes, it did arrive. I have seen the discharge. (13) It's a yellow sheet that Greater Southeast gives to (14) inmates that are discharged.
(15) Q Did it make any difference that he didn't (16) go through receiving and discharge?
(17) MR. SPENCE: Objection. You may answer.
(18) THE WITNESS: No, because I don't know (19) what happened that night, but the paperwork I've seen. (20) I don't know if it came with him, or later was (21) delivered to the medical, but I have seen the (22) paperwork, so the paperwork was there – that one

Page 115

(1) sheet that I recall seeing.
(2) BY MR. S. ANDERSON:
(3) Q So Ms. Alexander, the Plaintiff's lawyer, (4) she was asking you questions about, like, whether or (5) not you could, I guess, accept or not accept patients (6) that were coming into CTF. Do you remember that?
(7) A No, but refresh my memory now.
(8) Q Seemed like you were saying that the (9) doctor at D.C. General would give nurses notice and (10) then see if there was a place, and that was the place (11) where the CTF could either reject or accept the (12) patient, or is that true?
(13) A CTF will do that based on their occupancy.
(14) Q Okay. Are you allowed to accept and (15) reject patients that you don't think you have a (16) facilities for?
(17) A Yes.
(18) Q And that would be when they give you the (19) notice that the person's coming?
(20) A Yes.
(21) Q Is that, like, documented, or –
(22) A Well –

Page 116

(1) MR. SPENCE: Objection. Are you asking (2) about Mr. Magbie's case or something different?
(3) BY MR. S. ANDERSON:
(4) Q Typically, is it documented?
(5) A If a doctor that initially sees the (6) patient and writes a note to the effect to transfer to (7) CTF and CTF doctor refuses, than the doctor writes the (8) note that the patient would not be going to CTF. (9) Because if CTF refuses, the only place to send the (10) patient is out. They have no other place to keep him.
(11) Q Right. Right. And so do you know if (12) Magbie passed through the custody of the District (13) between when he was discharged by Greater Southeast (14) and when he arrived at CTF, or did he come directly, (15) or do you know?
(16) MR. SPENCE: Objection.
(17) THE WITNESS: I do not know.
(18) BY MR. S. ANDERSON:
(19) Q You know, earlier, not too long ago, you (20) were talking about your conversation with Judge (21) Retchin's law clerk and you said that you didn't tell (22) her that he had a ventilator, but you told her that

### Page 117

(1) you wanted him moved back to the hospital?
(2) A Yes.
(3) Q Did you give any reason, or – to the law (4) clerk?
(5) A My main reason at that time was that Mr. (6) Magbie was confined to his wheelchair, and he was so - (7) - his posture was so fixed that he could not even, (8) kind of, extend his back or move. I mean, he was just (9) the way he was – he was fixed in that position. And (10) we couldn't provide him with a bed that was capable of (11) taking care of his needs. That was my main concern.
(12) Q And not the ventilator thing?
(13) A No, it wasn't at the time. No it wasn't. (14) I also thought that his care was best given to him by (15) a hospital and CTF infirmary.
(16) Q From your review of the medical records, (17) do you know why he experienced the unconsciousness (18) before he was sent to Greater Southeast?
(19) A No, I don't.
(20) Q Did somebody at D.C. tell you that you (21) weren't supposed to call the doctors or was that (22) something that somebody else at CCHPS has decided, or

### Page 118

(1) that was just implied, or how did that come to you?
(2) MR. SPENCE: Objection. You said, (3) "doctors." I think he meant something else.
(4) MR. S. ANDERSON: Oh. And now I've (5) forgotten what I said.
(6) MR. TEMPLE: Steve, can you do better form (7) in terms of your questions? You're asking four (8) questions in one there.
(9) MR. S. ANDERSON: Sure.
(10) BY MR. S. ANDERSON:
(11) Q How did it come to you that you were (12) disinclined to call the Judge about a medical problem (13) with an inmate?
(14) MR. SPENCE: Objection. This has been (15) asked and answered.
(16) MS. IVANYI: Joined.
(17) BY MR. S. ANDERSON:
(18) Q Was it a person? Can you identify a (19) person that said that?
(20) MS. IVANYI: Same objection.
(21) MR. SPENCE: You can answer the question.
(22) THE WITNESS: That was implied by Ms.

