**Mary R. Scott, et al. V. District of Columbia, et al.**
**United States District Court for the District of Columbia**

**05CV01853**

**Exhibit No. 10**

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Department of Health

**Health Care Regulation and
Licensing Administration**



NOV 1 8 2004

TO:  Denise S. Pope RN, MSN
    Administrator

THRU: Sharon Williams Lewis
    Acting Program Manager

FROM: Constance McKoy
    Nurse Consultant

SUBJECT: Greater Southeast Community Hospital
    **Complaint No: 05-001**
    **Intake No: DC00000689**

---

### Introduction and Background

On September 28, 2004, the Health Regulation Administration (HRA), Health Care Facilities Division (HCFD), was notified by Dr. Cyril Allen, the Associate Medical Director for Greater Southeast Community Hospital (GSCH), of the death of James Magbie (Patient #1), on September 24, 2004 in the Emergency Department (ED). Patient #1 was a twenty-seven (27) year-old male with a history of quadriplegia and tracheostomy, who was transferred to the ED at GSCH from the Department of Corrections (DOC). Patient #1 was initially transferred from DOC to the ED at GSCH on September 20, 2004 and discharged on September 21, 2004 back to the DOC after treatment. On September 24, 2004, Patient #1 was transferred back to GSCH ED, triaged, provided medical care and scheduled for admission to the hospital. Before Patient #1 could be admitted to the hospital, his condition deteriorated while he was still in the ED. Patient #1 expired while in the ED on September 24, 2004.

This complaint investigation was assigned to this surveyor on September 28, 2004. The investigation consisted of medical record, policy and procedure review and interviews with both employees and contract staff of GSCH and DOC. The investigation was focused on patient care in the ED at GSCH and at DOC. HRA did not interview all relevant GSCH staff because GSCH Administrators, on the advice of counsel, refused to make themselves available. Pertinent interviews had been requested of a physician that provided care to patient #1 on September 21, 2004 and another physician involved in treatment delivery on September 24, 2004. While our purpose, as the regulatory authority for hospitals, was to determine whether this complaint was the result of any violation of law related to the operation of GSCH, we did interview DOC staff and review DOC records. The purpose of our review of records and interview of staff under the

purview of DOC was to make determinations about care provided by GSCH. Therefore, there are no findings in this report related to the compliance or noncompliance of DOC.

DOC facilities are (1) the Central Detention Facility (CDF), also referred to as the D.C. Jail, which includes the Urgent Care Center and other clinic areas and (2) the Correctional Treatment Facility (CTF), managed by Correctional Corporations of American (CCA), which provides medical care to inmates.

## FINDINGS

### GREATER SOUTHEAST COMMUNITY HOSPITAL

*October 1, 2004*

#### 4:30 PM- Mary Jozwick, Director of Performance Improvement (DPI)

A telephone interview was conducted to clarify information in the medical records for Patient #1 and request additional medical record information; facility policies and procedures; staffing schedules; and contact information for staff. The DPI also assisted in reading portions of the medical record because of ineligible handwriting.

The findings from the medical record review revealed, incomplete information for Patient #1. Therefore, the following information was requested from the DPI:

1. Repeat glucose level(s) from the September 20, 2004 ED visit;

2. Results of laboratory tests completed on September 24, 2004;

3. Reassessment documentation from the medical staff on September 20, 2004; and

4. Respiratory Therapy staff documentation.

The DPI forwarded the results of the laboratory test results for September 24, 2004 on October 3, 2004. There were no supporting documents for a repeat glucose test or documentation by respiratory therapy for any intervention rendered on September 20, 2004. Facility policies and procedures, and staff information was provided.

*October 2, 2004*

#### GSCH On-site visit

1:20 PM to 5:45 PM. - Joan Phillips, the Chief Executive Officer, Henrietta Pike, Nursing Supervisor, and Donna Byrd, Clinical Resource Nurse were informed of the reason for the visit.

2

Rounds were conducted in the ED and the correctional unit 7-Secure. The on-site visit included:

- Open and closed medical record reviews from the ED and 7-Secure.
- Patient and staff interviews
- Documentation review to include hospital census for September 20th and 24th 2004 and October 2, 2004; hospital staffing from September 20 to 24, 2004 and October 2, 2004.
- Total number of ED visits on September 20 and 24, 2004.
- Total number of ED deaths for September 2004.

**2:00 PM - Joan Phillips, Chief Executive Officer**
Personal interview - CEO was asked if DOC staff called the hospital to request that Patient #1 be admitted or reevaluated? The CEO stated, "that the statement was untrue. The jail did not call the hospital back to request admission." She further stated, "Why would the hospital say no, that is the reason we are here, to care for patients."

*October 4, 2004*

**3:45 PM - Dr. Cyril Allen, Associate Medical Director (AMD) GSCH**

A telephone interview was conducted with the AMD.  Subsequent communications were made during the course of the investigation. The DPI for GSCH and the Acting Program Manager (APM) for HCFD were included in this telephone interview.

The purpose of the interview was to review portions of the medical records and clarify information regarding contact with DOC.

The AMD confirmed that no one from the DOC called to request that Patient #1 be returned to GSCH for admission. The AMD revealed that the physicians from DOC never called GSCH physicians. They did not talk with Dr. Ackerman, Medical Director, the AMD or the Emergency Department physicians regarding concerns of Patient #1's medical management.

The AMD stated we could contact Ms. Hilliard, the Clinical Liaison for DOC. The AMD revealed that the Clinical Liaison was employed by DOC but interacted between the physicians at GSCH and DOC to facilitate continuity of care.

The AMD confirmed there were no notes written by a Respiratory Therapist on September 24, 2004. When questioned, regarding the physician in the ED calling for Respiratory Therapy for a patient with a tracheotomy and possible respiratory distress, the AMD stated "it depends on the comfort level of the physician caring for the patient".

The AMD also revealed there was no follow up glucose level from September 20, 2004. There was no evidence that blood was drawn or that the nursing staff completed a finger stick after the Dextrose 50% was given at 1:45 AM.

3

The AMD was questioned regarding Patient #1 receiving oxygen (02) via nasal cannula when the patient had a tracheotomy. The AMD indicated that it was not unusual to administer O2 via nasal cannula for this of patient.

The AMD was questioned regarding the results of the ABGs (Arterial Blood Gases) for Patient #1 on September 24, 2004. The pO2 (oxygen level) was elevated at 429 (normal reference 95% to 100%). The AMD revealed that patients with Chronic Obstructive Pulmonary Disease (COPD) have more trouble exhaling oxygen. The patient received O2 at CTF, in transient to GSCH and in the ED at GSCH.

