**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**MARY R. SCOTT,**

        **Plaintiff,**

**v.**                                                                                            **No. 05-cv-1853 (RWR)**

**DISTRICT OF COLUMBIA,** *et al.*,

        **Defendants.**

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANT VAUGHN'S
MOTION FOR SUMMARY JUDGMENT</u>**

**I. PLAINTIFF'S STATEMENT OF FACTS**

A.  <u>Mr. Magbie's Respiratory Issues</u>

       This case involves, in addition to claims under 42 U.S.C. § 1983, malpractice claims asserted under the Court's supplemental jurisdiction.  Jonathan Magbie, the Plaintiff's decedent, had suffered from quadriplegia since the age of four.  Mr. Magbie's spinal injury had occurred at the C1-C2 level of his vertebrae.  Exh. 8[1], Scott Dep. at 35.  Mr. Magbie's  spinal lesion, because it was so high in the spinal column, prevented neural impulses from his brain from traveling to the phrenic nerve.  Thus, the phrenic nerve could not perform its function of stimulating the muscles of the diaphragm to contract, allowing the lungs to breathe.  For this reason, Mr. Magbie also required an implanted device, a diaphragm pacemaker, to stimulate the phrenic nerve.  Exh. 1, Cooper Dep. at 67-68.

---

[1]  Citations to Exhibits 1 to 13 in this motion incorporate by reference the same Exhibits attached in Plaintiff's Motion in Opposition of Defendant's Motion for Partial Summary Judgment as to All Civil Rights Claims.

1

Mr. Magbie's diaphragm pacemaker thus allowed him to breathe room air by artificial stimulation of his diaphragm muscles.  It could not, however, force air into his lungs if his muscles were too weak.  A ventilator or ambu bag was necessary for that function.  Plaintiff's medical experts explained this point:

> Well, if the man can't breathe fast enough or deep enough that in a minute's time he has ended up moving more air, a combination of his rate times the amount of air that he is moving with each breath, then the only way to do it is by doing it yourself using either a bag valve device or a ventilator.

Exh.  2, Baker Dep. at 101.

> You could ventilate him with an Ambu bag, you could ventilate him with a ventilator. Seeing these results in this clinical picture of a man who has paralysis and who has developed this amount of respiratory failure he's going to need ventilator support[.]
>
> ***
>
> [T]he trach mask can give him plenty of oxygen to make sure he gets enough oxygen.  He was getting enough oxygen. . . but it's not going to help the high carbon dioxide.  The high carbon dioxide is a sign that there's just not enough air moving in and out and that's what he needs help with.

Exh. 7, Cooper Dep. at 90-91.

Ms. Scott testified that Mr. Magbie needed the availability of a ventilator on a regular basis:

> Jonathan was a C1-C2 quad who was ventilator dependent. The only thing the phrenic nerve pacer did was to enable him to be off the ventilator for a certain amount of time.  The ventilator was his main support system. . . . He used the ventilator – if he were home he used the ventilator during the daytime.  Whenever he – he slept on the vent at night.

2

Exh. 8, Scott Dep. at 35.  Mr. Magbie's use of the ventilator was typical of that of patients whose

spinal injury is above the third cervical vertebra.  Exh. 1, Cooper Dep. at 40-42.

B.  Dr. Vaughn's Care of Mr. Magbie

On September 20, 2004, Jonathan Magbie came into the custody of the District of

Columbia as the result of a ten-day sentence for a first offense of possession of marijuana.    He

was transferred from the Central Detention Facility of the Department of Corrections ("DOC")

on September 20, 2004 to Greater Southeast Community Hospital ("Hospital") due to breathing

difficulties.

At the Hospital, Mr. Magbie came under the care of William Vaughn, M.D., the attending

physician.  Dr. Vaughn diagnosed hypoglycemia (low blood sugar), hypovolemia (dehydration),

and respiratory distress.  Defs.' Exh. 5, Hosp. Med Rec. at 8.  Dr. Vaughn provided symptomatic

treatment for these diagnoses by giving Mr. Magbie intravenous saline and dextrose, and

providing oxygen by nasal cannula,[2] but he did not investigate the causes for these conditions.

*See* Exh. 2, Baker Dep. at 7-8, 120, 126, 128, 135, 139.

There is a factual dispute as to what Mr. Magbie told Dr. Vaughn about his need for a

ventilator at night.  Dr. Vaughn has testified that Mr. Magbie told him he needed a ventilator

only at times, but all the medical records, for both the DOC and the Hospital, before and after the

encounter with Dr. Vaughn, indicate that Mr. Magbie said he needed a ventilator at night.    Defs.'

