**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

MARY SCOTT, Individually and as      \*
Personal Representative of the Estate of
JONATHAN MAGBIE,      \*

     Plaintiff      \*      Civil Action No. 1:05-CV-01853-RWR

Vs.      \*

DISTRICT OF COLUMBIA, *et al.*      \*

     Defendants      \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO**
**DEFENDANT VAUGHN'S MOTION FOR SUMMARY JUDGMENT**

Now comes Defendant, William S. Vaughn, M.D., by his counsel, and submits this Reply to Plaintiff's Opposition to Defendant Vaughn's Motion for Summary Judgment.

**FACTUAL BACKGROUND**

On September 20, 2004, this Defendant, Dr. Vaughn, was employed by National Emergency Services District of Columbia, Inc. (NES) and working in the Emergency Room at Greater Southeast Community Hospital (the Hospital) in Washington, D.C. At that time he evaluated the Plaintiff's Decedent, Jonathan Magbie, and recommended that Mr. Magbie be admitted to the hospital. Another physician, who was neither an employee of Dr. Vaughn's nor of NES but who was responsible for the in-patient service to which Mr. Magbie would have to be admitted at the Hospital, informed Dr. Vaughn that Mr. Magbie could not be admitted to a ventilator-equipped bed because Mr. Magbie had no current need for a ventilator. (Exhibit I, Vaughn Depo., pp. 55, 67-68.) The mere potential that he would need one in the future was not sufficient to warrant an admission, Dr. Vaughn was told. As a result, Dr. Vaughn made

arrangements for Mr. Magbie to return to the infirmary at the DC jail where, Dr. Vaughn was assured, Mr. Magbie could receive supplemental oxygen by nasal cannula as needed. (Exhibit I, Vaughn Depo., p. 67.) Dr. Vaughn went off duty at 8:00 a.m. on September 21, 2004. Mr. Magbie was discharged from the Hospital at 11:45 a.m. on September 21, 2004.

Mr. Magbie returned to the Greater Southeast Community Hospital Emergency Room on the morning of September 24, 2004. Dr. Vaughn was not present in the Emergency Room then and had no involvement with the care of Mr. Magbie that day. Another doctor promptly evaluated Mr. Magbie and determined that he should be admitted to the hospital. More than nine hours after Mr. Magbie arrived at the Emergency Room, Mr. Magbie's tracheostomy tube dislodged. Despite resuscitative efforts by a physician, a respiratory therapist and others, Mr. Magbie died. The Plaintiff has sued Dr. Vaughn arguing that his alleged negligence on the night of September 20-21, 2004 was the proximate cause of Mr. Magbie's death on the evening of September 24, 2004.

## PROCEDURAL BACKGROUND

Dr. Vaughn has filed a Motion for Summary Judgment in this case which demonstrates that the Plaintiff has failed to establish that Dr. Vaughn's alleged negligence was the proximate cause of Mr. Magbie's death. Rather, intervening acts of negligence by health care providers were not foreseeable and were an intervening, superseding cause of Mr. Magbie's death. Dr. Vaughn has asked for judgment in his favor as to any and all claims against him alleging damages as a result of Mr. Magbie's death.

The Plaintiff has now filed an Opposition to Dr. Vaughn's Motion for Summary Judgment. The Opposition fails to address the arguments advanced in support of Dr. Vaughn's motion or to explain or address the totally contradictory theories of causation offered by the Plaintiff's two

2

experts. For the reasons set forth below and for those which have been laid out in great detail in Dr. Vaughn's Memorandum in Support of his Motion for Summary Judgment, the Plaintiff has failed as a matter of law to demonstrate a causal connection between any allegations of negligence on Dr. Vaughn's part and Mr. Magbie's unfortunate death 3 ½ days later. In her Opposition, the Plaintiff accuses the Defendant of employing "torturous (sic) logic" to argue that there was no causal connection between the alleged negligence of Dr. Vaughn and the subsequent death. To the contrary, as is required at this stage of litigation, the Defendant has been forced to accept and to address the contradictory testimony of the Plaintiff's two medical experts and has demonstrated that neither of their conflicting theories of causation withstands scrutiny. In fact, it is the Plaintiff who has engaged in very tortured logic to try to link events on September 21, 2004 to an unanticipated, unforeseeable death 3 ½ days later.

## LEGAL ARGUMENT

To assess the role of Dr. Vaughn in this case, it is worth taking a step back and recognizing those things for which he can and cannot be held responsible. First, it is significant that he is an Emergency Room physician, not a physician who cares for patients on an in-patient basis. The Plaintiff has argued through her experts that Dr. Vaughn had an obligation to arrange for Mr. Magbie's admission to Greater Southeast Community Hospital on September 21, 2004. However, it is instructive to understand what Dr. Vaughn was not required to do. First, Dr. Vaughn was not charged with any responsibility for the ongoing care of Mr. Magbie after his admission. Furthermore, even if Mr. Magbie had been admitted to the hospital in the early hours of September 21, 2004, there is no suggestion by any witness in this case that Mr. Magbie needed to be placed on a ventilator immediately. Consequently, even after admission to the hospital, Mr. Magbie

3

would only have been placed on a ventilator if some other health care provider, outside the control and direction of Dr. Vaughn, chose to do so.

The conduct by Dr. Vaughn which the Plaintiff criticizes was his decision to send Mr. Magbie back to the jail infirmary with an understanding that he would be treated with supplemental oxygen as needed and returned to the Emergency Room if he developed respiratory problems.  In fact, Mr. Magbie did return to the Emergency Room early on the morning of September 24, 2004.  Consequently, it is undisputed that Dr. Vaughn's alleged negligence did not prevent Mr. Magbie from being treated at Greater Southeast Community Hospital, a facility at which ventilators were available.  However, just as Dr. Vaughn had no ability to control what care Mr. Magbie would have received had he been admitted to the hospital on September 21, 2004, Dr. Vaughn also had no ability to control or influence the care which Mr. Magbie received once he returned to Greater Southeast Community Hospital on September 24, 2008.

In her Opposition to the Motion for Summary Judgment, the Plaintiff has spent substantial time and effort arguing whether or not Dr. Vaughn created a "barrier" to readmission and whether or not he understood that Mr. Vaughn, as alleged by the Plaintiff, used his ventilator every night. These issues are irrelevant and have absolutely no bearing on the Motion for Summary Judgment. The fact remains that Mr. Magbie was at Greater Southeast Community Hospital and under the care of physicians and nurses other than Dr. Vaughn for a period of more than nine hours before he died.  It is the events during the nine-hour period which demonstrate beyond any doubt that the alleged negligence of Dr. Vaughn was not a proximate cause of Mr. Magbie's death.

### Dr. Baker's Theory of Causation

The Plaintiff's Opposition fails completely to contradict the testimony of the Plaintiff's own expert, Frank Baker, M.D., who attributes the cause of death to the dislodgment of Mr. Magbie's tracheostomy tube on September 24, 2004. At pages 12 through 15 of his Memorandum of Facts and Law in Support of his Motion for Summary Judgment, Dr. Vaughn has demonstrated that Dr. Baker believes that the cause of Mr. Magbie's death was an acute event occurring on the evening of September 24, 2004 when Mr. Magbie's tracheostomy tube inexplicably dislodged and was repositioned in such a way that no air got to Mr. Magbie's lungs during resuscitative efforts. There has been absolutely no testimony offered by the Plaintiff which demonstrates "a direct and causal relationship" between any breach in the standard of care by Dr. Vaughn four days earlier, the dislodging of the trach tube and Mr. Magbie's subsequent demise.

Dr. Baker authored a report listing five alleged breaches in the standard of care by Dr. Vaughn, and each of these was parroted in the Plaintiff's Opposition to Dr. Vaughn's Motion for Summary Judgment. *See* Exhibit 6 to Defendants' Motion, p. 2; Plaintiff's Opposition, p. 4. Yet none of these five alleged breaches played any role in the dislodgment of the tracheostomy tube. Although Dr. Baker stated that Mr. Magbie needed oxygen provided by a tracheostomy mask or similar device, the evidence in this case reveals that throughout the entire afternoon of September 24, 2004, Mr. Magbie was receiving oxygen at 5 liters per minute through a tracheostomy mask. (Exhibit II, Dr. Ilouyomade Depo., p. 55.) Dr. Baker has never attempted to link this to the death. Furthermore, the statement by Dr. Baker that Mr. Magbie needed to have a "diaphragm pacemaker made available" is extraordinarily odd as the evidence in this case is that Mr. Magbie had an implanted pacemaker which was working at all times. Dr. Baker has testified that Dr. Vaughn

5

successfully reversed Mr. Magbie's hypovolemia (Exhibit III, Dr. Baker Depo., p. 135.) He has also testified that Mr. Magbie's hypoglycemia on September 20, 2004 was diagnosed by Dr. Vaughn and was not a factor in his death. Id.

