UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | | |
|---|---|---|
| MARY SCOTT, Individually and as Personal Representative of the Estate of JONATHAN MAGBIE, | * | |
| | * | |
| Plaintiff | * | Civil Action No. 1:05-CV-01853-RWR |
| vs. | * | |
| DISTRICT OF COLUMBIA, *et al.* | * | |
| Defendants | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO ALL CIVIL RIGHTS CLAIMS

Now come the Defendants, William S. Vaughn, M.D. and Rotimi A. Iluyomade, M.D., by their counsel, and submit this Reply to Plaintiff's Opposition to Defendants' Motion for Partial Summary Judgment As to All Civil Rights Claims.

## I.   STATEMENT OF FACTS

This is a medical malpractice case brought by the mother and personal representative of the Estate of Jonathan Magbie, deceased, against various physicians, medical providers, and others involved in Mr. Magbie's care and treatment for respiratory and other problems that developed after he received a ten-day prison sentence on September 20, 2004. Plaintiff has erroneously filed this action pursuant to 42 U.S.C. § 1983 on the theory that Defendants acted under the color of law with deliberate indifference to Mr. Magbie's civil rights.

At the time of his death, Decedent, Jonathan Magbie, was a 27-year old quadriplegic, paralyzed from the neck down due to a childhood accident. He breathed through a permanent tracheostomy tube. In addition, he had undergone placement of a battery-operated phrenic nerve stimulator which continuously operated to assist his breathing. After sentencing on September 20, 2004, Mr. Magbie was transferred to the Central Detention Facility of the District of Columbia (the "Jail"). Thereafter, the jail transferred Mr. Magbie to the Correctional Treatment Facility ("CTF"). On September 20, while awaiting placement at the jail, Mr. Magbie developed respiratory problems and was transferred to the emergency room at Greater Southeast Community Hospital (the "Hospital"), a private community hospital that, under contract with the D.C. Corrections Department, provided medical services to certain jail inmates who were brought to the hospital by jail custodians. In relevant part, that contract provided:

> ▪ GSCHC shall provide Corrections Health Care Services at Greater Southeast Community Hospital, . . . and at D.C. General Urgent Care Center and Ambulatory Care Center, D.C. General Health Campus . . . .

> ▪ GSHC shall be the provider of inpatient hospital services except in those case where the treatment must be obtained at another hospital and shall utilize the hospital unit specifically equipped by or on behalf of the District at Greater Southeast Community Hospital to house persons in the custody of DCDC who require Corrections Health Care Services on an inpatient basis.

Memorandum of Understanding p. 3 (Attached as Exhibit I.)

On admission to the ER, Mr. Magbie came under the care of Dr. Vaughn, an emergency room physician at Greater Southeast Community Hospital. Dr. Vaughn was an employee of

National Emergency Services District of Columbia ("NES"), which provided emergency-room services under contract with the hospital. Dr. Vaughn, at no time, was a party to a contract with the Hospital or with the Department of Corrections. Dr. Vaughn only saw decedent, Mr. Magbie, on that one occasion and treated him between about 10:50 p.m. on September 20 and 8:00 a.m. the next morning (September 21st), when Dr. Vaughn went off shift. At all times, Mr. Magbie was seen by Dr. Vaughn in the emergency room and never in the inpatient ward as suggested by Plaintiff.[1] As a result of Dr. Vaughn's treatment, Mr. Magbie's condition stabilized by 3:20 a.m., if not before.

---

[1] Plaintiff repeatedly implies that in this case the medical services rendered by Dr. Vaughn took place in a unit under control of the State. *See e.g.* Plaintiffs Opposition to Defendants' Motion for Summary Judgment at p.13. Such an implication is incorrect. Plainly there is no record evidence that Mr. Magbie was treated by Dr. Vaughn in the inpatient portion of the hospital. Rather, the testimony of Dr. Vaughn makes clear that Mr. Magbie was treated by Dr. Vaughn in the publicly accessible emergency room. This is supported by the testimony of Dr. Vaughn:

> Q. Okay. Emergency room here (indicating.) Would you have to go into a hall, into another area to see those patients?
>
> A. Well, no. What happens is that the patients were in a room aside from their triage deemed not to be emergency care.
>
> Q. Okay
>
> A. They would be sent over to the holding room.
>
> Q. Where is the holding room?
>
> A. Holding room, is separate from the emergency room. You have to walk probably down a couple corridors but the room – it's like, they can give the patients, prisoners, secured in a secured location away from the main emergency room populace. Once they are ready to be seen, they are called over to be seen in the emergency room.
>
> Q. Okay. And then do some of the patients, *after they are seen in the emergency room*, are they sent back to the holding room?
>
> A. No. Usually once they are treated, they are either sent back to jail or be admitted.

Vaughn depo. at 87. Emphasis added. (Attached hereto as Exhibit II)

-3-

Plaintiff contends that because Dr. Vaughn was a physician offering services at Greater Southeast Community Hospital, he acted under the color of law and that by not admitting Mr. Magbie to the hospital he acted with deliberate indifference despite the fact that Mr. Magbie's condition had stabilized. Regardless of Plaintiff's creative attempt to characterize her claims, this is no more than a medical malpractice case regarding Mr. Magbie's care and treatment for respiratory and other problems that developed after receiving a ten-day jail sentence. In its opposition Plaintiff insists that Mr. Magbie's civil rights were violated but fails to recognize that the factual scenario does not support its § 1983 claims. In support of her erroneous assertions, Plaintiff relies on cases that are distinguishable from the instant case. Accordingly, summary judgment should be granted.

## II.   ARGUMENT

### A.

Plaintiff initially alleged that both Dr. Vaughn and Dr. Iluyomade were state actors in providing emergency treatment to Mr. Magbie. On February 20, 2008, Defendant moved to dismiss all civil rights claims against both Dr. Vaughn and Dr. Iluyomade. In her opposition, the Plaintiff now states that she does "not contest Defendants' motion insofar as it seeks partial summary judgment regarding Plaintiff's claim that Dr. Iluyomade violated Mr. Magbie's rights under the Eighth Amendment." Plaintiff's Opposition at 5. Although the Plaintiff is not required to do so, she has not articulated the distinction she draws between Dr. Vaughn and Dr. Iluyomade. Both physicians were employed by NES and worked in the emergency room pursuant to NES's contract with the Hospital. Neither was a party to the contract between the Hospital and the Department of Corrections that established a separate inpatient unit for

-4-

prisoners. There is no contention or any evidence in this matter suggesting that either Dr. Vaughn or Dr. Iluyomade worked in the prisoner's <u>inpatient</u> ward of the hospital. Further, the alleged violations of the standard of care -- failure to address Mr. Magbie's respiratory problems -- are similar. It appears that the only difference that is arguably relevant to this legal issue is that Dr. Vaughn recalls treating a prison patient once per shift, whereas Dr. Iluyomade testified he saw approximately one prisoner per week (i.e. one every three or four shifts). If this distinction is what has convinced the Plaintiff to abandon her claim that Dr. Iluyomade was a state actor, it emphasizes the thin reed on which the Plaintiff's theory dangles. As this Reply Memorandum will show, the Plaintiff's remaining claim that Dr. Vaughn acted under the color of state law and demonstrated deliberate indifference to Mr. Magbie should fail as a matter of law.

### B.

In its opposition, Plaintiff primarily relies upon two cases to support its contention that Dr. Vaughn acted under color of law: *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988) and *Conner v. Donnelly,* 42 F.3d. 220 (4th Cir. 1994). The factual scenarios giving rise to those cases are significantly dissimilar to the instant case. In *West,* an inmate brought a §1983 action against a private physician who was under contract with North Carolina to provide orthopedic services at a State prison hospital on a part-time basis. Pursuant to the contract, the physician would, *inter alia*, provide two orthopedic clinics per week, see all orthopedic and neurological referrals, conduct rounds, perform orthopedic surgery as scheduled, and furnish two days of professional service each week in fulfillment of these duties. The physician treated the inmate at the state run hospital for a leg injury that he sustained while incarcerated. The prisoner

alleged that he was given inadequate medical treatment and as a result his Eighth Amendment right to be free from cruel and unusual punishment was violated. Similarly, in *Conner* an inmate brought a § 1983 action against a private physician who treated him on referral from a prison physician, and alleged that the private physician was deliberately indifferent to the inmate's serious medical needs in violation of the Eighth Amendment. In *West* and in *Atkins*, the court held that, under the unique factual circumstances presented in those cases, the physicians acted "under the color of state law."

The Plaintiff encourages the Court to apply the holdings of *West* and *Conner* to the instant case. *West* and *Conner* are distinguishable, however, on two separate grounds. First, in *West*, the treatment of the inmate took place at a State-run hospital to which the physician consulted. At all times the consultation took place at a State-run facility. On the contrary, in the instant case, Mr. Magbie was seen in the emergency room as any other member of the general public would have been seen. This is supported by the testimony of Dr. Vaughn:

> Q.  Okay. Emergency room here (indicating.) Would you have to go into a hall, into another area to see those patients?
>
> A.  Well, no. What happens is that the patients were in a room aside from their triage deemed not to be emergency care.
>
> Q.  Okay
>
> A.  They would be sent over to the holding room.
>
> Q.  Where is the holding room?

A.    Holding room, is separate from the emergency room. You have to walk probably down a couple corridors but the room – it's like, they can give the patients, prisoners, secured in a secured location away from the main emergency room populace. *Once they are ready to be seen, they are called over to be seen in the emergency room.*

Q.    Okay. And then do some of the patients, after they are seen in the emergency room, are they sent back to the holding room?

A.    No. Usually once they are treated, they are either sent back to jail or be admitted.

Vaughn depo. at 87. (Attached hereto as Exhibit II) Mr. Magbie was treated and evaluated by Dr. Vaughn, not because he was a prisoner, rather because he was in need of emergency services[2]. This is no different from any member of the general public. *Accord Sykes v. McPhillips*, 412 F. Su 2d 197, 200-04 (N.D.N.Y. 2006) (despite tendering treatment pursuant to EMTALA, neither private hospital nor treating physicians were state actors.)