### Page 119

(1) Willis and confirmed by Ms. Rainey Ransom that she had (2) been told by Department of Corrections that if she has (3) any medical concerns from the court, she should not (4) talk to us; she should contact Ms. Willis.
(5) BY MR. S. ANDERSON:
(6) Q And the converse of that is?
(7) A And what? I'm sorry.
(8) Q "Converse" is that you shouldn't call her?
(9) A That I should not – that Ms. Rainey (10) Ransom, Dr. Malek and CTF should not directly (11) communicate about the medical needs of a particular (12) inmate if there's such a question. That those (13) questions should be addressed to Department of (14) Correction through Ms. Lorella Willis and than if she (15) so chose, she would call us.
(16) Q I see. And Rainey Ransom, she was an (17) employee of the court?
(18) A Yes.
(19) MR. S. ANDERSON: I think that's all my (20) questions.
(21) MR. TEMPLE: Is Juan still on the phone? (22) Juan?

### Page 120

(1) MR. RUMSEY: I'll go ahead.
(2) MR. J. ANDERSON: I have a couple (3) questions if you want to get through everybody on the (4) phone before you –
(5) MR. SPENCE: Go ahead.
(6) BY MR. J. ANDERSON:
(7) Q Doctor, my name's Juan Anderson. I (8) represent Dr. Vaughn and Dr. Iluyomade in this case. (9) Can you hear me?
(10) A Yes.
(11) Q Doctor, correct me if I'm wrong, but is it (12) accurate that Mr. Magbie had been at the CTF two days (13) before you had heard about his care and treatment? (14) Does that kind of characterize what you testified to (15) earlier?
(16) A Yes. Mr. Magbie had been there about two (17) days before I found out about it.
(18) Q Okay. So would it also be fair to say (19) that you were not aware of any care and treatment for (20) Mr. Magbie before Wednesday, the 22nd of September of (21) 2004?
(22) A That's correct.

### Page 121

(1) Q Okay. Did you ever speak – well, let me (2) ask you first: Do you know Dr. William Vaughn or Skip (3) Vaughn?
(4) A No.
(5) Q Okay. Did you ever speak to Dr. Vaughn at (6) any time between September 20th and September 24 of (7) 2004?
(8) A No.
(9) Q I'm sorry, Doctor, I didn't hear you.
(10) A No.
(11) MR. SPENCE: He said no.
(12) BY MR. J. ANDERSON:
(13) Q And then you also spoke about the (14) mechanism by which oxygen was being provided to Mr. (15) Magbie at the CTF, and that was through this trach (16) tube as opposed to a nasal cannula. Is that correct?
(17) A That's correct.
(18) Q Okay. Is there any difference in (19) oxygenation between providing the oxygen by way of (20) nasal cannula as opposed to through his trach tube?
(21) A Well, in Mr. Magbie's case it would be (22) pointless to give him a nasal cannula when he has a

### Page 122

(1) much better access to his tracheostomy.
(2) Q Okay. So the preferred – would it be (3) fair to say, then, that if oxygen is going to be (4) provided to Mr. Magbie effectively, the method that (5) the CTF would choose would be through his trach tube?
(6) A Yes.
(7) Q Okay. So if it was requested that Mr. (8) Magbie receive oxygen at the CTF that the oxygen would (9) be provided through his trach tube, even if it was (10) requested it be provided by way of nasal cannula. Is (11) that right?
(12) MR. SPENCE: Objection. You may answer (13) the question if you can.
(14) THE WITNESS: If it was me giving the (15) oxygen, I would connect it through the tracheostomy (16) tube.
(17) BY MR. J. ANDERSON:
(18) Q Doctor, do you know of a Dr. Rotimi (19) Iluyomade?
(20) A Just by reading the Greater Southeast (21) report – I mean, discharge notes, yes. That's the (22) only –