The AMD stated that the discharge was appropriate for Patient #1.

Arrangements were made with the AMD to interview the physician that treated Patient #1 in the ED. The schedules for the ED physicians were given to HCFD by the DPI.

### 5:50 PM - Dr. Vaughn, (Physician #1) ED

The APM for HCFD was present during the telephone interview via speaker. The purpose of the interview was explained to the physician.

ED Physician #1 stated he had a copy of his notes from Patient#1's medical record. The physician was asked to clarify entries in the medical record related to his documentation.

Physician #1 stated that Patient #1 presented to the ED for evaluation because the patient may need a ventilator at night. It was the patient's first day in jail. No one from the jail called prior to the patient's arrival.

When questioned, Physician #1 stated a repeat glucose was done by accucheck. The nursing staff completed the test prior to the patient's discharge. He stated he does not remember the glucose reading.

According to the physician the patient's oxygen saturation on room air was 90%. His oxygen saturation was 99% with two liters of oxygen by nasal cannula. The patient used ventilator support when needed; however, "he did not need ventilator support at that time."

Physician #1 stated he called Dr. Bastein, a House Officer at the jail, on September 21, 2004. Dr. Bastien informed him that the jail could not support a ventilator. The jail could supply oxygen.

Additionally, Physician #1stated, he discussed the case with the House Officer for GSCH. Patient #1, "Had no fever, the white blood cell count was okay." The patient possibly needed oxygen by ventilator. Staff at the jail did not know the type or make of the ventilator, previously used by the inmate.

Physician #1 stated that, at approximately 6:00 am on September 21, 2004, he called the jail to arrange oxygen for the patient. The patient would not be sent back to the jail until the oxygen

4

was available. It was further stated that he was off duty at 8:00 AM on September 21, 2004. He gave a report on Patient #1 to the on coming physician (Dr. Nunoi) noting that the patient was waiting for oxygen at the jail.

When questioned, Physician #1 informed the surveyors that Patient #1 was able to talk in a low whisper voice. He was alert and verbally responsive. Additionally, Physician #1 stated when he questioned Patient #1 about his use of the ventilator; the patient stated he used the vent if he tired, at nighttime only.

Physician #1 stated he told Dr. Bastien, "If the patient has problems send him back".
*October 6, 2004*

### 3:05 PM - Beverly Hilliard, Nurse Liaison for DOC and GSCH

The Nurse Liaison in telephone interview confirmed that DOC did not contact her regarding the transfer of Patient #1 back to GSCH.

The Nurse Liaison revealed that she went to the ED on September 20 and 24, 2004. The Nurse stated she was not needed on September 20, 2004 because when she arrived in the ED, Patient #1 was present in the ED however; he was scheduled for discharge back to the DOC.

On September 24, 2004 the Nurse Liaison stated she received a telephone call from Dr. Malek. Dr. Malek requested that she go to the ED to check on the progress of Patient #1. The Nurse Liaison stated by the time she arrived in the Ed, Patient #1 was scheduled for admission and the staff did not need her assistance.

### *Interview with Monica James, Certified Respiratory Therapist (CRT)*

A telephone interview was conducted with the CRT on November 9, 2004 at approximately 4:50 pm. The APM for HCFD and the DPI for GSEH were included in the interview via speaker telephone.

The CRT has been an employee at GSEH for 15 years. She presently works 12-hour shifts at the hospital. She was assigned to cover the ED September 24, 2004 and was involved in the care of Patient #1.

The CRT was questioned regarding the duties of Respiratory Therapist in the ED. The CRT stated that the therapist have several duties; "respiratory treatments, obtaining arterial blood gases (ABG) oxygen therapy, assistance with intubations, and assistance with Code Blues."

When questioned regarding the staff that was responsible for completion of the physician order "Tracheal Toilet." The CRT stated that nursing and respiratory staff, "Share the responsibility" for tracheal toileting. The CRT stated she did not complete the order for tracheal toilet. The CRT stated the nurse told her that she (the nurse) would to the tracheal toilet. The CRT stated the nurse's name was "Tina." When questioned, the CRT revealed that the tracheal toilet consists of "deep tracheal suctioning to clear an airway and obtain specimens.

5

The CRT was questioned regarding documentation in the medical record for the ED. The CRT stated that the respiratory staff utilized the progress notes to document about anything related to respiratory therapy; treatments given, document medications to include the dose, time and date. The respiratory staff utilizes respiratory forms and/or progress notes for hospitalized inpatients. The ED the respiratory staff documents in the progress notes.

The CRT was questioned regarding obtaining the ABGs for Patient #1. The CRT stated she obtain the first blood gas from Patient #1 in the morning. The CRT stated, "A call came into the office to come a see the patient because he was de-saturating." The CRT stated, "Through out the whole day the patient's saturation (oxygen) was 100%.

When questioned, the CRT stated that the ABG results are obtained in the ED. The respiratory staff does not go back to the office to run the results of the ABGs.

The CRT stated she went to the patient's room to obtain the second ABG, noticed the tracheal tube was protruding out approximately an inch and pushed the tracheal tube back in place. "The tube was out just a little. Dr. I came by the patient room to make sure I was drawing the blood for the ABG."

The CRT stated she checked both the patient's wrists for a pulse at least twice; the left wrist's pulse was faint. Then she looked at the patient's chest and noticed the chest was not rising or falling. The CRT stated, she called the nurse; "The patient is not breathing." The CRT called the doctor back to the room and informed him that the patient was not breathing." The doctor went to bag (Ambu) the patient and noticed the tracheal tube was protruding and pushed the tube back into place. The doctor began to bag the patient.

When questioned, if there was some resistance when the doctor bagged the patient and the CRT stated no at the time however, the doctor did have problems with resistance when he continued to bag the patient.

The tracheal tube did not have a connector between the Ambu bag and the tracheal tube. There was not an inner cannula in place. The doctor placed a cannula into the tracheal tube and continued to bag the patient. A code was called in the process.

When questioned, the CRT revealed that she did not complete intubations the doctors perform intubations and the respiratory therapist assisted.

The CRT revealed that she first saw the patient when the doctor ordered the ABGs in the am. The doctor did not request/order a respiratory evaluation.

The CRT stated that the patient's body was contracted and it was difficult to obtain the ABGs.

When questioned, the CRT confirmed that she did not document any respiratory notes in the medical record regarding the patient.

6

**Review of GSCH Medical Record #1   Patient #1 (JM)**

Information cited in references to specific medical records was taken from the original documents.