Exh. 5, Hosp. Med. Rec. at 3-5; Exh. 9, DOC Med. Rec. at 6.  Dr. Vaughn knew that no

ventilator would be available to Mr. Magbie if he were returned to the DOC.   Exh. 4, Vaughn

---

[2] *Id*. at 6.

3

Dep. at 65-66.  After first deciding to admit Mr. Magbie, Dr. Vaughn changed his mind and

decided to return him to the DOC with instructions to provide him with oxygen by nasal cannula

as needed.  Defs.' Exh. 5, Hosp. Med. Rec. at 9.  After Dr. Vaughn's shift had ended, Mr.

Magbie went into shock while still in the Hospital, but was nonetheless discharged.  Exh. 2,

Baker Dep. at 7-8.

Dr. Vaughn's decision to discharge Mr. Magbie from the Hospital violated the standard

of care applicable to physicians.  According to Plaintiff's expert Dr. Baker:

> Mr. Magbie's treatment deviated from the standard of care in
> several respects:
>
> (1) He needed to be admitted for diagnosis and treatment of
> his hypotension.
> (2) He needed to be admitted for diagnosis and treatment of
> his hypoglycemia.
> (3) He needed to be admitted for diagnosis and treatment of
> his respiratory distress and hypoxia including provision of
> a ventilator at night.
> (4) He need[ed] to have oxygen provided by a tracheostomy
> mask or other similar device.
> (5) He needed to have a diaphragm pacemaker made
> available.

Exh. 12, Baker Expert Rpt. at 2; *see also* Exh. 7, Cooper Expert Rpt. at 2 (failure to admit Mr.

Magbie to the Hospital on September 20, 2004 was a breach of the standard of care).

C.  Mr. Magbie's Care by Dr. Iluyomade

Mr. Magbie returned to the Hospital on September 24, 2004, after he was found

unresponsive and in acute respiratory distress at the DOC.  Rotimi Iluyomade, M.D., the

attending emergency care specialist, diagnosed Mr. Magbie with altered mental status, multi-

substance abuse, pneumonia, and a urinary tract infection and urosepsis.  Defs.' Exh. 5, Hosp.

4

Med. Rec. at 29-31.  Dr. Iluyomade treated the patient with narcan, a narcotics reversal agent.

He also ordered blood gases.  *Id*. at 32-33.  Mr. Magbie's blood gases were provided to Dr.

Iluyomade at 11:10 a.m. that day, and showed that Mr. Magbie was not breathing well enough to

remove excessive carbon dioxide from his blood.  According to Plaintiff's medical experts, the

laboratory reports indicated that Mr. Magbie needed to be placed on a ventilator immediately.

Exh. 7, Cooper Rpt. at 2; Exh. 2, Baker Dep. at 8-9.  This was never done.  Following a downhill

course that afternoon, Mr. Magbie died at 6:40 p.m.

D.  The Link Between Dr. Vaughn's Care and the Death of Mr. Magbie

The cause of death was determined by the District of Columbia Chief Medical Examiner

to be acute respiratory failure following dislodgement of Mr. Magbie's tracheostomy tube.  Exh.

11, Autopsy Rpt. at unnumbered page __.  Dr. Baker testified that the death resulted from cardiac

arrest secondary to dislodgement of the tracheostomy tube.  Exh. 2, Baker Dep. at 68-72.  In Dr.

Cooper's opinion, Mr. Magbie died as a result of  muscle exhaustion after the failure to place

him on a ventilator on September 24.  Exh. 1, Cooper Dep. at 33-39, 78-87.

Dr. Vaughn's decision to discharge Mr. Magbie from the Hospital did not simply mean

that Mr. Magbie went to a facility where he could not be safely housed; it created new barriers to

retransferring Mr. Magbie to a facility where a ventilator would be available to him.  These

barriers included the DOC's staff inability to send Mr. Magbie to any medical facility other than

the Hospital.  Since the Hospital could provide a ventilator, the DOC was obligated by contract

to use the Hospital exclusively for the care of Mr. Magbie, so Dr. Vaughn's actions effectively

blocked hospitalization of Mr. Magbie until he experienced a severe respiratory crisis.  *See* Exh.

3, Memorandum of Understanding at 3.  As Dr. Cooper pointed out about Dr. Vaughn:

> [A]fter he sent Mr. Magbie to the jail or decided that he was
> well enough to go back to the jail the staff at the jail knew
> that he had already been to the emergency room and that
> the doctor there decided that he didn't need a ventilator.
> Their idea that he might need a ventilator was viewed in
> the light of the fact that all they could do if they thought
> he needed a ventilator was to send him back to the
> emergency room but they knew there that the doctor
> there had considered this question and said he didn't
> need it.  I don't fault them for not sending him right
> back.