Consequently, the only remaining allegation of negligence offered by Dr. Baker which the Plaintiff could hope to tie into an argument that it caused Mr. Magbie's death is found in subparagraph (3) of Dr. Baker's report which states, "he [Mr. Magbie] needed to be admitted [by Dr. Vaughn on September 21, 2004] for diagnosis and treatment of his respiratory distress and hypoxia including provision of a ventilator at night."

Whether or not this constitutes a breach in the standard of care, the subsequent deposition testimony by Dr. Baker made it absolutely clear that this had nothing to do with Mr. Magbie's death. Dr. Baker acknowledged that even though Mr. Magbie was in respiratory distress at the time that he was brought back to the Emergency Room at Greater Southeast Community Hospital on the morning of September 24, 2004, his condition was treatable and salvageable if he had been properly monitored upon his return. (Exhibit III, p. 143.) Although Dr. Baker was highly critical of the care which Mr. Magbie received throughout the day of September 24, 2004 (*see* Dr. Vaughn's Memorandum in Support of Motion for Summary Judgment, pp. 13-14), he ultimately explained that the dislodgment of the tracheostomy tube was an acute event, the cause of which he cannot explain. When asked about this under oath at his deposition, Dr. Baker stated:

> Q.    . . . In your report your (sic) have an opinion as to the cause of death. On the last page you indicated that, "he would not have succumbed from hypoxia, which was the immediate cause of his cardiac arrest, and which was a direct result of dislodgment of his tracheostomy tube."
>
> A.    Yes.
>
> Q.    All right. Is that still your opinion as to the cause of death . . . .

6

A.    Yes.

\* \* \*

Q.    . . . If, in fact, that is the opinion as to the cause of his death, a dislodgment
of the tracheostomy tube, can you tell me how this dislodgment occurred?

A.    I think that we don't really know. I don't think that we really know. I mean,
there is no evidence that any individual, either intentionally or accidentally,
dislodged it.

(Exhibit III, Baker depo., pp. 57-58.)

There is no dispute in this case that after the endotracheal tube dislodged, a physician

reinserted it believing that he had returned it to a position within Mr. Magbie's trachea. However,

according to Dr. Baker, there was some blockage to the tube which thereafter prevented proper

ventilation of Mr. Magbie's lungs. He has concluded that the only explanation for this is that the

tube was reinserted in the wrong place. (Exhibit III, Dr. Baker Depo., pp. 87-88.)

Dr. Baker has categorically exploded the Plaintiff's theory that Mr. Magbie died because

he had been sent back to the jail infirmary and was exhausted from breathing without the benefit

of a ventilator over the preceding several days. When confronted with that possible explanation

for Mr. Magbie's death, Dr. Baker dismissed it as follows:

Q.    It says here, and I will read it. It says, "it is quite possible that Mr. Magbie
was exhausted from several days during his imprisonment where he was
forced to go without a period of ventilation in the evening to provide
sufficient rest and recovery so that he could breathe properly during the day.
The further stress of pneumonia and urinary tract sepsis, which likely were
progressing during the delayed admission and treatment as an in-patient,
could have added very significantly to the respiratory failure." Do you agree
with that?

A.    Well, that certainly is possible, but then that should have all been reversed
when you started to actively ventilate him with an Ambu bag.

7

Q.    Okay. If, in fact, it was not reversed by Ambu bag, is there a way that the body just cannot respond even to the Ambu bag because of the sheer exhaustion that existed before he was brought into the hospital . . . .

A.    No.

Q.    . . . for the three days at the jail where he was not properly treated?

A.    No.

Q.    So the only explanation that you have, then, would be that there must have been some other type of obstruction that prevented his being ventilated, and somehow the airway was blocked?

A.    Yes.

(Exhibit III, Baker Depo., pp. 87-89.)

In summary, Dr. Baker testified that Mr. Magbie's tracheostomy tube dislodged for reasons which he cannot explain. Thereafter it was reinserted but Mr. Magbie's airway remained blocked. Dr. Baker notes that in the absence of a blockage, it would have been easy to ventilate Mr. Magbie, and this would have reversed any ill effects on his ability to breathe from having been at the jail infirmary for the preceding three days. The only explanations for Mr. Magbie's death, therefore, are the dislodgment of the tube and the blockage of Mr. Magbie's airway after reinsertion. Neither of these causes was due to any action or inaction by Dr. Vaughn.

In a half-hearted attempt to contradict this definitive testimony given by Dr. Baker at his deposition on May 16, 2007 explaining his report of August 1, 2005, the Plaintiff has now submitted a "Declaration" from Dr. Baker in an effort to breathe life into the Opposition to Dr. Vaughn's Motion for Summary Judgment. Dr. Baker fails to offer any opinion regarding what actually happened to cause the dislodgment of the tracheostomy tube on the evening of September 24, 2004. Instead, he engages in some speculation and states, "the use of an Ambu bag to

8

ventilate a patient with an in-dwelling tracheostomy tube can place pressure on the tube, causing it to move, resulting in a blocked airway for the patient."

Although this may be a correct statement and of some academic interest, it has absolutely no relevance to this case. There is no testimony that any nurse, physician or other individual manipulated the tracheostomy tube for any purpose at or shortly before the time that it was discovered to be dislodged. In the passage quoted above from Dr. Baker's deposition, he stated not once but several times that he has no knowledge how the tracheostomy tube became dislodged. He could not state that it was intentional or accidental or ascribe any other explanation. Most significantly, in his deposition, his report and in this most recent declaration, he has never offered any testimony to a reasonable degree of medical probability based upon any evidence in this case which would assist the Plaintiff in proving that Dr. Vaughn was the proximate cause of the dislodgment of the tracheostomy tube or of Mr. Magbie's death. To the contrary, Dr. Baker's testimony establishes just the opposite – that the dislodgment of the tracheostomy tube and its subsequent reinsertion in such a fashion that Mr. Magbie could not be ventilated caused his death acutely on the evening of September 24, 2004 and was unrelated to any alleged negligence of Dr. Vaughn.

### Dr. Cooper's Theory of Causation

Dr. Cooper's alternative theory of causation also does not support the conclusion that Dr. Vaughn's alleged negligence was the proximate cause of Mr. Magbie's death. Rather, he demonstrates that unforeseeable subsequent negligence by other health care providers was an intervening, superseding cause of the death.

For purposes of this Motion for Summary Judgment, the Defendant recognizes that he must accept as true any opinions offered by Dr. Cooper which are supported by facts in this case. For that reason, the Plaintiffs have the luxury of being able to present two completely conflicting theories of causation and to put the Defendant to the task of demonstrating that neither can survive this Motion for Summary Judgment. As unfair as that may seem, this Defendant has done just that.

Dr. Cooper has argued that Dr. Vaughn breached the standard of care on September 21, 2004 by sending Mr. Magbie to a facility that did not have a ventilator. As indicated above, there is no testimony offered by any expert for the Plaintiff that Dr. Vaughn had to place Mr. Magbie on a ventilator. Rather, the argument is simply that Dr. Vaughn had to assure that Mr. Magbie would be in a facility where such a ventilator was available should it be necessary at which point other health care providers would have to arrange for the use of the ventilator. Also, as indicated above, the evidence is irrefutable that Mr. Magbie was in such a facility, Greater Southeast Community Hospital, by 9:50 a.m. on September 24, 2004. Therefore, the evidence in this case demonstrates that no conduct by Dr. Vaughn prevented Mr. Magbie from being in a facility where he could be ventilated for at least nine hours before he died.

The fatal defect in the Plaintiff's case against Dr. Vaughn is that the proof demonstrates only that Mr. Magbie had a period of respiratory distress on the morning of September 24, 2004 which prompted his caretakers at the jail infirmary to return him to the Emergency Room at Greater Southeast Community Hospital. The Plaintiff's proof does not demonstrate that this "crisis" caused Mr. Magbie's death. To the contrary, both Dr. Baker and Dr. Cooper testified that Mr. Magbie was "salvageable" at the time he returned to Greater Southeast. The Plaintiff

repeatedly quotes her experts' opinions that Mr. Magbie <u>could</u> experience a respiratory crisis that would cause him in very short order to stop breathing. Such statements are totally irrelevant to this issue because that is not what occurred in the Hospital on September 24, 2004. The Plaintiff's experts have consistently demonstrated that Mr. Magbie's crisis was addressed timely and that he had stabilized on the morning of September 24, 2004. Thereafter, Dr. Cooper has argued that his condition slowly deteriorated because of inattention and inadequate care by people other than Dr. Vaughn. This is a far cry from a sudden demise after a respiratory crisis.