---

[2] In fact, arguably Mr. Magbie's condition triggered a duty to act under the Emergency Medical Treatment and Active Labor Act ("EMTALA"). Congress enacted EMTALA in 1986 to "address a distinct and rather narrow problem-the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them." *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136 (8th Cir.1996); 42 U.S.C. § 1395dd. EMTALA provides a medical screening requirement, which states that "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . " 42 U.S.C. § 1395dd(a). In addition, the statute requires that when the hospital determines that a person has an emergency medical condition, "the hospital must provide either such treatment as may be required to stabilize the medical condition, or for transfer of the individual to another medical facility ..." 42 U.S.C. § 1395dd(b)(1)(A) and (B). With regard to proper screening procedure, the *Summers* court held, "[a]n inappropriate screening examination is one that has a disparate impact on the plaintiff. Patients are entitled under EMTALA, not to correct or non-negligent treatment in all circumstances, but to be treated as other similarly situated patients are treated, within the hospital's capabilities." 91 F.3d at 1138. As for treatment to stabilize the medical condition, the court noted that "stabilization" requires the hospital to first determine that the individual has an emergency medical condition. *Id.* at 1140; see also *Baber v. Hospital Corp. of America*, 977 F.2d 872, 883 (4th Cir.1992) ("the plain language of the statute dictates a standard requiring actual knowledge of the emergency medical condition by the hospital staff"). Dr. Vaughn's stabilization of Mr. Magbie is more accurately described as being triggered by his duty under EMTALA and not the language of a contract between the Hospital and the Department of Corrections.

Dr. Vaughn did not see exclusively prisoner patients nor were they the majority of patients seen by Dr. Vaughn. Rather, prisoners requiring emergency services represented only a miniscule percentage of patients seen by Dr. Vaughn. In its opposition, Plaintiff frequently notes that because Mr. Magbie was in custody, he was unable to choose his medical provider. Dr. Vaughn was placed in a similar situation in that like Mr. Magbie he was without a meaningful choice. In Dr. Vaughn's circumstance he had no control over the patients that he saw yet his duty remained the same; Dr. Vaughn had an affirmative duty to treat and stabilize each patient he evaluated. Further, Mr. Magbie is one of dozens of patients that Dr. Vaughn saw on any given shift.

The nature of Dr. Vaughn's role at the hospital is distinct and separate from the physician in *West* inasmuch as Dr. Vaughn's role was to treat every person that came through the door regardless of their status. Dr. Vaughn did not make special trips to a State-run facility nor did he see Mr. Magbie in the portion of the hospital designated for inpatient services for prisoners. Under Plaintiff's theory, irrespective of position or title, because of the Department of Corrections' limited contract for "services at Greater Southeast Community Hospital" (setting up a separate unit for inpatient treatment of prisoners), every employee of the hospital is a state actor. The Plaintiff's theory extends the holdings of *West* and *Conner* and creates a limitless number of State actors. To find that Dr. Vaughn was a state actor necessarily extends similar status to all of the nurses, technicians, doctors, surgeons and even janitorial staff at Greater Southeast Community Hospital.

The second irrefutable difference between *West* and *Conner* and the instant case is that the contractual relations linking Dr. Vaughn and the Department of Corrections are insufficient

-8-

to demonstrate that Dr. Vaughn acted under color of law.   As Plaintiff correctly notes, in this case the Department of Corrections had a contract with Greater Southeast Community Hospital, which had a contract with NES to cover the emergency room at the hospital. NES in turn had a contract with Dr. Vaughn to provide emergency room services at the hospital. Plaintiff continues that from the point of view of Dr. Vaughn, the situation was no different than that of the physicians in *West* and *Conner*. This analysis, however, ignores the facts of each case. In *West* and *Conner*, the physicians' treatment was specifically geared towards prisoners. In fact, in *West* the physician went to the State-run prison hospital with the intent of consulting and providing treatment to prisoners twice each week. In <u>Connor</u>, the Defendant received the patient via a direct referral from the prison physician and treated him electively under this arrangement on four separate visits. In contrast, Dr. Vaughn treated every patient that came through the door in need of emergency services. He did not, at any time, contract with the State to provide services to prisoners. Rather his contract was with NES to provide emergency services to all that needed emergent care and happened through the doors of GSCH. Simply, the Plaintiff has failed to show that Dr. Vaughn was privy to, or received any benefit from a contract with the State to provide services to prisoners on an <u>inpatient</u> basis.

The Plaintiff contends that when "Dr. Vaughn undertook to treat Mr. Magbie at the Hospital's [Emergency Room] he assumed the District's obligation to provide medical care to Mr. Magbie and became a government actor." This presumably is because "Dr. Vaughn routinely treated prisoners indicat[ing] that he had to have been aware of the contractual relationship between the DOC and the Hospital." The Plaintiff, by leaps and bounds of misplaced logic, attributes to Dr. Vaughn not only knowledge of a contractual relationship

-9-

between the state and the Hospital but also the obligations of that contract. Plaintiff's claims notwithstanding, there is an absence of record evidence to support the Plaintiff's notion that Dr. Vaughn had any knowledge of the contractual relationship between the DOC and the Hospital or that his treatment of emergency room patients would transform him into a government actor. Accordingly, the Plaintiff's claim must fail.

### C.

In order to establish that Magbie was subjected to cruel and unusual punishment, the Plaintiff must prove (1) that "the deprivation of [a] basic human need was objectively 'sufficiently serious,'" and (2) that "subjectively 'the officials act[ed] with a sufficiently culpable state of mind.'" *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir.1993)(citation omitted). Plaintiff appropriately notes that to satisfy the subjective component of an Eighth Amendment claim the Plaintiff must demonstrate deliberate indifference by prison officials. *See Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[D]eliberate indifference entails <u>something more than mere negligence</u> ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. It requires actual knowledge of and disregard of an objectively serious condition, medical need, or risk of harm. *See id.* at 837, 114 S.Ct. 1970.

Plaintiffs recitation of the *Farmer* standard notwithstanding, they fail to distinguish those cases which have appropriately held, in analogous factual scenarios, that the physicians' actions have not amounted to deliberate indifference. *See Stewart v. Murphy*, 174 F.3d 530 (1999) (holding that repeated instances of alleged negligence by prison-hospital physicians in treatment of swollen legs indicative of congestive heart failure and the related decubitus ulcers that led to

-10-

an inmate's death did not establish any constitutional violation under the deliberate-indifference standard); *see also Steele v. Choi*, 82 F.3d 175, 177-79 (7th Cir. 1996) (holding that a prison infirmary physician's failure over several days of treatment to diagnose and treat a possible brain hemorrhage did not reflect deliberate disregard for the inmate's constitutional rights, especially since the inmate's actual medical condition was not clear and, as a result, it could not be said that the physician's alternative treatment decisions reflected deliberate disregard for a known, dangerous condition) *Accord, Nunez*, 72 F. Supp. 2d at 27-29 (possible negligence by physician in managing inmate's pain and assessing his need for surgery did not constitute deliberate indifference).

The record evidence does not support Plaintiffs' contention that, under the *Farmer* standard, Dr. Vaughn acted with deliberate indifference. It is undisputed that Dr. Vaughn treated Mr. Magbie with three liters of oxygen via nasal cannula, an intravenous ampule of glucose, known as D-50, for his low blood sugar, and fluids for his dehydration and hypovolemia. Dr. Vaughn's immediate treatment of Mr. Magbie's symptoms belies Plaintiff's assertion that he acted with a disregard that was equivalent to placing a male-to-female transsexual in a prison's general population despite knowledge of a violent atmosphere. *See generally Farmer*, 511 U.S. 825. Dr. Vaughn not only ensured that Mr. Magbie's condition stabilized but also that it remained stable for a period of time. Demonstrating an abundance of caution, he contacted the CTF to ensure that Mr. Magbie could be provided with supplemental oxygen delivery via cannula. Vaughn depo. at 67. (Attached hereto as Exhibit III). The foresight exhibited by Dr. Vaughn is inconsistent with the "deliberate indifference" exhibited in *Farmer*. As discussed

*supra*, Plaintiffs are unable to satisfy the subjective component of an Eighth Amendment claim by demonstrating deliberate indifference and therefore, summary judgment is appropriate.

**D.**

Plaintiff urges a finding that Dr. Vaughn knowingly allowed a prisoner to be exposed to a substantial risk of serious harm, and therefore, Dr. Vaughn's claim of qualified immunity should be defeated. Private parties such as Dr. Vaughn may raise the defense of qualified immunity in certain circumstances where their allegedly wrongful conduct has been held to constitute state action. *See Williams v. O'Leary*, 55 F.3d 320, 323-24 (7th Cir. 1995) (holding that although physician defendant worked for a private entity providing prison medical services under contract with the state he was allowed the defendant to raise the defense of qualified immunity); *Sherman v. Four County Counseling Center*, 987 F.2d 397, 406 (7th Cir.1993) (holding that since the defendant mental institution had provided the plaintiff discretionary medical care pursuant to a court order, the defendant was allowed to raise the defense of qualified immunity.) Under the qualified-immunity defense, public officials and others performing discretionary governmental functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *Harlow* requires that the court conduct two inquiries: (1) whether at the time of the alleged conduct there was a clearly established constitutional right that was violated; and (2) whether a reasonable person would have known that his conduct violated that right. *See Burns*, 907 F.2d at 235-36. The Supreme Court has held that, to find a "clearly established" constitutional right, the contours of the right must be sufficiently clear that a reasonable official or other state actor would understand that

what he is doing violates that right. *Anderson*, 483 U.S. at 640. The constitutional right must be established at the time of the alleged violation, so a court may not find that the right was established through the use of hindsight. *Harlow*, 457 U.S. at 818; *Brennan v. Hendrigan*, 888 F.2d 189, 192 (1st Cir.1989).