### Page 123

(1) Q Did you ever speak to Dr. Iluyomade –
(2) A No.
(3) Q – at any time during the September 24, (4) 2004?
(5) A Is this a male or a female?
(6) Q Male.
(7) A No.
(8) Q Doctor, are you aware of whether – I (9) think you testified earlier that in your view, Mr. (10) Magbie's trach tube should always be sutured as (11) opposed to placed. Is that right?
(12) A No. I said most of them are sutured if (13) they are permanent.
(14) Q Okay. And if not sutured, than what's the (15) proper way to place a trach tube.
(16) MR. SPENCE: Well, I'm going to object. (17) This clearly calls for an expert opinion and this is (18) not an expert witness. Do you want to withdraw the (19) question or do you want him to answer it?
(20) MR. J. ANDERSON: I want him to answer it.
(21) MR. SPENCE: No, I object but I'm not (22) going to instruct you to not answer it.

### Page 124

(1) THE WITNESS: I have to concur with my (2) attorney. I'm not an expert. I really don't know (3) what other mechanism available, but the ones that I've (4) seen, most of the permanent ones are sutured. I'm (5) sure there are other mechanisms of putting them in (6) place, and maybe suture would not work in a very long (7) term, but I'm not familiar with the mechanism used.
(8) BY MR. J. ANDERSON:
(9) Q Okay. Let me ask you it this way, Doctor: (10) I believe that you testified that you read in the (11) record that a physician at Greater Southeast Hospital (12) pushed Mr. Magbie's trach tube back in. Is that (13) right?
(14) A Yes. Yes.
(15) Q Okay. I believe you then went on to (16) testify that the trach tube should not have been (17) pushed in, it should've been sutured, and that x-rays (18) should've been taken to confirm it's placement. Is (19) that right?
(20) MR. SPENCE: Objection.
(21) MR. RUMSEY: It's not correct. Same (22) objection.

Page 125

(1) MS. IVANYI: Joined.
(2) BY MR. J. ANDERSON:
(3) Q If that's incorrect, Doctor, just let me (4) know.
(5) A Yes. That's incorrect.
(6) Q That's incorrect. Okay.
(7) MS. ALEXANDER: Was there another – were (8) you going to rephrase your question or were you going (9) to offer another question?
(10) MR. J. ANDERSON: Give me a second, (11) Counsel.
(12) BY MR. J. ANDERSON:
(13) Q Doctor, let me ask you this with respect (14) to the trach tube: Do you take issue at all with what (15) you read in the record with respect to Mr. Magbie's (16) trach tube being pushed in?
(17) MR. SPENCE: I object. I'm not sure what (18) you're asking, Juan. Are you asking whether he takes (19) a factual issue with it? Whether he is in a position (20) to dispute factually what happened, or are you asking (21) him whether he disputes that it was proper medical (22) care? I'm not sure what your question is.

Page 126

(1) MR. J. ANDERSON: Doctor Malek offered (2) testimony that I thought he testified that that was (3) somehow incorrect, and I'm asking him, is there a (4) correct way that that should've been done.
(5) MR. SPENCE: Again, same objection.
(6) MR. RUMSEY: I'll object as well.
(7) MR. SPENCE: In other words, this is the (8) same objection that I've made previously during the (9) course of this deposition. This is not relevant, it's (10) not calculated to lead to the discovery of admissible (11) evidence, if anything, it falls into the peer review (12) that encompasses his review of this case. He simply (13) recited earlier in his testimony what he learned from (14) a telephone call made to Greater Southeast about (15) factually what occurred. He's not here to express (16) opinions about the propriety or the properness, (17) appropriateness of other physicians' healthcare.
(18) MR. RUMSEY: I'll add to that, but there's (19) also no foundation. You're asking him to render an (20) expert opinion as to a patient that he barely saw.
(21) MR. J. ANDERSON: I think all I was trying (22) to do was clarify what I thought his testimony was