*First Admission: September 20 through 21, 2004*

According to the GSCH "Emergency Department (ED) Triage/Initial Assessment Record", the patient arrived in the ED at 9:45 PM on September 20, 2004. The arrival time to the ED was not legible on the EMS record.

- The chief complaint: "quadriplegia with a trach" (tracheostomy) "requires a vent (ventilator)."
- Narrative notes: "Conscious-alert and oriented to time and place. Skin temperature warm and dry, color good. Doctor states patient needs a breathing vent." Patient requires a vent at night. Patient has no shortness of breath at this time.

Patient #1's vital signs were monitored twice.

- The first set of vital signs was (not timed): blood pressure 100/62, pulse rate 90 (reference range of 60-100 beats/minute), respiratory rate 24, (reference range of 12-24 breaths/minute) and pulse oximetry 98%. The second set of vital signs was (not timed): pulse 86, and respirations 20. The respiratory quality was documented as one (1) indicating "normal."
- The Glasgow Coma scale was thirteen (13) times two. The EMS staff did not document the clock times when assessments were completed.

*GSCH Triage Assessment Record*

The patient was triaged from 9:45 PM to 10:05 PM on September 20, 2004. The triage disposition was documented as "Core" (to be seen immediately).

- "Chief complaint/History Present Illness: Trouble breathing. Sent for breathing treatment and vent. Sleeps on vent at home. Information obtained from transfer slip."
- Medications: Valium five (5) milligrams (mg) four times a day, Ditropan, Dantrium 10mg three times a day.
- Medical history included diaphragm pacemaker.
- Social history: "Tobacco and substance abuse."
- Vital signs: "Temperature 97.1F route not indicated; heart rate 89, respirations 14; blood pressure 103/65, pulse oximetry was 97 % on room air."
- Initial triage assessment: mental status alert and oriented times three. All other systems were documented as normal including the respiratory system.
- The exceptions were urology and musculo-skeletal systems. The information checked on the triage form was: Foley-suprapubic (catheter) and skin broken with back ulcer.
- Pain assessment was zero (0), on a scale of zero to ten (0- 10) with zero meaning no pain.
- Vital signs: Temperature 97.1F, pulse 89, respirations 14, blood pressure 103/65, and pulse oximetry 97%.

7

*Emergency Physician Record*
The Emergency Department clinical pathway and physicians' orders titled "Dyspnea COPD, CHF (Congestive Heart Failure) and other" was utilized by Physician # 1 and revealed the following documentation.

*September 20, 2004 at 11:00 PM.* The physician evaluated Patient #1, and completed a history and physical. The chief complaint was "Shortness of breath." The duration/start time was "This PM. Trach dependent patient who uses ventilator at night."

The physician's documentation indicated: the patient had a non-productive cough as an associated symptom. Additionally, the patient had a history of asthma and heart disease.

All systems were reviewed. The history and physical revealed the following systems that had deficits: "Skin and lymph: sacral decubiti; Neck: tracheostomy; Respiratory: wheezing, rales; Musculoskeletal/extremities: contractures; Neurology: quadriplegic."

*11:10 PM:* The physician ordered the following laboratory and diagnostic tests on the "Emergency Department Physician Order Form": Electrocardiogram (ECG) (which was later discontinued), Complete Blood Count (CBC) with differential, Chemistry 12, Prothrombin time (PT), Partial thromoplastin time (PTT), Amylase/Lipase and a portable Chest x-ray. The tests were completed by 12:00 midnight.

The following laboratory tests were not within normal limits:

| Test | Results | Hospital's normal range |
| --- | --- | --- |
| Carbon Dioxide | 17 millimoles/liter | 22-32 mMol/liter |
| Glucose | 58 milligrams/deciliters | 65-99 mg/Dl |
| SGOT | 12 units/liter | 16-41 IU/L |
| Total Bilirubin | 1.9 milligrams/deciliter | .03-1.3 mg/Dl |
| White blood cells | 12.6 kilo/cubic millimeter | 4.0-11.5 k/cumm |

*September 21, 2004 at 1:45 AM:* The physician ordered Dextrose 50% intravenous for the glucose; other physician orders included: *2:00AM* Normal Saline (NS) wide open (fast flow) one (1) liter and nasal oxygen at two liters via nasal cannula; *9:50 AM* an order was written for Normal Saline at 150 milliliters (ml) per hour, give a bolus of 500 ml (the patient had a low blood pressure of 68/48).

*September 21, 2004 at 1:50 AM:* The physician progress notes revealed, that Dextrose 50 one ampule was ordered for a "glucose of 56"; oxygen saturation 90% on room air and 99% with two liters of oxygen by nasal cannula.

Additionally, the note revealed that the physician, "Called D.C. Jail infirmary-no ventilator support, mechanical ventilation support is oxygen at the infirmary; patient to be admitted for Hypovolemia (blood pressure 80 mm), Hypoglycemia and Respiratory Distress."

*September 21, 2004 at 3:20 AM:* The physician's progress note documented that the patient's

8

oxygen saturation was 95 % on room air, blood pressure 91/48 and the patient was alert and oriented. "May only need nasal oxygen while in the D.C. Jail, infirmary can provide. Spoke with Dr. Bastien at D.C. Jail, will arrange for a room at Central Treatment Facility (CTF) ward for Mr. Magbie."

The Emergency Department Course documentation by the physician revealed, "Air movement: fair," and repeated the oxygen saturation on room air (90%) and oxygen saturation with oxygen at two liter nasal cannula (99%).
**The "Clinical Impression"** documented by the physician: **"COPD–acute exacerbation, hypovolemia, and hypoglycemia."** The plan was to admit the patient to the hospital. The case was discussed with House Officer assigned. The physician did not time this note. The Clinical Impression is normally the physician's final documentation.