Exh. 1, Cooper Dep. at 60-61; *see also id.* at 66 (physicians at the DOC would have had to find a

different medical facility than the Hospital to which they could send Mr. Magbie).

## II. THE PROBLEMS WITH DEFENDANTS' STATEMENT OF FACTS

Defendants employ torturous logic in presenting a complex theory arguing that depriving

Mr. Magbie of a ventilator had nothing to do with his subsequent respiratory crisis and death.

First, Defendants argue that Dr. Vaughn stabilized Mr. Magbie before he was discharged.  Defs.'

Mem. at 2.  Plaintiff disputes this; Mr. Magbie in fact went into shock prior to his discharge from

the Hospital.  Exh. 2, Baker Dep. at 128, 135.  Second, Defendants rely on their implausible

claim that Mr. Magbie "assured" Dr. Vaughn that he did not use a ventilator at night[3] – a claim

that is at variance with multiple separate medical records, including Dr. Vaughn's own notes, that

record that Mr. Magbie consistently indicated that he was ventilator-dependent at night.  Exh. 9,

DOC Med. Rec. at 6; Defs.' Exh. 5, Hosp. Med. Rec. at 3, 5, 7.

In addition, Defendants state that Dr. Vaughn agreed to send Mr. Magbie back to the

DOC only "after being assured by Dr. Bastien that Mr. Magbie *would* receive supplemental

oxygen by a nasal cannula; Mr. Magbie never received oxygen via a nasal cannula while at the

---

[3]  Defs.' Mem. at 2-3.

jail." Defs.' Mem. at 5 (emphasis added).  This statement is misleading because Dr. Vaughn's discharge orders direct that Mr. Magbie receive nasal oxygen "as needed."  Defs. Exh. 5, Hosp. Med. Rec. at 9.   Further, as noted above, nasal oxygen could not address the critical issue of the exhaustion of Mr. Magbie's diaphragm muscles.

Defendants then imply that the blame shifts to Dr. Malekghasemi and Dr. Nwosu from the DOC because of their failure to re-transfer Mr. Magbie to a hospital.  Dr. Malekghasemi was never the treating physician in direct charge of Mr. Magbie.  Exh. 6, Malekghasemi Dep. at 9, 21. Further, Dr. Vaughn's discharge of Mr. Magbie created an obstacle for any DOC physician seeking to transfer Mr. Magbie to a hospital for ventilator care.  Under the contract between the Hospital and the District of Columbia, DOC physicians could only transfer to the Hospital for any services that the Hospital could provide,  Exh. 3, Mem. of Understanding at 3, and the Hospital in theory could provide ventilators.  Exh. 4, Vaughn Dep. at 55-56.

Defendants also claim that Plaintiff's experts admitted that  Mr. Magbie "initially received appropriate care and treatment" from Dr. Iluyomade   Defs.' Mem. at 6.  For that proposition, again they cite three exhibits, but none supports their claim; in fact Defendants do not even attach one of the pages they cite.[4]

---

[4] Defendants first cite their Exhibit 5,  Dr. Cooper's deposition, at page 59.  At that point in the deposition, Dr. Cooper is criticizing Dr. Vaughn and not discussing Dr. Iluyomade at all. Defendants next cite to their Exhibit 2, the deposition of Dr. Baker.  At all three cited pages, Dr. Baker is also discussing Dr. Vaughn, not Dr. Iluyomade.  Finally, Defendants cite their Exhibit 7, Dr. Iluyomade's own deposition.  Dr. Iluyomade testifies, in the cited pages, that Mr. Magbie's condition had improved, and at that point Dr. Iluyomade expected Mr. Magbie to survive.  It does not make the claim that Dr. Iluyomade's treatment was appropriate; in any event that deposition can scarcely support an argument about the opinions of Plaintiff's experts.  *See* Defs.' Exh. 7 at 72-73.  In fact, as noted above, Plaintiff's experts thought that Mr. Magbie needed to place Mr. Magbie on a ventilator as soon as his blood gases came back, but Dr. Iluyomade failed to do so.  *See* Exh. 2, Baker Dep. at 98-103; Exh. 1, Cooper Dep. at 77-78, 92-95.

Similarly, Defendants point out that Dr. Iluyomade also violated the standard of care by failing to put Mr. Magbie on a ventilator on September 24, 2004, when his blood gases indicated that his muscles were not moving enough carbon dioxide out of his lungs.  Defs.' Mem. at 6-7.  This is a strange point for the counsel representing both Dr. Vaughn and Dr. Iluyomade to pursue.