Dr. Cooper has made it clear that after Mr. Magbie's arrival at Greater Southeast Community Hospital on the morning of September 24, 2004, Mr. Magbie was stabilized for a period of time and his oxygen saturation levels were within normal limits initially. (*See* Exhibit IV, Dr. Cooper Depo., p. 73.) Dr. Cooper testified that it was possible to prevent Mr. Magbie's death if he had received proper treatment throughout the day on September 24, 2004 but that did not occur. (Exhibit IV, p. 62.)

Dr. Cooper agreed that Dr. Ilouyomade took many appropriate steps in caring for Mr. Magbie on the morning and early afternoon of September 24. Notably, he ordered a variety of tests including x-rays, a CT scan, arterial blood gases, a complete blood count, serum chemistries and a urinalysis. Id. pp. 73-74. By 1:25 p.m., under the direction of Dr. Ilouyomade, Mr. Magbie had also received intravenous fluids, Narcan, thiamine and levaquin. Id. p. 74. Dr. Ilouyomade also saw to it that Mr. Magbie was placed on a tracheostomy mask and ordered that the nurses perform trach toilet, a process by which the tracheostomy is suctioned to be sure that it is patent. Id. pp. 75-76. Additionally, Mr. Magbie's condition was monitored using equipment to show his cardiac data, his blood pressure and his oxygen saturation. Id. p. 76. Within two hours after Dr.

11

Ilouyomade had seen Mr. Magbie, his condition had greatly improved. In the words of the

Plaintiff's expert, Dr. Cooper, he was basically stabilized and in no acute distress. Under oath,

Dr. Cooper testified as follows:

> Q. It looks from the records that his [Mr. Magbie's] pulse ox had gotten up to a hundred percent as of 12:15 a couple hours after he [Dr. Ilouyomade] starts seeing him, is that right?
>
> A. Yes.
>
> Q. His vital signs were all stable as of about the same point in time. I'm reading from nursing papers 0031 of the exhibit.
>
> A. Yes, that's right.
>
> Q. He's alert and responsive and looking at 0029 his blood pressure was 132 over 85 which would have been acceptable for this patient, right?
>
> A. Yes.
>
> Q. His respiration was 24 which would have been okay.
>
> A. Yes.
>
> Q. Pulse at 108 would have been okay, right?
>
> A. Yes.
>
> Q. So he's stabilized and he comes in unresponsive and within three hours of care he is basically stabilized and no acute distresses as of that point in time, right?
>
> A. Yes.[1]

---

[1] At page 7 of the Plaintiff's Opposition, the Plaintiff notes that the Defendants have argued that the Plaintiff's experts admitted that Mr. Magbie "initially received appropriate care and treatment from Dr. Ilouyomade." She argues that the authorities cited by the Defendant do not support this statement. Clearly, the testimony recited at length above from Dr. Cooper's deposition at pages 73-77 support the Defendant's contention in great detail. The Defendant has accurately represented Dr. Cooper's testimony but is guilty of citing to the wrong page of Dr. Cooper's deposition. Apparently, the Plaintiff in her Opposition craftily has argued that exhibits do not support the point for which they are cited while avoiding the fact that the assertion attributed to the Plaintiff's expert is accurate based upon lengthy testimony elsewhere in his deposition. Such sleight of hand is not helpful and potentially will mislead this Court. Hopefully, it was not designed to do that.

12

Although the Plaintiff's experts have demonstrated that the "crisis" had passed and Mr. Magbie was stabilized shortly after noon on September 24, 2004, both Dr. Baker and Dr. Cooper have argued that the standard of care required that Mr. Magbie's physicians at Greater Southeast Community Hospital recognize during the morning hours when the results of Mr. Magbie's arterial blood gases became available that he needed to be placed on a ventilator immediately. Thereafter, the Plaintiff's experts have outlined a series of breaches in the standard of care by health care providers – not Dr. Vaughn – which caused Mr. Magbie to slowly deteriorate over the space of more than six hours.

Whereas both Dr. Cooper and Dr. Baker stated that Mr. Magbie was "salvageable" upon arrival at the Emergency Room on the morning of September 24, 2004 and Dr. Cooper initially stated that it was "possible" that Mr. Magbie would have survived if he had received reasonable care, subsequent testimony made it crystal clear that with appropriate care Mr. Magbie "most

---

Elsewhere, the Plaintiff is guilty of even more twisted arguments that serve no purpose other than to try to convince the Court, incorrectly yet again, that the Defendants have not accurately quoted the opinions of the Plaintiff's experts. At page 9 of the Opposition, the Plaintiff states:

"Finally, Defendants say that 'Dr. Cooper stated categorically that he did not fault any of the care which Dr. Vaughn rendered to Mr. Magbie in the Emergency Department.' Defs.' Mem. At 10. [Actually this was from page 16.] In fact, Dr. Cooper testified, at the page cited by Defendants, that he did not criticize the care of Dr. Vaughn 'other than deciding to send Mr. Magbie to a location where he could not have a ventilator.' Exh. 1, Cooper Dep. At 51."

One need only look back at the Defendant's Memorandum in Support of the Motion for Summary Judgment at page 16 to see how ludicrous this purported clarification is. Verbatim, the Defendant stated in the Memorandum:

"Dr. Cooper joins in the criticism of Dr. Vaughn for sending Mr. Magbie back to jail where there was no ventilator. However, Dr. Cooper stated categorically that he did not fault any of the care which Dr. Vaughn rendered to Mr. Magbie in the Emergency Department. (Exhibit 5 at p. 51.)"

In other words, the Plaintiff has quoted one sentence from the Defendant's Memorandum and ignored the preceding sentence. What the Defendant represented in his Memorandum and what the Plaintiff argues he should have said are indistinguishable. To imply to the Court that there was any disparity between Dr. Cooper's testimony in fact and what was represented to be his testimony by the Defendant is dumbfounding. This is a tactic which is designed solely to try to mislead the Court without serving any other purpose.

likely" would have survived. It is not only true that he most likely would have survived if appropriate care had been instituted shortly after the arterial blood gases came back, but it is also clear, according to the Plaintiff's experts, that with appropriate care he would have survived as late as 5:40 p.m.

Dr. Cooper noted that the arterial blood gases were obtained at 10:55 a.m. (Exhibit IV, p. 93.) He then testified as follows:

Q.    Sometime within an hour or less of when the results came back Mr. Magbie should have been put on a ventilator?

A.    I would say promptly. When you look at this result that tells you that he is not breathing enough and he is going to need a ventilator so there is really no reason to wait. As it turned out, if it had been supplied within an hour he would have been fine. At the time when you first receive this information, you don't know what the future has in store so the prudent thing to do is to supply the ventilator as soon as you can.

Q.    Given the fact that his pulse ox was still 80% at 17:40 (5:40 p.m.) would you agree if in fact he had been ventilated at that point in time he would have survived?

A.    Most likely, yes.

In summary, if we ignore Dr. Baker's completely contradictory theory of causation, the Plaintiff's evidence as presented by Dr. Cooper demonstrates that Mr. Magbie returned to the Greater Southeast Community Hospital Emergency Room in respiratory distress on the morning of September 24, 2004. He was treated and stabilized by no later than 12:15 p.m. However, as early as 10:55 a.m., his laboratory data demonstrated that he needed to be on a ventilator in order to assist his breathing. Instead, he was placed on a trach mask. His doctor ordered that he be admitted to the hospital, but that did not occur for more than five hours. During that time he was

14

being monitored electronically, but there is no evidence that any physician further evaluated him until his tracheostomy tube dislodged at approximately 5:40 p.m.

The plaintiff's experts criticized the nurses for failing to monitor Mr. Magbie throughout the afternoon and have accused them of breaching the standard of care by failing to alert the attending physician to the declining oxygen saturation level and the rising carbon dioxide levels. Gradually, over a period of many hours, according to the Plaintiff's experts, Mr. Magbie developed a respiratory acidosis which the health care providers should have been aware of, should have responded to and yet did not. *See* Defendant's Memorandum in Support of Motion for Summary Judgment, pp. 13-14. Dr. Cooper has made it clear that he believes that if the appropriate care had been rendered any time before 5:40 p.m. by placing Mr. Magbie on a ventilator, he more likely than not would have survived.