In this case, despite the Plaintiffs' urgings to the contrary, Dr. Vaughn is entitled to immunity from suit because the unconstitutionality of his actions was not so clearly established at the time of the conduct that a reasonable defendant would have understood that he was violating that constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court must judge the reasonableness of Dr. Vaughn's actions from his perspective at the time he engaged in the allegedly injurious conduct, not in hindsight. *Id.* In this case, not only was Dr. Vaughn forced to make quick decisions regarding how to best provide Mr. Magbie with care, but neither Mr. Magbie nor anyone else told Dr. Vaughn that Mr. Magbie required the use of a respirator every night. Instead, as Dr. Vaughn testified, Mr. Magbie told Dr. Vaughn that he needed a respirator at night <u>on some occasions</u>. Vaughn depo. at 54. (Attached hereto as Exhibit III.) As a result, Dr. Vaughn's decision to release Mr. Magbie back to the Jail and its CTF did not effectively deprive Mr. Magbie of something Dr. Vaughn knew that Mr. Magbie had a constitutional right to have. Additionally, neither Mr. Magbie nor anyone else told Dr. Vaughn that Mr. Magbie's condition could not be treated at night using supplemental oxygen delivered via cannula. Rather, Dr. Vaughn treated and monitored Mr. Magbie for the entire night and was able to correct and stabilize Mr. Magbie's condition using supplemental oxygen, without use of a respirator. Moreover, Dr. Vaughn made his decision to release Mr. Magbie to the Jail and the CTF only after learning from Dr. Bastien at the CTF that Mr. Magbie could be provided with

-13-

supplemental oxygen delivery via cannula. Vaughn depo. at 67. (Attached hereto as Exhibit IV.) As a result, Dr. Vaughn's decision to release Mr. Magbie back to the Jail and its CTF provided Mr. Magbie what appeared to be a reasonable alternative treatment that the Jail or its CTF would provide him as needed under a doctor's supervision. As a result, as Dr. Vaughn then understood the situation, by releasing Mr. Magbie from the emergency room he was not knowingly exposing Mr. Magbie to custodial circumstances where his continuing medical needs would not be monitored, treated and otherwise met. Based upon the record evidence, it is clear that Dr. Vaughn's conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known and, as such, is entitled to a qualified immunity defense.

Accordingly, the Defendant Vaughn is entitled to summary judgment in this matter because the record demonstrates that the allegations and evidence give rise to nothing more than a claim of negligence and do not support a finding of deliberate indifference to Mr. Magbie's right to adequate medical care.

## CONCLUSION

For all the reasons set forth above, the Court should grant Defendant Vaughn's Motion for Partial Summary Judgment as to all of the Plaintiff's civil rights claims.

Respectfully submitted,

*/s/ Thomas V. Monahan, Jr.*
Thomas V. Monahan, Jr. (04471)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland   21202
(410) 783-4000

**Attorneys for Defendants William S. Vaughn, M.D.,
Rotimi A. Iluyomade, M.D. and National Emergency
Services District of Columbia**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of April, 2008, I caused to be served *via* electronic filing a true and correct copy of the Reply to Plaintiff's Opposition to Defendants' Motion for Partial Summary Judgment as to All Civil Rights Claims was served *via* electronic mail upon the following:

Donald M. Temple, Esquire
Temple Law Office
1229 15th Street, NW
Washington, DC 20005
*Counsel for Plaintiff*

Edward J. Connor, Esquire
5210 Auth Road, Suite 304
Camp Springs, Maryland 20746-4341
*Counsel for Plaintiff*

Elizabeth Alexander, Director
National Prison Project of the ACLU
    Foundation
915 15th Street, NW, 7th Floor
Washington, DC 20005-2302
*Counsel for Plaintiff*

                                    */s/ Thomas V. Monahan, Jr.*
                                    Thomas V. Monahan, Jr.

4832-4421-2994

-16-

## **TABLE OF AUTHORITY**

Baber v. Hospital Corp. of America, 977 F.2d 872, 883 (4th Cir.1992)

Brennan v. Hendrigan, 888 F.2d 189, 192 (1st Cir.1989)

Conner v. Donnelly, 42 F.3d. 220 (4th Cir. 1994).

Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)

Saucier v. Katz, 533 U.S. 194, 201 (2001).

Sherman v. Four County Counseling Center, 987 F.2d 397, 406 (7th Cir.1993)

Stewart v. Murphy, 174 F.3d 530 (1999)

Steele v. Choi, 82 F.3d 175, 177-79 (7th Cir. 1996)

Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir.1993)

Summers v. Baptist Med. Ctr. Arkadelphia, 91 F.3d 1132, 1136 (8th Cir.1996)

Sykes v. McPhillips, 412 F. Su 2d 197, 200-04 (N.D.N.Y. 2006)

West v. Atkins, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)

Williams v. O'Leary, 55 F.3d 320, 323-24 (7th Cir. 1995)

42 U.S.C. § 1395dd

# EXHIBIT I

# MEMORANDUM OF UNDERSTANDING
## FOR
## INTRA-DISTRICT FUNDING
## FOR
## CORRECTIONAL HEALTH SERVICES
## AND
## CORRECTIONAL ADMINISTRATIVE SERVICES
## PERFORMED PURSUANT TO
## CONTRACT NO. DCFRA#-00-C-39

### October 1, 2003 to September 30, 2004

This Memorandum of Understanding for Intra-District Funding ("MOUIDF") is made by and between the District of Columbia Department of Health ("DOH"), the District of Columbia Department of Corrections ("DOC"), and the District of Columbia Office of Contracting and Procurement ("OCP").

Whereas, the District of Columbia Financial Responsibility and Management Assistance Authority ("Authority") previously executed a Master Agreement designated as Contract No. DCFRA#-00-C-39 with Greater Southeast Community Hospital Corporation I ("GSCHC") regarding health services;

Whereas, the Authority assigned Contract No. DCFRA#-00-C-39 to OCP effective October 1, 2003;

Whereas, Contract No. DCFRA#-00-C-39 requires GSCHC to provide health care services and administrative services for persons in the custody of DOC consistent with the requirements established by DOC;

Whereas, provisions of Section 8 of Exhibit A and second revised Exhibit G (See Attached) of the Agreement, as modified, shall apply to Corrections Health Care Services.

Whereas, GSCHC has provided, is providing and will provide Correctional Health Care Services and Corrections Administrative Services to persons in the custody of DOC;

Whereas, the District of Columbia has paid, is paying and will pay GSCHC the sum for Correctional Health Care Services and corresponding Corrections Administrative Services as stated in the Disbursing Agreement per month from DOH's funds;

Whereas, DOC is required to reimburse DOH for the payments for Correctional Health Care Services and the corresponding Corrections Administrative Services;

Therefore, DOC, DOH and OCP agree as follows:

## General Provisions

1. **Monthly Review:** Pursuant to the Financial Review Process ("FRP") mandated by the Office of the Chief Financial Officer of the District of Columbia ("OCFO"), all services provided by GSCHC for which DOH seeks reimbursement through intra-district funding shall be reported monthly in DOH's FRP submission to the Office of Budget and Planning.

2. **Resolution of Financial Disputes:** The District of Columbia Office of Financial Operations and Systems shall resolve all financial adjustments and/or financial disputes arising from this MOUIDF.

1

3.  **Resolution of Health Care Disputes:**  If a disagreement arises between GSCHC and DOC regarding the provision of health care services for patients in the custody of DOC, such as patient care issues, patient care complaints and/or patient care problems, DOH, through the Health Care Safety Net Administration, and in conjunction with DOC, shall expeditiously resolve the disagreement with GSCHC.

## Obligations of DOH

1.  DOH, through OCFO, shall confirm that GSCHC is paid the appropriate monthly amount for Correctional Health Care Services and Corrections Administrative Services and that DOC reimburses DOH for the same amount.

2.  DOH shall fulfill its legislative mandates to administer and monitor compliance with DCFRA#-00-C-39 and to exercise oversight regarding the health of the persons in custody of DOC.

## Obligation of DOC

1.  DOC shall pay DOH the sum of $ 2,665,000 for the fiscal year starting October 1, 2003 and continuing until September 30, 2004.

2.  Within fifteen days of the execution of this MOUIDF by all signatories, DOC shall pay DOH all sums due from October 1, 2003 to the date of execution of this MOUIDF by all signatories.

## Obligations of OCP

1.  OCP shall continue DCFRA#-00-C-39 so that persons in the custody of DOC receive the Correctional Health Care Services and corresponding Corrections Administrative Services.

## Effective Date

This MOUIDF shall be effective October 1, 2003.

IN WITNESS WHEREOF, authorized signatories executed and dated this MOUIDF.

Dated    5-27-  2004        _____
                            Herbert Tillery
                            Interim Director
                            D.C. Department of Health

Dated: _____ 2004      _____
                            Odie Washington
                            Director
                            D.C. Department of Corrections

Dated  6-21-  2004          _____
                            Jacque Abadie, III
                            Director
                            D.C. Office of Contracting and Procurement

DOH17 Z:\canejas\Corrections\MOU for Health Services-2004

## Second Revised Exhibit G

### Corrections Services

### General

1. The provisions of Section 8 of **Exhibit A** of the Agreement, as modified, shall apply to Corrections Health Care Service. As required by Section 8.1 of this Agreement, as modified, GSCHC shall be responsible for providing, or causing to be provided, health care services for persons in the custody of the District of Columbia Department of Corrections ("Corrections Health Care Services") and providing administrative services related thereto ("Corrections Administrative Services").

### Corrections Health Care Services

2. Corrections Health Care Services shall be provided consistent with the requirements established by the District of Columbia Department of Corrections ("DCDC").

3. GSCHC shall provide Corrections Health Care Services at Greater Southeast Community Hospital, 1310 Southern Avenue, S.E., Washington, DC 20032 and at D.C. General Urgent Care Center and Ambulatory Care Center, D.C. General Health Campus, 1900 Massachusetts Avenue, S.E., Washington, DC 20003.

4. GSCHC shall be the provider of inpatient hospital services except in those cases where treatment must be obtained at another hospital and shall utilize the hospital unit specifically equipped by or on behalf of the District at Greater Southeast Community Hospital to house persons in the custody of DCDC who require Corrections Health Care Services on an inpatient basis.

5. GSCHC shall provide or caused to be provided all Corrections Health Care Services. At no expense to the District, GSCHC may utilize the services of Chartered, as the administrative service organization, for coordination of Corrections Health Care Services. Should GSCHC elect to utilize Chartered's services, GSCHC shall remain responsible for the coordination of Corrections Health Care Services and may not delegate such responsibility to Chartered.