Page 127

(1) before. And from what I understand now – Doctor, let (2) me ask you this: Was that information factually as (3) you put it forth in your earlier testimony, (4) information that you received by way of someone (5) telling you that or by way of your reviewing the (6) records and reading that?
(7) THE WITNESS: I think both.
(8) BY MR. J. ANDERSON:
(9) Q The placement of and the dislodgement of (10) his trach tube and its replacement.
(11) A I think both.
(12) Q Okay. Was it Nurse Hilliard that informed (13) you of that information?
(14) A I believe so.
(15) Q And you read that also in the record after (16) your conversation with Ms. Hilliard?
(17) A I'm almost certain that I read it in the (18) ER notes from Greater Southeast Hospital.
(19) Q Doctor, I believe you testified that (20) you're not board certified in internal medicine. Are (21) you board certified in any other specialties?
(22) A No, I'm not.

Page 128

(1) MR. J. ANDERSON: That's all I have.
(2) MR. RUMSEY: I'll go ahead then.
(3) BY MR. RUMSEY:
(4) Q Doctor, you testified that you spoke with (5) a female physician at Greater Southeast sometime after (6) Magbie's death. Is that correct?
(7) A That's correct.
(8) Q And I believe you testified that this (9) female physician was not the treating physician?
(10) A That is what she told me.
(11) Q Do you have any other description of who (12) this woman might have been?
(13) A No, I don't.
(14) Q Do you think if you heard a name that (15) maybe you could recollect what her name was?
(16) A It's possible.
(17) Q When Mrs. Scott came to the Jail sometime (18) about 10:00 a.m. on Friday, did you actually see the (19) portable vent that she brought with her?
(20) A Yes, I did.
(21) Q Could you just describe what it looked (22) like?

### Page 129

(1) A It's like a steel box, maybe about 30 (2) inches by 14, 15 inches, with a couple of dials and a (3) couple of buttons, and a tube connection.
(4) Q Did it look any different than what you (5) would consider a standard vent?
(6) A Yes.
(7) Q At that point, did Mrs. Scott leave the (8) ventilator with you or did she take it with her?
(9) A No. Left it with me.
(10) Q Do you know what happened to the (11) ventilator that Mrs. Scott left with you?
(12) A Actually, I took the ventilator off to the (13) infirmary and by that time Mr. Magbie was gone into (14) the hospital, and I showed the nurses how it needs to (15) be hooked up based on what Mrs. Scott had told me, and (16) told them if they have any problems call me and we'll (17) take care of it when he comes back.
(18) Q On Friday when you received the emergency (19) call about Mr. Magbie, were they – you went to the (20) CTF, correct?
(21) A I was at CTF, yes.
(22) Q You went to the infirmary and saw Mr.

### Page 130

(1) Magbie?
(2) A I went to the infirmary.
(3) Q Were they already having difficulties with (4) the trach tube when you arrived?
(5) A No. When I arrived, Mr. Magbie's (6) oxygenation has normalized and the EMT was there and (7) they were trying to manage how to take him. I think (8) they attempted to move him from his wheelchair, but (9) that proved to be not practical because of his (10) posture. And then there was the issue with the oxygen (11) tubing and once that all resolved, then they took him (12) on his wheelchair.
(13) Q But they weren't having any problems with (14) the oxygen tubing when you arrived?
(15) A They were having problems with the oxygen (16) tubing when I arrived.
(17) Q Were they having that problem immediately (18) when you arrived or it occurred as you were there?
(19) A I'm not really sure. It was somewhere (20) within immediately arrived or five, ten seconds after (21) that. I'm not really sure, but that's one event that (22) I remember that we were having problems.