**September 21, 2004 at 8:00 AM:** The physician wrote the discharge order.

*Nursing Staff Documentation*

*September 21, 2004:* The nursing staff assessed the patient's vital signs, pain and oxygen saturation every two hours between 1:00 AM and 9:15 AM. The patient was reassessed at 10:00 AM, 11:00AM and 11:25 AM.

| Date/time | Pain | Temp | Pulse | Resp | B/P | FIO2 | Pulse ox |
|-----------|------|------|-------|------|------|------|----------|
| 9/21/0100 | 0/10 | 96.3 F | 96 | 12 | 87/53 | RA | 97% |
| 9/21/0300 | 0/10 | 96.8 F | 92 | 12 | 95/49 | RA | 95% |
| 9/21/0500 | 0/10 |      | 88 | 19 | 94/59 | RA | 96% |
| 9/21/0715 | 0/10 | 97.6 F | 93 | 16 | 95/58 | RA | 96% |
| 9/21/0915 | 0/10 | 97.8 F | 97 | 18 | **68/48** | RA | 96% |
| 9/21/1000 | 0/10 | 97.6 F | 87 | 18 | 92/55 | RA | 100% |
| 9/21/1100 | 0/10 | 98.2 | 71 | 18 | 99/60 | RA | 100% |
| 9/21/1125 | 0/10 | 97.6 | 73 | 20 | 107/68 | RA | 100% |

Legend: Temp= Temperature, Resp= Respirations, B/P=Blood Pressure, RA= Room air.

The patient's lowest oxygen saturation was documented at 3:00 AM, 95% on room air. The patient's oxygen saturation was 100% at 10:00AM, 11:00 AM and 11:25 AM on room air. The nursing documentation revealed that throughout the ED course, including the hypertensive episode the patient did not experience shortness of breath or respiratory distress.

*September 21, 2004 at 7:00 AM:* There was a shift change. The nursing staff documentation at 7:15 AM revealed, "Patient has been discharged, waiting for a room to be prepared…"

*9:50 AM: Nursing progress note:* The patient's blood pressure dropped to 68/42 at 9:15 AM on September 21, 2004. The patient received 500 ml Normal Saline bolus. His blood pressure elevated to 92/55 and the normal saline was continued at 150 ml per hour.
 "Patient is not in acute distress, no respiratory distress, or shortness of breath noted. Will

9

continue to monitor. Patient waiting to be transferred to D. C. Jail."

**11:45 AM:** *Nursing note:* The patient was transported to the jail via a contract ambulance at 11:45 AM on September 21, 2004. "No acute distress, no respiratory distress or shortness of breath noted." Patient's blood pressure was up to 107/68.

*Discharge Instructions*

The patient received discharge instructions. The discharge instruction included, the patient's diagnosis of Hypoglycemia-resolved, Hypovolemia-resolved and bronchitis-stable. Medications given in ED: Normal saline and glucose. Other instructions: nasal oxygen at nighttime as needed. Prescription: plenty of fluids.

The nursing staff documented that a doctor at the jail (CTF) was contacted. Additionally, the nursing staff completed a final assessment and documented that the patient verbalized the understanding of the discharge instructions.

**2nd Admission to GSCH on September 24, 2004**

*EMS Patient Care Report: September 24, 2004*

***Please note portions of the EMS report were illegible

Time of Service: illegible
Medical History: other
Medical Necessity for transport: unmoved by stretcher, non-ambulatory, unconscious, physical restraints.
**Chief Complaint: unresponsive.**
**Narrative:** "History of quadriplegic, trach tube, Tess machine. Arrived on scene to find patient, male unknown age quad (quadriplegic) in wheelchair responsive."
Chief complaint: "Unresponsive, staff states found in cell".
Physical exam: "Respiratory rate decreased approximately six (6) [breathes per minute] minutes". Heart rate increased. Pulse ox 90% on nasal cannula by jail staff. Skin: warm and dry, pupils fixed and dilated, trach tube, Foley bag, and Tess machine. Contracted with Posey.
**Treatments:** "Oxygen by Trach tube nasal cannula, unable to bag due to trach tubing, (illegible word) noted. IV access left arm 20 gauge, keep open. Due to crackles to left lung. Blood glucose 148, pulse ox 100%, heart rate decreased from 105 to 98 (time illegible) change enroute to hospital."

Review of GSCH Medical Record #2      Patient #1 (JM)

*Second Admission: September 24, 2004*

**Arrival and Triage time: 9:50 AM** by EMS
**Triage Disposition:** Core
**Chief Complaint:** Respiratory-Unresponsive.
Current Medications: Oxybutin, Lorazepam, Dulcolax
**Triage Vital signs:** "Temperature 95.6 F axillary; heart rate: 107; respirations 26; B/P 105/55; pulse oximetry 100%".

10

Past Medical History: Quadriplegic, tracheostomy.
**Triage Assessment:** Mental status: Unresponsive; Respiratory status: Trach; Temperature of skin: warm; GT status: G-tube, stoma; musculo-skeletal status: contracture.
**Triage completed: 10:10 AM.**

**10:10 AM:** Seen by physician (Emergency Physician Record (preprinted form titled "Altered Mental Status")
History limited by Altered Mental Status
Chief complaint: Unresponsive, Respiratory distress
Duration/started: Today. Sent from D.C. Jail. (Found unresponsive by staff in jail).
Quality of altered mental status: Unresponsive. Usually: alert and oriented x3.
Allergies: Unknown
Review of Systems (ROS): unable to assess (History)
"Obtunded" ( dull especially to blunt sensation). No apparent distress (NAD)
ENT: Tracheostomy; Neuro: pupils small; Peripheral exam: quadriplegic/contractures.
Neck: chronic stiff; *Respiratory:* "Respiratory distress (unable to read) resp..." decreased air exchange left lung; Musculoskeletal/extremities: contractures, decubitus ulcer.

**10:15 AM: Laboratory and Diagnostic Test Ordered**
Complete blood count with differential, Chemistry 7, urinalysis, urine toxicity, cultures: blood and urine, portable chest x-ray, head/CT scan, arterial blood gases (ABG), trach mask at room air.

**Additional treatment: 10:15 AM** IV of Normal Saline solution @ 125 ml/hr, Tracheal toilet, Narcan 2mg intravenous, Thiamine 100mg intravenous (completed at 11:40AM). **1:05 PM:** Levaquin 500 mgs intravenous (started at 1:25 PM).

**11:40 AM:** One liter of Normal Saline at 125 ml/hr. First liter completed at 4:18 PM. Next liter started at 4:18 PM.
**11:45 PM -12:20 PM:** Laboratory and diagnostic tests completed.
- CT of Head without contrast-Normal.
- Chest x-ray single view: Left Lower Lobe infiltrate and/or consolidation.
- Urine toxicity: positive for benzodiazapam and terahydrocannaboinal (THC).
- Urinalysis: Ketones: large; Blood: 3+
- White blood count 19.1
- ABG sent at 11:10 AM: ph: 7.29  (hospital range 7.350-7.450) pCO2: 56.1 (hospital range 35-45 millimeter mercury/mmHg); pO2: 429(hospital range 85-100 mm/Hg)

**12:15 PM:** Temperature 96 F axillary; pulse 108 (reference range 60-100 beats/minute); respirations 24 (reference range of 12-24 breaths per minute); blood pressures 132/85; *pulse oximetry 100% via trach mask.*

**1:05 PM: Emergency Department Course** by physician: awake improved, re-examined. Results on ABGs and CT scan of head documented.