Defendants also argue that the nursing staff at the Hospital failed to notify Dr. Iluyomade early enough about Mr. Magbie's worsening respiratory crisis and further argue that the record supports a claim "notifying him earlier may have changed the response and the outcome."  None of the three record citations Defendants provide, however, support this claim.  Defs.' Mem. at 7-8.[5]

Defendants also claim that, if the nurses at the Hospital had notified Dr. Iluyomade earlier, Mr. Magbie might have survived.  Defs.' Mem. at 7-8.  Again, Defendants cite to documents that provides no support for this claim.  *See* Defs.' Exh. 2, Baker Dep.,  at 106; Defs.' Exh. 5, Cooper Dep. at 88.  Defendants also cite to their Exhibit 8, which they describe as the expert report of Dr. Cooper, but nothing that supports this claim appears in their Exhibit 8.  While Dr. Cooper's report says that Mr. Magbie should have been placed on a ventilator soon

_____

[5]  Defendants' first citation is to the deposition of Dr. Baker.  At the page cited, Dr. Baker agrees that Dr. Iluyomade should have been notified by the nursing staff; he does not address whether the notification may have changed the outcome.  Defendants' second citation is to the deposition of Dr. Cooper at 94-96.  At pages 94-95, the first two pages cited, Dr. Cooper testified that in the morning Mr. Magbie should have been put on the ventilator.  This has nothing to do with the failure of the nurses in the afternoon.  On pages 95-96, Dr. Cooper says that Mr. Magbie would most likely have survived if provided a ventilator at 5:40 p.m., the time the nurses notified Dr. Iluyomade.  Defendants then cite the expert report of Dr. Cooper, although what they attached as that report did not contain it.  Dr. Cooper's Report, Plaintiff's Exhibit 7, in fact also does not make the statement attributed to it.

after arrival at the Hospital, and that "no one at the [H]ospital took action to help" Magbie

between 15:30 and 17:40, Exh. 7, nothing Defendants cite supports the claim that Mr. Magbie

might have survived if Dr. Iluyomade had been notified earlier, particularly because Dr.

Iluyomade earlier had evidence that Mr. Magbie needed to be on a ventilator, and took no action.

Finally, Defendants say that "Dr. Cooper stated categorically that he did not fault any of

the care which Dr. Vaughn rendered to Mr. Magbie in the Emergency Department." Defs.' Mem.

at 10. In fact, Dr. Cooper testified, at the page cited by Defendants, that he did not criticize the

care of Dr. Vaughn "other than deciding to send Mr. Magbie to a location where he could not

have a ventilator." Exh. 1, Cooper Dep. at 51.

## III. DR. VAUGHN'S LEGAL RESPONSIBILITY FOR MR. MAGBIE'S DEATH

A. <u>Legal Requirements for Proving a Claim of Malpractice</u>

Defendants' motion seeks summary judgment on the medical malpractice claim against

Dr. Vaughn. Medical malpractice claims are a subclass of tort negligence claims, and are thus

subject to the standards that all negligence claims must meet under District of Columbia law.[6]

Under District law, in order to recover, a plaintiff must prove an applicable standard of care, a

deviation from that standard by the defendant, an injury on the part of plaintiff, and a causal

relationship between the deviation and the injury. Ordinarily expert testimony will be required

for the plaintiff to prevail. *District of Columbia v. Watkins,* 684 A.2d 395, 401 (D.C. 1996);

*Psychiatric Institute of Washington v. Allen,* 509 A.2d 619, 623-24 (D.C. 1986).

As noted above, Plaintiffs have provided expert testimony and reports indicating that the

---

[6]

 The medical malpractice claim is asserted under District of Columbia law pursuant to the
Court's supplemental jurisdiction, so District law applies as to matters of substance.

applicable standard of care required keeping Mr. Magbie in the Hospital on September 20.

Defendants' motion does not claim that Plaintiff has failed to produce evidence on this issue.

Nor do Defendants challenge, for purposes of this motion, Plaintiff's evidence that Dr. Vaughn

deviated from the applicable standard of care when he discharged Mr. Magbie from the Hospital

to the DOC.  Obviously, there is no dispute that Mr. Magbie was injured.  Accordingly, the only

issue in Defendants' motion is whether Plaintiff has presented sufficient evidence that a

reasonable juror might conclude that Dr. Vaughn's deviation from the applicable standard of care

was a proximate cause of Mr. Magbie's death.  *See* Defs.' Mot. at 1 (claiming that "the

undisputed evidence in this matter clearly shows that such alleged negligence was not a

proximate cause of Mr. Magbie's death); *see also District of Columbia v. Zukerberg,* 880 A.2d

276, 281 (2005) ("To establish proximate cause, the plaintiff must present evidence from which a

reasonable juror could find that there was a direct and causal relationship between the

defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were

foreseeable.") (citations omitted).