The conclusion is inescapable that Mr. Magbie returned to the Emergency Room at Greater Southeast Community Hospital in plenty of time to be treated and, in fact, was stabilized initially. Setting aside Dr. Baker's theory of proximate cause, Dr. Cooper insists that Mr. Magbie's death occurred only because a series of violations of the standard of care by health care providers during the afternoon of September 24, 2004 caused him to go without a ventilator for more than seven hours after clinical and laboratory evidence revealed that it was necessary.

The Plaintiff's Opposition acknowledges that her burden of proof is to demonstrate that the alleged negligence of Dr. Vaughn on September 24, 2004 caused Mr. Magbie's death through a "direct and causal relationship." Despite all of the evidence to the contrary, she attempts to argue that the decision to send Mr. Magbie back to the jail infirmary was a substantial cause of his death. Neither the evidence nor the opinions of her experts support this conclusion. At most, the

decision to send Mr. Magbie back to the jail infirmary led to the need for him to return to the Emergency Room to be stabilized and admitted to the hospital. The evidence is undisputed that Mr. Magbie returned in plenty of time to be treated and, in fact, was stabilized within a matter of hours after his return.

The Plaintiff also acknowledges in her Opposition that she must demonstrate that Mr. Magbie's death was a foreseeable consequence of sending him to the jail infirmary. There is nothing in the Plaintiff's Opposition or in the evidence which she has presented in this case which leads to this conclusion. Rather, the Plaintiff's experts demonstrate that Mr. Magbie returned to the hospital in plenty of time to be treated but that his death occurred only because he went more than seven hours without being ventilated and without being monitored appropriately by nurses or physicians.[2]

Not only is Dr. Vaughn entitled to summary judgment because the inadequate care which caused Mr. Magbie's death was not foreseeable and thereby precludes a finding that the death was a direct and proximate result of his decision to discharge the patient on September 20, 2004, but this Court should also conclude that the multiple acts of negligence identified by the Plaintiff's experts constitute a superseding, intervening proximate cause of Mr. Magbie's death.

---

[2] The conclusion is inescapable that the Plaintiff is asking this Court to conclude that Dr. Vaughn should be held responsible for foreseeing the negligent treatment in the Emergency Room as described by the Plaintiffs experts. The Plaintiffs cannot prevail unless a determination is made that Dr. Vaughn should have anticipated, i.e. foreseen, that Mr. Magbie would be stabilized but then slowly deteriorate over a period of many hours without adequate physician or nursing monitoring. On the other hand, the Plaintiffs argue that if Dr. Vaughn had admitted Mr. Magbie to the hospital on September 20, 2004, it was likely that Mr. Magbie would have received appropriate treatment and, therefore, would have survived. In other words, Dr. Vaughn is being whip-sawed between a presumption of good care following an admission that did not occur and being held legally responsible for foreseeing the allegedly negligent care that actually occurred in the same facility. The Plaintiff is asking this Court to establish a playing field that is far from level. Rather, the Plaintiff wants Dr. Vaughn to be forced to assume that only good care would have followed an admission on September 20 but to be unable to rely upon an expectation that reasonable care would have occurred upon Mr. Magbie's return to the hospital on September 24.

16

The Plaintiffs have cited no case which supports their contention that Dr. Vaughn's alleged negligent discharge on September 20 was a cause of the death 3 ½ days later. All the cases they cite are easily distinguishable. For instance, in *Graham v. Roberts*, 441 F.2d 995 (D.C. Cir. 1970), the defendant dentist was accused of delaying a referral of his patient to a specialist. In that case, the plaintiff succeeded in producing evidence that the plaintiff's condition worsened during the delay and that the plaintiff continued to deteriorate even after receiving treatment from a specialist. Unlike the instant case, there was no evidence that the underlying condition stabilized and, more importantly, no evidence that after the initial stabilization negligence by the subsequent treaters deprived the plaintiff of treatment which "most likely" would have saved him.

In *District of Columbia v. Zukerberg*, 880 A.2d 276 (D.C. 2005), the District of Columbia Court of Appeals found that several causes acted concurrently to cause a child to fall from a three meter swimming pool diving board. The facts of that case are easily distinguishable. The Court found that the plaintiff presented sufficient evidence to the jury to demonstrate that all of the allegedly negligent conditions and acts were occurring concurrently. It then left it to the jury to determine which played a substantial factor in the child's injuries. This is a far cry from the evidence offered by the plaintiff herein. The evidence does not support the conclusion that the negligence of Dr. Vaughn was concurrent with the events on September 24, 2004. Rather, the allegation is that Dr. Vaughn's negligence caused a crisis which required Mr. Vaughn to return to the Emergency Room for care. However, the Plaintiff's experts' testimony reveals that crisis had been dealt with and abated as of midday on September 24. Thereafter, according to Dr. Cooper, there was plenty of time to provide the necessary treatment – just as Dr. Vaughn anticipated. Unlike *Zukerberg*, the Plaintiff herein has presented substantial proof through her experts that a

17

series of unforeseeable, negligent acts occurred over the course of many hours and but for those acts, Mr. Magbie would have survived. The *Zukerberg* opinion provides no support for the conclusion that there was a direct and causal relationship between Dr. Vaughn's alleged negligence and Mr. Magbie's death.

The Plaintiffs offer no case to refute the conclusion that, under Dr. Cooper's theory of proximate cause, the events in the Emergency Room on September 24, 2004 represent an intervening, superseding cause of Mr. Magbie's death. Dr. Vaughn had every right to foresee that upon his return to the Emergency Room, Mr. Magbie would be assessed, diagnosed and treated. The Plaintiff's experts' testimony demonstrates that Mr. Magbie was assessed, diagnosed and stabilized. However, starting at approximately 10:55 a.m., Dr. Cooper and Dr. Baker contend that a series of negligent acts ensued and that but for these acts Mr. Magbie would not have died. Significantly, the Plaintiff's theory of causation is based upon the argument that the necessary treatment for Mr. Magbie simply stopped after he was stabilized. If one believes the evidence of the Plaintiff's case, which we must for purposes of this Motion, nurses failed to monitor Mr. Magbie and his physician over the course of many hours failed in his obligation to arrange for him to be placed on a ventilator. Only because of inattention, if you believe Dr. Cooper, Mr. Magbie slowly deteriorated after his respiratory distress had reversed and stabilized.

The gravamen of the alleged negligence on the part of Dr. Vaughn was that he sent Mr. Magbie to a location where he did not have access to a ventilator. No one has accused Dr. Vaughn of having any duty to actually place Mr. Magbie on a ventilator. Rather, Dr. Vaughn was by necessity dependent upon others to make the right choices and to place Mr. Magbie on a ventilator. For nine hours before he arrested, Mr. Magbie was in just such a location. If the

18

Plaintiff's case is to be believed, the failure to place Mr. Magbie on a ventilator for a period of more than seven hours after the arterial blood gas results revealed the need for one and the failure to monitor his slowly declining respiratory situation is, as a matter of law, the intervening, superseding proximate cause of his death.   Therefore, Dr. Vaughn is entitled to summary judgment on all claims that his decision to discharge Mr. Magbie on September 21, 2004 was the proximate cause of his death.

WHEREFORE, having demonstrated that neither of the Plaintiff's contradictory theories of liability in this case demonstrates that Dr. Vaughn caused Mr. Magbie's death, this Defendant respectfully requests that his Motion for Summary Judgment be GRANTED.

Respectfully submitted,

*/s/ Thomas V. Monahan, Jr.*
Thomas V. Monahan, Jr. (04471)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland  21202
(410) 783-4000
tvm@gdldlaw.com
**Attorneys for Defendants William S. Vaughn, M.D.,
Rotimi A. Iluyomade, M.D. and National Emergency
Services District of Columbia**

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of April, 2008, I caused to be served *via* electronic filing a true and correct copy of Defendant's Reply to Plaintiff's Opposition to Defendant Vaughn's Motion for Summary Judgment was served *via* electronic mail upon the following:

Donald M. Temple, Esquire
Temple Law Office
1229 15th Street, NW
Washington, DC  20005
*Counsel for Plaintiff*

Edward J. Connor, Esquire
5210 Auth Road, Suite 304
Camp Springs, Maryland  20746-4341
*Counsel for Plaintiff*

Elizabeth Alexander, Director
National Prison Project of the ACLU
    Foundation
915 15th Street, NW, 7th Floor
Washington, DC  20005-2302
*Counsel for Plaintiff*

                                                          */s/ Thomas V. Monahan, Jr.*
                                                          Thomas V. Monahan, Jr.