6. If GSCHC makes a referral for specialty care or services not provided by GSCHC at Greater Southeast Community Hospital, 1310 Southern Avenue, S.E., Washington, DC 20032 and at D.C. General Urgent Care Center and Ambulatory Care Center, D.C. General Health Campus, 1900 Massachusetts Avenue, S.E., Washington, DC 20003, the referral shall be coordinated by GSCHC and approved by DCDC.

### Corrections Administrative Services

7. GSCHC shall provide the following Corrections Administrative Services:

   a. Assure access to care;
   b. Assure quality of care;
   c. Monitor utilization of services;
   d. Make appropriate projection plans;
   e. Ensure that funding for the next Contract Year is appropriate; and,
   f. Review utilization of high-cost services, average lengths of stay and one-day admissions.

8. GSCHC and the District shall meet at least once per quarter year to review issues surrounding Corrections Services, including utilization, projections, and other components to coordinate the care. For the purpose of the quarterly meeting, the term "District" shall mean at least representatives from Health Care Safety Net Administration of the Department of Health and DCDC. Issues to be addressed at the quarterly meetings include the following:

3

a. Utilization of Corrections Health Care Services;
b. Access to Corrections Health Care Services;
c. Quality of Corrections Health Care Services;
d. Formulating and/or revising appropriate projection plans for Corrections Health Care Services;
e. Review the appropriateness of current funding and future funding;
f. Review utilization of high-cost services, average length of stays, and one-day admissions; and,
g. Any other issues raised by GSCHC or the District.

9. GSCHC shall continuously and carefully monitor the contracted payment rates and utilization of Corrections Health Care Services.

10. GSCHC shall advise the Health Care Safety Net Administration at the Department of Health when reaching seventy-five percent (75%) of the Corrections Health Care Service Amount for the Third Contract Year or the Fourth Contract Year.

11. GSCHC shall provide to the Health Care Safety Administration at the Department of Health a report by the tenth business day of each month showing all DCDC patients (1) receiving Corrections Health Care Services at Greater Southeast Community Hospital, 1310 Southern Avenue, S.E., Washington, DC 20032 and at D.C. General Urgent Care Center and Ambulatory Care Center, D.C. General Health Campus, 1900 Massachusetts Avenue, S.E., Washington, DC 20003 and (2) referred for Correctional Health Care Services pursuant to paragraph 6 of this Second Revised Exhibit G.

## Monthly Reconciliation

12. By the tenth business day of each month, GSCHC shall provide to the DOH/HCSNA, for the purpose of monthly claim reconciliation, a listing of all patients receiving Correctional Health Care Services at Greater Southeast Community Hospital and at D.C. General Urgent Care Center and Ambulatory Care Center, D.C. General Health Campus. The list shall include the Patient's Name, DCDC Number, Date of Service, Date of Discharge, Claim Type, Length of Stay, Diagnosis Code, Billed Charges, Adjustments and the Reimbursement Received.

13. By the tenth business day of each month, DCDC shall provide to the DOH/HCSNA, for the purpose of the monthly claim reconciliation, a listing of all patients who received Correctional Health Care Services during the prior month. The list shall include the Patient's Name, DCDC Number, Date of Service, Date of Discharge, Length of Stay, and Type of Service received.

14. Chartered, as the administrative service organization for the D.C. HealthCare Alliance, shall provide for the purpose of the monthly claim reconciliation, monthly, a listing of all claims adjudicated. A summary report shall include all claims received, paid and denied by Providers, monthly. A detailed report shall be inclusive of Patient name, DCDC number, Type of Claim, Diagnosis code, Amount Billed and Amount Paid by Provider.

## Semi-Annual Reconciliations

15. GSCHC and the District shall perform semi-annual reconciliation between the actual level and the budgeted level for Corrections Health Care Services and Corrections Administrative Services.

16. The actual level of Corrections Health Care Services provided during any six (6) month period shall be determined by multiplying the Payment Rates, as adjusted for the applicable Contract Year, by the actual level of utilization for such six (6) month period. GSCHC shall be paid for any Corrections Health Care Services provided in excess of expected utilization, if any, at the same rates, within thirty (30) days of the completion of the Mid-Year Reconciliation or Final Reconciliation. If actual utilization was less than expected utilization, GSCHC shall refund any excess payments to the Department of Corrections of the District of Columbia within thirty (30) days of the completion Mid-Year Reconciliation or Final Reconciliation.

4

17. For the purposes of reconciliation activities, the term "District" shall mean at least representatives from Health Care Safety Net Administration of the Department of Health and DCDC.

18. The Corrections Services Amount will be reconciled separately from the Budget Reconciliations that are prescribed by the Agreement for Health Care Services and Administrative Services that are covered by **Exhibit E**, of the Master Agreement, as modified.

19. The "Mid-Year Reconciliation" for the Third Contract Year shall occur within sixty (60) days after the close of the second quarter of the Third Contract Year. The "Final Reconciliation" for the Third Contract Year shall occur within one hundred twenty (120) days after the end of the Third Contract Year.

20. The "Mid-Year Reconciliation" for the Fourth Contract Year shall occur within sixty (60) days after the close of the second quarter of the Fourth Contract Year. The "Final Reconciliation" for the Fourth Contract Year shall occur within one hundred twenty (120) days after the end of the Fourth Contract Year.

21. The reconciliations will be performed by comparing the Corrections Services Amount to the Actual Costs of Corrections Health Care Services provided by the Contractor (which is computed by multiplying the Payment Rates specified by Actual Utilization) without application of the fifty percent (50%) adjustments or negotiations that are called for in the Budget Reconciliations that apply to **Exhibit E** services.

**Reimbursement**

22. Effective October 1, 2003, the Corrections Services Amount is the sum of the Corrections Health Care Services Amount and the Corrections Administrative Services Amount.

23. GSCHC shall not be required to provide Corrections Health Care Services or Corrections Administrative Services in excess of the amounts set forth in this **Second Revised Exhibit G**.

24. For the Third Contract Year, the Corrections Health Care Services Amount is Four Million, Four Hundred Eight-Five Thousand, Eight Hundred Forty-Four and no/100 Dollars ($4,485,844.00). The Corrections Health Care Services Amount applies to GSCHC and all other entities providing Corrections Health Care Services Amount.

25. The Corrections Health Care Services Amount shall be disbursed as specified in the Disbursing Agreement, as modified, based on advance monthly payments as specified in this **Second Revised Exhibit G**.

26. For the Fourth Contract Year, the Corrections Health Care Services Amount is Four Million, Three Hundred Ninety-Seven Thousand, Four Hundred Thirty-Six and no/100 Dollars ($4,397,436.00). The Corrections Health Care Services Amount shall be disbursed as specified in the Disbursing Agreement, as modified, based on clean claims for Corrections Health Care Services as adjudicated by Chartered, as the administrative services organization for the D.C. HealthCare Alliance.

27. For the Third Contract Year, the Corrections Administrative Services Amount is an amount equal to two percent (2%) of the Corrections Health Care Services Amount and equals Eighty Seven Thousand, Nine Hundred Forty-Eight and 72/100 Dollars ($87,948.72) payable in monthly disbursement of Seven Thousand, Three Hundred Twenty-Nine and 06/100 Dollars ($7,329.06) per month from October 2003 to September 2004.

28. The payment to GSCHC for Corrections Services and Corrective Administrative Services for each of the months of October 2003 and November 2003 in the amount of One Hundred Twenty-One Thousand, Nine Hundred Fifty-Three and 72/100 Dollars ($121,953.72) per month included the monthly disbursement for Corrections Administrative Services in the amount of Seven Thousand,

Three Hundred Twenty-Nine and 06/100 Dollars ($7,329.06) and a periodic interim payment of One Hundred Fourteen Thousand, Six Hundred Twenty-Four and 66/100 Dollars ($114,624.66) per month for Corrections Health Care Services. The periodic interim payments in the monthly amount of One Hundred Fourteen Thousand, Six Hundred Twenty-Four and 66/100 ($114,624.66) per month for Corrections Health Care Services for October 2003 and November 2003 shall be offset by Health Care Claims submitted by GSCHC for Corrections Health Care Services during the Third Contract Year and, if not so offset, shall be returned to the District through Final Reconciliation for the Third Contract Year.

29. For the Fourth Contract Year, the Corrections Administrative Services Amount is an amount equal to two percent (2%) of the Corrections Health Care Services Amount and equals Eighty Seven Thousand, Nine Hundred Forty-Eight and 72/100 Dollars ($87,948.72) payable in monthly disbursement of Seven Thousand, Three Hundred Twenty-Nine and 06/100 Dollars ($7,329.06) per month from October 2004 to September 2005.