### Page 131

(1) Q I guess ultimately my question – I can (2) ask in a more direct way – do you know how long, in (3) time, they were having difficulties with the tubing?
(4) A I don't know, but I mean, can I elaborate (5) a little, because it really didn't matter, because Mr. (6) Magbie was getting oxygen through our tubing and when (7) they tried to change tubing, then they had a problem. (8) So they put him back while trying to figure out what (9) to do with what they had.
(10) Q Did you ever get a chance to observe the (11) trach that was in Mr. Magbie's neck?
(12) A No. I mean, I saw the trach, but I didn't (13) really pay attention to it because we were having an (14) emergency. I wasn't interested that what the trach (15) looked like. I just want him to get his oxygen.
(16) Q Was there anything, if you know, different (17) about the trach that may have been the reason for the (18) difficulties tubing?
(19) A As I mentioned, the difficulty was the (20) size of the tube versus the size of the insert for it, (21) and I don't know whether it was too big or too small, (22) but it was some issue. But since our tube was working

### Page 132

(1) fine we discussed that one and gave it to them and (2) they took care of it.
(3) MR. J. ANDERSON: That's all the questions (4) I have.
(5) MS. ALEXANDER: Anybody else?
(6) MR. S. ANDERSON: I have one more (7) question. Steve Anderson.
(8) BY MR. S. ANDERSON:
(9) Q You said that he had poor posture and that (10) was the concern that you raised with the Judge. Can (11) you describe what he looked like? What the posture (12) was?
(13) A Mr. Magbie had been paralyzed since he was (14) four, and he was muscle-atrophied. In other words, (15) his muscles because of lack of use they practically (16) were just maybe 10 percent or 20 percent of what (17) they're supposed to look like. And because of his (18) inability to move and they way he was maintained, I (19) guess, in his home, he was basically frozen in a (20) hunched-over position and he could not straighten out.
(21) Q Like a fetal position?
(22) A It's not exactly fetal, but it's like your

Page 133

(1) back bent in maybe a 120-degree angle with your knees
(2) bent and basically close to a fetal position, but not a
(3) complete fetal position, no.
(4) MR. S. ANDERSON: Okay. I have no more
(5) questions.
(6) REDIRECT EXAMINATION
(7) BY MS. ALEXANDER:
(8) Q Okay. Two more questions: Isn't it true
(9) that when Mr. Magbie returned from Greater Southeast
(10) the first time and went to the infirmary that, in
(11) fact, no oxygen was ordered for him?
(12) MR. SPENCE: Objection.
(13) THE WITNESS: I don't remember.
(14) BY MS. ALEXANDER:
(15) Q Okay. I have here a copy of a medical – I
(16) understand you have a copy there, but I've opened to
(17) the page that has the medical order. Can you review
(18) them and would that refresh your memory as to whether
(19) oxygen was actually ordered for him at the infirmary?
(20) MR. RUMSEY: Can we get that document
(21) because I don't think all the defense counsel have a
(22) copy of that document.

Page 134

(1) MS. PHILLIPS: I know I sure don't. This
(2) is Louise Phillips.
(3) MS. ALEXANDER: Yes, but let's let him
(4) review it first.
(5) THE WITNESS: No. Here it says oxygen,
(6) check oxygen saturation.
(7) BY MS. ALEXANDER:
(8) Q Yes, it's an order to check the oxygen
(9) saturation but no order for oxygen, either nasal or
(10) any other way, right?
(11) A But there is an oxygen order somewhere.
(12) I'm kind of –
(13) Q So would you agree that if oxygen were
(14) ever ordered for him it should be reflected in this
(15) medical record?
(16) A Can I flip through this?
(17) Q Be my guest.
(18) MS. ALEXANDER: While Dr. Malekghasemi is
(19) reviewing the record, this is a copy of the electronic
(20) record from the D.C. Jail, including the infirmary.
(21) MR. RUMSEY: You don't happen to have
(22) extra copies? We'll make copies afterwards. Do you