11

**1:20 PM: Disposition time: Clinical Impression:** Altered mental status, Multi-substance abuse, Pneumonia, Urinary tract infection- Urospesis.

**1:25 PM: Nurses note:** Patient responsive at times, attempting to communicate. Patient admitted to the hospital. Awaiting bed assignment. Oxygen continued via trach mask. Resting quietly.

**2:05 PM:** pulse 70; respirations 24; blood pressure: 99/52, *pulse oximetry 95%* five liters of oxygen.

**3:30 PM:** Patient alert, attempting to answer questions but unable to related to trach. *Pulse oximetry 97%.*

**4:00 PM:** Temperature 95.5 F (route not documented); pulse 88; respirations: 20; blood pressure 91/54; *pulse oximetry 92% via trach mask.*

**5:40 PM:** "Patient alert; *pulse ox decreasing, presently 80% trach mask.* Respiratory therapy and the physician called to the bedside. Patient in respiratory distress, trach protruding out 1 ½ inches from neck dressing under trach collar. Physician pushed trach back in." Trach not sutured to neck. No apparent distress. Blood gas to be obtained."

Pulse: 62, respirations: 22, blood pressure 106/54.

**6:00 PM:** Pulse oximetry continues decreasing, respiratory therapy attempt blood gas unsuccessful. Respiratory therapy continues to try. Patient on 100% trach mask, saturation 71%. Patient has diaphragm pacemaker, spikes on monitor, mild respiratory distress.

**6:10 PM:** Physician progress note: "Asked to patient's bedside he has stopped breathing. Patient had decompensated. Attempted to get ABG. No pulse, no respirations-Asystole. Cardio-pulmonary resuscitation (CPR) and Advance cardiac life support (ACLS) activated".

Medications Administered: Atropine and Sodium Bicarbonate were given. Patient eventually had a pulse but later went into ventricular tachycardia (V-tach) without pulse. Defibrillated times three at 200, 300 and 360 joules. Pulse tachycardiac. Pacing attempted without capture. Asystole. Pronounced dead at 1840 (6:40 PM). Noted, "See Code Blue Sheet for details."

**6:16 PM: Nurses notes:** "While at beside with respiratory therapy, this nurse noticed no rise and fall of chest-decreasing. This nurse checked for breathing and pulse; no breathing or pulse. Cardiopulmonary resuscitation started; See Code Blue Sheet".

**Code Blue Sheet**
- Code witnessed on September 24, 2004 at 6:15 PM by the nursing staff.
- Arrest features: First-degree cardiac and respiratory arrest.
- Pre-code Diagnosis: Left lower lobe pneumonia and Urosepsis.
- Ventilation initiated by: Respiratory Therapist at 6:15 PM to bag trach.

12

- Intravenous line: Pre-existing line by the EMS; peripheral-anticubital.
- Shock time: 6: 32 PM, rhythm: V-tach, 200 joules. Next shock was 300 joules (no time documented). Note the third defibrillation of 360 joules was not recorded.
- Medications Administrated: Epinephrine one ampule at 6:16 PM, 6:19 PM, 6:21 PM, 6:25 PM and 6:30 PM. Atropine one ampule at 6:17 PM and 6:20 PM. Amiodarone 150 mg started at 6:33 PM. Sodium Bicarbonate one ampule give at 6:22 PM.

**Patient Outcome**: Deceased. Time of death was 6:40 PM.

The physician and nursing staff signed the code blue sheet. Appropriate persons notified, i.e. Department of Corrections, law enforcement staff, medical examiner, transplant consortium.

## DEPARTMENT OF CORRECTIONS INTERVIEWS

*October 4, 2004*

<u>4: 15 PM- Lorella Willis, Administrator Health Services Administration (AHSA) and Julianna Tyer, Nurse Consultant, (NC) for Health Services Administration for DOC.</u>

A telephone interview was conducted with the administrator and a Nurse Consultant from DOC Health Services administration. The purpose of the interview was explained. The APM for HCFD was also present via telephone speaker.

The AHSA gave a brief summary of the admission process to the correctional system. Patient #1 was received in Receiving and Discharge (R& D) on September 20, 2004 at 11:52 AM. The correctional staff called the medical staff to assist when staff observed a pacemaker on Patient #1. The medical staff responded and stayed with Patient #1 until the patient was processed into the correctional facility.

Patient #1 was taken to Urgent Care, (located at DC Jail) for medical evaluation at 2:00 PM. The following evaluations were completed for Patient #1 between 2:00 PM to 4:30 PM: nursing, medical, radiology, and mental health evaluation. Patient #1 was cleared for Admission to CTF's infirmary at 4:30 PM however, remained in Urgent Care until 9:00 PM.

The AHSA stated that on September 20, 2004 at 9:00 PM, the nurse in Urgent Care noticed that Patient #1 was having difficulty breathing. Patient #1 revealed to the nurse that he used a "breathing vent" at night. The nurse called the physician. The physician responded by 9:15 PM and evaluated Patient #1. The physician called 911. The patient was transported to GSCH. The physician for CTF called the ED physician at GSCH to inform the staff that Patient #1 used a "vent" at night.

Patient #1 was treated at GSCH and returned to CTF on September 21, 2004 at 11:45 AM. The patient was transported to sick call for reassessment. Patient #1 remained in sick call from 11:45 AM to 4:42 PM.

13

When questioned, the AHSA revealed that the infirmary in CTF is staffed with physician and nursing staff. Nursing staff coverage is twenty-fours. The physician coverage is from 7:30 AM to 5:00 PM. The physician staff from Central Detention Facility (CDF) provide coverage in the absence of CTF medical staff from 5:00 PM to 7:30 AM.

The NC from DOC revealed, on September 24, 2004 at 8:40 AM, that Patient #1 developed respiratory distress. The nursing staff noted that the patient who was in a wheelchair was not moving. The nurse assessed Patient #1. According to the nurse, the patient was clammy and had white secretions from the mouth. The nursing staff assessed the patient's vital signs: blood pressure 78/51 and pulse oximetry (ox) 26% (normal reference range 95% to 100%). No respirations were recorded.

The nursing staff used an Ambu bag (an assistive device to administer oxygen) to ventilate the patient. Patient #1 was suctioned and administered oxygen 96% via facemask. A pulse oximetry reading of 99% was obtained after the above nursing intervention. The physician was notified and 911 was called. The nursing and physician staff monitored the patient until the EMS ambulance arrived.