B.  Evidence of Causation

     As noted above, in *District of Columbia v. Zukerberg,* 880 A.2d 276 (D.C. 2005), the

District of Columbia Court of Appeals recently considered the issue of proximate cause.  The

court of appeals noted that proximate cause is ordinarily a jury issue, and that the plaintiff can

meet the applicable burden by offering either direct or circumstantial evidence.  *Id.* at 281.

Plaintiff has met that burden of showing "a direct and causal relationship between the

defendant's breach of the standard of care," *id.*,  and the plaintiff's injuries.

     Indeed, as *Zukerberg* reasons, proving a direct and causal relationship does not require

10

the plaintiff to demonstrate that injury to the plaintiff was the only possible outcome from the

defendant's deviation from the standard of care.  In *Zukerberg,* a child was injured after falling

from a pool diving board that, according to expert testimony, had not been maintained in a

manner consistent with the applicable standard of care.  The defendant argued that there was no

evidence to support a jury verdict finding the defendant liable, but the court of appeals held that

the plaintiff's evidence, including expert testimony that incorrect maintenance was a substantial

factor in the fall, supported a reasonable inference that the maintenance caused the fall.  *Id.* at

282. The defendant also argued that there could have been many reasons for the fall not

attributable to the defendant.  In response, the court pointed out the following

> The plaintiff was not required to show that the negligent condition
> of the diving board was the only possible cause of the fall, or that
> injury must necessarily follow from its use, but that the negligence
> substantially increased the chances of the harm that resulted from
> the use of the board.

*Id.* at 283.

Plaintiff here has produced evidence that, if credited by the jury, would show that Dr.

Vaughn sent a patient who had to have a ventilator available for use as needed to a place where

the patient had no access to a ventilator.  Plaintiff's evidence also shows that Dr. Vaughn's

decision to discharge Mr. Magbie prevented the DOC staff from returning Mr. Magbie to the

Hospital, or to any other medical facility, or at least made that return far more difficult, prior to

the inevitable crisis.  Further, Plaintiff's evidence allows the inference that the predictable

respiratory crisis would take place where a ventilator would not be available and that any

treatment for that crisis would take place under emergency conditions.  Plaintiff's evidence could

thus persuade a reasonable juror that Dr. Vaughn's actions were a "substantial factor" in Mr.

Magbie's death even if death was not the inevitable outcome of Dr. Vaughn's negligence.[7]

In *Graham v. Roberts,* 441 F.2d 995 (D.C. Cir. 1970), the District of Columbia Circuit

Court of Appeals held that a jury was entitled to find that action of dentist in delaying referral of

a patient to a specialist qualified to treat the problem allowed the patient's condition to worsen

and was thus a substantial factor in the injury. *Id*. at 98 n.3 (cited with approval in *Lacy v.

District of Columbia,* 424 A.2d 317, 319 n.3 (D.C. 1980)). Given that the evidence here without

question would allow a jury to conclude that the failure to provide Mr. Magbie with access to a

ventilator worsened his condition and produced the respiratory crisis on September 24, a jury

would also be entitled to find that Dr. Vaughn's actions were a substantial factor in Mr. Magbie's

death.

C.  The Presence of More than One Cause-in-Fact

The fact that, according to Plaintiff's evidence, Dr. Iluyomade also committed

malpractice does not change the analysis. There may not be a single proximate cause for every

injury; indeed several causes may combine to produce the harm. *R. & G. Orthopedic Appliances

& Prosthetics, Inc., v. Curtin,* 596 A.2d 530, 544 (D.C. 1991). A tortfeasor is responsible for all

---

[7] In *Daniels v. Hadley Memorial Hospital,* 566 F.2d 749 (D.C. Cir. 1977), in which the court was considering a wrongful death claim brought pursuant to District of Columbia law, the court stated that, in considering whether proximate cause has been shown in cases involving negligent treatment of a potentially fatal condition, a court should look at two factors: the patient's chance of survival if properly treated; and the extent to which the defendant's treatment reduced the patient's chances of survival. *Id*. at 757. In this case, Mr. Magbie's chance of survival had he been admitted to the Hospital by Dr. Vaughn and thus had access to a ventilator for use as needed appears, from all the evidence in the record, to have been 100%. Dr. Vaughn's actions markedly reduced those chances, by essentially ensuring that Mr. Magbie would face a major respiratory crisis in the DOC, where no ventilator was available. In *Daniels*, the court of appeals reversed the district court because the district court had failed to consider that the negligent treatment of the decedent had reduced his chances for survival. *Id.* at 758-60.