4843-8906-1378

20

# EXHIBIT I

**07/19/06: Scott v D.C.: Depo: William Vaughn, MD**

PAGE 1 TO PAGE 108

**NEAL R. GROSS & CO., INC.**

**(202) 234-4433**

**CONDENSED TRANSCRIPT AND CONCORDANCE**
PREPARED BY:

*NEAL R. GROSS & CO., INC.*
*1323 RHODE ISLAND AVE., NW*
*WASHINGTON, DC    20005*
*Phone:    (202) 234-4433*



DEFENDANT'S EXHIBIT
I

BSA

## Page 53

(1) 99 percent with 3 liters of oxygen via nasal cannula."
(2)   Q   Okay.  So before you administered the (3) oxygen, he was at 90?
(4)   A   Yes.
(5)   Q   And that would be below normal, correct?
(6)   A   Yes.
(7)   Q   And thereafter it says you discussed the (8) matter with Dr. Ackerman.  Is that right?
(9)   A   Yes.
(10)   Q   Do you remember your discussion with Dr. (11) Ackerman?
(12)   A   I did not speak to Dr. Ackerman directly. (13) Dr. Haghigi was the person in the hospital at night. (14) I actually spoke to Dr. Haghigi as opposed to Dr. (15) Ackerman.
(16)   Q   So this should say, "Haghigi," (17) technically.
(18)   A   Yes.  But it's the exact same service.
(19)   Q   Okay.  Can you tell me what your (20) discussion was with Dr. Haghigi?
(21)   A   Yes.  The question was on Mr. Magbie.  I (22) asked him specifically what was his ventilator.  He

## Page 54

(1) said, "Use the ventilator if he needed to, as he (2) needed to."  No rhyme, no reason.  It was not like he (3) used it every night, so I was trying to figure out how (4) I could take care of Mr. Magbie.  He said, "You can (5) use it every night, use it sometimes or not (6) sometimes."  So I'm looking to how to best accommodate (7) his "sometime" use of a ventilator, as he put it.
(8)   Q   As who put it?
(9)   A   Mr. Magbie.  Before I got out there, I (10) said, "Mr. Magbie, how often do you use your (11) ventilator."  He said, "I use it sometimes if I need (12) to, as I need to.  It's not all the time, it's not (13) every day, it's just whenever."  I'm trying –
(14)   Q   Did you – I'm sorry.  I didn't mean to (15) cut you off.
(16)   MS. JOHNSON:  Continue.
(17)   THE WITNESS:  I'm trying to figure out how (18) could I possibly admit somebody with a "whenever" (19) ventilator use was my problem I had admitting him at (20) the time.  He was breathing well, but he says he may (21) crash but whether he was going to crash, he didn't (22) know.  So I can't say – how can I justify a PRN

## Page 55

(1) ventilator use for admission.  That was the problem I (2) had with Mr. Magbie.
(3)   BY MR. CONNOR:
(4)   Q   Okay.  Are you finished?
(5)   A   And as Dr. Haghigi who had run the service (6) for Dr. Ackerman and was in charge of the inmates, how (7) could I quarantine or put a ventilator to the side for (8) a PRN use was the problem I had, although at the time (9) he was not in respiratory distress.  He sat the entire (10) time well.  How could I justify a PRN use for a (11) ventilator is the problem I had on my hands.
(12)   Q   Okay.  Are you finished now?
(13)   A   Yes.
(14)   Q   I don't want to cut you off again.
(15)   A   Yes.
(16)   Q   When you say, "How can you justify (17) quarantining a ventilator," do you mean the equipment (18) that you had at the hospital, like taking in a (19) ventilator that was available at the hospital –
(20)   A   Yes.
(21)   Q   – using it for this patient?
(22)   A   On a – yes – on a PRN use.  He's not

## Page 56

(1) using it, so if somebody would need one you take it (2) away from them because he may need it at sometime. (3) That was the problem I had.
(4)   Q   Were you short of ventilator equipment (5) that night?
(6)   A   I don't know the status of vents in the (7) hospital.  I do not control the vents.
(8)   Q   All right.  I think some minutes ago we (9) were talking about your experience over five years.
(10)   A   Yes.
(11)   Q   And I think you told me that you had (12) treated a number of ventilator-dependent patients over (13) the years.
(14)   A   Yes.
(15)   Q   I believe that was your answer.  This (16) wasn't the first rodeo.
(17)   A   No, but –
(18)   MS. JOHNSON:  Hold on.
(19)   THE WITNESS:  Go ahead and ask your (20) question.  I'm sorry.
(21)   BY MR. CONNOR:
(22)   Q   Okay.  My question is:  When you treated

BSA

Page 65

(1)  A  Correct.

(2)  Q When you made that entry had you already (3) spoke to Dr. Bastien?

(4)  A Well, yes that I spoke with him.  It's on (5) the same note.  Yes, sir.  I'm sorry.

(6)  Q Okay.  How many times did you talk to Dr. (7) Bastien –

(8)  A Twice.

(9)  Q – that evening?

(10)  A Twice.

(11)  Q Okay.  When was the first call if you (12) remember?

(13)  A At 1:50 a.m.

(14)  Q And did you call him or did he call you?

(15)  A I called the jail.

(16)  Q And why did you call the jail?

(17)  A To see what facilities they had at the (18) jail infirmary.

(19)  Q To see what services they had?

(20)  A To see what they could provide there.

(21)  Q And what were you specifically trying to (22) learn about?

Page 66

(1)  A  Learn about if they provide a PRN (2) ventilator which Mr. Magbie I guess was used to.

(3)  Q A PRN ventilator.

(4)  A Yes.

(5)  Q All right.

(6)  A And they said they could not do anything (7) mechanical ventilation there at all.

(8)  Q Okay.  And was it after that phone call (9) that you made the entry the patient to be admitted?

(10)  A Yes.  After I talked to Dr. Batien, yes. (11) I'm sorry.

(12)  Q And then you had a second call with Dr. (13) Bastien?

(14)  A Correct.

(15)  Q What time was that, if you remember?

(16)  A Around 3:20 in the morning.

(17)  Q And again, did he call you or did you call (18) him?

(19)  A I called him.

(20)  Q And why did you call him at 3:20 in the (21) morning?

(22)  A To see if they could provide oxygen by

Page 67

(1) nasal cannula.  Just to make sure they could provide (2) some kind of oxygen therapy there.

(3)  Q And what did Dr. Bastien tell you?

(4)  A He said they do have oxygen support there (5) by way of nasal cannula; they could monitor it.  (6) said, "If I send Mr. Magbie back, can you make sure he (7) gets O2 that can be monitored on the oxygen?" He (8) said, "Yes, but I have to make arrangements and can (9) you keep him there until we make arrangements?"  I (10) said, "Fine." And we'd leave him in the emergency (11) room until everything's set for him back at the jail.

(12)  Q So was there a point when you changed your (13) mind about admitting the patient?

(14)  A Yes.  His condition had changed.  It (15) improved.

(16)  Q Did you note that?

(17)  A That's where I failed to make the proper (18) documentation on the chart there.  Although I list it (19) here on the 3:20 note, it's listed on my discharge (20) note, discharge instructions.  I transferred the (21) instructions to the second page of the doctor's note.

(22)  Q When you talked to Dr. Bastien the second

Page 68

(1) time, did you discuss providing a ventilator at night (2) for Mr. Magbie?

(3)  A No.

(4)  Q Did you make any further effort to obtain (5) a ventilator for him?

(6)  A No.

(7)  Q Did you feel that you had addressed his (8) respiratory issues by sending him back with a nasal (9) cannula?

(10)  A From my assessment I figured I addressed (11) all his problems.  If he had shown any signs of (12) decompensation, I would've changed my course of (13) action.  He didn't decompensate.  And vital signs (14) reading at 99 percent, 95, 90 percent of room air, to (15) me is not in respiratory distress.  His respiratory is (16) 12 to 15; that's not distress.  His vital signs were, (17) like, 95 over 65 between through the entire course of (18) the emergency room when I had him.  That's not (19) distress to me.  S what I'm looking at, I'm looking (20) although he has a lo of preexisting problems, he's (21) stable.