30. During the Third Contract Year, the following payment rates, which includes any applicable Index Factor for the Third Contract Year, shall apply and GSCHC shall be paid the Amount per month:

1. Inpatient Hospital Services (excluding Physician Services fees)
   a. Base Rate (Medical) = $6,479.00
   b. Base Rate (Surgical) = $8,400.00
   c. Expected Number of Discharge/Month = 30.5
   d. Amount per month = $212,019.00
   e. Amount per year = $2,544,204.00
2. Emergency Room ("ER") Services
   a. All-Inclusive Payment Rate Per ER Visit = $295.02
   b. Expected Number of ER Visits/Month = 51
   c. Amount per Month = $15,046.02
   d. Amount per Year = $180,552.24
3. Ambulatory Surgery
   a. All-Inclusive Payment Rate Per Ambulatory Surgery Visit = $617.00
   b. Expected Number of Ambulatory Surgery Visits/Month = 40
   c. Amount per Month = $24,680.00
   d. Amount per Year = $296,160.00
4. Urgent Care
   a. All-Inclusive Payment Rate Per Visit = $185.00
   b. Expected Number of Visits/Month = 10
   c. Amount per Month = $1,850.00
   d. Amount per Year = $22,200.00
5. Other Hospital Outpatient Visits
   a. All-Inclusive Payment Rate Per Outpatient Visit = $156.00
   b. Expected Number of Outpatient Visits/Month = 265
   c. Amount per Month = $41,340.00
   d. Amount per Year = $496,080.00
6. Outpatient Dialysis Visits
   a. All-Inclusive Payment Rate Per Outpatient Visit = $156.75
   b. Expected Number of Outpatient Visits/Month = 50
   c. Amount per Month = $7,387.00
   d. Amount per Year = $94,050.00
7. Community Clinic Services
   a. All-Inclusive Payment Rate Per Comm. Clinic Visit = $156.75
   b. Expected Number of Comm. Clinic Visits/Month = 0
   c. Amount per Month = $ 0
   d. Amount per Year = $ 0
8. Physician Services as classified:
   a. Primary Care Services
      1. Primary Care Payment Rate Per Visit = $45.00
      2. Expected Number of Visits Per Month = 223

6

            3.   Amount Per Month = $10,035
            4.   Amount Per Year =$120,420
       b.   Specialty Care Services
            1.   Payment Rate Per Visit =  $65.00
            2.   Expected Number of Visits Per Month = 334
            3.   Amount Per Month = $21,710.00
            4.   Amount Per Year =$260,520.00
       c.   Inpatient Surgery Services
            1.   Payment Rate Per Visit = $550.00
            2.   Expected Number of Visits Per Month = 7.5
            3.   Amount Per Month = $4,125.00
            4.   Amount Per Year = $49,500.00
       d.   Ambulatory Surgery Services
            1.   Payment Rate Per Visit = $483.00
            2.   Expected Number of Visits Per Month = 40
            3.   Amount Per Month =$19,320.00
            4.   Amount Per Year =$231,840.00
       e.   Hospital Based Physician Services
            1.   Payment Rate Per Visit = $35.00
            2.   Expected Number of Visits Per Month = 208
            3.   Amount Per Month = $7,280.00
            4.   Amount Per Year = $87,360.00
   9.   Dental Services
       a.   All-Inclusive Payment Rate Per Visit = $125.00
       b.   Expected Number of Visits/Month = 10
       c.   Amount per Month = $1,250.00
       d.   Amount per Year = $15,000.00

31.     In exchange for the District's commitment on funding levels for the Fourth Contract Year in Modification #12, GSCHC and the District expressly agree that the Index Factor for Corrections Health Care Services for the Fourth Contract is zero percent (0.00%), notwithstanding any other provision in this Agreement as modified, specifying directly or otherwise a different Index Factor for the Fourth Contract Year.

32.     Effective with the commencement of the Fifth Contract Year on October 1, 2005, the Payment Rates for Corrections Health Care shall be adjusted by the Index Factor, as set forth in the Agreement, and are stated in section 1.7.1.11 of the Master Agreement.

33.     GSCHC shall submit Health Care Claims to Chartered, as the administrative service organization for the D.C. HealthCare Alliance, for all Corrections Health Care Services. The District shall render or cause to be rendered payments to GSCHC for such Health Care Claims in accordance with the Disbursing Agreement, as modified.

34.     GSCHC shall cause all contractors and providers providing Corrections Health Care Services to submit Health Care Claims to Chartered, as the administrative service organization for the D.C. HealthCare Alliance, for all Corrections Health Care Services. The District shall render or cause to be rendered payments directly to such contractors and providers in accordance with the Disbursing Agreement, as modified.

35     GSCHC shall submit a bill to Chartered, as the administrative service organization for the D.C. HealthCare Alliance, for all Corrections Administrative Services. The District shall render or cause to be rendered payments to GSCHC for such Administrative Services in accordance with the Disbursing Agreement, as modified.

36.     Claims for Corrections Health Care Service must be submitted to and adjudicated by D.C. Chartered Health Plan, Inc. ("Chartered"), the administrative service organization for the D.C. HealthCare Alliance program, before the District is obligated to make payment for Corrections Health Care Service.

37.    Claims for Corrections Health Care Service shall not be "clean claims" that can be adjudicated for payment if the a copy of the Trip Ticket issued by the D.C. Department of Corrections for the health services accompanies the claims indicating the D.C. Department of Corrections authorized health services for the patient.

38.    Persons appearing with the Trip Ticket issued by the D.C. Department of Corrections are not persons entitled to receive Corrections Health Care Services. Persons not appearing with the Trip Ticket issued by DCDC are not persons entitled to receive Corrections Health Care Services.

39.    Persons appearing with guards from the D.C. Department of Corrections are persons eligible to receive Corrections Health Care Services. Person not appearing with guards from DCDC are not persons eligible to receive Corrections Health Care Services.

40.    Chartered shall submit all adjudicated claims for Corrections Health Care Service on a requisition containing only Corrections Health Care Service.

The requisition shall include all the elements required for Health Care Services required by this Agreement, as modified, and the Disbursing Agreement, as modified.

In addition to the elements required by this Agreement, as modified, and the Disbursing Agreement, as modified, the requisition for Corrections Health Care Service shall include the District of Columbia Department of Corrections ("DCDC") number for each patient and shall attach a copy of the Trip Ticket required to accompany each Claim for Corrections Health Care Service.

Three copies of the Requisition must be submitted simultaneously as follows:

Deputy Director
Health Care Safety Net Administration
D.C. Department of Health
825 North Capitol Street, N.E., Room 4112
Washington, DC 20002

Agency Chief Financial Officer
D.C. Department of Health
825 North Capitol Street, N.E., Room 5100
Washington, DC 20002

Health Services Administrator
D.C. Department of Corrections
1923 Vermont Avenue, N.W., Room N207
Washington, DC 20001

41.    By the fifteenth day of each month starting December 1, 2003, the D.C. Department of Corrections shall advise Chartered, the Health Care Safety Net Administration, and the Agency's Chief Financial Officer of any persons shown on the list of claims that were not in the custody of the Department of Corrections on the date of service.

### GSCHC Privileges for DCDC Physicians

42.    At no cost to the District or its employed physicians, physicians employed by the D.C. Department of Corrections shall be eligible for clinical privileges to admit, follow and treat persons in the custody of the D.C. Department of Corrections while such persons are hospitalized at Greater Southeast Community Hospital."

8

## Utilization Review

43.     GSCHC shall allow for the incorporation of a well-defined utilization management system (UM) that ensures adequate control over high cost and high-risk services and coordination of care of high cost Corrections inmates within the Corrections Unit at Greater Southeast Community Hospital and at the DC General Health Campus (Urgent Care and Ambulatory Care Centers). The UM system will be administered through the ASO and shall be a part of the larger Care Management Program as directed by the Health Care Safety Net Administration.

44.     GSCHC shall grant admitting privileges to a DOC physician as appointed by DOC to oversee the UM system at GSCHC and DCG campus facilities for healthcare services provided to corrections inmates.

45.     The UM systems shall be funded by the Department of Corrections (DOC). The DOC shall participate in UM and Care Management Meetings as determined by the Health Care Safety Net Administration.

9

# MEMORANDUM OF UNDERSTANDING
## FOR
## INTRA-DISTRICT FUNDING
## FOR
## CORRECTIONAL HEALTH SERVICES
## AND
## CORRECTIONAL ADMINISTRATIVE SERVICES
## PERFORMED PURSUANT TO
## CONTRACT NO. DCFRA#-00-C-39

### Addendum to the MOU for Additional Funds
### October 1, 2003 to September 30, 2004

This Memorandum of Understanding for Intra-District Funding ("MOUIDF") is made by and between the District of Columbia Department of Health ("DOH"), the District of Columbia Department of Corrections ("DOC"), and the District of Columbia Office of Contracting and Procurement ("OCP").

Whereas, the District of Columbia Financial Responsibility and Management Assistance Authority ("Authority") previously executed a Master Agreement designated as Contract No. DCFRA#-00-C-39 with Greater Southeast Community Hospital Corporation I ("GSCHC") regarding health services;

Whereas, the Authority assigned Contract No. DCFRA#-00-C-39 to OCP effective October 1, 2001.

Whereas, GSHC has executed a follow-on contract No. POHC#-2004-C-0081;

Whereas, Contract No. POHC#-2004-C-0081 requires GSCHC to provide health care services and administrative services for persons in the custody of DOC consistent with the requirements established by DOC.

Whereas, provisions of Section 8 of Exhibit A and second revised Exhibit G (See Attached) of the Agreement, as modified, shall apply to Corrections Health Care Services.

Whereas, GSCHC has provided, is providing and will provide Correctional Health Care Services and Corrections Administrative Services to persons in the custody of DOC;

Whereas, the District of Columbia has paid, is paying and will pay GSCHC the sum for Correctional Health Care Services and corresponding Corrections Administrative Services as stated in the Disbursing Agreement per month from DOH's funds;

Whereas, DOC is required to reimburse DOH for the payments for Correctional Health Care Services and the corresponding Corrections Administrative Services;

Therefore, DOC, DOH and OCP agree as follows:

## General Provisions

1. <u>Monthly Review</u>:  Pursuant to the Financial Review Process ("FRP") mandated by the Office of the Chief Financial Officer of the District of Columbia ("OCFO"), all services provided by GSCHC for which DOH seeks reimbursement through intra-district funding shall be reported monthly in DOH's FRP submission of the Office of Budget and Planning.

2. <u>Resolution of Financial Disputes</u>:  The District of Columbia Office of Financial Operations and Systems shall resolve all financial adjustments and/or financial disputes arising from this MOUIDF.

3.    <u>Resolution of Health Care Disputes</u>:  If a disagreement between GSCHC and DOC regarding the provision of health care services for patients in the custody of DOC, such as patient care issues, patient care complaints and/or patient care problems, DOH, through the Health Care Safety Net Administration, and in conjunction with DOC, shall expeditiously resolve the disagreement with GSCHC.

## Obligations of DOH

DOH, through OCFO, shall confirm that GSCHC is paid the appropriate monthly amount for Correctional Health Care Services and Corrections Administrative Services and that DOC reimburses DOH for the same amount.

2    DOH shall fulfill its legislative mandates to administer and monitor compliance with POHC#-2004-C-0081 and to exercise oversight regarding the health of the persons in custody of DOC.