Page 135

(1) have an extra copy right now?
(2) MS. ALEXANDER: No, I don't.
(3) THE WITNESS: If this is a complete
(4) record, I don't see it here.
(5) BY MS. ALEXANDER:
(6) Q Now, I believe your counsel indicated that
(7) you had a medical record, a copy yourself here. If
(8) you want to review the copy that your counsel has, you
(9) can feel free to do that, too.
(10) MS. ALEXANDER: Let's go off the record
(11) because this is going to make noise.
(12) (Whereupon, the foregoing matter
(13) went off the record, briefly.)
(14) BY MS. ALEXANDER:
(15) Q Doctor, have you had an opportunity during
(16) the break to review the medical record from the
(17) infirmary and also your own copy that I handed you and
(18) also your own copy of that record?
(19) A I have reviewed all that was provided to
(20) me by both you and my own counsel, yes.
(21) Q And did you see any order for oxygen in
(22) that record?

Page 136

(1) A No, I did not.
(2) MR. SPENCE: An order from CCHPS, you
(3) mean.
(4) MS. ALEXANDER: Order from CCHPS.
(5) MR. SPENCE: Right. As opposed to some
(6) other healthcare provider.
(7) MS. ALEXANDER: Exactly.
(8) MR. SPENCE: Okay.
(9) THE WITNESS: But also, if I may raise a
(10) point, the recommendation from Greater Southeast for
(11) oxygen as needed, that doesn't translate on oxygen
(12) order, so if I was reading this note, I would – okay.
(13) I wouldn't say that, but –
(14) MR. TEMPLE: Let me just state for the
(15) record, that type of an insinuation from counsel, you
(16) can't interrupt the witness.
(17) THE WITNESS: I'm new to this game, so
(18) forgive me. But when you asked for check oxygenation
(19) Q eight hours, you show concern about level of
(20) oxygenation, and if it is low, than the "as needed"
(21) kicks in. That's what I'm trying to say.
(22) BY MS. ALEXANDER:

06/15/06 MARY R. SCOTT v D.C. DEPO: MALEK MALEKGHASEMI   XMAX(35)
BSA

Page 137

(1) Q How long did you observe Mr. Magbie on the (2) day that he died?
(3) A Maybe five to ten minutes.
(4) Q Okay. Did you talk to Mrs. Scott before (5) or after the medical emergency that day?
(6) A After.
(7) Q So at the time you talked to her, you knew (8) her son had already gone to Greater Southeast (9) Hospital?
(10) A That's correct.
(11) Q Did you tell her that?
(12) A No, I did not.
(13) Q Why did you not tell her?
(14) A We have explicit instructions not to tell (15) anybody when an inmate is being transferred.
(16) Q Are you also required not to tell someone (17) that they require a transfer?
(18) A Yes. We're not allowed to share medical (19) information or transfer information.
(20) Q Did you tell her anything about her son's (21) condition?
(22) A You know, I was dying to tell her to be

Page 138

(1) honest, but I just couldn't. The rules are simple. (2) You just can't. You don't tell the inmate when he's (3) going to the hospital. You don't tell the inmate when (4) he's going anywhere. You cannot call me and tell me (5) if Jane Doe is there or is in the hospital. I just (6) can't tell you. You have to go through the DOC.
(7) Q Did you make any attempt to contact her (8) after you learned of her son's death?
(9) A No.
(10) Q Can you tell us a policy that reflects the (11) orders not to give any information about a patient's (12) medical condition to concerned family members?
(13) A I haven't seen a written policy, but it's (14) understood. It is beyond the shadow of a doubt you (15) don't give that kind of information.
(16) Q Now, it is from my experience, it is a (17) fairly common policy and practice among correctional (18) facilities not to give specific information about (19) transfers at times, but ordinarily there is no such (20) prohibition of sharing information about the family (21) circumstance. So if –
(22) A Yes, there is.