The NC provided the nursing staff's assessment of Patient #1 at 7:45 AM on September 24, 2004. Patient #1 was alert, oriented, no distress, no congestion; vital signs: temperature 98.2 F (degrees Fahrenheit), 88 pulse, blood pressure 112/68 and pulse oximetry 96%.

The AHSA revealed that Patient #1's mother brought his ventilator from home, approximately one half hour after Patient #1 was transferred to GSCH on September 24, 2004.

According to the AHSA, Dr. Malek did not know about the ventilator. Patient #1's attorney called Dr. Malek and informed him of the ventilator. The AHSA stated she did not know when or what the attorney said to Dr. Malek.

The AHSA also revealed, Patient #1's mother visited the patient on September 22, 2004 and did not mention the ventilator.

*October 5, 2004*

**6:35 AM - Dr. Bastien (Physician at DC Jail)**

Sharon Lewis, Acting Program Manager, conducted the telephone interview. Dr. Bastein was queried on the events of September 20, 2004 regarding his involvement with inmate Jonathan Magbie. The physician reported to work at 12 :00AM on September 21, 2004 and left at 7:00AM; therefore, he did not see the inmate prior to his 911 transfer to GSCH.

According to Dr. Bastien a physician called him from GSCH (he did not remember the physician's name) during his tour of duty and informed him of the following: "The patient's vital

14

signs were okay, pulse ox (oximetry) okay, condition stable. He was not on a vent, [but I] heard he was in need of respiratory support during the night".

Dr. Bastien informed GSCH physicians that CDF (Central Detention Facility) did not have any equipment to "deal" with his respiratory needs. GSCH physician called Dr. Bastien a second time and asked if there was an infirmary at the jail. In response, he informed that the infirmary at the jail is not an acute care unit. However, CTF (Central Treatment Facility) has a higher-level infirmary.

Additionally, the infirmary is closed to admissions during the night because there isn't a physician at that location. Physicians are located at CDF during the night. This interviewer asked what is the acuity level for medical care at CTF.  Dr. Bastien directed that Dr. Malek, Medical Director, would best answer that question. The interview concluded at 6:50 AM.

*October 6, 2004*

### 1:30 PM - Dr. Malek Malekghasemi, Chief Medical Officer  (CMO) for Correctional Treatment Facility (CTF)

A telephone interview was conducted with the CMO for CTF. Included in the interview was the APM for HCFD. The purpose of interview was explained to the CMO.

When questioned, the CMO stated he has been the CMO for CTF since 1995.

The types of patients that are admitted to CTF are patients that require intravenous medications, incontinent patients, paraplegics, quadriplegics, and patients that are too sick to be in the general population.

The CMO revealed he did not see the patient on admission to CTF. He found out about the ventilator after the patient's attorney informed him one day after the patient was admitted to CTF, around September 22, 2004. The CMO stated that the attorney revealed that he "thought the patient used a vent at home." The CMO stated that the patient was sent to the hospital, sent back, and admitted to CTF's infirmary.

According to the CMO, he thought "that was odd because we (CTF) should not have a patient that required a vent." The CMO revealed, the next day (September 23, 2004) he got nervous and called the attorney back, "Tell his Mom to bring the vent in."  He received the vent on Friday, September 24, 2004 between 10:00AM and 10:30 AM.

The CMO stated he called the judge before he called the patient's attorney. He asked the judge, "Why would this patient (Patient #1) be in the jail?" According to the CMO, the judge said, "Send him to the hospital". The CMO responded, "He (Patient #1) was in the hospital and they sent him back." The CMO further stated, "I need a court order to have him placed in the hospital."

15

The judge checked and called the CMO back and stated she could not write a court order to make the hospital take the patient back.

When questioned, the CMO revealed he did not call the hospital (GSCH) to request that Patient#1 be admitted.

When questioned, the CMO stated that the patient's mother did not bring the ventilator (vent) in prior to the request on September 23, 2004. The CMO stated the patient had been transferred to GSCH on September 24, 2004 by the time the mother brought the vent to CTF.

The CMO revealed that Dr. Nwosu was in charge of the infirmary. Dr. Nwosu saw the patient during his stay at CTF.

When questioned, the CMO admitted that in the past, CTF had patients with a tracheostomy and quadriplegics, but that was years ago. Patient #1 had a wheelchair and he never left the wheelchair.

The CMO revealed that on September 24, 2004 after Patient #1 was transferred to GSCH, he called the ED twice while the patient was in the ED, at 2:00 PM and around 6:00 PM. The first nurse that the CMO spoke with revealed that Patient #1 was being admitted for pneumonia and urosepsis.

The CMO called back to the hospital at 6:00 PM and the nurse stated that the patient was hyperventilating, low pulse ox at 90% and vital signs stable. The patient was groggy but he was fine.

Additionally, the CMO stated that when EMS was ready to transport the patient to GSCH, the EMS could not connect the oxygen to the tracheostomy tube, it would not connect. The CMO stated he cut some tubing from another product and attached the tubing into the tracheostomy so the patient could receive oxygen.

When questioned, the CMO confirmed that Patient #1 was suctioned as needed (prn). It was also stated by the CMO that he was not aware that Patient #1 had COPD. The interview concluded at 1:45 PM.

### Additional communication with CMO

**October 8, 2004 -** during the on-site visit to CTF and CDF, the CMO revealed that the reason Patient #1 was in Urgent Care instead of the lock cell was because of his wheelchair and safety for the inmate. This decision was based on limited room in the holding cell and the inmate had a diaphragm pacemaker and tracheostomy.

**October 13, 2004 -** a telephone communication was conducted with the CMO regarding EMS staff referencing a Teso/Tess machine on Patient #1 upon arrival. The CMO revealed that Patient

16

#1 did not have a machine in use. He stated it was probably the diaphragm pacemaker that the EMS staff referenced.

**October 7, 2004**

**1:05 PM - Dr. Sunday Nwosu, Medical Officer for CTF**

The interview was conducted by speakerphone and the purpose of the interview was explained to MO/CTF by the surveyor and APM
The APM from HCFD, the Administrator and Nurse Consultant for Health Service Administration for DOC and the CMO for CTF were also present during the interview.

According to the MO/CTF, his title is Medical Officer and he is responsible for the infirmary in CTF. His working hours are from 8:30 AM to 5:00 PM, Monday through Friday.