damages that naturally and proximately flow from the initial tort, including the consequences of

medical malpractice in treating the injuries that were caused by the initial wrong.  *Id*. at 547; *see*

*also Posner v. Holmes,* 739 A.2d 358 (D.C. 1999), quoting District of Columbia standard jury

instruction 5-13:

> There may be more than one proximate cause of an injury.
> That is, several factors or circumstances, or the negligent
> acts or omissions of two or more persons, may work at the
> same time, either independently or together, to cause an
> injury.  Each of the contributing acts or omissions is regarded
> in law as a proximate cause.  This is true regardless of
> whether one of the participating acts or omissions
> contributed more than another to causing the injury.
> Each person whose negligent act or omissions is a
> proximate cause of an injury is liable for the resulting
> injury.
>
> It is no defense that some other person who is not a
> defendant in this lawsuit participated in causing the
> injury, even if it should appear to you that the
> negligence of the other person was greater than the
> negligence of the defendant.

*Id.* at 364.  Thus, neither the malpractice of Dr. Iluyomade nor the negligence of any of the DOC

actors relieves Dr. Vaughn of his liability because Dr. Vaughn's negligent acts were a substantial

factor and thus cause-in-fact of the resulting injury.

D. Foreseeability of the Subsequent Negligence

In addition to presenting evidence from which a reasonable juror could conclude that the

malpractice of Dr. Vaughn was a cause-in-fact of Mr. Magbie's death, Plaintiff must make an

appropriate showing on the issue of foreseeability.   As the District of Columbia Court of

Appeals said in *District of Columbia v. Carlson,* 793 A.2d 1285 (D.C. 2002):

> We have held that a defendant may not be held liable for harm

13

> actually caused where the chain of events leading to the injury
> appears highly extraordinary in retrospect.  Although the
> intervening act of another makes the causal connection
> between the defendant's negligence and the plaintiff's injury
> more attenuated, such an act by itself does not make the
> injury unforeseeable.  A defendant will be responsible for
> the damages which result, despite the intervention of
> another's act in the chain of causation, if the danger of
> an intervening negligent or criminal act should have been
> been reasonably anticipated and protected against.

*Id*. at 1290 (internal quotation marks and citations omitted).

Defendants cite *Smith v. Hope Village,* 481 F. Supp. 2d 172, 200 (D.D.C. 2007),[8] in

support of their claim that the subsequent negligence of Dr. Iluyomade and others was not

"reasonably foreseeable" and that it was "highly extraordinary in retrospect."  Defs.' Mem. at 10.

Of note, Defendants rely on a case involving the foreseeability of a criminal act, not a negligent

act, although courts are most reluctant to "hold a defendant liable for harm caused by the

criminal act of a third party."  *Smith,* 481 F. Supp. 2d at 185 (citations omitted).  Nonetheless, the

court found that the defendant in that case was liable for criminal acts occurring subsequent to

the defendant's  negligence, because those acts were reasonably foreseeable.  Of particular

significance to the instant case is the court's discussion of whether the subsequent alleged

negligence of the Court Services and Offender Supervision Agency relieved the defendant half-

way house from liability for the negligent supervision of an offender who then committed a

criminal act.  The court found that it did not do so, because of the more direct responsibility on

the part of the half-way house for the offender's supervision.  *Id.* at 198 n.21.  This case is

---

[8]  Defendants, however, miscite the case in a manner that indicates that the case was
decided by the District of Columbia Circuit Court of Appeals.  Plaintiff has corrected
Defendants' citation.

instructive here, because Dr. Vaughn was the initial physician who made the fatal determination that Mr. Magbie could get by without a ventilator, and also created barriers to the timely re-hospitalization of Mr. Magbie.  The subsequent actors were simply following the road that Dr. Vaughn had blazed.

The District of Columbia case that is most similar to the instant case is *National Health Laboratories v. Ahmadi,* 596 A.2d 555 (D.C. 1991).  In that case, the plaintiff consulted a medical center about her symptoms, and the first physician who examined her decided that the differential diagnosis included multiple sclerosis and vitamin B-12 deficiency.  He sent the plaintiff for laboratory tests to rule out a vitamin deficiency.  The laboratory erroneously reported a normal result to the physician.  The patient then briefly went to a hospital, where a second vitamin deficiency test was ordered, but never performed, and the hospital staff instead  relied on the laboratory's erroneous report.  The patient then returned to the original medical center, which again ruled out a vitamin B-12 deficiency without conducting a new laboratory test.  The patient subsequently was hospitalized in yet another hospital, which diagnosed a vitamin B-12 deficiency even before the laboratory results were known.  *Id.* at 556-57.