(22)  MS. JOHNSON:  Is this a good time to take

# EXHIBIT II

**07/19/06: Scott v D.C.: Depo: Rotima Iluyomade, MD**

PAGE 1 TO PAGE 107

**NEAL R. GROSS & CO., INC.**

**(202) 234-4433**

**CONDENSED TRANSCRIPT AND CONCORDANCE**
PREPARED BY:

*NEAL R. GROSS & CO., INC.*
*1323 RHODE ISLAND AVE., NW*
*WASHINGTON, DC   20005*
*Phone:   (202) 234-4433*



DEFENDANT'S
EXHIBIT
II

## Page 53

(1)  Q You were treating other patients in the (2) emergency room?

(3)  A Yes.

(4)  Q And following Mr. Magbie's progress?

(5)  A Right.

(6)  Q And relying on nurses and respiratory (7) therapists to keep you informed –

(8)  A Yes.

(9)  Q – as to his progress?

(10) A Yes.

(11) Q And were you following his oxygen levels (12) that afternoon?

(13) A Yes.

(14) Q Now, you examined him around 10:10, (15) correct?

(16) A Yes.

(17) Q And did you examine him again around 1:05 (18) when you ordered the additional –

(19) A Yes.

(20) Q – medications?

(21) A I may have.  I'm not sure..

(22) Q And when –

## Page 54

(1)  A I must have.

(2)  Q I'm sorry?

(3)  A I must have, between the first time he (4) arrived and the time that he was admitted.

(5)  Q Well, you would've reassessed him before (6) ordering additional medication at 1:05, wouldn't you?

(7)  A Yes.

(8)  Q Okay.  And when did you next examine him (9) after 1:05.

(10) A He was sitting not quite – I mean, he was (11) in bed not quite 20 feet from where I was writing and (12) sitting, so it's continuous observation; I could see (13) the progress. I could tell, and I went by there, you (14) know, all the time.

(15) Q Well, I don't mean when did you observe (16) him across the room. I mean when did you do a hands- (17) on examination of him after 1:05.

(18) A I can't.  Not by these records I don't (19) know exactly when, but I did.

(20) Q Okay.  Would that have been at 5:40?

(21) A Oh, I'm sure before then, but it's (22) according to the records I was there at 5:40, yes.

## Page 55

(1)  Q How was he getting oxygen during these (2) hours in the afternoon of September 24th?

(3)  A When he first came, after the trachea (4) toilet, I mean, he was placed on high-flow oxygen with (5) the mask, and his oxygen level – and a blood-gas was (6) done which showed him to be oxygenating quite well. (7) And at some point he was downgraded, according to the (8) records, to five liters and there was a continuous (9) pulse oxygenator being done.  And he was conscious and (10) stable for most of his stay in the emergency room.

(11) Q So he was on a trach mask?

(12) A Yes.

(13) Q So he was getting oxygen over his mouth. (14) Is that right?

(15) A Over his trachea.

(16) Q Or his trachea.  Okay.  And I'm looking (17) now at the emergency department progress notes.  This (18) is page, I believe, 10.

(19) MR. NEWSOME: I'm sorry.  What did you (20) say?

(21) MR. CONNOR: I believe it's page 10, (22) emergency department progress notes.

## Page 56

(1)  MR. NEWSOME: Okay.

(2)  MR. CONNOR:  It's got a grid of his (3) oxygenation. We're on page 10.

(4)  THE WITNESS: It says page 7 here.

(5)  MS. JOHNSON: It's the right page. (6) Disregard what that says.

(7)  BY MR. CONNOR:

(8)  Q All right.  I'm looking at the upper-left, (9) "Vital signs –"

(10) A Yes.

(11) Q – grid.  And it looks like pulse ox, the (12) second column from the right, "pulse ox," 9;50 a.m. it (13) was 100 percent; 12:15 p.m. it was 100 percent, (14) correct?

(15) A Yes.

(16) Q 2:05 it's down to 95 percent?

(17) A Yes, on five liters.

(18) Q 4:00 p.m. it was down to 92 percent?

(19) A Yes.

(20) Q Would you have wanted to be consulted if (21) it went down to 92 percent at 4:00 o'clock?

(22) A Yes.

# EXHIBIT III

FRANK J. BAKER, II, M.D., MAY 16, 2007

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3                    CIVIL DIVISION

 4   MARY SCOTT, individually and )

 5   as personal representative    )

 6   of the Estate of JONATHAN     )

 7   MAGBIE,                       )          ORIGINAL

 8                  Plaintiff,     )

 9        vs.                      ) Civil Action No.:

10   DISTRICT OF COLUMBIA,         )   1:05-CV-01853 RWR

11   et al.,                       )