## Obligation of DOC

1    DOC shall pay DOH the sum of $900,000 for the fiscal year starting October 1, 2003 and continuing until September 30, 2004.

2    Within fifteen days of the execution of this MOUIDF by all signatories, DOC shall pay DOH all sums due from October 1, 2003 to the date of execution of this MOUIDF by all signatories.

## Obligations of OCP

1    OCP shall continue POHC#-2004-C-0081 so that persons in the custody of DOC receive the Correctional Health Care Services and corresponding Corrections Administrative Services.

## Effective Date

This MOUIDF shall be effective October 1, 2003.

IN WITNESS WHEREOF, authorized signatories executed and dated this MOUIDF.

Approved as to Legal Sufficiency:

Dated.  9/23  2004 _____
Kenneth Campbell, General Counsel

Dated.  9/29/04  2004 _____
Gregg A. Pane, M.D., Acting Director
D.C. Department of Health

Dated  11/5/04  2004 _____
Odie Washington
Director
D.C. Department of Corrections

Dated _____ 2004 _____
Herbert R. Tillery
Interim Director
D.C. Office of Contracting and Procurement

**INTRA-DISTRICT STANDARD REQUEST FORM**
Government of the District of Columbia

**PART I**

**GENERAL**

MOU NUMBER: _____          DATE OF MOU: 4/14/2004

**SELLER INFORMATION**

AGENCY: Department of Health          AGENCY CODE: HC0

NAME OF CONTACT: Delores Shepard, Assoc. Chief Financial Officer

ADDRESS : Department of Health

825 North Capitol St., Suite 5100

Washington, DC 20002

TELEPHONE # : 202 442-9069

FAX # : (202) 442-4811

AUTHORIZING OFFICER _____ DATE: / /2004

**BUYER INFORMATION**

AGENCY: Department of Corrections          AGENCY CODE: FL0

NAME OF CONTACT: Michael Williams

ADDRESS : 1923 Vermont Ave. N.W.

Suite NB 11

Washington, DC 20001

TELEPHONE # : (202) 671-2172

FAX # : (202) 671-3274

AUTHORIZING OFFICER _____ DATE: 04/14/2004

*PLEASE SEE NEXT PAGE FOR FUNDING INFORMATION*

PART II

MOU NUMBER: _____                    2    OF    2

**SERVICE INFORMATION AND CODING CODES**

GOOD/ SERVICE:    DC Health Alliance Medical Services ($4,488,844.00)

DATE: 04 / 14 / 2004                        TOTAL: $    2,500,000.00

| | AGY | YR | ORG CODE | FUND | INDEX | PCA | OBJ | ADBJ | GRANT/PH | PROJ/PH |
|---|---|---|---|---|---|---|---|---|---|---|
| SELLER | HC0 | 2004 | | | | | | | | |
| BUYER | FL0 | 2004 | 3050 | 0100 | APPRO | 30500 | | D409 | | |

GOOD/ SERVICE:                DC Health Alliance Medical Services

DATE: 04 / 14 / 2004                        TOTAL:    1,988,844.00

| | AGY | YR | ORG CODE | FUND | INDEX | PCA | OBJ | ADBJ | GRANT/PH | PROJ/PH |
|---|---|---|---|---|---|---|---|---|---|---|
| SELLER | HC0 | 2004 | | | | | | | | |
| BUYER | FL0 | 2005 | 2002 | 1130 | RESER | 20002 | | D409 | | |

GOOD/ SERVICE: _____

DATE: ___ / ___ / ___                        TOTAL: _____

| | AGY | YR | ORG CODE | FUND | INDEX | PCA | OBJ | ADBJ | GRANT/PH | PROJ/PH |
|---|---|---|---|---|---|---|---|---|---|---|
| SELLER | | | | | | | | | | |
| BUYER | | | | | | | | | | |

GOOD/ SERVICE: _____

DATE: ___ / ___ / ___                        TOTAL: _____

| | AGY | YR | ORG CODE | FUND | INDEX | PCA | OBJ | ADBJ | GRANT/PH | PROJ/PH |
|---|---|---|---|---|---|---|---|---|---|---|
| SELLER | | | | | | | | | | |
| BUYER | | | | | | | | | | |

Revised 9/15/98

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of Health Services
Administration



## MEMORANDUM

TO:         Odie Washington, Director

FROM:       Lorella B. Willis
            Health Services Administrator

DATE:       April 9, 2004

SUBJECT:    **DOH/HCSNA MOU - FY2004**

---

Attached for your final review and signature is a hard copy of the MOU for medical care for the inmate population of the DOC. The MOU has been through the appropriate levels of review and includes input from DOC staff. I will also send the MOU electronically, should you desire to sign electronically.

I am available to respond to your questions and to hear your comments. Do not hesitate to call me at (202) 671-2066.

LBW

Attachments.

---

# MEMORANDUM OF UNDERSTANDING
## FOR
## INTRA-DISTRICT FUNDING
## FOR
## CORRECTIONAL HEALTH SERVICES
## AND
## CORRECTIONAL ADMINISTRATIVE SERVICES
## PERFORMED PURSUANT TO
## CONTRACT NO. DCFRA#-00-C-39

### October 1, 2003 to September 30, 2004

This Memorandum of Understanding for Intra-District Funding ("MOUIDF") is made by and between the District of Columbia Department of Health ("DOH"), the District of Columbia Department of Corrections ("DOC"), and the District of Columbia Office of Contracting and Procurement ("OCP").

Whereas, the District of Columbia Financial Responsibility and Management Assistance Authority ("Authority") previously executed a Master Agreement designated as Contract No. DCFRA#-00-C-39 with Greater Southeast Community Hospital Corporation I ("GSCHC") regarding health services;

Whereas, the Authority assigned Contract No. DCFRA#-00-C-39 to OCP effective October 1, 2003;

Whereas, Contract No. DCFRA#-00-C-39 requires GSCHC to provide health care services and administrative services for persons in the custody of DOC consistent with the requirements established by DOC;

Whereas, provisions of Section 8 of Exhibit A and second revised Exhibit G (See Attached) of the Agreement, as modified, shall apply to Corrections Health Care Services.

Whereas, GSCHC has provided, is providing and will provide Correctional Health Care Services and Corrections Administrative Services to persons in the custody of DOC;

Whereas, the District of Columbia has paid, is paying and will pay GSCHC the sum for Correctional Health Care Services and corresponding Corrections Administrative Services as stated in the Disbursing Agreement per month from DOH's funds;

Whereas, DOC is required to reimburse DOH for the payments for Correctional Health Care Services and the corresponding Corrections Administrative Services;

Therefore, DOC, DOH and OCP agree as follows:

### General Provisions

1.   Monthly Review:  Pursuant to the Financial Review Process ("FRP") mandated by the Office of the Chief Financial Officer of the District of Columbia ("OCFO"), all services provided by GSCHC for which DOH seeks reimbursement through intra-district funding shall be reported monthly in DOH's FRP submission to the Office of Budget and Planning.

2.   Resolution of Financial Disputes:  The District of Columbia Office of Financial Operations and Systems shall resolve all financial adjustments and/or financial disputes arising from this MOUIDF.

1

7.   **Resolution of Health Care Disputes:** If a disagreement arises between GSCHC and DOC regarding the provision of health care services for patients in the custody of DOC, such as patient care issues, patient care complaints and/or patient care problems, DOH, through the Health Care Safety Net Administration, and in conjunction with DOC, shall expeditiously resolve the disagreement with GSCHC.

## Obligations of DOH

1.   DOH, through OCFO, shall confirm that GSCHC is paid the appropriate monthly amount for Correctional Health Care Services and Corrections Administrative Services and that DOC reimburses DOH for the same amount.

2.   DOH shall fulfill its legislative mandates to administer and monitor compliance with DCFRA#-00-C-39 and to exercise oversight regarding the health of the persons in custody of DOC.

## Obligation of DOC

1   DOC shall pay DOH the sum of $ 2,665,000 for the fiscal year starting October 1, 2003 and continuing until September 30, 2004.

2.   Within fifteen days of the execution of this MOUIDF by all signatories, DOC shall pay DOH all sums due from October 1, 2003 to the date of execution of this MOUIDF by all signatories.

## Obligations of OCP

1   OCP shall continue DCFRA#-00-C-39 so that persons in the custody of DOC receive the Correctional Health Care Services and corresponding Corrections Administrative Services.

## Effective Date

This MOUIDF shall be effective October 1, 2003.

IN WITNESS WHEREOF, authorized signatories executed and dated this MOUIDF.


Dated: _____ 2004          _____
                                     Herbert Tillery
                                     Interim Director
                                     D.C. Department of Health


Dated: _____ 2004          _____
                                     Odie Washington
                                     Director
                                     D.C. Department of Corrections


Dated _____ 2004           _____
                                     Jacque Abadie, III
                                     Director
                                     D.C. Office of Contracting and Procurement


DCH'7 2. ...ctsjas\Corrections\MOU for Health Services-2004

2

## Second Revised Exhibit G

Corrections Services

### General

The provisions of Section 8 of **Exhibit A** of the Agreement, as modified, shall apply to Corrections Health Care Service. As required by Section 8.1 of this Agreement, as modified, GSCHC shall be responsible for providing, or causing to be provided, health care services for persons in the custody of the District of Columbia Department of Corrections ("Corrections Health Care Services") and providing administrative services related thereto ("Corrections Administrative Services").

### Corrections Health Care Services

2.      Corrections Health Care Services shall be provided consistent with the requirements established by the District of Columbia Department of Corrections ("DCDC").

3.      GSCHC shall provide Corrections Health Care Services at Greater Southeast Community Hospital, 1310 Southern Avenue, S.E., Washington, DC 20032 and at D.C. General Urgent Care Center and Ambulatory Care Center, D.C. General Health Campus, 1900 Massachusetts Avenue, S.E., Washington, DC 20003.

4.      GSCHC shall be the provider of inpatient hospital services except in those cases where treatment must be obtained at another hospital and shall utilize the hospital unit specifically equipped by or on behalf of the District at Greater Southeast Community Hospital to house persons in the custody of DCDC who require Corrections Health Care Services on an inpatient basis.