Page 139

(1) Q So, I really am interested if you can (2) point me to the language of a specific policy about (3) that.
(4) A As I said, I haven't seen a policy, but if (5) somebody is working Corrections for ten years, that's (6) drilled into you day in and day out. We don't show (7) any information regarding transfers to the hospital, (8) transfers to the doctors. If they're interested you (9) tell them please call the Department of Corrections (10) and talk to them.
(11) Q And you talked to Mr. Cobbina, right?
(12) A Yes.
(13) Q And you discussed the medical situation of (14) Mr. Magbie with him?
(15) A Right.
(16) Q Was there any violation of policy in that?
(17) A No, because I didn't tell him about (18) specifics of Mr. Magbie. It was his telling me what's (19) going on because it was the first time I'm hearing (20) about this, so he was doing the talking and I was (21) doing the listening.
(22) Q Did you tell him where Mr. Magbie was at

Page 140

(1) at that point?
(2) A Yes. CTF. I can tell you that if (3) somebody's in custody in a jail, yes.
(4) Q Okay. So you were permitted to tell her (5) whether or not Mr. Magbie was at CTF?
(6) A I don't think that came up in specific (7) terms. I think he pretty much knew where Mr. Magbie (8) was. He had already spoken to some other people.
(9) Q And you didn't raise up where Mr. Magbie (10) was in the conversation with Mrs. Scott?
(11) A No.
(12) Q You said that the ventilator that Mrs. (13) Scott brought over didn't look like the sorts of (14) ventilators you've seen before?
(15) A Correct.
(16) Q In view of that, did you tell Mrs. Scott (17) that she could take the ventilator to Greater (18) Southeast?
(19) A No. Greater Southeast has their own (20) ventilators. If they so choose, they can use.
(21) Q So you're not implying that there's any (22) difference in function of the home ventilator and the

Page 141

(1) one that the hospital would have?
(2) A I'm sure there are a lot of differences. (3) The ones in the hospital are much more sophisticated.
(4) Q One more question: When you did a (5) mortality review, did it cover issues only with regard (6) to the performance of your staff, or did it evaluate (7) performance of offsite medical providers?
(8) A We look at the whole picture.
(9) Q Okay. So did it actually evaluate the (10) performance of offsite personnel?
(11) MR. SPENCE: Objection. Are you talking (12) in general?
(13) BY MS. ALEXANDER:
(14) Q I'm talking in general. Could you answer?
(15) A That's not the function of a mortality (16) morbidity report.
(17) Q Understood, and that's why I'm asking you (18) the question.
(19) A All right. The function of it is to give (20) a report of the circumstances surrounding the outcome (21) and then at the end make some educated guesses at what (22) went wrong and what could we do differently next time

Page 142

(1) so it won't happen again.
(2) Q And the suggestions about things that you (3) might be able to do differently, was that limited to (4) things your own staff could do differently?
(5) MR. S. ANDERSON: Objection.
(6) BY MS. ALEXANDER:
(7) Q Could you answer?
(8) A That, and also you can point out if you (9) find something that somebody on the outside did wrong, (10) you can try to – you point those out but you don't (11) have much power over to changing things.
(12) Q The recommendations – those would deal (13) with your own staff?
(14) A Correct.
(15) Q Okay. So just for purposes of this (16) deposition, let's put aside any recommendations for (17) your own staff. In thinking it over, are there things (18) that you believe that Greater Southeast should have (19) done differently with regard to the care of Mr. (20) Magbie?
(21) MR. SPENCE: Objection. Please do not (22) answer the question. This is peer review privilege.

Page 143

(1) This is opinions formed in anticipation of potential (2) litigation. This is not calculated to lead to the (3) discovery of admissible evidence, it's irrelevant, and (4) it's covered by D.C. statute that says that it's (5) privileged, so I'm instructing Dr. Malek to not answer (6) that question.
(7) MS. ALEXANDER: Nothing further.
(8) (Whereupon, at 12:50 p.m. the (9) foregoing matter was adjourned.)