MO/CTF stated he examined the patient when he returned from the hospital on September 21, 2004. The assessment of Patient #1 revealed, the patient was a quadriplegic, wheelchair bound, with a diaphragm pacemaker, tracheostomy, requiring total care. The patient was alert and oriented and in no distress.

MO/CTF revealed that the information written in Patient #1's record referenced the patient use of a breathing ventilator at home.

When questioned regarding the frequency that Patient #1 uses the ventilator, the MO/CTF stated that the patient used the ventilator at night, when he tired. The MO/CTF stated that the patient did not clarify nor did he ask, the frequency in which he used the ventilator.

The MO/CTF stated he made rounds the days that he worked. The patient was okay on admission and the next day, September 22, 2004. On Thursday, September 23, 2004 the MO/CTF was not on duty. When he arrived on duty Friday, September 24, 2004, the staff in CTF were involved with the code for Patient #1. The ambulance had been called.

When questioned, the MO/CTF stated the infirmary had portable suction machines and portable oxygen tanks; the small cylinder tanks for transport and the large cylinder tanks for individual use in each patient's room.

When questioned, the MO/CTF revealed he did not receive a shift report from the nursing staff. The MO/CTF stated he talked with the head nurse and made patient rounds.

The MO/CTF revealed, Patient #1 "Was not using oxygen while he was in CTF. He did not need oxygen." He was riding around in his wheelchair in no respiratory distress.

When questioned, the MO/CTF stated that he did not talk to any physician at GSCH about Patient #1. The physician from GSCH sent written information back regarding Patient #1.

17

When questioned, the MO/CTF revealed there was "no immediate concern" that Patient #1 did not need a ventilator at night because "he was doing well."

The MO/CTF also revealed that he checked Patient #1 more than once during the day after patient rounds were completed.

**October 8, 2004**

**HRA on-site Visit to DOC**

An on-site visit was conducted by this surveyor to the DOC, Central Detention Facility (CDF-DC Jail) and Correctional Care of America-Correctional Treatment Facility [CTF] on October 9, 2004. Lorella Willis, Administrator for DOC Health Service Administration, Julianna Tyer, Nurse Consultant, Dr. Malek, Chief Medical Officer for CTF, and Ms. Hunter, the Chief Nursing Officer were informed of the reason for the on-site visit.   The Administrator the Nurse Consultant from Health Service Administration and the Chief Medical Officer for CTF toured with this surveyor.

The on-site visit included:

- The computerized medical record was reviewed with Dr. Malek in order to clarify time frames related to medical and nursing documentation.

- The Urgent Care and clinic areas in CDF were reviewed for emergency response, e.g. equipment and space.   A clinic service was in process during the on-site visit.

- The infirmary (Unit 82) located in CTF tour included:  Patient rooms, bathrooms, the day room, the supply storage areas, storage of O2 cylinders and suction machines.

The Nurse Director for CTF and CDF reviewed staffing with this surveyor to include medical, nursing and ancillary staff.

*October 19, 2004*

**3:23 PM.- Janice Long, Registered Nurse  (RN #1) CCA**

The reason for the telephone interview was explained to Ms. Long. The Nurse Consultant (NC) from DOC Health Services Administration (HSA) was present during the telephone interview.

According to RN #1, she made patient rounds at 8:00 AM on September 24, 2004. At approximately 8:25 AM Patient #1 was moving around in his wheelchair trying to mouth words but she did not understand him. RN#1 stated she assessed the patient's vital signs and the vital signs were abnormal including the pulse. RN #1 stated she used the Ambu bag to ventilate

18

Patient #1, suctioned the patient and called for assistance. The medical and nursing staff responded.

RN #1 stated, "911 was called and arrived at approximately 8:55 AM on September 24, 2004. The nursing staff continued to Ambu the patient, oxygen was started at four (4) liters via facemask, and the patient's pulse oximetry was 96%. The patient's pulse oximetry was as high as 99%.

RN #1 stated that one of the physicians completed transport papers for the patient and another physician and a physician assistant stayed with the patient and staff. The EMS assumed the care of the patient and continued to use the Ambu bag until the patient left the CCA unit.

When RN #1 was questioned about the position of Patient #1's tracheostomy tube, RN #1 stated, "Can't say." RN #1 also revealed, Patient #1 did not have a trach collar for his tracheotomy tube.

### 4:15 PM - Interview with Risikat Gbajabiamila, RN #2 for Central Detention Facility (CDF)

A telephone interview was conducted with RN #2 on October 19, 2004. The NC from DOC's HSA was also present during the interview. The reason for the interview was explained to RN #2.

RN #2 stated that she met Patient #1 when she came on duty at the Urgent Care Center at 4:00 PM on September 20, 2004. Patient #1 was waiting to be transferred to CCA (CTF).

RN #2 stated she observed the patient to have increased respirations, so she took the patient's vital signs. His respirations were 24 and oxygen saturation was 96%. RN #2 stated she questioned the patient and he stated he could not sleep without his ventilator.

The physicians were called and responded. One of the physicians talked to one of the ED physicians at GSCH. RN #2 stated she did not know the name of the physician that the DOC physician communicated to regarding information about Patient #1.

When questioned, RN #2 revealed that the patient's tracheostomy tube was "All the way in." She did not give any medications or oxygen to the patient while he was in Urgent Care and the physician for CDF stayed with the patient until the ambulance arrived.

RN #2 stated that Patient #1 was not in distress when she left Urgent Care enroute to GSCH.

### DOC's Medical Record Review
Patient #1 was admitted to DOC via "Receiving and Discharge" on September 20, 2004. A comphensive history and physical was completed between 2:00 PM and 4:30 PM. The patient had nursing, mental health, radiology, and a medical evaluation and a purified protein derivative (PPD) placement to test for tuberculosis.

19

Hand-written admissions "Doctor orders" were noted at 2:45 PM on September 20, 2004.
- Diagnosis: quadriplegia and pressure ulcer.
- Condition: guarded, Vitals: every four hours, Allergy: no known allergies, Activity: wheelchair bound
- Medications for muscle spasms and a laxative were ordered.
- Nursing duties included: Dressing changes of wet to dry Normal Saline to right elbow and right upper back once a day, tracheostomy tube cleaning with Normal Saline and suprapubic catheter cleaning with Normal Saline every day.

The computerized medical records under "Medications":
- "Tracheostomy suction tracheostomy every eight (8) hours."
- "Check oxygen sat (saturation) every shift"
- "Please do not wait for this patient to use call bell because he cannot. Check every 30 minutes."