The patient, who as a result suffered permanent paralysis, then filed suit against the first medical center, the laboratory, and the first hospital.  The jury exonerated the hospital, but found that both the medical center and the laboratory were liable.  On appeal, the laboratory argued that the medical center's subsequent negligence in failing to repeat the test was, as a matter of law, a superseding cause relieving it of any liability.   The court noted that the jury had been instructed to consider whether the acts of the medical center were foreseeable and could have been reasonably anticipated by the laboratory, or whether the intervening acts of the medical center,

were, in retrospect, "highly extraordinary." *Id.* at 560.

The court upheld the jury verdict, reasoning that the normal test could have thrown the physicians at the medical center off, and that the center's negligent failure to discover the error over the subsequent months "was not necessarily an extraordinary event" so that it could not be held to be unforeseeable as a matter of law. *Id.* at 561. The same is true here, since the subsequent DOC actors knew that Dr. Vaughn had decided not to admit Mr. Magbie for ventilator use, and had thus created barriers to re-hospitalization. Given the complete foreseeability of a severe respiratory crisis, this sequence of events, like the sequence in *Ahmadi,* was not so extraordinary as a matter of law as to preclude a reasonable juror from finding liability. *See also Smith,* 481 F. Supp. 2d at 204 ("this [subsequent] negligence is immaterial unless the defendant can show that the post-release negligence somehow diverted [the criminal wrong-doer] onto the path that led him to kill the plaintiff's daughter, *rather than simply allowing the wheels that were already set in motion by the negligence of Hope Village to continue to spin.*") (emphasis added). The negligent acts subsequent to those of Dr. Vaughn also simply allowed the wheels set in motion by Dr. Vaughn to continue to spin.

F.  The Irrelevance of the Minor Differences of Opinion of Plaintiffs' Experts

While Plaintiff's experts have different opinions as to the immediate cause of Mr. Magbie's death,[9] they do not differ on the issue of Dr. Vaughn's role in that death by discharging Mr. Magbie to the DOC, where no ventilator was available. Dr. Cooper noted that discharging Mr. Magbie from the Hospital was not safe, because if Mr. Magbie developed a respiratory crisis

---

[9]  Dr. Cooper thought that the immediate cause of death was muscle failure because of deprivation of a ventilator. Dr. Baker thought that the immediate cause of death was the dislodgement of the tracheostomy tube.

16

at a place without a ventilator, there could be just a short window of time to treat him. *Id.* at 54.

This problem, Dr. Cooper noted, is illustrated by the events at the DOC on the morning of September 24, when Mr. Magbie looked fine at 7:50 a.m., and an hour later was nearly dead. He further noted that this sequence is typical for persons who have severe weakness as the cause of their respiratory problems; "[t]hey may look fine until they just stop breathing." *Id.* at 55. Mr. Magbie had a respiratory crisis on the morning of September 24 because of the lack of ventilator support at the DOC after he was discharged from the Hospital. *Id.* at 58. Dr. Cooper also testified, in response to a question about proximate cause, that ". . . it could be viewed as a proximate cause in the sense that if [Dr. Vaughn] admitted Mr. Magbie to the hospital then he most likely would not have died because he would have been in a facility that could provide mechanical ventilation." *Id.* at 62.

Dr. Baker's testimony on the role of Dr. Vaughn was consistent with Dr. Cooper on this point, as shown by the critical exchange in Dr. Baker's deposition:

> Q: Is there anything that Dr. Vaughn did that you feel now based upon what happened subsequently over this last three days between the time that Dr. Vaughn saw him and the time of his death that you feel could possibly be related approximately[10] causing his death?
>
> A: I think that the best way to answer that is to say that I do believe had he been admitted and treated that actually he wouldn't have died, that they would have rehydrated him, that his x-ray the following day or two days later would have shown an early pneumonia before it got to the point

---

[10] Plaintiffs believe that this is a mistake by the court reporter and that this word should be "proximately".

>   where it did,[11] that he wouldn't have then been marginally
>   hypoxic, and, in fact, wouldn't have been hypoxic to the
>   point of becoming unconscious, and that he would have
>   been in better physical shape to ventilate himself, you
>   know, had he been admitted, given IV hydration, given
>   IV nutrition.
>
>   So I think ultimately had Dr. Vaughn done what the
>   standard of care requires, that the patient wouldn't have
>   gone on to deteriorate and return on the 24th in the
>   condition he was.