12                  Defendants.    )

13

14         The deposition of FRANK J. BAKER, II,

15   M.D., called for examination, taken pursuant to

16   the Federal Rules of Civil Procedure of the United

17   States District Courts pertaining to the taking of

18   depositions, taken before NANCY A. GUIDOLIN, CSR

19   No. 84-2531, a Notary Public within and for the

20   County of DuPage, State of Illinois, and a

21   Certified Shorthand Reporter of said state, at HQ

22   Global Workspace, Tower Floor, 415 West 22nd

23   Street, Oak Brook, Illinois, on the 16th day of

24   May, A.D. 2007, at 11:38 a.m.
```


DEFENDANT'S EXHIBIT

FRANK J. BAKER, II, M.D., MAY 16, 2007

1  question is this: In your report you have an

2  opinion as to the cause of death.  On the last

3  page you indicated that, "He would not have

4  succumbed from hypoxia, which was the immediate

5  cause of his cardiac arrest, and which was a

6  direct result of dislodgement of his tracheostomy

7  tube."

8       A.    Yes.

9       Q.    All right.  Is that still your opinion

10  as to the cause of death --

11       A.    Yes.

12       Q.    -- based upon present information and

13  the updated information that you were provided?

14       A.    Yes.

15       Q.    Okay.  Have you read the autopsy

16  report?

17       A.    Yes.

18       Q.    All right.  Have you seen any evidence

19  of any dislodgement of the tracheostomy tube in

20  the autopsy report?

21       A.    No.  Not per se.  In fact, I think

22  there is a statement, let me find it here, that --

23  and actually an endotracheal tube was in place.

24       Q.    Yes.  I think that's exactly right.

FRANK J. BAKER, II, M.D., MAY 16, 2007

1    Let's go back to your opinion anyway.  If, in

2    fact, that is the opinion as to the cause of his

3    death, a dislodgement of the tracheostomy tube,

4    can you tell me how this dislodgement occurred?

5        A.    I think that we don't really know.  I

6    don't think that we really know.  I mean, there is

7    no evidence that any individual, either

8    intentionally or accidentally, dislodged it.

9        Q.    Do you know -- let's just start with

10   you give me some background so I can try to learn

11   the medicine through you, unfortunately.  I will

12   admit that's what I am doing.

13           How does that dislodgement cause

14   hypoxia in your opinion?  That's the thing that

15   causes the cardiac arrest, right, hypoxia?

16       A.    Yes.

17       Q.    So we don't know how it occurred, but

18   if it did occur, what would -- how would it cause

19   this hypoxia to start occurring?

20       A.    Well, because hypoxia -- the reason

21   that you have a tracheostomy tube in is so that a

22   patient who is moving a minimal amount of air can

23   get the air into their lungs because the airway is

24   shorter; in other words, the distance from my

FRANK J. BAKER, II, M.D., MAY 16, 2007

1  trach toilet.  There is no incidence of any

2  obstruction.  He has got his trach tube in proper

3  position, and let's assume that that is in proper

4  position.  Then why is he not responding to the

5  Ambu bag at 8:15?

6        A.    Well, the point is he should be.

7        Q.    I agree.  What explanation do you have

8  for that?

9        A.    Well, the only explanation is either a

10  mucus plug or the trach is in the wrong place.

11  That's the only two possibilities.

12        Q.    You said that you read the recent

13  report of April 29th of our expert, Dr. Roger A.

14  Johns.

15        A.    Yeah.

16        Q.    Do you have that handy?

17        A.    Yes.  I do.

18        Q.    The last page, Page 3.

19        A.    Yes.

20        Q.    It says here, and I will read it.  It

21  says, "It is quite possible that Mr. Magbie was

22  exhausted from several days during his

23  imprisonment where he was forced to go without a

24  period of ventilation in the evening to provide

FRANK J. BAKER, II, M.D., MAY 16, 2007

1  sufficient rest and recovery so that he could

2  breathe properly during the day.  The further

3  stress of pneumonia and urinary tract sepsis,

4  which likely were progressing during the delayed

5  admission and treatment as an in-patient, could

6  have added very significantly to the respiratory

7  failure."  Do you agree with that?

8       A.    Well, that certainly is possible, but

9  then that should have all been reversed when you

10 started to actively ventilate him with an Ambu

11 bag.

12      Q.    Okay.  If, in fact, it was not reversed

13 by Ambu bag, is there a way that the body just

14 cannot respond even to the Ambu bag because of

15 this sheer exhaustion that existed before he was

16 brought into the hospital --

17      A.    No.

18      Q.    -- for the three days at the jail where

19 he was not properly treated?

20      A.    No.

21      Q.    So the only explanation that you have,

22 then, would be that there must have been some

23 other type of obstruction that prevented his being

24 ventilated, and somehow the airway was blocked?

FRANK J. BAKER, II, M.D., MAY 16, 2007

1  he has two other reasons to admit the patient.  He

2  has actually three.  He has the issue of

3  hypovolemia to the point of a patient being

4  shocky.

5          Why would you -- you know, how did this

6  patient become shocky?  Well, he clearly didn't

7  have enough fluid intake.  So, you know, you don't

8  simply reverse that and send the patient back to

9  the same situation that caused the problem.

10          You have the same issue with

11  hypoglycemia.

12      Q.    Well, let me stop you there.  Let's

13  talk about each one of them.  He had other

14  problems.  One of them would be the hypovolemia.

15  And he did reverse that problem, did he not?

16      A.    Did he reverse it?  Yes.  Sure.

17      Q.    He was basically stabilized by the time

18  he left the patient's care that morning, correct?

19      A.    Was he immediately stable at the

20  moment?  The answer is yes.  The question is:  Was

21  he suffering from a condition which would lead him

22  back into the same situation, and I think that the

23  answer to that is also yes.

24      Q.    Okay.  And how do you know that?  What

FRANK J. BAKER, II, M.D., MAY 16, 2007

1  done what I think the standard of care requires,

2  that the patient wouldn't have gone on to

3  deteriorate and return on the 24th in the

4  condition that he was.

5      Q.    Okay.  But you indicated that -- in

6  fact, on the 24th you indicated that he still

7  could have been salvaged if, in fact, he had been

8  properly monitored, right?

9      A.    That's true, too.

10      Q.    What, if anything, given the situation

11  that Dr. Vaughn apparently found presenting to

12  himself that he requested admission of the patient

13  and then was told that by the hospital

14  administrator who was in charge of the admission

15  that he was not permitted to admit the patient,

16  what, if anything, could he have done or did do at

17  that point in time?

18      A.    Well, the problem is this:  The problem

19  is that he presented this only as a case of a

20  patient who may need a ventilator.

21          What he should have done is presented

22  this as a patient who is dehydrated, who needs to

23  be admitted for rehydration.

24          We do this all of the time.  We have

# EXHIBIT IV

Kevin R. Cooper, MD

Page 1

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF COLUMBIA

2                  Civil Division

3    _____

4    MARY SCOTT, Individually

     and As Personal Representative

5    of the Estate of

     JONATHAN MAGBIE,

6

                   Plaintiff,

7

          v.              Case No. 1:05-CV-01853

8

     DISTRICT OF COLUMBIA,

9    et al.,

10                 Defendants.

     _____

11

12

13               DEPOSITION OF

14          KEVIN R. COOPER, M.D.

15        10:00 a.m. - 12:45 p.m.

16            May 21, 2007

17          Richmond, Virginia

18

19

20             Job #181058

21

22   REPORTED BY:  Joseph C. Spontarelli, CCR

DEFENDANT'S
EXHIBIT
IV

Kevin R. Cooper, MD

Page 62

1    A    Yes.

2    Q    Putting standard of care aside with

3    regards to Dr. Vaughn you agree that the care and

4    treatment that he rendered was appropriate up to a

5    point; that is, his care and treatment was within

6    the standard of care except for his decision to

7    return him to the CTF, right?

8    A    Right.

9    Q    That decision to return him to the CTF

10   would you not agree was remote in time and not in

11   fact a proximate causation of his ultimate death?

12       MR. CONNOR: I'm going to object to the

13   form. You can answer.

14       THE WITNESS: I think you could view

15   that in two different ways. It was remote in time

16   by a little more than three days. However, it

17   could be viewed as a proximate cause in the sense

18   that if he admitted Mr. Magbie to the hospital

19   then he most likely would not have died because he

20   would have been in a facility that could provide

21   mechanical ventilation.

22       It's true that he did survive several

Page 63

1    days and that it would have been possible to

2    prevent his death if proper treatment had been

3    subsequently provided but that did not occur.

4    BY MR. GUZIAK:

5    Q    You agree there were other physicians

6    under whose care Mr. Magbie came under on the

7    21st?

8    A    Yes.

9    Q    You pointed out you thought that Dr.

10   Malekghasemi should have returned Mr. Magbie to

11   the emergency room on the 21st, correct?

12   A    Yes.

13       To explain that, I believe if a patient

14   has an obvious reason that he may need a

15   ventilator and the patient tells the doctor I need

16   a ventilator at night that the doctor should

17   believe that patient and to make a ventilator

18   available to the patient at night. Whether or not

19   the patient uses it every night that ventilator

20   should be there so that if the patient says I need

21   a ventilator now it can be used.

22       On the other hand, Mr. Magbie had just

Page 64

1    been evaluated at the emergency room which is

2    where the doctor at the jail could have returned

3    him. The doctor there said he doesn't need a

4    ventilator. It was a confusing set of information

5    and options that were available to the staff at

6    the jail.

7    Q    But you would agree in fact another

8    doctor who would be involved in his subsequent and

9    intervening care after Dr. Vaughn's care on the

10   20th that some other doctor like Malekghasemi or

11   Nwosu or any other one in charge of Mr. Magbie's

12   care on the 21st could have made an independent

13   decision to return him to the emergency room,

14   correct?

15   A    I believe so. I believe they both had

16   the authority to do that.

17   Q    They could have in fact tried to find a

18   portable ventilator during the interim while he

19   was interred so that he could have a ventilator at

20   the CTF, correct?

21   A    I don't know if that was one of the

22   options they had.

Page 65

1    Q    There are portable ventilators that are

2    accessible and you could rent them. I think in

3    fact Mrs. Scott, Magbie's mother, had one

4    available did she not?

5    A    That's right.

6        In addition to the ventilator you also

7    need to have someone available who knows how to

8    operate the ventilator and attach it correctly.

9    It can certainly be done at home, but you do have

10   to have somebody there who knows how to handle it.

11   Q    If there is any way to tie in Dr.

12   Vaughn to this death of Mr. Magbie it would be

13   because he wasn't put on the ventilator at some

14   point between the 20th in the morning and 8:40 at

15   night on the 24th at the time of his death, right?