5       GSCHC shall provide or caused to be provided all Corrections Health Care Services. At no expense to the District, GSCHC may utilize the services of Chartered, as the administrative service organization, for coordination of Corrections Health Care Services. Should GSCHC elect to utilize Chartered' services, GSCHC shall remain responsible for the coordination of Corrections Health Care Services and may not delegate such responsibility to Chartered.

6.      If GSCHC makes a referral for specialty care or services not provided by GSCHC at Greater Southeast Community Hospital, 1310 Southern Avenue, S.E., Washington, DC 20032 and at D.C. General Urgent Care Center and Ambulatory Care Center, D.C. General Health Campus, 1900 Massachusetts Avenue, S.E., Washington, DC 20003, the referral shall be coordinated by GSCHC and approved by DCDC.

### Corrections Administrative Services

7       GSCHC shall provide the following Corrections Administrative Services:

    a.      Assure access to care;
    b.      Assure quality of care;
    c.      Monitor utilization of services;
    d.      Make appropriate projection plans;
    e.      Ensure that funding for the next Contract Year is appropriate; and,
    f.      Review utilization of high-cost services, average lengths of stay and one-day admissions.

8.      GSCHC and the District shall meet at least once per quarter year to review issues surrounding Corrections Services, including utilization, projections, and other components to coordinate the care. For the purpose of the quarterly meeting, the term "District" shall mean at least representatives from Health Care Safety Net Administration of the Department of Health and DCDC. Issues to be addressed at the quarterly meetings include the following:

a. Utilization of Corrections Health Care Services;
b. Access to Corrections Health Care Services;
c. Quality of Corrections Health Care Services;
d. Formulating and/or revising appropriate projection plans for Corrections Health Care Services;
e. Review the appropriateness of current funding and future funding;
f. Review utilization of high-cost services, average length of stays, and one-day admissions; and,
g. Any other issues raised by GSCHC or the District.

9.  GSCHC shall continuously and carefully monitor the contracted payment rates and utilization of Corrections Health Care Services.

10. GSCHC shall advise the Health Care Safety Net Administration at the Department of Health when reaching seventy-five percent (75%) of the Corrections Health Care Service Amount for the Third Contract Year or the Fourth Contract Year.

11. GSCHC shall provide to the Health Care Safety Administration at the Department of Health a report by the tenth business day of each month showing all DCDC patients (1) receiving Corrections Health Care Services at Greater Southeast Community Hospital, 1310 Southern Avenue, S.E., Washington, DC 20032 and at D.C. General Urgent Care Center and Ambulatory Care Center, D.C. General Health Campus, 1900 Massachusetts Avenue, S.E., Washington, DC 20003 and (2) referred for Correctional Health Care Services pursuant to paragraph 6 of this **Second Revised Exhibit G**.

### Monthly Reconciliation

12. By the tenth business day of each month, GSCHC shall provide to the DOH/HCSNA, for the purpose of monthly claim reconciliation, a listing of all patients receiving Correctional Health Care Services at Greater Southeast Community Hospital and at D.C. General Urgent Care Center and Ambulatory Care Center, D.C. General Health Campus. The list shall include the Patient's Name, DCDC Number, Date of Service, Date of Discharge, Claim Type, Length of Stay, Diagnosis Code, Billed Charges, Adjustments and the Reimbursement Received.

13. By the tenth business day of each month, DCDC shall provide to the DOH/HCSNA, for the purpose of the monthly claim reconciliation, a listing of all patients who received Correctional Health Care Services during the prior month. The list shall include the Patient's Name, DCDC Number, Date of Service, Date of Discharge, Length of Stay, and Type of Service received.

14. Chartered, as the administrative service organization for the D.C. HealthCare Alliance, shall provide for the purpose of the monthly claim reconciliation, monthly, a listing of all claims adjudicated. A summary report shall include all claims received, paid and denied by Providers, monthly. A detailed report shall be inclusive of Patient name, DCDC number, Type of Claim, Diagnosis code, Amount Billed and Amount Paid by Provider.

### Semi-Annual Reconciliations

15. GSCHC and the District shall perform semi-annual reconciliation between the actual level and the budgeted level for Corrections Health Care Services and Corrections Administrative Services.

16. The actual level of Corrections Health Care Services provided during any six (6) month period shall be determined by multiplying the Payment Rates, as adjusted for the applicable Contract Year, by the actual level of utilization for such six (6) month period. GSCHC shall be paid for any Corrections Health Care Services provided in excess of expected utilization, if any, at the same rates, within thirty (30) days of the completion of the Mid-Year Reconciliation or Final Reconciliation. If actual utilization was less than expected utilization, GSCHC shall refund any excess payments to the Department of Corrections of the District of Columbia within thirty (30) days of the completion Mid-Year Reconciliation or Final Reconciliation.

17.    For the purposes of reconciliation activities, the term "District" shall mean at least representatives from Health Care Safety Net Administration of the Department of Health and DCDC.

18.    The Corrections Services Amount will be reconciled separately from the Budget Reconciliations that are prescribed by the Agreement for Health Care Services and Administrative Services that are covered by **Exhibit E**, of the Master Agreement, as modified.

19.    The "Mid-Year Reconciliation" for the Third Contract Year shall occur within sixty (60) days after the close of the second quarter of the Third Contract Year. The "Final Reconciliation" for the Third Contract Year shall occur within one hundred twenty (120) days after the end of the Third Contract Year.

20.    The "Mid-Year Reconciliation" for the Fourth Contract Year shall occur within sixty (60) days after the close of the second quarter of the Fourth Contract Year. The "Final Reconciliation" for the Fourth Contract Year shall occur within one hundred twenty (120) days after the end of the Fourth Contract Year.

21.    The reconciliations will be performed by comparing the Corrections Services Amount to the Actual Costs of Corrections Health Care Services provided by the Contractor (which is computed by multiplying the Payment Rates specified by Actual Utilization) without application of the fifty percent (50%) adjustments or negotiations that are called for in the Budget Reconciliations that apply to **Exhibit E** services.

**Reimbursement**

22.    Effective October 1, 2003, the Corrections Services Amount is the sum of the Corrections Health Care Services Amount and the Corrections Administrative Services Amount.

23.    GSCHC shall not be required to provide Corrections Health Care Services or Corrections Administrative Services in excess of the amounts set forth in this **Second Revised Exhibit G**.

24.    For the Third Contract Year, the Corrections Health Care Services Amount is Four Million, Four Hundred Eight-Five Thousand, Eight Hundred Forty-Four and no/100 Dollars ($4,485,844.00). The Corrections Health Care Services Amount applies to GSCHC and all other entities providing Corrections Health Care Services Amount.

25.    The Corrections Health Care Services Amount shall be disbursed as specified in the Disbursing Agreement, as modified, based on advance monthly payments as specified in this **Second Revised Exhibit G**.

26.    For the Fourth Contract Year, the Corrections Health Care Services Amount is Four Million, Three Hundred Ninety-Seven Thousand, Four Hundred Thirty-Six and no/100 Dollars ($4,397,436.00). The Corrections Health Care Services Amount shall be disbursed as specified in the Disbursing Agreement, as modified, based on clean claims for Corrections Health Care Services as adjudicated by Chartered, as the administrative services organization for the D.C. HealthCare Alliance.

27.    For the Third Contract Year, the Corrections Administrative Services Amount is an amount equal to two percent (2%) of the Corrections Health Care Services Amount and equals Eighty Seven Thousand, Nine Hundred Forty-Eight and 72/100 Dollars ($87,948.72) payable in monthly disbursement of Seven Thousand, Three Hundred Twenty-Nine and 06/100 Dollars ($7,329.06) per month from October 2003 to September 2004.

28.    The payment to GSCHC for Corrections Services and Corrective Administrative Services for each of the months of October 2003 and November 2003 in the amount of One Hundred Twenty-One Thousand, Nine Hundred Fifty-Three and 72/100 Dollars ($121,953.72) per month included the monthly disbursement for Corrections Administrative Services in the amount of Seven Thousand,

Three Hundred Twenty-Nine and 06/100 Dollars ($7,329.06) and a periodic interim payment of One Hundred Fourteen Thousand, Six Hundred Twenty-Four and 66/100 Dollars ($114,624.66) per month for Corrections Health Care Services. The periodic interim payments in the monthly amount of One Hundred Fourteen Thousand, Six Hundred Twenty-Four and 66/100 ($114,624.66) per month for Corrections Health Care Services for October 2003 and November 2003 shall be offset by Health Care Claims submitted by GSCHC for Corrections Health Care Services during the Third Contract Year and, if not so offset, shall be returned to the District through Final Reconciliation for the Third Contract Year.

29.    For the Fourth Contract Year, the Corrections Administrative Services Amount is an amount equal to two percent (2%) of the Corrections Health Care Services Amount and equals Eighty Seven Thousand, Nine Hundred Forty-Eight and 72/100 Dollars ($87,948.72) payable in monthly disbursement of Seven Thousand, Three Hundred Twenty-Nine and 06/100 Dollars ($7,329.06) per month from October 2004 to September 2005.