*Nursing Note* on September 20, 2004 -Urgent Care: Hospital Transfer
Provider: Risikat Gbajabiamila, RN (RN#2)
- Vital signs: Temperature (oral): 97.2 F; pulse: 95; respirations: 24 and blood pressure: 96/65 millimeter of mercury; pulse oximetry: 96%.
- Nursing note: "He was in urgent care awaiting transfer to CCA upon taking over the shift. During this waiting period, inmate exhibits difficulty breathing; tracheostomy patient."
- Patient claims he does not receive oxygen via his trach, he stated that he needed "continuous breathing treatment-ventilator at night."
- Dr. Abdulwahab and Dr. Doh notified about inmate's condition. "Evaluation done and recommendation given to transfer inmate to hospital"
- "Inmate was transferred to GSCH via 911 at 9:00 PM, he was alert and oriented times three upon transfer."

*Physician Note:* September 20, 2004
"The patient complaining of difficulty in breathing, he stated that he is ventilator dependent at night therefore, send him to GSCH and informed the ER doctor."

*Physician Note:* September 21, 2004: Routine Sick Call
" 27 year old quadriplegic was sent to GSCH yesterday from CDF for breathing problem. He returned this evening from hospital…has tracheostomy in place, needs regular breathing treatments. He wears vent diaphragm pacemaker operated by a nine-volt battery. He claims he is ventilator dependent at night."

- "Assessment: quadriplegia from motor vehicle accident (MVA) at age four. Total care, on trach mechanical voice transducer, wheelchair bound (motorized), diaphragmatic pacer.
- Plan: Admit to L-82 (CCA Infirmary)"

20

The other orders written by the CCA physician were similar to the previous admission orders with this exception: "Sign of serious difficult breathing refer patient via Ambulance to GSECH on stat basis after consultation with medical doctor (MD) covering you."

*Nursing Notes from:* September 21, 2004 at 8:44 PM to September 24, 2004 at 7: 45 AM revealed that Patient #1 had no respiratory distress. The patient was suctioned via tracheostomy as needed. The nursing staff followed the physician's orders according to the nursing documentation.

Starting on September 21, 2004, signed at 11:19 PM, Patient #1 refused to sleep in the bed. He stated that his wheelchair was more comfortable.

The tuberculosis PPD reading was completed on September 22, 2004 signed at 4:39 PM. The PPD was negative.

On September 24, 2004 at approximate 8:30 AM the nurses' notes revealed the patient attempted to tell the nurse something. The nurse could not understand the patient but noted the patient's skin was "Clammy." His vital signs were assessed: temperature 97.4 F, blood pressure 78/51, and pulse 43 at 8:40 AM; pulse oximetry was 26%.

The nurse's note revealed, nurse "Started to Ambu inmate-suctioned large amount whitish secretions. 911 called. Dr. Desta arrived, continued to Ambu patient until pulse oximetry 99% and above. Facemask applied at four liters, heart rate 105 and pulse oximetry 96%. Continued to monitor inmate until 911 arrived. The last pulse oximetry reading was 99% and heart rate 105. Respiratory Distress. Plan: Patient to GSCH for evaluation and treatment."

**Physician Note:** September 24, 2004 revealed same information as the nurse's note except: the physician indicated that a "Code Blue" was called. "Impression: Acute Respiratory; Plan: Transferred to hospital ER by ambulance with oxygen treatment continued on route."

<u>Conclusion</u>

Based on observation, medical record reviews, staff and patient interview, and documentation reviewed, it was determined that GSCH was in noncompliance with certain provisions of local and federal rules on hospital operations during the time Patient #1 was in its care from September 20 - 24, 2004.  Deficiencies will be cited under in accordance with Title 22 of the District of Columbia Municipal Regulations, Chapter 21 and Title 42 of the Code of Federal Regulations, sections 482.24 - 482.43.

As a result of this investigation, it was determined that the hospital staff failed to evaluate the appropriateness of the Emergency Department (ED) discharge plan for Patient #1 on September 20, 2004, given the patient's prior history and equipment needs.  It was also determined that the medical record lacked evidence of a medical staff's reassessment after a change in the condition of the patient and medical intervention.  Finally, there was no documented evidence that nursing

21

and/or respiratory staff followed physicians' orders related to respiratory care.  A notice of infraction will be recommended.

**Medical Examiner Preliminary Report**

The Office of the Chief Medial Examiner released the Cause and Manner of death for patient #1: "Cause: Acute respiratory failure following dislodgement of tracheostomy tube placed for treatment of respiratory insufficiency due to remote upper cervical spinal cord injury with quadriplegia due to blunt impact trauma. Manner: Accidental." The final autopsy report is pending.

22

## DISTRICT OF COLUMBIA
### Department of Health

**Health Care Regulation and**
**Licensing Administration**



November 18, 2004

Joan Phillips RN, PhD
Chief Executive Officer
Greater Southeast Hospital
1310 Southern Avenue, S.E.
Washington, D.C.  20032

Dear Ms. Phillips:

On September 28, 2004 an onsite incident (#05-001, DC00000689) investigation was initiated at your facility by a surveyor from the Department of Health, Health Regulation Administration to determine if your facility was in compliance with federal participation requirements for hospitals participating in the Medicare and Medicaid programs and in compliance with the licensing standards for hospitals in the District of Columbia. This investigation found that your facility was not in compliance with the participation requirements and licensing standards. Enclosed are licensure deficiencies and a CMS 2567 Statement of Deficiencies and Plan of Correction form. Please indicate your plan to correct the deficiencies including the expected completion dates on the right side of the form.

Your plan of correction (POC) is to be returned to this office no later than ten (10) calendar days after receipt. The POC must contain the following:

- Address how corrective action will be accomplished for those patients found to have been affected by the deficient practice.
- Address how you will identify other patients having the potential to be affected by the same deficient practice and what corrective action will be taken.
- Address what measures will be put in place or what systemic changes you will make to ensure that the deficient practice does not recur.
- Indicate how you plan to monitor your performance to make sure that solutions are sustained.  You must develop a plan for ensuring that correction is achieved and sustained.  This plan must be implemented, and the corrective action evaluated for its effectiveness.  The plan of correction must be integrated into the quality assurance system.  At the revisit, the quality assurance plan will be reviewed to determine the earliest date of compliance.
- Include dates when corrective action will be completed.

2

If you have any questions concerning the instructions contained in this letter, please contact me on (202) 442-5888.

Sincerely,

Denise S. Pope RN, MSN
Administrator

Enclosures: (Licensure Deficiencies and HCFA-2567L)

cc:    CMS Regional Office