Exh. 2, Baker Dep. at 142-143.  Dr. Baker's expert report is equally clear:

>   Within a reasonable degree of medical certainty, had
>   Mr. Magbie been admitted on 9/21/04 or had his airway
>   been reestablished on 9/24/05, he would not have
>   succumbed from hypoxia which was the immediate
>   cause of his cardiac arrest and which was a direct
>   result of dislodgement of his tracheostomy tube.

Exh. 12, Baker Expert Rpt. at 3.

Whether Mr. Magbie directly from exhaustion because he had no access to a ventilator after Dr. Vaughn discharged him, or because in the respiratory crisis he experienced, his tracheostomy tube became dislodged, does not matter.  Either immediate cause of death was reasonably foreseeable.  Obviously, Mr. Magbie's death from muscle exhaustion because he was denied a ventilator for use as needed was completely foreseeable at the time Dr. Vaughn discharged him.

Death from tracheostomy dislodgement was also, however, foreseeable.  Although Dr. Baker was not questioned by Defendants at his deposition as to why he thought Mr. Magbie's death was foreseeable, he has provided a declaration that spells out his reasoning:

---

[11]  The autopsy of Mr. Magbie showed that, at the time of death, he also suffered from acute bronchopneumonia.  *See* Exh. 11, Autopsy Rpt. at unnumbered page  ___.

18

> Dr. Vaughn's discharge of Mr. Magbie to the jail, where
> ventilatory support was not available, deviated from the
> standard of care, and foreseeably placed Jonathan Magbie
> at great risk of a respiratory crisis that could kill him in a
> short period of time.   One of the foreseeable risks that
> Dr. Vaughn's decision posed was that, during the likely
> respiratory crisis that would ensue if Mr. Magbie did
> not have a ventilator available, attempts at treatment
> would require manipulation of his tracheostomy tube
> and accidentally dislodge it.  In particular, the use of an
> ambu bag to ventilate a patient with an indwelling
> tracheostomy tube can place pressure on the tube,
> causing it to move, resulting in a blocked airway for
> the patient.

Exh. 13, Baker Decl. at 1-2.

Accordingly, whether Mr. Magbie's immediate cause of death was muscle fatigue or

tracheostomy tube displacement, either cause was reasonably foreseeable from Dr. Vaughn's

actions, which made it just a matter of time before deprivation of ventilator access caused a

respiratory crisis.  In either case, it was foreseeable that "the wheels that were already set in

motion by the negligence [of Dr. Vaughn would] continue to spin."  *See Smith,* 481 F. Supp. 2d

at 204.

**CONCLUSION**

For the above reasons, Plaintiff requests that Defendant Vaughn's motion for partial

summary judgment be denied.

Respectfully submitted,

/S/ELIZABETH ALEXANDER
Elizabeth Alexander, D.C. Bar No. 412904
National Prison Project of the ACLU Foundation
915 15th Street, NW, 7th Floor
Washington, DC 20005
202-393-4930

19

Donald M. Temple, D.C. Bar No. 408749
Temple Law Office
1229 15th Street, NW
Washington, DC 20005
202-628-1101

Edward J. Connor, D.C. Bar No. 321505
5210 Auth Road, Suite 304
Camp Springs, MD 20746
301-899-7801

Arthur B. Spitzer, D.C. Bar No. 235960
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, NW, Suite 119
Washington, DC 20036
202-457-0800

Counsel for Plaintiffs

Dated: March 25, 2008

## TABLE OF CASES

*Daniels v. Hadley Memorial Hospital,* 566 F.2d 749 (D.C. Cir. 1977)

*District of Columbia v. Carlson,* 793 A.2d 1285 (D.C. 2002)

*District of Columbia v. Watkins,* 684 A.2d 395 (D.C. 1996)

*District of Columbia v. Zukerberg,* 880 A.2d 276 (D.C. 2005)

*Graham v. Roberts,* 441 F.2d 995 (D.C. Cir. 1970)

*Lacy v. District of Columbia,* 424 A.2d 317 (D.C. 1980)

*National Health Laboratories v. Ahmadi,* 596 A.2d 555 (D.C. 1991)

*Posner v. Holmes,* 739 A.2d 358 (D.C. 1999)

*Psychiatric Institute of Washington v. Allen,* 509 A.2d 619 (D.C. 1986)

*R. & G. Orthopedic Appliances & Prosthetics, Inc., v. Curtin,* 596 A.2d 530 (D.C. 1991)

*Smith v. Hope Village,* 481 F. Supp. 2d 172 (D.D.C. 2007)