16   A    That's right.

17   Q    You would agree there was any number of

18   doctors who were more immediately in charge of him

19   from the 20th through 8:40 at night on the 24th

20   that had the responsibility for his care to

21   include putting him on a ventilator if they felt

22   that's what he needed, right?

17 (Pages 62 to 65)

Kevin R. Cooper, MD

Page 70

1  sometime afterwards he had the diaphragm pacemaker
2  inserted and that was able to sustain his
3  breathing for periods of time that he was able to
4  come off the ventilator.
5      Q    In your experience quadriplegics like
6  Mr. Magbie with pacemakers and this type of
7  traumatic injury what is their life expectancy?
8      A    It varies tremendously from
9  person-to-person depending on the level of care
10  that's available for them to receive and also on
11  other illnesses that they run into.  People with
12  spinal cord injuries frequently develop urinary
13  tract infections because they can't control their
14  urination.  They frequently develop pneumonia
15  because of being ventilator-dependent and having
16  to be suctioned.  With very good care sometimes
17  people can live a long time.
18      Q    Their life expectancy is not that of
19  the average normal person, is it?
20      A    Oh, no.
21      Q    The examiner who initially conducted
22  her examination had trouble finding the cause of

Page 71

1  death just based upon the autopsy.  Did you read
2  that?
3      A    I'm not sure what you're referring to.
4  You mean a comment by the medical examiner?
5      Q    The medical examiner was interviewed as
6  part of an investigation as to what happened and
7  the cause of death.  She indicated initially she
8  did not really find anything on the autopsy report
9  which could definitively be in her mind the cause
10  of death and so she went back and got the medical
11  records to assist her.  Did you read anything like
12  that?
13      A    I did not read that interview as far as
14  I can remember.  I did read the final report of
15  the autopsy.
16      Q    Do you agree with her assessment that
17  the cause of death was dislodgement of
18  tracheostomy tube?
19      A    No.
20      Q    Why not?
21      A    I don't think that the dislodgement of
22  the tracheostomy tube was a significant problem

Page 72

1  that was the cause of death.  The tracheostomy
2  tube is a plastic tube which is in an opening that
3  goes through the tissues of his neck and into the
4  wind pipe.  You put a plastic tube in there to
5  keep the hole open so that it doesn't close up and
6  to provide you a nice standard fitting that you
7  can attach things to such as a ventilator so that
8  you can assist his breathing through it.  It also
9  provides you with a conduit that you can put a
10  suction catheter down so that you know you're
11  going directly into the trachea.
12      When the tube sticks out further than
13  it should it can often be replaced back into the
14  proper position by following the normal curvature
15  of the tube.  It was mentioned in the record that
16  it slid in with no resistance.  Also, when they
17  were using the Ambu bag using that tube after it
18  had slid out and been replaced that the air went
19  in easily.  That's an indication to me that it was
20  in the correct position and that the dislodgement
21  of the tube was not a significant factor in his
22  death.

Page 73

1      Q    Let's go back to your report.  On page
2  two you talked about after he was found
3  unresponsive at the jail on September 24th the
4  appropriate actions were taken to improve his
5  respiratory status and he was appropriately
6  transported to the hospital.  That would be the
7  actions that were taken about 8:40 in the morning
8  by the nurses there to get him stabilized so that
9  he could be transported over to the emergency
10  room, right?
11      A    Yes, that's right.
12      Q    Then you say Mr. Magbie was stabilized
13  for a period of time while he was at Greater
14  Southeast.  His oxygen saturations were within
15  normal limits initially.  When he came in Dr.
16  Ilouyomade took over his care, right?
17      A    Yes.
18      Q    At least initially he did a lot of
19  appropriate and good things to stabilize
20  Mr. Magbie, did he not?
21      A    Yes.
22      Q    He ordered a variety of tests that were

19 (Pages 70 to 73)

Kevin R. Cooper, MD

Page 74

1    done, x-rays, CT scan, arterial blood gases, CBC,
2    serum chemistries, urinalysis -- those tests would
3    have all been appropriate given the presentation,
4    correct?
5        A    Yes.
6        Q    He also gave him some fluids, Narcan,
7    Thymine and Levaquin at 1325.  Generally he was
8    given certain medications and fluids, right?
9        A    Yes.
10       Q    Those would all be appropriate given
11   the presentation, right?
12       A    Yes.
13       Q    It was unclear as to whether there was
14   a problem with drugs or possible drug effects upon
15   him by use of drugs at the time, correct?
16       A    He had a urine toxicology test that
17   showed evidence of benzodiazepines and
18   tetrahydrocannabinol in his urine.  The
19   benzodiazepines are sometimes drugs that are used
20   but are also commonly prescribed as they were for
21   Mr. Magbie.  THC is a component of marijuana which
22   shows that he had used either that drug or the

Page 75

1    marijuana sometime prior to that.
2        Q    Could the drugs found in his urinalysis
3    somehow resulted in his unresponsiveness or any of
4    the other symptoms which necessitated his being
5    transported to the hospital that morning?
6        A    Knowing all the details about the case
7    I can say no.  If I were in the position of an
8    emergency room physician evaluating him I would
9    have to consider overdose of the benzodiazepine
10   might be responsible for the unresponsiveness.
11   It's unlikely in a patient who is transported from
12   a jail that they would have got an overdose but
13   it's a consideration, possible.
14       Q    If he had taken these drugs how long
15   would those drugs like marijuana and the other
16   drugs you mentioned stay in the system before they
17   would be cleared out?
18       A    It depends on the test that's done.  I
19   couldn't tell you for sure.
20       Q    Dr. Ilouyomade also put Mr. Magbie on a
21   trach mask and ordered a trach toilet as well,
22   right?

Page 76

1        A    Yes.
2        Q    That would be appropriate given the
3    circumstances and situation presented, right?
4        A    Yes.
5        Q    He also placed him on monitors,
6    cardiac, blood pressure and pulse ox, right?
7        A    Yes.
8        Q    All of which would have been
9    appropriate to do, correct?
10       A    Yes.
11       Q    It looks from the records that his
12   pulse ox had gotten up to a hundred percent as of
13   12:15 a couple hours after he starts seeing him,
14   is that right?
15       A    Yes.
16       Q    His vital signs were all stable as of
17   about the same point in time. I'm reading from
18   nursing papers 0031 of the exhibit.
19       A    Yes, that's right.
20       Q    He's alert and responsive and looking
21   at 0029 his blood pressure was 132 over 85 which
22   would have been acceptable for this patient,

Page 77

1    right?
2        A    Yes.
3        Q    His respiration was 24 which would have
4    been okay.
5        A    Yes.
6        Q    Pulse at 108 would have been okay,
7    right?
8        A    Yes.
9        Q    So he's stabilized and he comes in
10   unresponsive and within three hours of care he is
11   basically stabilized and no acute distresses as of
12   that point in time, right?
13       A    Yes.
14       Q    We're going to talk about one thing,
15   we're going to talk about the arterial blood
16   gases.
17       A    We do need to talk about that.
18            His mental status, although improved
19   was still not perfectly sharp.  He's described as
20   responsive at times attempting to communicate with
21   staff and then at other times not responsive.
22       Q    The arterial blood gases came back.

20 (Pages 74 to 77)

Kevin R. Cooper, MD

Page 90

1    Q    What does that show?
2    A    That's lower than normal. That's an
3 acidosis.
4    Q    It ties in with your initial opinion
5 that he's not breathing on his own properly,
6 right?
7    A    Exactly.
8    Q    You can have respiratory and metabolic
9 acidosis, is that right?
10    A    That's correct.
11    Q    At that point in time did you know one
12 way or the other?
13    A    This is a respiratory acidosis.
14    Q    There was some question about him being
15 on drugs. With metabolic would medications have
16 been a reasonable thing to try to see if they
17 would change that reading?
18    A    This is not a metabolic acidosis, this
19 is a respiratory acidosis.
20    Q    Your opinion is that he should have
21 been ventilated?
22    A    Yes. You could ventilate him with an

Page 91

1 Ambu bag, you could ventilate him with a
2 ventilator. Seeing these results in this clinical
3 picture of a man who has paralysis and who has
4 developed this amount of respiratory failure he's
5 going to need ventilator support long enough so
6 it's not going to be feasible to stand next to him
7 and bag him for hours, he's going to need a
8 mechanical ventilator.
9    Q    Would it have been reasonable to try to
10 see if in fact you could put a trach mask on him
11 to give him some medications, give him some bolus,
12 glucose in case he's dehydrated to try to see if
13 you get a response? Would that have been
14 appropriate?
15    A    I don't think so given the trach mask
16 can give him plenty of oxygen to make sure that he
17 gets enough oxygen. He was getting enough oxygen
18 for most of the afternoon until the saturations
19 started falling but it's going to help the
20 high carbon dioxide. The high carbon dioxide is a
21 sign that there's just not enough air moving in
22 and out and that's what he needs help with.

Page 92

1    Q    After getting these readings and
2 reviewing them what should the doctor have done?
3 How long should the doctor have waited before
4 ventilating the patient?
5    A    I wouldn't wait at all if I saw this.
6 You don't know whether he'll be able to hang on
7 for minutes, hours or a day when you see these
8 numbers.
9          Any increase in PCO2 in this clinical
10 situation in a patient with a spinal cord injury
11 is abnormal and it tells me that he needs help
12 with a ventilator.
13    Q    How often are the arterial blood gases
14 taken?
15    A    It depends on the clinical situation.
16 Sometimes they can repeat it as often as every 30
17 minutes. Sometimes they're done once a day,
18 sometimes every several days. It all depends how
19 quickly things are changing with the patient and
20 how much you need the information that you can
21 learn from a blood gas.
22    Q    If in fact an order was given for

Page 93

1 arterial blood gas would it have been within the
2 practice and procedures of an emergency room for
3 the arterial blood gases to be repeated without
4 additional orders?
5    A    That could be done. You might want to
6 see just with the passage of time whether things
7 are getting better or worse in terms of the
8 acidosis and the PCO2.
9    Q    These were taken early on in his
10 admission, right?
11    A    10:55 a.m.
12    Q    I think that's the time when Dr.
13 Ilouyomade just became involved and just started
14 to do all of these other things we mentioned which
15 were appropriate for him to do, right?
16    A    Yes.
17    Q    Therefore would it have been
18 appropriate for him to at least wait to see what
19 reaction all of his other non-ventilation type
20 practices and procedures and orders -- what type
21 of result would have occurred just based upon the
22 other measures he has taken?

24 (Pages 90 to 93)