30.    During the Third Contract Year, the following payment rates, which includes any applicable Index Factor for the Third Contract Year, shall apply and GSCHC shall be paid the Amount per month:

1.    Inpatient Hospital Services (excluding Physician Services fees)
   a.    Base Rate (Medical) = $6,479.00
   b.    Base Rate (Surgical) = $8,400.00
   c.    Expected Number of Discharge/Month = 30.5
   d.    Amount per month = $212,019.00
   e.    Amount per year = $2,544,204.00
2.    Emergency Room ("ER") Services
   a.    All-Inclusive Payment Rate Per ER Visit = $295.02
   b.    Expected Number of ER Visits/Month = 51
   c.    Amount per Month = $15,046.02
   d.    Amount per Year = $180,552.24
3.    Ambulatory Surgery
   a.    All-Inclusive Payment Rate Per Ambulatory Surgery Visit = $617.00
   b.    Expected Number of Ambulatory Surgery Visits/Month = 40
   c.    Amount per Month = $24,680.00
   d.    Amount per Year = $296,160.00
4.    Urgent Care
   a.    All-Inclusive Payment Rate Per Visit = $185.00
   b.    Expected Number of Visits/Month = 10
   c.    Amount per Month = $1,850.00
   d.    Amount per Year = $22,200.00
5.    Other Hospital Outpatient Visits
   a.    All-Inclusive Payment Rate Per Outpatient Visit = $156.00
   b.    Expected Number of Outpatient Visits/Month = 265
   c.    Amount per Month = $ 41,340.00
   d.    Amount per Year = $ 496,080.00
6.    Outpatient Dialysis Visits
   a.    All-Inclusive Payment Rate Per Outpatient Visit = $156.75
   b.    Expected Number of Outpatient Visits/Month = 50
   c.    Amount per Month = $7,387.00
   d.    Amount per Year = $94,050.00
7.    Community Clinic Services
   a.    All-Inclusive Payment Rate Per Comm. Clinic Visit = $156.75
   b.    Expected Number of Comm. Clinic Visits/Month = 0
   c.    Amount per Month = $ 0
   d.    Amount per Year = $ 0
8.    Physician Services as classified:
   a.    Primary Care Services
      1.    Primary Care Payment Rate Per Visit = $45.00
      2.    Expected Number of Visits Per Month = 223

6

      3.  Amount Per Month = $10,035
      4.  Amount Per Year =$120,420

b.  Specialty Care Services
    1.  Payment Rate Per Visit = $65.00
    2.  Expected Number of Visits Per Month = 334
    3.  Amount Per Month = $21,710.00
    4.  Amount Per Year =$260,520.00

c.  Inpatient Surgery Services
      1.  Payment Rate Per Visit = $550.00
      2.  Expected Number of Visits Per Month = 7.5
      3.  Amount Per Month = $4,125.00
      4.  Amount Per Year = $49,500.00

d.  Ambulatory Surgery Services
    1.  Payment Rate Per Visit = $483.00
    2.  Expected Number of Visits Per Month = 40
    3.  Amount Per Month =$19,320.00
    4.  Amount Per Year =$231,840.00

e.  Hospital Based Physician Services
      1.  Payment Rate Per Visit = $35.00
      2.  Expected Number of Visits Per Month = 208
      3.  Amount Per Month = $7,280.00
      4.  Amount Per Year = $87,360.00

9  Dental Services
a.  All-Inclusive Payment Rate Per Visit = $125.00
b.  Expected Number of Visits/Month = 10
c.  Amount per Month = $1,250.00
d.  Amount per Year = $15,000.00

31.    In exchange for the District's commitment on funding levels for the Fourth Contract Year in Modification #12, GSCHC and the District expressly agree that the Index Factor for Corrections Health Care Services for the Fourth Contract is zero percent (0.00%), notwithstanding any other provision in this Agreement as modified, specifying directly or otherwise a different Index Factor for the Fourth Contract Year.

32.    Effective with the commencement of the Fifth Contract Year on October 1, 2005, the Payment Rates for Corrections Health Care shall be adjusted by the Index Factor, as set forth in the Agreement, and are stated in section 1.7.1.11 of the Master Agreement.

33.    GSCHC shall submit Health Care Claims to Chartered, as the administrative service organization for the D.C. HealthCare Alliance, for all Corrections Health Care Services. The District shall render or cause to be rendered payments to GSCHC for such Health Care Claims in accordance with the Disbursing Agreement, as modified.

34.    GSCHC shall cause all contractors and providers providing Corrections Health Care Services to submit Health Care Claims to Chartered, as the administrative service organization for the D.C. HealthCare Alliance, for all Corrections Health Care Services. The District shall render or cause to be rendered payments directly to such contractors and providers in accordance with the Disbursing Agreement, as modified.

35.    GSCHC shall submit a bill to Chartered, as the administrative service organization for the D.C. HealthCare Alliance, for all Corrections Administrative Services. The District shall render or cause to be rendered payments to GSCHC for such Administrative Services in accordance with the Disbursing Agreement, as modified.

36.    Claims for Corrections Health Care Service must be submitted to and adjudicated by D.C. Chartered Health Plan, Inc. ("Chartered"), the administrative service organization for the D.C. HealthCare Alliance program, before the District is obligated to make payment for Corrections Health Care Service.

37. Claims for Corrections Health Care Service shall not be "clean claims" that can be adjudicated for payment if the a copy of the Trip Ticket issued by the D.C. Department of Corrections for the health services accompanies the claims indicating the D.C. Department of Corrections authorized health services for the patient.

38. Persons appearing with the Trip Ticket issued by the D.C. Department of Corrections are not persons entitled to receive Corrections Health Care Services. Persons not appearing with the Trip Ticket issued by DCDC are not persons entitled to receive Corrections Health Care Services.

39. Persons appearing with guards from the D.C. Department of Corrections are persons eligible to receive Corrections Health Care Services. Person not appearing with guards from DCDC are not persons eligible to receive Corrections Health Care Services.

40. Chartered shall submit all adjudicated claims for Corrections Health Care Service on a requisition containing only Corrections Health Care Service.

The requisition shall include all the elements required for Health Care Services required by this Agreement, as modified, and the Disbursing Agreement, as modified.

In addition to the elements required by this Agreement, as modified, and the Disbursing Agreement, as modified, the requisition for Corrections Health Care Service shall include the District of Columbia Department of Corrections ("DCDC") number for each patient and shall attach a copy of the Trip Ticket required to accompany each Claim for Corrections Health Care Service.

Three copies of the Requisition must be submitted simultaneously as follows:

> Deputy Director
> Health Care Safety Net Administration
> D.C. Department of Health
> 825 North Capitol Street, N.E., Room 4112
> Washington, DC 20002

> Agency Chief Financial Officer
> D.C. Department of Health
> 825 North Capitol Street, N.E., Room 5100
> Washington, DC 20002

> Health Services Administrator
> D.C. Department of Corrections
> 1923 Vermont Avenue, N.W., Room N207
> Washington, DC 20001

41. By the fifteenth day of each month starting December 1, 2003, the D.C. Department of Corrections shall advise Chartered, the Health Care Safety Net Administration, and the Agency's Chief Financial Officer of any persons shown on the list of claims that were not in the custody of the Department of Corrections on the date of service.

### GSCHC Privileges for DCDC Physicians

42. At no cost to the District or its employed physicians, physicians employed by the D.C. Department of Corrections shall be eligible for clinical privileges to admit, follow and treat persons in the custody of the D.C. Department of Corrections while such persons are hospitalized at Greater Southeast Community Hospital."

## Utilization Review

43    GSCHC shall allow for the incorporation of a well-defined utilization management system (UM) that ensures adequate control over high cost and high-risk services and coordination of care of high cost Corrections inmates within the Corrections Unit at Greater Southeast Community Hospital and at the DC General Health Campus (Urgent Care and Ambulatory Care Centers). The UM system will be administered through the ASO and shall be a part of the larger Care Management Program as directed by the Health Care Safety Net Administration.

44    GSCHC shall grant admitting privileges to a DOC physician as appointed by DOC to oversee the UM system at GSCHC and DCG campus facilities for healthcare services provided to corrections inmates.

45.    The UM systems shall be funded by the Department of Corrections (DOC). The DOC shall participate in UM and Care Management Meetings as determined by the Health Care Safety Net Administration.

# EXHIBIT II

1          Q      Okay.  Emergency room here (indicating.)

2    Would you have to go into a hall into another area to

3    see those patients?

4          A      Well, no.   What happens is that the

5    patients were in a room aside from their triage deemed

6    not to be emergency care.

7          Q      Okay.

8          A      They would be sent over to the holding

9    room.

10         Q      Where is the holding room?

11         A      Holding room, it's separate from the

12   emergency room.  You have to walk probably down a

13   couple corridors but the room -- it's like, they can

14   give the patients, prisoners, secured in a secure

15   location away from the main emergency room populace.

16   Once they're ready to be seen, they're called over to

17   be seen in the emergency room.

18         Q      Okay.  And then do some of the patients,

19   after they're seen in the emergency room, are they

20   sent back to the holding room?

21         A      No.  Usually once they're treated they're

22   either sent back to jail or be admitted.

# EXHIBIT III

54

1   said, "Use the ventilator if he needed to, as he

2   needed to." No rhyme, no reason. It was not like he

3   used it every night, so I was trying to figure out how

4   I could take care of Mr. Magbie. He said, "You can

5   use it every night, use it sometimes or not

6   sometimes." So I'm looking to how to best accommodate

7   his "sometime" use of a ventilator, as he put it.

8          Q     As who put it?

9          A     Mr. Magbie. Before I got out there, I

10  said, "Mr. Magbie, how often do you use your

11  ventilator." He said, "I use it sometimes if I need

12  to, as I need to. It's not all the time, it's not

13  every day, it's just whenever." I'm trying --

14         Q     Did you -- I'm sorry. I didn't mean to

15  cut you off.

16              MS. JOHNSON:  Continue.

17              THE WITNESS:  I'm trying to figure out how

18  could I possibly admit somebody with a "whenever"

19  ventilator use was my problem I had admitting him at

20  the time. He was breathing well, but he says he may

21  crash but whether he was going to crash, he didn't

22  know. So I can't say -- how can I justify a PRN

# EXHIBIT IV

1    nasal cannula.  Just to make sure they could provide

2    some kind of oxygen therapy there.

3        Q    And what did Dr. Bastien tell you?

4        A    He said they do have oxygen support there

5    by way of nasal cannula; they could monitor it.  I

6    said, "If I send Mr. Magbie back, can you make sure he

7    gets O2 that can be monitored on the oxygen?"  He

8    said, "Yes, but I have to make arrangements and can

9    you keep him there until we make arrangements?"  I

10   said, "Fine."  And we'd leave him in the emergency

11   room until everything's set for him back at the jail.

12       Q    So was there a point when you changed your

13   mind about admitting the patient?

14       A    Yes.  His condition had changed.  It

15   improved.

16       Q    Did you note that?

17       A    That's where I failed to make the proper

18   documentation on the chart there.  Although I list it

19   here on the 3:20 note, it's listed on my discharge

20   note, discharge instructions.  I transferred the

21   instructions to the second page of the doctor's note.

22       Q    When you talked to Dr. Bastien the second